# EXHIBIT 2
## (PART III)

| | |
|---|---|
| at least one camshaft, | Col 1, lines 18; Col 4, lines 15-16; |
| at least one camshaft, | Camshaft 7 - col 4, line 13; |
| and an engine control unit for controlling the operation of the engine, | lever 40, linkage 44 accelerator pedal 45, throttle 53, Col 5, lines 23-75; Col 6, lines 1-20; or FIG. 4 embodiment, Col 6, lines 21-45; or non-illustrated embodiment, Col 6, lines 46-54; |
| the at least one camshaft being position variable relative to the crankshaft and being subject to torque reversals | Col 2, lines 39-56; Col 3, lines 20-67; Col 4, lines 17-66; Col 5, lines 50-75; Col 6, lines 1-11; |
| the method of varying the position of the at least one camshaft relative to the crankshaft comprising; | Col 2, lines 39-56; Col 3, lines 20-67; Col 5, lines 43-75; Col 6, lines 1-11; |
| actuating, in response to a control signal from the engine control unit, | Col 5, lines 23-75; Col 6, lines 1-54; |
| the means for varying the position of the at least one camshaft in reaction to torque reversals in the at least one camshaft. | lever 40, etc. Col 3, lines 20-73; Col 4, lines 50-75; Col 5, lines 23-75; Col 6, lines 1-11; |

B.    Burden of Proof - Presumption of Validity

In opposing the aforesaid 37 CFR §1.633(a) motion, Junior Party claimed the benefit of the statutory presumption of

-16-

Exhibit 2 page 88

validity of its Claims 1 and 4 under 35 U.S.C. §282.  If Junior Party's contention in that regard is sound, the motion should not have been granted, and its granting should be reversed by this honorable Board, because the attorney argument only interpretation of Garcea is inadequate as a matter of law to overcome the "clear and convincing evidence" standard that must be met by one challenging the validity of a claim in an issued patent.

The claimed presumption of validity as to Claims 1 and 4 was denied based on the authority of Lamont v. Berguer, 7 USPQ2d 1580, 1582 (BPAI 1988) (expanded panel) and Okada v. Hitosumachi, 16 USPQ2d 1789 (Comm'r Pats 1990).  However, the Board decision in Lamont and the Commissioner's decision in Okada are no longer controlling (if they ever were[3]) in view of a recent Federal Circuit decision.  In Price v. Symsek, 988 F.2d 1187, 26 USPQ2d 1031 (Fed. Cir. 1993), the court, relying on Radio Corp. of America v. Radio Eng'g Lab Inc., 293 U.S.1, 21 USPQ 353 (1934), stated:

> An interference involving an already issued patent embraces the societal interests derived from the statutory presumption that an issued patent is valid.  These interests require a standard of proof higher than a mere, or dubious, preponderance of the evidence.  293 U.S. at 8...Accordingly, we conclude that the standard of "clear and convincing" evidence, enunciated in [citation omitted] is the correct standard to be applied in this [interference] case.

_____

[3]See, Langevin v. Nicholson, 110 F.2d 687, 694, 45 USPQ 92, 99 (CCPA 1940), stating, "[W]e see no reason why a rule relating to the weight of evidence should be applied in an interference, where priority is involved, different from that in an infringement proceeding."

-17-

Exhibit 2 page 89

26 USPQ2d at 1036.

Thus, under the statutory presumption of validity to which the Junior Party issued patent is entitled and Price, Claims 1 and 4 of Junior Party's involved patent must be held not to be invalid if Senior Party has failed to prove, under the demanding standards of "clear and convincing" evidence, every element of its contentions regarding the unpatentability of each of such Claims 1 and 4. This standard requires "evidence which produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is 'highly probable'". Id., 26 USPQ2d at 1034 (quoting Buildex, Inc. v. Kason Indus. Inc., 849 F.2d 1461, 1463, 7 USPQ2d 1325, 1327 (Fed. Cir. 1988) and citing Colorado v. New Mexico, 467 U.S. 310, 316 (1983). Among other reasons, such Claims 1 and 4 must be held not to be invalid because Senior Party's motion with respect thereto, relying only as it does on attorney argument, is utterly devoid of the level of evidence needed to establish the level of "ordinarily skill in the pertinent art," as required under Graham v. John Deere, 383 U.S. 1, 148 USPQ 459 (1966), to meet the requisite "clear and convincing evidence" standard. Further, for the reasons which will hereinafter be shown, even under a "preponderance of the evidence" standard, Claims 1 and 4 are patentable over Garcea '220, under the extremely demanding standards of 35 U.S.C. §102, the only statutory provision cited in support of the motion, which requires that "...all the claim limitations [be] shown in a single prior art reference...arranged as in the claim." Richardson v. Suzuki Motor Co., 868 F.2d 1226, 9 USPQ2d 1913, 1920 (Fed. Cir. 1989).

Exhibit 2 page 90

C.    <u>Claim 1 of Junior Party's Involved Patent Is</u>
      <u>Patentable Over Garcea '220</u>

Junior Party opposed the Rule 633(a) motion with respect to the patentability of its Claims 1 and 4 of its involved patent over Garcea '220 on the following grounds.

1.    Garcea states very clearly that the energy source for causing phase shift is the engine oil pump pressure, as opposed to camshaft torque pulsations. See column 3, lines 25-29, especially the portion which reads "...the energy for the variation of the phasing relationship is <u>drawn from the existing lubrication circuit for the lubrication of the engine under pressure</u>...." (emphasis supplied). This disclosure is inconsistent with, and thereby avoids "reading on," the limitation of Claim 1 which reads, "....actuating [said] means for varying the position of the at least one camshaft relative to the crankshaft <u>in reaction to torque reversals in the at least one camshaft</u>" (emphasis supplied), and similar language in Claim 4.

2.    Garcea discloses, at column 6, lines 11-19, the use of a preloaded leaf spring 41 to "prevent that, in the case of a negative minimum driving torque, pulsation movements and thus noisy operation may take place during the delayed phase operation." This disclosure is directly contrary to the use of torque pulses to <u>cause</u> a phase shift. Rather, it is consistent with a system which relies on engine oil pressure to <u>cause</u> such a phase shaft and is intended to <u>prevent</u> a phase shift from occurring when a temporary negative torque pulse from the camshaft removes a load on the pistons (22).

3.    Garcea recognizes that there are torque pulsations in a rotating camshaft. However, Garcea only utilizes this phenomenon as a way of permitting engine oil pressure to provide adequate torque for a phase shift to overcome camshaft torque during periods of low camshaft torque. Thus, again we have a clear disclosure that the camshaft torque pulses do not "<u>actuate</u>" the means for varying the position of the camshaft relative to the crankshaft.

4.    Garcea's pistons (22) both act in the same direction, and can only be effective to advance the camshaft position relative to that of the crankshaft. Clearly, the, Garcea's pistons are not capable of retarding the camshaft position relative to that of the crankshaft. Thus, Garcea's pistons are only partly capable of "varying the position of the at

-19-

Exhibit 2 page 91

least one camshaft relative to the crankshaft," as required by Claims 1 and 4, since such language requires that the "varying" operate in both directions to be meaningful.

Further, following the submission of further argument (attorney argument only) by Senior Party in reply to the Junior Party Opposition, Junior Party filed a proposed "Supplemental Opposition," with a supporting Motion for Leave, to address technical comments in the Senior Party Response which it considered to be inaccurate and/or misleading. This proposed Supplemental Opposition, which the Examiner In Chief refused to consider,[4] made the following points in opposition to those set forth for the first time in the Response to the Opposition to the motion:

1.    In its October 26, 1992 Response, Senior Party argues that "Garcea '220 discloses that the energy source for causing the phase shift is taken from the internal forces generated in the system by the cyclical compressing and releasing of the valve springs by the cam." This argument, which is unsupported by evidence, is incorrect!

