# EXHIBIT 2
## (PART IV)

information regarding camshaft torque was sent to Ford on
August 28 (JX 154; JR 248), and information regarding possible
failure modes was compiled as of August 30 (JX 155; JR 248,
249).

In summary, during August 1989 much activity relating to
the design of a camshaft mounted hydraulic VCT system had
taken place, continued testing relating to the pivoting
bracket hydraulic VCT system had taken place, and frequent
contact had taken place with Ford regarding failure modes and
production of prototypes (JR 249, 250).

G.   <u>September 1989</u>

The high level of hydraulic VCT project activity within
BWA during August 1989 continued into and throughout September
1989.  Information regarding a control algorithm was sent to
Ford on September 5 (JX 156; JR 250, 251) and a request to
Ford for parts for further testing was sent on the same day
(JX 447; JR 251, 252).  Further test result information was
sent to Ford on September 6, 1989  (JX 158; JR 252), and
another telephone contact with Ford took place on September
22, 1989 (JX 159; JR 253, 254), this one regarding plans to
build 6000 engines.  Further engineering analysis was done and
documented (JX 160; JR 254, 255), and further testing of a
hydraulic pivoting bracket VCT was documented as of September
19, 1989 (JX 161; JR 255).  Further activity relating to the
preparation of the patent application took place in September
1989 (JX 177, 178, 179, 180; JR 461-464), and there is
confirmation of a personal meeting between Junior Party
inventor Smith and patent counsel regarding such patent
application prior to September 21, 1989 (JR 483).  The level
of staffing of the hydraulic VCT project remained high at the
end of September 1989 (JR 259).

-52-

Exhibit 2 page 124

### H. October 1989 and Beyond

In addition to the continuing activity that led to the October 16, 1989 filing of the patent application on which the involved Junior Party patent (JX 3) was granted (JX 81; JR 465, 466; JX 167; JR 262-264), further activity relating to the development of hydraulic VCT systems took place in October.  Test data was transmitted to Ford on October 3, 1989 (JX 164; JR 259, 260), a previously prepared sketch of a spool valve with an internal check valve was transmitted to Ford on October 10 (JX 165; JR 260, 261), and a further conversation with Ford took place and was documented on October 10 (JX 166; JR 261).  Project activity of an intensive nature continued even into November 1989 (JX 168; JR 264, 265), and by then all VCT activity, "for several months," had related to the hydraulic VCT system (JR 266).

### I. Conclusion

The documented and corroborated intensive level of activity by Junior Party with respect to developing and perfecting the subject matter of the Count from the claimed date(s) of actual reduction to practice in February 1989 until its October 16, 1989 constructive reduction to practice is sufficient to constitute continuing "reasonable diligence" throughout that period of time under the standards of In re Nelson, supra; Weisner, supra, if this Board concludes that Junior Party's claims with respect to its February date(s) of actual reduction to practice are not well-founded.  In any event, such level of activity by Junior Party during that eight-month period, involving, as it did, frequent and open discussions with Ford throughout such time frame, militates against a finding that Junior Party ever intended to "suppress or conceal" its invention.  In that regard, see, Dewey v.

-53-

Exhibit 2 page 125

<u>Lawton</u>, 347 F.2d 629, 632, 146 USPQ 187, 189-190 (CCPA 1965), which permitted testing and refinement of the invention at issue for more than a year after the reduction to practice without a finding of an intent to conceal the invention.

VI.    Senior Party Is Not Entitled To A Finding That It Was Reasonably Diligent In Its Efforts To Reduce The Invention Of The Count To Practice At Any Time Prior To Its January 13, 1989 French Priority Date

In its Preliminary Statement, Senior Party asserted that "[a]ctive exercise of reasonable diligence in the United States toward reducing to practice the invention defined by Count I[13] of the Interference began on October 28, 1988. This claim is without a shred of supporting evidence, and is preposterous! Senior Party Melchior, in deposition cross-examination during the Senior Party testimony period, testified as follows:

Q.    Prior to the filing of your French application on the VCT system -- whatever date that was -- on January 13, 1989, did any activity relating to your VCT development program take place in the United States?

A.    After?

Q.    Prior to January 13, 1989.

A.    Activity in United States?

Q.    In the United States.

_____

[13]No preliminary statements were requested or filed as to Count II, following the decision on preliminary motion that Count I was unpatentable over the prior art.

-54-

Exhibit 2 page 126

A.    We didn't have any activity in United States.

(JR 628).

Thus, even if Senior Party's claim that an invention according to Count II was introduced into the United States on October 28, 1988 is determined to be well-founded, a period of approximately 2 1/2 months elapsed after such date until Senior Party's claimed January 13, 1989 French priority date. While evidence of continuing activity during a critical period may not be necessary to establish "reasonable diligence," In re Nelson, supra, stands for the principle that an unexplained two-month period of inactivity precludes a finding of reasonable diligence. A fortiori, the 2 1/2 month period of inactivity of Senior Party Melchior between its claimed October 28, 1988 date of conception and its claimed French January 13, 1989 priority date, without any explanation for such period of inactivity being offered, let alone proven, precludes a finding that Senior Party was "reasonably diligent" during such period of time.

Conclusions

Junior Party has shown that it was the first to conceive the invention of the Count, and that it was reasonably diligent in its efforts to reduce the invention of the Count to practice through a time period beginning prior to any date of conception that Senior Party can prove until Junior Party's actual reduction to practice in February 1989 and/or until its constructive reduction to practice in October 1989. Junior Party has also shown that it never abandoned, suppressed or concealed its invention of the Count. Consequently, Junior Party is entitled to an award of priority with respect to the Count and to all claims which correspond to it.

-55-

Exhibit 2 page 127

Junior Party has also shown that Claims 1 and 4 of its involved patent are patentable over the only prior art reference cited in support of the decision of the Examiner In Chief that such claims are unpatentable. Consequently, the decision of the Examiner In Chief holding such claims to be unpatentable should be reversed or at least remanded for further consideration.

Junior Party has also shown that Claims 3-6 of its involved patent are independently patentable over the Count. Consequently, the decision of the Examiner In Chief that such claims correspond to the Count should be reversed.

