# TAB  1

Not Reported in F.Supp.                                                      Page 1
1996 WL 467273 (N.D.Cal.), 41 U.S.P.Q.2d 1770
**(Cite as: 1996 WL 467273 (N.D.Cal.))**

H

**Motions, Pleadings and Filings**

United States District Court, N.D. California.
ADVANCED CARDIOVASCULAR SYSTEMS, INC.,
Plaintiff,
v.
MEDTRONIC, INC., Defendant.
MEDTRONIC, INC., Counter-Claimant,
v.
ADVANCED CARDIOVASCULAR SYSTEMS, INC.,
Counter-Defendant.
**No. C-96-0942 DLJ.**

July 24, 1996.

Timothy J. Malloy, Edward A. Mas, II, David D. Headrick,
McAndrews, Held & Malloy, Chicago, IL, Richard H.
Abramson, Hope L. Hudson, Heller, Ehrman, White &
McAuliffe, Palo Alto, CA, for Plaintiff.

Lynn J. Grano, Robins, Kaplan, Miller & Ciresi, San
Francisco, CA, Michael V. Ciresi, Robins, Kaplan, Miller &
Ciresi, Minneapolis, MN, Ernest I. Reveal, III, Robins,
Kaplan, Miller & Ciresi, Costa Mesa, CA, for Defendant.

ORDER

JENSEN, District Judge.

**\*1** On July 10, 1996, the Court heard argument on plaintiff's
motion to strike defendant's affirmative defenses and to
dismiss the counterclaim. Timothy J. Malloy, David D.
Headrick, and Edward A. Mas II of McAndrews, Held &
Malloy and Hope L. Hudson of Heller, Ehrman, White &
McAuliffe appeared on behalf of plaintiff Advanced
Cardiovascular Systems, Inc.; Michael V. Ciresi, Ernest I.
Reveal III, and Lynn J. Grano of Robins, Kaplan, Miller &
Ciresi appeared for defendant Medtronic, Inc. Having
considered the arguments of counsel, the papers submitted,
the applicable law, and the record in this case, the Court
hereby strikes without prejudice defendant's affirmative
defenses for invalidity and inequitable conduct and strikes
with prejudice defendant's affirmative defenses for failure to
state a claim, prosecution history estoppel, laches and
estoppel due to delay in prosecution, and patent misuse.

Defendant's counterclaim is dismissed to the extent that it
refers to those affirmative defenses stricken with prejudice.

I. BACKGROUND
A. *Factual Background and Procedural History*

Advanced Cardiovascular Systems, Inc. ("ACS") and
Medtronic, Inc. ("Medtronic") are both companies engaged
in developing, manufacturing, promoting, and selling
interventional medical devices, including rapid exchange
catheters used in percutaneous transluminal coronary
angioplasty ("PTCA") for treating coronary artery disease.
[FN1] These parties and others are currently involved in a
complex series of patent infringement suits. The Court has
ordered that all of the following cases be related pursuant to
Civil Local Rule 3-12(e).

> FN1. During a PTCA procedure, a balloon
> dilatation catheter is carried through the patient's
> vasculature over a guidewire to a point where
> deposits, or "lesions," in the coronary arteries have
> blocked or narrowed the arteries thereby restricting
> blood flow. Once the catheter is in place, the
> balloon is inflated to compress or break the
> material forming the lesion in order to open the
> restricted artery to improve blood flow.

On October 10, 1995, ACS filed two similar patent
infringement suits. The first, C-95-3577-DLJ, was brought
against Medtronic for infringement of Patent Nos.
5,040,548, 5,061,273, and 5,451,233 ("the '548 patent, "
"the '273 patent," and "the '233 patent," respectively). These
patents relate to certain kinds of "rapid exchange" catheters
that can be used for PTCA. The patents were issued to the
inventor, Dr. Paul G. Yock, pursuant to continuation
applications relating to an original patent application filed
on April 15, 1986. The rights to these patents were
subsequently licensed to ACS. ACS alleges that Medtronic's
"Falcon" rapid exchange PTCA catheters infringe on one or
more claims of the '548, '273, and '233 patents.

The second suit ACS filed on October 10, 1995,
C-95-3580-DLJ, was brought against SciMed Systems, Inc.
("SciMed"), for infringement of the '548, '273, and '233
patents, as well as for infringement of U.S. Patent No.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 2
1996 WL 467273 (N.D.Cal.), 41 U.S.P.Q.2d 1770
**(Cite as: 1996 WL 467273 (N.D.Cal.))**

5,350,395 ("the '395 patent"), all of which were issued to Dr. Paul G. Yock between August 20, 1990 and September 19, 1995. Plaintiff alleges that SciMed's "Express Plus" and "Express Plus II" rapid exchange PTCA catheters infringe on the named patents.

On March 12, 1996, ACS filed the present action, C-96-0942-DLJ, against Medtronic for infringement of U.S. Patent No. 5,496,346 ("the '346 patent"), claiming that Medtronic's "Falcon" rapid exchange catheter infringes one or more claims of the '346 patent. The '346 patent, entitled "Reinforced Balloon Dilatation Catheter With Slitted Exchange Sleeve and Method," was issued on March 5, 1996 in the names of the inventors, Michael J. Horzewski and Dr. Paul G. Yock. The '346 patent relates generally to rapid exchange balloon dilatation catheters which are used in PTCA for treating coronary artery disease.

**\*2** On March 12, 1996, ACS also filed a suit, C-96-0950-DLJ, against SciMed for infringement of the '346 patent. ACS claims that SciMed's "Express Plus II" and "Leap Express Plus" catheters infringe one or more claims of the '346 patent.

B. *Legal Standard*

1. *Motion to Dismiss*

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. The question presented by a motion to dismiss is not whether a plaintiff will prevail in the action, but whether she is entitled to offer evidence in support of her claim. *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974).

In answering this question, the Court must assume that plaintiff's allegations are true and must draw all reasonable inferences in plaintiff's favor. *Usher v. City of Los Angeles,* 828 F.2d 556, 561 (9th Cir.1987). Even if the face of the pleadings suggests that the chance of recovery is remote, the Court must allow her to develop her case at this stage of the proceedings. *United States v. Redwood City,* 640 F.2d 963, 966 (9th Cir.1981).

If the Court chooses to dismiss the complaint, it must then decide whether to grant leave to amend. In general, leave to amend is only denied if it is clear that amendment would be futile and "that the deficiencies of the complaint could not be cured by amendment." *Noll v. Carlson,* 809 F.2d 1446, 1448 (9th Cir.1987) (quoting *Broughton v. Cutter Laboratories,* 622 F.2d 458, 460 (9th Cir.1980) (per curiam)); *see Poling v. Morgan,* 829 F.2d 882, 886 (9th Cir.1987) (citing *Foman v. Davis,* 371 U.S. 178, 182 (1962)) (futility is basis for denying amendment under Rule 15).

2. *Motion to Strike*

Federal Rule of Civil Procedure 12(f) provides that "the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."

3. *Rule 8*

Civil Rule 8(a) requires that a pleading contain "(1) a short and plain statement of the grounds upon which the court's jurisdiction depends, unless the court already has jurisdiction and the claims needs no new grounds of jurisdiction to support it, (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks." "The key to determining the sufficiency of pleading an affirmative defense is whether it gives plaintiff fair notice of the defense." *Wyshak v. City National Bank,* 607 F.2d 824, 827 (9th Cir.1979).

4. *Rule 9(b)*

Civil Rule 9(b) requires that "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."

II. ARGUMENTS

On May 8, 1996, plaintiff ACS filed a motion to strike the affirmative defenses and to dismiss the counterclaim alleged in Medtronic's April 4, 1996 Answer to this suit, C-96-0942-DLJ. Medtronic's Answer alleges the following affirmative defenses: (1) failure to state a claim; (2)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 3
1996 WL 467273 (N.D.Cal.), 41 U.S.P.Q.2d 1770
(Cite as: 1996 WL 467273 (N.D.Cal.))

noninfringement; (3) invalidity and unenforceability of the '346 patent; (4) prosecution history estoppel; (5) laches and estoppel arising from delays in prosecuting the ' 346 patent; (6) inequitable conduct; and (7) patent misuse. Plaintiff moves to strike all of these defenses except the noninfringement defense. In addition, plaintiff argues that Medtronic's counterclaim should be dismissed to the extent that it incorporates the insufficient affirmative defenses.

A. *Affirmative Defenses*

1. *Failure to State a Claim*

**\*3** Plaintiff argues that this defense is insufficient, because plaintiff has adequately pled a claim of patent infringement, and because Medtronic's pleading does not satisfy Rule 8 of the Federal Rules of Civil Procedure.

Federal Rule of Civil Procedure 12(b) provides that the defense of failure to state a claim upon which relief can be granted may be "asserted in [a] responsive pleading" or "made by motion." If a court finds that the plaintiff has stated a valid claim, however, the court may strike the defense. *See Federal Savings and Loan Ins. Corp. v. Maio, 736 F.Supp. 1039, 1042 (N.D.Cal.1989).*

In order to state a claim of patent infringement, a plaintiff must allege that the defendant makes, uses, offers to sell, or sells the patented invention within the United States, during the term of the patent, and without the authority of the patent holder. *See* 35 U.S.C. § 271(a). Plaintiff here has pled that "ACS owns all rights, interests, and legal title to the '346 patent," Compl. at ¶ 8, and that "Medtronic has manufactured, used, offered for sale, sold or distributed PTCA catheters ... which infringe one or more claims of the '346 patent." Compl. at ¶ 11. For purposes of evaluating the sufficiency of pleadings, all averments must be taken as true and construed in the light most favorable to the pleading party. *Pillsbury, Madison & Sutro v. Lerner, 31 F.3d 924, 928 (9th Cir.1994).* Given that plaintiff has alleged the essential elements of patent infringement, the Court finds plaintiff's pleading sufficient and strikes this affirmative defense with prejudice.

2. *Invalidity and Unenforceability*

Medtronic asserts as an affirmative defense that the '346 patent " is invalid, void, and unenforceable for failure to satisfy the requirements of patentability contained in Title 35 United States Code, including but not limited to, sections 101, 102, 103, and/or 112." Answer at ¶ 16. Under Rule 8 of the Federal Rules of Civil Procedure, an affirmative defense must be pled with the minimal specificity necessary to give the plaintiff "fair notice" of the defense. *Wyshak, 607 F.2d at 827.* Since sections 101, 102, 103, and 112 provide numerous grounds for finding a patent invalid, defendant must provide a more specific statement of the basis for this defense in order to give ACS fair notice of the claims being asserted. Accordingly, the Court hereby strikes this affirmative defense without prejudice and grants leave to amend. [FN2]

> FN2. Defendant should note the Court's ruling on this issue in response to an identical motion brought by ACS in *Advanced Cardiovascular Systems, Inc. v. SciMed Systems, Inc.,* C-96-0950-DLJ. The Court has approved a proposed amended answer submitted by SciMed in response to ACS' motion to strike. The factual specificity of SciMed's amended invalidity defense would be sufficient in this case as well.

3. *Prosecution History Estoppel*

Both parties agree that Paragraphs 17 and 18 of Medtronic's Answer assert the defense of prosecution history estoppel. [FN3] According to Medtronic, "ACS is estopped from ignoring the representations it made and positions it took before the PTO [Patent & Trademark Office] in order to secure issuance of the '346 patent." Def's Opp. at 7:13-15. Plaintiff argues that these allegations should be stricken as a matter of law, because prosecution history estoppel is not a recognized defense to a claim for patent infringement.

> FN3. Paragraph 17 of the Answer alleges:
> ACS is precluded or estopped from claiming an interpretation or scope of any valid claim of United States Patent No. 5,496,346 so as to bring within the scope of that claim any balloon dilatation catheter manufactured and/or sold by Medtronic, in light of the relevant prior art.

Not Reported in F.Supp.                                                                    Page 4
1996 WL 467273 (N.D.Cal.), 41 U.S.P.Q.2d 1770
(Cite as: 1996 WL 467273 (N.D.Cal.))

Paragraph 18 of the Answer alleges:

The balloon dilatation catheters manufactured and/or sold by Medtronic do not infringe upon any valid claims of United States Patent No. 5,496,346 when those claims are properly construed in light of the relevant prior art and certain admissions, representations, and/or statements made by or on behalf of applicants in connection with prosecution of the applications resulting in the '346 patent.

*4 Prosecution history estoppel is a defense to the assertion of the doctrine of equivalents. The doctrine of equivalents provides that an accused product which does not literally infringe the claims of a patent may infringe the patent nonetheless, if the differences between the accused product and the claimed invention are so insubstantial that the accused product falls within the patent's "range of equivalence." Hilton Davis Chem. Co. v. Warner- Jenkinson Co., 62 F.3d 1512, 1516-22 (Fed.Cir.1995) (en banc), cert. granted, 116 S.Ct. 1014 (1996). "The essence of prosecution history estoppel is that a patentee should not be able to obtain, through the doctrine of equivalents, coverage of subject matter that was relinquished during prosecution to procure issuance of the patent." Hoganas AB v. Dresser Indus., Inc., 9 F.3d 948, 951-52 (Fed.Cir.1993). Since prosecution history estoppel is only applicable where the doctrine of equivalents has been raised as a means of constructing an infringement claim, prosecution history estoppel is not an affirmative defense. [FN4] Accordingly, the Court strikes with prejudice Paragraphs 17 and 18 from Medtronic's Answer. This ruling, however, does not preclude defendant from raising prosecution history estoppel should plaintiff assert a patent infringement claim based on the doctrine of equivalents.

FN4. In Carman Industries, Inc. v. Wahl, 724 F.2d 932, 942 (Fed.Cir.1983), the court made an off-hand reference to prosecution history estoppel as an affirmative defense. However, the remark was made in the context of finding that a party cannot raise the defense of prosecution history estoppel for the first time on appeal. Therefore, this case does not specifically authorize pleading prosecution history estoppel as an affirmative defense.

4. Laches and Estoppel from Delay in Prosecution

Paragraph 19 of Medtronic's Answer pleads the following affirmative defense:

[The '346 patent] is invalid, unenforceable and/or void under the doctrines of estoppel and laches, and due to the unreasonable, improper and undue delay in the prosecution of this patent. In summary, the conception of the alleged invention claimed in the '346 patent occurred sometime prior to January 1987, yet the claims that appear in the '346 patent were not first asserted until well after that date.

According to plaintiff, this pleading fails to satisfy the fair notice requirement of Rule 8, does not allege the elements of laches or estoppel, and does not allege a cognizable defense to a claim of patent infringement.

