# EXHIBIT   1

US005497738A

# United States Patent [19]

## Siemon et al.

[11]  Patent Number: 5,497,738

[45]  Date of Patent:  * Mar. 12, 1996

[54]  **VCT CONTROL WITH A DIRECT ELECTROMECHANICAL ACTUATOR**

[75]  Inventors:  Edward C. Siemon; Stanley B. Quinn, Jr., both of Ithaca, N.Y.

[73]  Assignee:  Borg-Warner Automotive, Inc., Sterling Heights, Mich.

[ * ]  Notice:  The portion of the term of this patent subsequent to Jun. 15, 2010, has been disclaimed.

[21]  Appl. No.: 56,635

[22]  Filed:  May 3, 1993

### Related U.S. Application Data

[63]  Continuation-in-part of Ser. No. 940,273, Sep. 3, 1992, Pat. No. 5,218,935.

[51]  Int. Cl.⁶ ............................................ F01L 1/34
[52]  U.S. Cl. ........................ 123/90.17; 123/90.31; 137/312
[58]  Field of Search ...................... 123/90.15, 90.17, 123/90.31; 74/568 R; 137/312, 625.65; 464/1, 2, 160

[56]  **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,762,141 | 8/1988 | Kanps ................ | 137/312 |
| 4,856,465 | 8/1989 | Denz et al. ............ | 123/90.17 |
| 4,858,572 | 8/1989 | Shirai et al. ........... | 123/90.12 |
| 5,000,420 | 3/1991 | Hendrixon ............ | 137/625.65 |
| 5,012,774 | 5/1991 | Stauber et al. ......... | 123/90.17 |
| 5,056,477 | 10/1991 | Linder et al. .......... | 123/90.17 |
| 5,088,456 | 2/1992 | Suga ................. | 123/90.17 |

| | | | |
|---|---|---|---|
| 5,150,671 | 9/1992 | Suga ................. | 123/90.17 |
| 5,172,659 | 12/1992 | Butterfield et al. ...... | 123/90.17 |
| 5,201,289 | 4/1993 | Imai ................. | 123/90.17 |
| 5,218,935 | 6/1993 | Quinn, Jr. et al. ...... | 123/90.17 |
| 5,271,360 | 12/1993 | Kato et al. ........... | 123/90.17 |

Primary Examiner—Weilun Lo
Attorney, Agent, or Firm—William Brinks Hofer et al.; Greg Dziegielewski

[57]  **ABSTRACT**

A camshaft (126) has a vane (160) secured to an end thereof for non-oscillating rotation therewith. The camshaft also carries a sprocket (132) which can rotate with the camshaft but which is also oscillatable with the camshaft. The vane has opposed lobes (160a, 160b) which are received in opposed recesses (132a, 132b), respectively, of the sprocket. The recesses have greater circumferential extent than the lobes to permit the vane and sprocket to oscillate with respect to one another, and thereby permit the camshaft to change in phase relative to a crankshaft whose phase relative to the sprocket is fixed by virtue of a chain drive extending therebetween. The camshaft tends to change in reaction to pulses which it experiences during its normal operation, and it is permitted to change only in a given direction, either to advance or retard, by selectively blocking or permitting the flow of hydraulic fluid, preferably engine oil, through the return lines (194, 196) from the recesses by controlling the position of a vented spool (200) within a valve body (198) of a control valve (192) in response to a signal indicative of an engine operating condition from an engine control unit (208) via cable (238). The vented spool is selectively positioned within the valve body by a electromechanical actuator (201) which is controlled by the engine control unit. The spool is centered when an optimum phase angle between crankshaft and camshaft is achieved.

**13 Claims, 13 Drawing Sheets**



Case 1:05-cv-00048-SLR    Document 214-2    Filed 05/04/2006    Page 3 of 70



FIG. 1



FIG. 2



FIG. 6

U.S. Patent    Mar. 12, 1996    Sheet 3 of 13    5,497,738



FIG. 3

FIG. 5



FIG. 4

FIG. 9



FIG. 7



FIG. 8



FIG. 10



FIG. 11



FIG. 12



FIG. 13



FIG. 15                    FIG. 16



FIG. 14



FIG. 17



FIG. 18



FIG. 19



FIG. 20

5,497,738

1

# VCT CONTROL WITH A DIRECT ELECTROMECHANICAL ACTUATOR

## CROSS REFERENCE TO APPLICATION

This application is a continuation-in-part of application Ser. No. 940,273 which was filed Sep. 3, 1992, now U.S. Pat. No. 5,218,935, granted Jun. 15, 1993.

## FIELD OF THE INVENTION

This invention relates to an hydraulic control system for controlling the operation of a variable camshaft timing (VCT) system of the type in which the position of the camshaft is circumferentially varied relative to the position of a crankshaft in reaction to torque reversals experienced by the camshaft during its normal operation. In such a VCT system, an electromechanical/hydraulic system is provided to effect the repositioning of the camshaft in reaction to such torque reversals, and a control system is provided to selectively permit or prevent the hydraulic system from effecting such repositioning.

More specifically, the present invention relates to a control system which utilizes a variable force solenoid to directly control the position of a fully vented spool valve which is an useful part of the hydraulic system.

## BACKGROUND OF THE INVENTION

Consideration of information disclosed by the following U.S. Patents, which are all hereby incorporated by reference, is useful when exploring the background of the present invention.

U.S. Pat. No. 5,002,023 describes a VCT system within the field of the invention in which the system hydraulics includes a pair of oppositely acting hydraulic cylinders with appropriate hydraulic flow elements to selectively transfer hydraulic fluid from one of the cylinders to the other, or vice versa, to thereby advance or retard the circumferential position on of a camshaft relative to a crankshaft. The control system utilizes a control valve in which the exhaustion of hydraulic fluid from one or another of the oppositely acting cylinders is permitted by moving a spool within the valve one way or another from its centered or null position. The movement of the spool occurs in response to an increase or decrease in control hydraulic pressure, $P_C$, on one end of the spool and the relationship between the hydraulic force on such end and an oppositely direct mechanical force on the other end which results from a compression spring that acts thereon.

U.S. Pat. No. 5,107,804 describes an alternate type of VCT system within the field of the invention in which the system hydraulics include a vane having lobes within an enclosed housing which replace the oppositely acting cylinders disclosed by the aforementioned U.S. Pat. No. 5,002,023. The vane is oscillatable with respect to the housing, with appropriate hydraulic flow elements to transfer hydraulic fluid within the housing from one side of a lobe to the other, or vice versa, to thereby oscillate the vane with respect to the housing in one direction or the other, an action which is effective to advance or retard the position of the camshaft relative to the crankshaft. The control system of this VCT system is identical to that divulged in U.S. Pat. No. 5,002,023, using the same type of spool valve responding to the same type of forces acting thereon.

2

U.S. Pat. Nos. 5,172,659 and 5,184,578 both address the problems of the aforementioned types of VCT systems created by the attempt to balance the hydraulic force exerted against one end of the spool and the mechanical force exerted against the other end. The improved control system disclosed in both U.S. Pat. Nos. 5,172,659 and 5,184,578 utilizes hydraulic force on both ends of the spool. The hydraulic force on one end results from the directly applied hydraulic fluid from the engine oil gallery at full hydraulic pressure, $P_s$. The hydraulic force on the other end of the spool results from an hydraulic cylinder or other force multiplier which acts thereon in response to system hydraulic fluid at reduced pressure, $P_{Ci}$, from a PWM solenoid. Because the force at each of the opposed ends of the spool is hydraulic in origin, based on the same hydraulic fluid, changes in pressure or viscosity of the hydraulic fluid will be self-negating, and will not affect the centered or null position of the spool. There are, however, several disadvantages inherent in the inventions disclosed in the '659 and '578 patents.

One disadvantage is the inability of this differential pressure control system ("DPCS") to properly control the position of the spool during the initial start-up phase of the engine. When the engine first starts, it takes several seconds for oil pressure to develop. During that time, the position of the spool valve is unknown. Because the system logic has no known quantity with which to perform the necessary calculations, the DPCS is prevented from effectively controlling the spool valve position until the engine reaches normal operating speed.

Another problem with existing VCT systems is sluggish dynamic response. Even after the engine stabilizes at normal operating speed, individual characteristics vary substantially from engine to engine. A new engine at high speed and low temperature can have a drastically different oil pressure than a worn engine at hot idle. Current methods employed to allow operation over such a wide spectrum of engine characteristics (such as increased cross-sectional area of the hydraulic piston and the undersizing of springs) result in a slow response time, requiring relatively low closed-loop controller gains to maintain stability.

The low closed-loop controller gains render the system more sensitive to component tolerances and operating environment. The net effects (such as a change in the PWM duty cycle required to achieve a null position of the spool) cause degradation of overall closed-loop system performance.

Finally, the moving parts of the PWM solenoid typically used in a conventional DPCS create unwanted noise in the system. During operation, the solenoid cycles through its full stroke with every PWM pulse. The rapid cycling results in armature and poppet "chatter", i.e., high frequency collisions, thus introducing the unwanted noise.

## SUMMARY OF THE INVENTION

The present invention provides an improved method and apparatus for controlling the position of a vented spool in a hydraulic control valve. Specifically, the present invention provides an improved method and apparatus for controlling the position of a vented spool in a hydraulic control valve in a VCT system, for example, a hydraulic control valve similar to the one used in an oppositely-acting hydraulic cylinder VCT timing system of the type disclosed in U.S. Pat. No. 5,002,023, or a hydraulic control valve similar to the one used in a vane-type VCT timing system of the type disclosed in U.S. Pat. No. 5,107,804.

3

The control system of the present invention eliminates the hydraulic force on one end of the spool resulting from directly applied hydraulic fluid from the engine oil gallery at full hydraulic pressure, $P_s$, utilized by previous embodiments of the VCT system. The force on the other end of the vented spool results from an electromechanical actuator, preferably of the variable force solenoid type, which acts directly upon the vented spool in response to an electronic signal issued from an engine control unit ("ECU") which monitors various engine parameters. The ECU receives signals from sensors corresponding to camshaft and crankshaft positions and utilizes this information to calculate a relative phase angle. The preferred embodiment employs a closed-loop feedback system, such as the one disclosed in U.S. Pat. No. 5,184,578, which corrects for any phase angle error. The present invention offers an efficient and economical solution to the problems recited above, as well as additional advantages over the conventional DPCS.

When the relationship between spool position and control signal (solenoid current) is independent of engine oil pressure, any problems associated with oil pressure or its fluctuation are eliminated. For example, the lack of normal operating oil pressure during initial engine start-up does not result in start-up error because the signal from the ECU is fed immediately to the solenoid which directly positions the spool.

The use of a variable force solenoid also solves the problem of sluggish dynamic response. Such a device can be designed to be as fast as the mechanical response of the spool valve, and certainly much faster than the conventional (fully hydraulic) DPCS. The faster response allows the use of increased closed-loop gain, making the system less sensitive to component tolerances and operating environment.

Also, a variable force solenoid armature only travels a short distance, as controlled by the current from the ECU, as opposed to the complete cycles which result from the use of a PWM solenoid. Because the travel required rarely results in extremes, the chattering is eliminated, rendering the system virtually noise-free.

Possibly the most important advantage over the conventional DPCS is the improved control of the basic system. The present invention provides a greatly enhanced ability to quickly and accurately follow a command input of VCT phase.

Furthermore, because the preferred embodiment of the present invention is not dependent upon oil pressure, the present invention can be used for applications where an oil-free actuator is desirable, such as with timing belt engines.

In an alternate embodiment, a lever arrangement or equivalent is functionally positioned between the electromechanical actuator and the spool. The lever arrangement effectively acts as a stroke amplifier/force attenuator, allowing either a reduction in the required solenoid current or reduction in the air gap distance without sacrificing valve travel.

Accordingly, it is an object of the present invention to provide an improved method and apparatus for controlling the operation of a hydraulic control valve of the vented spool type. It is a further object of the present invention to provide an improved method and apparatus for controlling the operation of a hydraulic control valve of the vented spool type in an automotive variable camshaft timing system.

For a further understanding of the present invention and the objects thereof, attention is directed to the drawings and the following brief description thereof, to the detailed

4

description of the preferred embodiment, and to the appended claims.

