IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| HITACHI, LTD., and HITACHI AUTOMOTIVE PRODUCTS (USA), INCORPORATED | ) ) | **REDACTED PUBLIC VERSION** |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 05-048-SLR |
| BORGWARNER INC., and BORGWARNER MORSE TEC INC., | ) ) ) | |
| Defendants. | ) ) | |
| BORGWARNER INC., | ) ) | |
| Counterclaimant, | ) ) ) | |
| v. | ) ) | |
| HITACHI, LTD., and  HITACHI AUTOMOTIVE PRODUCTS (USA), INCORPORATED | ) ) ) | |
| Counterdefendants. | ) ) | |

**PLAINTIFFS' OPENING CLAIM CONSTRUCTION BRIEF**

*Of Counsel:*

Kenneth E. Krosin
Michael D. Kaminski
Pavan K. Agarwal
C. Edward Polk
Liane M. Peterson
Foley & Lardner LLP
3000 K Street, N.W., Suite 500
Washington, D.C. 20007–5109
(202) 672–5300

William J. Robinson
Foley & Lardner LLP
2029 Century Park East, Suite 3500
Los Angeles, CA 90067
(310) 277-2223

Dated: September 28, 2006

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. # 3950)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654–1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Plaintiffs Hitachi, Ltd. and Hitachi Automotive Products (USA), Inc.*

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION..................................................................................................1

II.   AN OVERVIEW OF VCT TECHNOLOGY AND THE '738 PATENT......................2

  A.   Variable Camshaft Timing Systems ..................................................................2

      1.   The Basic OPA Design...........................................................................4

      2.   The Basic CTA Design...........................................................................5

  B.   The '738 Patent...................................................................................................7

      1.   The Developmental Background ............................................................7

      2.   The Disclosure And Claims Of  The '738 Patent ..................................8

          a)   The Disclosure ...............................................................................8
          b)   Claims 10 and 11 ........................................................................ 12
          c)   The Prosecution of the '738 Patent........................................... 13

III.  THE LAW OF CLAIM CONSTRUCTION...........................................................16

IV.   HITACHI'S PROPOSED CLAIM CONSTRUCTION ...........................................18

  A.   The Claim Terms..............................................................................................18

  B.   The Evidence Supporting the Proposed Construction .......................................20

      1.   The Preamble Terms (1a-1d).................................................................20

          a)   Term 1a: "variable camshaft timing system"........................... 21
          b)   Term 1b: "regulating the flow of hydraulic fluid".................. 22
          c)   Term 1c: "a source" .................................................................. 24
          d)   Term 1d: "means for transmitting rotary movement
               [from said crankshaft to a housing]"........................................ 25

      2.   The Calculating and Electrical Signal Terms........................................26

          a)   Term 2a: "calculating a relative phase angle between
               said camshaft and said crankshaft"........................................... 26
          b)   Term 2b: "electrical signal corresponding to said phase
               angle".......................................................................................... 28

      3.   The Spool Valve Terms.........................................................................28

          a)   Term 3a: "vented spool"............................................................ 28

**Page**

b)    Term 3b: "valve body" ............................................................. 31

c)    Term 4a: "supplying hydraulic fluid from said source
through said spool valve" [to a means for transmitting
rotary movement...] ................................................................ 31

d)    Term 4c: "said spool valve selectively allowing and
blocking flow of hydraulic fluid through an inlet line
and through return lines" .......................................................... 32

**4.**    The "Transmitting" Terms ..................................................................... 35

a)    Term 4b: "means for transmitting rotary movement to
said camshaft" ......................................................................... 35

b)    Term 5: "transmitting rotary movement to said
camshaft in such a manner as to vary the phase angle of
said camshaft with respect to said crankshaft, said
rotary movement being transmitted through a housing,
said housing being mounted on said camshaft, said
housing further being rotatable with said camshaft and
being oscillatable with respect to said camshaft" ................... 36

**5.**    The "Solenoid" Terms .......................................................................... 37

a)    Term 3c: "utilizing an electromechanical actuator to
vary the position of said vented spool" ................................... 37

b)    Term 3d: "variable force solenoid" ......................................... 37

c)    Term 11: [a coil] "adapted to receive said electrical
signal from said engine control unit" ....................................... 38

d)    Term 12b: "said armature to exert a force upon said
spool and induce movement in said spool, said
movement corresponding to said signal from said
engine control unit" .................................................................. 39

e)    Term 13: "said air gap separating said coil from said
armature" .................................................................................. 40

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*AquaTex Indus., Inc. v. Techniche Solutions*,
  419 F.3d 1374 (Fed. Cir. 2005) .............................................................................17

*Atofina v. Great Lakes Chem. Corp.*,
  441 F.3d 991 (Fed. Cir. 2006) ...............................................................................16

*Bell Comm. Research, Inc. v. Vitalink Comm.*,
  55 F.3d 615 (Fed. Cir. 1995) .................................................................................17

*Bicon, Inc. v. Diro, Inc.*,
  441 F.3d 945 (Fed. Cir. 2006) ...............................................................................17

*Day, Int'l, Inc. v. Reeves Bros, Inc.*,
  260 F.3d 1343 (Fed. Cir. 2001) ........................................................................17, 24

*Default Proof Credit Card System, Inc. v. Home Depot U.S.A., Inc.*,
  412 F.3d 1291 (Fed. Cir. 2005) .............................................................................36

*Eaton Corp. v. Rockwell Int'l Corp.*,
  323 F.3d 1332 (Fed. Cir. 2003) .............................................................................20

*Globetrotter Software, Inc. v. Elan Computer Group, Inc.*,
  236 F.3d 1363 (Fed. Cir. 2001) .............................................................................36

*Honeywell Int'l Inc. v. ITT Indus., Inc.*,
  452 F.3d 1312 (Fed. Cir. 2006) .............................................................................21

*In re Paulsen*,
  30 F.3d 1475 (Fed. Cir. 1994) ...............................................................................17

*Terlep v. Brinkmann Corp.*,
  418 F.3d 1379 (Fed. Cir. 2005) ........................................................................ 16-17

*Kinik Co. v. ITC*,
  362 F.3d 1359 (Fed. Cir. 2004) .............................................................................16

*Markman v. Westview Instruments, Inc.*,
  52 F.3d 967 (Fed. Cir. 1995) ...........................................................................1, 16

*Network Commerce, Inc. v. Microsoft Corp.*,
  422 F.3d 1353 (Fed. Cir. 2005) .............................................................................35

**Page(s)**

*Northrop Grumman Corp. v. Intel Corp.*,
    325 F.3d 1346 (Fed. Cir. 2003) ...................................................................26

*Nystrom v. TREX Co.*,
    424 F.3d 1136 (Fed. Cir. 2005)................................................... 16-17, 38

*O.I. Corp. v. Tekmar Co.*,
    115 F.3d 1576 (Fed. Cir. 1997) ..................................................................26

*Omega Eng'g, Inc. v. Raytek Corp.*,
    334 F.3d 1314 (Fed. Cir. 2003).............................................................17, 23

*On Demand Mach. Corp. v. Ingram Indus., Inc.*,
    442 F.3d 1331 (Fed. Cir. 2006)......................................................16, 20, 22

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)............................................................. 16-17

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
    182 F.3d 1298 (Fed. Cir. 1999) ..........................................................18, 20

*Purdue Pharma L.P. v. Faulding Inc.*,
    230 F.3d 1320 (Fed. Cir. 2000)...................................................................35

*Rhodia Chimie v. PPG Indus., Inc.*,
    402 F.3d 1371 (Fed. Cir. 2005) ...........................................................17, 25

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
    242 F.3d 1337 (Fed. Cir. 2001) ..................................................................37

*Seachange Int'l Inc. v. C-Cor Inc.*,
    413 F.3d 1361 (Fed. Cir. 2005)...........................................................17, 24

*Storage Tech. Corp. v. Cisco Sys.*,
    329 F.3d 823 (Fed. Cir. 2003) ....................................................................18

*Strattec Security Corporation v. General Automotive Specialty Co.*,
    126 F.3d 1411 (Fed. Cir. 1997) ..................................................................18

*TurboCare Div. Of Demag Delaval Turbomachinery Corp. v. General Elec. Co.*,
    264 F.3d 1111 (Fed. Cir. 2001) ..................................................................35

*V-Formation, Inc. v. Benetton Group SpA*,
    401 F.3d 1301 (Fed. Cir. 2005)...................................................................38

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996)...............................................................16, 21

iv

**Page(s)**

STATUTES

35 U.S.C. § 103 .................................................................................................. 14-15

35 U.S.C. § 112, ¶ 1 ....................................................................................... 21-22, 34

35 U.S.C. § 112, § 6 ............................................................................................... 35

## I.    INTRODUCTION

Declaratory judgment Plaintiffs Hitachi, Ltd. and Hitachi Automotive Products (USA), Inc. (collectively, "Hitachi") set forth herein their *Markman* contentions relative to Claims 10 and 11 of U.S. Patent 5,497,738 ("the '738 patent") (Ex. 1). Defendants BorgWarner Inc. and BorgWarner Morse TEC Inc. (collectively, "BW") have counterclaimed for infringement of these claims.

The '738 patent concerns automotive engine technology and, in particular, a specific improvement to a Variable Camshaft Timing ("VCT") system. VCT systems change the position or phase of a camshaft relative to a crankshaft. Such a change modifies the timing of the opening and closing of the intake and/or exhaust valves relative to the pistons, which are connected to the crankshaft, to modify engine performance, fuel efficiency, and/or emissions. VCT systems, and even the specific components shown in the '738 patent, existed long before the filing of the application for the '738 patent. The '738 patent was directed to a narrow modification to the control system of one of BW's prior art VCT systems. That modification involved using a "variable force solenoid," a type of solenoid already known in the automotive field, and a vented spool in the spool valve that controlled the actuator portion of the system.

An overarching issue for the claim construction of Claims 10 and 11 is the energy source needed to move the camshaft relative to the crankshaft, which is done "hydraulically" (i.e., via oil). Such energy has to come from somewhere in the engine, and there are two basic choices: "externally" via the oil pump; or, "internally" via camshaft torque. VCT systems fall into two major groups based on the energy source, as BW's own publications confirm: Oil Pressure Activated ("OPA") and Cam Torque Activated ("CTA").[1] BW's own patents describe its system as a CTA system with the camshaft torque acting as the internal energy source. The claims of the '738 patent should be construed accordingly.

---

[1]  As recently stated in BW's U.S. Patent publication US2006/0086332 (Ex. 2): "Two types of phasers are Cam Torque Actuated (CTA) and Oil Pressure Activated (OPA). In OPA … the engine oil pressure is applied to one side of the vane or the other … to move the vane. … In a CTA phaser, the variable cam timing system uses torque reversals in the camshaft … to move the vane. … The CTA phaser has oil input to make up for losses due to leakage, *but does not use engine oil pressure to move the phaser.*" (¶¶ 0006-0007; emphasis added.)

## II.    AN OVERVIEW OF VCT TECHNOLOGY AND THE '738 PATENT

### A.    Variable Camshaft Timing Systems

The figures below depict one cylinder of a typical internal combustion engine. A piston connected to a rotating crankshaft moves up and down in the cylinder as part of the combustion cycle. The crankshaft, usually via a chain connection, rotates a camshaft. The camshaft has



lobes that contact intake and exhaust valves to open and close these valves, timed according to the combustion cycle. Valve timing systems can be used to control the timing of opening and closing the intake or exhaust valves based on different engine conditions. One form of valve timing system is VCT, which adjusts the rotational phase angle of the camshaft relative to the crankshaft. VCT makes this adjustment by either advancing the camshaft or retarding the camshaft relative to the crankshaft.

