**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| HITACHI, LTD. and HITACHI AUTOMOTIVE PRODUCTS (USA), INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Civil Action No. 05-048-SLR |
| BORGWARNER INC., and BORGWARNER MORSE TEC INC., | ) ) ) | |
| Defendants. | ) | |
| BORGWARNER INC., | ) ) | |
| Counterclaimant, | ) ) | |
| v. | ) ) | |
| HITACHI, LTD., and HITACHI AUTOMOTIVE PRODUCTS (USA), INC., | ) ) ) | |
| Counterdefendants. | ) ) | |

**OPENING CLAIM CONSTRUCTION BRIEF OF
BORGWARNER INC. AND BORGWARNER MORSE TEC INC.**

OF COUNSEL:

SIDLEY AUSTIN BROWN & WOOD, LLP
Hugh A. Abrams
Thomas D. Rein
Lisa Schneider
Marc A. Cavan
Lara V. Hirshfeld
10 South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

Richard K. Herrmann (I.D. #405)
Mary B. Matterer (I.D. #2696)
MORRIS JAMES, HITCHENS &
WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE 19801
(302) 888-6800
mmatterer@morrisjames.com

*Attorneys for BorgWarner Inc. and
BorgWarner Morse TEC Inc.*

Dated: September 28, 2006

## TABLE OF CONTENTS

I.    THE '738 PATENT..................................................................................1

    A.  Internal Combustion Engines and Variable Camshaft Timing...........................1

    B.  The Control System of the '738 Patent......................................................2

        1.    The Closed-Loop VCT System of the '738 Patent..........................2

        2.    The Variable Force Solenoid and Vented Spool of the '738 Patent..........5

        3.    The Preferred Embodiment of the '738 Patent................................7

    C.  The Advantages of the '738 Patented Invention Over Prior Art VCT Systems..........8

II.   APPLICABLE CLAIM CONSTRUCTION LAW.....................................9

III.  BORGWARNER'S PROPOSED CONSTRUCTIONS FOR CLAIMS 10 AND 11......11

    *CLAIM 10*...........................................................................................12

    *CLAIM 11*...........................................................................................36

IV.   CONCLUSION....................................................................................40

## TABLE OF AUTHORITIES

### CASES

*Altiris, Inc. v. Symantec Corp.,*
  318 F.3d 1363 (Fed. Cir. 2003)......................................................... 13

*Amgen Inc. v. Hoechst Marion Roussel, Inc.,*
  314 F.3d 1313 (Fed. Cir. 2003)......................................................... 11

*Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.,*
  340 F.3d 1298 (Fed. Cir. 2003)......................................................... 31

*Cook Biotech Inc. v. ACell, Inc.,*
  ___ F.3d ___, No. 05-1458, 2006 WL 2381972 (Fed. Cir. Aug. 18, 2006)...................... 3

*CVI/Beta Ventures, Inc. v. Tura LP,*
  112 F.3d 1146 (Fed. Cir. 1997)......................................................... 15, 18

*Digital Biometrics, Inc. v. Identix, Inc.,*
  149 F.3d 1335 (Fed. Cir. 1998)......................................................... 10, 18

*Gart v. Logitech, Inc.,*
  254 F.3d 1334, 1342 (Fed. Cir. 2001)................................................... 26

*Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n,*
  383 F.3d 1352 (Fed. Cir. 2004)......................................................... 10, 26

*Globetrotter Software, Inc. v. Elan Computer Group, Inc.,*
  362 F.3d 1367 (Fed. Cir. 2004)......................................................... 30

*Golight, Inc. v. Wal-Mart Stores, Inc.,*
  355 F.3d 1327 (Fed. Cir. 2004)......................................................... 11

*Intirtool, Ltd. v. Texar Corp.,*
  369 F.3d 1289 (Fed. Cir. 2004)......................................................... 13

*Inverness Med. Switz. GmbH v. Warner Lambert Co.,*
  309 F.3d 1373 (Fed. Cir. 2002)......................................................... 17, 39

*Johns Hopkins Univ. v. CellPro, Inc.,*
  152 F.3d 1342, 1355 (Fed. Cir. 1998)................................................... 27

*Liebel-Flarsheim Co. v. Medrad, Inc.,*
  358 F.3d 898 (Fed. Cir. 2004).......................................................... 10, 26

*Markman v. Westview Instruments, Inc.,*
  52 F.3d 967 (Fed. Cir. 1995)........................................................... 9

*Markman v. Westview Instruments, Inc.*,
    517 U.S. 370 (1996) ................................................................... 9

*Northern Telecom Ltd. v. Datapoint Corp.*,
    908 F.2d 931 (Fed. Cir. 1990) ................................................... 15

*Northern Telecom Ltd. v. Samsung Electronics, Co.*,
    215 F.3d 1281 (Fed. Cir. 2000) ........................................... 16, 17

*Omega Eng'g v. Raytek Corp.*,
    334 F.3d 1314 (Fed. Cir. 2003) ................................................ 16

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ................. 9, 10, 11, 14, 18, 22, 39

*Rambus Inc. v. Infineon Techs. AG*,
    318 F.3d 1081 (Fed. Cir. 2003) ................................................ 10

*Rexnord Corp. v. Laitram Corp.*,
    274 F.3d 1336 (Fed. Cir. 2001) ................................................ 15

*SanDisk Corp. v. Memorex Prods., Inc.*,
    415 F.3d 1278 (Fed. Cir. 2005) ................................................ 20

*Schumer v. Lab. Computer Sys., Inc.*,
    308 F.3d 1304 (Fed. Cir. 2002) ................................................ 13

*Serrano v. Telular Corp.*,
    111 F.3d 1578 (Fed. Cir. 1997) ................................................ 16

*Smiths Indus. Med. Sys., Inc. v. Vital Signs, Inc.*,
    183 F.3d 1347 (Fed. Cir. 1999) ................................................ 33

*SRI Int'l v. Matsushita Elec. Corp. of Am.*,
    775 F.2d 1107, 1121 (Fed. Cir. 1985) ...................................... 11

*Standard Oil Co. v. Am. Cyanamid Co.*,
    774 F.2d 448 (Fed. Cir. 1985) ................................................. 18

*U.S. Surgical Corp. v. Ethicon, Inc.*,
    103 F.3d 1554 (Fed. Cir. 1997) ................................................ 24

*Va. Panel Corp. v. MAC Panel Co.*,
    133 F.3d 860 (Fed. Cir. 1997) ................................................. 26

*Vanguard Prods. Corp. v. Parker Hannifin Corp.*,
    234 F.3d 1370 (Fed. Cir. 2000) ........................................... 15, 16

*Varco, L.P. v. Pason Sys. USA Corp.*,
    436 F.3d 1368 (Fed. Cir. 2006) ........................................................ 10

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ....................................................... 9, 10

*Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*,
    239 F.3d 1225 (Fed. Cir. 2001) ....................................................... 33

## STATUTES AND REGULATIONS

35 U.S.C. § 112 ...................................................... 12, 13, 21, 32, 33

37 C.F.R. § 1.57 ................................................................................. 3

## OTHER REFERENCES

*Academic Press Dictionary of Science and Technology* (1992) ........................................... 25, 38

*Manual of Patent Examining Procedure* ("MPEP"), § 2163.07(b) ................................. 3

*McGraw-Hill Dictionary of Scientific and Technical Terms* (4th ed. 1989) ....................... 25, 38

*McGraw-Hill Dictionary of Science and Engineering* (3d ed. 1984) .................................. 25, 38

*Merriam-Webster's Collegiate Dictionary* (10th ed. 1993) ....................................... 25

*Webster's Third New Int'l Dictionary of the English Language Unabridged* (1993) ....... 24, 25, 37

Defendant BorgWarner Morse TEC Inc. and Defendant/Counterclaimant BorgWarner Inc. (collectively, "BorgWarner") submit this memorandum in support of their proposed constructions for asserted claims 10 and 11 of U.S. Patent No. 5,497,738 ("the '738 patent"), a copy of which is attached as Ex. 1 to the Matterer Decl.[1]  As explained below, the Court should adopt BorgWarner's proposed constructions because they are true to the language of the claims and are supported by the specification and prosecution history.  Hitachi, by contrast, is trying to avoid infringement by asking the Court to import limitations into the claims from the specification and prosecution history.  In doing so, Hitachi is inviting legal error.

## I.  THE '738 PATENT

### A.    Internal Combustion Engines and Variable Camshaft Timing

The '738 patent describes methods of electronically controlling the timing of the valves in an internal combustion ("IC") engine to improve engine performance, fuel economy and exhaust emissions.  An IC engine produces power by burning a mixture of fuel (gasoline) and air in engine cylinders.  In an IC engine, a rotating camshaft is responsible for opening and closing the intake and exhaust valves to allow a mixture of raw, unburned fuel and air to be drawn into the engine cylinders (intake) and expelled from the cylinders after combustion (exhaust).[2]  As the camshaft rotates, lobes (or "cams") on the shaft open the intake and exhaust valves at specific intervals in the combustion cycle.  (*See* Expert Report of William B. Ribbens

---

[1]  References to the "Matterer Decl." are to the Declaration of Mary B. Matterer in Support of the Opening Claim Construction Brief of BorgWarner Inc. and BorgWarner Morse TEC Inc.

[2]  Rotation of the camshaft is caused by a chain or belt that connects the camshaft to the engine crankshaft.  Sprockets on the camshaft and crankshaft are interconnected in much the same way as bicycle sprockets are connected by a chain to transfer the rotary motion of the pedals to the wheels.  Combustion of fuel in the engine cylinders causes rotation of the crankshaft, which transmits power to the vehicle's wheels, and also causes rotation of the camshaft (and opening or closing of the valves) by rotation of the chain or belt connecting the camshaft and crankshaft.

Regarding Infringement of U.S. Patent No. 5,497,738 ("Ribbens Rep.") at 7 (Matterer Decl. Ex. 17)).

The timing of the opening and closing of the intake and exhaust valves is a critical factor in engine performance and exhaust emission characteristics. Without some type of variable valve timing system, the timing of the opening and closing of the intake and exhaust valves occurs at fixed intervals. The invention of the '738 patent relates to variable camshaft timing ("VCT") systems for adjusting the valve timing while the engine is running.