Garcea does recognize that torque varies in magnitude and direction during the operation of an engine. However, Garcea does not use this phenomenon to actuate his VCT system in reaction to such torque pulses. To the contrary, Garcea, in recognition of this phenomenon, uses engine oil at sufficient pressure to actuate his VCT system, notwithstanding the pressure of torque pulses in the camshaft, the engine oil pressure being sufficient to <u>overcome</u> the torque when the torque is cyclically low.  In that regard, see Garcea at column 1, lines 19-21, and column 3, lines 25-30.  The '023 system, on the other hand, uses the camshaft torque pulses as the phenomenon by which a phase change in its VCT system is

---

[4]The proposed Supplemental Opposition was summarily dismissed from consideration, without even a discussion of the reasons set forth in the accompanying Motion For Leave, solely on the basis that "...supplemental oppositions are not contemplated nor are they provided for in the interference rules. The filing of multiple papers on the same issues is not warranted and is not to be countenanced."

-20-

Exhibit 2 page 92

actuated, as claimed in Claim 1 (and in Claim 4).  In that regard, see the '023 patent at column 7, lines 34-44.

2.    Further, Garcea, at column 5, lines 53-55, describes a VCT system in which phase change occurs "at the time of _minimum_ value of the drive torque..." (Emphasis supplied.)  In the '023 system, on the other hand, phase change occurs at the time of _maximum_ value of the driving torque, either its maximum positive value or its maximum minimum value.  Thus, Garcea _cannot_ use a torque pulse, either positive or negative, to "actuate" a phase change in his VCT system in the manner in which Butterfield, et al. use such a torque pulse, and as is required by Claim 1 (and by Claim 4), since Garcea is only changing phase at the exact moment when there is no torque (or only minimum torque) in the camshaft.

3.    The argument, in the [Senior Party] Response served on October 26, 1992, in the first full paragraph on page 5, that "...very large forces (and torques) which are necessary to advance engine valve timing _may be overcome_ by utilizing the internal cyclically varying forces in the camshaft engine valve _so that the system can be hydraulically actuated_ utilizing only the low pressure lubricating engine oil pump to provide a make-up oil supply" (emphasis supplied), is inaccurate and misleading.  The '023 system does not function based on _overcoming_ the torque pulses in the camshaft; to the contrary, it _uses_ such torque pulses, at their maximum values, _rather than the engine oil pressure_, as _a source of energy_ to "actuate" a phase change in its VCT system.  This observation confirms the point made in the preceding paragraph that Garcea's phase shift occurs at an instant of zero or minimum torque in the camshaft, an operating characteristic which permits a phase change to be "actuated" by only a low pressure engine oil lubricating pump.

4.    The springs of Junior Party's '460 patent [U.S. Patent 5,046,460 - cited for the first time by Senior Party in support of its motion in its Response], compression spring 554B of Figure 24/compression spring 654B of Figure 25/torsional wrap spring 60 of Figures 26 and 27, are _not_ "fully equivalent" (or even functionally equivalent) to Garcea's spring 42, as argued (without evidence) in the paragraph bridging pages 5 and 6 of Senior Party's Response.  Garcea's spring 42 only serves to _eliminate_ negative pulses in the camshaft to eliminate noise.  Thus, with a spring 42 Garcea's torque will vary between a high positive value and a low positive value, and will never go negative.  The torque in the camshaft of the VCT system of the '460 patent, embodiments of Figures 24-27, on the other hand, will vary between a maximum positive value and a maximum negative value, just like the torque in the substantially friction-free camshaft of the

-21-

Exhibit 2 page 93

'023 patent. Thus, the springs of the Figures 24-27 embodiments of the '460 patent serve only to overcome the undirectionally acting torque in a non-friction-free VCT system and ensure that the net torque does go negative, in spite of the positive torque continually experienced by the camshaft. The avoidance of negative torque in the Garcea system is important to avoid imposing negative forces on the pistons of his VCT system, and the noise which would result therefrom, since both pistons face in the same direction of rotation. This is not a problem in the VCT system of the '023 and '460 patents, since the pistons of the various embodiments face in opposite directions of rotation.

5. Garcea, as is clear from his disclosure at column 3, lines 61-66, utilizes the "escape" of oil in effecting a phase change. Such "escape" does not require a torque pulse to occur. In fact, it would occur more readily at a steady state, high torque level. The arguments in the Response at page 7, in the paragraph bridging pages 6 and 7, which are not supported by evidence, are without merit, and do not confirm that the camshaft torque pulses of Garcea are effective to "actuate" a VCT phase change as asserted by Senior Party.

6. Garcea allows phase changes in both directions, but only causes it in one direction, and it does that in reaction to engine oil pressure. The Garcea phase change in the opposite direction is only permitted by the "escape" of oil. The phase change of the VCT system of the '023 patent, on the other hand, is caused to move in both directions, and in "reaction" to the torque reversals in the camshaft.

7. The Appendix to the Response, at page 6, indicates that the pressure in cylinders 21 of Garcea "may be negative." This appears to be incorrect, since the pistons 22 of the Garcea appear to be free floating within the cylinders 21, and would, therefore, float to relieve any tendency to develop negative pressure in the cylinders.

8. Senior Party, in the Appendix to the Response at page 5, recognizes that "pistons 22[of Garcea] do not move or bounce back against the back wall of cylinders 21 when the camshaft phase remains retarded despite these cyclical torque reversals in the system." This contention appears to be in contradiction to Senior Party's other assertions that the "cyclical torque reversals" cause camshaft phase changes in the Garcea system. (Emphasis in original.)

In view of the foregoing arguments, the decision of the Examiner-In-Chief in holding Claims 1 and 4 of the involved

-22-

Exhibit 2 page 94

Junior Party patent to be unpatentable [invalid], even under a "preponderance of the evidence" standard, was "manifestly erroneous" under the requirements of 37 CFR §1.655(a), and should be reversed.

Further, the decision of the Examiner-In-Chief in refusing to consider the points of argument in Junior Party's proposed Supplemental Response was "manifestly erroneous" and/or an abuse of discretion since such decision failed to cite, let alone analyze, the foremost of all interference rules, that of 37 CFR §1.601, which reads "[t]his [Interferences] subpart shall be construed to secure the just, speedy and inexpensive determination of every interference" (emphasis supplied).[5] At the very least, the decision of the Examiner-In-Chief on the Senior Party motion under 37 CFR §1.633(a) should be remanded to the Examiner-In-Chief for a reconsideration of his decision refusing to consider Junior Party's Supplemental Opposition under the "just" portion of the standards of 37 CFR §1.601.

---

[5]The refusal to consider Junior Party's Supplemental Response left Junior Party defenseless as against Senior Party contentions made for the first time in its 16-page Response (including a 7-page Appendix) after Junior Party's Opposition to the 4-page motion; this certainly does not comport with the "just" requirements of 37 CFR §1.601. Moreover, even if the affected claims of the Junior Party involved patent are not entitled to the benefit of the statutory presumption of validity, the presence of such claims in an issued patent should at least entitle them to the benefit of consideration of all applicable argument in support of their patentability before they are stricken from the patent based on arguments as to which no effective opposition was possible, if there is to be any "justice" in the interpretation of the interference rules.

-23-

Exhibit 2 page 95

D.   Claim 4 of Junior Party's Involved Patent Is Patentable Over Garcea '220

Claim 4 of Junior Party's involved patent is patentable over Garcea '220 for all of the reasons set forth above with respect to the patentability of Claims 1 and 4 over Garcea, and for the further reason that, under the statutory presumption of validity, 35 U.S.C. §282, Claim 4 is presumed to be valid independently of Claim 1.

Claim 4 is also patentable over Claim 1 for the various reasons asserted for its independent patentability in Junior Party's Second Preliminary Motion Under 37 CFR §1.633(c)(4) to redefine the interference subject matter by designating Claim 4 (as well as each of Claims 3, 5 and 6) as being directed to a separate patentable invention.  Specifically, as to Claim 4, its independent patentability over Claim 1 was urged in its Rule 633(c)(4) motion on the following grounds:

> [Claim 4] is patentable over [Claim 1] by virtue of the inclusion in [each of] such claim[s] of added limitations which do not find response in [Claim 1] (the Count) (nor in the disclosure of Senior Party for that matter), namely the limitations with respect to an "engine control unit" and its use in controlling the operation of the invention of the Count.
>
> In the use of camshaft torque pulses to control hydraulic flow in an internal combustion engine variable camshaft timing system, it is quite important to be able to rapidly change the setting of the system and thereby to be able to respond to change engine operating conditions in a timely manner.  [Junior Party], alone among the makers of inventions in this field, including Senior Party, developed a timing system which is capable of achieving suitable setting change response rates, or at least recognized such fact, and the fact that their system was now suited for control in such sophisticated manner.  In any case, this feature of

-24-

Exhibit 2 page 96

[Junior Party's] [Claim 4] which is <u>clearly novel</u> in
the claimed context, is of such substantial
performance significance in the context of a modern
internal combustion engine that to hold it to be
"obvious" over the Count, without benefit of a
secondary reference to suggest its use in the
claimed environment, would do a substantial
disservice to the letter and spirit of 35 U.S.C.
§103.