Respectfully submitted,

Thomas A. Meehan
Lead Counsel
Registration No. 19,713

-56-

Exhibit 2 page 128

<u>Appendix</u>

The sole Count remaining in this Interference, Count II, reads as follows:

Count II

In an internal combustion engine having a crankshaft, at least one camshaft, the at least one camshaft being position variable relative to the crankshaft and being subject to torque reversals, the method comprising:

providing oppositely acting first and second hydraulic means for varying the position of the at least one camshaft;

varying the position of the at least one camshaft relative to the crankshaft by transferring hydraulic fluid from one of the first and second hydraulic means to the other of the first and second hydraulic means; and

actuating the first and second hydraulic means for varying the position of the at least one camshaft relative to the crankshaft in reaction to torque reversals in the at least one camshaft.

-57-

Exhibit 2 page 129

## CERTIFICATE OF SERVICE

I hereby certify that copies of the foregoing SENIOR PARTY'S MOTION UNDER 37 CFR 1.656(h) TO SUPPRESS JUNIOR PARTY EXHIBITS AND RELATED TESTIMONY was served on counsel for Junior Party by Express Mail, postage prepaid, on the 25th day of February, 1994, to the following: THOMAS A. MEEHAN, ESQ., Willian Brinks Olds Hofer Gilson & Lione, 1130 Edison Plaza, Toledo, Ohio 43604-1537 and GREG DZIEGIELEWSKI, ESQ., Borg-Warner Automotive, Inc., 6700 18½ Mile Road, P.O. Box 8022, Sterling Heights, Michigan 48311-8022.

Robert C. Collins, Esq.
BARNES, KISSELLE, RAISCH, CHOATE,
    WHITTEMORE & HULBERT, P.C.
3500 Penobscot Building
Detroit, Michigan    48226
(313)  962-4790

RCC:bp


[WJW/89/bp]

-11-

Exhibit 2 page 130

## CERTIFICATE OF SERVICE

I hereby certify that copies of the foregoing SENIOR PARTY OPPOSITION TO JUNIOR PARTY MOTION TO SUPPRESS UNDER 37 CFR 1.656(h) was served on counsel for Junior Party by Express Mail, postage prepaid, on the  25th day of  February , 1994, to the following: THOMAS A. MEEHAN, ESQ., Willian Brinks Olds Hofer Gilson & Lione, 1130 Edison Plaza, Toledo, Ohio 43604-1537 and GREG DZIEGIELEWSKI, ESQ., Borg-Warner Automotive, Inc., 6700 18½ Mile Road, P.O. Box 8022, Sterling Heights, Michigan 48311-8022.

```
            Robert C. Collins, Esq.
            BARNES, KISSELLE, RAISCH, CHOATE,
              WHITTEMORE & HULBERT, P.C.
            3500 Penobscot Building
            Detroit, Michigan    48226
            (313)  962-4790
```

RCC:bp

[WJW/89/bp]

-5-

Exhibit 2 page 131

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing SENIOR PARTY'S REPLY TO JUNIOR PARTY OPPOSITION TO SENIOR PARTY MOTION UNDER 37 CFR 1.656(h) TO SUPPRESS JUNIOR PARTY EXHIBITS AND TESTIMONY was served on counsel for Junior Party Butterfield et al, by express mail, postage prepaid, on this 29th day of March, 1994, to the following: Thomas A. Meehan, Esq., WILLIAN BRINKS OLDS HOFER GILSON & LIONE, 1130 Edison Plaza, Toledo, Ohio 43604-1537 and Greg Dziegielewski, Esq., BORG-WARNER AUTOMOTIVE, INC., 6700 18½ Mile Road, P.O. Box 8022, Sterling Heights, Michigan 48311-8022.

By: _____

Robert C. Collins
Registration No. 27,430
BARNES, KISSELLE, RAISCH, CHOATE,
WHITTEMORE & HULBERT, P.C.
3500 Penobscot Building
645 Griswold Street
Detroit, Michigan  48226-4217
(313) 962-4790

WJW/RCC/ds

[DS-63/RCC]

-8-

Exhibit 2 page 132

APR 1 1 1996

PATENT AND TRADE
BOARD OF PATENT APPEALS
AND INTERFERENCES
                                         Paper No. 94

## THIS OPINION WAS NOT WRITTEN FOR PUBLICATION

The opinion in support of the decision being entered today
(1) was not written for publication in a law journal and
(2) is not binding precedent of the Board.


### UNITED STATES PATENT AND TRADEMARK OFFICE

---

### BEFORE THE BOARD OF PATENT APPEALS AND INTERFERENCES

---

ROGER P. BUTTERFIELD
and FRANKLIN R. SMITH,

Junior Party,[1]

v.

JEAN F. MELCHIOR,

Senior Party.[2]

---

Patent Interference No. 102,923

---

FINAL HEARING: NOVEMBER 21, 1994

---

Before CALVERT, PATE, and MARTIN, *Administrative Patent Judges.*

PATE, *Administrative Patent Judge.*

---

[1] Patent 5,002,023, granted March 26, 1991, based on Application 07/422,353, filed October 16, 1989. Assignors to Borg-Warner Automotive Transmission & Engine Components Corporation, A Corp. of Delaware.

[2] Application 07/576,451, filed September 13, 1990. Accorded benefit of France 89-00366, filed January 13, 1989 and PCT FR90/00009, filed January 5, 1990.

1

Exhibit 2 page 133

Interference No. 102,923

### Final Decision

This is a decision after final hearing in Interference No. 102,923. The junior party patentees are Roger P. Butterfield and Franklin R. Smith. Their U.S Patent No. 5,002,023, issued March 26, 1991, is assigned to Borg-Warner Automotive Transmission & Engine Components Corporation.   The senior party applicant is Jean F. Melchior.  His application Serial Number 07/576,451, filed September 13, 1990 has been accorded benefit of France 89-00366, filed January 13, 1989 and PCT FR90/00009 filed January 5, 1990.

The interference was declared with count 1, which reads as follows:

1.   In an internal combustion engine having a crankshaft, at least one camshaft, the at least one camshaft being position variable relative to the crankshaft and being subject to torque reversals during the operation thereof, and means for varying the position of the at least one camshaft relative to the crankshaft, the method comprising:

actuating means for varying the position of the at least one camshaft relative to the crankshaft in reaction to torque reversals in the at least one camshaft.

The claims of the parties that corresponded to this count were:

Butterfield:  Claims 1 through 6.

Melchior:  Claims 53 through 58.