To invoke a defense of laches, a defendant must allege "neglect or delay in bringing suit to remedy an alleged wrong, which taken together with lapse of time and other circumstances, causes prejudice to the adverse party and operates as an equitable bar." A.C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020, 1028-29 (Fed.Cir.1992) (en banc). In the context of patent litigation, "[t]he period of delay is measured from the time the plaintiff knew or reasonably should have known of the defendant's alleged infringing activities to the date of the suit." Id. at 1032. The Federal Circuit has explicitly stated that "the period [of delay] does not begin prior to issuance of the patent." Id.; see also Stark v. Advanced Magnetics, Inc., 29 F.3d 1570, 1576 (Fed.Cir.1994) ("[T]he laches period does not accrue until [the] patent issues ..."). Since the only delay that can form the basis of a laches defense is delay between the issuance of the patent and the filing of the infringement action, defendant's theory of laches based on delay in prosecution of the patent is not cognizable.

*5 Furthermore, since there is no allegation that plaintiff violated any of the statutory or regulatory rules for prosecuting patents, there was no improper delay in the prosecution of this patent to justify a laches or equitable estoppel defense. [FN5] The '346 patent issued from a series of "continuation" applications relating back to the original

Not Reported in F.Supp.                                                                                    Page 5
1996 WL 467273 (N.D.Cal.), 41 U.S.P.Q.2d 1770
**(Cite as: 1996 WL 467273 (N.D.Cal.))**

application filed on January 6, 1987. Under 35 U.S.C. § 120, the prosecution of this patent dates back to the filing of the original application. *Transco Prods., Inc. v. Performance Contracting, Inc.,* 38 F.3d 551, 556 (Fed.Cir.1994). By providing this relation back doctrine, Congress evidenced a clear intent to regulate the timing of continuation applications. Accordingly, only Congress can determine what constitutes unreasonable delay in the filing of such an application. It is not for this Court to decide that the prosecution of a patent according to the rules of the PTO is unreasonable and inequitable. Since defendant's laches and equitable estoppel defenses ask the Court to make precisely this determination, the Court strikes these defenses with prejudice.

> FN5. To invoke a defense of equitable estoppel, a defendant must allege three essential elements: (1) the plaintiff, who usually must have had knowledge of the true facts, communicated something in a misleading way, either by words, conduct or silence; (2) the defendant relied upon that communication; and (3) the defendant would be harmed materially if the plaintiff is permitted to assert any claim inconsistent with his earlier conduct. *Aukerman,* 960 F.2d at 1041.

### 5. *Inequitable Conduct*

The doctrine of inequitable conduct renders a patent unenforceable and thereby provides a defense to a patent infringement suit, if the patent applicant acted inequitably before the PTO in prosecuting the patent. *Kingsdown Medical Consultants, Ltd. v. Hollister, Inc.,* 863 F.2d 867, 872 (Fed.Cir.1988), *cert. denied,* 490 U.S. 1067 (1989). Inequitable conduct includes fraud, deception, or failure to disclose material information. *Id.*

Under Rule 9(b), fraud defenses must be pled with particularity. Fed.R.Civ.P. 9(b). Rule 9(b) is designed to give an opposing party notice of particular misconduct. *Semegen v. Weidner,* 780 F.2d 727, 731-35 (9th Cir.1985). This court has previously held that Rule 9(b) should be applied to pleadings of inequitable conduct as well. *See Chiron Corp. v. Abbott Labs.,* 156 F.R.D. 219, 220 (N.D.Cal.1994). According to the court's reasoning, "a plain

reading of the Federal Rules, the weight of authority, and sound public policy all require that pleadings which allege inequitable conduct before the PTO comply with Rule 9(b)." *Id.*

Paragraph 20 of Medtronic's Answer alleges:

> Upon information and belief, United States Patent No. 5,496,346 is unenforceable because of the inequitable conduct in the prosecution of such patent, and specifically, the failure to disclose pertinent, material prior art of which applicants or person(s) acting on behalf of the applicants were aware with the intent to mislead the United States Patent and Trademark Office in its examination of the validity of the patent.

Since this allegation is essentially a fraud claim, defendant must plead this claim with the particularity required under Rule 9(b). Accordingly, defendant is required to "state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Schreiber Distributing v. Serv-Well Furniture Co.,* 806 F.2d 1393, 1401 (9th Cir.1986).

**\*6** Medtronic claims that it has met these requirements by identifying the time of the inequitable conduct as "during the prosecution of the '346 patent," the place as "in the PTO proceedings," and the nature of the alleged misconduct as "failure to disclose pertinent material prior art of which [ACS] was aware with the intent to mislead." Def's Opp. at 17:6-9. The Court does not find that Medtronic's general allegations satisfy the requirements of Rule 9(b). Most significantly, defendant has not provided the particulars of what ACS failed to disclose and the circumstances indicating ACS' intent to mislead the PTO. Therefore, the Court hereby strikes this defense without prejudice and grants leave to amend.

### 6. *Patent Misuse*

Defendant's patent misuse defense alleges that despite the fact that ACS "knows that [the '346 patent] is invalid and/or unenforceable, ... [ACS] nonetheless misuses such patent by willfully, deliberately, and intentionally asserting it against Medtronic in this action." Answer at ¶ 21. Under 35 U.S.C. § 271(d), a patent owner cannot be denied relief or found guilty of misuse simply by reason of seeking to enforce his

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.    Page 6
1996 WL 467273 (N.D.Cal.), 41 U.S.P.Q.2d 1770
**(Cite as: 1996 WL 467273 (N.D.Cal.))**

or her patent. Therefore, the crux of this defense is that ACS knew the patent was invalid or unenforceable at the time it filed this action. Since defendant has provided no factual basis for this pleading and has not opposed plaintiff's motion to strike the defense, the Court hereby strikes defendant's patent misuse defense with prejudice.

B. *Counterclaim*

Plaintiff argues that Medtronic's counterclaim should be dismissed pursuant to Rule 12(b)(6) to the extent that it incorporates insufficient affirmative defenses. As defendant concedes, if any affirmative defense is stricken, then the counterclaim cannot state a claim based on that defense. Therefore, in order to keep the law of this case clear, the Court hereby strikes from the counterclaim all references to defendant's affirmative defenses for failure to state a claim, prosecution history estoppel, laches and estoppel from delay in prosecution, and patent misuse.

## III. CONCLUSION

The Court hereby STRIKES WITH PREJUDICE defendant's affirmative defenses for failure to state a claim, prosecution history estoppel, laches and estoppel from delay in prosecution, and patent misuse. The Court STRIKES WITHOUT PREJUDICE defendant's affirmative defenses for invalidity and inequitable conduct. In addition, the Court STRIKES from the counterclaim all references to those affirmative defenses that have been stricken with prejudice. Any amended answer must be filed by August 16, 1996. [FN6]

> FN6. The Court notes that both parties have violated Civil Local Rule 3-4(c)(2), which requires that the written text of all papers presented to the Court for filing, including footnotes and quotations, be no less than pica size typewriting. In addition, all papers must be double-spaced and contain no more than 28 lines per page. Any violation of these rules is grounds for sanctions. *See* Civil Local Rule 1-4.

IT IS SO ORDERED.

1996 WL 467273 (N.D.Cal.), 41 U.S.P.Q.2d 1770

**Motions, Pleadings and Filings (Back to top)**

. 4:96CV00942 (Docket) (Mar. 12, 1996)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB   2

Westlaw.

Not Reported in F.Supp.2d                                                                                   Page 1
2000 WL 433505 (N.D.Cal.), 2000-1 Trade Cases P 72,890, 55 U.S.P.Q.2d 1011
**(Cite as: 2000 WL 433505 (N.D.Cal.))**

**c**

United States District Court, N.D. California.
Brent TOWNSHEND, Plaintiff,
v.
ROCKWELL INTERNATIONAL CORP. and Conexant
Systems, Inc., Defendants.
CONEXANT SYSTEMS, INC., Defendant and
Counterclaimant
v.
Brent TOWNSHEND and 3Com Corporation,
Counterdefendants
**No. C99-0400SBA.**

March 28, 2000.

*ORDER*

[ARMSTRONG](), J.

**\*1** Pending before the Court is Townshend's request for judicial notice (Docket 49-1), Townshend's motion to dismiss Conexant's first, second, third, fifth and sixth counterclaims and to strike Conexant's sixth and seventh affirmative defenses (Docket 47-1), 3Com's motion to dismiss Conexant's first, second, and third counterclaims (Docket 44-1), and 3Com's motion to strike Paragraphs 86, 87, and 99 from Conexant's answer (Docket 44-2). For the following reasons, the Court GRANTS Townshend's request for judicial notice. The Court GRANTS 3Com and Townshend's motion to dismiss Conexant's first, second, and third counterclaims and dismisses these claims without leave to amend. The Court GRANTS Townshend's motion to dismiss Conexant's fifth counterclaim with leave to amend and GRANTS Townshend's motion to dismiss Conexant's seventh affirmative defense with leave to amend. The Court GRANTS Townshend's motion to dismiss Conexant's sixth counterclaim without leave to amend and grants the motion to strike Conexant's sixth affirmative defense without leave to amend. The Court DENIES 3Com's motion to strike Paragraphs 86, 87, and 99.

*BACKGROUND*

Plaintiff Brent Townshend is the inventor of the technology underlying "56K modems." A 56K modem allows a computer user to access information at 56,000 bits per second ("56K"). In December 1994, Plaintiff filed a United States patent application for 56K modem technology.

In April 1996, Townshend entered into a licensing agreement with U.S. Robotics ("USR")--now part of 3Com Corporation--to make and sell the technology covered by Townshend's patents.

On October 14, 1997, Townshend commenced an action in the San Mateo Superior Court against defendant Rockwell and co-defendant Conexant Systems, Inc. (formerly known as Rockwell Semiconductor Systems, Inc.) asserting state claims for unfair competition, misappropriation of trade secrets, breach of contract and breach of confidence. Townshend alleged that Rockwell and Conexant Systems (collectively "Conexant") had misappropriated information which he had disclosed to them during negotiations over a possible licensing agreement in August 1995.

On September 1, 1998, September 15, 1998, and November 10, 1998, U.S. patents 5,801,695, 5,809,075, and 5,835,538 were issued to Townshend based on the 56K modem technology which he had developed. The 1996 licensing agreement between Townshend and USR provided that 3Com would have an option to purchase Townshend's patents between March 1, 1999 and March 31, 1999. On March 30, 1999, 3Com exercised its option to purchase Townshend's patents. In tandem with the exercise of that option, 3Com executed an Assignment and License Agreement granting all ownership rights back to Townshend, including the right to enforce the patents and collect damages for past infringement. Under the new agreement, 3Com retained only a non-exclusive license in the patents.

On January 27, 1999, Townshend obtained authorization from 3Com to file suit on the patents and filed a federal complaint against Rockwell and Conexant. On that same day, he dismissed the state case without prejudice.

**\*2** In the federal action pending before this Court, Townshend has asserted three claims of patent infringement and has reasserted the four state law claims that he dismissed in the state action. Defendant moved to dismiss the state claims, and this Court denied the motion on April 26, 1999.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                      Page 2
2000 WL 433505 (N.D.Cal.), 2000-1 Trade Cases P 72,890, 55 U.S.P.Q.2d 1011
**(Cite as: 2000 WL 433505 (N.D.Cal.))**

Conexant answered the complaint, asserting several counterclaims and affirmative defenses, which are at issue in the present motion. These allegations assert that Townshend and 3Com have engaged in antitrust violations, including Sections 1 and 2 of the Sherman Act and Cal. Bus. & Prof.Code § 17200 and that Townshend has engaged in inequitable conduct and patent misuse. Conexant alleges that 3Com conspired with Townshend to obtain invalid patents purporting to cover technology facilitating the operation of 56K PCM modem chipset products, to fraudulently procure an industry standard for the operation of these products which it claims requires Townshend's technology, to deny the technology to 3Com's competitors or condition the availability of the technology on reciprocal dealing with 3Com. See Answer ¶ 82.

The allegations are based on Conexant's contention that 3Com and Townshend lobbied the International Telecommunications Union ("ITU") to adopt an industry standard which embodied Townshend's technology. See Answer ¶ 93. Conexant also alleges that 3Com and Townshend submitted a proposed licensing arrangement to the ITU in September 1997 which violated the Patent Policy of the ITU's Standards Board. See id. Conexant further alleges that 3Com and Townshend did not disclose to the ITU that Townshend had filed a trade secret action in state court against Conexant or that Townshend intended to file a patent infringement suit against Conexant. See id. at ¶ 95. In February 1998, the ITU recommended adoption of the V.90 standard for 56K chipset modems. Conexant alleges that 3Com and Townshend have asserted that the V.90 standard incorporates Townshend's technology. Conexant argues that this assertion, combined with 3Com and Townshend's lobbying activities before the ITU and their proposed licensing terms, constitute anticompetitive conduct.

Townshend first requests judicial notice of (1) Conexant's filings before the Securities Exchange Commission ("SEC") and (2) specific records from the ITU. Townshend also moves to dismiss Conexant's first, second, and third counterclaims and moves to strike two affirmative defenses. Counterdefendant 3Com also brings a motion to dismiss Conexant's first, second, and third counterclaims and moves to strike three paragraphs (86, 87, and 99) from Conexant's

answer.

*ANALYSIS*
I. REQUEST FOR JUDICIAL NOTICE

LEGAL STANDARD

Fed.R.Evid. 201 provides that a judicially noticed fact is "one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." In a civil action or proceeding, the Court shall instruct the jury to accept as conclusive any fact judicially noticed. Fed.R.Evid. 201(g). Information requested to be judicially noticed must be relevant to the matter before the Court. See 29 Am Jur 2d Evid. § 25 (1994).

DISCUSSION

*3 Townshend has requested judicial notice of Conexant's SEC filings and records from the ITU. The request is unopposed.

Conexant's SEC filings contain statements regarding Conexant's market share for modem chipset products, which are relevant to Conexant's arguments regarding 3Com's market share in the 56K PCM modem product market. An SEC filing is a public document which can be readily verified. The Court finds that this filing presents information relevant to this action and that this information is capable of accurate and ready determination. The Court GRANTS Townshend's request for judicial notice of Conexant's SEC filings.

Townshend also requests that the Court take judicial notice of certain records from the ITU. The ITU records are relevant to this action given Conexant's allegations that 3Com and Townshend engaged in anti-competitive conduct by deceiving the ITU in connection with the patents at issue. Given the relevance of the ITU records and the lack of any challenge to the accuracy of this information, the Court GRANTS Townshend's request for judicial notice of the ITU records.