## BRIEF DESCRIPTION OF THE DRAWING

FIG. 1 is a fragmentary view of a dual camshaft internal combustion engine incorporating an embodiment of a variable camshaft timing arrangement according to the present invention, the view being taken on a plane extending transversely through the crankshaft and the camshafts and showing the intake camshaft in a retarded position relative to the crankshaft and the exhaust camshaft;

FIG. 2 is a fragmentary view similar to a portion of FIG. 1 showing the intake camshaft in an advanced position relative to the exhaust camshaft;

FIG. 3 is a fragmentary view taken on line 3—3 of FIG. 6 with some of the structure being removed for the sake of clarity and being shown in the retarded position of the device;

FIG. 4 is a fragmentary view similar to FIG. 3 showing the intake camshaft in an advanced position relative to the exhaust camshaft;

FIG. 5 is a fragmentary view showing the reverse side of some of the structure illustrated in FIG. 1;

FIG. 6 is a fragmentary view taken on line 6—6 of FIG. 4;

FIG. 7 is a fragmentary view taken on line 7—7 of FIG. 1;

FIG. 8 is a sectional view taken on line 8—8 of FIG. 1;

FIG. 9 is a sectional view taken on line 9—9 of FIG. 1;

FIG. 10 is an end elevational view of a camshaft with an alternative embodiment of a variable camshaft timing system applied thereto;

FIG. 11 is a view similar to FIG. 10 with a portion of the structure thereof removed to more clearly illustrate other portions thereof;

FIG. 12 is a sectional view taken on line 12—12 of FIG. 10;

FIG. 13 is a sectional view taken on line 13—13 of FIG. 10;

FIG. 14 is a sectional view taken on line 14—14 of FIG. 11;

FIG. 15 is an end elevational view of an element of the variable camshaft timing system of FIGS. 10–14;

FIG. 16 is an elevational view of the element of FIG. 15 from the opposite end thereof;

FIG. 17 is a side elevational view of the element of FIGS. 15 and 16;

FIG. 18 is an elevational view of the element of FIG. 17 from the opposite side thereof; and

FIG. 19 is a simplified schematic view of the variable camshaft timing arrangement of FIGS. 10–18; and

FIG. 20 is a simplified schematic view similar to FIG. 19 of an alternative embodiment of the present invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

In the embodiment of FIGS. 1–9, a crankshaft 22 has a sprocket 24 keyed thereto, and rotation of the crankshaft 22 during the operation of the engine in which it is incorporated, otherwise not shown, is transmitted to an exhaust camshaft 26, that is, a camshaft which is used to operate the exhaust valves of the engine, by a chain 28 which is trained

5,497,738

5

around the sprocket 24 and a sprocket 30 which is keyed to the camshaft 22. Although not shown, it is to be understood that suitable chain tighteners will be provided to ensure that the chain 28 is kept tight and relatively free of slack. As shown, the sprocket 30 is twice as large as the sprocket 24. This relationship results in a rotation of the camshaft 26 at a rate of one-half that of the crankshaft 22, which is proper for a 4-cycle engine. It is to be understood that the use of a belt in place of the chain 28 is also contemplated.

The camshaft 26 carries another sprocket, namely sprocket 32, FIG. 3, 4 and 6, journalled thereon to be oscillatable through a limited arc with respect thereto and to be otherwise rotatable with the camshaft 26. Rotation of the camshaft 26 is transmitted to an intake camshaft 34 by a chain 36 which is trained around the sprocket 32 and a sprocket 38 that is keyed to the intake camshaft 34. As shown, the sprockets 32 and 38 are equal in diameter to provide for equivalent rates of rotation between the camshaft 26 and the camshaft 34. The use of a belt in place of the chain 36 is also contemplated.

As is illustrated in FIG. 6, an end of each of the camshafts 26 and 34 is journalled for rotation in bearings 42 and 44, respectively, of the head 50, which is shown fragmentarily and which is bolted to an engine block, otherwise not shown, by bolts 48. The opposite ends of the camshafts 26 and 34, not shown, are similarly journalled for rotation in an opposite end, also not shown, of the head 50. The sprocket 38 is keyed to the camshaft 34 at a location of the camshaft 34 which is outwardly of the head 50. Similarly, the sprockets 32 and 30 are positioned, in series, on the camshaft 26 at locations outwardly of the head 50, the sprocket 32 being transversely aligned with the sprocket 38 and the sprocket 30 being positioned slightly outwardly of the sprocket 32, to be transversely aligned with the sprocket 24.

The sprocket 32 has an arcuate retainer 52 (FIGS. 7 and 8) as an integral part thereof, and the retainer 52 extends outwardly from the sprocket 32 through an arcuate opening 30a in the sprocket 30. The sprocket 38 has an arcuate hydraulic body 46 bolted thereto and the hydraulic body 46, which houses certain of the hydraulic components of the associated hydraulic control system, receives and pivotally supports the body end of each of a pair of oppositely acting, single acting hydraulic cylinders 54 and 56 which are positioned on opposite sides of the longitudinal axis of the camshaft 26. The piston ends of the cylinders 54 and 56 are pivotally attached to an arcuate bracket 58, and the bracket 58 is secured to the sprocket 32 by a plurality of threaded fasteners 60. Thus, by extending one of the cylinders 54 and 56 and by simultaneously retracting the other of the cylinders 54 and 56, the arcuate position of the sprocket 32 will be changed relative to the sprocket 30, either to advance the sprocket 32 if the cylinder 54 is extended and the cylinder 56 is retracted, which is the operating condition illustrated in FIGS. 2 and 4, or to retard the sprocket 32 relative to the sprocket 30 if the cylinder 56 is extended and the cylinder 54 is retracted, which is the operating condition illustrated in FIGS. 1, 3, 7 and 8. In either case, the retarding or advancing of the position of the sprocket 32 relative to the position of the sprocket 30, which is selectively permitted or prevented in reaction to the direction of torque in the camshaft 26, as explained in the aforesaid U.S. Pat. No. 5,002,023, will advance or retard the position of the camshaft 34 relative to the position of the camshaft 26 by virtue of the chain drive connection provided through the chain 36 between the sprocket 32, which is journalled for limited relative arcuate movement on the camshaft 26, and the sprocket 38, which is keyed to the camshaft 34. This relationship can be seen in

6

the drawing by comparing the relative position of a timing mark 30b on the sprocket 30 and a timing mark 38a on the sprocket 38 in the retard position of the camshaft 34, as is shown in FIGS. 1 and 3, to their relative positions in the advanced position of the camshaft 34, as is shown in FIGS. 2 and 4.

FIGS. 10–20 illustrate two embodiments of the present invention in which a housing in the form of a sprocket 132 is oscillatingly journalled on a camshaft 126. The camshaft 126 may be considered to be the only camshaft of a single camshaft engine, either of the overhead camshaft type or the in block camshaft type. Alternatively, the camshaft 126 may be considered to be either the intake valve operating camshaft or the exhaust valve operating camshaft of a dual camshaft engine. In any case, the sprocket 132 and the camshaft 126 are rotatable together, and are caused to rotate by the application of torque to the sprocket 132 by an endless roller chain 138, shown fragmentarily, that is trained around the sprocket 132 and also around a crankshaft, not shown. As will be hereinafter described in greater detail, the sprocket 132 is oscillatingly journalled on the camshaft 126 so that it is oscillatable at least through a limited arc with respect to the camshaft 126 during the rotation of the camshaft, an action which will adjust the phase of the camshaft 126 relative to the crankshaft.

An annular pumping vane 160 is fixedly positioned on the camshaft 126, the vane 160 having a diametrically opposed pair of radially outwardly projecting lobes 160a, 160b and being attached to an enlarged end portion 126a of the camshaft 126 by bolts 162 which pass through the vane 160 into the end portion 126a. In that regard, the camshaft 126 is also provided with a thrust shoulder 126b to permit the camshaft to be accurately positioned relative to an associated engine block, not shown. The pumping vane 160 is also precisely positioned relative to the end portion 126a by a dowel pin 164 which extends therebetween. The lobes 160a, 160b are received in radially outwardly projecting recesses 132a, 132b, respectively, of the sprocket 132, the circumferential extent of each of the recesses 132a, 132b being somewhat greater than the circumferential extent of the vane lobe 160a, 160b which is received in such recess to permit limited oscillating movement of the sprocket 132 relative to the vane 160. The recesses 132a, 132b are closed around the lobes 160a, 160b, respectively, by spaced apart, transversely extending annular plates 166 which are fixed relative to the vane 160 and, thus, relative to the camshaft 126, by bolts 170 which extend from one to the other through the same lobe, 160a, 160b. Further, the inside diameter 132c of the sprocket 132 is sealed with respect to the outside diameter of the portion 160d of the vane 160 which is between the lobes 160a, 160b, and the tips of the lobes 160a, 160b of the vane 160 are provided with seal receiving slots 160e, 160f, respectively. Thus each of the recesses 132a, 132b of the sprocket 132 is capable of sustaining hydraulic pressure, and within each recess 132a, 132b, the portion on each side of the lobe 160a, 160b, respectively, is capable of sustaining hydraulic pressure.

The functioning of the structure of the embodiment of FIGS. 10–18, as thus far described, may be understood by reference to schematic FIGS. 19 and 20. It also is to be understood, however, that the hydraulic control system of FIGS. 19 and 20 is also applicable to an opposed hydraulic cylinder VCT system corresponding to the embodiment of FIGS. 1–9, as well as to a vane type VCT system corresponding to the embodiment of FIGS. 10–18.

In any case, hydraulic fluid, illustratively in the form of engine lubricating oil, flows into the recesses 132a, 132b by

7

way of common inlet line 182. Inlet line 182 terminates at a junction between opposed check valves 184 and 186 which are connected to recesses 132a, 132b, respectively, by branch lines 188, 190, respectively. Check valves 184, 186 have annular seats 184a, 186a, respectively, to permit the flow of hydraulic fluid through check valves 184, 186 into recesses 132a, 132b, respectively. The flow of hydraulic fluid through check valves 184, 186 is blocked by floating balls 184b, 186b, respectively, which are resiliently urged against seats 184a, 186a, respectively, by springs 184c, 186c, respectively. Check valves 184, 186, thus, permit the initial filling of recesses 132a, 132b and provide for a continuous supply of make-up hydraulic fluid to compensate for leakage therefrom. Hydraulic fluid enters inlet line 182 by way of spool valve 192, which is incorporated within camshaft 126, and hydraulic fluid is returned to spool valve 192 from recesses 132a, 132b by return lines 194, 196, respectively.

Spool valve 192 is made up of cylindrical member 198 and vented spool 200 which is slidable to and fro within cavity 198a. Vented spool 200 has cylindrical lands 200a and 200b on opposed ends thereof, and lands 200a and 200b, which fit snugly within member 198, are positioned so that land 200b will block the exit of hydraulic fluid from return line 196, or land 200a will block the exit of hydraulic fluid from return line 194, or lands 200a and 200b will block the exit of hydraulic fluid from both return lines 194 and 196, as is schematically shown in FIGS. 19 and 20, where camshaft 126 is being maintained in a selected intermediate position relative to the crankshaft of the associated engine, referred to as the "null" position of spool 200.

In the present invention, the position of vented spool 200 within member 198 is influenced by spring 202 which acts on the end of land 200a. Thus, spring 202 resiliently urges spool 200 to the left, as oriented in FIGS. 19 and 20. Inlet line 182 receives its pressurized fluid (engine oil) directly from main oil gallery ("MOG") 230 of the engine by way of conduit 230a, bypassing vented spool 200. This oil is also used to lubricate bearing 232 in which camshaft 126 of the engine rotates.

The control of the position of spool 200 within member 198 is in direct response to electromechanical actuator 201, preferably a variable force solenoid, as shown in FIG. 19. An electrical current is introduced via cable 238 through solenoid housing 201d into solenoid coil 201a which repels, or "pushes", armature 201b. Armature 201b bears against extension 200c of vented spool 200, thus moving vented spool 200 to the right, as oriented in FIG. 19. If the force of spring 202 is in balance with the force exerted by armature 201b in the opposite direction, spool 200 will remain in its null or centered position. Thus, vented spool 200 can be moved in either direction by increasing or decreasing the current to solenoid coil 201a, as the case may be. Of course, the configuration of solenoid 201 may be reversed, converting the force on spool extension 200c from a "push" to a "pull." This would require the function of spring 202 to be redesigned to counteract the force in the new direction of armature 201b movement. However, there are instances when it is desirable for spool 200 to be forced to the far left, or biased, position. The location of spring 202 in cavity 198a, as shown in FIG. 19, or in cavity 198a, as shown in FIG. 20, ensures the return of spool 200 to its biased position when there is no current applied to solenoid coil 201a, such as periods of power failure or engine shutdown.

The movement of armature 201b is controlled by an electrical current applied to solenoid coil 201a in response to a control signal from electronic engine control unit (ECU)

8

203, shown schematically in FIG. 19, which may be of conventional construction. In previous versions of the VCT system, the force exerted against spool extension 200c must balance with the force of spring 202 plus any system oil pressure in cavity 198a acting on the end of land 200a if a null position of spool 200 was desired. A problem arose when attempting to achieve this balance because the system included a component which could vary significantly, namely oil pressure. The optimum solution is a control system completely independent of variable parameters, i.e., one independent of engine oil pressure.