VCT systems existed for decades prior to BW entering the field in the early 1990's. One commonly known approach uses an actuator mechanism mounted on the camshaft. A chain or belt connects the actuator mechanism and the crankshaft so that they rotate in tandem. The actuator can be angularly shifted relative to the camshaft, thereby changing the phase of the camshaft relative to the crankshaft. One such system is shown in U.S. Patent 2,861,557 (Ex. 3):



In this system, the camshaft 24 has an actuator housing 14 on the end that is connected to the crankshaft via a belt engaging a gear 10 such that the housing rotates with the crankshaft. Inside the housing 14 are a series of "driver" vane lobes 26 and 28 that move a set of "driven" vane lobes 42 and 44 when oil is forced into chambers

78 and 80. Driven lobes 42 and 44 are connected to a hub 38 attached to the camshaft 24. The amount of oil forced into the cavities 78 and 80 determines the amount of rotation of the driven lobes 42 and 44 and thus the change in the phase of the camshaft 24 relative to the crankshaft.

In most VCT systems, and in the kinds of VCT systems at issue in this case, oil is pressurized to push vane lobes or pistons apart to rotate the camshaft relative to the crankshaft. The difference in the systems has to do with the source of energy to pressurize the oil. Two starkly different approaches exist for the energy source to pressurize the oil: (1) "oil pressure actuated" or "OPA" systems that use an "external" energy source such as the engine oil pump to force oil between the vane lobes or pistons, and (2) "cam torque actuated" or "CTA" systems that use an "internal" energy source such as internal camshaft torque pulsations (sometimes referred to as camshaft torque reversals) to force oil between the vane lobes or pistons. Because the energy source is different in each approach, they use essentially opposite principles of oil flow to effect the phase change, as explained below. BW's technology used the CTA "internal energy" approach.

Indeed, as stated in BW U.S. Patent No. 5,107,804 (Ex. 4), which shows in Fig. 29 (left)



the same basic vane-based CTA system as shown in the '738 patent:

"The present invention is designed to overcome these problems associated with prior art variable camshaft timing arrangements by providing a self-actuating, variable camshaft timing arrangement *which does not require external energy for the operation thereof…*" (1:57-62)

"The vane 460 is alternatingly urged in clockwise and counter clockwise directions by the torque pulsations in the camshaft 426 and *these torque pulsations tend to oscillate the vane 460 and, thus, the camshaft 426, relative to the sprocket 432.*" (13:27-31)

The details of each type of VCT system are illustrated below.

**1.      The Basic OPA Design**

Oil pressure actuated (OPA) VCT systems use engine oil from the main engine oil circuit that is pressurized by the engine oil pump to rotate the camshaft relative to the crankshaft. In an OPA system, as in a CTA system, a valve is used to direct pressurized oil against vane lobes or pistons. This valve is usually called a "spool" valve because it has a part that looks like an empty thread spool sliding inside a cylinder. The sliding part is the "spool" and the cylinder in which it slides is the "body." The diagram from U.S. Patent No. 4,858,572 (Ex. 5) illustrates the basic OPA design, with the usual vane lobe-based actuator and the spool valve 62:



In this system, the engine oil flows from the external engine oil pump 80 to the spool valve 61. A solenoid 68 under direction of a control system 82 moves the internal spool 63 back and forth to route oil into the actuator housing into the chambers 21-25 to push against and move vane lobes 31-35, thereby rotating the hub 18 and the camshaft (*see generally* col. 3). At the same time, engine oil also drains from the opposite side of the vane lobes back to the oil pump "sump," e.g., the oil pan. Depending on which direction of cam rotation is desired, the spool valve directs pressure from the oil pump against one side of the vane lobes or the other to make them and thus the cam rotate clockwise or counter-clockwise. "Oil pressure actuated" refers to this reliance on engine oil pump pressure to rotate the camshaft. The source of energy to pressurize the oil in an OPA system is the oil pump.

OPA systems represent the traditional approach for VCT, and still remains the approach used by nearly every company selling VCTs. Since the late 1980s, BW rejected OPA style VCT systems, and instead adopted the cam-torque actuated approach.

### 2.    The Basic CTA Design

Cam torque actuated (CTA) systems work contrary to the OPA system to effectuate a phase change.  As reflected in the quoted portion of BW's '804 patent, CTA systems expressly avoid using engine oil pump pressure to effectuate the phase change, using instead camshaft torque pulsations as the energy source.  Camshaft torque pulsations naturally occur when lobes on the camshaft rotate and bear down against the intake/exhaust valves, which are biased upwardly by the valve springs.  This periodic torque creates a pressure on the oil that exists inside the chambers containing the vane lobes.  A spool valve is used to control movement of the pressurized oil from one chamber to another chamber.

Shown below is Fig. 29 from BW's own prior art '804 patent (Ex. 4), together with two other diagrams reflecting the flow paths under for clockwise and counter-clockwise cam rotation, as shown in the right and middle diagrams, respectively:



The camshaft torque pulsations change in direction with the opening and closing of the engine valves.  In a VCT system such as shown, oil fills chambers on either side of vane 460 lobes 460a/b and the cam torque pressurizes the oil on each side of the lobes.  A spool valve is

used to release the oil pressure on one side of one lobe 460a/b to allow the cam torque pulsations to turn that lobe against the oil in the chamber 432a/b and force the oil into the opposing chamber 432b/a and bear against the lobe 460b/a in that chamber to rotate vane 460 to change the cam phase. Thus, relative to the figures, the left figure shows the spool valve in the "closed" position, with no oil flowing[2] between the chambers. Each lobe has an active side (e.g., recesses 432a,b) that has check valves in the flow path that cooperate with the spool valve to allow the cam torque pulsations to move the vane by shifting the oil shown in yellow against the lobes. Each lobe also has a passive side with no check valves that merely shifts the oil shown in blue back and forth to follow the movement of the active side of the lobe. (The green parts of the flow path indicate "static" oil with no place to flow.) The basic "mechanism" to shift the camshaft is the vane lobe/check valve assembly or actuator and flow path between chambers through the spool valve.

Operation of the CTA system is simple. To rotate the camshaft counter-clockwise (middle picture), the spool is moved to the right. This releases the oil pressure in the top yellow chamber, allowing the cam torque to push the oil from that chamber to the lower yellow chamber via the spool valve and the left check valve which is pushed open. (The right check valve has balanced pressure across it and remains closed.) Oil is thus "supplied" from the top yellow chamber to the bottom yellow chamber until the desired rotation is achieved,[3] whereupon the spool moves again to the middle position, stopping the flow.

Similarly, to rotate the camshaft clockwise (right picture), the spool is moved to the left. This releases the oil pressure on the lower yellow chamber, allowing the cam torque to push the oil from that chamber to the top yellow chamber via the spool valve and the right check valve which is pushed open. (The left check valve has balanced pressure across it and remains closed.) Oil is thus "supplied" from the bottom yellow chamber to the top yellow chamber until the desired rotation is achieved, whereupon the spool moves again to the middle position, stopping the flow.

---

[2] The flow arrows are misleading in the figure, as they depict potential flow patterns, rather than actual flow with the spool valve as shown.

[3] Many early CTA systems were on/off systems that moved the cam between two positions.

Importantly, the energy source for the phase change in a CTA system is internal because the pressurization of the oil to move the vane is done by the cam torque internally in the CTA actuator. In carrying out the phase change, in a CTA system, the engine oil pump pressure is not needed and the oil does not have to flow to or from the main engine oil circuit, just as BW has described (*see* n.1, and '804 patent at 2:40-51). The CTA system, by its source of energy to pressurize the oil and oil flow, directly contrasts with the OPA approach.

**B.      The '738 Patent**

**1.      The Developmental Background**

Starting in the late 1980s, in an effort to win business from Ford, BW tried to develop a VCT system. BW needed to differentiate itself from the VCT market leaders, including a predecessor company to Hitachi Ltd., Atsugi Unisia. BW developed its version of a CTA system, while the competition generally used OPA VCT systems. All of the basic components were well known, such as an actuator housing driven by a chain connected to a crankshaft, internal vane lobes or pistons moved by oil pressure to rotate the camshaft, spool valves, etc., as reflected in the prior art mentioned in this brief.

Tracking its developmental effort, BW began to file VCT patent applications directed to its version of CTA VCT, starting with a patent application that issued as U.S. 5,002,023 ("the '023 patent;" Ex. 6). As indicated in the quote from the '804 patent *supra*, BW's approach emphasized the advantage that its CTA approach had over the prior art OPA approach that used engine oil pump pressure as the energy source. This emphasis naturally began with the '023 patent, which squarely rejected using engine oil pump pressure to create the phase change, and instead adopted internal camshaft torque pulsations pressurizing internal oil flow (2:20-35):

> Because the *flow of hydraulic oil* between the cylinders *results from changes in torque* experienced by one of the camshafts, *no separate pump* or other actuating device is required. Further, because the camshaft which is advanced or retarded is advanced or retarded by moving hydraulic fluid which is already within one or another of the oppositely acting cylinders to the other, this hydraulic fluid, *engine oil in the preferred embodiment, does not have to flow through the main lubricating pump* during the short time interval in which the phase adjustment must take place. Thus, the variable

> camshaft timing arrangement does not require the use of a significantly larger engine oil lubricating pump than would otherwise be required, and the *actuation rate of the variable camshaft timing arrangement is not limited by the capacity of the engine oil pump.*

Building upon its base system of the '023 patent, between 1990-1993, BW filed many other VCT patent applications, *all* directed to a CTA system, but with specific features such as different control systems, modifications to the spool valve and its solenoid. Four of these patents are listed in the background of the '738 patent. The '738 patent discloses the same base CTA system as all these other patents, as the basic mechanical structure remained the same.[4]

BW ultimately failed to produce a commercially viable system and essentially abandoned its CTA efforts in the mid-1990s, in large part due to technical problems with its approach. Late in its development efforts, BW filed a patent application for a "new" solution that reverted to a system using engine oil pump activation as one method for effecting the phase change. That application was filed in late 1994 and eventually led to U.S. Patent No. 5,657,725 (Ex. 7). Reflecting the change in approach, the '725 patent stated: "The current invention addresses the problems previously discussed by using the *engine oil pump pressure as one source of energy for actuating* the VCT mechanism" (2:15-17). The '725 patent also confirmed that the prior systems, of the same kind as the '738 patent, used the cam torque reversals as the energy source for movement of the cam (*see* 2:1-3: "In all the systems described above, timing control is achieved in response to torque reversals, or pulses, from the camshaft generated during normal operation of the engine.)

### 2.    The Disclosure And Claims Of The '738 Patent

#### a)    The Disclosure

As stated, the '738 patent is directed to a CTA-type VCT system having particular features. The '738 patent discloses two alternative mechanical arrangements attached to the end of the camshaft to move it: (a) opposing hydraulic cylinders, and (b) a vane lobes in chambers.

---

[4]  Not unexpectedly, the '738 patent criticized (*see* 2:34-36) systems that relied on engine oil pressure ("A new engine at high speed and low temperature can have a drastically different oil pressure than a worn engine at hot idle.").

Both alternatives exist in the prior art, including BW's own prior art.[5] Fig. 19 of the '738 patent illustrates the vane version of CTA system.

As is immediately evident, the new aspects were details of the spool valve 198 and its



solenoid 201. The basic vane lobe/check valve mechanism to move the camshaft was old and was the same as in other BW patents of that era, such as the '804 patent discussed above in connection with the explanation of CTA systems. Even the same drawing figures for that mechanism were used. The operation of the structure[6] has been explained previously. Movement of the spool[7] from its center position left or right releases the pressure on the oil on one of the active sides of the vane lobes 160a/b caused by the cam torque pulsations. Oil flows between the spool valve and the check valve/vane lobe

FIG. 19

assembly via an inlet line 182 and two return lines immediately adjacent the inlet line. By moving the spool, oil is supplied from one cavity 132a/b to the other through the spool valve and one of the check valves 186b/184b. Rotation of the cam results, as per the previous colored diagrams. The piston version of the invention, as shown in Fig. 1, wherein pressurized oil is transferred between piston cylinders 54 and 56, worked the same.