A VCT system permits the timing of the opening and closing of the intake and/or exhaust valves to be adjusted, or varied, in order to enhance the operation and performance of the engine and associated vehicle. For example, the acceleration of the vehicle from a stopped position can be enhanced by advancing the valve timing to get more fuel into the engine more quickly. Acceleration from a stopped position is quickened by opening the intake valves earlier in the combustion cycle to increase the amount of fuel drawn into the cylinders.

Of course, always having the timing in this "advanced" condition would cause excess fuel to be delivered to the engine cylinders while the vehicle is idling in a stationary position, or when the vehicle is coasting or being driven at a constant speed. Under such conditions, the VCT system can "retard" the timing and cause the intake valves to open later in the combustion cycle. Engine exhaust emissions can be similarly affected by whether the valve timing is advanced or retarded in specific situations involving the speed of the engine, the load on the vehicle and the temperature of the engine (start-up or smoothly running).

**B.    The Control System of the '738 Patent**

**1.    The Closed-Loop VCT System of the '738 Patent**

The '738 patent is directed to a novel VCT system. In the claimed system, the

angular position of the camshaft relative to the crankshaft is varied by regulating and controlling the flow of oil. By electronically controlling the amount of fluid (oil) that flows into or out of recesses on one side or the other of moveable vanes in a vane housing, fluid pressure is created on one side or the other of the vanes, which causes the vanes to rotate relative to the vane housing, and thereby causes rotation of the camshaft relative to the housing because the vanes are connected to the camshaft. The vane housing is connected to the crankshaft via sprockets and a chain or belt. Therefore, movement of the vanes and camshaft relative to the vane housing adjusts the relative angular position of the camshaft with respect to the crankshaft. ('738 patent, col. 6, line 7-col. 8, line 46; Ribbens Rep. at 8, 9).

The flow of oil in the '738 patent is electronically controlled using a "closed loop" system, which means that the system uses feedback to adjust the camshaft to the desired phase angle. The '738 patent builds upon the work of the inventors, Dr. Stanley Quinn and Mr. Edward Siemon, described in earlier patents. These earlier patents of the inventors, and other co-workers at BorgWarner, are "incorporated by reference" in the '738 patent, meaning that their detailed descriptions are part and parcel of the disclosure of the '738 patent.[3] For example, the '738 patent incorporates by reference U.S. Patent No. 5,184,578 ("the '578 patent"). (*See* '738 patent, col. 1, lines 32-35; col. 2, lines 1-20). In fact, "[t]he preferred embodiment" of the '738 patent "employs a closed-loop feedback system, such as the one disclosed in U.S. Pat. No. 5,184,578." (*Id.* at col. 3, lines 13-16).

---

[3]  *See, e.g., Cook Biotech Inc. v. ACell, Inc.*, ___ F.3d ___, No. 05-1458, 2006 WL 2381972, at *10 (Fed. Cir. Aug. 18, 2006) ("Incorporation by reference provides a method for integrating material from various documents into a host document by citing such material in a manner that makes clear that the material is effectively part of the host document as if it were explicitly contained therein.") (internal quotation omitted); 37 C.F.R. § 1.57; *Manual of Patent Examining Procedure* ("MPEP"), § 2163.07(b) ("The information incorporated is as much a part of the application as filed as if the text was repeated in the application, and should be treated as part of the text of the application as filed.") (Matterer Decl. Ex. 7).

The incorporated '578 patent sets out the details of the closed loop control system used in the '738 patent to electronically control the flow of oil to the vane housing. As described in the '578 patent, the feedback control system processes signals sent from sensing devices (*e.g.*, camshaft and crankshaft angle sensors), and the engine control unit ("ECU") determines or calculates the relative phase angle between the camshaft and crankshaft. ('578 patent, col. 7, lines 21-28) (Matterer Decl. Ex. 2)). In other words, the ECU determines present or current timing of the intake and exhaust valves at a specific instant by measuring the relative phase angles of the camshaft and crankshaft and electronically comparing those two signals. The ECU then compares the present relative position of the camshaft and crankshaft with a desired phase angle, or "predetermined set point." The "desired" phase angle is the predetermined optimum target or preferred phase angle value electronically stored in the ECU in a reference table or map based on factors such as engine speed and load. The map is programmed or set by the vehicle manufacturer as the target phase angle for various combinations of engine operating conditions. The ECU thus compares the present phase angle (based upon measured operating conditions) with the target or desired phase angle (as found in the map based upon measured values) and determines whether the present angle needs to be advanced or retarded to approach the target angle, or whether it can be left alone because it equals the target angle. The ECU then outputs an electrical signal, or feedback signal, that changes the amount of oil flowing to the vane housing in order to mechanically move the position of the camshaft toward the set point relative to the crankshaft. (*See* '578 patent, col. 7, lines 27-38).[4]

---

[4] The '578 patent describes details of the closed loop control system used in the '738 patent. For example, Figures 1a through 1f of the '578 patent describe the control strategy, including the proportional-integral control block '208' and the feedback control law '108.' These elements, which are also part of a closed loop control system of the '738 patent, add a level of complexity and advantages not found in the open loop control systems of the prior art. The fundamental

**2.      The Variable Force Solenoid and Vented Spool of the '738 Patent**

In the '738 patent, the feedback signal that causes adjustment in the phase angle of the camshaft is an electrical signal sent to a device known as a variable force solenoid. A solenoid is a coil of wire that generates a magnetic field when electric current travels through the coil. The energization of the magnetic field causes magnetic attraction and movement of a moveable piece within the solenoid, called the armature. (*See* '738 patent, col. 7, lines 41-46; Ribbens Rep. at 13, 23-24). The armature acts as an actuator by bearing against the spool of an associated spool valve and causing the spool to move against the resisting force of a spring. Thus, turning on and off the electrical signal to the solenoid coil generates a magnetic force that moves the armature, which in turn moves a spool that is pushed against the armature by the force of a spring. In this way, the electrical signal adjusts the position of the spool within the spool valve.

The spool has lands or raised portions that can block or allow the flow of fluid through the spool valve body. Therefore, when the electrical signal sent to the solenoid causes adjustment of the physical position of the spool, the electrical signal is controlling the flow of oil through the spool valve and through fluid lines that extend to the vane housing. The mechanical movement of the spool, as controlled by the electrical signal to the variable force solenoid, therefore regulates the amount of oil fed to one side or the other of the moveable vanes that are attached to the camshaft. Because the system utilizes closed-loop control, this series of steps is

---

difference between open loop and closed loop systems is that a closed loop system uses feedback to cause the system to move to the desired condition. An everyday example of a closed loop system is a thermostat and furnace. The thermostat continuously checks the temperature of the room and sends a feedback signal to cause the furnace to continue to run until the desired room temperature or "set point" is reached. Upon reaching the set point, the thermostat sends a signal to turn the furnace off. In contrast, an example of an open loop system would be a fire in a fireplace that is used to heat a room, without a thermostat to control the temperature to a desired set point. The fire burns and provides heat without regard to the temperature of the room.

repeated over and over again until the vane has adjusted the camshaft to the desired phase angle. Then, the system can correct for changes in conditions by adjusting the camshaft to a different desired phase angle.

In contrast to many other types of solenoids, the variable force solenoid of the '738 patent allows very precise control of the position of the armature (and associated spool of the spool valve). In the variable force solenoid, the magnetic force on the armature generated by the solenoid coil acts against the spring force that pushes the spool against the armature. The variable force solenoid allows a proportional output that can vary continuously with the input electrical signal. This allows the variable force solenoid to continuously adjust the position of the associated spool valve. Therefore, the spool valve can be precisely controlled and can occupy a theoretically infinite number of positions to provide precise control of the amount of oil that flows to the vane housing, and a more precise control of the camshaft phase angle. (*See* Ribbens Rep. at 13-15, 18, 23-24).

In order to achieve the precise control desired, the invention of the '738 patent also relieves fluid pressure from the external ends of the spool valve so that the primary forces controlling the position of the valve are the magnetic force on the solenoid armature and the spring force that pushes the spool against the armature. Unlike many prior art valves, including prior art hydraulic valves using a variable force solenoid, the claimed invention eliminates the force of oil against the *external* ends of the spool valve, and also provides a vent or opening in the spool valve that allows relief of any remaining pressure from fluid (such as oil or air) against the external ends of the spool. Although the spool valve has oil flowing along the internal lands or recesses as it moves from the source to the vane housing, that internal oil flow does not

provide a pressure against the external ends of the spool that must be balanced with the force of

the spring and the magnetic force.

### 3.    The Preferred Embodiment of the '738 Patent

An example of the preferred embodiment of the VCT system of the '738 patent is

shown in Figure 19, which is reproduced below.[5]



FIG. 19

This embodiment depicts a VCT system including:  at least one source of engine oil in the

main oil gallery ("MOG") (labeled 230), which is the passage that carries oil throughout the

engine; a spool valve with a movable spool (labeled 200) that is operationally connected to

the armature (labeled 201b) of a variable force solenoid (labeled 201); interconnecting fluid

supply and return lines; and the vane housing (labeled 132) with fluid-actuated, movable

---

[5]   The text labels and identification lines have been added to Figure 19.  This figure does not
show the engine camshaft and crankshaft.  For examples of such components, see Figures 1-5 of
the '738 patent.

vanes (labeled 160a and 160b) that are connected to the camshaft. Also shown is an ECU (labeled 208) with an electrical connection to the variable force solenoid (labeled 201).

### C.    The Advantages of the '738 Patented Invention Over Prior Art VCT Systems

Prior art VCT control systems are described in the patents incorporated by reference in the '738 patent. (*See* '738 patent, col. 1, line 32-col. 2, line 53).[6] As in the '738 patent, some prior art utilized closed loop control to regulate the position of a spool valve, whereas most used more simplistic open loop systems. Even the prior art closed loop systems, however, had shortcomings when compared to the invention of the '738 patent.