    In opposition to such motion, Senior Party argued,
(attorney argument only/no "testimony"), specifically with
respect to Claim 4:

    The only difference between Junior Party's patent
Claim 4 and Junior Party's Claim 1 (Count I) lies in
the recitations in Claim 4 of "an engine control
unit for controlling the operation of the engine,"
and actuation of the position-varying means "in
response to a control signal from the engine control
unit." However, Garcea '220 clearly shows such
"engine control unit" and signal-responsive means
for varying the camshaft position. See in
particular the engine throttle control pedal 61 in
FIG. 3 with the cable 44 providing a mechanical
"signal" to the lever 40, and the throttle control
cable 50 with capsule 55 and cable 60 providing the
corresponding mechanical "signal" to the lever 40 in
FIG. 4. In this connection, it is noted that Junior
Party's patent claim 4 does <u>not</u> recite an
"electronic" engine control unit or means responsive
to an "electrical" control signal. It is well
established that Junior Party's claim 4 is to be
given the broadest interpretation that it will
reasonably support. <u>DeGeorge v. Bernier</u>, 226 USPQ
750, 760-61 (Fed. Cir. 1985); <u>Mead v. McKirnow</u>, 199
USPQ 513 (CCPA 1978); <u>Lamont v. Berguer</u>, 7 USPQ2d
1580 (BPAI 1988). The disclosure of such mechanical
means in Garcea is, of course, for exactly the same
purpose as that recited in Junior Party's Claim 4.
Thus, provision of an "engine control unit" and
"signal-responsive means" for accomplishing the task
of varying camshaft position in Claim 1 would have
been obvious to persons of ordinary skill in the art
in view of Garcea, which is to say that Claim 4 is
not patentable over Claim 1.

-25-

Exhibit 2 page 97

Moreover, even if one were to assume for the sake of discussion that the "engine control unit" and "signal-responsive means" in Junior Party's patent Claim 4 were somehow to be interpreted or limited to electronic control means and an electronic control signal, such would still not be patentable over Claim 1 in view of Bruss 4,627,825 or Shirai 4,858,572. (Copies of Bruss and Garcea were enclosed with Senior Party's Preliminary Motion to Redefine. A copy of Shirai [was] enclosed [with Junior Party's Opposition.) Both of these patents disclose an electronic control unit and means responsive to an electrical signal therefrom for varying camshaft timing. See Bruss FIGS. 7 and 8 with electronic control means 40-48 and electrical signal-responsive valves 20, 21, and Shirai FIG. 1 with electronic control unit 82 and solenoid valve 62, 68. In both of such prior art disclosures, the engine control unit and signal-responsive means are for the same purpose as recited in Junior Party Claim 4 – i.e., varying the position of the camshaft. Thus, it would have been obvious to persons of ordinary skill in the art to employ such electronic control unit and electronic signal-responsive means in combination with the subject matter of Junior Party Claim 1, which is to say Junior party Claim 4 is not patentable over Junior Party claim 1.

The foregoing Senior Party contentions were responded to by Junior party, in an Opposition to Senior Party's Motion to Strike Junior Party's Reply to Senior Party's Opposition to Junior Party's Preliminary Motion, as follows:

In its Motion For Judgment Under 37 CFR §1.633(c) (sic, 1.633(a)), with respect to Claim 4 (and Claim 1) of the Junior Party involved patent, Senior Party, at page 3 thereof, apparently contends that the "engine control unit" of Claim 4 "reads on" (although not asserting this as a "material fact") the lever 40, linkage 44, accelerator pedal 45, the bottle 53, etc. of Garcea. However, the engine control unit of Claim 4 is an additional element in Junior Party's VCT system, an element over and above the conventional accelerator control system found in conventional automobiles, in that it is a "microprocessor" (column 2, lines 13-21) or an

-26-

Exhibit 2 page 98

"electronic" engine control unit (column 6, lines
52-58) which controls the operation of the VCT
system by controlling the operation of the spool
valve 92.

The arguments with respect to the patentability of Claim
4 over Claim 1, thus, were before the Examiner-In-Chief when
the motion under 37 CFR §1.633(a) with respect to the
patentability of Claim 4 over Garcea '220 was considered.  It
was an "abuse of discretion" not to consider such arguments in
ruling adversely on the patentability (validity) of Claim 4
pursuant to the Rule 633(a) motion.  Further, it was
"manifestly erroneous " to hold Claim 4 to be "anticipated by"
Garcea '220 pursuant to the motion under 37 CFR §1.633(a) when
the Senior Party Opposition to the motion under 37 CFR
§1.633(c)(4) with respect to the independent patentability of
Claim 4 over the original Count, a verbatim duplication of
Claim 1, relied to a major extent on secondary references,
Bruss '825 or Shirai '572, in addition to Garcea '220; this is
the antithesis of an "anticipation" basis for holding claims
of an issued patent to be invalid, and this Honorable Board
should reverse the holding that Claim 4 is invalid, even if it
affirms the decision that Claim 1 is invalid.

II.  The Examiner-In-Chief Erred In Refusing To Hold That Each
     Of Claims 3-6 Of Junior Party's Involved Patent Is
     Directed To A Separate Patentable Invention And Does Not
     Correspond To The Count.

A.  Background

This interference was declared following the copying of
Claims 1-6, inclusive, from the Junior Party involved patent
into the Senior Party involved application.  In doing so,
Senior Party requested that an interference be declared with

-27-

Exhibit 2 page 99

six (6) Counts corresponding, respectively, to Claims 1-6 of
the Junior Party patent.  The interference was subsequently
declared, but with only a single Count corresponding to Claim
1 of the Junior Party patent.  In the original declaration of
the interference, Claims 2-6 of the Junior Party patent were
held to correspond to the Count.

During the preliminary motion period, Junior Party moved,
under 37 CFR §1.633(c)(4), to redefine the interfering subject
matter by designating its Claims 3-6 as being directed to a
separate patentable invention under the standards of 37 CFR
§1.601(n).  This motion was opposed by Senior Party and was
eventually denied as to Claims 3, 5 and 6, it being moot as to
Claim 4 by virtue of the holding, pursuant to Senior Party's
motion under 37 CFR §1.633(a), that Claim 4 was anticipated by
the Garcea U.S. patent.

B.  **Argument**

As noted in Junior Party's 37 CFR §1.633(c)(4) motion
with respect to Claims 3-6, such claims include the following
limitations which were not found in the original Count in this
interference (then based on Claim 1 of the Junior Party
patent):

**Claim 3**
    "wherein the first and second hydraulic means are first
    and second oppositely acting hydraulic cylinders";

**Claim 4**
    "an engine control unit for controlling the operation of
    the engine"
                                    and
    "actuating, _in response to a signal from the engine
    control unit_..." (emphasis in original);

**Claim 5**
    the limitations from Claim 4, as set forth above;

-28-

Exhibit 2 page 100

<u>Claim 6</u>
        the limitations from Claim 4, as set forth above,
                                and
        "wherein the first and second hydraulic means are first
        and second oppositely acting cylinders."

        The independent patentable significance of the foregoing
features was argued as follows:

            ...Claims 3 and 6 of the Senior Party patent are
        directed to an invention which is separate from the
        Count if the limitation with respect to "first and
        second oppositely acting hydraulic cylinders" in
        each of such claims makes such claims patentable
        under 35 U.S.C. §103, notwithstanding that the
        subject matter of the Count may be found to be a
        prior invention of another under 35 U.S.C. §102(g).