2

Exhibit 2 page 134

Interference No. 102,923

The interference was redeclared by substituting count 2, which corresponds exactly to claim 2 of the involved patent. Count 2 reads as follows:

2. In an internal combustion engine having a crankshaft, at least one camshaft, the at least one camshaft being position variable relative to the crankshaft and being subject to torque reversals, the method comprising:

providing oppositely acting first and second hydraulic means for varying the position of the at least one camshaft;

varying the position of the at least one camshaft relative to the crankshaft by transferring hydraulic fluid from one of the first and second hydraulic means to the other of the first and second hydraulic means; and

actuating the first and second hydraulic means for varying the position of the at least one camshaft relative to the crankshaft in reaction to torque reversals in the at least one camshaft.

Pursuant to this decision, the interference will be redeclared in a separate paper. See page 11, *infra*. At that time, the claims of the parties that correspond to this count will be:

Butterfield:  Claims 1 through 6.

Melchior: Claims 53 through 58.

During the preliminary motion stage of the interference the following motions, *inter alia*, were filed and decided:

A motion by Melchior for judgment that claims 1 and 4 of party Butterfield's involved patent are unpatentable over U.S. patent 3,721,220 to Garcea was granted by the Administrative

3

Exhibit 2 page 135

Interference No. 102,923

Patent Judge (APJ). As a result of the granting of this motion Count 2 was substituted for Count 1; and

A motion to have Butterfield claims 3 through 6 designated as not corresponding to count 1 was granted by the APJ. A motion to have claims 3 through 6 designated as not corresponding to substituted count 2 was not filed, contrary to arguments in the junior party's brief. In the reply to the senior party opposition to the motion to have claims 3 through 6 designated as not corresponding to count 1, Butterfield included what the APJ construed as a motion to have claims 3-6 of the Butterfield involved patent each designated as separate counts in the interference. The APJ dismissed this request.

Junior party Butterfield asks for review of these interlocutory matters at final hearing. Additionally, both parties have filed motions to suppress evidence submitted by the opposing party. Finally, each party's respective case for priority of invention will be taken up for decision.

## Motion of Unpatentability Over Garcea

The interference was originally declared with Count 1. Claim 1 of the Butterfield patent corresponds exactly to Count 1. Melchior filed a motion under 37 CFR § 1.633(a) that claims 1 and 4 of the Butterfield involved patent were unpatentable over

4

Exhibit 2 page 136

Interference No. 102,923

the Garcea patent. The APJ agreed and granted the Melchior preliminary motion. Butterfield asks for review of this decision at final hearing.

It is noted that all interlocutory orders are presumed to have been correct, and the burden of showing an abuse of discretion is on the party Butterfield, the party attacking the order. 37 CFR § 1.655(a). An abuse of discretion occurs if the APJ's decision 1) is clearly unreasonable, arbitrary, or fanciful; 2) is based on an erroneous conclusion of law; 3) rests on clearly erroneous fact findings; or 4) follows from a record that contains no evidence on which the APJ could rationally base his or her decision. *Gerritsen v. Shirai*, 979 F.2d 1524, 1529, 24 USPQ2d 1912, 1916 (Fed. Cir. 1992).

Butterfield's initial argument is that the APJ applied the wrong standard of proof, *i.e.*, preponderance of the evidence, with regard to the decision granting the motion for unpatentability. According to Butterfield, the standard to be applied is that of clear and convincing evidence, when the motion alleges unpatentability of claims in an issued patent. Butterfield cites the recent Federal Circuit case of *Price v. Symsek*, 988 F.2d 1187, 1193-94, 26 USPQ2d 1031, 1036 (Fed. Cir. 1993) and relies on the decision's discussion of the public policy considerations inherent in an interference. Butterfield quotes the following language from the decision:

5

Exhibit 2 page 137

Interference No. 102,923

An interference involving an already issued patent
embraces the societal interests derived from the statutory
presumption that an issued patent is valid.  These interests
require a standard of proof higher than a mere, or dubious,
preponderance of the evidence.  Accordingly, we conclude
that the standard of "clear and convincing evidence" is the
correct standard to be applied in this case (citations
omitted). *Id.* at 1193-94, 26 USPQ2d at 1036.

It is apparent that this quotation, taken out of context, has

been misinterpreted by the junior party. Just prior to the quoted

portion the decision reads:

As Justice Cardozo explained in *Radio Corp.* [*Radio Corp.*
*of America v. Radio Engineering Labs., Inc.*, 293 U.S. 1,
54 S.Ct. 752 (1934)], the core thought or value running
through these varying expressions is that the proof which
establishes another's priority of invention over the
patentee's must be highly persuasive and lead to a thorough
conviction in one's mind of the truth of the challenger's
position.  However, the evidentiary standard usually used in
civil cases, clear and convincing evidence, is sufficient
for this purpose. *See Radio Corp.*, 293 U.S. at 8.  We see
no reasonable justification for extending a criminal
standard into the field of patent law or using verbiage
which can only lead to confusion. *Id.* at 1193, 26 USPQ2d at
1036.

It is clear, then, that the decision in *Price* is limited to

proof with respect to the issue of priority, and the clear and

convincing standard is applied when a party in interference

attempts to prove priority of invention or derivation over a

patent that was issued prior to the filing date of the

application of the party. Indeed, the court unequivocally

stated the issue in *Price* was "the quantum of proof required

to establish priority in an interference with an issued

patent...." *Id.* at 1191, 26 USPQ2d at 1034. It is our conclusion

6

Exhibit 2 page 138

Interference No. 102,923

that the APJ applied the proper standard of proof, in this instance, that of a preponderance of the evidence. *See Okada v. Hitotsumachi,* 16 USPQ2d 1789 (Comm'r Pats. 1990) and *Lamont v. Berguer,* 7 USPQ2d 1580 (Bd. Pat. App. & Int. 1988). Accordingly, the junior party has not shown abuse of discretion on the part of the APJ with regard to the standard of review.

Butterfield Claim 1 reads as follows:

1.  In an internal combustion engine having a crankshaft, at least one camshaft, the at least one camshaft being position variable relative to the crankshaft and being subject to torque reversals during the operation thereof, and means for varying the position of the at least one camshaft relative to the crankshaft, the method comprising:

actuating [said] means for varying the position of the at least one camshaft relative to the crankshaft in reaction to [said] torque reversals in the at least one camshaft.