II. MOTION TO DISMISS COUNTERCLAIMS AND TO

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                   Page 3

2000 WL 433505 (N.D.Cal.), 2000-1 Trade Cases P 72,890, 55 U.S.P.Q.2d 1011

**(Cite as: 2000 WL 433505 (N.D.Cal.))**

STRIKE AFFIRMATIVE DEFENSES

LEGAL STANDARD

A. MOTION TO DISMISS

Under Federal Rule of Civil Procedure 12(b)(6), a motion to dismiss should not be granted unless it appears beyond a doubt that the non-moving party "can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). For purposes of such a motion, the pleading is construed in a light most favorable to the non-moving party and all properly pleaded factual allegations are taken as true. *Jenkins v. McKeithen,* 395 U.S. 411, 421 (1969); *Everest and Jennings, Inc. v. American Motorists Ins. Co.,* 23 F.3d 226, 228 (9th Cir.1994). Although the court is generally confined to consideration of the allegations in the pleadings, when the pleading is accompanied by attached documents, such documents are deemed part of the pleading and may be considered in evaluating the merits of a Rule 12(b)(6) motion. *Hal Roach Studios v. Richard Feiner & Co.,* 896 F.2d 1542, 1555 (9th Cir.1990).

"[A] document is not 'outside' the [pleading] if the pleading specifically refers to the document and if its authenticity is not questioned." *Branch v. Tunnell,* 14 F.3d 449, 453 (9th Cir.1994). Moreover, the Court may consider matters of which it may properly take judicial notice without converting the motion to dismiss to one for summary judgment. *Barron v. Reich,* 13 F.3d 1370, 1377 (9th Cir.1994) (records and reports of administrative bodies); *Emrich v. Touche Ross & Co.,* 846 F.2d 1190, 1198 (9th Cir.1988) (court records).

When the pleading is dismissed for failure to state a claim, "leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well Furniture Co.,* 806 F.2d 1393, 1401 (9th Cir.1986). Leave to amend is properly denied "where the amendment would be futile." *DeSoto Yellow Freight Sys.,* 957 F.2d 655, 658 (9th Cir.1992).

B. MOTION TO STRIKE

**\*4** Under Federal Rule of Civil Procedure 12(f), a court has the discretion to strike a pleading, or portions thereof. *Federal Savings and Loan v. Gemini Management,* 921 F.2d 241, 243 (9th Cir.1990). Rule 12(f) provides that a court "may order stricken from any pleading ... any redundant, immaterial, impertinent, or scandalous matter." "[T]he function of a rule 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial...." *Sidney-Vinstein v. A.H. Robins, Co.,* 697 F.2d 880, 885 (9th Cir.1983).

Motions to strike are disfavored, and should not be granted unless it is clear that the matter to be stricken can have no possible bearing upon the subject matter of the litigation. *Naton v. Bank of California,* 72 F.R.D. 550 (1976), citing 2A J. Moore, *Federal Practice,* Section 12.2(2) at 244429 (2d ed.1975). In addition, motions to strike are rarely granted in the absence of a showing of prejudice to the moving party. *See* 61 Am.Jur.2d Pleading § 505 (West 1999). However, if a pleading is deficient, the Court may strike the pleading and require the non-moving party to submit an amended pleading which includes more specific allegations. *See Farlow v. Union Central Life Insurance Company,* 874 F.2d 791 (11th Cir.1989) (granting leave to amend in conjunction with a motion to strike state law claims from a complaint); *Williams v. California 1st Bank,* 859 F.2d 664 (9th Cir.1988) (granting motion to strike affirmative defense and giving defendantleave to amend the defense as a counterclaim); *Miles v. Ertl Company,* 722 F.2d 434 (8th Cir.1983) (granting plaintiff leave to amend after striking the complaint). In addition, a court within this district has indicated the appropriateness of granting leave to amend in conjunction with a motion to strike allegations of inequitable conduct. *See Chiron v. Abbott Laboratories,* 156 F.R.D. 219, 222 (1994) (granting plaintiff's motion to strike an affirmative defense of inequitable conduct and providing defendants with the opportunity to amend their answer to plead the defense with the requisite particularity).

DISCUSSION

A. FIRST COUNTERCLAIM--SHERMAN SECTION 1

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 4

2000 WL 433505 (N.D.Cal.), 2000-1 Trade Cases P 72,890, 55 U.S.P.Q.2d 1011

**(Cite as: 2000 WL 433505 (N.D.Cal.))**

Both Townshend and 3Com have moved to dismiss the first counterclaim asserted by Conexant, which alleges conspiracy in restraint of trade in violation of Section 1 of the Sherman Act. An allegation of conspiracy pursuant to Section 1 of the Sherman Act requires (1) an agreement or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intend to harm or restrain competition, and (3) which actually injures competition. *See Les Shockley Racing v. National Hot Rod Assoc., 884 F.2d 504, 507 (9th Cir.1989).* In the first counterclaim, Conexant alleges that Townshend and 3Com have combined and conspired to obtain invalid patents, to deceive the ITU into incorporating Townshend's patent into the industry standard, to deny competitors access to this technology, to restrain competition, and to file this lawsuit in order to prevent Conexant from using Townshend's technology. *See Answer ¶ 104.*

1. Sufficiency of Conspiracy Allegation

**\*5** Both 3Com and Townshend move to dismiss Conexant's first counterclaim on the basis that licensors and licensees are legally incapable of conspiring under Section 1 of the Sherman Act. In response, Conexant argues the determination of whether these two entities are capable of conspiring is a question of fact which cannot be resolved in a 12(b)(6) motion to dismiss. Conexant also asserts that 3Com and Townshend have independent economic motivations which would make them legally capable of conspiring under the antitrust laws.

a) Question of Fact

In *Los Angeles Memorial Coliseum Commission v. National Football League, et al., 726 F.2d 1381, 1387 (9th Cir.1984),* the Ninth Circuit explained that "the nature of an entity and its ability to combine or conspire in violation of § 1 [of the Sherman Act] is a fact question." In that case, the Ninth Circuit affirmed the district court's rejection of a defense which asserted that the defendants were incapable of conspiring because they were a single entity. Given the Ninth Circuit's finding that the ability of an entity to enter a conspiracy is a question of fact, the Court finds that 3Com and Townshend's contention that they are incapable of entering into a conspiracy cannot be resolved in a 12(b)(6)

motion to dismiss.

b) Legal Capability to Enter Conspiracy

Even if the Court were to evaluate the allegations regarding 3Com and Townshend's capability to enter into a conspiracy, the case law regarding the ability of licensors and licensees to enter a conspiracy does not establish that 3Com and Townshend are legally incapable of conspiring under Section 1 of the Sherman Act.

3Com and Townshend rely on the Supreme Court's holding in *Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752 (1984)* for their position that they are legally incapable of conspiring under the antitrust laws. In *Copperweld,* the Supreme Court considered the issue of whether a parent company and its subsidiary could conspire under the Sherman Act and held that these two entities could not conspire. This holding was based upon the Supreme Court's reasoning that coordinated activity by parties who lack independent sources of economic power and separate interests did not warrant scrutiny under the antitrust laws. *Copperweld, 467 U.S. at 771.* The Court expressly limited its holding to parent companies and their subsidiaries and has not extended this holding to the licensor/licensee context, which is at issue in the motion before this Court. Because of the limited holding in *Copperweld,* the Court does not find that *Copperweld* requires a finding in this case that 3Com and Townshend are legally incapable of conspiring under the antitrust laws.

3Com and Townshend also rely upon a case within this district which held in the context of a motion for summary judgment that a patent holder and its exclusive licensee were legally incapable of entering into an antitrust conspiracy. *See Levi Case Co. v. ATS Products, 788 F.Supp. 428 (N.D.Cal.1992)* (Walker, J.). In *Levi Case,* the court granted summary judgment to a patentee and its exclusive licensee on the basis that they were legally incapable of engaging in the alleged conspiratorial acts in dealing with sublicensees.

**\*6** While the facts in *Levi Case* resulted in a finding by that court that a patent holder and its exclusive licensee were incapable of entering into a conspiracy with respect to their

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                Page 5
2000 WL 433505 (N.D.Cal.), 2000-1 Trade Cases P 72,890, 55 U.S.P.Q.2d 1011
(Cite as: 2000 WL 433505 (N.D.Cal.))

conduct with sublicensees, the court did not set forth a bright-line rule that patent holders and their licensees could never conspire. In fact, the *Levi Case* court explained that the relationship between a patent holder and its licensee *could* be a conspiracy in violation of the antitrust laws if the relationship "deprive[d] the marketplace of independent actors." *Levi Case,* 788 F.Supp. at 431.

The conspiratorial conduct alleged in this action involves "agreements [between 3Com and Townshend] to expand the market power conferred by Townshend's patents by (i) fraudulently obtaining from the ITU a standard incorporating those patents; (ii) using the market power conferred by that standard as leverage to acquire competitors' technology; and (iii) barring competitors from access to the patents they need in order to block them from manufacturing standard-compliant products, and thus, preventing them from competing in the relevant markets." Def Opp. at 9. Conexant asserts that 3Com and Townshend lack any *legitimate* joint interest which would justify a finding that 3Com and Townshend are incapable of entering into a conspiracy because "neither a patent owner nor its licensee has any business engaging in concerted action to create market power beyond that conferred by their patents." Def. Opp. at 9. [FN1]

> FN1. Conexant also argues that 3Com became a non-exclusive licensee in March 1999, which removes any shield from conspiracy liability conferred by *Levi Case. See* Def. Opp. at 9. However, Conexant has alleged conspiratorial acts occurring prior to March 1999, at a time period when the exclusive license was still in effect.

The *Levi Case* court explained that a patent holder and licensee could be legally capable of entering into a conspiracy if the alleged conduct deprived the marketplace of independent actors. Conexant has argued that Townshend and 3Com are independent actors [FN2] and has alleged that Townshend and 3Com acted jointly to unlawfully expand the market power conferred by Townshend's patents. The independent motivations of Townshend and 3Com combined with the allegations that Townshend and 3Com acted jointly with respect to Townshend's patents render 3Com and Townshend legally capable of entering a

conspiracy under the reasoning of *Levi Case.*

> FN2. At the hearing, Conexant represented that 3Com and Townshend are independent actors in that they have different interests with respect to the patented technology. 3Com, as a competitor in the market for products incorporating the patented technology, has an interest in excluding competitors, whereas Townshend, who does not manufacture or sell products incorporating the patented technology, does not share this interest. Townshend has represented that his interest in this action is to maximize the licensing revenue from his patents.

Because the question of capability to enter a conspiracy is a question of fact and because the case law does not establish that Townshend and 3Com are legally incapable of entering into a conspiracy under the factual circumstances alleged by Conexant, the Court finds that 3Com and Townshend's 12(b)(6) challenge to their capability to enter a conspiracy does not warrant dismissal of Conexant's first counterclaim.

2. Sufficiency of Allegations of Injury

Townshend and 3Com also challenge Conexant's counterclaim for conspiracy on the basis that the alleged antitrust injury is insufficient to state a claim under Section 1 of the Sherman Act. The allegations plead that 3Com and Townshend have used the market power conferred by the ITU standard to injure competition generally and to injure Conexant specifically.

a) Injury to Competition

**7** Conexant argues that the allegations of antitrust injury adequately plead that 3Com and Townshend have used the market power conferred by the ITU standard to injure competition generally because Townshend's Licensing Proposal sets out proposed terms which violate ITU's Telecommunications Standards Board (TSB) Patent Policy. Conexant alleges that the proposed terms of the Licensing Proposal violate TSB's Patent Policy by denying access to Townshend's technology or conditioning the availability of the technology on reciprocal dealing, by extracting

Not Reported in F.Supp.2d                                                                                      Page 6
2000 WL 433505 (N.D.Cal.), 2000-1 Trade Cases P 72,890, 55 U.S.P.Q.2d 1011
**(Cite as: 2000 WL 433505 (N.D.Cal.))**

cross-licenses at fixed, artificially low rates and by attempting to double-charge Conexant and its customers by requiring them each to pay a separate license fee for Townshend's patents. *See* Answer ¶¶ 93-99.

The issue before this Court is whether Conexant has adequately plead antitrust injury through its allegations that the licensing terms proposed by 3Com violate the TSB Patent Policy. The TSB Patent Policy provides that if a standardization proposal incorporates technology which is patented or is part of a pending patent application, the patent holder should either waive his rights or "be willing to negotiate licenses with other parties on a non-discriminatory basis on reasonable terms and conditions." *See* Rees Decl., Ex. A, App. 1, 1.2.2. However, the policy goes on to state that "such negotiations are left to the parties concerned and are performed outside the ITU-T (Standardization Sector)." *See id.* The ITU does not consider the substance of the licensing provisions in deciding whether or not to adopt a particular standard. Instead, the ITU assesses whether the patent holder is willing to negotiate such terms. If a patent holder is not willing to negotiate licenses, the TSB patent policy provides that "no Recommendation can be established." *See id.* at 1.2.3.

The ITU recommended the V.90 standard in February 1998 and ratified the standard in September 1998. The proposed licensing terms were submitted to the ITU in September 1997, before adoption of the V.90 standard occurred. As required by the TSB patent policy, 3Com stated its willingness to negotiate licenses by submitting a "Proposed Key Terms and Conditions for Licensing Patents Relating to an ITU-T Standard for V.PCM." *See* Rees Decl., Ex. B. This submission contains the proposed terms which Conexant now contends are discriminatory, unfair, and unreasonable. [FN3] Here, the ITU, whose members included Rockwell (Conexant's predecessor), adopted the V.90 standard after receiving 3Com's submission. The adoption of the V.90 standard by the ITU suggests that the ITU was satisfied that the proposed terms submitted by 3Com evidenced a willingness by 3Com to negotiate non-discriminatory, fair, and reasonable terms. [FN4]

> FN3. Conexant alleges that "[t]he Townshend Licensing Proposal, along with other

accompanying statements to the ITU, violated the rules of the TSB Patent Policy....3Com and Townshend ostensibly represented that Townshend was willing to negotiate licenses with other parties on a non-discriminatory basis." Answer ¶ 93.

> FN4. Conexant has also alleged that 3Com and Townshend failed to disclose Townshend's trade secret action to the ITU prior to adoption of the V.90 standard. Conexant, the defendant in the trade secret action, was a member of the ITU during this time and has not alleged any injury to competition resulting from this failure to disclose.