In the present invention, oil pressure in cavity 198a is relieved, leaving only the force of armature 201b to be balanced against the force of spring 202 to achieve a null position of spool 200. Relieving the pressure in cavity 198a may be accomplished, for example, by providing an engine oil flow path to the vane system which bypasses spool 200, that is, does not utilize a passage internal to spool 200 to supply oil to inlet line 182, as in previous systems. The bypass of spool 200 may be achieved by connecting bypass line 230a directly to inlet line 182 and substituting inlet oil check valve 222c for the check valve previously contained in the passage internal to the spool. In conjunction with providing an alternate flow path, venting spool valve 198 to atmosphere via vent 198d would complete the objective of relieving the pressure in cavity 198a which acted on the end of land 200a in previous VCT systems.

With the oil pressure variable eliminated, the only forces left to consider in controlling the position of vented spool 200 are ones with predictable rates of change. The force of armature 201b corresponds to the electrical current applied to solenoid coil 201a, and the force of spring 202 is also predictable (with respect to spring position). The result is the position of spool 200 being readily ascertainable based on solenoid current alone.

The type of solenoid normally used in the preferred embodiment is the cylindrical armature, or variable area, solenoid shown in FIG. 19. Main air gap 201c extends radially around armature 201b and may contain nonmagnetic bearing material. As armature 201c moves axially, the cylindrical area of main gap 201c increases but the force and distance to the coil remain constant. Because the force is relatively insensitive to axial armature position, an extremely precise distance from solenoid housing 201d to vented spool 200 is not required.

An alternate embodiment of the present invention is shown in FIG. 20. A variable force solenoid of the flat-faced armature, or variable gap, type is used. Force is inversely proportional to the square of air gap 201c. It is thus advantageous to limit air gap 201c to a relatively small value. By using a stroke amplifier in conjunction with a variable gap solenoid, a net gain in force can be achieved. Lever arrangement 201e connects armature 201b with spool extension 200c and provides just such a gain in force. This net gain can be exploited by reducing the physical size of electromechanical actuator 201, thus decreasing the current requirements of solenoid coil 201a without sacrificing valve travel.

By using only imbalances between an electrically-generated force on one end 200a of spool 200 and a spring force on other end 200b for movement in one direction or another (as opposed to using imbalances between hydraulic loads from a common source on both ends), the control systems of FIGS. 19, and 20 are completely independent of hydraulic system pressure. Thus, it is not necessary to design a compromised system to operate within a potentially wide

5,497,738

9

spectrum of oil pressures, such that may be attributed to individual characteristics of particular engines. In that regard, by designing a system which operates within a narrower range of parameters, it is possible to rapidly and accurately position the spool 200 in its null position for enhanced operation of a VCT system.

The vane 160 is alternatingly urged in clockwise and counterclockwise directions by the torque pulsations in the camshaft 126 and these torque pulsations tend to oscillate vane 160, and, thus, camshaft 126, relative to sprocket 132. However, in the spool position shown in FIGS. 19 and 20, such oscillation is prevented by the hydraulic fluid within recesses 132a, 132b of sprocket 132 on opposite sides of lobes 160a, 160b, respectively, of vane 160, because no hydraulic fluid can leave either recesses 132a or 132b. Both return lines 194, 196 are blocked by the position of vented spool 200. If, for example, it is desired to permit camshaft 126 and vane 160 to move in a counterclockwise direction with respect to sprocket 132, it is only necessary to increase the amount of current to solenoid coil 201a. This will "push" armature 201b to the right, urge spool 200 to the right, and thereby unblock return line 194. In this condition of the apparatus, counterclockwise torque pulsations in camshaft 126 will pump fluid out of the portion of recess 132a and allow lobe 160a of vane 160 to move into the other portion of recess 132a which has been emptied of hydraulic fluid. However, reverse movement of vane 160 will not occur as the torque pulsations in camshaft 126 become oppositely directed unless and until vented spool 200 moves to the left, because of the blockage of fluid flow through return line 196 by land 200b of spool 200. While illustrated as a separate closed passage in FIGS. 19 and 20, the periphery of vane 160 has open oil passage slot 160c shown in FIGS. 10, 11, 15, 16 and 17, which permits the transfer of oil between that portion of recess 132a on the right side of lobe 160a and the portion of recess 132b on the right side of lobe 160b, which are the non-active sides of lobes 160a and 160b; thus, counterclockwise movement of vane 160 relative to sprocket 132 will occur when flow is permitted through return line 194 and clockwise movement will occur when flow is permitted through return line 196.

Further, inlet line 182 is provided with extension 182a to the non-active side of one of lobes 160a or 160b, shown as lobe 160b, to permit a continuous supply of make-up oil to the non-active sides of lobes 160a, 160b for better rotational balance, improved damping of vane motion, and improved lubrication of the bearing surfaces of vane 160. The flow of make-up oil does not affect, and is not affected by, the operation of electromechanical actuator 201. Make-up oil will continue to be provided to lobes 160a and 160b.

Although the best mode contemplated by the inventors for carrying out the present invention as of the filing date hereof has been shown and described herein, it will be apparent to those skilled in the art that suitable modifications, variations, and equivalents may be made without departing from the scope of the invention, such scope being limited solely by the terms of the following claims.

What is claimed is:

1. An internal combustion engine, comprising:

a crankshaft, said crankshaft being rotatable about an axis;

a camshaft (126), said camshaft being rotatable about a second axis, said camshaft being subject to torque reversals during rotation thereof;

a vane (160), said vane having first and second circumferentially spaced apart lobes (160a, 160b), said vane being attached to said camshaft, said vane being rotat-

10

able with said camshaft and being non-oscillatable with respect to said camshaft;

a housing (132), said housing being rotatable with said camshaft and being oscillatable with respect to said camshaft, said housing having first and second circumferentially spaced apart recesses (132a, 132b), each of said first and second recesses receiving one of said first and second lobes and permitting oscillating movement of said one of said first and second lobes therein;

means for transmitting rotary movement from said crankshaft to said housing; and,

means for controlling the oscillation of said housing, said control means being reactive to torque reversals in said camshaft for varying the position of said housing relative to said camshaft, said control means comprising:

a spool valve body (198);

a spool (200), said spool being reciprocable within said body and having first and second spaced apart lands (200a, 200b), said spool further having a vent to atmosphere (198d);

a first return line means (194) extending from one of said first recess and said second recess to said spool valve body, one of said first and second lands blocking flow through said first return line means in a first range of positions of said spool within said valve body and permitting flow through said first return line means in a second range of positions of said spool within said valve body;

a second return line means (196) extending from the other of said first recess and said second recess to said valve body, the other of said first and second lands blocking flow through said second return line means in said second range of positions of said spool within said valve body, permitting flow through said second return line means in a first portion of said first range of positions of said spool within said valve body, and blocking flow through said second return line means in a second portion of said first range of positions of said spool within said valve body;

an inlet line means (182) extending from said valve body to each of said first recess and said second recess, said inlet line means permitting hydraulic fluid to flow from said valve body to said each of said first recess and said second recess regardless of the position of said spool, said inlet line means having check valve means (184, 186) for preventing the flow of hydraulic fluid from each of said first recess and said second recess to said valve body;

means for sensing (207a, 207b) the positions of said crankshaft and said camshaft;

an engine control unit (208), said engine control unit for receiving information from said sensing means and for calculating a relative phase angle between said crankshaft and said camshaft using said information;

an electromechanical actuator (201), said electromechanical actuator comprising a variable force solenoid, said variable force solenoid for controlling the position of said spool in response to a signal issued from said engine control unit; and,

means for biasing (202) said spool valve, said biasing means for urging said spool valve to a full advance position during periods when said electromechanical actuator is deenergized.

2. An engine according to claim 1 wherein each of said first and second lobes respectively divides each of said first

5,497,738

11

and second recesses into a first portion and a second portion, each of said one of said first portion and said second portion of said each of said first and second recesses being capable of sustaining hydraulic pressure.

3. An engine according to claim 2 wherein said control means is capable of being reversed to transfer hydraulic fluid out of said one of said first portion and said second portion of said each of said first and second recesses and to transfer hydraulic fluid into said other of said first portion and said second portion of said each of said first and second recesses.

4. An engine according to claim 3 wherein said hydraulic fluid comprises engine lubricating oil, said engine further comprising at least one conduit means (230a) for transferring engine lubricating oil from a pressurized lubricating oil source (230) to said control means and back again in response to said torque reversals of said camshaft.

5. An engine according to claim 4 further comprising means for hydraulically connecting (182a) one of said first portion and said second portion of one of said first recess and said second recess with one of said first portion and said second portion of the other of said first recess and said second recess to permit hydraulic fluid to flow between said one of said first portion and said second portion of said one of said first recess and said second recess and said one of said first portion and said second portion of said other of said first recess and said second recess.

6. An engine according to claim 5 further comprising at least one other conduit means (230a), said other conduit means providing communication for the flow of hydraulic fluid through said valve body to said inlet line means, said other conduit means having second check valve means (222a) for preventing the flow of hydraulic fluid from said inlet line means through said valve body.

7. An engine according to claim 1 wherein said variable force solenoid comprises:

a coil (201a), said solenoid coil for receiving an electrical current from said engine control unit;

an armature (201b), said armature being substantially surrounded by said coil, said armature being connected to said spool, said coil, when energized, for creating a magnetic field sufficient to cause said armature to exert a force upon said spool and induce movement in said spool, said movement corresponding to said signal from said engine control unit;

an air gap, said air gap for separating said coil from said armature; and,

a housing, said housing for providing an enclosure for said coil, said armature, and said air gap.

8. An engine according to claim 1 wherein said electromechanical actuator further comprises a stroke amplifier, said stroke amplifier providing a net gain in force as applied to said vented spool.

9. An engine according to claim 8 wherein said stroke amplifier comprises a lever arrangement (201c).

12

10. In an internal combustion engine having a variable camshaft timing system for varying the phase angle of a camshaft relative to a crankshaft, a method of regulating the flow of hydraulic fluid from a source to a means for transmitting rotary movement from said crankshaft to a housing, comprising the steps of:

sensing the positions of said camshaft and said crankshaft;

calculating a relative phase angle between said camshaft and said crankshaft, said calculating step using an engine control unit for processing information obtained from said sensing step, said engine control unit further issuing a electrical signal corresponding to said phase angle;

controlling the position of a vented spool slidably positioned within a spool valve body, said controlling step being in response to said signal received from said engine control unit, said controlling step utilizing an electromechanical actuator to vary the position of said vented spool, said electromechanical actuator comprising a variable force solenoid;

supplying hydraulic fluid from said source through said spool valve to a means for transmitting rotary movement to said camshaft, said spool valve selectively allowing and blocking flow of hydraulic fluid through an inlet line and through return lines; and,

transmitting rotary movement to said camshaft in such a manner as to vary the phase angle of said camshaft with respect to said crankshaft said rotary movement being transmitted through a housing said housing being mounted on said camshaft, said housing further being rotatable with said camshaft and being oscillatable with respect to said camshaft.

11. The method of claim 10 wherein said variable force solenoid comprises:

a coil, said coil being adapted to receive said electrical signal from said engine control unit;

an armature, said armature being substantially surrounded by said coil, said armature being connected to said spool, said coil, when energized, creating a magnetic field sufficient to cause said armature to exert a force upon said spool and induce movement in said spool, said movement corresponding to said signal from said engine control unit;

an air gap, said air gap separating said coil from said armature; and,

a housing, said housing providing an enclosure for said coil, said armature, and said air gap.

12. The method of claim 10 wherein said electromechanical actuator further comprises a stroke amplifier, said stroke amplifier for providing a net gain in force as applied to said spool.

13. The method of claim 12 wherein said stroke amplifier comprises a lever arrangement.

*  *  *  *  *

# EXHIBIT  2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| HITACHI, LTD., and UNISIA NORTH AMERICA, INC., | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 05-048-SLR |
| v. | ) ) | |
| BORGWARNER INC., and BORGWARNER MORSE TEC INC., | ) ) ) | |
| Defendants. | ) ) | |
| BORGWARNER INC., | ) ) | |
| Counterclaimant, | ) ) | |
| v. | ) ) | |
| HITACHI, LTD., and UNISIA NORTH AMERICA, INC. | ) ) ) | |
| Counterdefendants. | ) ) | |

## DEFENDANTS' FIRST SET OF INTERROGATORIES (NOS. 1-10) TO PLAINTIFFS HITACHI, LTD. AND UNISIA NORTH AMERICA, INC.

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendants BorgWarner Inc., and BorgWarner Morse TEC Inc., hereby request that Plaintiffs Hitachi, Ltd., and Unisia North America, Inc., answer the following interrogatories in writing and under oath within the time allowed by the Federal Rules of Civil Procedure.