---

[5] See, e.g., U.S. Patents No. 5,002,023 (Ex. 6) (disclosing the hydraulic cylinder approach) and No. 5,107,804 (Ex. 4) (disclosing the vane approach).

[6] Basically, the VCT includes a housing, in the form of a sprocket 132. The crankshaft (not shown) is connected to the housing 132 through a chain or belt (not shown). Vanes 160a/b extend in the housing 132. The vanes are fixed to a camshaft 126 (not shown). Recesses 132a/b are formed between the vanes 160a/160b and the housing 132 and are filled with oil.

[7] The spool valve 192 includes a spool valve body 198, and a vented spool 200 that is slidably disposed in the spool valve body 198. The vented spool 200 has a vent 198d in the spool, and an annular recess 198b that is positioned to connect the passage connected to the inlet line 182 with either of the two return passages to release the oil pressure to allow the cam torque to move the cam. The purpose of the vent 198d was to vent pressure in the spool valve "to the atmosphere" (8:24-25) such that the only force on the spool was that applied by the solenoid 201 and the spring 202 (8:28-31).

The '738 patent confirmed, just as did other patents filed by BW in the early 1990s, that the energy source for the rotation was camshaft torque.[8] In carrying out a phase change, oil does not drain back to the main engine oil circuit that includes the main oil gallery with an oil pump that pressurizes the oil. Any oil provided by the main oil gallery to the vane mechanism is limited to make-up oil, i.e., making up oil that has leaked from that mechanism.[9] With the CTA system of the '738 patent, engine oil pump pressure does not make the phase change occur.

As noted, what was described as novel in the '738 patent was *not* the vane lobe/check valve mechanism, but instead the control system in the CTA system. Indeed, as stated at 1:24-27: "More specifically, the present invention relates to a *control system which utilizes a variable force solenoid to directly control the position of a fully vented spool valve* which is an useful part of *the* hydraulic system[10]" (emphasis added). Notwithstanding this assertion, most of the patent deals with the details of the vane lobe(or piston)/check valve mechanism, which was old. The patent gives no details of the electronic control system. The patent did no more than direct the reader to another BW patent at 3:13-16: "The preferred embodiment employs a closed-loop feedback system, such as the one disclosed in U.S. Pat. No. 5,184,578, which corrects for any phase angle error."

Nothing was new about the "variable force solenoid" ("VFS") either, as it also was in the automotive art. Solenoids are, of course, very well known and consist of a coil of wire through which electric current is applied to create a magnetic field and thus cause movement of a piece of metal or "armature" inside the coil. U.S. Patent No. 3,754,482 states for example, concerning a

---

[8] *See* 9:7-15: "The vane 160 is alternately urged in clockwise and counterclockwise directions by the torque pulsations in the camshaft 126 and these torque pulsations tend to oscillate vane 160, and, thus, camshaft 126, relative to sprocket 132. However, in the spool position shown in FIGS. 19 and 20, such oscillation is prevented by the hydraulic fluid within recesses 132a, 132b of sprocket 132 on opposite sides of lobes 160a, 160b, respectively, of vane 160, because no hydraulic fluid can leave either recesses 132a or 132b."

[9] *See* 7:10-13: "Check valves 184, 186, thus, permit the initial filling of recesses 132a, 132b and provide for a continuous supply of make-up hydraulic fluid to compensate for leakage therefrom."

[10] That hydraulic system was described as one "of the type in which the position of the camshaft is … varied … in reaction to torque reversals experienced by the camshaft," i.e., a CTA system (1:15-18).

VFS in an automotive application, that "The variable force solenoid valve functions such that as the current applied to the solenoid increases the output force of the solenoid valve increases *so that the solenoid valve progressively moves toward [the] closed position with increasing current*" (4:67-5:4; emphasis added). The '482 patent references U.S. Patent No. 3,225,619 (Ex. 8) for the technical details of the solenoid. A comparison of Fig. 1 from the '619 patent (left) and the solenoid portion of Fig. 19 (middle) shows the similarity. All that was disclosed structurally in the '738 patent was that the VFS was a "cylindrical armature, or variable area, solenoid" (8:37-38) in which a "Main air gap 201c extends radially around armature 201b and may contain nonmagnetic bearing material" (8:38-40). Even the spool venting was old, as seen from Fig. 1 of U.S. Patent 4,524,947 (Ex. 9) (right; vent is passage 38).



All that was said functionally about the VFS was that it had advantages over a "PWM [pulse-width modulated] solenoid" (3:37) and that "the position of spool 200 [was] readily ascertainable based on solenoid current alone" (8:33-35), just like the statement in the '482 patent. A PWM signal looks as follows:



The '738 patent also stated that an ECU 208 sends a *current control signal* to the variable force solenoid 201, whose magnitude is increased or decreased, such that the solenoid 201 moves the spool 200 against the bias of spring 202. Taking the concept of avoiding engine oil pressure one step further, the spool position was "completely independent" of oil pressure (8:9-11; 60-66).



FIG. 13

It should be noted that while Fig. 19 showed a functional view of the solenoid and spool, Fig. 13 depicted the actual construction of the VCT system, where the spool valve 192 is incorporated in the camshaft 126, i.e., the housing 132 exists around the spool valve 192.

### b) Claims 10 and 11

Claim 10 of the '738 patent is set forth below, with the terms really needing construction in bold. As a whole, Claim 10 recites, along with the preamble, method steps to effectuate a phase change using a variable camshaft timing system in an internal combustion engine, and is not just about a control system for moving a vented spool, which is how the patent described the invention, as discussed *supra*.

10. In an internal combustion engine having a **variable camshaft timing system** for varying the phase angle of a camshaft relative to a crankshaft, a method of **regulating the flow of hydraulic fluid from a source** to a **means for transmitting rotary movement from said crankshaft to a housing**, comprising the steps of:

sensing the positions of said camshaft and said crankshaft;

**calculating a relative phase angle between said camshaft and said crankshaft,** said calculating step using an engine control unit for processing information obtained from said sensing step, said engine control unit further issuing a **electrical signal corresponding to said phase angle**;

controlling the position of a **vented spool** slidably positioned within a **spool valve body**, said controlling step being in response to said signal received from said engine control unit, said controlling step utilizing an electromechanical actuator to vary the position of said vented spool, said electromechanical actuator comprising a **variable force solenoid**;

**supplying hydraulic fluid from said source through said spool valve to a means for transmitting rotary movement to said camshaft, said spool valve selectively allowing and blocking flow of hydraulic fluid through an inlet line and through return lines**; and,

**transmitting rotary movement to said camshaft in such a manner as to vary the phase angle of said camshaft with respect to said crankshaft said rotary movement being**

**transmitted through a housing said housing being mounted on said camshaft, said housing further being rotatable with said camshaft and being oscillatable with respect to said camshaft.**

Claim 11 depends from claim 10 and recites the VFS in more detail:

11. The method of claim 10 wherein said variable force solenoid comprises:

a coil, said coil being **adapted to receive said electrical signal from said engine control unit**;

an armature, said armature being substantially surrounded by said coil, said armature being **connected** to said spool, said coil, when energized, creating a magnetic field sufficient to cause said armature to **exert a force upon said spool and induce movement in said spool, said movement corresponding to said signal from said engine control unit**;

**an air gap, said air gap separating said coil from said armature**; and,

a housing, said housing providing an enclosure for said coil, said armature, and said air gap.

### c) The Prosecution of the '738 Patent

Given the nature of the invention of the '738 patent and the large amount of VCT prior art, the claims were rejected on various bases, with the more significant ones being as follows.

### (1)    BW's Preamble Amendments and Statements

During prosecution, BW extensively amended the preamble of application claim 11 (which became patent claim 10) in response to obviousness concerns raised by the examiner, as follows (Ex. 10; Prelim. Amd., 11/23/93, p. 2). BW's amendments show that it intimately meshed the preamble with the body, so that together they defined the claimed method:

In an internal combustion engine having a variable camshaft timing system for varying the phase angle of a camshaft relative to a crankshaft, a method of regulating the flow of hydraulic fluid from a source to a means for transmitting rotary movement from said crankshaft to a housing, the method comprising the steps of:

sensing the positions of [a] said camshaft and [a] said crankshaft; ..

supplying hydraulic fluid from said source through said spool valve . . . .

BW's accompanying remarks stated: "[d]uring [Examiner] conversations the Examiner

13

expressed his concern that the present invention was obvious over prior art, but suggested that a continuation-in-part would be considered for allowance if the proper formalities were observed." *Id.*, p. 4.  As BW explained, the examiner stated that "method Claims 11-15 needed more detail before they would be allowed."  BW stated that "[c]laims 11 and 13-15 are amended to add the detail required by the Examiner; Claim 12 is cancelled."  *Id.*

### (2)    BW's Repeated Statements Confirming The "Internal" Aspect of the Oil Flow

Consistent with the nature of a CTA system, with its use of the internal energy source of camshaft torque to force the oil between chambers adjacent the active sides of the lobes in the VCT actuator, BW repeatedly asserted throughout the prosecution that its invention "*controls the flow of oil internal to the VCT mechanism only*" and distinguished the prior art applied by the PTO on this basis.  These arguments directly track the preamble phrase "regulating the flow of hydraulic fluid . . . ." and the supplying step, as the claimed method manipulates the recited structure to control the flow of oil between the internal parts of the actuator.

The first instance of the assertion was in response to a January 4, 1994 Office Action rejecting all pending claims in the '738 application (application claims 1-11 and 13-15), under 35 U.S.C. § 103, as being unpatentable over Linder et al. (U.S. Patent No. 5,056,477), Butterfield et al. (U.S. Patent No. 5,172,659) and Strauber et al. (U.S. Patent No. 5,012,774) (Ex. 11), shown below.  In Strauber, the external engine oil pressure from the oil pump (colorized version including engine oil circuit) is used to rotate the camshaft relative to the crankshaft, with oil from another part of the VCT mechanism draining back to the oil pan.



Strauber discloses a VCT in which the energy source energy for the phase change was the engine oil pump (*see* 3:38-40: "Lubricating oil passes under pressure from the engine oil circuit into … the control piston" to rotate the cam). BW responded on June 30, 1994 (Ex. 12) and argued as follows to distinguish Strauber's VCT (Ex. 12 at p. 4 ; emphasis added):

> Further, the Strauber et al. system controls the flow of oil both internal and external to the VCT mechanism. *The present invention, however, controls the flow of oil internal to the VCT mechanism only.*

BW's statement matches exactly what the specification depicts – oil is controlled, by the spool valve, to flow "internally" back and forth from chamber or piston cylinder to the other through the check valve assembly. BW repeated this same statement two more times during prosecution,[11] further underscoring precisely how the invention worked.[12]

Thus, all of BW's statements during prosecution demonstrate a clear rejection of VCT systems that depend on engine oil pressure, including where oil pressure may be present on the spool during operation.

---

[11]  An August 1, 1994 Office Action again rejected all pending claims under Section 103 as being obvious based upon a combination of the Linder, Butterfield and Strauber patents, as well as a patent to Hendrixon et al. (U.S. Patent No. 5,000,420). BW responded on November 7, 1994, in which it "reassert [its] position that Strauber et al. does not teach what the Examiner suggests" because, *inter alia*, this reference "controls the flow of oil both internal and external to the VCT mechanism," while **"[t]he present invention, however, controls the flow of oil internal to the VCT mechanism only**." (Ex. 13, at p. 3; emphasis added). Likewise, an December 15, 1994 Office Action, again rejected all claims under Section 103, based upon the same prior art, including Strauber. This time, BW appealed the Examiner's decision to the PTO Board of Patent Appeals and Interferences. In its Appeal Brief, filed May 24, 1995, BW argued for the third time that its invention **"controls the flow of oil internal to the VCT mechanism only**," as opposed to Strauber, which "controls the flow of oil both internal and external to the VCT mechanism." (Ex. 14, at p. 8; emphasis added.)