For example, some such prior art systems utilized a complex hydraulic control system that positioned the spool in response to changes in the fluid pressure against one external end of the spool. In the "differential pressure control systems" ("DPCS") shown in the '578 and '659 patents, the position of the spool was adjusted in response to changes in the balance of fluid pressure against both external ends of the spool. The prior art's use of fluid pressure against one or both external ends of the spool created problems in controlling the spool valve's position, especially when oil pressure is low, as during engine start-up. (*See, e.g.,* '738 patent, col. 2, lines 21-30). The system of the '738 patent, by contrast, relieves oil pressure from the external ends of the spool while still permitting oil to flow through internal passages of the spool valve.

In the specification and prosecution history of the '738 patent, the applicants stressed that their invention achieves precise control over the position of the spool by use of the variable force solenoid in conjunction with relief of fluid pressure against the external ends of the spool. (*See, e.g.,* '738 patent, col. 3, lines 1-10; col. 8, lines 2-15, lines 23-35; App. Br. at 4-5

---

[6]  The patents incorporated by reference include U.S. Patent No. 5,002,023 ("the '023 patent"), the '578 patent, U.S. Patents Nos. 5,107,804 ("the '804 patent") and 5,172,659 ("the '659 patent"), and the parent application for the '738 patent, which issued as U.S. Patent No. 5,218,935 ("the '935 patent"). (*See* Matterer Decl. Exs. 2-6).

(Matterer Decl. Ex. 11)).  For example, the specification states that the '738 patent permits the system to easily determine the "null" or starting position of the spool valve and allows for precise control of the spool position when oil pressure is low or non-existent (such as at engine start-up). (*See, e.g.,* '738 patent, col. 3, lines 19-26; col. 8, lines 28-35).

As explained further below, the use of a variable force solenoid in place of the prior art "PWM solenoids" also eliminated noise problems associated with solenoids that cycle through their full stroke with each pulse width modulated ("PWM") input pulse.  As described in the '738 patent specification, prior art "PWM solenoids" include an armature that cycles back and forth from one mechanical stop, or extreme, to the other, which causes "chatter" and "unwanted noise."  (*See* '738 patent, col. 2, lines 48-53).

With that technical background, BorgWarner will now address the construction of the asserted claims of the '738 patent claims.

## II.    **APPLICABLE CLAIM CONSTRUCTION LAW**

Claim construction is a matter of law for the Court.  *See, e.g., Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996).  "It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (internal quotation omitted).  *See also, e.g., Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("First, we look to the words of the claims themselves . . . to define the scope of the patented invention."); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc) ("The written description part of the specification itself does not delimit the right to exclude.  That is the function and purpose of claims.").  The Court should construe the claims as they would be understood by one of ordinary skill in the art at the time of the invention.  *See,*

*e.g.*, *Rambus Inc. v. Infineon Techs. AG*, 318 F.3d 1081, 1088 (Fed. Cir. 2003).[7]

The "words of a claim are generally given their ordinary and customary meaning." *Phillips*, 415 F.3d at 1312-13 (internal quotation omitted). The "intrinsic evidence of record, *i.e.*, the patent itself, including the claims, the specification and, if in evidence, the prosecution history," is "the most significant source of the legally operative meaning of disputed claim language." *Vitronics*, 90 F.3d at 1582. However, even though the specification and prosecution history may be consulted, within the intrinsic evidence "there is a hierarchy of analytical tools" and "[t]he actual words of the claim are the controlling focus." *Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1344 (Fed. Cir. 1998).

It is axiomatic that claims should not be limited to the disclosure of the preferred or specific embodiments discussed in the specification. *See, e.g., Varco, L.P. v. Pason Sys. USA Corp.*, 436 F.3d 1368, 1373 (Fed. Cir. 2006) ("In examining the specification for proper context . . . this court will not at any time import limitations from the specification into the claims.") (citation omitted); *Phillips*, 415 F.3d at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments."); *Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n*, 383 F.3d 1352, 1366 (Fed. Cir. 2004) ("Our precedent has emphasized that the disclosure in the written description of a single embodiment does not limit the claimed invention to the features described in the disclosed embodiment."); *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) ("[T]his court has expressly rejected the contention that if a patent describes only a

---

[7] In the context of the '738 patent, one of ordinary skill in the art at the time of the invention (May 1993) would have at least a bachelor's of science degree in mechanical engineering, electrical engineering, physics, or a related discipline, with one or more years of design, test and analysis experience in the field of automotive electronic engine/drive train control. (*See* Ribbens Rep. at 5-6). If the Court were to define one of skill in the art differently, BorgWarner's proposed constructions should still be adopted.

single embodiment, the claims of the patent must be construed as being limited to that embodiment.") (citing cases); *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1325 (Fed. Cir. 2003) ("[C]ourts must take extreme care when ascertaining the proper scope of the claims, lest they simultaneously import into the claims limitations that were unintended by the patentee.").

This principle makes sense because a patentee cannot be expected to disclose every modification or variation within the scope of the patented invention. *See, e.g., Phillips*, 415 F.3d at 1323 (explaining that "persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments"); *Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1331 (Fed. Cir. 2004) (refusing to limit claims to the single disclosed embodiment because the inventors "were not required to include within each of their claims all of the[] advantages or features described as significant or important in the written description"); *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc) (stressing that "[t]he law does not require the impossible" – it "does not require that an applicant describe in his specification every conceivable and possible future embodiment of his invention"). Therefore, as explained below, the Court must construe the language of claims 10 and 11 of the '738 patent and should not import limitations that are absent from the claims.

## III.    BORGWARNER'S PROPOSED CONSTRUCTIONS FOR CLAIMS 10 AND 11

Claim 10 is an independent method claim, and claim 11 depends from claim 10. The following sections set forth the limitations of claims 10 and 11 and the parties' proposed constructions. As explained below, the Court should adopt BorgWarner's proposed constructions and reject Hitachi's attempts to read limitations into the claims.

**CLAIM 10**

| TERMS AND ELEMENTS | BORGWARNER'S PROPOSED CONSTRUCTION | HITACHI'S PROPOSED CONSTRUCTION |
|---|---|---|
| *Preamble*<br>"In an internal combustion engine having a variable camshaft timing system for varying the phase angle of a camshaft relative to a crankshaft, a method of regulating the flow of hydraulic fluid from a source to a means for transmitting rotary movement from said crankshaft to a housing, comprising the steps of:" | The preamble introduces intended function and is not a limitation of the claim. Therefore, it does not need to be construed.<br><br>If the Court decides that the preamble is a limitation of the claim, it should be construed as follows:<br><br>"*In an internal combustion engine having a variable camshaft timing system for varying the phase angle of a camshaft relative to a crankshaft*" means: A system for varying the phase angle of a camshaft relative to a crankshaft.<br><br>"*A method of regulating the flow of hydraulic fluid*" means: A series of method steps involving controlling the flow of hydraulic fluid (e.g., oil).<br><br>"*Source*" means: A point of origin in the engine that supplies oil, such as an oil gallery or oil crankcase.<br><br>"*A means for transmitting rotary movement from said crankshaft to a housing*" means: This means plus function clause covers the structure shown in the '738 patent specification for performing the function of transmitting rotary movement (transmission of power) from the crankshaft to a housing, and equivalents thereof. The structure includes a crankshaft sprocket, a camshaft sprocket, and a timing chain or timing belt wrapped around the crankshaft sprocket and | The preamble is a limitation of the claim.<br><br>"*In an internal combustion engine having a variable camshaft timing system for varying the phase angle of a camshaft relative to a crankshaft*" means: A system in which the angular position of a camshaft relative to a crankshaft is varied in reaction to camshaft torque reversals.<br><br>"*A method of regulating the flow of hydraulic fluid*" means: A method of directing the flow of oil "internal to the VCT mechanism only" (i.e., internal to the VCT actuator), in order to change the phase angle of the camshaft relative to a crankshaft.<br><br>"*Source*" means: A supply volume of oil located in a recess on one side of certain of the lobes of a vane in a housing (or piston-cylinder) and pressurized primarily by camshaft torque.<br><br>"*A means for transmitting rotary movement from said crankshaft to a housing*" means: [§ 112 ¶ 6 function is transmitting rotary movement from said crankshaft to a housing. § 112 ¶ 6 "means" structure is, according to the specification:] A sprocket attached to the housing and a |

12

| TERMS AND ELEMENTS | BORGWARNER'S PROPOSED CONSTRUCTION | HITACHI'S PROPOSED CONSTRUCTION |
|---|---|---|
|  | camshaft sprocket, with a housing connected to the camshaft sprocket, and equivalents thereof.<br><br>"*Housing*" means:  A vane housing having recesses for receiving fluid. | chain or belt attaching the sprocket to a crankshaft, or the equivalents under § 112 ¶ 6. |

## A.    The Preamble of Claim 10 Is Not a Limitation

The preamble of claim 10 recites the intended use of the invention, namely, a system for controlling or varying the phase angle of a camshaft relative to a crankshaft in an IC engine.  The body of claim 10 then specifies all of the limitations of the claimed method.  Where, as here, the body of a claim fully sets forth all of the limitations of the invention, and the preamble merely states the purpose or intended use of the invention, the preamble is not a claim limitation.  *See, e.g., Schumer v. Lab. Computer Sys., Inc.*, 308 F.3d 1304, 1310 (Fed. Cir. 2002) (preamble not limiting because it simply described the features of the invention without specifying "how the device is to operate with respect to those features"); *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1367, 1371-72 (Fed. Cir. 2003) (preamble not limiting even when it provided antecedent basis for terms used in claim body); *Intirtool, Ltd. v. Texar Corp.*, 369 F.3d 1289, 1295-96 (Fed. Cir. 2004) (preamble not limiting because it added nothing to the "highly detailed claim" and thus could not "be considered to give life, meaning, and vitality to it") (internal quotation omitted).  Because the preamble of claim 10 does nothing more than explain the purpose or intended use of the invention, it is not a limitation and the Court does not need to construe it.

**B.    If the Preamble Is Held To Be a Limitation, BorgWarner's Proposed Constructions Should Be Adopted**

　　　　**1.    The Phrase "In an Internal Combustion Engine Having a Variable Camshaft Timing System for Varying the Phase Angle of a Camshaft Relative to a Crankshaft"**

If the Court decides that the preamble limits claim 10, the first phrase – "[i]n an internal combustion engine having a variable camshaft timing system for varying the phase angle of a camshaft relative to a crankshaft" – should be construed to mean a system for varying the phase angle of a camshaft relative to a crankshaft. This is a straightforward interpretation of the plain meaning of the phrase.