            Likewise, Claim 4-6 are directed to an invention
        which is separate from the Count if the limitation
        with respect to "actuating, in response to a signal
        from the engine control unit" makes such claims
        patentable under 35 U.S.C. §103, notwithstanding
        that the subject matter of the Count may be found to
        be a prior invention of another under 35 U.S.C.
        §102(g); moreover, Claim 6 is directed to a separate
        patentable invention on such basis if the
        <u>combination</u> of the feature of the "first and second
        oppositely acting hydraulic Cylinders" <u>plus</u> the
        feature of "actuating, in response to a signal from
        an engine control unit" is likewise patentable under
        35 U.S.C. §103, notwithstanding that each of such
        <u>novel</u> features, individually, could be held to be
        inadequate to impart patentability to Claim 6.

            The use of hydraulically interconnected hydraulic
        cylinders to implement the invention of the Count,
        as required by Claims 3 and 6, is patentable over
        the Count because of the absence of any specific
        prior art reference to support the modification of
        an invention corresponding to the Count to respond
        to the limitations of such claims, and because of
        the myriad of advantages which flows from the use of
        hydraulics in such a manner.

            Specifically, in the context of an internal
        combustion engine as recited by Claims 2 and 4, the
        use of interconnected hydraulic cylinders provides

                            -29-

Exhibit 2 page 101

an inherently balanced, low friction, double-acting
means for <u>both</u> advancing and retarding the position
of a camshaft relative to a crankshaft. Balance is
important because of the inherent speeds of rotation
of the rotating camshaft to which the elements must
be carried to be effective, and it is very important
for proper operation of the engine that the
mechanism be able to operate in both directions to
be effective.

To the extent that it would be "obvious" to use
hydraulic cylinder means in the implementation of
the invention of Claim 1, the most likely hydraulic
cylinder means would be that of Fig. 7 of the Senior
Party Melchior application, namely a <u>single</u>, double-
acting hydraulic cylinder. Such an embodiment does
not respond to the limitations of Claims 3 and 6.
Further, its implementation in an embodiment
corresponding to the Count would either require a
cylinder (31) which must rotate relative to the
piston (30) that reciprocates therein, a factor that
would require careful balancing of the cylinder
(30), or it would require that the piston (30) be
free to rotate within and with respect to the
cylinder (31) as it reciprocates with respect
thereto, a factor that would greatly add to the
complexity of the seal required between the piston
(30) and the cylinder (31) and the frictional losses
occurring therebetween.

Accordingly, it is clear that the oppositely
acting, interconnected first and second hydraulic
cylinders of Claims 3 and 6 of the Junior Party
patent offer substantial advantages over other
"cylinder" means that could be devised for
implementing the invention of the Count, such as
that of Senior Party's Fig. 7, assuming, arguendo,
its "obviousness" in view of the Count.
Consequently, Junior Party submits that Claims 3 and
6 are patentable over the Count under the provisions
of 35 U.S.C. §103, at least in the absence of a
secondary reference suggesting the use of such
structure in the claimed environment.

Claims 4 and 6 are patentable over the Count by
virtue of the inclusion in each of such claims of
added limitations which do not find response in the
Count (nor in the disclosure of Senior Party for
that matter), namely the limitations with respect to
an "engine control unit" and its use in controlling
the operation of the invention of the Count.

-30-

Exhibit 2 page 102

In the use of camshaft torque pulses to control hydraulic flow in an internal combustion engine variable camshaft timing system, it is quite important to be able to rapidly change the setting of the system and thereby to be able to respond to changing engine operating conditions in a timely manner. Applicants, alone among the makers of inventions in this field, including Senior Party, developed a timing system which is capable of achieving suitable setting change response rates, or at least recognized such fact, and the fact that their system was now suited for control in such sophisticated manner. In any case, this feature of applicants' Claims 4-6, which is <u>clearly novel</u> in the claimed context, is of such substantial performance significance in the context of a modern internal combustion engine that to hold it to be "obvious" over the Count, without benefit of a secondary reference to suggest its use in the claimed environment, would do a substantial disservice to the letter and spirit of 35 U.S.C. §103. (Emphasis in original)

Junior Party also claimed the benefit of the statutory presumption of validity under 35 U.S.C. §282, which requires that "[e]ach claim of a patent...shall be presumed valid independently of the validity of other claims."

Senior Party opposed the foregoing Junior Party motion, as to Claims 3, 5 and 6, as being "incomplete," because it did "not suggest what should be done with its patent Claims 3-6 (or the identical claims of Junior Party's application), which clearly define interfering subject matter." Senior Party also noted, "that Junior Party does not assert patentability of Claim 3 over Claim 2, or Claim 6 over Claim 5."

Junior Party then filed a Reply to Senior Party's Opposition stating as follows:[6]

---

[6]In its Reply, Junior Party also complained of the failure of Senior Party to separately identify any "material fact set forth in the motion which is in dispute," as required of every

-31-

Exhibit 2 page 103

Senior Party's Opposition to the Motion at issue
is based on large part on the failure of Junior
Party to propose new Counts corresponding to Claims
3, 5 and 6 of its '023 patent and to the claims of
Senior Party's application which correspond thereto,
namely its Claims 55, 57 and 58.  Junior Party
believes that it is unnecessary to propose such
Counts, because claims corresponding thereto are
unpatentable to Senior Party for the reasons set
forth in Junior Party's Preliminary Motions Under 37
CFR §§1.633(a) and (g) herein, and in Junior Party's
Opposition To Senior Party Motion To Redefine
Subject Matter Under 37 CFR §1.633(c) herein, and
further for failure of Senior Party to adequately
demonstrate support for the specific limitations of
Claims 3, 5 and 6 of its '023 patent in either its
involved or priority applications.  Nevertheless,
Junior Party hereby provisionally proposes four (4)
new Counts, Counts III, IV, V and VI, corresponding
to Claims 3-6 of its '023 patent, as a basis for a
redeclaration of this interference, should the
Examiner of Interferences not decide in Junior
Party's favor on one or another of the aforesaid
preliminary motions, and otherwise decide that there
is an interference between the subject matter of any
of Claims 3-6 of the '023 patent and their
counterparts in the Senior Party involved
application.

Senior Party then filed a Motion Under 37 CFR §1.635 to
Strike the foregoing Junior Party Reply or in the alternative
for leave to file a "Supplemental Opposition" to such Junior
Party preliminary motion under 37 CFR §1.633(c)(4).[7]  In this
Motion and in the proposed Supplemental Opposition that was
filed with it, Senior Party opposed the presentation of
proposed new Counts in a Reply based on the untimeliness of
presenting proposed new Counts in such a document, for reason

_____

opposition under 37 CFR §1.638.

[7]As noted in Senior Party's "certificate" under 37 CFR
§1.637(b) with respect to such motion, Junior Party consented to
the granting of leave to file the Supplemental Opposition but
only on the condition that it be granted leave to file a
Supplemental Reply to such Supplemental Opposition.

-32-

Exhibit 2 page 104

that Claim 4, proposed Count IV, was unpatentable over the [original] Count "in view of Garcea, Bruss 4,627,825 or Shirai 4,858,572," and on the basis that "Junior Party provides no showing whatsoever that [Counts II, V and VI] are patentable over current Count I and proposed Count II (to which both parties have agreed) as required in 37 CFR 1.637(c)(1)(v)."

Junior Party, in its Opposition to such motion, filed a proposed Supplemental Reply to the proposed Supplemental Opposition[8] that was included with it, argued as follows:

> With respect to the merits of Senior Party's contentions regarding Junior Party's Reply, namely that Junior Party in attempting to add new Counts is raising "totally new issues not heretofore addressed," such contentions are patently false. Senior Party itself, in its March 25, 1992 filing under 37 CFR §1.607 in its involved application, requested that each of Claims 1-6 of the Junior Party involved patent be a separate Count in this interference. Junior Party's proposed provisional Counts III, IV, V and VI are identical to Claims 3-6 of its '023 patent and identical to Claims 55-58, respectively, of Senior Party's involved application. Senior Party thus, in effect, has admitted that each of its Claims 55, 57 and 58 (and also Claim 56/Proposed Count IV) is a "separate patentable invention." Therefore, Senior Party should not now be permitted to challenge the according of such status to those claims. In any event, it would be unconscionable and a violation of the principle of estoppel to permit Senior Party to now withdraw its treatment of such claims as "separate patentable inventions" by granting a Motion to Strike, without affording Junior Party, as the movant in the motion at issue, a full opportunity to establish what it

---

[8]The Examiner-In-Chief apparently refused to consider both the Senior Party Supplemental Opposition and the Junior Party Supplemental Reply to it on grounds that "[t]he interference rules do not provide for the filing of papers beyond the reply to an opposition to a motion"; the motion was denied for the reasons that Junior Party did meet its burden of making a case for separate patentability, and because the presentation of the proposed new counts "in a reply" was untimely.