We have interpreted claim 1 of Butterfield to include the two "said" interpolations, inasmuch as the claim would not have any true method step, if the last clause merely called for another "actuating means." Therefore, it seems clear that the means called for in the last clause is merely the same means as recited previously. The specification of Butterfield has this to say about a means for varying the position of the camshaft:

7

Exhibit 2 page 139

Interference No. 102,923

        The present invention provides a phase adjustment
    arrangement for an internal combustion engine in which
    the position of the camshaft, or the positions of one
    or both of the camshafts in a dual camshaft system, is
    phase adjusted relative to the crankshaft, that is, in
    which the camshaft is advanced or retarded relative to
    the crankshaft by an actuating arrangement which is
    controlled, for example, by a microprocessor, to
    control one or more important engine operating
    characteristics, such as idle quality, fuel economy,
    emissions, or torque.  The actuating arrangements
    utilizes a pair of oppositely acting hydraulic
    cylinders to advance or retard the angular position of
    a camshaft relative to the crankshaft.  Hydraulic
    fluid, in the form of engine oil, is transferred
    between the oppositely acting cylinders in reaction to
    changes in torque loads which are experienced by a
    camshaft as each of its lobes changes its angle of
    contact with the cam follower of the valve lifter of
    the engine which is operated thereby (column 1, line 63
    through column 2, line 13).

Accordingly, we have interpreted the "means" of claim 1 to be a

hydraulic piston cylinder arrangement (not necessarily double

acting--this feature is claimed expressly in claim 2) controlled

by a hydraulic circuit (the "means" does not additionally

comprise a control unit as is expressly claimed in claim 4) and

equivalents. See In re Donaldson Co., 16 F.3d 1189, 29 USPQ2d

1845 (Fed. Cir. 1994).

    Turning now to the findings of fact with regard to the

Garcea reference proper, the APJ credited the statement of facts

found in the original motion for judgment. Garcea discloses a

method for varying the position of a camshaft 7 with respect to a

crankshaft (not shown) of an internal combustion engine. Garcea

discloses hydraulic pistons 22 which vary the position of the

8

Exhibit 2 page 140

Interference No. 102,923

chain driven sprocket relative to the camshaft 7. The degree of advancement of the pistons is controlled by a hydraulic circuit that selectively exhausts cylinders 21, via radial bore 35. Butterfield has candidly admitted that:

> Garcea recognizes that there are torque pulsations in a rotating camshaft. However, Garcea only utilizes this phenomenon as a way of permitting engine oil pressure to provide adequate torque for a phase shift to overcome camshaft torque during periods of low camshaft torque. (Junior party brief at 19.)

Thus, Garcea is acknowledged by the junior party to utilize the camshaft torque under certain operating conditions and to be capable of varying the camshaft position in at least one direction. This is certainly all that the method claims 1 and 4 require.

It is further noted that the APJ did not abuse his discretion in ruling that claim 4 was anticipated by Garcea. The "engine control unit" of claim 4 is not stated in means-plus-function format and the APJ gave this term, in the context of the claim as a whole, its broadest reasonable interpretation. In the patentability context, claims are to be given their broadest reasonable interpretations. *In re Van Geuns, 988* F.2d 1181, 1184, 26 USPQ2d 1057, 1059 (Fed. Cir. 1993); *In re Zletz,* 893 F.2d 319, 321, 13 USPQ2d 1320, 1322 (Fed. Cir. 1989). Moreover, limitations are not to be read into the claims from

9

Exhibit 2 page 141

Interference No. 102,923

the specification. *Id.* As such, the engine control unit was
determined by the APJ to have been anticipated by the lever 40,
linkage 44, accelerator pedal 45, and the throttle 53 of Garcea.
Accordingly, it is our conclusion that Butterfield has not shown
an abuse of discretion on the part of the APJ in ruling that
claims 1 and 4 of Butterfield (and claims 53 and 56 of Melchior)
were anticipated by Garcea.

Junior party Butterfield also filed two motions to have
claims 2 through 6 designated as not corresponding to count 1.
The APJ granted these motions in concert with the granting of the
senior party motion that claims 1 and 4 of Butterfield were
unpatentable over Garcea. Only in reply to the senior party
opposition to these preliminary motions did the junior party
propose new counts corresponding exactly to claims 3 through 6 of
Butterfield. The APJ refused to consider new counts proposed in a
reply, stating that new counts should have been proposed in a
motion or opposition, and that proposing them in a reply did not
give an opponent notice or opportunity to respond.[3]  See 37 CFR

---

[3] To the extent that it is argued by the junior party, we
find no abuse of discretion on the part of the APJ in refusing
to consider papers beyond reply to an opposition to a motion.
The interference rules do not provide for such papers. See 37 CFR
§ 1.638. The only argument that junior party has mustered against
the action of the APJ is that it is not "just" under 37 CFR
§ 1.601 to not consider junior party's "supplemental
oppositions." On the contrary, strictly following the
(continued...)

10

Exhibit 2 page 142

Interference No. 102,923

§ 1.633(i), which restricts the filing of a 37 CFR § 1.633(c)
responsive motion to motions contemporaneous with oppositions.
According to the APJ, the motion to have proposed counts 3
through 6 (which corresponded exactly to claims 3 through 6 of
Butterfield) in issue should have been raised in Butterfield's
opposition to the Melchior motion proposing count 2 and
designating claims 3, 5 and 6 as corresponding thereto. Or the
motion could have been made in response to the Melchior motion
for judgment under 37 CFR § 1.633(a). See 37 CFR § 1.633(i). The
APJ granted this motion of the senior party and redeclared the
interference with count 2 substituted for count 1.

We find no error or abuse of discretion in the APJ's refusal
to consider the motion to add counts to an interference first
made in a reply. However, we do find an error in the APJ's
designation of claims corresponding to count 2 in Paper No. 61.
Claims 1 through 6 of Butterfield and claims 53 through 58 of
Melchior should have been designated as corresponding to count 2.
The interference will be redeclared in a separate paper to
correct this error on the part of the APJ.

_____

³(...continued)
interference rules is not an abuse of discretion. It is not
seen how allowing endless paper filings on a single issue inures
to the benefit of a speedy and just interference.