At the hearing and in its papers, Conexant has argued that the licensing terms are injurious to competition because 3Com and Townshend sought unfair royalty rates, double-charging of customers and manufacturers, mandatory cross-licenses, and reservation of the right to condition licenses on the resolution of litigation.

**\*8** Under the terms of the Patent Act, a patent owner has the legal right to refuse to license his or her patent to others. Pursuant to 35 U.S.C. § 271(d), "[n]o patent owner otherwise entitled to relief ... [shall be] deemed guilty of ... illegal extension of the patent right by reason of his having ... (4) refused to license or use any rights to the patent." 35 U.S.C. § 271(d). The Federal Circuit has indicated that "the antitrust laws do not negate a patentee's right to exclude others from patent property." *In Re Independent Service Organizations Antitrust Litigation,* 203 F.3d 1322 (Fed.Cir.2000) (internal quotations and citations omitted). Given that a patent holder is permitted under the antitrust laws to completely exclude others from practicing his or her technology, the Court finds that 3Com's submission of proposed licensing terms with which it was willing to license does not state a violation of the antitrust laws.

Even if the Court were to consider the unfair terms alleged by Conexant, the Court finds that these terms do not state an injury to competition. First, with respect to the proposed royalty rates, the Court notes the initial licensing proposal dated September 1997 sought a maximum $1.25 per-unit royalty for client-end products and a maximum $9.00 per-port royalty for server-end products. *See* Rees Decl., Ex.

Not Reported in F.Supp.2d                                                                                          Page 7
2000 WL 433505 (N.D.Cal.), 2000-1 Trade Cases P 72,890, 55 U.S.P.Q.2d 1011
**(Cite as: 2000 WL 433505 (N.D.Cal.))**

B at 4. In September 1998, after the V.90 standard had been adopted, 3Com submitted a revised licensing proposal which sought a maximum $1.25 per-unit royalty for client-end products and a maximum $2.50 per-port royalty for server-end products. *See* Rees Decl., Ex. C at 4. Conexant has not explained how the royalty rates state unfair terms. A patent owner's pursuit of optimum royalty income is not an act in restraint of trade which violates the antitrust laws. *See Genentech v. Eli Lilly,* 998 F.2d 931, 948 (Fed.Cir.1993). Second, with respect to the allegations of double-charging, Conexant alleges that the licensing proposal "purports to require both Conexant and its customers to each separately pay for a license." *See* Answer ¶ 98. Townshend argues that this allegation mischaracterizes the licensing proposal. The licensing proposal sets forth one royalty rate for client-end products and one royalty rate for server-end products. *See* Rees Decl., Ex. B and C. The proposal does not suggest that modem chipset manufacturers and modem chipset makers would each be obligated to pay royalties on the same product. In addition, an attempt to double-charge is prohibited under the doctrine of patent exhaustion. *See Intel v. ULSI System Tech.,* 995 F.2d 1566 (Fed.Cir.1993). Third, with respect to the mandatory cross-licensing provisions, Conexant has not identified any authority for the proposition that cross-licensing constitutes anticompetitive conduct. Generally, cross-licensing is considered a pro-competitive practice because it can facilitate the integration of complementary technologies. *See* U.S. Dep't of Justice and FTC, *Antitrust Guidelines for the Licensing of Intellectual Property* (1995). In fact, the terms of the licensing proposal indicate that 3Com sought cross-licenses for technologies which "are specified in the V.PCM Standard or are related to V.PCM technologies and are otherwise practically necessary or desirable, for technical or economic reasons, in order to make a commercially viable product compliant with the V.PCM Standard." *See* Rees Decl., Ex. B at 4. Based on this representation by 3Com and the lack of authority by Conexant in support of its argument that the cross-licensing practice is anticompetitive, the Court finds that this allegation does not state an antitrust injury. Finally, Conexant alleges that the licensing proposal purports to condition licenses on the resolution of litigation. Because a patent owner has the legal right to refuse to license his or

her patent on any terms, the existence of a predicate condition to a license agreement cannot state an antitrust violation. *See Genentech,* 998 F.3d at 949 (finding that a patentee's right to select its licensees is not an antitrust violation). The Court finds that the proposed licensing terms do not state an injury to competition in violation of the antitrust laws.

**\*9** In addition to alleging that the proposed licensing terms constitute injury to competition, Conexant has also alleged that the filing of Townshend's infringement suit is an antitrust injury resulting from a conspiracy between 3Com and Townshend. A patentee has the legal right to bring suit against those who infringe his or her patents. *See* 35 U.S.C. § 271. Conexant's allegations that Townshend initiated a patent infringement suit--without any additional allegations of anti-competitive aspects of this suit--does not state an antitrust injury, nor does it identify any antitrust injury caused by a conspiracy between 3Com and Townshend.

The Court finds that Conexant has not stated an injury to competition, either in its allegations regarding the proposed licensing terms or its allegations regarding the filing of Townshend's infringement suit. At the hearing on the motion, Conexant did not identify any other antitrust injury which it could allege in its answer.

b) Injury to Conexant

Conexant also argues that injury to itself is sufficient to allege injury to competition under Section 1. Injury to a competitor does not necessarily allege injury to competition. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477 (1977). Conexant must specifically indicate how the allegedly anticompetitive acts undertaken by Townshend and 3Com resulted in antitrust injury in order to state a claim. As indicated above, Conexant has not stated any allegations of antitrust injury.

The Court finds that Conexant's first counterclaim does not state a claim for conspiracy to restrain trade in violation of Section 1 of the Sherman Act. Conexant has not sufficiently alleged an antitrust injury or provided any arguments indicating that it could amend this counterclaim to add factual allegations to state an antitrust injury. 3Com and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 8
2000 WL 433505 (N.D.Cal.), 2000-1 Trade Cases P 72,890, 55 U.S.P.Q.2d 1011
**(Cite as: 2000 WL 433505 (N.D.Cal.))**

Townshend's motion to dismiss is GRANTED, and the first counterclaim is DISMISSED without leave to amend.

B. SECOND COUNTERCLAIM--SHERMAN SECTION 2

The second counterclaim is for attempted monopoly and conspiracy to monopolize in violation of Section 2 of the Sherman Act. A claim for attempted monopolization requires (1) a specific intent to control prices or to destroy competition in the relevant market; (2) predatory or anticompetitive conduct; and (3) a dangerous probability of achieving monopoly power; and (4) causal antitrust injury. *See McGlinchy v. Shell Chem Co., 845 F.2d 802 (9th Cir.1988).* A claim for conspiracy to monopolize requires (1) a conspiracy; (2) an attempt to monopolize; and (3) a causal antitrust injury. *See Morgan Strand Wheeler & Biggs v. Radiology, Ltd., 924 F.2d 1484 (9th Cir.1991).* Conexant alleges that 3Com and Townshend have willfully engaged in conduct creating a dangerous probability that 3Com will acquire and maintain monopoly power in the market for 56K modem chipset products and that 3Com and Townshend will acquire and maintain monopoly power in the related 56K modem technology market. *See* Answer ¶ 108. Conexant also alleges that 3Com and Townshend have acted with a specific intent to monopolize these markets. *See* Answer ¶ 109.

**\*10** This counterclaim concerns two relevant markets for 56K PCM modem chipsets: the "product" market and the "technology" market. Conexant defines the product market as "chipset devices which are capable of transmitting data and information over ordinary telephone lines at speeds up to 56 kilobits per second." Answer ¶ 78. Conexant defines the technology market as proprietary technology necessary to practice a 56K PCM modem and has explained that this market includes Townshend's patents as well as other proprietary technology.

1. Attempted Monopoly

The first allegation in Conexant's counterclaim is for attempted monopolization. An attempted monopolization claim requires (1) a specific intent to control prices or to destroy competition in the relevant market; (2) predatory or anticompetitive conduct; (3) a dangerous probability of

achieving monopoly power; and (4) causal antitrust injury. *See McGlinchy v. Shell Chem. Co., 845 F.2d 802 (9th Cir.1988).* In its opposition, Conexant concedes that the allegations related to attempted monopolization apply only to 3Com. *See* Def. Opp. at 12.

a) Specific Intent

A claim for attempted monopolization requires allegations of a specific intent to control prices or to destroy competition in the relevant market. *McGlinchy v. Shell Chem. Co., 845 F.2d 802 (9th Cir.1988).* Conexant argues that it has alleged the following facts to demonstrate anti-competitive intent: (1) 3Com and Townshend deceived the ITU by convincing the ITU to adopt an industry incorporating Townshend's patented technology and then refusing to license this patented technology to Conexant on fair terms; (2) 3Com prepared an internal memo in which 3Com officers indicated they would not make Townshend's technology available to Conexant. *See* Def. Opp. at 13; Answer ¶ 87.

With respect to the allegation of anti-competitive intent based upon deception of the ITU and subsequent refusal to license to Conexant, the Court finds that the alleged facts do not support an inference of anti-competitive intent. 3Com provided the ITU with the allegedly "unfair" licensing terms *before* the ITU adopted the V.90 standard, and 3Com stated its willingness to license with potential licensees in accordance with these terms. *See supra.* In addition, there is no allegation that 3Com has refused to license with Conexant in accordance with the proposed terms submitted to the ITU. The Court finds that 3Com's alleged conduct before the ITU does not support an inference of anti-competitive intent.

With respect to the 3Com memo, Conexant argues that this memo reveals that "3Com set out to abuse the market power *conferred upon it by the ITU standard*-- namely, by refusing to license Townshend's patents to Conexant in order to restrain trade and monopolize the relevant markets." Def. Opp. at 14 (emphasis added). The internal memo, which was written in 1996 before the V.90 standard was adopted, does not specifically discuss the ITU standard or any market power conferred by this standard. This allegation does not

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                        Page 9
2000 WL 433505 (N.D.Cal.), 2000-1 Trade Cases P 72,890, 55 U.S.P.Q.2d 1011
**(Cite as: 2000 WL 433505 (N.D.Cal.))**

support an inference of anti-competitive intent to abuse the market power conferred by the ITU standard.

**\*11** Conexant's counterclaim for attempted monopolization against 3Com does not provide allegations to support an inference of anticompetitive intent.

b) Anticompetitive Conduct

The second element in a claim for attempted monopolization is an allegation of anti-competitive conduct. Although the attempted monopolization claim is limited to 3Com, Conexant has identified the following anti-competitive conduct: 3Com and Townshend's conduct during the ITU standards-setting process, 3Com and Townshend's refusal to license Townshend's patents on fair terms and Townshend's current patent infringement suit against Conexant.

i) Conduct before the ITU

In support of its argument that 3Com's conduct before the ITU constitutes anti-competitive conduct, Conexant relies upon *In re Dell*, slip op., No. 931-0097 (LEXIS, Trade Library, FTC file). In that case, Dell lobbied a video electronics association for an industry standard incorporating Dell's patented technology but failed to disclose that it held this patent during its lobbying efforts. The Federal Trade Commission found that Dell's actions violated Section 5 of the FTC Act and issued a consent order prohibiting Dell from attempting to enforce the non-disclosed patent for a ten-year period.

*Dell* is not analogous to the instant case for several reasons. First, Townshend's patents issued after the ITU had adopted the V.90 standard, whereas in *Dell*, the patent owner had an issued patent at the time the standard-setting proceeding took place. 3Com informed the ITU that Townshend had pending patent applications covering 56K chipset modem technology, while the patent owner in *Dell* did not disclose the existence of the patent to the standards-setting organization. Conexant has not asserted that the ITU could have adopted a V.90 standard which did not encompass Townshend's technology, whereas in *Dell,* the standards-setting body was choosing among options, and

there was a possibility that they could have adopted a standard which did not incorporate Dell's patent. Because *Dell* is distinguishable from this case for several reasons, the Court finds that *Dell* does not provide support for Conexant's argument that 3Com's conduct before the ITU, including the proposed licensing terms, was anticompetitive. [FN5]

> FN5. 3Com makes the additional argument that if the Court were to find that this conduct is anti-competitive, its actions before the ITU would be immune from suit in light of the *Noerr-Pennington* doctrine. This doctrine confers immunity for acts that would otherwise be considered anti-competitive if these acts are directed towards influencing government action. Given the Court's finding that the conduct alleged by Conexant does not state any anti-competitive conduct by 3Com before the ITU, the Court does not reach the issue of Noerr-Pennington immunity.

ii) Refusal to License

Conexant next identifies 3Com's refusal to license on fair terms as an example of anticompetitive conduct. The Court again notes that 3Com made the proposed licensing terms and conditions--which Conexant now contends are unfair-- available to the ITU and its members before the V.90 standard was adopted. There is no allegation that 3Com has refused to license to Conexant in accordance with these proposed licensing terms and conditions. The Court finds that Conexant has not identified anti-competitive conduct by 3Com regarding refusal to license.

iii) Townshend's infringement suit

Conexant's third assertion is that the patent infringement suit filed by Townshend constitutes anticompetitive conduct sufficient to support a claim for attempted monopolization against 3Com. However, Conexant has conceded in its opposition that the attempted monopolization claim applies only to 3Com, not to Townshend. Def. Opp. at 12. The Court finds that this allegation does not state any anti-competitive conduct by 3Com.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2000 WL 433505 (N.D.Cal.), 2000-1 Trade Cases P 72,890, 55 U.S.P.Q.2d 1011
**(Cite as: 2000 WL 433505 (N.D.Cal.))**

*12 The Court finds that Conexant has not identified any anti-competitive conduct by 3Com in support of a claim for attempted monopolization.

c) Probability of Monopolization

The third element in a claim for attempted monopolization is an allegation of a dangerous probability of achieving monopoly power, which includes allegations regarding the market power held by the antitrust defendant.

i. Product Market

Conexant alleges that 3Com has a 50% share of the "product market." *See* Answer ¶ 81. The Ninth Circuit has indicated that market share is insufficient to show market power and has found that courts should also evaluate the presence of entry barriers and the inability of competitors to expand output. *See Rebel Oil Co., Inc., v. Atlantic Richfield Co., 51 F.3d 1421, fn 10 (9th Cir.1995)* (rejecting bright-line rule and finding that an analysis of market power should be decided by analyzing market share, entry barriers and the capacity of existing competitors to expand output). Here, Conexant has alleged that 3Com has a 50% market share in the product market and that this market contains entry barriers in the form of Townshend's patents and the ITU standard. These allegations satisfy two of the three criteria for *Rebel Oil.* However, Conexant has not alleged that competitors are unable to expand output, which is the third factor set forth by the Ninth Circuit in *Rebel Oil.* At the hearing, Conexant argued that the proposed licensing terms effectively prohibit competitors from building standard-complaint products, but Conexant has not demonstrated that it can allege facts to support this argument. There is no allegation that 3Com has refused to license Townshend's technology in accordance with the proposed terms submitted to ITU or that competitors are unable to license Townshend's technology in order to build standard-compliant products. Conexant has not alleged facts to show that competitors are unable to expand output, and as such, has not alleged that 3Com has a dangerous probability of monopolization in the product market.

ii. Technology Market

Conexant has not alleged any market share in the technology market. Instead, Conexant argues that under *Dell,* an industry standard confers market power, and because Townshend's patents are allegedly incorporated into the V.90 standard, these patents have market power in the technology market.