## DEFINITIONS

In the interrogatories appearing below, the following definitions shall apply:

A.    "Hitachi" as used herein shall mean plaintiff Hitachi, Ltd., any corporate affiliates, including plaintiff Unisia North America, Inc., and any parent or parents, subsidiaries, domestic or foreign, partners, officers, directors, successors, predecessors, assigns, and the employees, attorneys and agents of any and all of them.

B.    "Defendants" or "BorgWarner" as used herein shall mean BorgWarner Inc., and BorgWarner Morse TEC Inc.

C.    The term "patent-in-suit" or "the '738 patent" shall mean U.S. Patent No. 5,497,738.

D.    The term "variable camshaft timing components" as used herein shall include, without limitation, components used, or which can be used, in a system for controlling the timing of the opening and closing of an intake valve and/or exhaust valve (or for controlling the position of a camshaft relative to the position of a crankshaft or another camshaft) in an internal combustion engine, such components including without limitation:

(1) camshaft sprockets capable of being hydraulically adjusted (e.g., sprockets with body vanes), (2) camshaft position sensors, (3) variable timing control solenoids and solenoid valves,(4) variable timing control systems and related components, (5) camshaft phase

2

adjustment systems, and (6) electronic control units, and software and hardware contained therein;

        that have been, are, or are currently planned to be made, used, prototyped, sold, offered or intended for sale in the United States, or imported or exported by or on Hitachi's behalf, or imported into the United States as part of an engine or vehicle system.

      E.      The term "concerning" means comprising, relating to, referring to, reflecting, describing, evidencing or constituting.

      F.      The term "prosecution history" shall mean proceedings before the United States Patent and Trademark Office, including any interview, correspondence or other materials, whether or not included in the prosecution file history maintained at the United States Patent and Trademark Office.

      G.      The term "date of conception" shall mean the earliest date that Hitachi contends the patented invention was conceived.

      H.      "Documents" as used herein is employed in the broadest possible sense and means without limitation any written, printed, typed, stored, photographed, recorded or otherwise reproduced communication, compilation or reproduction including computer or electronically generated or stored information or data whether assertedly privileged or not and including all copies of drafts of any document which differs in any respect from the original.

      I.      "Communications" includes, without limitation, every manner or means of statement, utterance, notation, disclaimer, transfer or exchange of information of any nature whatsoever, by or to whomever, whether oral or written, or whether face-to-face, by telephone,

mail, personal delivery or otherwise, including but not limited to, letters, correspondence, conversations, memoranda, dialogue, discussions, meetings, interview, consultations, agreements and other understandings.

J.    "Person" shall refer to any natural person, firm, association, partnership, corporation, group, organization, or other form of legal business entity.

K.    "And" means "and/or." "Or" means "and/or." The plural of any word used herein includes the singular and the singular includes the plural. The masculine gender of any word used herein includes the feminine and the neuter. The past tense of a verb used herein includes the present tense and the present tense includes the past tense.

L.    "Any," "all," "each" or "every" means any and all, each and every.

M.    The terms "make," "use," "sell," "offer to sell," and "import" each assume the broadest possible meaning given those terms under U.S.C. § 154 and 35 U.S.C. §271(a).

N.    The term "prior art" means any patent publication, document, tangible thing, or event falling within any of the classes of information set forth in 35 U.S.C. §102 or §103 or 37 C.F.R. §1.56.

## GENERAL INSTRUCTIONS

Please comply with the following instructions:

A.    If any objection is made to any interrogatory herein, the objection shall state with particularity the bases therefor, and the interrogatory shall be answered to the extent

4

not objected to. If the objection is based on the attorney-client privilege or the work product doctrine, the objection shall identify the communication and shall in addition state the bases for the claim of privilege or work product as required by Federal Rule of Civil Procedure 26(b)(5).

B.    Consistent with the requirements of Federal Rule of Civil Procedure 26(e), Plaintiff shall promptly serve upon Defendants, in the form of additional or supplemental answers, any information requested in these interrogatories that may become known to Plaintiff after the date of Plaintiff's answers hereto.

## INTERROGATORIES

1.    Identify the following by product name, model number, and/or part number, and year of manufacture, use, sale and/or offer for sale in the United States:

(a)    all variable camshaft timing components, as defined in the Definitions herein, that have been made, used, prototyped, sold, offered or intended to be sold in the United States, or imported or exported by or on behalf of Hitachi, or imported into the United States, as part of an engine or vehicle system, since January 31, 1999;

(b)    all engine systems (by model number, manufacturer and date(s) of manufacture) using or intending to use the variable camshaft timing components described in part (a) above;

(c)    all vehicles (by model name, manufacturer and date(s) of manufacture) using or intending to use the variable camshaft timing components described in part (a) above;

5

(d)    all variable camshaft timing components, as defined in the Definitions herein, that have been made, used, prototyped, sold, offered or intended to be sold in the United States, or imported or exported by or on behalf of Hitachi, or imported into the United States, as part of an engine or vehicle system for Nissan Motors ("Nissan"), including without limitation, the Nissan 3.5L V-6 engine and/or the 2004 Nissan Altima; and,

(e)    all variable camshaft timing components, as defined in the Definitions herein, that have been made, used, prototyped, sold, offered or intended to be sold in the United States, or imported or exported by or on behalf of Hitachi, or imported into the United States, as part of an engine or vehicle system for Ford Motor Company ("Ford"), including without limitation, the Ford Duratec engine (2.5 L V-6 and 3.0L V-6), and Jaguar X-type vehicles, including the Jaguar XJ6; and,

(f)    documents sufficient to show the structure and operation of components identified in response to parts (a) through (e) above.

2.    With respect to the allegations in its pleadings that Hitachi has not infringed any claims of the '738 patent: (a) state the factual basis for that contention for each of claims 10 and 11 of the '738 patent and for each variable camshaft timing component and/or engine system and/or vehicle described in response to Interrogatory No. 1 above, by providing an element by element comparison between each of claims 10 and 11 with each variable camshaft timing component and/or engine system; (b) identify each feature, element, or limitation of each of claims 10 and 11 alleged to be absent from each such variable camshaft timing component and/or engine system and/or vehicle; (c) separately state the factual basis, with reference to the specific page and line number of the prosecution history of the '738 patent,

for any reliance on the prosecution history in support of any noninfringement contention; and

(d) identify persons having the most knowledge of the facts set forth in responses to paragraphs

(a) through (c) above.

      3.     For each of claims 10 and 11 of the '738 patent, state each fact, identify

each document (including prior art), and identify each person known to or believed by Hitachi to

have information that supports, refers to, relates to, or is inconsistent with, any of the following

claims and/or defenses that Hitachi is asserting:

        a)     invalidity of the '738 patent under 35 U.S.C. §§ 102, 103 and/or
                  112;

        b)     noninfringement of claims 10 and/or 11 of the '738 patent; and

        c)     unenforceability of the '738 patent due to inequitable conduct.

      4.     Identify each document, thing, or event that Hitachi contends is prior art

to the patent-in-suit on which Hitachi intends to rely, in whole or in part, to show that any

claim(s) of the patent-in-suit are invalid for anticipation and/or obviousness under 35 U.S.C. §§

102 and/or 103. For each such piece of prior art, identify specifically, by claim chart or

otherwise, any portion of that piece of prior art that discloses any element of any of the claims of

the patent-in-suit or that tend to show that any of the claims of the patent-in-suit is invalid for

anticipation or obviousness. If Hitachi intends to rely on any combination of prior art references

to show that the patent-in-suit is invalid for obviousness, identify that combination of prior art

references in detail and state specifically if and where the prior art provides the motivation to

make each such combination, and identify the characteristics of a person of ordinary skill in the relevant art.

      5.    Identify the person most knowledgeable of and describe their roles, duties, and responsibilities in each of the following activities with respect to the variable camshaft timing components identified in the answer to Interrogatory 1:

          a)    design;

          b)    commercialization and marketing;

          c)    research, development and/or testing;

          d)    manufacturing and product specifications;

          e)    manufacture of products or components thereof by third parties;

          f)    marketing and sales;

          g)    advertising;

          h)    finance and accounting;

          i)    executive management; and

          j)    review, analysis and opinions relating to the patent-in-suit.

      6.    Identify each person or entity who has considered or provided information, or has been consulted by Hitachi or on its behalf concerning the validity, invalidity, enforceability, unenforceability, infringement or non-infringement of any of the claims of the

patent-in-suit, and identify all documents relating or referring to such consideration, information or consultation.

       7.     Describe the circumstances under which Hitachi first learned of the patent-in-suit including the dates and the identities of the persons involved.

       8.     Identify, by name and current mailing address, any fact witness Hitachi intends to call to testify at trial, and for each such fact witness, provide a statement of the testimony that witness plans to provide.

       9.     Identify, by name and current mailing address, each expert or consultant (including employees of Hitachi) retained by Hitachi to assist in the present litigation who may or may not testify at trial, and for each such expert identified, state the subject matter of the expert's expertise, the factual basis for any opinion each expert has relating to the present litigation, and any documents relied upon, disclosed to, or persons consulted, concerning that opinion.

      10.    For any claim of the patent-in-suit which Hitachi contends should be construed by the Court:

         a)     state Hitachi's proposed construction;

         b)     identify each portion of the specification and prosecution of the patent-in-suit that Hitachi contends supports its proposed construction; and

9

c)    identify any extrinsic evidence that Hitachi contends supports its

construction.


Dated: April 25, 2005                          Respectfully submitted,

                                               Richard K. Herrmann (I.D. #405)
                                               Lewis H. Lazarus (I.D. #2374)
                                               Morris James Hitchens & Williams LLP
                                               222 Delaware Avenue, 10th Floor
                                               Wilmington, DE 19899
                                               (302) 888-6800

                                               Hugh A. Abrams (pro hac vice)
                                               Marc A. Cavan (pro hac vice)
                                               Hillary A. Mann (pro hac vice)
                                               Sidley Austin Brown & Wood, LLP
                                               10 South Dearborn Street
                                               Chicago, Illinois 60603
                                               (312) 853-7000

                                               Attorneys for BorgWarner Inc., and
                                               BorgWarner Morse Tec Inc.

10

## CERTIFICATE OF SERVICE

Hillary Mann, an attorney, hereby certifies that she caused a true and correct copy of the

foregoing document, Defendants' First Set of Interrogatories (Nos. 1-10) to Plaintiffs Hitachi,

Ltd. and Unisia North America, Inc. to be served on the following counsel of record in the

manner specified:

### By E-mail with confirmation copy by Overnight Courier

> Michael D. Kaminski, Esq.
> Pavan K. Agarwal, Esq.
> FOLEY & LARDNER LLP
> 3000 K Street, N.W. Suite 500
> Washington, D.C. 20007-5109
> Phone: (202) 672-5300
> Fax: (202) 672-5399
> mkaminski@foley.com
> pagarwal@foley.com
>
> Steven J. Balick
> John G. Day
> ASHBY & GEDDES
> 222 Delaware Avenue, 17th Floor
> P.O. Box 1150
> Wilmington, DE 19899
> Phone: (302) 654-1888
> Fax: (302) 654-2067
> sbalick@ashby-geddes.com
> jday@ashby-geddes.com

Dated: April 25, 2005

Hillary A. Mann

CHI 3192733v.1

# EXHIBIT  3

# EXHIBIT   REDACTED
# IN   ITS   ENTIRETY

# EXHIBIT   4

# EXHIBIT REDACTED IN ITS ENTIRETY

# EXHIBIT   5

# EXHIBIT  REDACTED
# IN  ITS  ENTIRETY

# EXHIBIT 6

# EXHIBIT REDACTED
# IN ITS ENTIRETY

# EXHIBIT   7

# EXHIBIT REDACTED
# IN ITS ENTIRETY

# EXHIBIT 8

# MORRIS, JAMES, HITCHENS & WILLIAMS LLP

222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19801
(302) 888-6800
Facsimile (302) 571-1750
www.morrisjames.com

Mary B. Matterer
(302) 888-6960
mmatterer@morrisjames.com

Mailing Address
P.O. Box 2306
Wilmington, DE 19899-2306

March 1, 2006

**VIA EMAIL AND HAND DELIVERY**

Collins J. Seitz, Jr., Esq.
Connolly Bove Lodge & Hutz LLP
The Nemours Building
1007 North Orange Street
Wilmington, DE 19801

Re:   *Hitachi Ltd. et al. v. BorgWarner, Inc. et al.,*
      D. Del., C.A. No. 05-048-SLR

Dear Special Master Seitz:

BorgWarner respectfully requests clarification pertaining to the scope of ECU discovery ordered in the Third Discovery Order. More specifically, BorgWarner previously requested financial and technical discovery related to Hitachi's sales of ECUs containing VCT modules to customers other than Nissan. (*See* Letter Brief to Special Master Seitz from Mary Matterer, 1/25/2006, p. 8-9). As we have previously indicated, such discovery is directly relevant to Hitachi's liability for induced infringement and contributory infringement. (*See id.* at p. 4). The Third Discovery Order does not directly address such discovery. However, given the liberal discovery standard applied in the Order and the fact that discovery was granted regarding ECU sales to Nissan, it appears that BorgWarner would also be entitled to this much needed and relevant information. BorgWarner wishes to avoid further disputes with Hitachi over ECU discovery and therefore requests clarification of the Order.