[12]  BW also emphasized entirely avoiding engine oil pressure in arguing patentability over a prior art reference to Hendrixon (U.S. Patent No. 5,000,420). BW stated that "Appellant submits that problems caused by the VCT system dependency on engine oil pressure were not known at the time of the Hendrixon et al. patent." These remarks confirm BW's rejection of "VCT systems" that use engine oil pressure. BW described that engine oil at control pressure acts on the spool to counteract the force of the solenoid on the spool. BW stated that "Given the *presence of engine oil* [on the face of the spool], the Hendrixon et al. invention could not have expected the problems caused by a VCT system dependent upon engine oil pressure." (Ex. 14; Appeal Brief, p. 10). BW stressed that its invention addressed problems such as lack of engine oil pressure at start-up. *Id.* (emphasis added).

15

## III.     THE LAW OF CLAIM CONSTRUCTION

While, this Court is obviously quite familiar with the basic claim construction precedent, a few points deserve mention in the context of the instant claim construction debate.  First, the "primary focus" in determining the meaning of a claim limitation is to "consider the intrinsic evidence of record, *viz.*, the patent itself, including the claims, the specification, and, if in evidence, the prosecution history, from the perspective of one of ordinary skill in the art." *Atofina v. Great Lakes Chem. Corp.*, 441 F.3d 991 (Fed. Cir. 2006) (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-17 (Fed. Cir. 2005)).[13]  Claim construction analysis begins with the words of the claim.  *See Nystrom v. TREX Co.*, 424 F.3d 1136, 1142 (Fed. Cir. 2005); *Vitronics*, 90 F.3d at 1582.  "The words of patent claims have the meaning and scope with which they are used in the specification and the prosecution history." *Kinik Co. v. ITC*, 362 F.3d 1359, 1365 (Fed. Cir. 2004), *quoted in Phillips*, 415 F.3d at 1315.  Extrinsic evidence may be helpful.[14]

Second, even aside from disclaimers of claim scope, it is "improper to read [a claim] term to encompass a broader definition" than the "ordinary and customary meaning revealed *by the context of the intrinsic record*." *Nystrom*, 424 F.3d at 1145 (emphasis added).  "[W]hen the scope of the invention is clearly stated in the specification, and is described as the advantage and distinction of the invention, it is not necessary to disavow explicitly a different scope." *On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331 (Fed. Cir. 2006).  Indeed, "[c]laims cannot be of broader scope than the invention set forth in the specification" *Id.*[15]

---

[13]   "[I]ntrinsic evidence is the most significant source of the legally operative meaning of disputed claim language" because it "constitute[s] the public record of the patentee's claim, a record on which the public is entitled to rely." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582-83 (Fed. Cir. 1996).

[14]   Extrinsic evidence, which is accorded less weight than intrinsic evidence, can shed useful light on the relevant art. *Phillips*, 415 F.3d at 1317.  Therefore, extrinsic evidence, such as expert testimony, dictionaries, and treatises, "may be considered if the court deems it helpful" as long as the court "attach[es] the appropriate weight" to extrinsic sources "in light of the statutes and policies that inform patent law." *Phillips*, 415 F.3d at 1317-18, 1324; *see also Terlep v. Brinkmann Corp.*, 418 F.3d 1379, 1382 (Fed. Cir. 2005).

[15]   The specification is "always highly relevant to the claim construction analysis," because one of ordinary skill in the art reads the claim term "not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313, 1315 (internal quotation marks omitted); *see Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (stating that claims

Third, the prosecution history "inform[s] the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317, *quoted in Terlep v. Brinkmann Corp.*, 418 F.3d 1379, 1382 (Fed. Cir. 2005).[16]  When the patentee makes repeated statements differentiating the invention over prior art, this demonstrates that the patentee has "unequivocally disavowed a certain meaning to obtain his patent," and the definition from the prosecution history must be applied.[17]  Thus, the court examines "the entire prosecution history, which includes amendments to claims and all arguments to overcome and distinguish references." *Seachange Int'l Inc. v. C-Cor Inc.*, 413 F.3d 1361, 1372 (Fed. Cir. 2005).

Fourth, preambles are claim limitations when they give meaning to the claim and properly define the invention. *In re Paulsen*, 30 F.3d 1475, 1479 (Fed. Cir. 1994).  Recently, in analyzing a claim preamble, the Federal Circuit strongly indicated that each word in the claim should be a limitation: "claims are interpreted with an eye toward giving effect to all terms in the claim." *Bicon, Inc. v. Diro, Inc.*, 441 F.3d 945, 950 (Fed. Cir. 2006).

The preamble is a limitation under various circumstances.  First, "when the claim drafter chooses to use *both* the preamble and the body to define the subject matter of the claimed invention, the invention so defined, and not some other, is the one the patent protects."[18]

---

"must be read in view of the specification, of which they are a part"). The specification provides a key context for the claim words and the invention itself, specifically preventing unduly broad interpretations that might otherwise stem from considering the ordinary meaning itself. *See, e.g.*, *AquaTex Indus., Inc. v. Techniche Solutions*, 419 F.3d 1374, 1380-81 (Fed. Cir. 2005), *discussed in Nystrom*, 424 F.3d at 1145.

[16]  "The purpose of consulting the prosecution history in construing a claim is to exclude any interpretation that was disclaimed during prosecution." *Rhodia Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) (internal quotation marks omitted).  "The prosecution history constitutes a public record of the patentee's representations concerning the scope and meaning of the claims, and competitors are entitled to rely on those representations . . . ." *Seachange International v. C-Cor*, 413 F.3d 1361, 1372 (Fed. Cir. 2005) (quoting *Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.*, 222 F.3d 951, 957 (Fed. Cir. 2000)).

[17]  *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324, 1327 (Fed. Cir. 2003); *Day, Int'l, Inc. v. Reeves Bros, Inc.*, 260 F.3d 1343, 1348 (Fed. Cir. 2001).

[18]  *Bell Comm. Research, Inc. v. Vitalink Comm.*, 55 F.3d 615, 620 (Fed. Cir. 1995) (finding that reference to "said packet" in body of claim expressly incorporated by reference the preamble

Second, the preamble is a limitation when a patentee relies on it for reasons related to patentability during prosecution.[19]

## IV.    HITACHI'S PROPOSED CLAIM CONSTRUCTION

### A.    The Claim Terms

Hitachi sets forth below its proposed claim construction, which mirrors both what BW actually invented in view of the extensive prior art and what BW said to the Patent Office about that invention.  The discussion of the evidence that supports the construction follows the table.

The various parts of the preamble and of each method step have been numbered for reference.

| Term No. | Claims 10 and 11 with terms to be construed in bold | Proposed Construction |
|---|---|---|
| 1a | **Claim 10**<br>In an internal combustion engine having a **variable camshaft timing system for varying the phase angle of a camshaft relative to a crankshaft,** | **A system in which the angular position of a camshaft relative to a crankshaft is varied in reaction to camshaft torque reversals.** |
| 1b | a method of **regulating the flow of hydraulic fluid** | A method of **directing the flow of oil "internal to the VCT mechanism only" i.e., internal to the VCT actuator, in order to change the phase angle of a camshaft relative to a crankshaft.** |
| 1c | from a **source** | A **supply volume of oil located in a recess on one side of certain of the lobes of a vane in a housing (or piston-cylinder) and pressurized primarily by camshaft torque.** |
| 1d | to a **means for transmitting rotary movement from said crankshaft to a housing**, comprising the steps of: | § 112 ¶ 6 function is transmitting rotary movement from said crankshaft to a housing.  § 112 ¶ 6 "means" structure is, according to the specification:<br>**A sprocket attached to the housing (vane or piston cylinder) and a chain or belt attaching the sprocket to a crankshaft, or the equivalents under § 112 ¶ 6.** |
| | sensing the relative positions of said camshaft and said crankshaft; | |
| 2a | **calculating a relative phase angle between said camshaft and said crankshaft**, said calculating step using an engine control unit for processing information obtained from said | **Calculating, using an ECU, the desired relative phase angle between the camshaft and crankshaft** using the sensed positions of the camshaft and crankshaft. |

phrase 'said packet including a source address and a destination address.'"); *see Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298 (Fed. Cir. 1999) (finding preamble reciting "producing on a photoreceptor an image of generated shapes made up of spots" was intimately meshed with the ensuing language in the claim which recited "the generated shapes" and the term "spots" recited twice in the body).

[19]    *See Strattec Security Corporation v. General Automotive Specialty Co.*, 126 F.3d 1411, 1418 (Fed. Cir. 1997) (finding that amendment to preamble and arguments associated therewith made preamble phrase a limitation); *Storage Tech. Corp. v. Cisco Sys.*, 329 F.3d 823, 834-35 (Fed. Cir. 2003) (finding that the term "forwarding device" in the preamble was a limitation based on prosecution arguments differentiating the prior art on this basis).

| | sensing step, | |
|---|---|---|
| **2b** | said engine control unit further issuing a **electrical signal corresponding to said phase angle;** | A **current control signal issued by the ECU corresponding to the desired relative phase angle** between the camshaft and crankshaft |
| **3a** | controlling the position of a **vented spool** slidably positioned within | A **spool having: (a) an internal passage passing through each end of the spool and leading to atmosphere to eliminate any influence on spool movement due to oil pressure, and (b) an annular recess allowing the flow of oil.** |
| **3b** | a spool **valve body** | A **housing in which the vented spool axially moves**. |
| **3c** | said controlling step being in response to said signal received from said engine control unit, said controlling step **utilizing an electromechanical actuator to vary the position of said vented spool,"** | **Using an electromechanical device to change the position of the vented spool, in response to the current control signal from the ECU.** |
| **3d** | said electromechanical actuator comprising a **variable force solenoid;** | The electromechanical device includes **a solenoid driven by a non-PWM, current control signal from the ECU with the force applied by the solenoid proportionally varying with the magnitude of the current control signal**. |
| **4a** | **supplying hydraulic fluid from said source through said spool valve to a** | **Directing the flow of oil "internal to the VCT mechanism only" from the "source" to the "means for transmitting" to allow cam torque pulsations to rotate the vanes (or shift the piston-cylinder),** |
| **4b** | **means for transmitting rotary movement to said camshaft** | [§ 112 ¶ 6  function is transmitting rotary movement to the camshaft.  § 112 ¶ 6  "means" structure is:]<br>　(a)  the sides of the lobes in the vane (or piston-cylinder) and the corresponding adjacent areas of the housing opposite to the supply volume sides of other lobes in the vane (or piston-cylinder); and<br>　(b) check valves that upon the axial movement of the annular recess, permit oil from the supply volumes to flow unidirectionally  into (a) such that cam torque pulsations may rotate the vanes to change the phase angle of the camshaft relative to the crankshaft, or the equivalents under § 112 ¶ 6. |
| **4c** | **said spool valve selectively allowing and blocking flow of hydraulic fluid through an inlet line and through return lines**; and | The oil is supplied as defined in Term 4a, with: **(a) the oil from the "source" to the "means for transmitting"** flowing via an inlet line and one of two return lines opened and closed responsively to selective axial movement of the annular recess in the spool,  and **(b) the inlet and return lines being  attached between the spool valve body and the "means for transmitting."** |
| **5** | **transmitting rotary movement to said camshaft in such a manner as to vary the phase angle of said camshaft with respect to said crankshaft, said rotary movement being transmitted through a housing, said housing** | **Transmitting rotary movement to the camshaft to vary the phase angle of the camshaft relative to the crankshaft.  The rotary movement is transmitted through a housing mounted on the camshaft.  The housing can rotate with and oscillate relative to the** |

| | | |
|---|---|---|
| | being mounted on said camshaft, said **housing further being rotatable with said camshaft and being oscillatable with respect to said camshaft**. | camshaft. |
| | **Claim 11**<br>The method of claim 10, wherein said variable force solenoid comprises: | |
| 11 | a coil, said coil being **adapted to receive said electrical signal from said engine control unit**; | A coil **that receives the current control signal from the ECU**. |
| 12a | an armature, said armature being substantially surrounded by said coil, said armature being **connected** to said spool, said coil, when energized, creating a magnetic field sufficient to cause | **Physically attached**. |
| 12b | said armature to exert a force upon said spool and induce movement in said spool, said movement corresponding to said signal from said engine control unit; | The armature applies a force on the spool in an amount that is proportionally related to the magnitude of the current control signal sent by the ECU. |
| 13 | an air gap, **said air gap separating said coil from said armature**; and, | **A fixed space or gap in the structure between the coil and the armature, extending the length of the armature, without magnetic bearing material between the coil and the armature, and with air in the gap during operation**. |
| | a housing, said housing providing an enclosure for said coil, said armature, and said air gap. | |