Hitachi contends that this claim phrase requires that the angular position of the camshaft relative to the crankshaft be "varied in reaction to camshaft torque reversals."[8] But neither the preamble nor any other limitation of claims 10 or 11 states or otherwise requires that the position of the camshaft be varied only in reaction to camshaft torque reversals. The words of the preamble are clear – the variable camshaft timing system must be able to vary the position of a camshaft relative to a crankshaft. Hitachi's competing proposal is nothing more than a transparent attempt to limit claim 10 to the preferred embodiment that utilizes camshaft torque reversals. This is improper, as the Federal Circuit has made clear. *See, e.g., supra* at p. 10-11.

A review of the other claims of the '738 patent reinforces that Hitachi's proposed construction is incorrect.[9] Unlike claim 10, claim 1 of the '738 patent specifies that the VCT

---

[8]  Hitachi is attempting to limit claim 10 to a cam-torque actuated system, as opposed to an oil pressure actuated system in which the angular position of the camshaft is varied in response to oil supplied under pressure to the vane housing.

[9]  Both asserted and unasserted claims can "be valuable sources of enlightenment as to the meaning of a claim term." *Phillips*, 415 F.3d at 1314 (explaining that differences among claims can "be a useful guide in understanding the meaning of particular claim terms"). *See also, e.g., Vitronics*, 90 F.3d at 1582 (explaining that courts first look "to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention").

mechanism is "reactive to torque reversals in [the] camshaft." ('738 patent, col. 10, lines 12-14). This makes clear that the patentees knew how to specify a cam-torque actuated ("CTA") system when they wanted to do so. It would therefore be error to import the same limitation into claim 10. *See, e.g., Vanguard Prods. Corp. v. Parker Hannifin Corp.*, 234 F.3d 1370, 1372 (Fed. Cir. 2000) (the district court correctly declined to read a coextrusion limitation into the claim at issue because a different independent claim specifically described the claimed gasket layers as "co-extruded").

### 2.    The Phrase "A Method of Regulating the Flow of Hydraulic Fluid" and the Term "Source"

If the Court decides that the preamble is a limitation, the next phrase – "a method of regulating the flow of hydraulic fluid" – should be construed to mean a series of method steps involving controlling the flow of hydraulic fluid (*e.g.*, oil). Additionally, the term "source" should be construed to be a point of origin in the engine that supplies oil, such as an oil gallery or oil crankcase. These are once again the straightforward, plain meanings of these preamble phrases.

The specification of the '738 patent corroborates that these proposed constructions are correct. For example, the specification describes the main oil gallery ("MOG") 230 of the engine as the source of "engine oil." ('738 patent, col. 7, lines 34-36 (explaining that "engine oil" is fed into the vane housing "directly from main oil gallery ('MOG') 230 of the engine")). Moreover, claim 4, which is not asserted, recites a "pressurized lubricating oil *source (230)*" (*id.* at col. 11, lines 14-15 (emphasis added)), confirming that the "source" recited in claim 10 is the point of origin of oil, such as the main oil gallery. Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims. *See, e.g., Rexnord Corp. v. Laitram Corp.*, 274 F.3d

1336, 1342 (Fed. Cir. 2001); *CVI/Beta Ventures, Inc. v. Tura LP,* 112 F.3d 1146, 1159 (Fed. Cir. 1997). This is particularly so here because claim 4 was included in the original application and therefore forms part of the disclosure of the specification of the patent. *See, e.g., N. Telecom, Inc. v. Datapoint Corp.,* 908 F.2d 931, 938 (Fed. Cir. 1990) ("The original claims as filed are part of the patent specification.").

In attempting to import a limitation into claim 10, Hitachi seizes on a statement that the applicants made during the prosecution of the '738 patent, namely, that their invention "controls the flow of oil internal to the VCT mechanism only." (*See* June 30, 1994 Reply to Office Action at 4 (Matterer Decl. Ex. 9); Nov. 1, 1994 Reply to Office Action at 3 (Matterer Decl. Ex. 10); App. Br. at 8 (Matterer Decl. Ex. 11)). Hitachi uses this statement to contend that an "internal to the VCT mechanism only" limitation should be read into the preamble of claim 10, which it then transmogrifies into a requirement that the system must be cam-torque actuated.[10]

In this regard, Hitachi asserts that the "VCT mechanism" is something it calls the "VCT actuator," and that the "source" in claim 10 is limited to a "supply volume of oil located in a recess on one side of certain of the lobes of a vane in a housing and pressurized primarily by camshaft torque." But no language in claim 10 even suggests the limitations that Hitachi proposes. Rather, Hitachi is subverting the clear intrinsic evidence of the claims and specification by relying on an erroneous reading of the prosecution history.

Contrary to Hitachi's suggestion, the applicants' prosecution statement does not constitute a disavowal of claim scope. Prosecution history statements can only limit a claim if an applicant has clearly and unambiguously disavowed claim scope. *See, e.g., N. Telecom Ltd. v.*

---

[10] Hitachi also attempts to read this same limitation into Step 4a of the claim discussed below.

*Samsung Elecs. Co.*, 215 F.3d 1281, 1293-95 (Fed. Cir. 2000); *Vanguard Prods.*, 234 F.3d at 1372; *Serrano v. Telular Corp.*, 111 F.3d 1578, 1584 (Fed. Cir. 1997); *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324-26 (Fed. Cir. 2003). In fact, where, as here, a prosecution statement is open to several reasonable interpretations, there simply is no disclaimer. *See N. Telecom*, 215 F.3d at 1293-95 (refusing to limit the clear claim term "plasma etching" to require total exclusion of ion bombardment where the prosecution history was open to different interpretations); *Inverness Med. Switz. GmbH v. Warner Lambert Co.*, 309 F.3d 1373, 1382 (Fed. Cir. 2002) (explaining that "[i]t is inappropriate to limit a broad definition of a claim term based on prosecution history that is itself ambiguous").

Far from being a clear and unambiguous disavowal of claim scope, the prosecution history statement at issue here does not constitute a disavowal at all. Rather, the applicants made the statement regarding "internal to the VCT mechanism" to reiterate the scope of the claims as drafted and to emphasize one of the key differences between the VCT system of the '738 patent and the prior art.

In contending otherwise, Hitachi skips over the essential inquiries regarding the statement at issue – namely, what is "the VCT mechanism" referenced in the prosecution history and what did the applicants mean by their statement? The term "VCT mechanism" is not used in the specification or claims of the '738 patent, and it is not used elsewhere in the prosecution history. Accordingly, to understand the statement at issue, it is essential to first determine what is meant by "VCT mechanism."[11]

Hitachi somehow assumes the "VCT mechanism" and "source" includes *only* the vane housing and recesses on either side of the vanes, but the intrinsic evidence compels a

---

[11] Hitachi's contention that the VCT mechanism is a "VCT actuator" adds nothing – that term is also not used anywhere in the '738 patent specification or prosecution history.

different conclusion. For example, Hitachi's construction excludes from the meaning of the term "source" the one item (*i.e.*, the main oil gallery) that the '738 patent explicitly refers to as a "source" in claim 4. (*See* '738 patent, col. 11, lines 14-15; Fig. 19). As such, Hitachi's interpretation cannot be correct because it cannot be squared with the claims and specification, which are the most important forms of intrinsic evidence. *See, e.g., Phillips*, 415 F.3d at 1315 (explaining that the Federal Circuit has "long emphasized the importance of the specification in claim construction"); *Digital Biometrics*, 149 F.3d at 1344 (stressing that the "actual words of the claim are the controlling focus" of the claim construction inquiry); *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985) (emphasizing that "[t]he specification is . . . the primary basis for construing the claims").

Hitachi's assumption that "VCT mechanism" and "source" must exclude the spool valve and the main oil gallery also makes no sense. Without the spool valve and main oil gallery, variable camshaft timing could not be achieved. (*See* Ribbens Rep. at 30-31, 36).

When the prosecution history statement at issue is examined in context, it is clear that BorgWarner's proposed constructions, not Hitachi's, are consistent with the prosecution history. In the specification, which was filed at the beginning of the prosecution of the '738 patent, the applicants repeatedly emphasized to the examiner that their invention overcame problems of prior art systems (such as DPCS systems) that required balancing and controlling against hydraulic pressure on one or both *external* ends of the spool valve. (*See, e.g.*, '738 patent, col. 1, lines 36-67; col. 2, lines 1-47; col. 3, lines 15-49; col. 8, lines 2-35. *See also, e.g.*, Orig. Spec. at col. 1, line 27-col. 4, line 2; col. 5, line 3-col. 6, line 3; col. 14, line 21-col. 15, line 20 (Matterer Decl. Ex. 8)). In the prior art, accounting for hydraulic pressure on one or both external ends of the spool valve created control problems because the pressure could vary

significantly under different engine operating conditions.    As the '738 patent specification explains:

> In previous versions of the VCT system, the force exerted against spool extension 200c must balance with the force of spring 202 plus any system oil pressure in cavity 198a acting on the end of land 200a if a null position of spool 200 was desired.  A problem arose when attempting to achieve this balance because the system included a component which could vary significantly, namely oil pressure.

('738 patent, col. 8, lines 2-9; Orig. Spec. at col. 14, lines 21-28.  *See also* App. Br. at 5.).  By relieving the hydraulic pressure on the *external* ends of the spool valve, through the use of a vented spool valve, the novel system of the '738 patent controlled the flow of oil *internal* to the VCT architecture only (*e.g.*, the main oil gallery, the fluid lines, the internal lands of the spool valve and the vane housing).