-33-

Exhibit 2 page 105

previously thought was admitted by Senior Party in a prior filing in connection with this Interference.

With respect to a showing that each of proposed Counts III, IV, V and VI is a separate patentable invention over proposed Count II, which each of the Parties agrees is separately patentable over Count I, Junior Party points out the following differences between such proposed Counts.

| Proposed Count II | Proposed Counts III and VI |
|---|---|
| 1.  The hydraulic operators are described as: "oppositely acting first and second hydraulic means." | The hydraulic operators are described as: "the first and second hydraulic means, are <u>first and second oppositely acting hydraulic cylinders</u>" (emphasis supplied). |
| 2.  The "varying" of the position of the ... camshaft relative to the crankshaft is accomplished by "transferring hydraulic fluid" from one of the hydraulic means to the other. | The "transferring" of hydraulic fluid is accomplished by providing "valve means" (this "reads on" the spool valve 92 of the '023 specification and drawing) for selectively permitting flow <u>out of</u> one or another of the hydraulic means <u>to</u> the other, and further by providing "check valve means" (check valves 84, 86 of the '023 specification and drawing) to permit flow <u>into</u> only one or the other of the cylinders (emphasis supplied). |

This arrangement of a "valve means" and a "check valve means," in combination, is not shown in the Garcea patent (3,721,220), which Senior Party apparently considers to be the most pertinent prior art reference, given its reliance solely on Garcea in its Motion For Judgment Under 37 CFR §1.633(a) with respect to Claims 1 and 4.  Further, the "first and second <u>oppositely acting</u> hydraulic cylinders" limitation does not read on the pistons 22 of Garcea, which <u>act in the same direction</u>.

In its Reply to Junior Party's Opposition To Senior Party's Motion To Redefine Interfering Subject Matter

-34-

Exhibit 2 page 106

Under 37 CFR §1.633(c), Senior Party points out that the Bruss et al. patent, 4,627,825, does disclose a VCT system using first and second oppositely acting hydraulic means in the form of pistons 25. However, Senior Party made no effort therein to establish why it would be "obvious" to rearrange the hydraulic cylinders of Garcea to meet the disclosure of Bruss et al., contrary to the explicit teachings of Garcea, and in spite of the massive reconstruction of Garcea that would be required to accommodate the arrangement. Such a reconstruction, it is submitted, would be a "hindsight" reconstruction of Garcea, which is impermissible under 35 U.S.C. §103. See, Panduit Corp. v. Dennison Mfg. Co., 1 U.S.P.Q.2d 1593, 1602 (Fed. Cir. 1988), requiring some reasons for the selective combination of the features of the prior art, other than hindsight gleaned from the invention itself, to support the application of 35 U.S.C. §103.

Further, in its aforesaid Reply at page 3, Senior Party, while pointing out that Bruss et al. "discloses a three-position valving control arrangement that is effective to pressurize one of the two piston cylinders while venting the other of oil to a return sump 22," admits that Bruss et al. does not disclose or suggest any means for transferring hydraulic fluid from one of the two cylinders to the other for any purpose. Further, neither Garcea nor Bruss et al. discloses any structure corresponding to the "check valve means" of the Proposed Count III, which is also a feature of Proposed Count VI.

Accordingly, it is respectfully submitted that each of Proposed Counts III and VI is a "separate patentable invention" with respect to Count I and Proposed Count II under the standards of 37 CFR §1.601(n), notwithstanding the Garcea and Bruss et al. patents, alone or in any combination with one another that is permissible under 35 U.S.C. §103.

It is also submitted that each of Proposed Counts V and VI is a "separate patentable invention" with respect to proposed Count III by virtue of their dependency from Claim 4, proposed Count IV, direct in the case of Proposed Count V and indirect in the case of Proposed Count VI.

In its Motion For Judgment Under 37 CFR §1.633(c)(sic (a)) with respect to Claim 4 (and Claim 1) of the Junior Party involved patent, Senior Party, at page 3 thereof, apparently contends that the "engine control unit" of Claim 4 "reads on" (although not asserting this as a "material fact") the lever 40,

-35-

Exhibit 2 page 107

linkage 44, accelerator pedal 45, the bottle 53, etc. of Garcea.  However, the engine control unit of Claim 4 is an additional element in Junior Party's VCT system, an element over and above the conventional accelerator control system found in conventional automobiles, in that it is a "microprocessor" (column 2, lines 13-21) or an "electronic" engine control unit (column 6, lines 52-58) which controls the operation of the VCT system by controlling the operation of the spool valve 92.  In comparison to the structure and function of the accelerator control system of Garcea, the "engine control unit" of Claim 4, as it is further specified in Claim 5/Proposed Count V and in Claim 6/Proposed Count VI, is novel because each of Proposed Counts V and VI requires that the controlled function, namely the function of "actuating" from Claim 4, be the function of "transferring hydraulic fluid [from one hydraulic means to the other] <u>when permitted by a control signal from the engine control unit</u>" (Claim 5/Proposed Count V).

The structure required by Claim 6/Proposed Count VI, which depends from Claim 5, is independently patentable over Proposed Count V because of its inclusion of material limitations with respect to "first and second oppositely acting hydraulic cylinders," a "valve for selectively permitting flow" and "check valve means," for the reasons set forth above in support of the patentability of Proposed Count III over Proposed Count II.  Further, Proposed Count VI is independently patentable over Proposed Count III by virtue of its inclusion of a material limitation with respect to an "engine control unit" from its primary parent claim, Claim 4, and the function of such engine control unit, as further specified in its secondary parent claim, Claim 5.

Accordingly, it is respectfully submitted that each of Proposed Counts V and VI is a "separate patentable invention" with respect to Count I, Proposed Counts II and III and each other under the standards of 37 CFR §1.601(n), notwithstanding the Garcea and Bruss et al. patents alone or in any combination with one another that is permissible under 35 U.S.C. §103.

It is also to be noted that Senior Party does not disclose any embodiment having "first and second oppositely acting hydraulic cylinders," which is a feature of Proposed Counts III and VI, does not disclose any embodiment having the combination of "valve means"/"check valve means," which is a feature of Proposed Counts III and VI, and does not disclose any embodiment having an "engine control unit," as defined in

-36-

Exhibit 2 page 108

Proposed Count IV, and as further limited by each of
Proposed Counts V and VI.  Thus, in any redeclaration of
this Interference based on one or more of Proposed Counts
III-VI, Junior Party will claim entitlement to judgment
under 37 CFR §1.633(a) and (g) on "right to make" (lack
of support under 35 U.S.C. §112) grounds with respect to
Senior Party's involved and priority applications,
respectively.

(Emphasis in original.)

Accordingly, it is respectfully submitted that Junior
Party has made a sufficient showing that its Claims 3, 5 and 6
(and Claim 4 as well) are independently patentable both over
the original Count and over the substitute Count set forth in
the redeclaration of this interference, even without the
benefit of the statutory presumption of independent
patentability to which each claim is entitled and most
assuredly if this honorable Board decides that the presumption
of the statute is applicable to such claims.  It is also
respectfully submitted that Senior Party, by virtue of its
request in its 37 CFR §1.607 filing that each of such claims
be treated as a separate Count in this interference, is
estopped to object to the timeliness of the inclusion of the
proposed Counts III through VI, in verbatim form, or to the
inclusion of arguments in support of the independent
patentability thereof, in a Reply to the Opposition to Junior
Party's [Second] Preliminary Motion under 37 CFR §1.633(c)(4).
Therefore, the decision of the Examiner-In-Chief in denying
such Junior Party motion was "manifestly erroneous" under the
requirements of 37 CFR §1.655(a), and should be reversed.