Exhibit 2 page 143

Interference No. 102,923

### Motions to Suppress Evidence

Junior party Butterfield has moved to suppress the senior party exhibit MX-10,[4] and the testimony of the senior party pursuant thereto, on the ground that the original viewgraphs were not submitted to the junior party for inspection. There was testimony from the senior party witness that the figures of MX-10 were altered from the originals. There was further testimony that the originals were lost or destroyed.

Senior party argues that MX-10 is offered as evidence of the content of documents disclosed to General Motors engineers on 28 October 1988. Senior party goes on to state that the testimony of the senior party witnesses is uncontroverted with respect to viewgraphs being identical except for reference numbers from the original viewgraphs presented to GM. Fed. R. Evid. § 1004 appears to be applicable to this situation wherein the copy offered is stated to be a true copy of the original. Therefore, we will not suppress MX-10 to the extent that it is offered as documentary evidence of the oral remarks made to GM on 28 October 1988. The motion to suppress is **DENIED**.

---

[4] Hereinafter, the Melchior Exhibits and Record page numbers will be abbreviated as MX and MR respectively. Likewise, the Butterfield Exhibits and Record are abbreviated BX and BR.

Exhibit 2 page 144

Interference No. 102,923

Senior party requests the suppression of BX-20 and BX-79 on the ground that, while the originals were presented during depositions for the senior party to inspect, the original exhibits were not submitted to the PTO. It appears that the junior party has now submitted the originals as attachments to the ribbon copy of Paper No. 87. A motion to accept the late filing of these papers was granted. Accordingly, the motion to suppress BX-20 and BX-79 is **DENIED**.

Senior party requests the suppression of BX-175 through BX-178 and BX-181 on the ground that they are incomplete. Redacted originals are ordinarily granted admission in lieu of originals as admissible duplicates under Rule 1003 Fed. R. Evid. Note the commentary citing the redacted evidence in *United States v. Alexander,* 326 F.2d 736 (4th Cir. 1964). In this case, the senior party has not argued that the remainder of the originals are needed for cross-examination or may disclose evidence qualifying the introduced parts. *See also, Suh v. Hoefle,* 23 USPQ2d 1321, 1329 (Bd. Pat. App. & Int. 1991). Consequently, the motion to suppress BX-175 through BX-178 and BX-181 on the ground that they are incomplete is **DENIED**.

Senior party requests the suppression of the testimony of junior party witness Dembosky, as it relates to BX-20 and BX-79. According to senior party, in the second notice which particularly identified Dembosky as a possible witness and

13

Exhibit 2 page 145

Interference No. 102,923

provided a list of documents that he was to testify about,
exhibits BX-20 and BX-79 were not included in the list of
documents. Therefore, the senior party alleges that it was
unfairly surprised by the Dembosky testimony specific to the
unidentified exhibits.

Under the provisions of 37 CFR § 1.673(b)(1), a party is
required to serve a list and copy of each document in the party's
possession, custody, or control upon which a party intends to
rely at any deposition. In our view, the rule does not require a
party to state which documents are going to be relied upon at one
or more of the scheduled depositions. *Samson v. Crittenden,*
14 USPQ2d 1810, 1812 (Bd. Pat. App. & Int. 1989). Therefore, the
general notice provided by the junior party is deemed sufficient.
The motion to suppress Dembosky testimony respecting BX-20 and
BX-79 is **DENIED**.

While we acknowledge that failure to state explicitly on the
record that an exhibit is "offered into evidence" is not
required, *Clevenger v. Martin,* 1 USPQ2d 1793, 1799 (Bd. Pat. App.
& Int. 1986)(*citing Gunn v. Bosch,* 181 USPQ 758 (Bd. Pat. Int.
1973)), the record establishes that exhibit 28 was expressly
excluded from being offered into evidence, as the senior party
suggests. Accordingly, we will suppress BX-28 and the testimony
pursuant thereto. The motion for suppression is **GRANTED** to the
extent that BX-28 is suppressed.

14

Exhibit 2 page 146

Interference No. 102,923

## Senior Party's Case for Priority

The senior party alleges a conception by introduction of the subject matter of the interference into the United States by the inventor Melchior in a presentation to General Motors on 28 October 1988. Three overhead projector slides similar in content to MX-10 were exhibited to the GM engineers, and the invention was discussed for approximately 15 minutes in the context of a larger presentation of the senior party's engine technology. Afterwards, the viewgraphs were taken outside the United States and ultimately lost or destroyed.   This disclosure of the invention in the United States is fully corroborated by the senior party witness Edelmann. Melchior and Edelmann further testified that the General Motors engineers "without any difficulty...understood" the subject matter of the count from Mr. Melchior's presentation. MR-86, 87.

The cases of *Clevenger v. Kooi,* 190 USPQ 188, 192-193 (Bd. Pat. Int. 1974) and *Chan v. Kunz,* 231 USPQ 462, 469 (Bd. Pat. Int. 1984) both dealt with the introduction of a written disclosure of the invention into the United States. Both of these cases expressly relied on the holding in *Mortsell v. Laurila,* 301 F.2d 947, 951, 133 USPQ 380, 384 (CCPA 1962).  In *Mortsell,* the operative fact pattern was that a complete written disclosure of the invention existed in the United States.  This fact establishes a conception of the invention in all three of the

15

Exhibit 2 page 147

Interference No. 102,923

cited cases. *Accord, Ex parte Hachiken,* 223 USPQ 879, 880 (Bd. Pat. App. 1984)(date of introduction of draft patent application into U.S. may be taken as date of conception).[5]

Accordingly, given that a written disclosure of the subject matter of the invention was disclosed to persons skilled in the relevant art by the senior party inventor on 28 October 1988, we accord the senior party a conception date of 28 October 1988 by introduction of the subject matter into the United States. Furthermore, since the senior party has been accorded the filing date of the French benefit application, we credit the senior party with a constructive reduction to practice as of 13 January 1989.

### Junior Party Case for Priority

The junior party involved patent was filed for after the filing date of the senior party's priority French application. Accordingly, for the junior party to prevail in a priority contest the junior party must prove priority of invention by a preponderance of the evidence. *See Peeler v. Miller,* 535 F.2d 647, 651 n.5, 190 USPQ 117, 120 n.5 (CCPA 1976). *Accord Bosies*

---

[5] *But see Tapia v. Micheletti v. Wignall,* 202 USPQ 123, 125 (Bd. Pat. Int. 1976)*(citing Gueniffet v. Wictorsohn,* 30 App. D.C. 432, 1908 C.D. 367, 369)(simple knowledge on the part of an agent for the inventor has been held not to be equivalent to an introduction of the invention into the United States). *Accord, Colbert v. Lofdahl,* 21 USPQ2d 1068, 1071 (Bd. Pat. App. Int. 1991).