In *Dell,* the FTC recognized that an industry standard which incorporates patented technology can confer market power in a market for *products* incorporating the industry standard. However, the FTC did not consider the issue of whether this standard conferred market power in a market consisting of *proprietary technology.*

In a market consisting of proprietary technology necessary to practice a 56 K modem, any party who has secured proprietary rights to such technology (i.e.--a patent) possesses the legal right to exclude others from practicing technology which has been protected. *See 35 U.S.C. § 271.* The adoption of a industry standard incorporating such proprietary technology does not confer any power to exclude that exceeds the exclusionary power to which a.patent holder is otherwise logally entitled. Moreover, Conexant has not alleged that the adoption of the V.90 standard prevents the development of proprietary technology that could otherwise be developed.

*13 In the absence of allegations of market share in the technology market or allegations that the industry standard prevents the development of proprietary technology that could otherwise be developed, Conexant has not alleged that the alleged incorporation of Townshend's patents into the V.90 standard presents a dangerous probability of monopolization in the market for proprietary technology.

d) Causal antitrust injury

The fourth element of a claim for attempted monopolization is causal antitrust injury--an injury to competition caused by 3Com's conduct. As discussed in the analysis of the Sherman Section 1 counterclaim, Conexant has not alleged a sufficient injury under the antitrust laws and has not demonstrated that it can amend its answer to state additional factual allegations. *See supra.* The existence of the proposed licensing terms in and of themselves do not state injury to

Not Reported in F.Supp.2d                                                                                                      Page 11
2000 WL 433505 (N.D.Cal.), 2000-1 Trade Cases P 72,890, 55 U.S.P.Q.2d 1011
**(Cite as: 2000 WL 433505 (N.D.Cal.))**

competition.

The Court finds that Conexant's second counterclaim fails to state a claim against 3Com for attempted monopolization of either the product market or the technology market. The claims for attempted monopolization lack allegations of anti-competitive intent, anti-competitive conduct, a dangerous probability of achieving monopoly power, and causal antitrust injury, and Conexant has not demonstrated that it can amend these claims to cure the identified deficiencies. [FN6] The Court GRANTS 3Com and Townshend's motion and dismisses the counterclaim for attempted monopolization without leave to amend.

> FN6. Because Conexant has not demonstrated that it can allege injury to competition, any amendment to the other elements of a claim for attempted monopolization would be futile.

2. Conspiracy to Monopolize

The second counterclaim asserted by Conexant under Section 2 is conspiracy to monopolize, which generally requires (1) a conspiracy (2) an attempt to monopolize and (3) a causal antitrust injury. See *Morgan Strand Wheeler & Biggs v. Radiology, Ltd.,* 924 F.2d 1484 (9th Cir.1991).

a) Conspiracy

The first element in a claim for conspiracy to monopolize is an allegation of concerted action to monopolize a relevant market. As discussed in the analysis of the Section 1 counterclaim, the question of whether two entities are capable of conspiring under the antitrust laws is a question of fact, and the case law does not establish that a patent holder and licensee under the circumstances of this case are legally incapable of entering into a conspiracy. The Court finds that 3Com and Townshend's 12(b)(6) challenge to the sufficiency of Conexant's conspiracy allegation does not warrant dismissal of this claim.

b) Attempt to monopolize

The second requirement in support of a claim for conspiracy to monopolize is an allegation that the parties attempted to monopolize a relevant market. An attempt to monopolize

requires (1) a specific intent to control prices or destroy competition in the relevant market; (2) predatory or anticompetitive conduct; (3) a dangerous probability of achieving monopoly power; and (4) causal antitrust injury. See *McGlinchy v. Shell Chem. Co.,* 845 F.2d 802 (9th Cir.1988).

**\*14** As to 3Com, Conexant's allegations that 3Com attempted to monopolize the product market and the technology market [FN7] are deficient because they lack allegations of anti-competitive intent, anti-competitive conduct, a dangerous probability of achieving monopoly power, and causal antitrust injury. See *supra.*

> FN7. As previously noted, Conexant cannot maintain a Section 2 claim for monopolization of a "technology" market.

Conexant has conceded that it is not pursuing a claim for attempted monopolization against Townshend. Def. Opp. at 12. Given that Conexant is not pursuing a claim for attempted monopolization against Townshend, Conexant also cannot maintain a claim for conspiracy to monopolize against Townshend because a claim for conspiracy to monopolize includes an allegation of attempted monopolization as one of its elements. See *Morgan Strand Wheeler & Biggs v. Radiology, Ltd.,* 924 F.2d 1484 (9th Cir.1991). Conexant has not alleged Townshend is a market participant in either the product market or the technology market and has not alleged that Townshend had an intent to monopolize either market. The Court finds that the attempted monopolization element as to Townshend is deficient.

c) Causal antitrust injury

Finally, a claim for conspiracy to monopolize requires a causal antitrust injury. Conexant has failed to sufficiently allege an antitrust injury caused by 3Com or Townshend's conduct. See *supra.*

The Court finds that Conexant has failed to state a claim for conspiracy to monopolize against 3Com and Townshend. Conexant has failed to allege that 3Com and Townshend attempted to monopolize the product market or the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 12
2000 WL 433505 (N.D.Cal.), 2000-1 Trade Cases P 72,890, 55 U.S.P.Q.2d 1011
**(Cite as: 2000 WL 433505 (N.D.Cal.))**

technology market and has failed to allege any antitrust injury resulting from 3Com and Townshend's conduct. Conexant has not demonstrated that it can amend this claim to add additional factual allegations. The Court GRANTS 3Com and Townshend's motion and dismisses the counterclaim for conspiracy to monopolize without leave to amend.

## C. THIRD COUNTERCLAIM--UNFAIR COMPETITION

Conexant's third counterclaim asserts a claim for unfair competition in violation of Cal. Bus. & Prof.Code § 17200. 3Com and Townshend argue that because Conexant's federal claims are deficient, this state claim should be dismissed as well. Conexant contends that its third counterclaim should be maintained because California case law provides an interpretation of the term "unfair" which is broader than the federal antitrust laws. *See Cel-Tech Communications, Inc., v. L.A. Cellular, 20 Cal.4th 163 (1999).* In *Cel-Tech,* the California Supreme Court made the following finding:

When a plaintiff who claims to have suffered injury from a direct competitor's "unfair" act or practice invokes section 17200, the word "unfair" in that section means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition. 20 Cal.4th at 186- 87.

**\*15** In opposing the motion to dismiss, Conexant contends that its allegations in the § 17200 claim regarding 3Com and Townshend's "deception" before the ITU are sufficient to state a claim in that these allegations mirror the anti-competitive conduct engaged in by patent owner in *Dell.* The facts in *Dell* regarding a patent holder's failure to disclose an issued patent to a standard-setting body are distinguishable from the facts in this case, where 3Com notified the ITU of the Townshend's pending patent applications and submitted proposed licensing terms prior to the adoption of the standard. *See supra.* Under *Dell,* Conexant has not stated allegations of anti-competitive conduct.

In addition, the allegations regarding 3Com and

Townshend's conduct before the ITU do not otherwise meet the definition of "unfair" set forth in *Cel-Tech.* The allegations do not state that this conduct threatens an incipient violation of the antitrust laws, violates the policy or spirit of one of those laws, or otherwise significantly threatens or harms competition. Conexant has not alleged any injury to competition resulting from 3Com or Townshend's conduct. *See supra.* Conexant has also not demonstrated that it can amend this claim to allege facts regarding additional "unfair" practices other than the allegations of conduct before the ITU specifically referenced in the opposition. The Court DISMISSES the third counterclaim without leave to amend.

## D. INEQUITABLE CONDUCT

The fifth counterclaim alleges that Townshend engaged in inequitable conduct before the Patent and Trademark Office (PTO) in obtaining his patents. The seventh affirmative defense also alleges inequitable conduct. Townshend moves to dismiss the fifth counterclaim and to strike the seventh affirmative defense.

Allegations of inequitable conduct involve fraud and as such are subject to the heightened pleading requirements of Fed.R.Civ.P. 9(b). *Advanced Cardiovascular Systems, Inc. v. Medtronic, Inc., 41 U.S.P.Q.2d 1770 (N.D.Cal.1996)* (Jensen, J.). Specifically, a party asserting a claim for inequitable conduct is required to state the "time, place and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Advanced Cardiovascular Systems, 41 U.S.P.Q.2d at 1775* (citing *Schreiber Distributing v. Serv-Well Furniture Co., 806 F.2d 1393, 1401 (9th Cir.1996)*); see also *Sun Microsystems, Inc. v. Dataram Corp.,* 1997 U.S. Dist. LEXIS 4557 (N.D.Cal. Feb. 4, 1997) (Williams, J.) (finding that a claim of inequitable conduct should set forth details regarding when the misrepresentations or omissions took place, who made or failed to make the representations, and which patents are at issue). Here, Conexant has merely alleged that inequitable conduct took place in obtaining Townshend's patents. This allegation is insufficient for the heightened pleading standard required for fraud claims.

**\*16** The Court GRANTS Townshend's motion to dismiss

Not Reported in F.Supp.2d                                                                                       Page 13
2000 WL 433505 (N.D.Cal.), 2000-1 Trade Cases P 72,890, 55 U.S.P.Q.2d 1011
**(Cite as: 2000 WL 433505 (N.D.Cal.))**

the fifth counterclaim. In its opposition, Conexant indicates that it can cure this deficiency by alleging additional facts regarding an alleged misrepresentation by Townshend to the PTO during prosecution of U.S. Patent No. 5,801,695. *See* Def. Opp. at 21. The Court GRANTS Conexant's request to amend this claim to include specific allegations of fraud to support a claim of inequitable conduct.

Townshend also moves to strike Conexant's seventh affirmative defense, which asserts inequitable conduct. The Court GRANTS Townshend's motion to strike without prejudice to Conexant amending its answer to plead the defense of inequitable conduct with the requisite particularity.

### E. PATENT MISUSE

The sixth counterclaim and sixth affirmative defense allege that Townshend's patents are unenforceable due to patent misuse. Townshend moves to dismiss the sixth counterclaim and to strike the sixth affirmative defense.

The doctrine of patent misuse in an extension of the equitable doctrine of unclean hands, whereby a court of equity will not lend its support to enforcement of a patent that has been misused. *Braun v. Abbott Laboratories,* 124 F.3d 1419, 1427. (Fed.Cir.1997). The purpose of this doctrine is to restrain practices that draw "anticompetitive strength from the patent right." *Braun,* 124 F.3d at 1427.

The issue before the Court is whether Conexant has identified any anti-competitive practice by Townshend that is premised upon his patent rights. Conexant contends that the allegations regarding Townshend's conduct before the ITU and his proposed licensing terms provide sufficient allegations of anti-competitive conduct to state a patent misuse claim. *See* Def. Opp. at 20.

As the Court has previously discussed, these allegations do not identify any anti-competitive conduct. Pursuant to 35 U.S.C. § 271(d), a patentee is not deemed guilty of misuse or illegal extension of the patent right by refusing to license or use any rights to the patent. Because a complete refusal to license does not constitute patent misuse, the Court finds that a statement of proposed licensing terms, which

indicates a willingness to license in accordance with these terms, cannot constitute patent misuse. In addition, the ITU was aware of Townshend's pending patent applications and was also aware of the proposed licensing terms for Townshend's patented technology prior to adoption of the V.90 standard, and it made a decision to adopt the V.90 standard after it had received this information. *See supra.*

The Court finds that these allegations do not state anti-competitive conduct by Townshend, and as such, Conexant has not alleged a claim for patent misuse. Moreover, Conexant has not demonstrated that it can amend this claim to state additional factual allegations of anti-competitive conduct by Townshend. The Court GRANTS Townshend's motion to dismiss the sixth counterclaim without leave to amend and GRANTS Townshend's motion to strike the sixth affirmative defense without leave to amend.

### III. 3COM'S MOTION TO STRIKE

**\*17** 3Com moves to strike Paragraphs 86, 87, and 99 from Conexant's answer on the basis that these allegations improperly use 3Com confidential information in violation of a state court protective order entered into between the parties in the state court trade secret action filed by Townshend in San Mateo Superior Court.

At the time 3Com filed the motion to strike before this Court, it had also filed a motion in San Mateo Superior Court for contempt and for sanctions against Conexant for violating the protective order. *See* 3Com Reply, Ex. H. On October 21, 1999, the San Mateo Superior Court held a hearing on 3Com's motion for contempt and for sanctions and declined to consider the motion, citing a lack of jurisdiction and lack of standing because Townshend had dismissed the state action without prejudice. *See* Letter from Christopher Cavan to Court dated October 25, 1999.

The first issue before this Court is whether Conexant has violated the state court protective order. The state court order, which was entered into by Townshend and Rockwell on March 25, 1998, required that information designated as "Confidential" or "Highly Confidential--Attorney's Eyes Only" be used by the parties "solely in connection with this

2000 WL 433505 (N.D.Cal.), 2000-1 Trade Cases P 72,890, 55 U.S.P.Q.2d 1011
**(Cite as: 2000 WL 433505 (N.D.Cal.))**

litigation." 3Com Reply, Ex. H, Stipulated Protective Order ¶¶ 3, 4. The order further provided that "within sixty days after receiving notice of the entry of an order, judgment or decree finally disposing of this action, including any appeals therefrom, all persons having received information designated as "Confidential" or "Highly Confidential--Attorney's Eyes Only" hereunder shall return such material and all copies thereof to counsel for the producing party, or shall certify destruction thereof." *See id.* at ¶ 25. 3Com, as a third party to this action, signed a stipulation on June 11, 1998, agreeing to be bound by the state court order. *See* 3Com Reply, Ex. H.