Respectfully,

Mary B. Matterer

cc: Steven J. Balick, Esq. (via email)
    Michael D. Kaminski, Esq. (via email)

Newark (302) 368-4200          Wilmington (302) 888-6800          Dover (302) 678-8815

# EXHIBIT   9

**CONNOLLY BOVE LODGE & HUTZ LLP**
ATTORNEYS AT LAW

The Nemours Building
1007 North Orange Street
P.O. Box 2207
Wilmington DE 19899
TEL (302) 658 9141
FAX (302) 658 5614

1990 M Street, NW, Suite 800
Washington DC 20036
TEL (202) 331 7111
FAX (202) 293 6229

Wells Fargo Center
South Tower, Suite 315G
355 South Grand Avenue
Los Angeles CA 90071
TEL (213) 787 2500
FAX (213) 687 0498

WEB www.cblh.com

Collins J. Seitz, Jr.
TEL        (302) 888-6278
FAX       (302) 255-4278
EMAIL    cseitz@cblh.com
REPLY TO   Wilmington Office

March 13, 2006

**By Electronic Mail**

Steven J. Balick, Esquire
John G. Day, Esquire
Ashby & Geddes
222 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899

Richard K. Herrmann, Esquire
Mary Matterer, Esquire
Morris James Hitchens & Williams
222 Delaware Avenue, 10th floor
P.O. Box 2306
Wilmington, DE 19899

Re:    *Hitachi Ltd. v. BorgWarner Inc., et al.*
       C.A. No. 1:05-cv-00048-SLR

Dear Counsel:

On March 1, 2006, BorgWarner requested clarification of the scope of ECU discovery set forth in the Third Discovery Order. Specifically, BorgWarner asked to clarify whether it would be permitted financial and technical discovery related to Hitachi's sales of ECU's containing VCT modules to customers other than Nissan.

In paragraph two of the Third Discovery Order, I ruled that BorgWarner was entitled to limited technical and financial information relating to Hitachi's sale of ECU's. With the exception of the financial information set forth in paragraph 2(e), each of the categories of documents to be produced related exclusively to sales to Nissan. Paragraph 2(e) was not so qualified, but was limited to differential pricing information only. Therefore, except as set forth in paragraph 2(e), BorgWarner is not entitled to ECU discovery for customers other than Nissan.

BorgWarner claims that such discovery is relevant to demonstrate Hitachi's liability for induced infringement and contributory infringement. I determined, however, that the nature of the ECU, the multitude of functions it

Steven J. Balick, Esquire
Mary Matterer, Esquire
March 13, 2006
Page 2

performs unrelated to VCT control, and the burden to Hitachi of providing voluminous discovery outweighed the possible benefit to BorgWarner.

This case has been focused on discovery relating to VCT components sold by Hitachi. To the extent that Hitachi sells ECU's with its VCT components, I allowed limited discovery to proceed. To permit discovery of Hitachi's ECU's unrelated to Hitachi's sales of VCT components would delay this proceeding and expand discovery beyond what is reasonable.

Yours very truly,

Collins J. Seitz, Jr.
Special Master

CJS,Jr./saj
(452339)

# EXHIBIT 10

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| HITACHI, LTD., and UNISIA NORTH AMERICA, INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 05-048-SLR |
| BORGWARNER, INC., and BORGWARNER MORSE TECH, INC., | ) ) ) | |
| Defendants. | ) ) | |

## FOURTH DISCOVERY ORDER

The Special Master, having considered the submissions from BorgWarner, Inc. and BorgWarner Morse Tech, Inc. (collectively "BorgWarner") and Hitachi, Ltd. and Unisia North America, Inc. (collectively "Hitachi") relating to pending discovery disputes, rules as follows:

1.    Hitachi's request for a 30(b)(6) deposition of BorgWarner to explain payments received by BorgWarner for past VCT sales.

Hitachi requests that BorgWarner be compelled to produce a 30(b)(6) witness to "explain" alleged factual inconsistencies relating to Hitachi's anticipated on-sale defense. Hitachi claims that the deposition testimony of Roger Butterfield and Phil Mott, and BorgWarner's interrogatory responses, are inconsistent with documents recently produced by BorgWarner. The recently produced documents relate to payments made by Ford to BorgWarner in the early 1990's for development of prototypes for VCT systems to be used in Ford engines. According to Hitachi, it did not have these documents before the depositions were taken, and it needs a further deposition to explore the alleged inconsistencies which relate to its "on-sale" defense. *See Petrolite Corp. v. Baker*

*Hughes, Inc.*, 96 F.3d 1423, 1426-27 (Fed. Cir. 1996) (payments received by patentee for devices covered by patent claims are relevant to on-sale defense). BorgWarner responds that a deposition is unnecessary because there are no inconsistencies between the depositions and discovery responses, and the recently produced documents.

After reviewing the documents attached to Hitachi's motion, it is in my judgment excessive to order another deposition to clarify what appears to be several narrow factual points, which may not even fairly qualify as inconsistencies with prior deposition testimony and discovery responses. I will therefore deny Hitachi's request for a 30(b)(6) deposition. Instead, on or before April 15, 2006, I will require that BorgWarner submit a declaration from a knowledgeable person explaining in detail the following issues: (1) Ford's statement in 1991 about recovery of engineering costs through overhead allocation in the selling price, as it relates to payments received by BorgWarner; (2) any agreement between BorgWarner and Ford that allowed BorgWarner to recover $700,000 in VCT expenses if Ford cancelled its VCT program in 1991; and (3) BorgWarner's negotiations and agreements with Ford concerning reimbursement for costs and expenses from January 1988 through July 1993 relating to research and development work on Ford's VCT program.

2.    Hitachi's motion to compel BorgWarner to produce a deponent to testify regarding Hitachi's fifth 30(b)(6) deposition.

Hitachi requests an order requiring BorgWarner to produce a deponent to testify about topics 3-10 and 19 of Hitachi's fifth 30(b)(6) notice of deposition (Hitachi has withdrawn or will not pursue topics 11 and 13-17, and there is no dispute about the remaining topics). The topics at issue are described by Hitachi as generally relating to

2

collaboration efforts between Hitachi and BorgWarner relating to VCT technology. BorgWarner had earlier agreed to produce a witness without any limitations in response to Hitachi's fifth 30(b)(6) deposition notice (Feb. 27, 2006 letter from BorgWarner counsel at page 3), but has subsequently refused to produce a witness on the foregoing topics.

In its February 22, 2006 supplemental interrogatory responses, BorgWarner stated that in support of its willful infringement claim, it will contend that, pursuant to earlier confidentiality agreements and a collaboration agreement between the parties, BorgWarner shared proprietary VCT technology information with Hitachi. Based on these disclosures, BorgWarner intends to argue that "Hitachi's possession of [BorgWarner's proprietary VCT technology], coupled with Hitachi's admitted knowledge of the '738 patent, strongly suggests that Hitachi copied aspects of the '738 patent invention in designing and developing its accused VCT products." BorgWarner's February 22, 2006 supplemental response to Hitachi Interrogatory 12. Hitachi claims that it needs to explore the state of VCT technology before and during the time that the parties were collaborating to rebut BorgWarner's claim that Hitachi unfairly used confidential information in the development of Hitachi's VCT system.

BorgWarner responds that deposition topics 3-10 and 19 relate only to a lost profits claim, which BorgWarner has agreed not to pursue, and are irrelevant or unrelated to the collaboration agreement between the parties. BorgWarner also contends that much of the subject matter has already been covered in previous depositions, and is therefore cumulative.

I find that Hitachi should be given an adequate opportunity to explore BorgWarner's claim that Hitachi's access to BorgWarner's VCT technology "strongly suggests that Hitachi copied aspects of the '738 patent invention when designing and developing its accused VCT products." Although BorgWarner faults Hitachi for not exploring some of the issues in earlier depositions, Hitachi was first put on notice of this argument in BorgWarner's February 22, 2006 supplemental interrogatory responses – after many of the depositions had occurred. It is therefore not unreasonable for Hitachi to request further deposition discovery to explore BorgWarner's contention. Hitachi's topics, however, are overbroad, and must be tailored to avoid duplicative discovery.

I therefore give BorgWarner a choice. It can decide not to pursue its "access to confidential information" argument as it relates to copying, and thereby avoid producing a witness for a 30(b)(6) deposition on this issue. If, however, it decides to pursue this claim, BorgWarner must make a knowledgeable witness available for a 30(b)(6) deposition on the following topics:

(a)    The reasons for BorgWarner's decision to enter into confidentiality agreements and the collaboration agreement with Hitachi, including the status of BorgWarner's efforts to commercialize a VCT system at the time of the confidentiality and collaboration agreements;

(b)    The BorgWarner VCT technology shared with Hitachi under previous confidentiality agreements and the collaboration agreement;

(c)    How the VCT technology shared with Hitachi at the time of the foregoing agreements compared to, or was different from, VCT technology known in the industry; and

4

(d)    What aspects of the VCT technology shared with Hitachi BorgWarner relies upon to support its claim that "Hitachi copied aspects of the '738 patent invention when designing and developing its accused VCT products."

To the extent that the foregoing categories do not capture all of Hitachi's topic numbers 3-10 and 19, Hitachi's request is denied as marginally relevant to the purpose of the inquiry, and in all likelihood cumulative of other deposition testimony already taken in the case.

3.    BorgWarner's request for reconsideration of the Special Master's March 13, 2006 Decision.

In my March 13, 2006 letter, I reaffirmed the denial of BorgWarner's request for discovery relating to electronic control units (ECU's) manufactured by Hitachi that were sold by Hitachi to customers other than Nissan.  I determined that, based on Hitachi's strenuous objection about the burden such discovery would present, as well as its representations about the broader functions performed by the ECU units in comparison to the limited functions it performs for VCT control, discovery should not be permitted.

BorgWarner has requested that I clarify the future effect of my decision, so as not to preclude BorgWarner from pursuing infringement claims in the future relating to Hitachi's ECU's sold to other customers.  Hitachi opposes this clarification, principally by re-hashing its earlier arguments about burdensomeness, as well as attacking the legal sufficiency of any infringement claim arising from the operation of its ECU's.

I find that Hitachi's opposition comes with ill grace.  Hitachi persuaded me to preclude additional ECU discovery based principally on the burden to Hitachi of allowing this discovery.  Now, it essentially asks for a merits determination of BorgWarner's

infringement claims relating to Hitachi's sale of ECU's (something I have no authority to do), and even though discovery has been precluded at Hitachi's request. Hitachi asks that I forever bar BorgWarner from pursuing possible claims in the future. That was not my intention, and not the intention of a discovery ruling.

Therefore, to clarify my March 13, 2006 Decision (and the following should be considered an integral part of that Decision), the March 13, 2006 Decision shall not preclude BorgWarner from filing a separate lawsuit against Hitachi in the future, for which discovery was precluded by the March 13, 2006 Decision. If Hitachi wants to address in the pending litigation the infringement issue for ECU sales to customers other than Nissan, then the Special Master will revisit his ECU discovery ruling at Hitachi's request.

4.    BorgWarner's request regarding discovery from Nissan North America (represented by Hitachi's counsel).

The Special Master will hold a teleconference with counsel on Thursday, April 6, 2006 at 10:00 a.m. ET. Counsel for plaintiffs shall make arrangements for the call.

_____
Special Master

Dated: April 3, 2006

6

# EXHIBIT   11

Westlaw.

Not Reported in F.Supp.2d                                                         Page 1
Not Reported in F.Supp.2d, 2000 WL 1521600 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

**H**
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
BANCMORTGAGE FINANCIAL
CORPORATION, d/b/a BancFinancial Services
Corp.,
v.
THE GUARANTEE TITLE & TRUST COMPANY,
et al.,
No. Civ.A.99-CV-2932.

Oct. 6, 2000.