## B.    The Evidence Supporting the Proposed Construction

### 1.    The Preamble Terms (1a-1d)

As discussed *supra*, preambles are claim limitations when they give meaning to the claim and properly define the invention. This is plainly the case for Claim 10 for the following reasons. First, the body of the claim recites "said camshaft," "said crankshaft," and "said source," where the preamble contains the antecedent basis for these terms.[20] Second, BW chose to use both the preamble and the body to define the claimed method, alone demonstrating that the preamble is a claim limitation.[21] Third, the prosecution history placed significant emphasis

---

[20]    *See Bell Communications* and *Pitney Bowes; see also Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332 (Fed. Cir. 2003) (determining that preamble was limitation because method steps required manipulation of particular structures that are identified and described only the preamble).

[21]    *See On Demand Mach. Corp.*, 442 F.3d at 1343-44 (finding that preamble phrase "high speed manufacture of a single copy of a book" limited claim scope because it provided a framework and focused the reader on the invention).

on the preamble, as BW's amendments tightly wove the preamble into the body of the claim to seamlessly define the claimed method. BW obviously regarded the preamble as significant.

### a) Term 1a: "variable camshaft timing system"

**Proposed Construction: a system in which the angular position of a camshaft relative to a crankshaft is varied in reaction to camshaft torque reversals.**

The intrinsic evidence compels this construction. First, the '738 patent specification uniformly and unambiguously defined (at 1:13-18) the "Field of the Invention" as a variable camshaft timing ("VCT") system that used camshaft torque reversals to vary the relative position of the camshaft relative to the crankshaft, i.e., a CTA VCT system:

> This invention relates to an hydraulic control system for controlling the operation of a variable camshaft timing (VCT) system of the type *in which the position of the camshaft is circumferentially varied relative to the position of a crankshaft in reaction to torque reversals experienced by the camshaft* during its normal operation. (emphasis added).

Second, both of the two alternative VCT embodiments are CTA. In the first embodiment (Figs. 1-9), hydraulic fluid is pushed by cam torque from one cylinder 54/56 to the other to change the camshaft phase. In the second embodiment (Figs. 10-20), hydraulic fluid is pushed by cam torque from one recess 132a/132b to the other to effectuate the camshaft phase change. No other VCT system is described or suggested and nothing is provided as to how to adapt what was disclosed in the patent to other types of VCT systems.[22] Indeed, any broader interpretation of "variable camshaft timing system" beyond CTA systems would run afoul of 35 U.S.C. § 112, ¶ 1. The specification has no explanation of how to make and use anything but a CTA system. Indeed, the system as disclosed in the '738 patent could not operate using engine oil pump pressure to create the phase change. Very significant structural and operational changes must be made compared to the disclosed system, as demonstrated by BW's own later

---

[22] *See Vitronics Corp. v. Conceptronics, Inc.*, 90 F.3d 1576, 1582, 1584, n. 6 (Fed. Cir. 1996); *Honeywell Int'l Inc. v. ITT Indus., Inc.*, 452 F.3d 1312 (Fed. Cir. 2006) (interpreting "fuel injection system component" to be a fuel filter, including because written description repeatedly described the invention as a fuel filter and no other fuel injection components were described as having the inventive properties).

patent (U.S. Patent No. 5,657,725) that operates using engine oil pump pressure in part to make the phase change occur.

Third, the '738 specification discusses several previous BW patents in the "Background of the Invention" section. All these BW patents disclose only CTA as the inventive VCT systems.[23] The intrinsic evidence completely supports Hitachi's construction and that construction is completely consistent with the specification disclosure.[24] The extrinsic evidence, in the form of inventor testimony[25] and BW's publications,[26] compels the same conclusion.

### b) Term 1b: "regulating the flow of hydraulic fluid"

**Proposed Construction: a method of directing the flow of oil "internal to the VCT mechanism only," i.e., internal to the VCT actuator, in order to change the phase angle of a camshaft relative to a crankshaft.**

The phrase "regulating the flow of hydraulic fluid" refers to controlling the flow of oil. The intrinsic evidence and the prior art (including BW's patents[27]) are clear as to how CTA VCT works to control that flow: camshaft torque keeps oil in vane chambers or piston cylinders under

---

[23] The '738 patent states that these previous BW patents either show a "VCT system within the field of the invention" or they address "the problems of the aforementioned types of VCT systems [that are within the field of the invention]." *See* 1:35-36 and 53-54; 2:1-2.

[24] *See On Demand Mach. Corp.*, 442 F.3d at 1340, 1344 (stating that "[c]laims cannot be of broader scope than the invention set forth in the specification" and claim terms "must be construed to implement the invention described in the specification").

[25]

### REDACTED

[26] BW told the world starting in the early 1990s that their CTA system was unique and better than OPA. One of BW's head engineers for VCT, Roger Butterfield, wrote an article in 1991 entitled "A Unique Approach to a VCT System," that described and extolled virtues of, *inter alia*, the same base CTA VCT system as shown in the '738 patent (Ex. 17). BW even tells the same story today. In February 2005, BW's announcement of a contract with GM stated that "BorgWarner VCT technology includes devices that utilize camshaft torque as their actuation energy, in contrast to conventional phaser devices that depend on engine oil pressure for actuation." (Ex. 18: 2/16/05 Press Release).

[27] Every background BW reference discussed in the '738 patent (U.S. Patent Nos. 5,002,023, 5,107,804, 5,172,659 and 5,184,578) disclose VCT systems that control the flow of oil internal to the VCT mechanism only. In every embodiment in those patents, the oil is controlled to flow from one recess/cylinder to another, all entirely within the VCT mechanism.

pressure, as discussed *supra*. When a camshaft phase change is desired, pressure in one of the chambers is released, allowing the energy of the cam torque to push the oil into the other chamber. This results in the vane lobes or pistons in the two disclosed embodiments moving and the cam rotating, just as shown in the color diagrams *supra*. No oil flow external to the vane lobe/check valve mechanism (the "VCT actuator") – and especially from the main engine oil circuit/engine oil pump pressure - is used in carrying out the phase change in the disclosed embodiments. The mechanical operation of the BW's CTA system was trivially simple, just like the fact that that system operates by controlling the flow "internal to the VCT mechanism only," as BW *repeatedly* argued to the Patent Office to obtain issuance of the '738 patent, as discussed *supra*. The disclosure of the '738 patent was thus consistent with BW's other patents, many of which showed the same "mechanism."

The prior art OPA systems (e.g., Strauber), by contrast, used the oil pump energy and flow from the main engine oil circuit to move the vanes. As such, the goal of the '738 patent was to avoid engine oil pressure to effect the phase change. In fact, the '738 patent limits the use of external engine oil to initially filling up the system and to provide make-up oil. The specification specifically stresses that the make-up oil "does not affect, and is not affected by, the operation of the electromechanical actuator 201" (9:47-50). The '738 patent teaches that make-up oil flow entirely bypasses the spool 200 to keep oil from the oil pump or "main oil gallery" ("MOG") circuit independent of operation of the actuator 201 (7:35-38, 8:15-23; 9:42-50). *As such, the MOG oil is not regulated by the spool valve*. Each disclosed embodiment involves moving the spool to allow oil to flow from a given recess/cylinder, through an associated return line, through the spool valve, through the inlet line and to the other recess. The system does not flow oil from the return line to the MOG; if it did, the phase change operation would fail for lack of oil to push the piston or vane lobe. Engine oil pressure energy does not change the phase.

Thus, the disclosure of the '738 patent, particularly when combined with BW's repeated statements[28] to the Patent Office regarding the "internal only" flow compel the construction

---

[28]  Repeated statements to the PTO about the "invention," and especially to differentiate over prior art, limit the scope of the claims. *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314,

proposed by Hitachi.

### c) Term 1c: "a source"

**Proposed Construction: a supply volume of oil located in a recess on one side of certain of the lobes of a vane in a housing (or piston-cylinder) and pressurized primarily by camshaft torque.**

As with the other terms, the intrinsic evidence compels the construction proffered by Hitachi. As discussed herein, to move the camshaft relative to the crankshaft, the starting point of the oil flow is the supply volume of oil in one of the recesses between vane lobes and the housing, or within the piston-cylinder. To effect a camshaft phase change, the spool is moved to position the annular recess 198b to establish oil flow between the inlet line 182 and one of the oil-filled chambers 132a/b through return lines. That flow forces one of the check valves 184b/186b open and oil flows into the other chamber.[29] The oil flow is always unidirectional from one chamber 132a/b through the spool valve 192 and one of the check valves 184b/186b to the other chamber 132b/a. As such, the "source" is that supply oil in one chamber that is pushed by the vane lobe in that chamber, under the pressure of the cam torque, into the other chamber when the spool valve opens. Either chamber 132a/b can be a "source" or "supply" chamber because, depending on the direction of movement of the spool, oil is always pushed or supplied from one chamber to the other during a cam phase change.

BW's proffered construction, which states that the "MOG" (i.e., the oil pump/oil pan

---

1326 (Fed. Cir. 2003) (holding that while the ordinary meaning was not specifically limiting, the patentee's repeated statements during prosecution regarding the invention created an unmistakable surrender of subject matter); *also Day, Int'l, Inc. v. Reeves Bros, Inc.*, 260 F.3d 1343 (Fed. Cir. 2001) (repeated statements during the prosecution distinguishing over prior art deemed to limit claims); *see also Seachange Int'l*, 413 F.3d at 1372 ("The prosecution history constitutes a public record of the patentee's representations concerning the scope and meaning of the claims, and competitors are entitled to rely on those representations . . . .").

[29] Thus, moving the spool recess 198b to the right connects inlet line 182 with chamber 132a. Under cam torque pressure, oil follows from that chamber and pushes check valve 186b open. (Check valve 184b does not move because pressure on both sides of it is balanced.) Oil flows into chamber 132b, allowing the vanes and thus the cam to rotate counter-clockwise until the spool valve moves to the null position and shuts off the flow. Similarly, moving the spool recess 198b to the left allows oil to flow from chamber 132b to inlet line 182 and into chamber 132a via check valve 184b. The piston version operates identically, with piston cylinders replacing the vane chambers.

system) is the "source" is wrong for the simple reason that oil is not flowed from the "MOG" to effect a phase change in the patent (1:13-18). The incorrect nature of such a construction is also manifest in view of the "internal only" flow issue discussed above. The '738 patent uses MOG oil as "make-up" oil that is supplied directly to the inlet line 182, bypassing the spool. Interpreting the "source" to be the MOG reads the preferred embodiment out of the claim, which is error absent highly persuasive evidentiary support. *See Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1377 (Fed. Cir. 2005).