The applicants repeatedly emphasized this point.  For example, the applicants explained that "[t]he control system of the present invention eliminates the hydraulic force on one end of the spool resulting from directly applied hydraulic fluid from the engine oil gallery at full hydraulic pressure, $P_s$, utilized by previous embodiments of the VCT system."  ('738 patent, col. 3, lines 1-3; Orig. Spec. at col. 4, lines 23-27; App. Br. at 3-4).  The applicants further stressed that "[t]he optimum solution is a control system completely independent of variable parameters, i.e., one independent of engine oil pressure."  ('738 patent, col. 8, lines 9-11; Orig. Spec. at col. 14, lines 28-30; App. Br. at 5).  To that end, the applicants explained that "[i]n the present invention, oil pressure in cavity 198a is relieved, leaving only the force of armature 201b to be balanced against the force of spring 202 to achieve a null position of spool 200."  ('738 patent, col. 8, lines 12-15; Orig. Spec. at col. 14, lines 31-34; App. Br. at 5).  The applicants emphasized that "[w]ith the oil pressure variable eliminated, the only forces left to consider in controlling the position of vented spool 200 are ones with predictable rates of change."  ('738

patent, col. 8, lines 28-30; Orig. Spec. at col. 15, lines 13-15).  Further, the applicants reiterated that "[b]y utilizing a direct electromechanical actuator on one land of the spool in combination with relieving the oil pressure on the other land, the present invention provides a solution to problems not expected by [the prior art] – problems which are well documented and resolved in the application for the present invention."  (App. Br. at 10-11 (emphasis in original)).

Given all of these statements, it is apparent that the applicants' remark that the invention "controls the flow of oil internal to the VCT mechanism only" was nothing more than a way to convey the idea that the use of a variable force solenoid with a vented spool valve advantageously eliminated the need to control the flow of oil on the external ends of the spool (in contrast to the prior art VCT systems).  The applicants had already repeated this concept multiple times, and the remark at issue did nothing more than emphasize this well-established point.

Although the "internal to the VCT mechanism" statement is consistent with the scope of claim 10 as stated in BorgWarner's proposed constructions, the Court should not inject the language into a claim construction.  Doing so will only confuse the jury and invite collateral claim construction issues.  There is no need to add this language to a claim limitation because the meaning of the statement is already conveyed through claim 10's requirement of a "variable force solenoid" and a "vented spool."

Moreover, limiting the claims as Hitachi suggests would be legal error.  At the very least, BorgWarner's interpretation of the statement during prosecution is reasonable.  And where, as here, that is the case, the claims should not be limited.  *See SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1288 (Fed. Cir. 2005) (where patentee's reading of the prosecution argument is "at least reasonable," there is no "clear and unmistakable surrender" of claim

meaning).[12]

### 3. The Phrase "A Means for Transmitting Rotary Movement from Said Crankshaft to a Housing"

The next preamble phrase – "a means for transmitting rotary movement from said crankshaft to a housing" – is set forth in means-plus-function language. If the Court determines that the preamble is a limitation, then this language should be construed according to 35 U.S.C. § 112, ¶ 6. Section 112, ¶ 6 requires the identification of corresponding structure in the specification for performing the function of transmitting rotary movement (transmission of power) from the crankshaft to a housing (which oscillates with respect to the camshaft). Such structure includes a crankshaft sprocket, a camshaft sprocket, and a timing chain or timing belt wrapped around the crankshaft sprocket and camshaft sprocket, with a housing connected to the camshaft sprocket, and equivalents thereof. (*See, e.g.,* '738 patent, col. 4, line 63 (crankshaft sprocket); col. 5, line 1 (camshaft sprocket); col. 5, line 4 (chain); col. 5, lines 8-9 (timing belt); col. 6, lines 8-9, 53-57 (housing); col. 10, line 3 (housing)).

Hitachi's proposed construction should be rejected because it is not complete. Hitachi ignores the crankshaft sprocket and housing, which are also part of the structure described in the specification for performing the function of transmitting rotary movement from the crankshaft to a housing.

### 4. The Term "Housing"

Finally, if the preamble is considered to be a limitation, the term "housing" should

---

[12] If the Court does decide to add a limitation regarding "internal to the VCT mechanism," it should make clear that this means that oil is not applied or controlled against the external ends of the spool, but that oil is still supplied and controlled through a main oil gallery, the fluid lines, the internal lands of the spool valve and the vane housing. Moreover, if an "internal to the VCT mechanism" limitation fits anywhere, it should modify the "controlling step" (step 3 below). The "controlling step" is the part of claim 10 that specifies how the position of the spool is controlled without hydraulic pressure on the external ends of the spool, namely, through the use of a variable force solenoid and a vented spool.

be construed to mean a vane housing having recesses for receiving fluid. The '738 patent describes embodiments of two types of VCT systems – a system with oppositely acting cylinders and a system with vanes inside a vane housing. (*See, e.g.,* '738 patent, Figs. 7-8 (cylinder system), Fig. 19 (vane housing system); col. 5, lines 38-63 (cylinder system); col. 6, line 7-col. 8, line 46 (vane housing system)). The specification then makes clear that when the term "housing" is used in the context of claim 10, it means vane housing.[13]

The specification never uses the term "housing" to refer to the oppositely acting cylinder system. But when it refers to a system with vanes inside a vane housing, the specification consistently uses the shorthand "housing." For example, the specification explains that prior art U.S. Patent No. 5,107,804 "describes an alternate type of VCT system within the field of the invention in which the system hydraulics include a vane having lobes within an enclosed *housing* which replace the oppositely acting cylinders disclosed by the aforementioned U.S. Pat. No. 5,002,023." ('738 patent, col. 1, lines 53-58 (emphasis added)). Similarly, the specification states that "Figs. 10-20 illustrate two embodiments of the present invention in which a *housing* in the form of a sprocket 132 is oscillatingly journalled on a camshaft 126." ('738 patent, col. 6, lines 7-9 (emphasis added)). Figures 10-20 show a vane housing VCT system. Because the patentees served as their own lexicographers in using the shorthand term "housing" for "vane housing," BorgWarner's proposed construction should be adopted. *See, e.g., Phillips,* 415 F.3d at 1316 ("[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise posses. In such cases, the inventor's lexicography governs.").[14]

---

[13] The term "housing" is also found in Step 5 of the claim discussed below.

[14] The specification and claims also use the term "housing" with respect to the variable force solenoid. However, the intrinsic evidence makes clear that when the term housing is used in that

| TERMS AND ELEMENTS | BORGWARNER'S PROPOSED CONSTRUCTION | HITACHI'S PROPOSED CONSTRUCTION |
|---|---|---|
| *Step 1*<br>"sensing the positions of said camshaft and said crankshaft" | The method step of sensing the angular or rotational position of a camshaft and the angular or rotational position of a crankshaft in an engine. | None. |

Hitachi has not proposed a construction for this claim limitation. BorgWarner's proposed construction is straightforward and should be adopted.

| TERMS AND ELEMENTS | BORGWARNER'S PROPOSED CONSTRUCTION | HITACHI'S PROPOSED CONSTRUCTION |
|---|---|---|
| *Step 2a*<br>"calculating a relative phase angle between said camshaft and said crankshaft, said calculating step using an engine control unit for processing information obtained from said sensing step," | The method step of calculating or determining the current relative phase angle (or relative angular or rotational position) of the camshaft with respect to the crankshaft and calculating or determining the desired (or target) relative phase angle of the camshaft with respect to the crankshaft. The calculation of the current relative phase angle is made by an electronic control module or engine control unit based on the electronic signals (or information) received that provide the sensed angular or rotational positions of the camshaft and the crankshaft. | Calculating, using an ECU, the desired relative phase angle between the camshaft and crankshaft using the sensed positions of the camshaft and crankshaft. |

The Court should adopt BorgWarner's proposed construction for this claim phrase because it comports with the plain meaning of the limitation. Hitachi's proposed construction should be rejected because it is not complete. For example, Hitachi fails to account for the fact that the ECU calculates or determines the current relative phase angle of the camshaft with respect to the crankshaft in addition to calculating or determining the desired phase angle. These determinations are described in the '578 patent, which is incorporated by reference into the '738 patent specification, as discussed above. (*See* '578 patent, col. 7, lines 25-30).

---

context, it refers to the housing that provides an enclosure for the solenoid coil, armature and air gap. (*See, e.g.,* '738 patent, col. 12, lines 46-47 (claim 11)).

| TERMS AND ELEMENTS | BORGWARNER'S PROPOSED CONSTRUCTION | HITACHI'S PROPOSED CONSTRUCTION |
|---|---|---|
| *Step 2b* "said engine control unit further issuing a[n] electrical signal corresponding to said phase angle" | The engine control unit outputs an electronic signal with information representing or designed to lead to the desired (or target) relative camshaft phase angle. | The current control signal issued by the ECU corresponding to the desired relative phase angle between the camshaft and crankshaft. |

BorgWarner does not believe this claim phrase requires construction. A jury can understand the word "electrical," and this claim phrase, without additional explanation. Thus, construction is unnecessary. *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("The *Markman* decisions do not hold that the trial judge must repeat or restate every claim term in order to comply with the ruling that claim construction is for the court.").

If the Court does construe this phrase, it should reject Hitachi's construction. Claim 10 does not require the signal to be "a current control signal." The claim only requires the signal to be "electrical," and the plain meaning of electrical encompasses more than "current." *See, e.g., Webster's Third New Int'l Dictionary of the English Language Unabridged* 731 (1993) ("electrical" means "of, relating to, or produced by electricity") (Matterer Decl. Ex. 12).

| TERMS AND ELEMENTS | BORGWARNER'S PROPOSED CONSTRUCTION | HITACHI'S PROPOSED CONSTRUCTION |
|---|---|---|
| *Step 3a* "controlling the position of a vented spool slidably positioned within a spool valve body, said controlling step being in response to said signal received from said engine control unit," | The method step of controlling the position (or location) of a vented spool within a spool valve body. Control of the position of the spool is based on a signal from the engine control unit (or electronic control module) that indicates, or is representative of, the desired (or target) relative phase angle of the camshaft.<br><br>"*Vented spool*" means: A spool valve that has a vent or opening to permit fluid (such as oil or air) to flow to the outside of the valve to allow relief of | Controlling the position of a vented spool (defined below) in a spool valve body.<br><br>"*Vented spool*" means: A spool having: (a) an internal passage passing through each end of the spool and leading to atmosphere to eliminate any influence on spool movement due to oil pressure, and (b) an annular recess allowing the flow of oil. |

| | pressure against the spool.<br><br>*"Spool valve body"* means: A body (or hollow member) that has a central passage for movement of the spool within it. | *"Spool valve body"* means: A housing in which the vented spool axially moves. |
| --- | --- | --- |

The Court should construe the term "vented spool" to mean a spool valve that has a vent or opening leading to atmosphere to allow relief of pressure against the external ends of the spool. This construction is consistent with the plain and ordinary meaning of "vent," which means "an opening for the escape of a gas or liquid or for the relief of pressure." *Merriam-Webster's Collegiate Dictionary* 1311 (10th ed. 1993) (Matterer Decl. Ex. 13).[15] This construction is also consistent with the intrinsic evidence of the '738 patent. The specification stresses that venting the spool valve to atmosphere "complete[s] the objective of relieving the pressure in cavity 198a which acted on the end of land 200a in previous VCT systems." ('738 patent col. 8, lines 24-26). (*See also* App. Br. at 5 (same)).