It is also to be noted that, under In re Van Geuns, 988
F.2d 1181, 26 USPQ2d 1057, 1060 (Fed. Cir. 1993), Junior Party
is entitled to separately argue the patentability of its
Claims 3-6 to this Board, even if not argued or properly
argued to the Examiner-In-Chief.  Thus, entitlement to a

-37-

Exhibit 2 page 109

decision on the merits of the separate patentability of each
of Junior Party's Claims 3-6 is claimed, notwithstanding any
defect, technical defect or alleged defect in the way in which
such issue was raised in Junior Party's motion under 37 CFR
§1.633(c) and/or for the reasons set forth in such motion.

III.  Junior Party Conceived The Invention of The Count Prior
      To Any Date On Which Senior Party Is Entitled To Rely and
      Can Prove.

      A.    <u>Senior Party Is Not Entitled To Rely On Any Date
            Prior To October 28, 1988</u>[9]

      Senior Party, in its Preliminary Statement under 37 CFR
§1.624, stated that "[t]he invention defined by Count I of the
subject Interference was made abroad," and claimed a date of
first disclosure of its invention to another person in the
United States of October 28, 1988.  Under 37 CFR §1.629,
Senior Party is to be "strictly held" to such date as its
earliest provable conception date unless it corrects its
Preliminary Statement under 37 CFR §1.628, which it has not
attempted to do.  Of course, under 35 U.S.C. §104, Senior
Party is not entitled to rely on any of its activities
"abroad," other than by way of 35 U.S.C. §119 and/or 365, and
has not attempted to do so herein.

---

[9]Junior Party, in a contemporaneous motion under 37 CFR
§§1.635, 1.656(h), is challenging Senior Party's right to rely on
the documents and testimony supporting its claim to October 28,
1988 as its conception date.  By arguing the adequacy of Junior
Party's conception documents and relevant testimony prior to such
date, Junior Party is not conceding that Senior Party is entitled
to any date of conception prior to its French priority date.

-38-

Exhibit 2 page 110

B.  <u>Junior Party Conceived The Invention Of The Count
Long Prior To Senior Party's Claimed Conception Date
Of October 28, 1988, To Wit, On Or About March 17,
1988</u>

Junior Party conceived the invention illustrated in its
Exhibit No. 20 ("JX 20"), which was prepared by Junior Party
inventor Smith as confirmed in Junior Party Record at 33-37,
401-405, 432, 433 ("JR 33-37, 401-405, 432, 433") during their
return from a trip by Junior Party inventors Butterfield and
Smith to Ford's Dearborn, Michigan facilities on March 17,
1988 (JR 282, 283).  At that time the Junior Party co-
inventors were employed by BWA at its Ithaca, New York
facility (JR 3, 4, 46).  During the same return trip, Junior
Party inventor Butterfield prepared a sketch of an alternative
embodiment of the invention of JX 20, that illustrated in JX
79 (JR 126, 127, 380).  The sketch of JX 20 is a sketch of an
invention meeting the requirements of Count II, JX 2, (JR 35-
37, 285-302, 401-405, 466-469), and the sketch of JX 79 is
also a sketch of an invention meeting the requirements of
Count II (JR 126, 127, 380-386, 405-409).

The fact of the conception of inventions "relating to a
torque-pulse actuated hydraulic variable camshaft timing
("VCT") system"[10] (occasionally referred to as a "variable
valve timing" or "VVT" system – JR 33) according to the
involved Junior Party patent (JX 3) came to the attention of
an engineering executive within the BWA organization, Mr.
Ledvina, (JR 491, 492) during the "March/April time frame of
1988" (JR 494).  The fact of the conception of such
inventions, and specifically in reference to JX 20 and JX 79,
also came to the attention of Mr. Dembosky, a BWA test

---

[10]Even Senior Party is comfortable with this description as
an accurate description of the subject matter of the Count (JR
639).

-39-

Exhibit 2 page 111

engineer (JR 514) by the April/May 1988 time frame (JR 516, 517). A general description of the invention of the Count had also been disclosed in words in the last paragraph on the first page of a March 25, 1988 letter to a Ford employee (JX 26) from Junior Party inventor Butterfield (JR 47-49, 316, 317). A general description of the invention was also included in a report (JX 23) submitted verbally and in writing to a group of "approximately 20 to 25" people at a BWA meeting on March 22, 1988 (JR 42, 43).

From the above, it is clear from the testimony of each of the Junior Party inventors that an invention corresponding to the Count was conceived on March 17, 1988. This conception is corroborated by the sketches of such an invention which were prepared by them on the same date, and is further corroborated by testimony of non-inventor Ledvina that such invention was disclosed to him no later than the end of April 1988 and by the testimony of non-inventor Dembosky that such invention was disclosed to him no later than the end of May 1988. It was also disclosed in words to Ford in a letter sent on or about March 25, 1988, and it was reported verbally and in writing to a large group of BWA personnel on or about March 22, 1988.

Consequently, Junior Party Butterfield et al. conceived the invention of the Count prior to any provable date on which Senior Party Melchior is entitled to rely as a date of conception of its invention with respect to the Count, and this conception is more than adequately corroborated by documents and testimony of non-inventors. Such corroborated evidence of conception is adequate under the standard of <u>Coleman v. Dines</u>, 754 F.2d 353, 359, 224 USPQ 857, 862 (Fed. Cir. 1985), that Junior Party "must show possession of every feature recited in the Count, and that every limitation of the

-40-

Exhibit 2 page 112

Count must have been known to the inventor at the time of the alleged conception."

IV.   Junior Party Was Reasonably Diligent In Reducing The
      Invention Of The Count To Practice From A Time Prior To
      Any Provable Date Of Conception That Senior Party Is
      Entitled To Rely On

      A.   <u>Junior Party Began The Exercise Of Reasonable
           Diligence[11] No Later Than Early Summer 1988</u>

      By May 2, 1988, BWA, Junior Party's assignee, had
identified the invention of the Count, a torque-pulse actuated
hydraulic variable camshaft timing system, as a system it
wished to include as part of an ongoing VCT/VVT development
project, project 19356 (JR 51; JX 29).  By May 5, 1988, the
magnitude of torque pulses for such a system was being
investigated (JX 30; JR 52-54).  By June 6, 1988, a "CAD"
layout, JX 31, had been prepared of a variable valve timing
(VVT) mechanism (JR 54, 55) according to another invention,
that of U.S. Patent 4,862,845 (Exhibit 5).  As we shall later
see, this hardware was subsequently modified to serve as the
first test prototype for an invention of the Count.  By June
9, 1988, a schedule for further testing of various VCT
concepts by Borg-Warner Automotive (JX 32) was sent to Ford
(JR 56, 57).

      By June 23, 1988, under project 19356, a computer program
had been developed to permit the calculation of the magnitude
of camshaft torque pulses for use in a hydraulic VCT system

---

[11]"Reasonable diligence," as required under 35 U.S.C.
§102(g) to permit one in a position of first to conceive - last
to reduce to practice to prevail in an interference, does not
require a showing of constant effort throughout the critical time
period.  <u>In re Nelson</u>, 420 F.2d 1079, 164 USPQ 458 (CCPA 1970).

-41-

Exhibit 2 page 113

(JX 33; JR 57-59). This activity was directly relevant to the subject matter of the Count (JR 58, 59). Further analysis of this phenomenon was done by Mr. Reece, a Borg-Warner Automotive contract engineer (JR 44, 45), and documented in a lengthy 6-27-88 report (JX 34; JR 58, 59). Mr. Reece did further work on this subject, including preparation of another document on July 1, 1988 (JX 35) and a computer program (JX 36) which was prepared on July 14, 1988 (JR 60-62). The status of the project 19356 during early June 1988 through mid-July 1988, as confirmed by JX 31, 32, 33, 34, 35 and 36 and by the testimony of inventor Butterfield (JR 62), is that Junior Party was diligent in its efforts throughout this time to reduce the invention of the Count to practice.

By July 29, 1988, BWA was sufficiently encouraged regarding the potential for its VCT system according to the Count, by its own activities and customer response, to request additional funding of $165,000[12] for its project 19356 for the second half of 1988 (JX 38; JR 64, 65, 334-341, 497, 498). JX 38 was fully approved within the Borg-Warner Automotive organization by August 15, 1988 (JX 40; JR 67, 68). A confidentiality agreement (JX 41) was thereupon entered into between the assignee of Junior Party involved patent, BWA, and its target customer, Ford (JR 69, 70). By late September 1988, specifically by September 23, 1988, Junior Party inventor Smith had prepared a list of required hardware elements and estimated costs (JX 41) for the building of an electric motor actuated prototype "pivoting bracket" system that was later modified to test a torque pulse actuated hydraulic VCT system (JR 71).