Exhibit 2 page 148

Interference No. 102,923

*v. Benedict,* 27 F.3d 539, 541-42, 30 USPQ2d 1862, 1864 (Fed. Cir. 1994). *Cf. Price* at 1194, 26 USPQ at 1036.

Conception has been defined as the formation, in the mind of the inventor, of a definite and permanent idea of the complete and operative invention. *Coleman v. Dines,* 754 F.2d 353, 359, 224 USPQ 857, 862 (Fed. Cir. 1985) (quoting *Gunter v. Stream,* 573 F.2d 77, 80, 197 USPQ 482, 484 (CCPA 1978)). It is settled that in establishing conception a party must show every feature recited in the count, and that every limitation in the count must have been known at the time of the alleged conception. *Coleman* at 359, 224 USPQ at 862.

Neither conception nor reduction to practice may be established by the uncorroborated testimony of the inventor. See *Tomecek v. Stimpson,* 513 F.2d 614, 619, 185 USPQ 235, 239 (CCPA 1975). The inventor's testimony, standing alone, is insufficient to prove conception--some form of corroboration must be shown. *See Price* at 1194, 26 USPQ2d at 1036. While the "rule of reason" originally developed with respect to reduction to practice has been extended to the corroboration required for proof of conception, the rule does not dispense with the requirement of some evidence of independent corroboration. See *Coleman* at 360, 224 USPQ at 862. As the CCPA stated in *Reese v. Hurst,* 661 F.2d 1222, 1225, 211 USPQ 936, 940 (CCPA 1981): "[the] adoption of the 'rule of reason' has not altered the requirement that evidence of

17

Exhibit 2 page 149

corroboration must not depend solely on the inventor himself."
There must be evidence independent from the inventor
corroborating the conception.

The purpose for requiring some form of corroboration is to
prevent fraud. The full discovery now available in interferences
may be better able to root out fraud, but it is nevertheless
clear that not all frauds will be discovered. Nor can such
discovery substantially replace the protection against fraud that
the longstanding rule of independent corroboration provides.
*Reese* at 1226 n.4, 211 USPQ at 940 n.4.

Additionally, we acknowledge that there is no single formula
that must be followed in proving corroboration.  An evaluation of
all pertinent evidence must be made so that a sound determination
of the credibility of the inventor's story may be reached.  *Price*
at 1195, 26 USPQ2d at 1037.

If a party places reliance on an embodiment of the invention
in some physical form, such as a sketch or drawing, for proof of
conception, the existence of the embodiment at the time must be
established by testimony of a person other than the inventor.
*Moran v. Paskert*, 205 USPQ 356, 359 (Bd. Pat. Int. 1979). *Accord*
*Price* at 1196, 26 USPQ2d at 1038 (testimony of secretary that she
recalled seeing drawing as of critical date provides necessary
evidence corroborating testimony of inventor as to date of

18

Exhibit 2 page 150

Interference No. 102,923

conception). *See also, for conception,* 1 Rivise & Caesar,
*Interference Law and Practice,* § 126; 3 Rivise & Caesar,
*Interference Law and Practice,* § 542, *and for reduction to
practice,* §§ 543 & 544 (Michie Co. 1947).

The junior party alleges a conception on 17 March 1988. For
corroboration, the junior party relies on the testimony of
witnesses Ledvina and Dembosky. Witness Ledvina's answers about
when he first learned of the torque pulse embodiment are
equivocal. At BR-494, he first became aware of the torque pulse
embodiment in "March/April 1988." At BR-530, he became aware of
the concept through general discussions with the inventors in
"May-to-June 1988." Not only are the dates given contradictory,
they generally lack specificity. With regard to Dembosky, his
testimony is vague and self-contradictory. He testified that he
first learned of the torque pulse concept in "early summer 1988."
BR-516, 517. After the BR-517 testimony of early summer, in the
next sentence he states "April/May 1988." When a witness'
testimony merely places acts within a stated time period, the
witness has not established a date for his activities earlier
than the last day of the period. *See Oka v. Youssefyeh,* 849 F.2d
581, 584, 7 USPQ2d 1169, 1172 (Fed. Cir. 1988). Accordingly, in
view of the Dembosky testimony of "early summer" and the Ledvina
testimony of May to June 1988, we credit the junior party with a
corroborated conception as of the last day of June 1988. However,

19

Exhibit 2 page 151

Interference No. 102,923

the exact date is not particularly an issue, as we merely note that the testimony establishes a junior party conception date well before the conception date proved by the senior party.

Having noted that the junior party has shown, by a preponderance of the evidence, a conception prior to the conception date of the senior party, on this record, it is our determination that the junior party has not established an actual reduction to practice, has not established diligence toward a reduction to practice, and has not provided any corroboration of diligence.

It is our view that the junior party has not established an actual reduction to practice, by this record, for several reasons. The junior party alleges an actual reduction to practice on the 14th, 23rd or 24th of February 1989. See junior party main brief at 43-45.

It is well established that proof of actual reduction to practice requires demonstration that the embodiment relied upon as evidence of priority actually worked for its intended purpose. *Newkirk v. Lulejian*, 825 F.2d 1581, 1582, 3 USPQ2d 1793, 1794 (Fed. Cir. 1987). It is equally well established that every limitation of the interference count must exist in the embodiment and be shown to have performed as intended. *Id*. This is so even if the "intended" purpose is not explicitly set forth in the count(s) of interference. *DSL Dynamic Sciences Ltd. v. Union*

20

Exhibit 2 page 152

Interference No. 102,923

*Switch & Signal, Inc.,* 928 F.2d 1122, 1125, 18 USPQ2d 1152, 1154
(Fed. Cir. 1991). The intended environment can be ascertained,
for example, from a party's involved specification. *Tomecek v.
Stimson,* 513 F.2d 614, 618, 185 USPQ 235, 239 (CCPA 1975).