In *On Command Video Corporation v. Lodgenet Entertainment Corp., 976 F.Supp. 917 (N.D.Cal.1997)* (Armstrong, J.), this Court interpreted a protective order which contained a provision stating that "any information designated as Confidential Information shall not be used by the other party for any purpose other than in connection with preparation of the parties [sic] analysis of issues presented in this litigation." *Lodgenet, 976 F.Supp. at 920*. In *Lodgenet,* the plaintiff obtained materials from the defendant under a protective order for a federal patent infringement suit and then filed a state court trade secret action which used confidential material from the protective order as the basis for its claims. This Court found that the plaintiff's actions violated the protective order because the purpose of the provision was to "limit the use of confidential information to this case. By using such information to file a separate lawsuit in another forum, plaintiff violated the plain terms of the [p]rotective [o]rder." *Lodgenet, 976 F.Supp. at 922*. Applying the reasoning of *Lodgenet* to 3Com's motion, the Court finds that Conexant has not complied with the literal terms of the state court order. Conexant has obtained confidential information from a trade secret action between Townshend and Conexant and has used this information in a federal forum to assert an antitrust counterclaim against 3Com. The protective order in the state action expressly provided that confidential information would be used "solely in connection with *this* litigation." *See* 3Com Reply, Ex. H, Stipulated Protective Order at ¶¶ 3, 4 (emphasis added). The protective order was entered into between the parties as plaintiff and defendant in Case No. 402639 in the San Mateo Superior Court. Pursuant to

*Lodgenet,* the state court protective order does not extend to the use of confidential information in the federal action.

**\*18** In addition, the state protective order provided that "within sixty days after receiving notice of the entry of an order, judgment or decree finally disposing of this action, including any appeals therefrom, all persons having received information designated as "Confidential" or "Highly ConfidentialAttorney's Eyes Only" hereunder shall return such material and all copies thereof to counsel for the producing party, or shall certify destruction thereof." *See id.* at ¶ 25. The state action was voluntarily dismissed by Townshend on January 27, 1999. In a letter to 3Com dated July 19, 1999, counsel for Conexant stated its intent not to return any confidential 3Com materials. *See* 3Com Reply, Ex. H. Because Conexant did not return confidential information to 3Com or certify destruction of this information within the time limitations set forth in the state court protective order, Conexant has technically violated the provision of this protective order regarding the return or destruction of information designated as "Confidential" or "Highly Confidential." However, the Court acknowledges that this technical violation is mooted by the fact that prior to the date required by the state court order for the return or destruction of this information, 3Com authorized the use of this information in the federal action. *See infra.*

The next issue before the Court is whether Conexant's non-compliance with the provisions of the state court protective order provides a basis for striking Paragraphs 86, 87, and 99 from Conexant's answer.

The record reflects that after the federal action was filed, counsel for Conexant contacted counsel for 3Com for its position on the use of Confidential and Highly Confidential information produced by 3Com in the trade secret action. 3Com responded to this inquiry on March 1, 1999 by indicating that it was not opposed to Conexant's use of documents produced by 3Com in response to subpoenas issuing out of the trade secret action, "provided that an identical Protective Order is entered" in the federal action. Lawrence Decl., Ex. 4.

On March 26, 1999, Magistrate Judge Zimmerman approved an interim protective order for this action. The

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                     Page 15
2000 WL 433505 (N.D.Cal.), 2000-1 Trade Cases P 72,890, 55 U.S.P.Q.2d 1011
**(Cite as: 2000 WL 433505 (N.D.Cal.))**

interim protective order adopted the state court protective order in its entirety and provided that the parties could "use in this lawsuit any discovery ....from the State Action as if the discovery had been provided in this lawsuit." Stipulation and Order Re: Entry of Protective Order and Cross Use of State Court Discovery ¶ 3 (Docket 18-1).

3Com does not dispute that it advised Conexant that it had no objection to the use of confidential information in the federal action provided that an identical protective order was entered. 3Com also does not dispute that the interim federal protective order is identical to the state court order. Instead, 3Com objects to the federal protective order on the grounds that it did not consent to this order and was not given notice or an opportunity to be heard.

**\*19** The Court finds that 3Com's objections regarding lack of consent, notice, and opportunity to be heard do not warrant a motion to strike. Conexant sought and obtained 3Com's position with respect to the use of confidential information in the federal action prior to any such disclosures being made. Further, Conexant entered into a federal protective order which fully accommodated 3Com's stated position. Finally, Conexant has complied with the terms of the federal protective order in the use of confidential information obtained by 3Com.

Under the terms of the federal protective order, the parties were permitted to use discovery obtained in the state court action. Conexant's statement of its intent to use confidential information obtained by 3Com and its allegations based upon this information are consistent with the terms of the federal protective order.

Although the Court finds that Conexant has not complied with the literal terms of the state court order, the Court further finds that Conexant acted appropriately and that the statements by 3Com and the subsequent actions taken by Conexant with respect to the federal protective order are compelling and adequately address 3Com's position regarding the use of confidential information in this action. The Court DENIES 3Com's motion to strike.

*CONCLUSION*

Townshend's request for judicial notice is GRANTED.

3Com and Townshend's motion to dismiss Conexant's first counterclaim alleging conspiracy to restrain trade is GRANTED WITH PREJUDICE.

3Com and Townshend's motion to dismiss Conexant's counterclaim alleging attempted monopolization and conspiracy to monopolize is GRANTED WITH PREJUDICE.

3Com and Townshend's motion to dismiss Conexant's counterclaim asserting a state law claim for unfair competition is GRANTED WITH PREJUDICE.

Townshend's motion to dismiss Conexant's counterclaim asserting inequitable conduct is GRANTED WITH LEAVE TO AMEND. Townshend's motion to strike Conexant's affirmative defense of inequitable conduct is GRANTED WITH LEAVE TO AMEND.

Townshend's motion to dismiss Conexant's counterclaim for patent misuse is GRANTED WITH PREJUDICE. Townshend's motion to strike Conexant's sixth affirmative defense of patent misuse is GRANTED WITH PREJUDICE.

3Com's motion to strike Paragraphs 86, 87, and 99 is DENIED.

Conexant shall submit an amended answer within twenty (20) days of the date of this order.

This matter is set for a telephonic case management conference on Thursday, May 4, 2000 at 3:00 p.m.

Plaintiff shall initiate the conference by calling chambers at (510) 637-3559. At least ten (10) days prior to the conference, the parties shall submit a case management conference statement. Failure to timely file such a statement may result in sanctions.

IT IS SO ORDERED.

2000 WL 433505 (N.D.Cal.), 2000-1 Trade Cases P 72,890, 55 U.S.P.Q.2d 1011

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB   3

LEXSEE 2003 U.S. DIST LEXIS 881

**TRUEPOSITION, INC. and KSI, INC., Plaintiffs/ Counterclaim Defendants v. ALLEN TELECOM, INC. Defendant/ Counterclaim Plaintiff.**

**C.A. No. 01-823 GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2003 U.S. Dist. LEXIS 881*

**January 21, 2003, Decided**

**SUBSEQUENT HISTORY:** As Amended September 4, 2003.

**DISPOSITION:** [*1] Motion to dismiss and/ or strike granted in part and denied in part. Claim dismissed.

**LexisNexis(R) Headnotes**

**COUNSEL:** For Trueposition Inc, KSI Inc, PLAINTIFFS: Donald F Parsons, Jr, Morris, Nichols, Arsht & Tunnell, Wilmington, DE USA.

For Allen Telecom Inc, DEFENDANT: John Leonard Reed, Timothy Ryan Dudderar, Duane Morris LLP, Wilmington, DE USA.

For Allen Telecom Inc, COUNTER–CLAIMANT: John Leonard Reed, Timothy Ryan Dudderar, Duane Morris LLP, Wilmington, DE USA.

For Trueposition Inc, KSI Inc, COUNTER–DEFENDANTS: Donald F. Parsons, Jr, Morris, Nichols, Arsht & Tunnell, Wilmington, DE USA.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Gregory M. Sleet

**OPINION:**

**MEMORANDUM AND ORDER**

**I. INTRODUCTION**

On December 11, 2001, the plaintiffs, TruePosition, Inc. and KSI, Inc. (collectively "TruePosition") filed a complaint against the defendant, Allen Telecom, Inc. ("Allen"). In the complaint, TruePosition alleges that Allen has infringed three of its patents, namely U.S. Patent No. 4,728,959 ("the '959 patent"), U.S. Patent

No. 6,108,555 ("the '555 patent"), and U.S. Patent No. 6,119,013 ("the '013 [*2] patent"). Each of these patents discloses a technology for locating cellular phones. In its Answer and Counterclaims (D.I. 6, 48), the defendant asserted six affirmative defenses to the plaintiffs' claims, as well as five counterclaims.

Presently before the court is TruePosition's Motion to Dismiss and/ or Strike the Defendant's Counterclaims III, IV, and V, and Affirmative Defenses III and VI (D.I. 58). For the following reasons, the court will grant in part and deny in part the plaintiffs' motion.

**II. STANDARDS OF REVIEW**

The plaintiffs move to dismiss Counterclaims III, IV, and V pursuant to *Federal Rule of Civil Procedure 12(b)(6)*. Dismissal is appropriate pursuant to this Rule if the complaint fails "to state a claim upon which relief can be granted." *FED. R. CIV. P. 12(b)(6)*. In this inquiry, the court must accept as true and view in the light most favorable to the non–movant the well–pleaded allegations of the complaint. *Doug Grant, Inc. v. Greate Bay Casino Corp., 232 F.3d 173, 183–84 (3d Cir. 2000)*. The court 'need not accept as true "unsupported conclusions and unwarranted inferences. "' *Id.* (quoting *City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 263 n.13 (3d Cir. 1998))* [*3] (quoting *Schuylkill Energy Res., Inc. v. Pennsylvania Power & Light Co., 113 F.3d 405, 417 (3d Cir. 1997))*. However, it is the duty of the court 'to view the complaint as a whole and to base rulings not upon the presence of mere words but, rather, upon the presence of a factual situation which is or is not justiciable.' *232 F.3d at 184* (quoting *City of Pittsburgh, 147 F.3d at 263)*.

The plaintiffs rely upon *Federal Rules of Civil Procedure 8* and *12(f)* for their motion to strike Affirmative Defenses III and VI. Rule 8 requires a "short and plain" statement of a claim or defense. *FED. R. CIV. P. 8(a)* and (b). It is well settled that the Federal Rules intend a liberal pleading standard. *See Leatherman v. Tarrant county Narcotic Intelligence & Coordination Unit, 507*

*U.S. 163, 168, 122 L. Ed. 2d 517, 113 S. Ct. 1160 (1993)* (holding that federal courts may not impose a more demanding standard of pleading beyond "the liberal system of 'notice pleading' set up by the Federal Rules"). Indeed, Rule 8 expressly mandates that "each averment of a pleading shall be simple, concise, and direct." *FED. R. CIV. P. 8(e).*

Rule 12(f) allows a court to [*4] strike "any insufficient defense" from any pleading. *FED. R. CIV. P. 12(f).* Motions to strike affirmative defenses are disfavored. *Proctor & Gamble Co. v. Nabisco Brands, Inc., 697 F. Supp. 1360, 1362 (D. Del. 1988).* When ruling on such a motion, "the court must construe all facts in favor of the nonmoving party ... and deny the motion if the defense is sufficient under the law." *Id.*

## III. DISCUSSION

### A. Counterclaim III

Counterclaim III alleges tortious interference with a contract. The plaintiffs move to dismiss the counterclaim pursuant to Rule 12(b)(6) on the grounds that it fails to plead an essential element of the alleged tort, namely, a breach of the relevant contract.

The tort of interference with a contract requires "an intentional act that is a significant factor in causing the breach of the contract." n1 *Cantor Fitzgerald, L.P. v. Cantor, 724 A.2d 571, 584 (Del. Ch. 1998).* Without a breach, there is no viable tortious interference claim. As to this point, Delaware law is well-settled. *See id.; see also Associated/Acc Int'l, LTD. v. Dupont Flooring Sys. Franchise Co., 2002 U.S. Dist. LEXIS 6464,* at *27–28 (D. [*5] Del. 2002); DeBakey Corp. v. Raytheon Serv. Co., 2000 Del. Ch. LEXIS 129, 2002 WL 1273317 (Del. Ch. 2000); Boyer v. Wilmington Materials, 1997 Del. Ch. LEXIS 97, 1997 WL 382979 (Del. Ch. 1997); Irwin & Leighton, Inc. v. W.M. Anderson Co., 532 A.2d 983, 992 (Del. Ch. 1987).* There is no discussion in these cases as to behavior that could constitute tortious interference when no breach of contract occurs. Presumably, this is because there is no conduct that could constitute the tort of interference with a contract, unless a breach of that contract results. n2

> n1 Contrary to the defendant's paraphrasing, the court did not style this element as requiring only some kind of interference and no resultant breach. *See* Answering Brief at 9.
>
> n2 Although the defendant acknowledges that "a review of the relevant case law shows that the cases are universally precipitated by a breach of contract," it maintains that "the absence of a to-

tal breach does not foreclose recovery for damages caused by improper interference." Answering Brief at 10–11. This assertion is unpersuasive as it applies to interference with a contract, particularly given Allen's conspicuous failure to cite any supporting caselaw for it. Furthermore, Allen's contention that a breach of contract is not required in such a case because "the applicable tort here is, for a reason, labeled 'tortious *interference* with contractual relations' not 'tortious *breach* of contractual relations,'" Answering Brief at 12 n.5 (emphasis added), is astounding in its fatuity. The tort is not labeled "tortious breach of contractual relations" because a non–party to a contract generally is not bound by the contract and thus can not breach the contract. *See, e.g., Traffas v. Bridge Capital Investors II, 1993 U.S. Dist. LEXIS 12028, 1993 WL 339293 (D. Kan. 1993),* at *3 ("It would be a novel holding for the court to rule that a breach of contract action can be maintained against a person who is not a party to the contract being sued upon ... A party to a contract cannot sue a person who is not a party to that contract for breach of contract."); *Credit Gen. Ins. Co. v. Midwest Indem. Corp.,916 F. Supp. 766, 772 (N.D. Ill. 1996)* (finding "ludicrous" the defendants' contention that a non–party to a contract can breach that contract).

[*6]

In this case, the contract at issue is between AT&T Wireless Services, Inc. ("AT&T") and Allen for the purchase of Allen's wireless location systems, which systems are the subject of the present patent infringement suit. In its counterclaim, Allen alleges that the plaintiffs, by filing the present suit and by publicizing it, intended to cause a breach of the AT&T contract. Answer and Counterclaims (D.I. 48) PP 17–18. This is insufficient to state a claim of tortious interference with a contract because, as the defendant concedes, there has been no breach of the AT&T contract. n3 Answering Brief at 10. Therefore, Counterclaim III must be dismissed.