Robert M. Bovarnick, Montgomery, McCracken,
Walker & Rhoads, LLP, Philadelphia, PA, David C.
Olson, Jill M. Vollman, Frost & Jacobs, Cincinnati,
OH, for the Guarantee Title & Trust Company,
Defendant.
Jay M. Green, Dechert, Price and Rhoads, Phila., PA,
Magdalen Braden, Phila., PA, William Crawford
Crenshaw, Powell, Goldstein, Frazer & Murphy,
Washington, DC, Camille Bennett, Powell Goldstein,
Washington, DC, for BancMortgage Financial
Corporation d/b/a BancFinancial Services Corp.,
Plaintiff.
Michael J. Hynes, Jeffrey B. McCarron, Swartz,
Campbell & Detweiler, Philadelphia, PA, for J.H.
Troup, Inc., Appraisers, Defendant.
Samuel J. Pace, Jr., Dugan, Brinkmann, Maginnis
and Pace, Philadelphia, PA, for Ousley, Inc. d/b/a
Appraisal Enhancement Services, Defendant.
Robert M. Bovarnick, Montgomery, McCracken,
Walker & Rhoads, LLP, Philadelphia, PA, David C.
Olson, Jill M. Vollman, Frost & Jacobs, Cincinnati,
OH, for the Guarantee Title & Trust Company,
Third-Party Plaintiff.
Peter D. Solymos, Griffith, Strickler, Lerman,
Solymos & Calkins, York, PA, for Mary E. Page,
Third-Party Defendant.
James S. Sorrentino, Sorrentino & Savoca, Lancaster,
PA, for Edgar M. Wright, Third-Party Defendant.
Laura Lyon Slaymaker, Blakinger, Byler and
Thomas, P.C., Lancaster, PA, for Glen Hartz, Third-
Party Defendant.
Laura Lyon Slaymaker, (See above), for Owen Hartz,
Third-Party Defendant.
Laura Lyon Slaymaker, (See above), for Karen Y.
Hartz, Third-Party Defendant.
Laura Lyon Slaymaker, (See above), for William A.
Formica, Third-Party Defendant.
Laura Lyon Slaymaker, (See above), Kelly R.
Ramsdell, Phila., PA, for Elizabeth K. Formica,
Third-Party Defendant.
Jeffrey M. Kolansky, Kolansky and Strauss, P.C.,
Phila., PA, for Vincent Dagen, Third-Party
Defendant.

### MEMORANDUM & ORDER

KAUFFMAN, J.
**\*1** This action involves the alleged fraudulent
appraisal and acquisition of properties located in the
Commonwealth of Pennsylvania. Plaintiff seeks
damages for common law fraud, breach of contract,
and negligence. Now before the Court is Plaintiff's
Motion to Sever Claims or, Alternatively, for
Separate Trials. For the following reasons, the
Motion will be denied.

### I. FACTUAL BACKGROUND

Plaintiff BancMortgage Financial Corporation, d/b/a
BancFinancial Sevices Corp., is the owner and holder
of a series of residential mortgage loans made to
Barrylee Beers and Mickey Weicksel (together, the
"Buyers"). The Buyers allegedly used these loans to
purchase property at artificially inflated prices and
then had a portion of the proceeds paid to entities
with which they were financially involved. (Second
Am. Compl. at ¶ 11.) Defendant Guarantee Title &
Trust Company ("Guarantee") was the title insurer
for the loans. Other Defendants in this action
allegedly facilitated the Buyers' fraudulent scheme in
various ways. Defendant J.H. Troup, Inc. ("Troup")
is a residential appraisal company that allegedly
appraised the properties at amounts much higher than
market value. Defendant Ousley, Inc. ("Ousley")
allegedly conducted negligent review appraisals of
the initial appraisals done by Troup and supported the
inflated prices. (Second Am. Compl. at ¶ 11.)
Defendant Wheatland Abstract, Inc. ("Wheatland") is
a title company that allegedly acted as Guarantee's
agent for the purpose of issuing the title insurance
and conducting the closings. Wheatland's principal,
Pamela Sue Rife ("Rife"), allegedly issued multiple
closing statements for the loans. (Second Am.
Compl. At ¶ 11.)

Plaintiff originally brought this action against only
Guarantee, but later filed a Second Amended

Not Reported in F.Supp.2d, 2000 WL 1521600 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

Complaint naming as additional defendants Wheatland, Rife, Troup, and Ousley. Guarantee filed its Answer and Affirmative Defenses together with a Cross-Claim against co-defendants Wheatland, Rife, Troup, and Ousley. Guarantee also filed a Third-Party Complaint against William Rybczuk d/b/a Earth Mortgage ("Earth"), Mary E. Page, Edgar M. Wright, Glen Hartz, Owen Hartz, Karen Hartz, William A. Formica, Elizabeth K. Formica, and Vincent Dagan seeking indemnification from the third-party defendants. Plaintiff has now brought this motion to sever or try separately its claims against Guarantee pursuant to Rules 21 and 42(b) of the Federal Rules of Civil Procedure. Guarantee has filed an Objection to Plaintiff's Motion ("Def.Resp.")

> FN1. According to Guarantee, "All of the Third Party Defendants, with the exception of Earth, were sellers of properties. As set forth in the Amended Complaint and the Second Amended Complaint, Earth served as the mortgage broker for all of the loans at issue, providing Habersham [ ("Habersham") (Plaintiff's predecessor in interest) ] with the underlying documents. Guarantee believes that Earth had actual or constructive knowledge of all material activities relating to the property purchase "program" of the Buyers, and Guarantee also believes that Earth located lenders for the Buyers, including Habersham. Further, Guarantee believes that Earth either had existing relationships with the lenders it contacted, or entered into agreements specifically to facilitate the Buyers' "program." (Def. Opp. at 8.)

## II. LEGAL STANDARD

This Court is afforded broad discretion when determining whether to sever a case under Federal Rules of Civil Procedure 21 and 42(b). *Brunet v. United Gas Pipeline Co.,* 15 F.3d 500, 505 (5th Cir.1994) (citing Fed.R.Civ.P. 21); *Idzojtic v. Pa. R.R. Co.,* 456 F.2d 1228, 1230 (3d Cir.1972) (discussing Fed.R.Civ.P. 42(b)). Rule 21 provides, in pertinent part, that "[a]ny claim against a party may be severed and proceeded with separately." Rule 42(b) provides:
*2 The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any

number of claims, cross-claims, counterclaims, third-party claims, or issues, always preserving inviolate the right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States.

Whereas separate trials under Rule 42(b) usually result in one judgment, severed claims under Rule 21 "become entirely independent actions to be tried, and judgment entered thereon, independently." *Rodin Properties-Shore Mall, N.V. v. Cushman & Wakefield of Pa., Inc.,* 49 F.Supp.2d 709, 720 (D.N.J.1999) (quoting 9 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2387 (2d ed.1994)).

To determine whether severance under Rule 21 or separate trials under Rule 42(b) is appropriate, the Court must consider the same concerns, namely, convenience of the parties, avoiding prejudice, and promoting expedition and economy. *Sutton Hill Assocs. v. Landes,* No. Civ.A.87-8452, 1988 WL 56710, at *2 (S.D.N.Y. May 25, 1988). Specifically, courts determine:
(1) whether the issues sought to be tried separately are significantly different from one another, (2) whether the separable issues require the testimony of different witnesses and different documentary proof, (3) whether the party opposing the severance will be prejudiced if it is granted, and (4) whether the party requesting the severance will be prejudiced if it is not granted.

*Official Comm. of Unsecured Creditors v.Shapiro,* 190 F.R.D. 352, 355 (E.D.Pa.2000) (quoting *German v. Fed. Home Mortgage Corp.,* 896 F.Supp. 1385, 1400 (S.D.N.Y.1995)).

## III. ANALYSIS

Plaintiff argues, "the convenience of the parties supports severance as it will simplify the proceedings.... The issues sought to be tried are significantly different from one another ... [requiring] different witnesses and different documentary proof." (Pl. Mot. at 7.) According to Plaintiff, "there are two core types of claims involved in the case: (1) Plaintiff's claims against Guarantee, all of which evolve out of the relationship between Plaintiff and Guarantee [specifically, whether Guarantee agreed to indemnify Plaintiff in the closing protection letters]; and (2) the remaining ancillary claims, all of which evolve out of the underlying mortgage fraud scheme." (Pl. Mot. at 4.) As Guarantee points out,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

however, Plaintiff added a myriad of new defendants when it filed its Second Amended Complaint and did not object to Guarantee's Motion to file its Third Party Complaint naming another group of new defendants allegedly involved in this fraudulent scheme. Furthermore, Guarantee argues that "whether [it] is liable to [Plaintiff] under the closing protection letters cannot be addressed until this Court determines whether ... [Plaintiff's] lending practices ... were negligent and, if so, were the proximate cause of the lending decisions." (Def. Resp. at 10.) In fact, during a Scheduling Conference on September 28, 2000, Guarantee represented that Plaintiff possibly was a participant in the fraudulent scheme.

**\*3** In consideration of the above, and in particular Guarantee's position that "any damages to [Plaintiff] were caused by [its] own actions" (Def. Sur Reply at ¶ 2), the Court finds that separating Plaintiff's claims against Guarantee from the ancillary claims related to the allegedly fraudulent scheme would not be in the interest of justice. Plaintiff is clearly interested in and affected by this allegedly fraudulent scheme, and its interests are not limited to the actions of Guarantee. Furthermore, the fact that, once litigation commenced, new parties were added and the allegations and involvement spread to entities Plaintiff had not forseen when it filed its Second Amended Complaint is not enough to justify severing or trying separately Plaintiff's claims against Guarantee. Judicial economy and interest in non-conflicting judgments are paramount considerations in situations such as these. Separating Plaintiff's claims would ultimately confuse the issue, especially given Guarantee's contention that Plaintiff's pre closing actions are relevant to an appropriate determination of the liability, if any, of Guarantee. (Def. Resp. at 4). Accordingly, the Motion will be denied.

An Order follows.

### ORDER

AND NOW, this 5 th Day of October 2000, upon consideration of Plaintiff's Motion to Sever Claims or, Alternatively, for Separate Trials, IT IS ORDERED, for the reasons set forth in the accompanying Memorandum, that the Motion is DENIED.

E.D.Pa.,2000.
BancMortgage Financial Corp. v. Guarantee Title & Trust Co.

Not Reported in F.Supp.2d, 2000 WL 1521600 (E.D.Pa.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT   12



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21402512 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
ENZO LIFE SCIENCES, INC.,
Plaintiff/Counterclaim Defendant,
v.
DIGENE CORPORATION, Defendant/Counterclaim
Plaintiff
v.
ENZO BIOCHEM, INC., Additional Counterclaim
Defendant.
No. Civ.A. 02-212-JJF.

June 10, 2003.

Josy W. Ingersoll, and Sara Beth Reyburn of Young, Conaway, Stargatt & Taylor, L.L.P., Wilmington, Delaware, for Plaintiff, Enzo Life Sciences, Inc. and Additional Counterclaim Defendant, Enzo Biochem, Inc., Richard L. DeLucia, Jeffrey M. Butler, and Paul M. Richter, Jr., of Kenyon & Kenyon, New York, New York, of counsel.
Richard D. Kirk, of Morris, James, Hitchens & Williams L.L.P., Wilmington, Delaware, for Defendant, Digene Corporation, Mark R. Labgold, Ph.D., Kevin B. Bell, Laura A. Donnelly, of Patton Boggs L.L.P., McLean, Virginia. Richard J. Oparil, of Patton Boggs L.L.P., Washington, DC, of counsel.

OPINION
FARNAN, J.
*1 A teleconference was held in this case on Wednesday, June 4, 2003, to discuss the pending motions. During the teleconference, the Court ruled on several motions. Specifically, for the reasons discussed below, the Court: 1) denied Enzo Biochem, Inc.'s ("Enzo Biochem") Motion to Strike the Expert Report of Stephen Jizmagian (D.I.144); (2) granted in part and denied in part Enzo Biochem's and Enzo Life Sciences Inc.'s ("Enzo Life Sciences") Joint Motion to Bifurcate Trial on Digene's Business Tort Claims (Counterclaims III-V) and Stay Discovery on Them (D.I.145); 3) denied Digene Corporation's ("Digene") Motions for Protective Orders (D.I.104, 113); and 5) denied Enzo Life Sciences' Motion to Compel (D.I.94).

I. *Factual Background*

This is a patent infringement action brought by Plaintiff Enzo Life Sciences against defendant Digene involving U.S. Patent No. 6,221,581B1 (the " '581 Patent"), issued on April 24, 2001. Both Enzo Life Sciences and Digene are companies involved in the development, manufacture and distribution of proprietary RNA and DNA testing systems. The '581 Patent concerns hybrid capture technology used in diagnostic medical applications.

Plaintiff, Enzo Life Sciences has alleged that Digene is infringing claims 16-26, 30-40, 44-53, 73-87, 91-100 and 104-107 of the '581 Patent by making, selling and offering for sale its "Hybrid Capture" diagnostic products. This action began on March 15, 2002 when Digene filed a Summons and Complaint for Declaratory Judgment. Enzo Life Sciences filed a separate lawsuit for patent infringement on March 20, 2002. During a May 2, 2002 status conference, the Court suggested that the parties stipulate to a dismissal of Digene's declaratory judgment Complaint, without prejudice and proceed with Enzo Life Sciences' patent infringement complaint. The Court further explained that Digene would be permitted to bring other claims against any Enzo entity, including Enzo Biochem, as permissive counterclaims. Thereafter, the parties filed a Stipulated Proposed Scheduling Order dismissing Digene's declaratory judgment action without prejudice, and the parties agreed to proceed with all pending and all related claims in Enzo Life Sciences' patent infringement action. Additionally, Digene filed Counterclaims against Enzo Life Sciences and Enzo Biochem.