### d) Term 1d: "means for transmitting rotary movement [from said crankshaft to a housing]"

**Proposed Construction: A sprocket attached to the housing (vane or piston cylinder) and a chain or belt attaching the sprocket to a crankshaft, or the equivalents under § 112 ¶ 6.**



FIG. 10

The preamble phrase "means for transmitting rotary movement from said crankshaft to a housing"[30] is drafted in means-plus-function format under 35 U.S.C. § 112, ¶ 6. BW added the preamble means limitation during prosecution to address obviousness rejections. The function is "*transmitting* rotary movement *from* said crankshaft *to* a housing." The function refers to taking the rotation of the crankshaft and transmitting that rotation *to* the housing so that the housing rotates.

Fig. 10 of the patent shows the structure to implement that "transmitting from-to" function. The specification discloses that the corresponding structure is a sprocket that is attached to (or part of) the housing and a chain or belt attaching the sprocket to a crankshaft. In discussing Fig. 10, the specification refers to sprocket 132 as a housing (6:7-9), and states:

> In any case, the sprocket 132 [i.e., housing] and the camshaft 126 are rotatable together, and are caused to rotate by the application of torque to the sprocket 132 [housing] by an endless roller chain 138, shown fragmentarily, which is trained around the sprocket 132 [housing] and also around a crankshaft, not shown. (6:15-20

---

[30] This recitation should be distinguished from another limitation in claim 10 that recites "means for transmitting rotary movement to said camshaft" discussed *infra*.

> [emphasis added]; see also 5:8-9 [stating that a belt may be used instead of a chain for transmitting rotary movement from the crankshaft.]

Notably, neither the crankshaft nor the housing carries out the function, because the housing is *what gets rotated* and the crankshaft supplies the rotation. As such, neither the crankshaft nor the housing can be part of the corresponding structure for the "transmitting from-to" function.[31] Thus, the intrinsic evidence compels that interpretation of this "means" phrase to be a sprocket attached to the housing and a chain or belt (or § 112, ¶ 6 equivalents).

### 2. The Calculating and Electrical Signal Terms

#### a) Term 2a: "calculating a relative phase angle between said camshaft and said crankshaft"

**Proposed Construction: Calculating, using an ECU, the desired relative phase angle between the camshaft and crankshaft using the sensed positions of the camshaft and crankshaft.**

Claim 10 recites "sensing the positions of said camshaft and said crankshaft." Then, the calculating step recites "calculating a relative phase angle between said camshaft and said crankshaft, said calculating step using an engine control unit for processing information obtained from said sensing step, said engine control unit ["ECU"] further issuing a electrical signal corresponding to said phase angle." These two steps concern generating the electrical signal to the solenoid that moves the spool to allow the camshaft torque to push the oil against the vane lobes to rotate the camshaft to the new position. Stated simply, the steps figure out where the camshaft should be moved and then tell the solenoid to move the spool to allow that movement.

The claim interpretation issue for Term 2a is what "relative phase angle" is referenced. Two relative angles exist between the camshaft and crankshaft: (a) present, or starting, relative phase angle, and (b) desired, or target, relative phase angle. The correct construction of "relative phase angle" is the *desired* relative phase angle. At the outset, the specification provides no

---

[31]    *See Northrop Grumman Corp. v. Intel Corp.*, 325 F.3d 1346, 1352-53 (Fed. Cir. 2003) (holding that the structure corresponding to the function recited in "means for monitoring a plurality of logical signals" did not include the signals being monitored); and *O.I. Corp. v. Tekmar Co.*, 115 F.3d 1576, 1581 (Fed. Cir. 1997) (the passage through which a slug travels "is not the means that causes the passing").

guidance, stating merely that the "ECU receives signals from sensors corresponding to camshaft and crankshaft positions and utilizes this information to calculate a relative phase angle" (3:10-13). The "calculation" is never again mentioned, much less explained.[32] While, as mentioned *supra*, the '738 patent references the '578 patent for details of the "closed loop feedback system" (3:14), the '578 patent does not confirm which relative angle – present or desired – must be meant in the calculating step of claim 10 of the '738 patent.

The only real clue as to the meaning arises from the use of the term "said phase angle" in the "electrical signal" step, which provides that "said engine control unit further issuing a *electrical signal corresponding to said phase angle*." The term "a relative phase angle" is the antecedent basis for "said phase angle," as no other angles are mentioned in the claim. Insofar as the signal to the solenoid moves the spool valve to allow the camshaft to move to the new position, "said phase angle" and thus the term "a relative phase angle" refer to the *desired* relative phase angle. This conclusion is underscored by BW itself, as BW already agrees that the electrical signal corresponds to the *desired* relative phase angle.[33] Indeed, sending a signal from the ECU corresponding to the present phase angle would accomplish nothing.

The remainder of the interpretation directly follows from this point. "Calculating a relative phase angle" means calculating a *desired* relative phase angle. Further, the calculating step uses the information from the sensing step, which is the sensed camshaft and crankshaft positions. Read together, it means calculating the desired relative phase angle between the camshaft and crankshaft using the sensed positions of the camshaft and crankshaft. Thus, what little intrinsic evidence exists confirms Hitachi's proposed construction.

---

[32] The Detailed Description also does not even identify the camshaft and crankshaft sensors. While Fig. 19 shows elements 207a and 207b, the written description does not discuss them.

[33] BW correctly refers to the *desired* relative angle in its Claim Construction that the "[ECU] outputs an electronic signal with information representing or designed to lead to the desired (or target) relative camshaft phase angle." BW's efforts, however, to make the 'calculating" step require both calculating the "present" phase angle *and* the desired relative phase angle is wholly unjustified.

### b) Term 2b: "electrical signal corresponding to said phase angle"

**Proposed Construction: The current control signal issued by
the ECU corresponding to the desired relative phase angle
between the camshaft and crankshaft.**

The claim construction issue for this term concerns the type of electrical signal provided
by the ECU to the solenoid to move the spool. Its interpretation directly stems from the
requirement that the "variable force solenoid" is driven by a non-PWM current control signal
because the patent itself repeatedly states that the VFS is driven by a current control signal.[34]
This is discussed in more detail below for Term 3d. Thus, the ECU signal is a current control
signal of varying magnitude.

### 3.     The Spool Valve Terms

The spool valve terms are Terms 3a, 3b, 4a, and 4c, as the spool valve appears in the
"controlling" step (3), as well as in the "supplying" step (4).

### a) Term 3a: "vented spool"

**Proposed Construction: A spool having: (a)  an internal
passage passing through each end of the spool and leading to
atmosphere to eliminate any influence on spool movement
due to oil pressure, and (b) an annular recess allowing the
flow of oil.**

The spool valve is shown in Fig. 19, a portion of which is shown to the left. The spool is



200 and the annular passage is 198b. The spool slides in a

spool valve body 198. The vent 198d is the internal passage

in the spool 200 that extends through each end of the spool.

The "vented spool" has three characteristics. First,

and as stated in the "controlling" step in Claim 10, the

"vented spool" is a *different* structural element than the

---

[34]  *See, e.g.* "a variable force solenoid armature only travels a short distance, as controlled by the
current from the ECU" (3:34-37); "the relationship between spool position and *control signal
(solenoid current)* is independent of engine oil pressure" (3:19-21, emphasis added). Also,
discussion of Fig. 19 says that the ECU introduces an "electrical current" via a cable 238 to the
solenoid 201, and the current travels through the solenoid housing 201d to the solenoid coil 201a
(7:43-45; 7:60-64, 65-67; 8:31-33 [referring to the current "applied" to the coil]. The spool 200
is moved "by increasing or decreasing the current to solenoid coil 201a" [7:51-53].

"spool valve body." Indeed, that step recites in part "controlling the position of a *vented spool slidably positioned within a spool valve body* . . . said controlling step utilizing an electromechanical actuator to vary the position of *said vented spool*." The plain claim language requires that the *spool* has a vent, as the claim does not say "vented spool valve body." The claim further recites that the electromechanical actuator (which includes a variable force solenoid) varies the position of the "vented spool." Both recitations demonstrate that "vented" modifies the term "spool," and not some other component. In particular, "vented" does not modify "spool valve body."[35] The specification confirms the plain language of the claims.[36] The "vented spool" is a separate and distinct component from the spool valve body. The spool has a vent.

Second, the vent in the spool is an internal passage 198d passing through each end of the spool and leading to atmosphere to eliminate any influence on spool movement due to oil pressure. As described in the specification, "oil pressure in cavity 198a is relieved, leaving *only* the force of armature 201b to be balanced against the force of spring 202 . . . [V]enting spool valve 198 to atmosphere via vent 198d would complete the objective of relieving the pressure in cavity 198a which acted on the end of land 200a in previous VCT systems" (8:12-27: emphasis added). This aspect of the vented spool is particularly significant, as the entire purpose of having the vent in the spool was to entirely eliminate any influence of engine oil pressure on movement of the spool. The Background in the '738 Patent described the problems associated with systems using engine oil pressure.[37] The stated solution was to eliminate entirely any possible influence

---

[35] The other independent claim, claim 1, is entirely consistent. It recites "a spool (200), said spool being reciprocable within said body and having first and second spaced apart lands (200a, 200b), said spool further having a vent to atmosphere (198d)." (emphasis added) In addition, original application claim 16 recited "a spool valve (192) . . . comprising a valve body (198) and a vented spool (200), said spool being reciprocable within said valve body . . . ."

[36] The specification states that "[s]pool valve 192 is made up of cylindrical member 198 and vented spool 200 which is slidable to and fro within cavity 198a" (7:19-21). *See also* Abstract (stating "a vented spool (200) within a valve body"); and 2:56-62 (two references in Summary of Invention to "a vented spool in a hydraulic control valve").

[37] The Background described how, at engine start-up, while oil pressure is developing, the spool cannot be immediately positioned (and therefore the VCT actuator cannot be positioned) and thus how the system must wait for engine oil pressure to build-up (2:21-30). Further, "[e]ven after the engine stabilizes at normal operating speed, individual characteristics vary substantially

of oil pressure on the spool position,[38] and the patent repeatedly describes how oil pressure has

no influence on spool position.[39]  The prosecution history is consistent.  In its Appeal Brief, BW

summarized its invention by stressing each of the points in n. 39 (*see* Ex. 14 at pp. 3-6).[40]

The structure for the venting is the vent 198d in the spool 200, as opposed to a vent in the

spool valve body 198, a fact confirmed by the plain words of the claim.  This point is also self-

evident from the fact that it is the vented spool that is moved by the VFS and thus needs to be

uninfluenced by anything but the VFS and its spring.  This point is also confirmed by the

specification's description of the functions and construction vented spool at 7:19-8:35[41] and use

of "vented spool" as opposed to spool valve body in describing the VFS operation.[42]  Thus, the

venting is of the spool, as in the proposed construction.

Third, the vented spool has an annular recess allowing the flow of oil to and from the

check valve/vane lobe assembly.  This is the annular passage 198b shown in the figures, but

otherwise unmentioned in the patent, which merely mentions the "cylindrical lands 200a and

---

from engine to engine. A new engine at high speed and low temperature can have a drastically different oil pressure than a worn engine at hot idle" (2:32-36).

[38]  The Summary of the Invention explains that "[w]hen the relationship between spool position and control signal (solenoid current) is *independent* of engine oil pressure, any problems associated with oil pressure or its fluctuation are eliminated." (3:19-22; emphasis added). According to the '738 patent, "the lack of normal operating oil pressure during initial engine start-up does not result in start-up error because the signal from the ECU is fed immediately to the solenoid which directly positions the spool" (3:22-26).