Hitachi asserts that "a vented spool" must have: "(a) an internal passage passing through each end of the spool and leading to atmosphere to eliminate any influence on spool movement due to oil pressure, and (b) an annular recess allowing the flow of oil." Hitachi's proposed construction should be rejected because it is far more restrictive than the plain and ordinary meaning of the term "vented" and does not comport with the intrinsic evidence.

It is true that certain figures in the '738 patent show a spool valve with a hollow

---

[15] *See also, e.g., McGraw-Hill Dictionary of Scientific and Technical Terms* 2022 (4th ed. 1989) ("vent" means "[a]n opening provided for the discharge of pressure or the release of pressure from tanks, vessels, reactors, processing equipment, and so on") (Matterer Decl. Ex. 14); *McGraw-Hill Dictionary of Science and Engineering* 910 (3d ed. 1984) (same) (Matterer Decl. Ex. 15); *Webster's Third New Int'l Dictionary of the English Language Unabridged* 2541 (1993) ("vent" means "an opening or hole for the escape or passage of something (as of a gas or liquid) or for the relief of pressure within something") (Matterer Decl. Ex. 12); *Academic Press Dictionary of Science and Technology* 2323 (1992) ("vent" means "any opening designed to allow air, water, or pressure to enter or escape from a confined space") (Matterer Decl. Ex. 16).

passage through it. (See, e.g., '738 patent, Figs. 12-13, 19-20). Without this passage, pressure could not be relieved from both ends of the spool in the specific embodiments shown in the specification. However, it is axiomatic that a claim is not limited to what is shown in the embodiments. See, e.g., Gart v. Logitech, Inc., 254 F.3d 1334, 1342 (Fed. Cir. 2001) (explaining that "drawings [depicting the preferred embodiment] are not meant to represent 'the' invention or to limit the scope of coverage defined by the words used in the claims themselves"); Va. Panel Corp. v. MAC Panel Co., 133 F.3d 860, 865-66 (Fed. Cir. 1997) (concluding that it was error to limit the plates to only linear movement, even though the patent drawings only showed linear movement); Gemstar-TV Guide, 383 F.3d at 1366 (emphasizing that "the disclosure in the written description of a single embodiment does not limit the claimed invention to the features described in the disclosed embodiment"); Liebel-Flarsheim, 358 F.3d at 906 (explaining that the Federal Circuit "has expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment").

Here, there is no indication that the inventors intended to limit the vent to the particular configuration shown in the figures of the '738 patent. The Court should therefore reject Hitachi's attempt to limit the vent to a structure that passes through each end of the spool. The term "vented" means that the spool valve has a vent to relieve pressure against the external ends of the spool. Nothing more is required.

Hitachi's attempt to read a limitation into the claim requiring the vent to "eliminate any influence on spool movement due to oil pressure" is likewise improper. There is no claim language or intrinsic evidence that supports Hitachi's construction. The applicants stated in the specification that "the relationship between spool position and control signal (solenoid current) is independent of engine oil pressure," and that "the preferred embodiment of

the present invention is not dependent upon oil pressure." ('738 patent, col. 3, lines 18-25; col. 3, lines 46-47. *See also, e.g.*, App. Br. at 5 ("The optimum solution is a control system completely independent of variable parameters, i.e., one independent of engine oil pressure.")). However, both the specification and the prosecution history make clear that the "engine oil pressure" that is eliminated is "the hydraulic force on one end of the spool resulting from directly applied hydraulic fluid from the engine oil gallery at full hydraulic pressure, $P_s$, utilized by previous embodiments of the VCT system." ('738 patent, col. 3, lines 1-2; App. Br. at 3-4). The applicants never stated that their invention eliminated "any influence on spool movement due to oil pressure." To the contrary, as explained above, the intrinsic evidence uniformly clarifies that the '738 patent system relieved the oil pressure on the external ends of the spool, which was present in prior art VCT systems.

Even more fundamentally, Hitachi's restrictive construction must be wrong because it could exclude *every* embodiment of the '738 patent. *See, e.g., Johns Hopkins Univ. v. CellPro, Inc.*, 152 F.3d 1342, 1355 (Fed. Cir. 1998) ("A patent claim should be construed to encompass at least one disclosed embodiment in the written description."). At some level, oil pressure always affects spool movement because the spool valve selectively allows and blocks the flow of fluid. The '738 patent system is dynamic, and oil flow may affect spool movement in ways other than by acting on the external ends of the spool. For example, at engine start up, hydraulic fluid, in the form of engine oil, enters the system "by way of [the] spool valve." ('738 patent, col. 7, lines 13-14). Thus, while the '738 patented invention relieved the oil pressure on *the external ends of the spool*, it did not – and could not – eliminate any and all "influence on

spool movement due to oil pressure." (*See* Ribbens Rep. at 33).[16]

| Terms and Elements | BorgWarner's Proposed Construction | Hitachi's Proposed Construction |
|---|---|---|
| *Step 3b* "said controlling step utilizing an electromechanical actuator to vary the position of said vented spool," | Using an electromechanical device to change the position of the vented spool in response to the signal from the engine control unit. | Using an electromechanical device to change the position of the vented spool, in response to the current control signal from the ECU. |

BorgWarner's and Hitachi's proposed constructions for this claim term differ only in that Hitachi would once again require the electromechanical device to change the position of the spool in response to the "current control" signal from the ECU. BorgWarner's proposed construction should be adopted because, as explained above, nothing in the claim language, specification or prosecution history requires adding a "current control" signal limitation.

| Terms and Elements | BorgWarner's Proposed Construction | Hitachi's Proposed Construction |
|---|---|---|
| *Step 3c* "said electromechanical actuator comprising a variable force solenoid" | The electromechanical actuator for the controlling step includes a variable force solenoid. A variable force solenoid allows a proportional output, or movement of the armature, that can vary continuously with the input electrical signal. The solenoid does not, in normal operation, cycle through its full stroke with every PWM pulse. | The electromechanical device includes a solenoid driven by a non-PWM, current control signal from the ECU with the force applied by the solenoid proportionally varying with the magnitude of the current control signal. |

This claim step requires the use of a "variable force solenoid." One of skill in the art with the '738 patent before him or her would understand that a "variable force solenoid" allows a proportional output, or movement of the armature, that can vary continuously with the

---

[16] The portion of step 3a that requires the controlling step to be "in response to [the] signal received from [the] engine control unit" is similar to the requirement of step 2 that the ECU issue an electrical signal representing the desired phase angle. Hitachi once again proposes adding a requirement that the signal from the ECU be a "current control signal." As explained above, there is no basis for adding such a limitation to the claims and BorgWarner's proposed construction should be adopted.

input electrical signal and can continuously adjust the position of the associated spool valve. In other words, this type of solenoid has the capability of an output displacement or force that can vary continuously (within the limits placed by mechanical stops) for a range of input electrical signals to the solenoid. (*See, e.g.,* Ribbens Rep. at 13-15, 18, 23-24). This is the plain meaning of the claim phrase – the solenoid outputs a variable force.

Hitachi wants to limit the term to solenoids that are driven by signals other than those that are pulse width modulated ("PWM"). A PWM signal is formed by a repeating series of on-off cycles, turning the current (or voltage) on and off many thousands of times each second. This repeating signal is described in terms of "duty cycle" or the amount of time the signal is "on" versus the amount of time it is "off." For example, a 90% duty cycle signal is "on" for 90% of a given time period and "off" for 10% of the period.

In attempting to read this limitation into the claim, Hitachi is attempting to conflate the use of a "PWM signal" (which refers to the *signal* input *to* the variable force solenoid) with a so-called "PWM solenoid" that has a PWM output and cycles through its full stroke with every PWM input pulse. The latter is not a variable force solenoid, as that term is used in the '738 patent. As explained in the specification, one of the problems with the prior art solenoid is that it "cycles through its full stroke with every PWM pulse." ('738 patent, col. 2, lines 50-51.). In contrast, as the specification explains, the "variable force solenoid armature only travels a short distance, as controlled by the current from the ECU, as opposed to the complete cycles which result from the use of a PWM solenoid." (*Id.* at col. 3, lines 34-37).[17]

---

[17] During prosecution, the applicants also emphasized the "continuously" variable output of the variable force solenoid, in contrast to the two positions ("on" or "off") of prior art solenoids. (*See, e.g.,* June 30, 1994 Reply to Office Action at 6 ("And nothing in [the prior art], a two-position only device which uses a 'common' (i.e., two-position only) solenoid, suggests using a variable force solenoid to actuate the spool valve of a continuously variable VCT system like the

Nothing in these statements, however, indicates that the variable force solenoid cannot receive a PWM signal – they just indicate that, in normal operation, the variable force solenoid does not have a PWM output that cycles through its full stroke with every PWM input pulse. Nothing in the '738 patent or prosecution history restricts the type of electrical signal that can be used with the variable force solenoid of the '738 patent. Indeed, confirming that Hitachi's proposed construction must be incorrect, the preferred embodiment of the '738 patent utilizes a variable force solenoid that is driven by a PWM input signal.