---

[12]Some of this activity was to support activity relating to the torque pulse actuated hydraulic system of the Count and some to support continuing activity relating to the electric pivoting bracket activity (JR 66, 67).

-42-

Exhibit 2 page 114



Thus, by late September 1988, BWA was well into the designing and building of hardware for the electric motor pivoting bracket VCT system that was later modified to test a torque pulse actuated hydraulic VCT system and was continuing development and analytical work relating to the torque pulse actuated hydraulic VCT system of the Count (JR 72); no "unreasonable" break in the Junior Party "diligence" had occurred in the mid-July through late September 1988 time frame, and by late September 1988 the emphasis within BWA had shifted from the electric pivoting bracket system to the hydraulic system of the Count (JR 497, 498, 506, 507). In fact, according to Mr. Ledvina, subsequent to August 1988 BWA never made a conscious decision to discontinue activity relating to the development of a torque pulse actuated hydraulic VCT system (JR 507, 508), and this testimony is reinforced by that of Mr. Dembosky who was assigned to the VVT project in the summer of 1988 (JR 516), that the intensity of the project always remained high throughout his involvement in the project during the balance of 1988 and throughout 1989. Moreover, on October 19, 1988 Junior Party inventor Smith prepared an agenda (JX 43) for a meeting with Ford engineers regarding VCT matters. The BWA hydraulic VCT system is referred to in this document and relates to the only BWA hydraulic VCT system then under consideration, the pulse system of the Count (JR 72-74, 341-344).

B.    <u>Junior Party Actually Reduced The Invention Of The Count To Practice On Or About February 14, 1989 And/Or On Or About February 23, 24, 1989 And Was Reasonably Diligent In Its Efforts Leading To Such Reduction(s) To Practice At All Times From A Time Prior To Senior Party's Claimed October 28, 1988 Conception Date</u>

As noted above, the emphasis of the dual VCT system development project path that had been followed by BWA prior

-43-

Exhibit 2 page 115



to August 1988, namely the electric motor pivoting bracket
project of JX 5 and the torque pulse actuated hydraulic
project according to the Count, had decidedly shifted in favor
of the torque pulse actuated hydraulic system by the end of
August 1988, and development work on such a torque pulse
system was never thereafter discontinued.  The activity after
August 1988 included the preparation of a December 13, 1988
drawing of a hydraulic actuator that was eventually tested on
a test stand (JX 50; JR 441), an activity which had taken
approximately 4-6 weeks of the time of a designer (JR 442).
The equipment was eventually built and photographed (JX 51; JR
84, 85; JX 56; JR 90-93).  See also, Senior Party Exhibit
("SX") numbers 1, 2 and 3, as described in JR 354-358.  This
activity led to the testing of a pivoting bracket VCT system
prototype, which had been modified to operate based on the
torque pulse actuation hydraulic system of the Count, on or
about February 14, 1989.  (JX 44; JR 74-76; 517-521; 105-110;
JX 67; JX 73; JR 118, 119, 377-380.)

     During the period of time leading up to the February 14,
1989 test, substantial additional work was being done.
Communications were taking place with Ford (JX 64; JR 102,
103); a "to do" list of assignments was prepared on November
16, 1988 and assignments were made based on such list (JX 47;
JR 78-80); sketches of equipment components were prepared (JX
44; JR 74-76; JX 52; JR 85, 86; JX 65; JR 103, 104); hardware
for the testing of the hydraulic pivoting bracket was being
built (JR 104); sketches of hardware components were made in
early November 1988 (JX 44; JR 74-76, 344-350); further
sketching of hardware components was done in late November
1988 (JX 49; JR 82, 83) and work was begun on the designing of
a second embodiment of a torque pulse actuated hydraulic VCT
system of the Count, namely a camshaft mounted embodiment, as
opposed to the pivoting bracket mounted embodiment (JX 57; JR

-44-

Exhibit 2 page 116



93). The hydraulic pivoting bracket VCT system that was tested on February 14, 1989 is illustrated in a December 14, 1988 sketch (JX 55) and in a photograph (JX 56), and corresponds to the requirements of the Count (JR 87-93). As of the date of JX 55, at least four (4) BWA employees were actively assigned to VCT activities, with support from test technicians, machine shop personnel and Mr. Reece (JR 452).

Further testing of a torque pulse actuated hydraulic VCT system of the Count was done shortly thereafter, on or about February 23, 1989 and February 24, 1989 (JX 68, 69, 70, 71, 72, 73; JR 526, 527, 113-119). While there were mechanical problems noted in the equipment being tested on February 23, 24, 1989 (JR 118-120, 526, 527, 529-536), the testing did confirm the soundness of the concept (JR 534), and development work on the device of JX 67 not only continued thereafter, but support therefor was increased (JR 537). This support included a supplemental appropriation (JX 83) for $705,000 ($680,000 was actually spent during 1989) which was submitted and approved in March 1, 1989, virtually all of which now related to torque pulse actuated hydraulic VCT systems (JR 132-135).

C.    Conclusion

The testing on February 14, 1989 and/or the testing on February 23, 24, 1989, corroborated at it was by documents and the testimony of a non-inventor, while revealing mechanical difficulties in the equipment being tested, constituted an actual reduction to practice of the invention of the Count, which only requires that the practicability or utility of the invention be proven, not that a commercially saleable product had been achieved. Weisner v. Weigert, 666 F.2d 582, 212 USPQ 721, 726 (CCPA 1981). Further, the level of activity from a

-45-

Exhibit 2 page 117



time immediately prior to the claimed October 28, 1988 date of
conception of Senior Party until the Junior Party date(s) of
actual reduction to practice in February 1989 was more than
adequate to constitute "reasonable diligence" throughout such
time period, especially since "reasonable diligence" requires
something less than "evidence of constant effort". Id., USPQ
at 726; Nelson, supra, USPQ at 459.

V.    Subsequent To Its Date(s) Of Actual Reduction To Practice
      On Or About February 14, 1989 And/Or February 23, 24,
      1989 Until Its Constructive Reduction To Practice On
      October 16, 1989, Junior Party Continued To Be Reasonably
      Diligent In Its Efforts To Further Reduce The Invention
      Of The Count To Practice; In Any Event, Junior Party Is
      Not Guilty Of Suppression Or Concealment Of The Invention
      During This Period Of Time

      A.    March 1989

      As noted above, by March 1, 1989 Junior Party's assignee,
BWA, had appropriated $705,000 for development work during the
remaining portion of 1989 relating to hydraulic torque pulse
VCT systems, and actually spent $680,000 during this period of
time. Staffing levels on the project were increased,
including the assignment of Mr. Wykstra, a designer (JR 136,
137), to the project on a full time basis in March 1989 (JR
545). As of Mr. Wykstra's assignment to the hydraulic VCT
project in March 1989, Junior Party inventor Smith, Mr.
Dembosky, Ms. Harris and Ms. Dalkert were then assigned to the
project (JR 136, 137, 546). Mr. Wykstra remained with the
project throughout the rest of 1989, and, indeed, well into
1993 (JR 547). Moreover, a substitute electric motor for the
test stand to permit further testing of the hydraulic VCT
system was ordered as of March 2, 1989 (JX 75; JR 121, 122),

-46-

Exhibit 2 page 118



another "To Do" list of VVT activities was prepared on March 10, 1989 (JX 76; JR 122-124) and relevant items checked off as completed on March 20, 1989 (JX 77; JR 124, 125), and a design modification sketch was prepared on March 14, 1989 to deal with some of the operating problems noted in prior testing (JX 73; JR 125, 126). A meeting with Ford was held at BWA on March 29 and documented on the same date (JX 169; JR 266, 267, 394, 395), a meeting which confirmed that all efforts would thereafter be committed to the hydraulic VCT program in view of the favorable test results that had been obtained during testing in February and March 1989.