In this case, of course, the intended purpose or use of the
invention is expressly set forth in the count. The intended
purpose of the subject matter is for varying the camshaft timing
in an internal combustion engine. Therefore, it is our view that
the testing of a device on a test stand outside the environment
of an internal combustion engine is not a test of the subject
matter for its intended use. Secondly, the requirement that every
limitation in the subject matter of the count be present and be
shown to work as intended was not satisfied, since the electric
test motor was substituted for the internal combustion crankshaft
required by the count. Moreover, the proposition argued by the
senior party--that a reduction to practice of an invention for
use in an internal combustion engine generally requires testing
in such an engine--is given some credence. To the cases cited by
the senior party on page 53 of his brief[6] might be added the

---

[6] *Knapp v. Anderson*, 477 F.2d 588, 177 USPQ 688 (CCPA 1973)
(lubricant composition for dispersing sludge in engines; no
correlation shown between bench tests and actual service
conditions in an internal combustion engine); *Payne v. Hurley*,
71 F.2d 208, 21 USPQ 624 (CCPA 1934)(laboratory tests on spark
plugs failed to fulfill the conditions which they must meet in
(continued...)

21

Exhibit 2 page 153

Interference No. 102,923

cases of *Burns v. Curtis*, 172 F.2d 588, 590, 80 USPQ 587, 588
(CCPA 1949)(fuel pump for internal combustion engine driven by
electric motor at constant speed and not by combustion engine at
varying speeds was not reduced to practice) and *Chandler v. Mock*,
150 F.2d 563, 565, 66 USPQ 209, 211 (CCPA 1945)(fuel supply means
for an internal combustion engine was not reduced to practice
without actual test even though the interference count was not
limited to use with an engine).

Additionally, there is substantial evidence that the tests
relied on were not successful. For example, in the first test,
that of 14 February, the pistons did not initially work due to
their cylinders being filled with air. While the mechanism would
advance and retard, it would not stabilize in position. The check
valves in the system were damaged during the testing having
"popped there [sic] tops." BX-67. Finally, the bracket was
"severely damaged" and had to be rebuilt in the machine shop. *Id.*
On 23 February, the bracket would not stabilize at low RPM (500)
and the bracket vibrated severely. BX-69. At extreme advanced or
retarded position, when the spool valve was in the neutral
position, the device would go unstable and bounce off the
mechanical stops. *Id.* At relatively low oil pressure the device

_____

[6](...continued)
service); *Jardine v. Hartog*, 36 F.2d 606, 4 USPQ 281 (CCPA
1930)(engine pistons).

22

Exhibit 2 page 154

Interference No. 102,923

would not advance the camshaft timing. *Id*. BX-70 adds the further detail that with oil pressure below 30 psi the device would advance the camshaft timing slowly or not at all. We further note that Butterfield testified the working range of the device with respect to oil pressure was between 5 and 80 psi. With respect to tests on 24 February, the device was very slow to advance at high speeds and the bracket was unstable at low speeds. BX-73.

Additionally it was learned on about 10 March 1989 that all the previous tests had been conducted with the check valves, an essential part of the hydraulic means of the count, installed in a reversed orientation to that intended. BR-123.

In the reply brief, the junior party emphasizes the testimony of test engineer Dembosky. Dembosky insisted that these tests proved that the "general concept was successful." However, showing that a general concept might be successful is not the standard for a successful reduction to practice. The device must actually work for its intended purpose. Dembosky's testimony is contradicted both by the test reports, summarized above, and by BX-71, a report labeled Test Priorities and dated 24 February 1989 by inventor Smith. The first line states: "Ron: The testing of the hydraulic pulse to date has revealed we do not have a feasible design yet." On this record, the junior party has failed to establish an actual reduction to practice as alleged in their brief.

23

Exhibit 2 page 155

Interference No. 102,923

Inasmuch as one who is first to conceive but the last to reduce to practice is chargeable with diligence from immediately prior to the time the later inventor entered the field, *Wilson v. Sherts,* 81 F.2d 755, 762, 28 USPQ 379, 386 (CCPA 1936), *Gould v. Schawlow,* 363 F.2d 908, 911, 150 USPQ 634, 637 (CCPA 1966), it is incumbent on the junior party to show such diligence in the critical period. Furthermore, during this period there must be "reasonably continuous activity." *Burns v. Curtis,* 172 F.2d 588, 591, 80 USPQ 587, 588-89 (CCPA 1949). Considering the record as a whole, it is our determination that the junior party has not shown the requisite diligence. As determined above, the senior party entered the field with a conception on 28 October 1988. Additionally, since we have determined, *supra*, that the junior party has not proved an actual reduction to practice, the critical period for which diligence must be shown by the junior party is from just prior to the 28 October 1988 date until the junior party's constructive reduction to practice date of 16 October 1989.

The record established by the junior party is replete with unexplained gaps in the junior party assignee's activities with regard to the invention. One such unexplained gap in activity, as clearly established in the record, occurs at the precise time the senior party entered the field. Butterfield's testimony

24

Exhibit 2 page 156

Interference No. 102,923

BR72/BR-75 does not even allege activity in the critical period between the design review meeting with Ford BX-43 on 19 October 1988 and the date of the Drawing BX-44 on 03 November 1988. Other unexplained gaps in activity include the periods of 04 November to 15 November, BX-44, BX-46; and 30 November to 13 December, BX-49, BX-50. While we acknowledge testimony by Butterfield and Smith of a general nature, e.g., BR-442, that work was occurring "in the October/November time frame", or BR-84, "parts were built in late December and January '88 and '89", such evidence which is of a general nature to the effect that work was continuous and which has little specific as to dates and facts does not constitute the kind of evidence required to establish diligence in the critical period. *Kendall v. Searles,* 173 F.2d 986, 993, 81 USPQ 363, 369 (CCPA 1949).

Secondly, the junior party has not adduced any corroborating evidence with respect to the critical period. Ledvina and Dembosky are silent with respect to activities of the junior party's assignee during the critical period. In this respect, junior party has misinterpreted the so-called "rule of reason." As quoted above, the rule does not dispense with the requirement of some evidence independent of the inventors. Of course, a

25

Exhibit 2 page 157

Interference No. 102,923

requirement of the law of reasonable diligence is the necessity
of providing adequate corroboration of that diligence. *See Gould*
at 919, 150 USPQ at 643.

Since we have determined that the junior party, although the
first to conceive, did not show reasonable diligence after the
entry of the senior party into the field and has not established,
by this record, an actual reduction to practice, we will enter
judgment in this interference in favor of the senior party.