> n3 The court is mindful of Allen's contention that "much of this may ... be a matter of semantics." Answering Brief at 12 n.6. Allen argues that, because the original AT&T contract was modified subsequent to TruePosition's initiation of the present suit, it suffered a complete loss of the original anticipated contract. *Id.* Apparently, Allen wishes the court to view this "loss" as a breach. However, a mutual modification of a contract certainly is not a breach. *See, e.g., Anderson v. Golden, 569 F. Supp. 122, 140 (S.D. Ga. 1982)* (distinguish-

ing between breach and mutual modification). To the extent such a loss represents the loss of an economic expectation, the corresponding tort is interference with a prospective business opportunity. The court reiterates that Delaware law requires a breach to sustain the tort of interference with a contract.

[*7]

**B. Counterclaim IV**

Counterclaim IV alleges tortious interference with prospective business opportunities. The elements of this tort are: '(a) the reasonable probability of a business opportunity, (b) the intentional interference by defendant with that opportunity, (c) proximate causation, and (d) damages, all of which must be considered in light of a defendant's privilege to compete or protect his business interests in a fair and lawful manner.' *DeBonaventura v. Nationwide Mut. Ins. Co., 428 A. 2d 1151, 1153 (Del. 1981)* (quoting *DeBonaventura v. Nationwide Mut. Ins. Co., 419 A.2d 942, 947 (Del. Ch. 1980)*) (citations omitted). The plaintiffs move to dismiss the counterclaim on the grounds that the defendant cannot prove all of the required elements, namely, a prospective business opportunity, or an interference with that opportunity.

The only "prospective business opportunity" at issue in the counterclaim is the AT&T contract. As stated above, the defendant acknowledges a completed and continuing contract with AT&T. Allen's expected business opportunity, thus, appears to have been consummated before the allegedly tortious conduct of the plaintiffs. [*8] This is particularly true because the "probability of the business opportunity must be assessed at the time of the alleged interference." *Malpiede v. Townson, 780 A.2d 1075, 1099 (Del. 2001)*. In this case, the alleged interference occurred after Allen had been awarded the contract with AT&T. Answer and Counterclaims (D.I. 48) P 17.

Allen maintains, however, that the plaintiffs' interference caused a modification of the expected contract terms. Following TruePosition's commencement of a patent infringement action against Allen and a press release announcing the same, Allen allegedly incurred additional legal expenses in renegotiating certain provisions of the AT&T contract, more onerous indemnification terms in the contract, and damages to its reputation. Thus, Allen contends, TruePosition's actions interfered with its expected business opportunity in that the final terms of the AT&T contract differed from the original terms. For purposes of this motion only, this is sufficient to state a claim of tortious interference with prospective business opportunities. *See McHugh v. Board of Educ., 100 F. Supp. 2d 231, 247 n.15 (D. Del. 2000)* (noting that the [*9] tort

requires "a valid business relationship or expectancy" and citing cases).

Assuming that these facts constitute a sufficient interference, the counterclaim may be challenged on other grounds, namely, that Allen has not shown that the plaintiffs engaged in any wrongful conduct. To sustain the tort of interference with a business opportunity, the interference must have been improper. *Bohatiuk v. Delaware Chiropractic Servs. Network, L.L.C., 1997 Del. Super. LEXIS 215, at *8–10 (Del. Super. 1997)*. The conduct at issue is the filing of a patent infringement suit and the public announcement of the suit by a press release. Normally, lawful actions cannot form the basis of a claim of tortious interference, particularly in light of TruePosition's "privilege to compete and protect its own business interests." *Acierno v. Preit–Rubin, Inc., 199 F.R.D. 157, 164–65 (D. Del. 2001)* (dismissing tortious interference with contractual relations claim because defendant corporation and real estate investment trust, in failing to affirmatively suggest to County that competitor plaintiff's property be included in a traffic impact study, committed no wrongful conduct) [*10] (citing caselaw). In this case, however, the defendant also has alleged the counterclaim of "sham litigation." In the sham litigation context, the mere initiation of a lawsuit may be wrongful if it constitutes unlawful antitrust activity. Because the court will allow the "sham litigation" counterclaim to stand, *see infra* Section I.C., the tortious interference with a prospective business opportunity claim must survive as well. It is axiomatic that if the defendant can prove that the instant lawsuit is merely a "sham" and violative of antitrust law, then the filing of the lawsuit constitutes improper conduct. Therefore, in the interest of consistency, and viewing the pleadings in the light most favorable to Alien, Counterclaim IV survives the instant motion to dismiss.

**C. Counterclaim V**

TruePosition moves for the dismissal of Counterclaim V, which alleges "sham litigation," on the grounds that such a cause of action does not exist. The term "sham litigation" refers to an exception to the doctrine of antitrust immunity. Immunity to certain antitrust suits was established by the Supreme Court in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 5 L. Ed. 2d 464, 81 S. Ct. 523 (1961)*, [*11] and *Mine Workers v. Pennington, 381 U.S. 657, 14 L. Ed. 2d 626, 85 S. Ct. 1585 (1965)*. These cases established that "the Sherman Act does not prohibit ... persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly." *Noerr, 365 U.S. at 136*. The Supreme Court refused to "impute to Congress an intent to invade" the First Amendment

right to petition. *Id. at 136.* Thus, the *Noerr–Pennington* doctrine protects those who petition the government from antitrust liability.

Later caselaw extended *Noerr* antitrust immunity to "the approach of citizens ... to administrative agencies ... and to courts." *California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 510, 30 L. Ed. 2d 642, 92 S. Ct. 609 (1972).* However, such immunity is not afforded to "sham" petitioning that is only "an attempt to interfere directly with the business relationships of a competitor." *Noerr, 365 U.S. at 144.* Litigation is a mere "sham" if it is objectively baseless and subjectively motivated to interfere [*12] with business competition by using a governmental process 'as an anticompetitive weapon.' *Professional Real Estate Investors v. Columbia Pictures Indus., 508 U.S. 49, 123 L. Ed. 2d 611, 113 S. Ct. 1920 (1993) (quoting Columbia v. Omni Outdoor Advertising, Inc., 499 U.S. 365, 380, 113 L. Ed. 2d 382, 111 S. Ct. 1344 (1991)).*

The plaintiffs urge that "sham litigation" is not a cognizable cause of action. The court cannot agree. A counterclaim of sham litigation is, essentially, an assertion that antitrust law has been violated. Indeed, in litigation leading to the Court's decision in *Professional Real Estate Investors,* Columbia Pictures had sued the defendant, PRE, for copyright infringement. *508 U.S. at 52.* The defendant counterclaimed, accusing Columbia of violations of §§ 1 and 2 of the Sherman Act, 26 Stat. 209, as amended, *15 U.S.C. §§ 1–2. Id.* "In particular, PRE alleged that Columbia's copyright action was a mere sham that cloaked underlying acts of monopolization and conspiracy to restrain trade." *Id.* Although the counterclaim did not survive summary judgment on the facts of the case, the Court upheld the validity [*13] of the sham counterclaim itself. Indeed, in announcing a two–part test for its application, the Court only clarified the existence and context of the sham litigation exception. n4

> n4 Of course, as already stated, a violation of antitrust law underlies any sham exception to antitrust immunity. Although the defendant has not specifically pled a violation of the Sherman Act in Counterclaim V, the invocation of the sham litigation doctrine is sufficient to give notice of the basis of its claim. This is particularly true in the context of a Rule 12(b)(6) motion to dismiss, and in light of both the liberal pleading philosophy of the Federal Rules and the court's responsibility 'to examine the complaint to determine if the allegations provide for relief on any possible theory.' *O ' Boyle v. Jiffy Lube Int'l, Inc., 866 F.2d 88, 93 (3d Cir. 1989)* (quoting C. WRIGHT & A. MILLER, FEDERAL

PRACTICE AND PROCEDURE, § 1357, at 601–02 (1969) (footnotes omitted)).

Since *Professional Real Estate Investors,* [*14] the sham litigation exception has been invoked in varied contexts. For example, in a recent case, the Supreme Court refused to strip antitrust immunity from an employer who filed a losing and retaliatory lawsuit where the suit was not objectively baseless. *BE&K Constr. Co. v. NLRB, 536 U.S. 516, 153 L. Ed. 2d 499, 122 S. Ct. 2390 (2002).* In so doing, the Court implicitly held that the sham litigation exception applies to the National Labor Relations Act in the same way it applies to the Sherman Act. *See 122 S. Ct. at 2402* (Scalia, J., concurring) ("The implication of our decision today is that ... we will construe the National Labor Relations Act ... in the same way we have already construed the Sherman Act: to prohibit only lawsuits that are *both* objectively baseless *and* subjectively intended to abuse process.") (emphasis in original). Other courts have applied the immunity principles *of Noerr–Pennington* to other contexts. *See, e.g., State of Missouri v. National Organization of Women, 620 F.2d 1301, 1318–19 (8th Cir. 1980)* (applying *Noerr–Pennington* liability principles to state tort laws); [*15] *Video International Production, Inc. v. Warner–Amex Cable Communications, Inc., 858 F.2d 1075, 1084(5th Cir. 1988)* (holding that *Noerr–Pennington* doctrine applies to Civil Rights Act liability); *Gorman Towers, Inc. v. Bogoslavsky, 626 F.2d 607, 614–15 (8th Cir. 1980)* (same). It follows that if the *Noerr–Pennington* immunity principles apply in these contexts, the sham litigation exception to immunity applies as well. n5 Other cases have explicitly or implicitly accepted the sham exception in the patent infringement context. *See, e.g., Carroll Touch, Inc. v. Electro Mechanical Sys., 15 F.3d 1573 (D.C. Cir. 1993)* (discussing sham litigation counterclaim in patent infringement context); *U.S. Philips Corp. v. Sears Roebuck & Co., 55 F.3d 592, 597 (Fed. Cir. 1995)* (rejecting sham counterclaim on the facts of the case).

> n5 Unlike the defendant, however, the court recognizes a distinction between the *Noerr–Pennington* doctrine, which shields petitioners from antitrust liability, and the sham litigation exception, which strips this immunity when the petition is meritless and anticompetitive in nature. *See, e.g.,* Answering Brief at 15 ('... the Noerr–Pennington *[i.e.,* "sham litigation"] doctrine ...').

[*16]

In sum, the court can find no justification for refusing to allow the sham exception to be litigated in the instant

case. Indeed, a copyright infringement action, like that at issue in *Professional Real Estate Investors*, and a patent infringement action such as the one at issue here present such analogous contexts regarding the application of the sham litigation exception that it would strain credibility to announce a relevant and dispositive difference between them. Thus, Counterclaim V may remain, to succeed or fail as it may in the ensuing litigation. n6

> n6 In this vein, the court stresses that the defendant, of course, will be tasked in the ensuing litigation with proving the elements of the sham litigation exception, namely, that the present patent infringement suit is objectively baseless and subjectively motivated by an intent to interfere with competition. *See Carroll Touch, 15 F.3d at 1583* (holding that sham litigation counterclaim could not survive summary judgment because defendant did not establish a genuine issue regarding whether the patent infringement action was baseless).

[*17]

### D. Affirmative Defense III

As its third affirmative defense, Alien alleges that TruePosition engaged in "fraud and/ or inequitable conduct" in acquiring the relevant patents. The plaintiffs move to strike the defense, as well as Counterclaim I, which is predicated on the inequitable conduct defense, on the grounds that the affirmative defense does not meet the pleading requirements of *Federal Rule of Civil Procedure 9(b)*.

Rule 9 requires that all pleadings of fraud or mistake "be stated with particularity." *FED. R. CIV. P. 9(b)*. n7 These averments, however, remain subject to the liberal pleading standard of Rule 8, which requires only a "short and plain" statement of a claim or defense. *See In re Westinghouse Sec. Litig., 90 F.3d 696, 703 (3d Cir. 1996)* (citing cases); *see generally Leatherman, 507 U.S. at 168* (holding that federal courts may not impose a more demanding standard of pleading beyond "the liberal system of 'notice pleading' set up by the Federal Rules"); 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER FEDERAL PRACTICE AND PROCEDURE § 1281, at 520-21 (1990) (pleading with particularity under Rule 9(b) should be done consistently with [*18] the general philosophy of Rule 8); 2A JAMES W. MOORE, MORRE'S FEDERAL PRACTICE P 8.13, at 8-58 (2d ed. 1995) (the mandate of Rule 8 applies "even where the Rules command particularity, as in the pleading of fraud under Rule 9(b)") (footnote omitted).

> n7 Because the court has found that Alien's pleadings satisfy the heightened pleading requirements of Rule 9(b), it need not address the defendant's argument that Rule 9(b) may not apply to allegations of inequitable conduct.

The pleading requirements are satisfied by Alien's third affirmative defense. The defense constitutes one paragraph which names the title and publication date of at least one allegedly withheld material prior art publication. In the context of alleged inequitable conduct before the PTO during a patent prosecution, "pleadings that disclose the name of the [allegedly withheld] relevant prior art and disclose the acts of the alleged fraud fulfill the requirements of Rule 9(b)." *EMC Corp. v. Storage Tech. Corp., 921 F. Supp. 1261, 1263 (D. Del. 1996)*. [*19] The third affirmative defense discloses at least this much, and thus suffices "to apprise the other party of what is being alleged in a manner sufficient to permit responsive pleadings" as Rule 9 requires. 5 WRIGHT & MILLER § 1296 (1990).

TruePosition objects that the named publication is relevant to only certain of their patents and, therefore, the defendant has not sufficiently pled the defense of inequitable conduct as to the other patents. The court declines, however, to weigh the relevance and materiality of the allegedly withheld prior art for purposes of this motion. It is the court's duty for purposes of this motion only to test the sufficiency of the pleading, not to resolve disputed facts or decide the merits of the case. *Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993)*. Furthermore, the Third Circuit has made clear that, although "it is certainly true that allegations of 'date, place or time'" satisfy the pleading requirements, "nothing in [Rule 9] requires them." *Seville Industrial Machinery v. Southmost Machinery, 742 F.2d 786, 791*. The affirmative defense, as pled, suffices to place the plaintiffs on notice of the misconduct with [*20] which they are charged. *Id.; see also Scripps Clinic and Research Found., et al. v. Baxter Travenol Lab., et al, 1988 U.S. Dist. LEXIS 1972, 1988 WL 22602,* at *3 (D. Del.) (defense of inequitable conduct sufficiently pled when defendant simply "alleged that [the plaintiff] failed to identify to the PTO relevant prior art of which it was aware").