On June 28, 2002, Enzo Life Sciences, Inc. and Enzo Biochem, Inc. moved to dismiss Digene's Counterclaims. On March 31, 2003, the Court denied the motion to dismiss Digene's Counterclaims. (D.I.124). Fact discovery closed on February 24, 2003 and the parties are currently conducting expert discovery which is scheduled to close on June 20, 2003.

II. *Enzo Biochem's Motion to Strike the Expert Report of Stephen Jizmagian (D.I.144)*

A. *Parties' Contentions*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 2
Not Reported in F.Supp.2d, 2003 WL 21402512 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Enzo Biochem contends that the expert report of Dr. Stephen Jizmagian should be stricken in its entirety. Specifically, it contends that Digene's counterclaims III-V should be limited to those that were actually pled in the case, namely those that are based upon the two, 2001 press releases by Enzo Biochem regarding the '581 Patent. Enzo Biochem points out that Digene, in its counterclaims, alleging causes of action under: 1) § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (Count III); 2) Unfair Competition under the Delaware Deceptive Trade Practices Act, 6 Del. C. § § 2531 et seq. (Count IV); and 3) Tortious Interference With Prospective Business Relations (Count V), listed two press releases as the factual basis for such claims. However, at this juncture, Enzo Biochem argues that Dr. Jizmagian's expert report concerning damages as to these claims does not mention the press releases, but rather details alleged instances that are not asserted in Digene's counterclaims. For instance, Enzo, points out that the report states that Dr. Jizmagian was told by Digene that Enzo Biochem somehow prevented Digene from obtaining one million dollars in capital through Goldman Sachs in 2000. As a result, Enzo argues that Digene's new claim, as suggested by the expert report, is not that Enzo Biochem interfered with customers seeking to purchase the Hybrid Capture product, but that Enzo Biochem somehow interfered with Digene's ability to raise capital through Goldman Sachs, which allegedly led to lost sales. Based on these facts, Enzo Biochem claims that it is improper for Digene to amend its counterclaims through Dr. Jizmagian's expert report, and therefore, the report should be stricken in its entirety.

**\*2** In response, Digene asserts that its responses to Enzo Biochem's interrogatories plainly set forth the factual basis for its damages claims, where Digene listed all parties that it had contracts and/or agreements with from as early as 1992 that were terminated. *See* Ex. 1 to Kirk Decl. Further, in regard to the time period of damages, Digene contends that it affirmatively stated that Biochem's actions before or at the time the case was filed resulted in direct harm to Digene, where in an interrogatory response they stated:
As a direct result of Biochem's actions Digene was forced to respond to, participate in or otherwise conduct extensive due diligence, including requests from potential funding entities as well as requests from potential joint venturers. Such requests include but are not limited to requests made when Digene completed its IPO and subsequent follow-on private placement transaction and includes potential follow-

on public offering and potential strategic partners such as requests from Cytyc, Affymetrix, Applera Corporation and Roche.

Ex. 1 to Kirk Decl. Further, Digene argues that all of the documents relied on by Dr. Jizmagian were produced during discovery, with the bulk of the disclosures, consisting of four hundred boxes of documents, produced as early as October 2002. Moreover, Digene argues that Enzo Biochem failed to pursue available discovery, because it did not take any depositions until the last week of extended fact discovery and points to the fact that during Ms. Seyfried's, Digene's Vice President of Business Development, deposition, she mentioned that the financing opportunities which were adversely affected by Enzo's actions included Goldman Sachs. *See* Ex. 6 to Kirk Decl. at 176-180. Digene contends that based on the fact that the Court determined that it properly pled the allegations in its Business Tort Counterclaims in its Memorandum Opinion regarding the motion to dismiss (D.I.124), and the fact that Digene provided all necessary discovery, Enzo's motion to strike should be denied.

### B. *Discussion*

The Motion to Strike will be denied because the Court concludes that Digene pled the necessary elements and provided the relevant discovery.

First, in its Memorandum Opinion denying Enzo's Motion to Dismiss, the Court stated that: 1) the alleged factual basis for the counterclaims were the press releases, and 2) that in the context of interference with business relationships Biochem's alleged actions constitute attempts to induce third parties, namely customers buying Digene's Hybrid Capture® products, not to enter into or continue their business relations with Digene. (D.I. 124 at 2-3, 12). However, after finding that Digene had properly pled these counterclaims for purposes of a motion to dismiss, the Court qualified its conclusions and noted that "there are discovery mechanisms, such as interrogatories, for ascertaining more details regarding the allegations of the complaint." (D.I. 124 at 14).

**\*3** Here, Digene's Counterclaims involve claims under: 1) § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (Count III); 2) Unfair Competition under the Delaware Deceptive Trade Practices Act, 6 Del. C. § § 2531 et seq. (Count IV); and 3) Tortious Interference With Prospective Business Relations

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(Count V). Although Digene listed two press releases as the factual basis for such counterclaims in its Complaint, all that it was required to do in its Complaint, under notice pleading, was to provide a short and plain statement showing that they are entitled to relief. Fed.R.Civ.P. 8(a)(2). The Court, in its Opinion regarding Enzo's Motion to Dismiss Digene's Counterclaims determined that Digene had fulfilled this requirement. (D.I.124). After this, and in line with the Court's suggestion, the parties conducted fact discovery to ascertain more details regarding the factual allegations of the Complaint. Although Digene did not give Enzo a factual roadmap for all of its allegations, it disclosed all the documents relied upon by Dr. Jizmagian in his report, disclosed potential contractual relationships and financial opportunities affected, including Goldman Sachs, and the relevant time periods, through discovery mechanisms such as interrogatories and depositions. In this case, Digene pled all relevant causes of action, and the parties were supposed to parse out the facts underlying those allegations through discovery. The Court concludes that the facts outlined by Enzo as not disclosed, were in fact disclosed through discovery, and were facts; not new causes of action as Enzo contends. Further, because Dr. Jazmagian's report does not discuss any new causes of action, and the dispute is not raised in the context of a Pretrial Order, the cases relied on by Enzo are inapposite. *See, e.g., Wilson v. Muckula, 303 F.3d 1207, 1216 (10 th Cir.2003)* (finding insufficient support in the amended complaint and ambiguous pretrial order to support a *claim* for negligent infliction of emotional distress); *Sound Video Unlimited, Inc. v. Video Shack, Inc., 700 F.Supp. 127, 148-149 (S.D N.Y.1998)* (dealing with time period for calculation of damages in the context of a dispute over a proposed pretrial order). Based on the following: 1) the Court has already determined that Digene has properly pled all the causes of action alleged in their Business Tort Counterclaims; 2) no new causes of action are raised by Dr. Jizmagian's report; and 3) all documents relied upon by Dr. Jizmagian have been provided to Enzo through discovery mechanisms such as interrogatories, depositions and document production, the Motion to Strike will be denied.

### III. Enzo Biochem and Enzo Life Science's Joint Motion to Bifurcate and Stay Discovery (D.I.145)

#### A. Parties' Contentions

Enzo Biochem and Enzo Life Sciences (collectively "Enzo") contend that whether or not Dr. Jizmagian's report is stricken, further discovery on Digene's Counterclaims should be stayed and any trial on them should be bifurcated from the patent infringement claims. First, Enzo contends that trial of these Counterclaims and any further discovery would be simplified if not mooted upon a finding of invalidity or infringement of the '581 Patent. Further, Enzo claims that the issues raise by Counts III-V of Digene's Counterclaims are prime for bifurcation because many of the issues to be tried on the Counterclaims have little or no evidentiary overlap with the issues to be tried in the patent infringement action. For instance, Enzo points out that in the patent infringement trial, evidence regarding the amount of Digene's sales will be at issue, whereas these topics will not be raised in the context of the Counterclaims. Instead, Enzo argues, the Counterclaim trial will deal with issues related to Digene's relationship with third parties and how Digene contends that Enzo harmed these relationships. Enzo also contends that bifurcation is called for because of the complexities involved with having a trial involving not only the issues of infringement and validity but also the issues involved in the Counterclaims. Finally, Enzo argues that if Dr. Jizmagian's expert report is not stricken, bifurcating the Business Tort Counterclaims and staying discovery on them is even more appropriate and urgent. Specifically, it argues that it should not be denied a speedy trial on the issue of patent infringement, while additional discovery is taken regarding Dr. Jizmagian's expert report. For example, Enzo points out that it would need to seek discovery regarding the financing of Goldman Sachs and would have to serve subpoenas on Goldman Sachs and its intellectual property counsel to determine why the funds were unavailable to Digene.

*4 In response, Digene contends that Enzo's request for bifurcation is neither warranted nor proper given the facts of the case. First, Digene contends that there is significant evidentiary overlap between the Counterclaims and the patent claims. For example, Digene's validity defenses which contend that Enzo's amended claims (1) are not supported by the specifications; (2) claim subject matter that Enzo did not invent; and (3) encompass prior art known to both Enzo an Digene, are the facts that Enzo intends to rely on for its willful infringement, are the same facts which Digene will rely on in support of its validity arguments and in turn are the same facts which Digene relies on in its Counterclaims. Therefore, Digene argues, bifurcation is not warranted because it would require the Court and the jury to hear the same

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21402512 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

facts as many as three times. Further, Digene argues that recent discovery has shown the interrelated nature of the Counterclaims, where documents received in the past two weeks from Johnson & Johnson demonstrate that the claims of the '581 Patent are not supported by the patent specification and that those limited embodiments which were disclosed in the patent specification were derived from another party. Digene argues that these documents further demonstrate the bad faith and anti-competitive nature of Enzo's acts which preceded the filing of this action and form a basis for Digene's Counterclaims. Finally, Digene argues that Enzo's request to stay further discovery on the Business Tort Counterclaims is untimely, where Enzo has been given unfettered access to Counterclaim discovery and has failed to pursue such discovery as evidenced by its failure to take any depositions until the last week of an already extended fact discovery.

### B. Discussion

The Court concludes that the Counterclaim and patent issues will be bifurcated in order to avoid jury confusion on complex legal issues. Federal Rule of Civil Procedure 42(b) ("Rule 42(b)") governs the bifurcation of trials and, in relevant part, provides:
The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim ... or of any separate issue or ... issues, always preserving inviolate the right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States.

Fed.R.Civ.P. 42(b).

Under Rule 42(b), "a district court has broad discretion in separating issues and claims for trial as part of its wide discretion in trial management." Gardco Mfg., Inc. v. Herst Lighting Co., 820 F.2d 1209, 1212 (Fed.Cir.1987); see also 9 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2388 (2d ed. 2002) ("Ultimately the question of separate trials under Rule 42(b) should be, and is, a matter left to the discretion of the trial court...."). Courts, when exercising their broad discretion to bifurcate issues for trial under Rule 42(b), should consider whether bifurcation will avoid prejudice, conserve judicial resources, and enhance juror comprehension of the issues presented in the case. Union Carbide Corp. v. Montell N.V., 28 F.Supp.2d 833, 837 (S.D.N.Y.1998). "In deciding

whether one trial or separate trials will best serve [the above factors] ... the major consideration is directed toward the choice most likely to result in a just final disposition of the litigation." In re Innotron Diagnostics, 800 F.2d 1077, 1084 (Fed.Cir.1986); see also Wright & Miller, supra, § 2388.

*5 In the context of patent cases, "[e]xperienced judges use bifurcation and trifurcation both to simplify the issues in patent cases and to maintain manageability of the volume and complexity of the evidence presented to a jury." Thomas L. Creel & Robert P. Taylor, Bifurcation, Trifurcation, Opinions of Counsel, Privilege and Prejudice, 424 PLI/Pat 823, 826 (1995); see also Manual for Complex Litigation (Third) § 33.62 (1995) (advising trial judges to bifurcate or trifurcate overly complex patent trials). In fact, bifurcation of complex patent trials has become common. Steven S. Gensler, Bifurcation Unbound, 75 Wash. L.Rev. 705, 725 (2000) ("Bifurcation is also common in patent litigation...."); Creel & Taylor, supra, at 825 ("Bifurcation or even trifurcation is common in patent cases.").

Typically, courts bifurcate patent cases into liability and damage trials. Swofford v. B & W, Inc., 336 F.2d 406 (5th Cir.1964), cert. denied, 379 U.S. 962 (1965) (bifurcating patent case into liability and damage trials). Courts also bifurcate complex patent cases in such a way to prevent jury confusion. Smith v. Alyeska Pipeline Service Co., 538 F.Supp. 977, 984 (D.Del.1982) (finding "that one trial of both issues [i.e., liability and damages] would tend to clutter the record and to confuse the jury."). This reasoning is also applicable to cases involving both patent and non-patent claims.