[39]  *See, e.g:* (1; (2)"*With the oil pressure variable eliminated*, the *only* forces left to consider in controlling the position of the *vented spool 200* are the ones with predictable rates of change. . . . The result is the position of spool 200 being readily ascertainable based on solenoid current alone" (8:28-35, emphasis added); (3) "By using *only* imbalances between an electrically-generated force on one end 200a of *spool 200* and a spring force on other end 200b for movement in one direction or another (as opposed to using imbalances between hydraulic loads from a common source on both ends), *the control systems of FIGS. 19 and 20 are completely independent of hydraulic system pressure* [i.e., engine oil pressure]" (8:60-66, emphasis added).

[40]  BW's Claim Construction, which merely states that the vented spool must have "a passage … to allow pressure relief" is woefully incomplete as the proper passage must be one that results in the oil pressure having no influence on spool position.

[41]  For example the "vented spool 200" has "cylindrical lands 200a and 200b as opposed ends thereof" that "fit snugly within member 198" (7:21-23).  Only the spool has "lands," not the spool valve body.

[42]  *See,* for example the description of how the position of the vented spool 200 is controlled "in direct response to electromechanical actuator 201" (7:41-43) and how "[a]rmature 201b bears against extension 200c of *vented spool 200*" (7:46-47; emphasis added).

200b" (7:20-21) next to the recess 198b that "block the exit of hydraulic fluid" when the spool is in its "null" position as shown in Fig. 19 (*see* 7:20-30). There should be no debate about this aspect of the vented spool claim construction, as without the annual recess, the spool would not be a spool and would not work in the overall context of the VCT.

### b) Term 3b: "valve body"

**Proposed Construction: A housing in which the vented spool axially moves.**

The intrinsic evidence compels this construction. The plain language of the claim recites "controlling the position of a vented spool slidably positioned within a spool valve body." As mentioned in connection with the discussion of "vented spool, the specification states that that "[s]pool valve 192 is made up of cylindrical member 198 and vented spool 200 which is slidable to and fro within cavity 198a" (7:17-19). The Abstract also describes stating "a vented spool (200) within a valve body." Thus, the proposed construction is correct and very similar to BW's.

### c) Term 4a: "supplying hydraulic fluid from said source through said spool valve" [to a means for transmitting rotary movement…]

**Proposed Construction: Directing the flow of oil "internal to the VCT mechanism only" from the "source" to the "means for transmitting" to allow cam torque pulsations to rotate the vanes (or shift the piston-cylinder)**

The construction issue for the "internal" aspect of this term has been discussed *supra* relative to Term 1b. The proffered construction of "directing the flow of oil 'internal to the VCT mechanism only' from the 'source' to the 'means for transmitting'" flows from the fundamental operation of the invention, in which the oil flow to effect cam phase changes is always internal, and in which "external" oil from the oil pump is used only for "make-up" oil to replace leakage. As discussed *infra* relative to Term 4b, the "means for transmitting rotary movement to said camshaft," is the combination of (1) the check valve assembly and the (2) vane lobe and chamber walls against which the oil pressurized by camshaft torque pulsations pushes to move the camshaft. The arrangement of the spool, the "source" and the "means for transmitting rotary movement" is shown below.



FIG. 19

"spool valve"

- - - "source"

- - - "means for transmitting rotary movement to said camshaft"

The basic "mechanism" to shift the camshaft phase is the vane lobe/check valve assembly. When the spool valve is moved from its null position to one of two alternate positions depending on the direction of camshaft rotation required, the camshaft torque energy pushes a lobe against the oil in the "source" chamber. Consistent with the proffered construction, this causes the oil to flow *from* that chamber *through* the spool valve and *to* the check valve assembly and into another chamber. That oil pushes the lobe in that chamber to a new position to move the camshaft. The source chamber and the particular lobe pushed by the oil pressure change based upon the desired direction of rotation of the camshaft.

   d)  **Term 4c: "said spool valve selectively allowing and blocking flow of hydraulic fluid through an inlet line and through return lines"**

   **Proposed Construction: (a) the oil from the "source" to the "means for transmitting" flowing via an inlet line and one of two return lines opened and closed responsively to selective axial movement of the annular recess in the spool, and (b) the inlet and return lines being attached between the spool valve body and the "means for transmitting."**

As discussed above in connection with Term 4a, as part of the supplying step, the spool valve controls the flow between the chambers 132a/b and through the check valve assembly. The portion of the claim represented by Term 4c concerns how the spool valve provides that control (i.e., the opening and closing of the inlet and return lines via the movement of the annular recess) and the location of the lines.

The intrinsic evidence completely supports the proffered construction. Part (a) of the construction recites "the oil from the 'source' to the 'means for transmitting' flowing via an inlet line and one of two return lines opened and closed responsively to selective axial movement of the annular recess in the spool." This tracks the plain language of the claimed supplying step: "supplying hydraulic fluid *from said source* through said spool valve *to a means for transmitting* rotary movement to said camshaft, said spool valve selectively allowing and blocking flow of hydraulic fluid *through an inlet line and through return lines*." As discussed previously, the part of the spool valve that allows or blocks the oil is the annular spool recess 198b that connects or "opens" the inlet line 182 to one of the two return lines 194/196. Aligning that recess between the inlet line 182 and one of the two return lines 194/196 connected to the spool valve body 198 releases the pressure on one of the chambers, allowing cam torque to push the oil into the other chamber and move the vane lobe therein to change the phase of the cam. The description in the patent is consistent.[43]

Part (b) of the construction recites that the inlet and return lines are attached between the spool valve body and the "means for transmitting." This construction also reflects what is shown in Fig. 19 and depicted in the colored diagrams, and follows the internal only flow BW repeatedly stressed to the PTO. The inlet line 182 and one of the two return lines 194/196 are part of the flow path from the chosen "source" chamber to the chosen "means for transmitting" during a camshaft phase change. One of the return lines (shown in green) is always inactive in a camshaft phase change because it is not aligned with the annular recess 198b and thus no oil

---

[43] As the plain claim words show, return lines 194/196 exist in the supply path between recesses 132a/132b (the "sources") and the spool valve 192: "hydraulic fluid is returned to the spool valve 192 from recesses 132a,132b by return lines 194,196, respectively" (7:16-18).

flows though it. In the "null" or center location of the recess as shown in Fig. 19, no oil flows through either return line. The proffered construction is consistent with the fact that the inlet line and the return lines connect between the spool valve body and the "means for transmitting" because each of the lines connects between the spool valve body and the check valve assembly, which is part of "means for transmitting." Internal only flow stressed in prosecution is achieved.

As noted above, BW has proffered a construction of "source" that equates with the MOG, and BW's construction of "inlet lines" is one that "allows passage of fluid from the source [i.e., from the MOG] *through* the spool valve." Such a construction would contradict the disclosed embodiments[44] and render claim 10 without support under 35 U.S.C. § 112, ¶1. Construing the inlet and return lines broadly to cover lines that extend to the MOG would cover systems using engine oil pump pressure to supply oil through the spool valve to make the camshaft rotate to effect a phase change, directly contradicting what BW said it invented: a CTA system that used cam torque energy for cam phase changes.[45] Indeed, in the '738 patent, the spool valve does not allow *and block* flow through inlet and return lines from the MOG.

The prosecution history is consistent with Hitachi's proffered construction. The "supplying step" was not original claim language. BW added this recitation to the claim during prosecution when the PTO Examiner required BW to "amend [the] claims to a unified invention" and to address certain obviousness concerns that the PTO Examiner had.[46] If the added supplying step had no support in the original specification, as would be the case if inlet

---

[44] The *sole* disclosure of "return lines" in the original application are lines 194/196 extending from the recesses/cylinders to the spool valve 192. *See* Figs. 19, 20 and original claim 1. The *sole* disclosure of the "inlet line" in the original application is one that extends between the spool valve 192 to the check valves 184/186. *Id.*

[45] This conclusion is also underscored by the fact that previous BW patents discussed in the '738 patent specification all refer to "return lines" as lines extending *from the recesses/cylinders to the spool valve*. *See, e.g.*, U.S. Patents No. 5,002,023 (return lines 94,96); No. 5,107,804 (return lines 94,96); No. 5,172,659 (return lines 194,196); and No. 5,184,578 (return lines 94,96). This intrinsic evidence also confirms the meaning of "return lines" and "inlet line" outlined above. Moreover, BW's construction of inlet and return lines as allowing passage "through" the spool valve is inconsistent with the fact that it is the annular passage that allows the flow "through."

[46] *See* Ex. 10 (BW 2147). The only other independent claim, claim 1, recited first and second return line means, each extending from one of the recesses (132a,132b) to spool valve body (198). Original claim 1 also recited inlet lines means extending from valve body to the recesses.

line were construed as connecting to the MOG, it would be invalid under § 112 and violate the prohibition against new matter.[47]  Thus, the intrinsic evidence supports Hitachi's construction.

### 4.    The "Transmitting" Terms

#### a)   Term 4b: "means for transmitting rotary movement to said camshaft"

**Proposed Construction: (a) the sides of the lobes in the vane (or piston-cylinder) and the corresponding adjacent areas of the housing opposite to the supply volume sides of other lobes in the vane (or piston-cylinder); and (b) check valves that upon the axial movement of the annular recess, permit oil from the supply volumes to flow unidirectionally into (a) such that cam torque pulsations may rotate the vanes to change the phase angle of the camshaft relative to the crankshaft, or the equivalents under § 112 ¶ 6.**

This term is means-plus-function term under 35 U.S.C. § 112, § 6.  The function is "transmitting rotary movement to said camshaft" to do the actual phase angle change.  This function is implemented by the combination of: (1) the side of the lobe 160a/160b and the adjacent areas of the chamber 132a/b that receive the oil from the "source" lobe 160b/a and chamber 132b/a, and (2) the check valves 184b/186b that permit oil pressurized by cam torque pulsations to flow in one direction.[48]  As has been explained repeatedly herein, in the "null" position of the spool, cam torque pressure is built up on the oil on all sides of the lobes 160a/b, but the lobes cannot move because no oil flows through the spool valve given the position of the annular recess 198b.  Once the spool moves to position the annular spool recess 198b between the inlet line and one of the two return lines to establish a flow path, pressure is relieved in one of the chambers 132a/b and the lobe therein 160a/b is free to rotate under the pressure of the cam torque pulsations.  That cam torque bears against that lobe 160a/b and forces the oil out of the

---

[47]  *See TurboCare Div. Of Demag Delaval Turbomachinery Corp. v. General Elec. Co.*, 264 F.3d 1111, 1118 (Fed. Cir. 2001) ("new claims or other added material must find support in the original specification"); *Purdue Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320, 1323 (Fed. Cir. 2000); *Network Commerce, Inc. v. Microsoft Corp.*, 422 F.3d 1353, 1360-61 (Fed. Cir. 2005) ("download component," added during prosecution, included a boot program because the only description in the specification was a download file containing a boot program).

[48]  The corresponding structure for the lobes and chambers in the piston version would be the pistons and piston cylinders 54/56, respectively. *See* U.S. Patent 5,002,023 (Ex. 6), referenced in the '738 patent for the explanation of the piston-cylinder structure.

chamber 132a/b and through the spool valve and check valve assembly into the opposing chamber 132b/a to bear against the opposing lobe 160b/a and the walls of that chamber to turn the lobe 160b/a and thus the vane 160. The cam torque pulsations thereby rotate the cam.