More specifically, the '738 patent refers to its preferred embodiment as "employ[ing] a closed-loop feedback system, such as the one disclosed in U.S. Pat. No. 5,184,578." ('738 patent, col. 3, lines 13-15. *See also* col. 1, lines 32-33; col. 2, line 1 (incorporating the '578 patent by reference)). This is confirmed in the prosecution history, where the preferred embodiment of the '738 patent is said to utilize a closed-loop control system, such as the one disclosed in the '578 patent. (*See, e.g.,* App. Br. at 4). The '578 patent, in turn, describes a VCT system having a closed-loop control system that utilizes a solenoid with a PWM input. (*See, e.g.,* '578 patent, title; col. 2, lines 8-10, lines 49-54; col. 5, lines 7-9; col. 7, lines 21-25 (Matterer Decl. Ex. 2)). The solenoid in the '578 patent is used to control the amount of fluid and fluid pressure on one side of the spool valve, which is balanced against hydraulic pressure on the other side of the spool valve, as in a conventional DPCS system. In contrast, in the '738 patent, the solenoid armature bears directly on an associated spool valve and the solenoid's operation is independent of hydraulic pressure on the external ends of the spool. Nevertheless, the preferred embodiments of the '578 and '738 patents both use solenoids that are driven by PWM *input* signals. Thus, the preferred embodiment of the '738 patent uses precisely

---

present invention.") (emphasis in original); Nov. 1, 1994 Reply to Office Action at 4 (same); App. Br. at 11 (same)).

the type of solenoid Hitachi is attempting to exclude from the scope of claim 10 – a variable force solenoid driven by a PWM input signal.

Because Hitachi's proposed construction would read out the preferred embodiment, it should be rejected. *See, e.g., Globetrotter Software, Inc. v. Elan Computer Group, Inc.*, 362 F.3d 1367, 1381 (Fed. Cir. 2004) (explaining that a construction that reads the preferred embodiment out of a claim is "rarely, if ever, correct") (quotation omitted); *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1308 (Fed. Cir. 2003) (same); *Vitronics Corp.*, 90 F.3d at 1583 (same).[18]

| TERMS AND ELEMENTS | BORGWARNER'S PROPOSED CONSTRUCTION | HITACHI'S PROPOSED CONSTRUCTION |
|---|---|---|
| *Step 4a* "supplying hydraulic fluid from said source through said spool valve [to a means for transmitting rotary movement to said camshaft]," | The method step of supplying or allowing oil to flow from an oil source through the spool valve to a means for transmitting rotary movement to said camshaft (defined below). | Directing the flow of oil "internal to the VCT mechanism only" from the "source" to the "means for transmitting" to allow cam torque pulsations to rotate the vanes (or shift the piston-cylinder), with: (a) the oil from the "source" to the "means for transmitting" flowing via an inlet line and one of two return lines opened and closed responsively to selective axial movement of the annular recess in the spool, and (b) the inlet and return lines being attached between the spool valve body and the "means for transmitting." |

This claim step requires that an oil "source" provide hydraulic fluid to the

---

[18] The '659 patent, also incorporated by reference into the '738 patent, confirms that using a PWM *input* signal to the variable force solenoid is a preferred embodiment of the '738 patent. (*See, e.g.*, '659 patent, col. 2, lines 40-44, lines 61-68 (describing use of solenoid with a PWM input signal); col. 7, lines 34-47 (same); col. 10, lines 41-55 (same) (Matterer Decl. Ex. 3)). One of ordinary skill in the art would recognize that the position of the spool in a spool valve assembly incorporating a variable force solenoid can be controlled by varying the duty cycle of a periodic pulse input signal, such as a PWM signal. The excitation frequency must simply be high enough that the time varying displacement is negligible. (*See* Ribbens Rep. at 15, 34-36).

components used to impart rotary movement to the camshaft. As explained above with regard to the preamble, "source" should be construed as a point of origin in the engine that supplies oil, such as an oil gallery or oil crankcase. This is consistent with the other, unasserted, claims of the '738 patent, as well as the specification and prosecution history. For all of the reasons discussed above, the Court should reject Hitachi's attempt to limit claim 10 to a CTA system. There is no basis to read an "internal to the VCT mechanism only" limitation into this claim step or to limit the term "source" to the recesses on either side of the vane housing.

| TERMS AND ELEMENTS | BORGWARNER'S PROPOSED CONSTRUCTION | HITACHI'S PROPOSED CONSTRUCTION |
|---|---|---|
| *Step 4b* "a means for transmitting rotary movement to said camshaft," | A structure that performs the function of transmission of rotary movement to the camshaft, e.g., the structure shown in the specification that includes the housing, recesses and vanes, or equivalents thereof. | [§ 112 ¶ 6 function is transmitting rotary movement to the camshaft. § 112 ¶ 6 "means" structure is:] (a) the sides of the lobes in the vane (or piston-cylinder) and the corresponding adjacent areas of the housing opposite to the supply volume sides of other lobes in the vane (or piston-cylinder); and (b) check valves that upon the axial movement of the annular recess, permit oil from the supply volumes to flow unidirectionally into (a) such that cam torque pulsations may rotate the vanes to change the phase angle of the camshaft relative to the crankshaft, or the equivalents under § 112 ¶ 6. |

This phrase should be construed according to 35 U.S.C. § 112, ¶ 6. The relevant function is rotating the camshaft, and the corresponding structure includes the housing, recesses and vanes shown in the specification, as well as equivalents thereof. (*See, e.g.*, '738 patent, col. 6, lines 8-9, 53-57 (housing); col. 10, line 3 (housing); col. 6, lines 35-42 (recesses); col. 6, lines 25-30 (vanes); Ribbens Rep. at 24-25).

Hitachi argues that the corresponding "structure" includes "check valves that upon the axial movement of the annular recess, permit oil from the supply volumes to flow unidirectionally . . . such that cam torque pulsations may rotate the vanes to change the phase angle of the camshaft relative to the crankshaft." This language reveals an attempt by Hitachi to further restrict the relevant *function* under the guise of *corresponding structure*, which is improper. *See, e.g., Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001) ("Under § 112, ¶ 6, a court may not import functional limitations that are not recited in the claim, or structural limitations from the written description that are unnecessary to perform the claimed function."); *Smiths Indus. Med. Sys., Inc. v. Vital Signs, Inc.*, 183 F.3d 1347, 1357 (Fed. Cir. 1999) (The district court erred "by interpreting the claim language 'means for supplying gas' to require a means for supplying gas under pressure. It is improper to import the limitation 'under pressure' from the written description into the claim because the claim language is clear on its face.") (emphasis omitted). The claim language itself identifies the relevant function – rotating the camshaft. The claim language says nothing about rotating the camshaft only in response cam torque pulsations. The structure that performs the claimed function includes the housing, recesses, and vanes, or equivalents thereof. One of ordinary skill in the art would recognize that the check valves (and CTA) are only a feature of specific embodiments described in the '738 patent and are not required for the transmission of rotary movement to the camshaft. (*See* Ribbens Rep. at 37). The Court should therefore reject Hitachi's attempt to inject a cam torque actuation requirement into this limitation.

| TERMS AND ELEMENTS | BORGWARNER'S PROPOSED CONSTRUCTION | HITACHI'S PROPOSED CONSTRUCTION |
|---|---|---|
| *Step 4c* "said spool valve selectively allowing and blocking flow of | The position of the spool can be adjusted or moved to permit flow of fluid or block flow of fluid through an inlet line and return lines (i.e., the valve | Stated in construction for step 4a and 4b above. |

33

| | | |
|---|---|---|
| hydraulic fluid through an inlet line and through return lines" | "selectively allows" fluid flow).<br><br>The term "*an inlet line*" means:  At least one line or conduit that allows passage of fluid from the source through the spool valve.<br><br>The term "*return lines*" means:  At least two lines or conduits that allow passage of fluid from the vane housing through the spool valve. | |

BorgWarner's proposed constructions for these terms should be adopted because they are consistent with the plain meaning of the terms and the intrinsic evidence, including the specification that discloses conduits or lines that form an inlet to the spool valve from the oil source and outlets from the vane housing to the spool valve.  (*See, e.g.,* '738 patent, Figs. 19-20). Hitachi's proposed construction should be rejected because it improperly seeks to limit the exact location of the inlet and return lines – requiring that they run only between a vane recess and the spool valve body, and *not* between the source and the spool valve body.   In advancing this construction, Hitachi is once again seeking to read in limitations, which are not even suggested by the claim language, in an attempt to limit the invention to a CTA system.

Among other things, Hitachi incorrectly ignores what happens at engine start up. At engine start up, oil flows from the source – the main oil gallery – into the vane housing.  The '738 patent specification makes clear that "[i]nlet line 182 receives its pressurized fluid (engine oil) directly from main oil gallery ('MOG') 230."  (*Id.* at col. 7, lines 35-37; *see also, e.g.,* Fig. 19). Hitachi's proposed construction would read out this preferred embodiment and vitiate one of the key objectives of the invention of the '738 patent – having a VCT system that assists with variable valve timing at engine start up.  (*See, e.g., id.* at col. 2, lines 21-30; col. 3, lines 22-26).   The operation of the patented system at engine start up cannot be marginalized.   The specification

emphasizes the functioning of the VCT system at start up and describes it as an important shortcoming of the prior art:

> One disadvantage is the inability of this differential pressure control system ("DPCS") to properly control the position of the spool during the initial start-up phase of the engine. When the engine first starts, it takes several seconds for oil pressure to develop. During that time, the position of the spool valve is unknown. Because the system logic has no known quantity with which to perform the necessary calculations, the DPCS is prevented from effectively controlling the spool valve position until the engine reaches normal operating speed.

(*Id.* at col. 2, lines 21-30).