### B. April 1989

In connection with a proposed comprehensive disclosure of BWA's torque pulse actuated VCT system, on April 3, 1989 a multitude of BWA disclosure materials were witnessed by Mr. Haley, a BWA hydraulics expert who retired in 1991 (JR 37, 38, 565) and Mr. Wykstra. The documents witnessed by Mr. Wykstra included JX 20 (JR 548), JX 67 (JR 549) JX 79, a comprehensive invention disclosure document JX 87, (JR 551), JX 88 (JR 552), JX 89 (JR 552, 553), JX 91 and 93 (JR 147, 148, 554) and JX 94. A meeting with Ford did take place on April 5, 1989, and was documented in JX 98 (JR 151-155). Mr. Wykstra himself began to contribute documentation of the invention of the Count as early as April 7, 1989 (JX 93; JR 147, 148); a comprehensive layout of a torque pulse actuated hydraulic VCT system (JX 96) was completed by designer Harris on or about April 11, 1989, a project which had taken "two to three months" (JR 150-152). Further hardware testing was done and recorded on April 12, 1989 (JX 97; JR 152-154), and a further meeting with Ford was held at a Ford facility on April 26, 1989 and documented (JX 101; JR 159-162).

-47-

Exhibit 2 page 119

C.  <u>May 1989</u>

An aggressive test program for May 1989 was proposed on
May 2, 1989 (JX 102; JR 162); a second test stand had been
ordered and parts were being obtained (JR 163); requirements
for check valves had been identified and documented as of May
5, 1989 (JX 103; JR 163-166) and May 8, 1989 (JX 104; JR 166,
167); and the "Generation II" hardware described in JX 103 was
eventually built and tested on a test stand by mid to late
summer 1989 (JR 165, 166).  Further design activity took place
on May 9, 1989 (JX 105; JR 167, 168), and investigation of
control systems was identified and documented as a project
activity by May 10, 1989 (JX 106; JR 168, 169) and May 11,
1989 (JX 107; JR 169, 170) and achieved by early winter 1989
(JR 169).

An additional test stand was requisitioned by May 16,
1989 (JX 108; JR 170, 171) at an estimated capital cost of
$90,000; this test stand was ordered during the summer of 1989
(JR 172), it involved a three-month lead time procurement
schedule (JR 172) and was operational by December 1989 and was
then used in the testing of the camshaft mounted torque pulse
actuated hydraulic VCT system.  Another meeting with Ford
personnel took place on May 17, 1989 and was documented (JX
109; JR 172, 173), and resulted in a continuation of BWA's VCT
development activity (JR 173).

D.  <u>June 1989</u>

A further meeting was held with Ford in Ithaca on June
28, 1989 based on an agenda that was prepared on June 5, 1989
(JX 110; JR 173-175); during such visit Ford was permitted to
inspect a pivoting bracket hydraulic VCT system on a BWA test
stand during such visit (JR 174, 175).  Documented engineering

-48-

Exhibit 2 page 120

information, including test results, that had been prepared at
various times during May and early June was sent to Ford on
June 9, 1989 (JX 111; JR 175-178). Further documented
information regarding the hydraulic VCT program was sent to
Ford on June 13, 1989 (JX 112; JR 178, 179). A quotation in
the amount of $39,000 for electrical control equipment for the
hydraulic VCT test stand was received in early June 1989 and a
purchase order was eventually placed therefor (JX 113; JR 194,
195), and by June 14, 1989 a proposal was made regarding a
major modification of an existing test stand as opposed to the
purchase of a new one for the hydraulic VCT program (JX 114,
JR 196-198). Cost estimates for production planning purposes
for hydraulic VCT parts were requested on June 15, 1989 (JX
115; JR 198 - JR 200). Further design information regarding
assumptions for hydraulic VCT prototypes were sent to Ford on
June 22, 1989 (JX 116; JR 200, 201), and a telephone
conversation between Junior Party inventor Butterfield and a
Ford engineer regarding the hydraulic VCT project took place
and was documented on the same date (JX 117; JR 201-202). As
of June 22, 1989, testing of the pivoting bracket hydraulic
VCT activity had been ongoing for several weeks (JR 202, 203).

On June 23, 1989 Junior Party inventor Butterfield
prepared a cost estimate to convert a test stand to a VCT
operation (JX 118; JR 203, 204), an activity which was
completed by December 1989 (JR 204). Preparation for a
meeting with Ford regarding hydraulic VCT matters was
undertaken and documented on June 23, 1989 and such meeting
later took place in July 1989 (JX 119; JR 204, 205). Further
discussions between Mr. Butterfield and Ford took place and
were documented on June 26, 1989 (JX 120; JR 205, 206), and by
June 27, 1989 a group of engineering documents related to the
hydraulic VCT project had been prepared and collected (JX 121;
JR 206-208). Another meeting between BWA and Ford, that

-49-

Exhibit 2 page 121

contemplated by JX 119, took place in Ithaca on June 28, 1989
and was documented on July 5, 1989 (JX 122; JR 208-210).  By
the end of June 1989, meetings between Ford and BWA were
occurring typically on a monthly basis, and the project was
staffed full-time by Messrs. Smith and Wykstra with part-time
support from Messrs. Dembosky, Brewer, Mahler and Ms. Harris
(JR 210-212).

    E.    July 1989

    During July 1989, work relating to solenoids for the
hydraulic VCT project was underway (JX 123; JR 212, 213); work
was underway relating to an updated pivoting bracket hydraulic
VCT embodiment and a revised project schedule was prepared (JX
124; JR 213, 214); design issues relating to a cam mounted
hydraulic VCT design were analyzed and documented (JX 125; JR
215); preparation for information to be sent to Ford was begun
and documented (JX 126; JR 216); and design changes were made
and documented with respect to the camshaft mounted hydraulic
VCT design (JX 127; JR 217, 218).  Further contact between BWA
and Ford with respect to solenoid matters for the hydraulic
VCT project took place and were documented (JX 129; JR 220-
222); further conversations between Mr. Butterfield and Ford
took place and were documented (JX 130; JR 222, 223; JX 131;
JR 223, 224), and further engineering documents were sent to
Ford by Mr. Butterfield (JX 132; JR 224, 225).  Design issues
relating to the camshaft mounted hydraulic VCT program were
identified and documented by July 24, 1989 (JX 133; JR 225,
226), another conversation between Mr. Butterfield and Ford
took place and was documented on the same date (JX 134; JR
226, 227), and on the same date a schedule of activities for
testing of various hydraulic VCT embodiments for the balance
of 1989 was prepared (JX 135; JR 227, 228).  Further activity
relating to solenoid valve matters for the hydraulic VCT

-50-

Exhibit 2 page 122

project was documented by July 27, 1989 (JX 136; JR 228, 229).
Consequently, by the end of July 1989 the hydraulic VCT
project was one of BWA's "highest priority projects" (JR 229,
230).

F.  <u>August 1989</u>

A high level of activity relating to the development of
the BWA hydraulic VCT system of the Count continued through
August 1989.  Junior Party inventor Butterfield was in
frequent telephone communication with his contacts at Ford,
including telephone conversations, which are corroborated by
contemporaneous notes, on August 1 (JX 137; JR 230), August 3
(JX 138; JR 231), August 8 (JX 139; JR 231, 232; JX 140; JR
233, 234), August 9 (JX 141; JR 234, 235), August 16 (JX 142;
JR 235), August 21 (JX 149; JR 243, 244) and August 28 (JX
153; JR 247, 248).  The planned trip of Mr. Davenport that is
the subject of JX 139 did occur, actually two trips, during
late summer 1989, and each lasted several days (JR 232, 233).
An agenda for a meeting on August 31 was prepared on August 16
and sent to Ford (JX 143; JR 236), and further design
information was also sent to Ford on August 16 (JX 144; JR
236-238).  Further design work regarding check valves for the
project was documented as of August 17 (JX 145; JR 238, 239),
more information regarding a solenoid nozzle design for the
project was sent to Ford on August 17 (JX 146; JR 239),
another agenda for a meeting on August 29 was sent to Ford on
August 23 (JX 150; JR 244, 245), information relating to the
design of a spool valve was prepared and sent to Ford on
August 24 (JX 151; JR 245), and an early parts list for the
right head of an engine with a hydraulic VCT mechanism was
prepared on August 20 (JX 152; JR 245-247).  More testing of a
hydraulic VCT system was documented on August 21 and reported
to Ford (JX 148; JR 242, 243), more documented engineering

-51-

Exhibit 2 page 123