### Judgment

Judgment in this interference is entered in favor of the
senior party, Jean Melchior. Jean Melchior is entitled to a
patent containing claims 54, 55, 57 and 58, which claims
correspond to the count. Melchior is not entitled to a patent
containing claims 53 and 56, which claims correspond to the count
in interference, on the grounds of unpatentability.  Judgment is
entered against Roger P. Butterfield and Franklin R. Smith, the
junior party. Roger P. Butterfield and Franklin R. Smith are not
entitled to their patent claims 1 through 6, which correspond to

26

Exhibit 2 page 158

Interference No. 102,923

the count in interference, on the ground of priority of
invention, and they also are not entitled to claims 1 and 4 on
the additional ground of unpatentability.


IAN A. CALVERT                    )
Administrative Patent Judge       )
                                  )
                                  )
                                  )
WILLIAM F. PATE, III              )    BOARD OF PATENT
Administrative Patent Judge       )      APPEALS AND
                                  )     INTERFERENCES
                                  )
                                  )
JOHN C. MARTIN                    )
Administrative Patent Judge       )

27

Exhibit 2 page 159

Interference No. 102,923


Attorney for Junior Party:

Greg Dziegielewski et al.
Borg-Warner Automotive, Inc.
6700 18 1/2 Mile Road
P. O. Box 8022
Sterling Heights, MI  48311-8022


Attorney for Senior Party:

Douglas E. Jackson et al.
Larson & Taylor
727-23rd Street, South
Arlington, VA  22202

28

Exhibit 2 page 160

MAILED

APR 1 1 1996

PAT.&T.M. OFFICE
BOARD OF PATENT APPEALS
AND INTERFERENCES

Butterfield et al.          )

v.                          )          Paper No. 95

                            )          REDECLARATION
Melchior                    )

                            )          Interference No. 102,923

                            )

                            )

## Redeclaration

The interference is hereby redeclared to correct the obvious error in Paper No. 61.

The claims of the parties corresponding to count 2 are as follows:


Butterfield *et al.*:       Claims 1 through 6

Melchior:                   Claims 53 through 58


William F. Pate, III
Administrative Patent Judge
(703)308-9797


1

Exhibit 2 page 161

Interference No. 102,923


Junior Party:

Greg Dziegielewski et al.
Borg-Warner Automotive, Inc.
6700 18 1/2 Mile Road
P. O. Box 8022
Sterling Heights, MI  48311-8022


Senior Party:

Douglas E. Jackson et al.
Larson & Taylor
727-23rd Street, South
Arlington, VA    22202

2

Exhibit 2 page 162



PAPER NO. 96

UNITED STATES DEPARTMENT OF COMMERCE
**Patent and Trademark Office**
Address: BOX INTERFERENCE
COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

**MAILED**

**JUN 2 8 1996**

PAT. & T.M. OFFICE
BOARD OF PATENT APPEALS
AND INTERFERENCES

Telephone: (703)308-9797
Facsimile:  (703)308-7953

Interference No. 102,923

Butterfield et al
v.
Melchior

On April 11, 1996 the Board of Patent Appeal & Interferences rendered its decision on judgment.  To date this Office has not been notified of an appeal having been taken from the Board's decision.  If, contrary to the indication in the Office records, an appeal has been filed, a notice to that effect should be filed in this interference within ten (10) days from the present communication, giving the jurisdiction, title and number of the action.  Such response should be directed to the Board of Patent Appeals & Interferences.  In the absence of a response, it will be assumed that no appeal has been taken and the files herein will be returned to the examining groups.

ce

*Olivia M. Duvall*
Olivia M. Duvall, Sup'v Legal
Instruments Examiner
Board of Patent Appeals &
    Interferences
(703) 308-9846

Exhibit 2 page 163

Interference No. 102,923                                          -1-


The cases involved in this interference are:

<u>Junior Party</u>

Patentees: Roger R. Butterfield and Franklin R. Smith

Address: Rd. 2, Box 98, Interlaken, NY 14847
         37 Midline Road, Slaterville Springs, NY 14881

Serial No.: 07/422,353, filed 10/16/89, now Patent No. 5,002,023,
            issued 03/26/91

For: VARIABLE CAMSHAFT TIMING FOR INTERNAL COMBUSTION ENGINE

Assignee: Borg-Warner Automotive Transmission & Engine Components
          Corporation, Sterling Heights, MI 48311-8022, A
          Corporation of Delaware

Attorneys of Record: Thomas A. Meehan and Greg Dziegielewski

Associate Attorney: None

Accorded Benefit of: None

Address: Greg Dziegielewski
         Borg-Warner Automotive, Inc.
         6700 18-1/2 Mile Road
         P.O. Box 8022
         Sterling Heights, MI 48311-8022



<u>Senior Party</u>

Applicant: Jean F. Melchior

Address: 126 Bid du Montparnasse, 75 014 Paris, France

Serial No.: 07/576,451, filed 09/13/90

For: COUPLING FOR THE TRANSMISSION OF ALTERNATING TORQUES

Assignee: None

Attorneys of Record: Andrew E. Taylor, Walter C. Gillis,
          Marvin Petry, Thomas P. Sarro, Ross F. Hunt, Jr.,
          William E. Jackson, Harold L. Novick, Douglas E.
          Jackson, B. Aaron Schulman, Mark J. Guttag and
          Daniel C. Mallery

Exhibit 2 page 164

Interference No. 102,923                                    -2-


Associate Attorneys: None

Accorded Benefit of: France - 89 00366, filed 01/13/89; PCT
          FR90/00009, filed 01/05/90

Address. Larson & Taylor
          727-23rd Street South
          Arlington, VA 22202


Count 1


          In an internal combustion engine having a crankshaft,
at least one camshaft, the at least one camshaft being position
variable relative to the crankshaft and being subject to torque
reversals during the operation thereof, and means for varying the
position of the at least one camshaft relative to the crankshaft,
the method comprising:

          actuating means for varying the position of the at
least one camshaft relative to the crankshaft in reaction to
torque reversals in the at least one camshaft.

          The claims of the parties which correspond to this

count are:

          Butterfield et al:  Claims 1-6.

          Melchior:  Claims 53-58.


                                        James R. Boler
                                        Examiner-in-Chief
                                        (703) 557-4018

     JRB/raj

Rede letter
102 923
Paper # 95
(Considing area in paper 61)


Exhibit 2 page 165