The motion to strike the third affirmative defense, and to dismiss Counterclaim I, which is at least partially premised on the defense of inequitable conduct, is denied.

### E. Affirmative Defense VI

Finally, the plaintiffs move to strike Affirmative Defense VI, abuse of process, on the grounds that it is not a defense to a patent infringement action, and that, in any event, it has not been pled properly.

The plaintiffs are correct that abuse of process is not a defense to a patent infringement action. Rather, it is a tort, *see* PROSSER, LAW OF TORTS, § 121 (4th Ed. 1971), which should have been pled as a counterclaim. This mistake is not fatal, however. *Federal Rule of Civil Procedure 8(c)* states that "when a party has mistakenly designated ... a counterclaim as a defense, the court on terms, if justice so requires, shall treat the pleading [*21] as if there had been a proper designation." *FED. R. CIV. P. 8(c)*. The court will view the defendant's averment of the "defense" of abuse of process as a counterclaim.

Abuse of process may be alleged in a patent infringement case as in any other. *See, e.g., Bayer AG v. Sony Elecs., Inc., 229 F. Supp. 2d 332 (D. Del. 2002).* A claim of abuse of process is established when "the defendant ... proves that the plaintiff had an 'ulterior purpose' and committed 'a willful act in the use of the process that is not proper in the regular conduct of the proceedings.'" *Id. at 368* (quoting *Feinman v. Bank of Delaware, 728 F. Supp. 1105, 1115 (D. Del. 1990), aff'd, 909 F.2d 1475 (3d Cir. 1990)).* "There must be 'some definite act or threat not authorized by the process or aimed at an objective not legitimate in the use of process ... there is no liability where the [plaintiff] has done nothing more than carry out the process to its authorized conclusion.'" *Id.* (citations omitted).

The defendant has asserted that the "plaintiffs have abused the judicial process by bringing the present action based on the patents that plaintiffs [*22] know are invalid, unenforceable, and/ or not infringed." Answer and Counterclaims (D.I. 48) at 8. There is no elaboration in the Answer and Counterclaims. The defendant's briefing, however, contends that "the same averments with regard to TruePositions tortious interference with Allen's business contracts and relations also establish a basis to proceed against TruePosition for abuse of process." Answering Brief at 17–18 n.10.

The defendant's averments are sufficient to sustain a Rule 8, Rule 12(f), or Rule 12(b)(6) motion to strike and/ or dismiss. Allen has offered a "short and plain" statement of the claim and has presented a factual context that, viewed in the light most favorable to Allen, states an abuse of process claim. Again, it is the court's duty for purposes of this motion only to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case. *Kost, 1 F.3d at 183.* Despite the defendant's anemic presentation of its abuse of process claim, the facts presented in the context of its sham litigation and tortious interference claims suffice to state a claim for relief for abuse of process as well. The plaintiffs' motion to [*23] dismiss the claim is denied.

## IV. CONCLUSION

The court concludes that the defendant's tortious interference with a contract claim can not be sustained because there has been no breach of contract. Allen's other counterclaims of tortious interference with prospective business opportunities, sham litigation, declaratory judgment, and abuse of process survive this motion to dismiss. Likewise, the defendant's third affirmative defense of fraud and/ inequitable conduct may remain.

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. TruePosition's Motion to Dismiss and/ or Strike (D.I. 58) is GRANTED IN PART and DENIED IN PART.

2. Counterclaim III, alleging tortious interference with a contract, is DISMISSED.

Dated: January 21, 2003

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

**TAB   4**

LEXSEE 2000 U.S. DIST. LEXIS 14648

**UNION CARBIDE CHEMS. & PLASTICS TECH. CORP. and UNION CARBIDE CORP., Plaintiff, Counter–Defendant v. SHELL OIL CO., SHELL CHEMICAL CO., and CRI CATALYST CO., Defendants, Counter–Plaintiffs.**

**Civil Action No. 99–CV–274–SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2000 U.S. Dist. LEXIS 14648*

**September 29, 2000, Decided**

**NOTICE:** [*1]  FOR ELECTRONIC PUBLICATION ONLY

**DISPOSITION:** Plaintiff's motion to strike defendant's affirmative defense and to dismiss defendant's counter-claim with respect to allegations of inequitable conduct denied.

**LexisNexis(R) Headnotes**

**COUNSEL:** For plaintiff, counter–defendant: Jeffrey B. Bove, Esquire, R. Eric Hutz, Esquire, Connolly, Bove, Lodge & Hutz, Wilmington, Delaware.

For plaintiff, counter–defendant:  Steven J. Glassman, Esquire, Benjamin C. Hsing, Esquire, Of counsel, Kaye, Scholer, Fierman, Hays & Handler, New York, New York.

For defendant, counter–plaintiff:  Allen M. Terrell, Jr., Esquire, Jeffrey L Moyer, Esquire, Richards, Layton & Finger, Wilmington, Delaware.

For defendant, counter–plaintiff:    William Slusser, Esquire, Of counsel, Slusser & Frost, Houston, Texas.

For defendant, counter–plaintiff: John D. Norris, Esquire, Of counsel, Howrey, Simon, Arnold & White, Houston, Texas.

**JUDGES:** Sue L. Robinson, Chief Judge.

**OPINIONBY:** Sue L. Robinson

**OPINION:**

**MEMORANDUM OPINION**

**Dated: September 29, 2000**
**Wilmington, Delaware**

**ROBINSON, Chief Judge**

**I. INTRODUCTION**

Plaintiff Union Carbide Chemicals & Plastics Technology Corporation filed this patent infringement action on [*2]  May 3, 1999 against defendant Shell Oil Company, Shell Chemical Company, and CRI Catalyst Company (collectively, "defendant"), alleging that defendant infringes U.S. Patent No.  *4,908,343* ("the *'343* patent"); U.S. Patent No.  *4,916,243* ("the *'243* patent"); and U.S. Patent No.  *5,057,481* ("the *'481* patent"). The *'343* and *'243* patents relate to particular types of catalysts and processes for making ethylene oxide. The *'481* patent relates to compositions used in coatings applications. Plaintiff Union Carbide Corporation joined this litigation through an amended complaint on January 4, 2000. (D.I. 75)

Defendant, in its answer to plaintiff's amended complaint, has denied infringement of all three patents–in–suit and filed affirmative defenses and counterclaims alleging that all three patents are invalid, unenforceable, and not infringed. Specifically, defendant alleges that the *'243* patent is unenforceable because it was procured by misrepresentations to the Patent and Trademark Office ("PTO"). (D.I. 78)

Plaintiff n1 is incorporated in Delaware and has its principal place of business in Connecticut. (D.I. 75, PP 4–5) Defendant is a Delaware corporation with its principal place of business [*3]  in Texas. (D.I. 75, PP 7–9; D.I. 78 PP 7–9) The court has jurisdiction over this action under *28 U.S.C. §§ 1331* and 1338. Venue is proper in this judicial district by virtue of *28 U.S.C. §§ 1391*(c) and 1400(b).

n1 Union Carbide Chemicals & Plastics Technology Corporation and Union Carbide Corporation are hereinafter referred to collectively

as "plaintiff."

Currently before the court is defendant's motion to strike under *Fed. R. Civ. P. 12(f)* defendant's affirmative defense, and under *Fed. R. Civ. P. 12(b)(6)* to dismiss defendant's counterclaim with respect to allegations of inequitable conduct. (D.I. 84) Because defendant's subsequent filings with this court clarify its pleadings, plaintiff's motion is denied.

## II. BACKGROUND

Plaintiff brings this motion claiming that defendant's inequitable conduct allegation fails to meet the particularity requirement of *Fed. R. Civ. P. 9(b)* n2 and leaves plaintiff guessing as to the details of its alleged wrongdoing. [*4] Plaintiff specifically complains about the affirmative defense in paragraph thirty–eight of defendant's answer which is repeated and realleged as a counterclaim in paragraph fifty. (D.I. 85 at 3) Paragraph thirty–eight reads:

> The *'243* patent is unenforceable because it was procured by misrepresentations to the PTO regarding the materiality of Union Carbide's own commercial activities to the patentability of claims pending in the prosecution of patent applications leading to the issuance of the patent and by misrepresentations regarding data submitted to the PTO to support the patentability of pending claims. During the prosecution of the *'243* patent, a continuation–in–part application was filed containing claims barred under *35 U.S.C. § 102*(b) as a result of Union Carbide's commercial use of the processes of these claims more than one year before their effective filing date. In a statement to the PTO, the applicants, through their attorneys, acknowledged the commercialization of the invention, but did so in a manner that obscured and misrepresented the significance of the event to the patentability of then pending claims. Additionally, during the prosecution [*5] of the *'243* patent, Union Carbide, on its own initiative, conducted tests based on the teachings of cited prior art references in an effort to distinguish the claimed invention from the teachings of these references. During this testing, Union Carbide deviated from the teachings of the prior art in ways yielding results that inaccurately portrayed the claimed invention as falling outside the

teachings of the prior art. Union Carbide also selectively submitted data tending to support the patentability of claims while not submitting data tending to show the contrary. All these misrepresentations were highly material to the PTO proceedings, were made with reckless or intentional disregard of the duty of candor required in proceedings before the PTO, and were made with an intent to deceive the PTO.

(D.I. 78, P 38)

> n2 Rule 9(b) provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."

Plaintiff contends the above paragraph does not [*6] satisfy Rule 9(b) because the allegations: (1) fail to identify what Union Carbide tests are alleged to have deviated from the teachings of the prior art, (2) fail to state how any such tests purportedly deviated from the prior art to yield misleading results, (3) fail to identify what data is alleged to have been "selectively submitted" to the PTO in support of the patentability of the claims, or what "data tending to show the contrary" is alleged to have been withheld, and (4) fail to state how any such data tended to support or refute patentability.

Defendant claims that plaintiff reads the Rule 9(b) requirements too broadly. Defendant claims there is no requirement to identify particular tests and, in any event, plaintiff is aware of the tests to which defendant refers. In its opposition to plaintiff's motion to strike, defendant contends that plaintiff submitted only two declarations that purported to duplicate examples in the prior art cited by the examiner as a basis for rejecting pending claims. Defendant attached those two declarations and claimed that the prior art references and tests they refer to in the pleadings are consistently referred to throughout the declarations. [*7] n3

> n3 The defendant is referring to two 37 C.F.R. § 132 declarations signed by: (1) the inventor, Dr. Madan Bhasin, on December 28, 1979 ("the Bhasin declaration"), and (2) Dr. Thomas Notermann on December 29, 1979 ("the Notermann declaration"). (D.I. 97 at 6)

Plaintiff argues that it submitted not two, but seven declarations during the prosecution of the *'243* patent — four of which discuss testing of catalysts prepared from the teachings of the prior art. In the four declarations,

eighteen catalysts were prepared based on five prior art references and twenty tests were conducted to determine whether the catalysts were synergistic. Plaintiff claims that even if defendant limited their inequitable conduct allegations to the two declarations cited in defendant's opposition brief, they would still be guessing about the specifics of the inequitable conduct allegations. In the two cited declarations, fifteen catalysts were prepared based on four prior art references and fifteen tests were conducted to determine [*8] whether those catalysts were synergistic.

## III. DISCUSSION

The purpose of *Fed. R. Civ. P. 9(b)* is "to place the [parties] on notice of the precise misconduct with which they are charged, and to safeguard [the parties] against spurious charges of immoral and fraudulent behavior." *Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984).* The particularity requirement of Rule 9 applies to inequitable conduct charges. See *EMC Corp. v. Storage Tech. Corp., 921 F. Supp. 1261, 1263 (D. Del. 1996).* Pleadings that disclose the relevant prior art and alert the patentee to the alleged fraud satisfy the requirements of Rule 9(b). Id. Rule 9(b) does not require that the pleadings allege the time, date, and place of the alleged misconduct. Id.

Here, the defendant's pleadings do appear to be "bare–boned" on their face. However, its brief submitted in opposition to the present motion sufficiently clarified its pleadings to overcome Rule 9(b)'s requirements. (D.I. 97) In that brief, defendant cites two specific 37 C.F.R. § 132 declarations that were part of the *'243* patent's prosecution history. In the Bhasin declaration, [*9] the inventor, through his attorney, responded to a rejection based on U.S. Patent Nos. *3,548,018*; *4,038,175*; *4,014,913*; *4,096,164*; and *4,162,262*. (D.I. 97, Ex. A at 115) The examiner contended that the above references disclosed combinations of potassium and cesium in silver catalysts for ethylene oxide manufacture to provide the synergism which Bhasin claimed to be his invention. (Id.) To overcome the rejection, Bhasin selected examples from four of the five cited references to show the use of a silver catalyst containing both potassium and cesium which would demonstrate whether such synergism is inherently taught

by the references. (Id. at 116) Bhasin then prepared several catalysts and conducted several tests to determine whether the catalysts were synergistic.

When defendant pleads that plaintiff "conducted tests based on the teachings of cited prior art references in an effort to distinguish the claimed invention from the teachings of these references," defendant is, in the court's opinion, referring to the five prior art references cited above. When defendant pleads that plaintiff "deviated from the teachings of the prior art" and "selectively submitted data tending [*10] to support the patentability of claims," defendant is suggesting that Bhasin did not select representative samples from the prior art references as he proclaimed in his declaration.

The Notermann declaration explains that Notermann evaluated the catalysts prepared by Bhasin. Notermann concurred with Bhasin's opinion that the catalysts he selected were the best choices in determining whether the cited references showed a synergistic combination of silver, cesium, and potassium for the manufacturing of ethylene oxide. (D.I. 97, Ex. B at 105)

This court has allowed a party to clarify its pleadings through responses to interrogatories. See *Scripps Clinic & Research Found. v. Baxter Travenol Labs., Inc., 1988 U.S. Dist. LEXIS 1972, 7 U.S.P.Q.2D (BNA) 1562, 1564 (D. Del. 1988).* Likewise, the court will allow defendant to clarify its affirmative defenses and counterclaims through its opposition brief. Note, however, insufficiently pled allegations of inequitable conduct shall not be used to justify subsequent discovery into such allegations. See *EMC Corp., 921 F. Supp. at 1263.*

Defendant's clarification has sufficiently put plaintiff on notice of the precise misconduct with which they [*11] are charged. Defendant will still carry the burden at trial to show that plaintiff did indeed engage in that conduct.

## IV. CONCLUSION

Plaintiff's motion to strike defendant's affirmative defense and to dismiss defendant's counterclaim with respect to allegations of inequitable conduct is denied. Defendant shall have thirty days to amend its answer to include the clarifications laid out in its opposition brief.