Bifurcation is an important discretionary tool that district courts can use to ensure that the cases are resolved in a just manner by juries that understand the complex issues before them.
Many scholars have endorsed bifurcation in complex cases as a method of improving juror comprehension. Specifically, bifurcation might enhance jury decision making in two ways: (1) by presenting the evidence in a manner that is easier for the jurors to understand, and (2) by limiting the number of legal issues the jury must address at any particular time.

Gensler, supra, at 751.

In this case, the bifurcation of issues would prevent jury confusion, in that it would enable a jury to concentrate on one complex body of law at a time.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 5
Not Reported in F.Supp.2d, 2003 WL 21402512 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Also, in order to enhance jury comprehension and avoid prejudice, the Court will separate the issues into three sequential phases for trial in the following manner: 1) infringement; 2) validity; and 3) Business Tort Counterclaims. Although the Court recognizes that there is some evidentiary overlap, the parties will not be prejudiced by separate trials and the procedure will produce an efficient and fair disposition of the parties' claims.

The issue of staying discovery on the Counterclaims, however, is a more difficult question. The discovery phase in this case has already been extended and the Court is concerned that a stay of discovery on the Business Tort Counterclaims will prevent a fair and efficient resolution to the Counterclaims. Although the Court recognizes that the Counterclaims may be mooted or simplified depending on the outcome of the patent issues, this must be weighed against the importance of judicial efficiency and fairness. After weighing the relevant factors, the Court will deny the motion to stay because the Court finds that the interest in efficiently moving on with the resolution of the Counterclaims outweighs Enzo's concerns. Additionally, the Court concludes that the interest of fairness is served by a further extension of fact discovery as to those claims. Thus, the Motion to Bifurcate and Stay discovery will be granted in part and denied in part.

### IV. *Digene's Protective Orders* (D.I.104, 113)

*6 Digene has filed two Protective Orders in the instant case. The first, D.I. 104, asks the Court for a Protective Order to preclude Enzo from disclosing Digene's confidential or outside counsel only information to Enzo's proposed expert Dr. James Wetmur. The Court concludes that Digene has not met its burden of proof with regard to this issue and also concludes that the Stipulated Protective Order is sufficient at this time. Therefore, Digene's Motion for a Protective Order (D.I.104), will be denied.

The second motion requests a Protective Order precluding Enzo Life Sciences from taking Digene's Deposition pursuant to Rule 30(b)(6) because it is unnecessarily duplicative and unduly burdensome. After reviewing the parties' arguments, the Court finds that the deposition notice was not unreasonably duplicative or unduly burdensome, and therefore, Digene's Motion for a Protective Order (D.I.113) will be denied.

An appropriate Order will be entered.

### ORDER

NOW THEREFORE, For The Reasons discussed in the Opinion issued this date, IT IS HEREBY ORDERED this 10th day of June 2003, that:

1) Enzo Biochem's Motion to Strike the Expert Report of Stephen Jizmagian (D.I.144) is *DENIED;*

2) Enzo Biochem's and Enzo Life Sciences' Joint Motion to Bifurcate and Stay Discovery (D.I.145) is *GRANTED* as to Bifurcation of issues but *DENIED* as to the Stay of Discovery on the Business Tort Counterclaims;

3) Fact Discovery as to the Business Tort Counterclaims shall be extended so as to be completed by August 15, 2003;

4) Digene's Motion for Protective Order (D.I.104) is *DENIED;*

5) Digene's Motion for Protective Order (D.I.113) is *DENIED;*

6) Plaintiff's Motion to Compel Digene to Produce a 30(b)(6) Deponent is *DENIED* as moot because the Parties have resolved the issue;

7) As discussed at the teleconference on Wednesday, June 4, 2003, Enzo counsel is permitted to show their clients an unredacted version of Dr. Jizmagian's expert report;

8) The parties shall submit a letter with a Proposed Agreed Upon Trial Date for February or March, 2004;

9) A Pretrial Conference will be held on Thursday, November 6, 2003 at 2:30 p.m., in Courtroom No. 4B on the 4th Floor, Boggs Federal Building, Wilmington, Delaware.

D.Del.,2003.
Enzo Life Sciences, Inc. v. Digene Corp.
Not Reported in F.Supp.2d, 2003 WL 21402512 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:02CV00212 (Docket) (Mar. 20, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                     Page 6
Not Reported in F.Supp.2d, 2003 WL 21402512 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT   13



Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
SONY ELECTRONICS, INC., Sony Computer
Entertainment America, Inc., Sony Pictures
Entertainment, Inc., Sony Connect, Inc., Sony Online
Entertainment, Inc., Sony Corporation of America,
Sony BMG Music Entertainment, Inc., Sony Ericsson
Mobile Communications (USA), Inc., Plaintiffs,
v.
ORION IP, LLC, Defendant.
No. C.A. 05-255(GMS).

March 14, 2006.

Josy W. Ingersoll, Young, Conaway, Stargatt &
Taylor, Wilmington, DE, for Plaintiffs.
Donald E. Reid, Morris, Nichols, Arsht & Tunnell,
Wilmington, DE, for Defendant.

*MEMORANDUM*
SLEET, J.
*1 On November 23, 2004, Orion IP, LLC ("Orion"),
a Delaware corporation headquartered in Texas, filed
a patent infringement suit in the United States
District Court for the Eastern District of Texas
against fifteen individual defendants, none of whom
are parties to this action. However, on February 10,
2005, Orion amended its complaint to add additional
parties, including Sony Corporation of America
("SCA"). On April 7, 2005, SCA responded by filing
an answer in the Texas action asserting the
affirmative defenses of non-infringement and
invalidity as to both patents in suit. Then, on May 2,
2005, SCA and seven other so-called non-SCA
plaintiffs filed an action in this court seeking a
declaratory judgment of non-infringement and
invalidity with respect to the same patents as those
asserted against SCA in the Texas action. However,
although the patents at issue are the same, the
potentially-infringing products of the non-SCA
plaintiffs-their websites-are allegedly different than
the accused SCA website. Presently before the court
is Orion's motion to either dismiss or stay this case
under the first-filed rule, or alternatively, to transfer it
to the Eastern District of Texas pursuant to 28
U.S.C.A. § 1404(a) (1993). (D.I.11.)

Generally speaking, the first-filed rule is as simple as

its name suggests: "[w]here two patent lawsuits
involving the same claims are filed in different
jurisdictions, the Federal Circuit requires that the
first-filed action be given preference absent special
circumstances." Corixa Corp. v. IDEC Pharm. Corp.,
No. 01-615-GMS, 2002 WL 265094, at *1 (D.Del.
Feb.25, 2002). The present case presents a small
complication, however, because only one of the
plaintiffs in this action is a defendant in the Texas
action. But, that complication is not too difficult to
overcome because "Civil Procedure Rule 21 permits
any claim against a party to be severed and proceeded
with separately." Triangle Conduit & Cable Co. v.
Nat'l Elec. Prods. Corp., 125 F.2d 1008, 1009 (3d
Cir.1942). Moreover, "Rule 21 permits a court to
sever claims *sua sponte.*" United States v. AMTRAK,
No. 86-1094, 2004 U.S. Dist. LEXIS 10867, at *21
(E.D. Pa. June 15, 2004). That being the case, and
there being no discernable prejudice in severing
SCA's claims against Orion, the court will exercise its
power to do so. As a result, the court is confronted
with a declaratory judgment action by SCA alone, the
inverse of which (i.e., an infringement action) was
filed about three months earlier in Texas. Therefore,
pursuant to the first-filed rule, SCA must be
dismissed from this case. Cf. Triangle Conduit, 125
F.2d at 1009 (holding that this district was under a
duty to enjoin a patent-holding defendant in a
declaratory judgment action from pursuing an
infringement action in another district against the
declaratory judgment plaintiff, even though the
infringement action in the other district would
proceed against other parties in the absence of the
declaratory judgment plaintiff).

*2 With SCA out of the case, the court must still
decide the fate of the non-SCA plaintiffs. Orion first
argues that, like SCA itself, the non-SCA plaintiffs
are subject to the first-filed rule under the holding of
Corixa, where this court granted a motion to transfer
a patent infringement action, based on the first-filed
rule, to a district where a previous declaratory
judgment action had been filed, even though one of
the plaintiffs in the patent infringement action was
not a defendant in the declaratory judgment action.
2002 WL 265094, at *1-*2. However, that plaintiff
was a licensee of a defendant in the declaratory
judgment action, and could therefore request
permission to join that action after the transfer. Id. at
*2. In this case, the non-SCA plaintiffs cannot be
licensees of SCA because SCA is not the patentee.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Moreover, the "accused products" in this action are the websites of the non-SCA plaintiffs, which are allegedly different than the SCA website accused in the Texas action. Thus, *Corixa* is distinguishable, and the first-filed rule does not apply to the non-SCA plaintiffs.

Orion's next argument is that the action should be transferred pursuant to § 1404(a). In *Jumara v. State Farm Insurance Co.*, the Third Circuit outlined six private interests and six public interests relevant to such a transfer. The private interests are:
(1) The plaintiff's forum preference as manifested in the original choice;
(2) The defendant's preference;
(3) Whether the claim arose elsewhere;
(4) The convenience of the parties as indicated by their relative physical and financial condition;
(5) The convenience of the witnesses-but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and
(6) The location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum).

55 F.3d 873, 879 (3d Cir.1995). Aside from Orion's preference for Texas and the non-SCA plaintiffs' preferences for Delaware, none of the other private interests are particularly relevant. Orion disagrees, and argues that convenience weighs in favor of transfer. Although Texas may indeed be more convenient for Orion, all of the non-SCA plaintiffs (and Orion) are incorporated in Delaware-a fact that certainly weighs against transfer. At best, then, the private interests are a wash.

The public interests outlined in *Jumara* include:
(1) The enforceability of the judgment;
(2) Practical considerations that could make the trial easy, expeditious, or inexpensive;
(3) The relative administrative difficulty in the two fora resulting from court congestion;
(4) The local interest in deciding local controversies at home;
(5) The public policies of the fora; and
(6) The familiarity of the trial judge with the applicable state law in diversity cases.

*Id.* at 879-80. Here, Orion argues that although it and the remaining plaintiffs are all Delaware corporations, the local interest favors Texas because Orion has offices in that state. In *Corixa*, three parties were Delaware corporations, and yet, that fact did not weigh against transferring the case to California because the "patents deal[t] with the treatment of

lymphoma, .... [which] has far-reaching implications [beyond Delaware's borders]." 2002 WL 265094, at *4. By the same token, the fact that Orion has offices in Texas does not weigh in favor of transfer where the patents deal with technology used in internationally-accessible websites. Orion also argues that because litigation involving the same patents is already underway in Texas, judicial resources will be saved granting a transfer. Although there may be some efficiency to be gained by consolidating certain aspects of discovery, Orion ignores the possibility that collateral issues specific to any one of the many unrelated parties involved in both cases may create inefficiencies that would not arise if the proceedings remained separate. *See Codex Corp. v. Milgo Elec. Corp.*, 553 F.2d 735, 739 (1st Cir.1977) ("Nor are we fully convinced of the propriety of using another customer suit of another manufacturer, which, incidentally, may have very different collateral issues, as a magnet to draw a suit to a jurisdiction where it otherwise should not be."). Moreover, simply because Orion initiated an action in Texas involving one set of parties, it should not be able to "bootstrap itself into staying there" when subsequent litigation arises involving a different set of parties. *Id.*

*3 In short, the *Jumara* interests do not weigh in favor of transfer, and therefore, Orion's motion must be denied as to the non-SCA plaintiffs.

### ORDER

IT IS HEREBY ORDERED THAT:

1. Orion's motion to dismiss (D.I.11) be GRANTED in part and DENIED in part; and

2. The claims of SCA against Orion be SEVERED and DISMISSED.

D.Del.,2006.
Sony Electronics, Inc. v. Orion IP, LLC
Slip Copy, 2006 WL 680657 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 2385656 (Trial Motion, Memorandum and Affidavit) Orion Ip, Llc'S Reply Brief in Support of its Motion to Dismiss, Stay, or Transfer this Action to the Eastern District of Texas (Jul. 29, 2005)
• 2005 WL 2385533 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Response in Opposition to Defendant's Motion to Dismiss, Stay or Transfer This

Slip Copy
Slip Copy, 2006 WL 680657 (D.Del.)
**(Cite as: Slip Copy)**

Page 3

Action to the Eastern District of Texas (Jul. 19, 2005)
• 2005 WL 1307841 (Trial Pleading) Complaint for
Delcaratory Judgment (May. 02, 2005)
• 1:05cv00255 (Docket) (May. 02, 2005)

**END OF DOCUMENT**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.