The check valves 184b/186b are a required part of the structure to implement the function of the means as they prevent backflow into the chamber supplying the oil. Without them, the camshaft would not rotate. They are thus properly part of the "means."[49] The green areas adjacent the check valves on the colored diagrams reflect oil that is not moving because one of the check valves is always closed during a cam phase shift. As such, oil only flows in one direction through each check valve, reflecting the "unidirectional" part of the construction. The intrinsic evidence and the nature of invention itself thus compel the proffered construction.

> **b) Term 5: "transmitting rotary movement to said camshaft in such a manner as to vary the phase angle of said camshaft with respect to said crankshaft, said rotary movement being transmitted through a housing, said housing being mounted on said camshaft, said housing further being rotatable with said camshaft and being oscillatable with respect to said camshaft"**

> <u>**Proposed Construction**</u>**: Transmitting rotary movement to the camshaft to vary the phase angle of the camshaft relative to the crankshaft. The rotary movement is transmitted through a housing mounted on the camshaft. The housing can rotate with and oscillate relative to the camshaft.**

This construction follows from what has been provided *supra*. The CTA system rotates the camshaft relative to the crankshaft. The vane lobes spin on the end of the camshaft in an oil-filled housing that has an external sprocket that is coupled to the crankshaft by a chain (*see* Term 1d). The chain spins the housing and thus the camshaft. The movement of the vane lobes in the housing under control of the spool valve moves or "oscillates" the camshaft relative to the housing to vary the phase of the camshaft relative to the crankshaft.

---

[49] *See Default Proof Credit Card System, Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005) (stating that "[w]hile corresponding structure need not include all things necessary to enable the claimed invention to work, it must include all structure that actually performs the recited function"); *Globetrotter Software, Inc. v. Elan Computer Group, Inc.*, 236 F.3d 1363, 1368 (Fed. Cir. 2001) (finding that UID (unique identification) was a necessary part of carrying out a claimed function of storing licenses, and specification gave no indication that licenses could be stored without the UID).

### 5.    The "Solenoid" Terms

#### a)    Term 3c: "utilizing an electromechanical actuator to vary the position of said vented spool"

**Proposed Construction: Using an electromechanical device to change the position of the vented spool, in response to the current control signal from the ECU.**



The patent recites that "The control of the position of spool 200 within member 198 is in direct response to an electromechanical actuator 201" (7:41-42). The "control current" nature of the ECU signal has been discussed relative to Term 2b.

#### b)    Term 3d: "variable force solenoid"

**Proposed Construction: A solenoid driven by a non-PWM [pulse-width modulated], current control signal from the ECU with the force applied by the solenoid proportionally varying with the magnitude of the current control signal.**

As discussed, the '738 patent provides few specific details regarding the "variable force solenoid." The '738 patent stressed that the VFS had advantages over a "PWM [pulse-width modulated] solenoid" (3:37),[50] including being driven by a current control signal from the ECU,[51] that "the position of spool [was] readily ascertainable based on solenoid current alone" (8:33-35), a fact consistent with the prior art discussed *supra*. The construction tracks those statements.

The other intrinsic evidence is consistent with the proffered construction. The prior art cited during prosecution confirms that the VFS was current controlled.[52]   BW's own prior art

---

[50]   The patent describes how PWM solenoids have particular problems, including asserting that such solenoids have complete or full cycles, and says that a variable force solenoid solves them (*see* col. 2-3). Nothing in the specification suggests using a PWM driving signal. Thus, a variable force solenoid cannot be a PWM solenoid, and "variable force solenoid" in the claims must be interpreted accordingly. *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001) (stating that claims must be construed appropriately when the specification makes clear that a particular structure is the invention, even if "the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question").

[51]   *See, e.g.* "a variable force solenoid armature only travels a short distance, as controlled by the current from the ECU" (3:34-37); "the relationship between spool position and *control signal (solenoid current)* is independent of engine oil pressure" (3:19-21, emphasis added).

[52]   During the prosecution, BW agreed that U.S. Patent No. 5,000,420 to Hendrixon discloses a variable force solenoid. Reply 11/1/94, p. 3. Hendrixon discloses a valve 10 that controls pressure "as a function of *current input signals from controller 90* to coil 22" (5:10-14; emphasis

cited in the patent,[53] which BW differentiated over, makes clear that PWM solenoids use a PWM signal.[54] Variable force solenoid was used in a particular way throughout the patent, so it must be construed consistently. *Nystrom v. Trex Co., Inc.*, 424 F.3d 1136, 1144-45 (Fed. Cir. 2005).

BW's own product literature confirms Hitachi's proposed construction that VFS solenoids are current-driven,[55] not PWM voltage driven.

### c) Term 11: [a coil] **"adapted to receive said electrical signal from said engine control unit"**

**Proposed Construction:** [a coil] **that receives the current control signal from the ECU.**

The intrinsic evidence supports this construction for the reasons discussed relative to Terms 2b, 3c and 3d, *supra*. The ECU supplies a current to the VFS coil 201a that moves the armature 201b. As stated in the patent, "an electric current is introduced … into solenoid coil 201a which repels or "pushes" armature 201b.

Term 12a: **[said armature being]** connected **[to said spool]**

**Proposed Construction:** [said armature being] **physically attached** [to said spool]

Figs. 19 (below left) and 20 (below right) in the '738 patent, which show the attachment

---

added; *see also* Fig. 2). The armature moves based on "*current is applied by the valve control electronics 90* to the solenoid coil 22" (5:24-25) and that displacement of a solenoid armature 32 varies linearly with current "applied to" the solenoid coil 22 (5:33-36; emphasis added). Further, the armature pushes a spool 58, which "likewise varies linearly with valve *control current* so as to vary (decrease) control pressure to the external device accordingly." (5:36-39; emphasis added).

[53] *See V-Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307, 1311 (Fed. Cir. 2005) ("prior art cited in a 'patent or cited in the prosecution history … constitutes intrinsic evidence'").

[54] U.S. 5,172,659 (cited at 2:1-13) discloses a PWM solenoid that is operated by controlling the duty cycle, i.e., the duration of the "on" cycles versus the duration of the "off" cycles ('659 patent at 2:12-22) *See also* 2:61-68 (the PWM solenoid is operated by "increasing or decreasing the duty cycle"), 7:34-47 and 10:41-55 (referring to using on-off pulses to the solenoid, and operating the solenoid by "increasing or decreasing the on duration relative to the off duration").

[55] BW's own product literature differentiates variable force solenoids from PWM solenoids based on the control input signal. BW advertisements of solenoids for transmissions describes variable force solenoids as follows: "Variable force solenoids control pressure proportionally or inversely proportionally to a *current driven input signal from the vehicle's power train computer*" (Ex. 19; emphasis added). A current driven input signal uses a current driver that provides a current control signal of varying magnitude. By contrast, as to PWM solenoids, "[h]igh- and low-flow pulse width modulated solenoids provide pressure output proportional or inversely proportional to *input voltage pulse width*" (Ex. 19; emphasis added).

of the armature to the spool support this construction. The attachment is a physical connection.



The specification supports this construction. Fig. 20 shows lever arrangement 201e physically attaching the armature 201b to spool extension 200c (which in turn is attached to the vented spool 200). As stated in the patent "Lever arrangement 201e connects armature 201b with spool extension 200c . . . ." '738 patent, 8:54-55. The use of "connect" in the specification is a physical attachment. Likewise, Fig. 19 depicts armature 201b, spool extension 201c, and vented spool 200. While the written description only describes the action of the armature 201b pushing against the spool extension 200c in operation and not the structural connection between the two (*see* '7:43-48), a person of ordinary skill in the art would recognize that the armature 201b is physically attached to the spool extension 201c. If the armature 201b was just abutting against spool extension 200c, then any bump or the like during engine operation would cause the two flat facings to become offset relative to one another.[56]

The plain meaning of the term "connected" also supports the proffered construction.[57]

> ### d) Term 12b: "said armature to exert a force upon said spool and induce movement in said spool, said movement corresponding to said signal from said engine control unit"
>
> **Proposed Construction:** The armature applies a force on the spool in an amount that is proportionally related to the magnitude of the current control signal sent by the ECU.

The intrinsic evidence supports this construction for the reasons discussed relative to Terms 2b, 3c and 3d, *supra*. The ECU supplies a current to the VFS coil 201a that moves the armature 201b. The specification states that "vented spool 200 can be moved in either direction by increasing or decreasing the current to solenoid coil 201a, as the case may be" (7:51-53).

---

[56] In connection with Fig. 19, the specification also states that "configuration of the solenoid 201 may be reversed, converting the force on spool extension 200c from a 'push' to a 'pull'" (7:53-56). If the armature is pulling on the extension 200c, the two must be physically attached.

[57] According to "Webster's Unabridged Dictionary of the English Language" (1989) (Ex. 20), the following definition is provided at p. 311: "connected: 1. united, joined, or linked. 2. having a connection... .."

That means that the magnitude of the current control signal from the ECU determines the position of the spool.

        **e)  Term 13: "said air gap separating said coil from said armature"**

        **<u>Proposed Construction:</u>  A fixed space or gap in the structure between the coil and the armature, extending the length of the armature, without magnetic bearing material between the coil and the armature, and with air in the gap during operation.**

The air gap is what separates the coil and the armature.  To achieve that separation, the '738 patent states that the VFS is a "cylindrical armature or variable area solenoid" (8:38) in which a "[m]ain air gap 201c extends radially around armature 201b and may contain nonmagnetic bearing material" (8:39-41).  *See* diagrams used for Term 12a.  Because the air gap "separates" the coil and armature from one another, it must extend axially the length of the armature, just as shown in Fig. 19.  Likewise, the air gap cannot have magnetic bearing material is because air gaps exist between two magnetic parts to change the intensity of magnetic flux, and magnetic bearing material would defeat that purpose.  Thus, the intrinsic evidence, as well as the plain meaning of "air gap,"[58] support the proffered construction.

---

[58]  Some ordinary meanings of "air gap" include: (a) "air gap (gap) (rotating machinery) A separating space between two parts of magnetic material, the combination serving as a path for magnetic flux."  *IEEE Standard Dictionary of Electrical and Electronics Terms* 14 (IEEE Inc., 2d Ed. 1977) (Ex. 21); and (b) "the space between two objects magnetically related, as between the rotor and the stator in a dynamo, or between two objects electrically related, as between the electrode and the tip of a spark plug."  *Webster's Unabridged Dictionary of the English Language* (1989)  (Ex. 22).

ASHBY & GEDDES

*/s/ Tiffany Geyer Lydon*

_____

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. # 3950)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888

*Attorneys for Plaintiffs Hitachi, Ltd. and.*
*Hitachi Automotive Products (USA), Inc.*

*Of Counsel:*

Kenneth E. Krosin
Michael D. Kaminski
Pavan K. Agarwal
C. Edward Polk
Foley & Lardner LLP
3000 K Street, N.W., Suite 500
Washington, D.C. 20007–5109
(202) 672–5300

William J. Robinson
Foley & Lardner LLP
2029 Century Park East Blvd., Ste. 3500
Los Angeles, CA 90067-3021
(310) 277-2223

Dated: September 28, 2006
173616.1

## CERTIFICATE OF SERVICE

I hereby certify that on the 28th day of September, 2006, the attached **REDACTED**

**PUBLIC VERSION OF PLAINTIFFS' OPENING CLAIM CONSTRUCTION BRIEF** was

served upon the following counsel of record in the manner indicated:


Richard K. Herrmann, Esquire                                    HAND DELIVERY
Morris, James, Hitchens & Williams LLP
222 Delaware Avenue, 10th Floor
P.O. Box 2306
Wilmington, DE  19801


Hugh A. Abrams, Esquire                                    VIA FEDERAL EXPRESS
Sidley Austin LLP
One South Dearborn Street
Chicago, IL  60603




                                    */s/ Tiffany Geyer Lydon*
                                    _____
                                    Tiffany Geyer Lydon

154486.1