The system of the '738 patent overcame this problem by employing a variable force solenoid acting directly on a vented spool valve. With the improved system of the '738 patent, "the lack of normal operating oil pressure during initial engine start-up does not result in start-up error because the signal from the ECU is fed immediately to the solenoid which directly positions the spool." (*Id.* at col. 3, lines 22-26). Hitachi's construction cannot be squared with the functioning of the VCT system at engine start up. As such, it should be rejected in favor of BorgWarner's construction, which comports with the plain meaning of the claim terms and the intrinsic evidence.

| TERMS AND ELEMENTS | BORGWARNER'S PROPOSED CONSTRUCTION | HITACHI'S PROPOSED CONSTRUCTION |
|---|---|---|
| *Step 5*<br>"transmitting rotary movement to said camshaft in such a manner as to vary the phase angle of said camshaft with respect to said crankshaft, said rotary movement being transmitted through a housing, said housing being mounted on said camshaft, said housing further being rotatable with said camshaft and | The method step of transmission of rotary movement (or power) to the camshaft includes structure that permits continuous variation of the phase angle of the camshaft with respect to the crankshaft. The rotary movement is transmitted through a vane housing that is mounted on the camshaft, and the vane housing can be rotated and oscillated with respect to the camshaft in order to permit adjustment of the phase angle of the camshaft with respect to the crankshaft. | Transmitting rotary movement to the camshaft to vary the phase angle of the camshaft relative to the crankshaft. The rotary movement is transmitted through a housing mounted on the camshaft. The housing can rotate with and oscillate relative to the camshaft.<br><br>The term "housing" means: Housing for vane or piston-cylinder structure, as outlined |

35

| | | |
|---|---|---|
| being oscillatable with respect to said camshaft." | The term "housing" means: A vane housing having recesses for receiving fluid. | in the "supplying" step. |

Although BorgWarner's and Hitachi's proposed constructions for this claim phrase are similar, Hitachi's proposed construction should be rejected. As explained above, Hitachi fails to recognize that the term "housing" means a vane housing in the context of claim 10 of the '738 patent.

## CLAIM 11

| TERMS AND ELEMENTS | BORGWARNER'S PROPOSED CONSTRUCTION | HITACHI'S PROPOSED CONSTRUCTION |
|---|---|---|
| (i) "a coil, said coil being adapted to receive said electrical signal from said engine control unit" | A coil that is able to receive an electrical signal from the engine control unit. | A coil that receives the current control signal from the ECU. |

The Court should adopt BorgWarner's proposed construction for this claim term because it follows directly from the language of the claim. Hitachi once again erroneously attempts to read in a limitation that the "electrical signal" from the ECU be a "current control signal." As explained above, nothing supports adding such a limitation to the claims.

| TERMS AND ELEMENTS | BORGWARNER'S PROPOSED CONSTRUCTION | HITACHI'S PROPOSED CONSTRUCTION |
|---|---|---|
| (ii) "an armature, said armature being substantially surrounded by said coil, said armature being connected to said spool, said coil, when energized, creating a magnetic field sufficient to cause said armature to exert a force upon said spool and induce movement in said spool, said movement | An armature, or moveable magnetic piece, is substantially surrounded by a coil. Energization of the magnetic field in the coil is sufficient to cause the armature to exert a force upon the spool and induce movement in the spool. The movement of the spool corresponds to, or can be continuously adjusted, by changing the signal from the engine control unit.<br><br>"*Connected*" means: Movement of the armature causes a corresponding | Armature is substantially surrounded by the coil. The armature applies a force on the spool in an amount that is proportionally related to the magnitude of the current control signal sent by the ECU.<br><br>"*Connected*" means: Physically attached.<br><br>"*Said armature [exerts] a force upon said spool and* |

36

| corresponding to said signal from said engine control unit" | movement of the spool.<br><br>"*Said armature [exerts] a force upon said spool and [induces] movement in said spool, said movement corresponding to said signal from said engine control unit*" means:  The armature applies a force on the spool as a result of the signal from the engine control unit, and the armature causes movement of the spool. | *[induces] movement in said spool, said movement corresponding to said signal from said engine control unit*" means:  Armature applies a force on the spool in an amount that is proportionally related to the magnitude of the current control signal sent by the ECU. |
| --- | --- | --- |

The Court should adopt BorgWarner's proposed construction for the term "connected" because it is consistent with the intrinsic evidence and the plain meaning of the term. An operational connection that allows movement of the solenoid armature to cause a corresponding movement of the spool is shown and described in the '738 patent specification.  For example, the specification explains that "[a]rmature 201b bears against extension 200c of vented spool 200, thus moving vented spool 200 to the right, as oriented in Fig. 19." ('738 patent, col. 7, lines 45-47).  Figure 19 shows the armature bearing or pushing against the spool extension such that movement of the armature causes a corresponding movement of the spool.  Contrary to Hitachi's assertion, the term "connected" does not require the armature to be "physically attached" to the spool.  In the preferred embodiment of Figure 19, there is no indication that the armature is "physically attached" to the spool – the armature merely bears against the spool extension.

BorgWarner's proposed construction also comports with the plain and ordinary meaning of the word "connected," namely "to join, fasten or link together usu[ally] by means of something intervening."  *Webster's Third New Int'l Dictionary of the English Language Unabridged* 480 (1993) (Matterer Decl. Ex. 12).  The plain meaning of "connected" – that two things are "link[ed] together usually by means of something intervening" – undercuts Hitachi's suggestion that the armature and spool must be "physically attached" to be connected.

The Court should likewise adopt BorgWarner's proposed construction for the phrase "said armature [exerts] a force upon said spool and [induces] movement in said spool, said movement corresponding to said signal from said engine control unit." BorgWarner's construction follows directly from the words of this claim element. On the other hand, Hitachi contends that the armature must apply a force on the spool that is "proportionally related to the magnitude of the current control signal sent by the ECU." No such language is in the claim, and none should be imported. The claim language requires nothing more than that the armature apply a force on the spool as a result of the signal from the engine control unit, and that the armature cause movement of the spool.

| TERMS AND ELEMENTS | BORGWARNER'S PROPOSED CONSTRUCTION | HITACHI'S PROPOSED CONSTRUCTION |
| --- | --- | --- |
| (iii) "an air gap, said air gap separating said coil from said armature" | A gap that separates the coil from the armature and may contain non-magnetic material. | A fixed space or gap in the structure between the coil and the armature, extending the length of the armature, without magnetic bearing material between the coil and the armature, and with air in the gap during operation. |

The Court should adopt BorgWarner's proposed construction for this claim phrase because it is based on the plain and ordinary meaning of the term "air gap." As understood by one of ordinary skill in the art, an "air gap" is a gap that separates the solenoid coil from the armature and may contain air or other nonmagnetic material. (*See* Ribbens Rep. at 28, 37-38).

Hitachi improperly attempts to limit this term to a device that only has air in the "air gap." However, "air gap" is a term of art that has a well-defined technical meaning. Numerous technical dictionaries confirm that BorgWarner's proposed construction is correct. *See, e.g., McGraw-Hill Dictionary of Scientific and Technical Terms* 51 (4th ed. 1989) ("air gap" means "[a] gap *or an equivalent filler of nonmagnetic material* across the core of a choke, transformer, or

other magnetic device") (emphasis added) (Matterer Decl. Ex. 14); *McGraw-Hill Dictionary of Science and Engineering* 22 (3d ed. 1984) (same) (Matterer Decl. Ex. 15); *Academic Press Dictionary of Science and Technology* 64 (1992) ("air gap" means "a small section of air *or another nonmagnetic material* between two magnetically related components; purposely designed so that a certain amount of voltage is required to overcome the gap") (emphasis added) (Matterer Decl. Ex. 16). *See also, e.g., Phillips,* 415 F.3d at 1318 (technical dictionaries can be used to help understand "the way in which one of skill in the art might use the claim terms"); *Inverness Med. Switz. GmbH v. Princeton Biomeditech Corp.,* 309 F.3d 1365, 1369 (Fed. Cir. 2002) (technical dictionaries should be "used for established specialized meanings in particular fields of art").

The '738 patent specification further confirms that the "air gap" may contain air or other nonmagnetic material: "[m]ain air gap 201c extends radially around armature 201b *and may contain nonmagnetic bearing material*." ('738 patent, col. 8, lines 39-41 (emphasis added)). The Court should thus reject Hitachi's attempt to limit this claim term to a gap that contains only air.

| TERMS AND ELEMENTS | BORGWARNER'S PROPOSED CONSTRUCTION | HITACHI'S PROPOSED CONSTRUCTION |
|---|---|---|
| (iv) "a housing, said housing providing an enclosure for said coil, said armature, and said air gap" | A structure that generally encloses the coil, armature and air gap. | None. |

Hitachi has not proposed a construction for this element of claim 11. BorgWarner's straightforward construction should therefore be adopted.

IV.    **CONCLUSION**

For the above reasons, BorgWarner respectfully requests that the Court adopt

BorgWarner's proposed constructions as set forth in the accompanying proposed Order.


Dated:  September 28, 2006                          */s/ Mary B. Matterer*
                                                    Richard K. Hermann (I.D. #405)
                                                    Mary B. Matterer (I.D. #2696)
                                                    222 Delaware Ave., 10th Floor
                                                    Wilmington, Delaware 19801
                                                    (302) 888-6800

                                                    Hugh A. Abrams (*pro hac vice*)
                                                    Thomas D. Rein (*pro hac vice*)
                                                    Lisa A. Schneider (*pro hac vice*)
                                                    Marc A. Cavan (*pro hac vice*)
                                                    Lara (Fleishman) Hirshfeld (*pro hac vice*)
                                                    SIDLEY AUSTIN LLP
                                                    One South Dearborn Street
                                                    Chicago, Illinois 60603
                                                    (312) 853-7000

## CERTIFICATE OF SERVICE

I hereby certify that on September 28, 2006, I caused the following document, **Opening Claim Construction Brief of BorgWarner Inc. and BorgWarner Morse Tec Inc.,** to be electronically filed with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

Steven J. Balick, Esq.
John G. Day, Esq.
Tiffany Geyer Lydon, Esq.
ASHBY & GEDDES
222 Delaware Avenue, 17th Floor
Wilmington, DE  19801

Additionally, I hereby certify that on September 28, 2006, I caused the foregoing document to be served via email and by overnight courier on the following non-registered participants:

Michael D. Kaminski, Esq.
Pavan K. Agarwal, Esq.
Liane M. Peterson
FOLEY & LARDNER LLP
3000 K Street, N.W., Suite 500
Washington, D.C.  20007-5109
mkaminski@foley.com
pagarwal@foley.com
lpeterson@foley.com

_____/s/ Mary B. Matterer_____
Mary B. Matterer (I.D. #2696)
MORRIS, JAMES, HITCHENS
   & WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19801
(302) 888-6800
mmatterer@morrisjames.com
Attorneys for Defendants and Counterclaimant,
BORGWARNER INC., and
BORGWARNER MORSE TEC INC.