IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| HITACHI, LTD., and HITACHI AUTOMOTIVE PRODUCTS (USA), INCORPORATED | ) ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-048-SLR |
| | ) | |
| BORGWARNER INC., and BORGWARNER MORSE TEC INC., | ) ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| BORGWARNER INC., | ) | |
| | ) | |
| Counterclaimant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HITACHI, LTD., and HITACHI AUTOMOTIVE PRODUCTS (USA), INCORPORATED | ) ) | |
| | ) | |
| Counterdefendants. | ) | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT OF INVALIDITY FOR FAILURE TO MEET THE
WRITTEN DESCRIPTION REQUIREMENT OF 35 U.S.C. § 112 UNDER
BORGWARNER'S PROPOSED CLAIM INTERPRETATION**

*Of Counsel:*

Kenneth E. Krosin
Michael D. Kaminski
Pavan K. Agarwal
C. Edward Polk
Liane M. Peterson
Foley & Lardner LLP
3000 K Street, N.W., Suite 500
Washington, D.C. 20007–5109

William J. Robinson
Foley & Lardner LLP
2029 Century Park East, Suite 3500
Los Angeles, CA 90067

Dated: October 4, 2006

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654–1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Plaintiffs Hitachi, Ltd. and
Hitachi Automotive Products (USA), Inc.*

# TABLE OF CONTENTS

**Page**

I.    STATEMENT OF NATURE AND STAGE OF PROCEEDING ............................. 1

II.   SUMMARY OF ARGUMENT ............................................................... 1

III.  STATEMENT OF FACTS ................................................................... 2

    A.    Claim 10 of the '738 Patent ...................................................... 2

    B.    BorgWarner's Proposed Claim Construction ................................. 3

    C.    '738 Patent Specification ......................................................... 4

        1.    Statement of the Invention ................................................ 4

        2.    '738 Patent Embodiments ................................................ 5

            a.    Piston-Cylinder Embodiment ................................. 5

            b.    Vane Structure Embodiment ................................. 7

        3.    Prior BorgWarner Patents Incorporated by Reference in the '738 Patent Are All CTA Systems and Reject OPA ......................... 10

        4.    The '738 Patent Avoids Use of the Engine Oil Pump During A Phase Shift, Except For Initial Fill and Make-Up Oil ....................... 10

    D.    Later BorgWarner Patent - U.S. Patent No. 5,657,725 ................................... 12

IV.   ARGUMENT ................................................................................. 13

    A.    Legal Standards ..................................................................... 13

        1.    Summary Judgment Standard ............................................ 13

        2.    Written Description Standard ............................................ 13

    B.    Under BorgWarner's Proposed Claim Interpretation, Claims 10 and 11 of the '738 Patent Are Invalid For Failure to Meet the Written Description Requirement Because the Specification Fails to Support a Claim Scope that Covers an Oil Pressure Actuated (OPA) VCT System ....... 15

        1.    The Only VCTs Disclosed or Suggested in the '738 Patent Are Cam Torque Actuated (CTA), Consistent With the Purpose and Statement of Invention of the '738 Patent ......................... 15

**TABLE OF CONTENTS (cont'd)**

2.    BorgWarner's Later-Filed '725 Patent Demonstrates the
      Significant Modifications to Change the Disclosed CTA VCT
      Into An OPA System, and the '738 Patent Specification Has
      No Teaching or Suggestion of Such Modifications............................ 20

3.    The Supplying Step Was First Added During Prosecution, And
      BorgWarner Wants It Interpreted in a Way That Contradicts
      What the Original Specification Taught ........................................... 20

V.    CONCLUSION...................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)..........................................................................................13

*Avia Group Int'l v. L.A. Gear Cal., Inc.*,
  853 F.2d 1557 (Fed. Cir. 1988)......................................................................13

*Crown Operations Int'l, Ltd. v. Solutia Inc.*,
  289 F.3d 1367 (Fed. Cir. 2002)......................................................................14

*Enzo Biochem, Inc. v. Gen-Probe, Inc.*,
  424 F.3d 1276 (Fed. Cir. 2005)......................................................................13

*eSpeed, Inc. v. Brokertec, USA, L.L.C.*,
  404 F. Supp. 2d 575 (D. Del. 2005)...............................................................15

*Gentry Gallery, Inc. v. Berkline Corp.*,
  134 F.3d 1473 (Fed. Cir. 1998)..........................................................14, 18, 23

*IPPV Enters., Inc. v. Echostar Communications Corp.*,
  106 F.Supp.2d 595 (D. Del. 2000)..................................................................15

*LizardTech, Inc. v. Earth Resource Mapping, Inc.*,
  424 F.3d 1336 (Fed. Cir. 2005)......................................................................18

*Lockwood v. American Airlines, Inc.*,
  107 F.3d 1565 (Fed. Cir. 1997)..........................................................14, 18, 19

*Merrill v. Yeomans*,
  94 U.S. 568 (1876)..........................................................................................19

*Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.*,
  984 F.2d 1182 (Fed. Cir. 1993)......................................................................13

*PIN/NIP, Inc. v. Platte Chem. Co.*,
  304 F.3d 1235 (Fed. Cir. 2002)................................................15, 18, 19, 23

*Reiffin v. Microsoft Corp.*,
  214 F.3d 1342 (Fed. Cir. 2000)......................................................................14

*TurboCare Div. of Demag Delaval Turbomach. Corp. v. Gen. Elec. Co.*,
  264 F.3d 1111 (Fed. Cir. 2001)..........................................................13, 15, 21

*Univ. of Rochester v. G.D. Searle & Co., Inc.*,
  358 F.3d 916 (Fed. Cir. 2004)........................................................................14

## TABLE OF AUTHORITIES (cont'd)

*Vas-Cath Inc. v. Mahurkar*,
    935 F.2d 1555 (Fed. Cir. 1991)......................................................................................14

*Wang Labs., Inc. v. America Online, Inc.*,
    197 F.3d 1377 (Fed. Cir. 1999)......................................................................................14

## STATUTES AND RULES

35 U.S.C. § 112, ¶ 1............................................................................................................1, 13

35 U.S.C. § 132......................................................................................................................21

Fed. R. Civ. P. 56(c)..............................................................................................................13

## I.    STATEMENT OF NATURE AND STAGE OF PROCEEDING

Plaintiffs Hitachi, Ltd. and Hitachi Automotive products (USA), Inc. (collectively "Hitachi") initiated this action for a declaratory judgment of non-infringement, invalidity and unenforceability of U.S. Patent No. 5,497,738 ("the '738 patent") against Defendants BorgWarner Inc. and BorgWarner Morse TEC Inc. (collectively "BorgWarner"). Fact discovery has closed and the parties have submitted their proposed claim constructions for asserted claims 10 and 11 of the '738 patent.

## II.    SUMMARY OF ARGUMENT

Hitachi submits this memorandum in support of its motion for summary judgment that claims 10 and 11 of the '738 patent are invalid because this patent fails to comply with the statutory written description requirement of 35 U.S.C. § 112, ¶ 1 under BorgWarner's proposed interpretation of claim 10. BorgWarner interprets these claims to broadly cover "oil pressure actuated" ("OPA") variable camshaft timing ("VCT") systems. As discussed in Hitachi's Opening Claim Construction Brief (D.I. at 264), BorgWarner's proposed interpretation is incorrect and lacks any support in the specification.[1] However, if the Court adopts BorgWarner's claim construction, then claims 10 and 11 are invalid under Section 112, first paragraph for lack of written description support.

*First*, the '738 patent specification, including earlier BorgWarner patents incorporated by reference, does not provide written description support for a claim scope that encompasses

---

[1]    Hitachi's claim construction position, as set forth in its Opening Claim Construction Brief, is that the '738 patent claims are limited to cam torque actuated ("CTA") systems, based on numerous claim limitations in claim 10. Under Hitachi's construction, OPA systems, with their actuator and associated hydraulic flow, would be excluded from the claimed subject matter. Therefore, the present written description issue does not arise under Hitachi's claim interpretation.

OPA VCTs.  Instead, the specification demonstrates a clear rejection of OPA-type VCTs in favor of CTA-type VCTs.

*Second*, BorgWarner's interpretation of certain limitations, done in an attempt to capture OPA VCTs, results in expanding the scope of claim 10 far beyond the disclosure in the '738 patent specification.  In particular, BorgWarner interprets terms such as "source" and the "supplying" step in claim 10 to cover structure and oil flow that have no support in the specification.  This is especially true in view of the fact that these were new limitations added during prosecution, and BorgWarner wants to interpret them way beyond the actual teachings of the specification.  In fact, BorgWarner's interpretation for these added limitations runs directly contrary to what the original disclosure taught.

## III.    STATEMENT OF FACTS

### A.    Claim 10 of the '738 Patent

Claim 10 of the '738 patent recites as follows, with underlining and brackets showing the claim terms that were added (underlined) or removed (bracketed) during prosecution:

> 10. [Application claim 11] In an internal combustion engine having a variable camshaft timing system <u>for varying the phase angle of a camshaft relative to a crankshaft</u>, a method of regulating the flow of hydraulic fluid <u>from a source to a means for transmitting rotary movement from said crankshaft to a housing</u>, comprising the steps of:
>
>     sensing the positions of [a] <u>said</u> camshaft and [a] <u>said</u> crankshaft;
>
>     calculating a relative phase angle between said camshaft and said crankshaft, said calculating step using an engine control unit [to] <u>for</u> process<u>ing</u> information obtained from said sensing step, said engine control unit <u>further</u> issuing a electrical signal corresponding to said phase angle; [and,]
>
>     controlling the position of a vented spool slidably positioned within a spool valve body, said controlling step being in response to said signal received from said engine control unit, said controlling step utilizing an electromechanical actuator to vary the position of said vented spool [whereby allowing or preventing flow of hydraulic fluid through said

2

valve body], said electromechanical actuator comprising a variable force solenoid;

supplying hydraulic fluid from said source through said spool valve to a means for transmitting rotary movement to said camshaft, said spool valve selectively allowing and blocking flow of hydraulic fluid through an inlet line and through return lines; and,

transmitting rotary movement to said camshaft in such a manner as to vary the phase angle of said camshaft with respect to said crankshaft said rotary movement being transmitted through a housing said housing being mounted on said camshaft, said housing further being rotatable with said camshaft and being oscillatable with respect to said camshaft.

As shown above, most of claim 10 was added during prosecution, primarily in response to the U.S. Patent and Trademark Office ("PTO") Examiner's requirement that BorgWarner "amend [the] claims to a unified invention" and to address certain obviousness concerns. Ex. 11 at BW2134-40 and Ex. 10, BW2147[2].

The amendments show that claim 10 was transformed from a claim directed to electronic control of a spool in a spool valve body to a claim directed to carrying out the overall phase change of a camshaft relative to a crankshaft in an internal combustion engine, including operation of the mechanical components and oil flow paths.

**B.     BorgWarner's Proposed Claim Construction**

Relevant to this motion, BorgWarner proposes the following interpretations of various claim limitations (*see* D.I. 265):

---

[2]     All exhibits are included in the Combined Appendix in Support of Hitachi, Ltd's and Hitachi Automotive Products (USA), Inc.'s Opening Summary Judgment Motions.

| Pertinent Terms in Claim 10 | BorgWarner's Proposed Construction |
|---|---|
| Variable camshaft timing system | A system for varying the phase angle of a camshaft relative to a crankshaft[3] |
| source | A point of origin in the engine that supplies oil, such as an oil gallery or oil crankcase |
| supplying hydraulic fluid from said source through said spool valve to a means for transmitting rotary movement to said camshaft, said spool valve selectively allowing and blocking flow of hydraulic fluid through an inlet line and through return lines; and, | The method step of supplying or allowing oil to flow from an oil source through the spool valve to a means for transmitting rotary movement to said camshaft (defined below). The position of the spool in the spool valve can be continuously adjusted or moved to permit flow of fluid or block flow of fluid through an inlet line and return lines (i.e., the valve "selectively allows" fluid flow). <br><br>The term "inlet line" means: At least one line or conduit that allows passage of fluid from the source through the spool valve. <br><br>The term "return lines" means: At least two lines or conduits that allow passage of fluid from the vane housing through the spool valve.[4] |

### C.    '738 Patent Specification

#### 1.    Statement of the Invention

The '738 patent "invention" is directed to a control system for "a variable camshaft timing (VCT) system of the type in which the position of the camshaft is circumferentially varied relative to the position of a crankshaft in reaction to torque reversals experienced by the camshaft during its normal operation." Ex. 1, '738 patent at 1:13-18. "In such a VCT system, an electromechanical/hydraulic system is provided to effect the repositioning of the camshaft in

---

[3]    BorgWarner contends that the preamble to claim 10 is not a limitation and therefore need not be interpreted. If it is a claim limitation, however, BorgWarner's interpretation is set forth in this table.

reaction to such torque reversals, and a control system is provided to selectively permit or prevent the hydraulic system from effecting such repositioning." *Id.* at 1:18-23. The '738 patent states that the "present invention" relates to a control system that is a useful part of "the hydraulic system," *i.e.*, the CTA VCT system. *See id.* at 1:24-27.

The '738 patent incorporates by reference the following earlier BorgWarner patents describing the mechanical features of the claimed VCT system: U.S. Patents Nos. 5,002,023 ("the '023 patent"); 5,107,804 ("the '804 patent"); 5,172,659 ("the '659 patent"); and 5,184,578 ("the '578 patent"). These patents all show the same base CTA-type VCT actuator and hydraulic flow lines associated with it, as outlined below. The '738 patent is an extension of the CTA system of these earlier patents.

### 2.    '738 Patent Embodiments

The '738 patent describes two embodiments for its CTA VCT system: (1) a piston-cylinder structure having opposing hydraulic cylinders, and (2) a vane-based structure.[5]

### a.    Piston-Cylinder Embodiment

Figures 1-9 of the '738 patent illustrate the piston-cylinder CTA embodiment. The '738 patent adopts this mechanical structure from the BorgWarner's prior art '023 patent, and summarizes its operation as follows:

> U.S. Pat. No. 5,002,023 describes a VCT system within the field of the invention in which the system hydraulics includes a pair of oppositely acting hydraulic cylinders with appropriate hydraulic flow elements to ***selectively transfer hydraulic fluid from one of the cylinders to the other, or vice versa***, to thereby

---

[4]    Only the relevant positions of BorgWarner's proposed construction of the "supplying" step in claim 10 are shown.

[5]    Although BorgWarner's proposed claim interpretation excludes the piston-cylinder embodiment, Hitachi addresses it for completeness of the written description analysis.

advance or retard the circumferential position of a camshaft relative to a crankshaft. (Ex. 1, '738 patent at 1:36-46 (emphasis added).)

The '738 patent relies upon disclosures from the '023 patent for details on how the piston-cylinder embodiment operates. *See* Ex. 1, '738 patent at 5:57-61 ("In either case, the retarding or advancing of the position of the sprocket 32 relative to the position of the sprocket 30, which is selectively permitted or prevented in reaction to the direction of torque in the camshaft 26, *as explained in the aforesaid U.S. Pat. No. 5,002,023* . . . ." (emphasis added). Figures 12 and 13 of the '023 patent illustrate the specific oil flow (unique to CTA VCTs) for causing a phase change between the camshaft and the crankshaft. Figure 12 is reproduced below:



FIG. 12

As shown above, oil pressurized by camshaft torque pulsations is directed from cylinder 54 through branch line 88, return line 94, an annular space 104 formed between spool

lands 100(a) and 100(b), inlet line 82, check valve 86 and branch line 90 to the opposed cylinder 56, thereby causing a phase shift of the camshaft relative to the crankshaft. Ex. 14, Declaration of Robert Kuhn I of Oct. 4, 2006 ("Kuhn II Decl."), at ¶ 12-13. Figure 13 of the '023 patent (not reproduced here) shows oil flow in the opposite direction to create a phase shift in the opposite angular direction. Ex. 14, Kuhn I Decl. at ¶ 16. Notably, the CTA VCT in the '023 patent does not rely on flow from the main engine oil circuit to the piston-cylinders to provide energy to create the phase shift. Instead, oil flows from one cylinder internally to the other cylinder (54,56) by positioning a spool 100 that slides within a cylindrical member 98, such that an annular recess of the spool 104 fluidly couples an inlet line 82 with one of the return lines 94,96. Ex. 4, '023 patent at 6:38-51.

The '023 patent makes abundantly clear that this system does not require external energy for its operation, and engine oil "does not have to flow through the main lubricating pump during the short interval in which the phase adjustment must take place." Ex. 4, '023 patent, at 1:60-62 and 2:27-30; Ex. 14, Kuhn I Decl. at ¶ 21. This is a critical feature of a CTA VCT system which differentiates it from an OPA VCT. Because the engine oil pump is not the energy source, "the actuation rate of the variable camshaft timing arrangement is not limited by the capacity of the engine oil pump." Ex. 4, '023 patent at 2:19-23 and 30-35.

In sum, a person of ordinary skill in the art would understand that the '738 patent, including its incorporation of the '023 patent, teaches that CTA VCTs are fundamentally different from, and allegedly superior to, OPA VCTs. Ex. 14, Kuhn I Decl. at ¶ 21.

### b. Vane Structure Embodiment

The second embodiment, illustrated in Figures 10-18 of the '738 patent, relies on the same CTA principles and internal oil circuit described above, but uses a vane structure instead

of a piston-cylinder structure.  Ex. 14, Kuhn I Decl. at ¶ 19.  The '738 patent adopts the vane

structure from BorgWarner's prior art '804 patent, summarizing it as follows:

> U.S. Pat. No. 5,107,804 describes an alternate type of VCT
> system within the field of the invention in which the system
> hydraulics include a vane having lobes within an enclosed
> housing which replace the oppositely acting cylinders disclosed
> by the aforementioned U.S. Pat. No. 5,002,023. The vane is
> oscillatable with respect to the housing, with appropriate
> hydraulic flow elements ***to transfer hydraulic fluid within the
> housing from one side of a lobe to the other, or vice versa***, to
> thereby oscillate the vane with respect to the housing in one
> direction or the other, an action which is effective to advance or
> retard the position of the camshaft relative to the crankshaft.
> (Ex. 1, '738 patent at 1:53-64 (emphasis added).)

In Figure 19 of the '738 patent, reproduced below, a rotating vane 160 is contained

within recesses 132a and 132b of housing 132.  Oil is transferred from one recess 132a, 132b to

the other.



FIG. 19

8

The two drawings below further illustrate operation of the CTA VCT disclosed in the '738 patent. The figure on the left shows oil flowing (yellow with red arrows) from recess 132a to recess 132b.[6] The figure on the right shows oil flowing in the opposite direction. In either case, oil flow is controlled within this internal circuit by the interaction of camshaft torque pulsations, the check valves, and the annular recess in the spool. *See* Ex. 1, '738 patent at 9:7-41; Ex. 5, '804 patent at 13:40-56; Ex. 14, Kuhn I Decl. at ¶ 19. These elements make the camshaft, which is attached to vane 160, rotate relative to housing 132, which is coupled to the crankshaft, creating the phase shift between the camshaft and crankshaft.



These drawings show that camshaft torque pulsations cause the phase shift, not engine oil pump pressure. Just like the '023 patent, the '804 patent says that engine oil does not have to return to the main engine pump during the phase shift and that the actuation rate is not

---

[6]     The blue oil flow is the transfer of oil on the non-active side of the vane.

limited by the capacity of the oil pump. Ex. 5, '804 patent at 2:44-56. Again, it rejects OPAs in favor of CTAs.

> **3.    Prior BorgWarner Patents Incorporated by Reference in the '738 Patent Are All CTA Systems and Reject OPA**

All of the BorgWarner patents incorporated by reference in the '738 patent (*i.e.*, the '023, '804, '578, and '659 patents) are directed to CTA VCT systems. Ex. 14, Kuhn I Decl. at ¶ 21. These patents, including the '023 and '804 patents discussed above, only disclose CTA VCT systems, and expressly reject using engine oil pressurized by the engine oil pump to create the phase shift. The '578 and '659 patents disclose the same piston-cylinder and vane CTA embodiments. The '578 patent expressly rejects using engine oil pump pressure to create the phase shift. *See* Ex. 15, '578 patent at 1:52-60. Similarly, the '659 patent states that its "invention" is directed to a hydraulic control system to control a VCT system that uses camshaft torque reversals to create the phase change. Ex. 16, '659 patent at 1:20-30; 3:4-9.[7] In sum, the patents incorporated into the '738 patent collectively reject the OPA approach.

> **4.    The '738 Patent Avoids Use of the Engine Oil Pump During A Phase Shift, Except For Initial Fill and Make-Up Oil**

Against the backdrop of the these prior art patents focused on CTA, the '738 patent further emphasizes the problem with fluctuations in engine oil pressure (which is a critical aspect of OPA systems) in a VCT. The '738 patent states that when an engine first starts, it

---

[7]    The difference between the '578 and the '659 patents over the '023 patent and the '804 patent pertains to the technique used for controlling the position of the spool. In the '023 and '804 patents, the spool position is controlled by applying a hydraulic pressure at one end of the spool, with a counteracting mechanical spring force by a compression spring applied on the other end of the spool. *See* Ex. 1, '738 patent at 1:42-52, 64-67. The '578 and '659 patent use hydraulic pressure on both ends of the spool to control its position. *See* Ex. 1, '738 patent at 2:5-7 and 21-22 (noting that '578 and '659 patents use a "differential pressure control system" that "utilizes hydraulic force on both ends of the spool").

must wait for oil pressure to develop. Ex. 1, '738 patent at 2:24-25. Further, the '738 patent states that "[a]nother problem with existing VCT systems is sluggish dynamic response. Even after the engine stabilizes at normal operating speed, individual characteristics vary substantially from engine to engine. A new engine at high speed and low temperature can have drastically different oil pressure than a worn engine at hot idle." *Id.* at 2:31-37.

To avoid problems with the engine oil pump, the '738 patent discloses a CTA-type VCT where "the lack of normal operating oil pressure during initial engine start-up does not result in start-up error . . . ." *Id.* at 3:22-24. The detailed description states that the "optimum solution is a control system completely independent of variable parameters, *i.e.*, one independent of engine oil pressure." *Id.* at 8:9-11; *see id.* at 8:64-9:2 (stating that control system is "completely independent of hydraulic system pressure. Thus, it is not necessary to design a compromised system to operate within a potentially wide spectrum of oil pressures, such that may be attributed to individual characteristics of particular engines."); *see id.* at 8:29 (stating that embodiment "eliminate[s]" the "oil pressure variable"). *See also* Ex. 14, Kuhn I Decl. ¶ 22-23.

The '738 patent stresses measures to isolate oil flow from the main engine oil circuit to operate the VCT. First, as described above, the phase shift is done by transferring oil, pressurized by camshaft torque pulsations, from one piston-cylinder or vane recess to another. Second, the '738 patent adopts a control system that is "completely independent of hydraulic system pressure." Ex. 1, '738 patent at 8:64-66.

As in all hydraulic systems, a small amount of oil leakage can occur from the piston-cylinder and vane recesses. To compensate for this leakage, the VCT system described in the '738 patent provides a limited amount of make-up oil from the main engine oil circuit directly

to the inlet line 182, <u>bypassing the vented spool</u>.  Ex. 1, '738 patent at 7:11-14 and 35-38, and 8:15-28; Ex. 14, Kuhn I Decl. at ¶ 18.  The movement of spool 200 in body 198 does not regulate this make-up oil flow.  Indeed, the '738 patent expressly states that "[t]he flow of make-up oil does not affect, and is not affected by, the operation of electromechanical actuator 201."  Ex. 1, '738 patent at 9:4-49.  Thus, actuator 201, which moves spool 200 in body 198, has no effect on this make-up engine oil from the main engine oil circuit.  Further, any make-up oil flows to the non-active sides of one of lobes 160a, 160b, which are fluidly connected to one another.  In sum, the make-up oil flow is not used to create the phase change in the VCT.  Ex. 14, Kuhn I Decl. at ¶ 18.

### D.    Later BorgWarner Patent - U.S. Patent No. 5,657,725

BorgWarner's U.S. Patent No. 5,657,725 ("the '725 patent") is entitled "VCT System *Utilizing Engine Oil Pressure For Actuation*."   (emphasis added).   The original parent application for the '725 patent was filed in September 1994, more than 16 months after the '738 patent application was filed.  In contrast to the earlier BorgWarner patents incorporated into the '738 patent, the '725 patent states that the "invention" relates to a control system for operating a VCT of the type that at least partially relies on "engine oil pressure for actuation." Ex. 17, '725 patent at 1:11-17.  In other words, it uses the OPA approach at least in part.

The '725 patent summarizes the piston-cylinder and vane embodiments of the '023 and '804 patents (and the '738 patent shows these same embodiments), and states that "[i]n all the systems described above, timing control is achieved in response to torque reversals, or pulses, from the camshaft generated during normal operation of the engine.  However, in some engines, camshaft torque reversals are not suitable for actuation of the aforementioned hydraulic system."  Ex. 17, '725 patent at 2:1-5.  The '725 patent states that its "invention" addresses the problems with these earlier systems by "using the engine oil pump pressure as

one source of energy for actuating the VCT mechanism." Ex. 17, '725 patent at 2:15-17. The

'725 patent states that its "new mechanism differs from previous mechanisms by utilizing re-

routed hydraulic passages and new check valve positions." *Id.* at 2:17-20. These "re-routed

hydraulic passages" and "new check valve positions" are not disclosed or suggested in the '738

patent. Ex. 14, Kuhn I Decl. at ¶ 27.

## IV.    ARGUMENT

### A.    Legal Standards

#### 1.    Summary Judgment Standard

Summary judgment is appropriate when there is no genuine issue of material fact and

the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Anderson v.*

*Liberty Lobby, Inc*., 477 U.S. 242 (1986); *Avia Group Int'l v. L.A. Gear Cal., Inc*., 853 F.2d

1557, 1560 (Fed. Cir. 1988).

The Federal Circuit has repeatedly stated that summary judgment is as appropriate in a

patent case as in any other type of case. *E.g., Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.*,

984 F.2d 1182, 1190 (Fed. Cir. 1993). A party can invalidate a patent at summary judgment by

showing clear and convincing evidence to overcome the patent's presumption of validity. *Enzo*

*Biochem, Inc. v. Gen-Probe, Inc*., 424 F.3d 1276, 1281 (Fed. Cir. 2005). Patent claims may be

held invalid on summary judgment for failure to satisfy the written description requirement.

*See, e.g., TurboCare Div. of Demag Delaval Turbomach. Corp. v. Gen. Elec. Co*., 264 F.3d

1111, 1117-19 (Fed. Cir. 2001).

#### 2.    Written Description Standard

The written description requirement is found in 35 U.S.C. § 112, ¶ 1, which provides

that "[t]he specification shall contain a written description of the invention." Compliance with

the written description requirement is a question of fact. *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563 (Fed. Cir. 1991).

To comply with the written description requirement, the patent specification must demonstrate to the person of ordinary skill in the art that the inventors were in possession of the full claimed invention, with all of its claim limitations:

> Nonetheless, the disclosure must convey with reasonable clarity to those skilled in the art that the inventor was in possession of the invention, although we have also clarified that the possession test alone is not always sufficient to meet the written description requirement. As such, the written description requirement is satisfied by the patentee's disclosure of such descriptive means as words, structures, figures, diagrams, formulas, etc., that fully set forth the claimed invention. Put another way, one skilled in the art, reading the original disclosure, must reasonably discern the limitation at issue in the claims.

*Crown Operations Int'l, Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1376 (Fed. Cir. 2002) (internal citations and quotation marks omitted). "One shows that one is 'in possession' of the invention by describing the invention, with all its claimed limitations, not that which makes it obvious." *Lockwood v. American Airlines*, 107 F.3d 1565, 1572 (Fed. Cir. 1565).

The written description requirement must be met by the patent specification itself. *Univ. of Rochester v. G.D. Searle & Co., Inc.*, 358 F.3d 916, 927 (Fed. Cir. 2004). Further, the purpose of the written description requirement is to ensure that the scope of the right to exclude, as set forth in the claims, does not overreach the scope of the inventor's actual contribution to the art as described in the patent specification. *Reiffin v. Microsoft Corp.*, 214 F.3d 1342, 1345 (Fed. Cir. 2000). Therefore, a limited disclosure in the specification may limit the allowable scope of the claims. *See Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1479 (Fed. Cir. 1998); *Wang Labs., Inc. v. America Online, Inc.*, 197 F.3d 1377, 1383 (Fed. Cir. 1999) (stating that in order for subject matter to be "covered by the claims that subject matter must be

14

sufficiently described as the applicant's invention to meet the requirements of section 112."); *accord IPPV Enters., Inc. v. Echostar Communications Corp*., 106 F.Supp.2d 595, 604-06 (D. Del. 2000). "A broad claim is invalid when the entirety of the specification clearly indicates that the invention is of a much narrower scope." *PIN/NIP, Inc. v. Platte Chem. Co*., 304 F.3d 1235, 1248 (Fed. Cir. 2002) (internal citations omitted).

In addition, when claim amendments are made during prosecution, the added material must find support in the original specification. *TurboCare*, 264 F.3d at 1118; *see eSpeed, Inc. v. Brokertec, USA, L.L.C.*, 404 F. Supp. 2d. 575, 579-580 (D. Del. 2005).

**B.     Under BorgWarner's Proposed Claim Interpretation, Claims 10 and 11 of the '738 Patent Are Invalid For Failure to Meet the Written Description Requirement Because the Specification Fails to Support a Claim Scope that Covers an Oil Pressure Actuated (OPA) VCT System**

Claim 10 recites numerous limitations relating to the source of hydraulic pressure in the VCT, including at least: (a) "variable camshaft timing system" and (b) "supplying hydraulic fluid from said source through said spool valve to a means for transmitting rotary movement to said camshaft, said spool valve selectively allowing and blocking flow of hydraulic fluid through an inlet line and through return lines." Under BorgWarner's construction of these claim terms, shown above in Section III.B, claims 10 and 11 would cover OPA VCTs. Since there is no written description support in the '738 specification for OPA systems, however, BorgWarner's interpretation would render these claims invalid for failure to meet the written description requirement.

**1.     The Only VCTs Disclosed or Suggested in the '738 Patent Are Cam Torque Actuated (CTA), Consistent With the Purpose and Statement of Invention of the '738 Patent**

As outlined in Section III.C above, the '738 patent only discloses a CTA VCT. Every disclosed embodiment in the patent is a CTA VCT, and, nothing in this patent teaches or

15

suggests anything but a CTA VCT.  In fact, the '738 patent specification (including the patents it incorporates by reference) *disavows* any use of the engine oil pump (which is *required* by OPA systems to change phase) beyond initial filling and make-up oil.

The '738 patent points to the prior, incorporated '023 and '804 patents for the structure and operation of the VCT actuator – both the piston-cylinder structure and vane structure. These earlier patents expressly *reject* VCT systems using engine oil pump pressure to cause the phase change because such a system "consumes significant additional energy and it increases the required size of the engine lubricating pump because of the required rapid response time for proper operation of the camshaft phasing actuator."  Ex. 4, '023 patent at 1:35-42; Ex. 5, '804 patent at 1:45-52.  Instead, those patents disclose VCTs "designed to overcome these problems" by using a timing arrangement that "does not require external energy for the operation thereof" and "does not add to the required size of the engine lubricating pump to meet transient hydraulic operation requirements of such variable camshaft timing arrangement."  Ex. 4, '023 patent at 1:47-55; Ex. 5, '804 patent at 1:57-65.

Moreover, these incorporated patents disclose CTA systems in which oil flows from one cylinder or vane recess to the other in response to camshaft torque pulsations.  Ex. 4, '023 patent at 2:7-13; Ex. 5, '804 patent at 2:29-34.  They do *not* rely on oil flow from the main engine oil circuit to create the phase change:

> because the camshaft which is advanced or retarded is advanced or retarded by moving hydraulic fluid which is already within one or another of the oppositely acting cylinders to the other, ***this hydraulic fluid***, engine oil in the preferred embodiment***, does not have to flow through the main lubricating pump during the short time interval in which the phase adjustment must take place***.

Ex. 4, '023 patent, at 2:23-34 (emphasis added); *see also* Ex. 5, '804 patent at 2:44-56.

The '738 patent further stresses the problems caused by oil pump pressure that varies from engine to engine, or even within the same engine under different operating conditions. Ex. 1, '738 patent at 2:24-26 and 8:66-9:2. The '738 patent specification thus discloses a CTA system that avoids the use of engine oil pump flow as much as possible, limiting its use to initial filling of the vane recesses (or piston-cylinders) and make-up oil.

OPA systems are fundamentally at odds with the underlying premise and purpose of the CTA system disclosed in the '738 patent. OPA systems specifically rely upon engine oil pressure from the main engine oil pump to shift the camshaft relative to the crankshaft to create the phase change. Ex. 14, Kuhn I Decl. at ¶ 16. In an OPA system, oil must flow from the main engine oil circuit to the VCT actuator in the short time necessary for the phase change to occur.[8] Ex. 14, Kuhn I Decl. at ¶ 10. OPA systems suffer from the problem the '738 patent identifies that a "new engine at high speed and low temperature can have a drastically different oil pressure than a worn engine at hot idle." Ex. 1, '738 patent at 2:35-37. OPA systems suffer from the problem the '738 patent identifies of having to "operate within a potentially wide spectrum of oil pressures, such that may be attributed to individual characteristics of particular engines." *Id.* at 8:66-9:2. The '738 patent CTA VCT is specifically designed to avoid these problems.

---

[8]    Even today, BorgWarner recognizes the distinct classification of these systems: "Two types of phasers are Cam Torque Actuated (CTA) and Oil Pressure Actuated (OPA). In OPA or torsion assist (TA) phasers, the engine oil pressure is applied to one side of the vane or the other, in the retard or advance chamber, to move the vane. . . . In a CTA phaser, the variable cam timing system uses torque reversals in the camshaft caused by the forces of opening and closing engine valves to move the vane . . . *The CTA phaser has oil input to make up for losses due to leakage but does not use engine oil pressure to move the phaser.*" Ex. 2, U.S. Patent Publication No. 2006/0086332 at 1:[0006-0007] (emphasis added).

In *Gentry Gallery, Inc.*, 134 F.3d 1473, the Federal Circuit stated that, while a claim need not be limited to a preferred embodiment, "in a given case, the scope of the right to exclude may be limited by a narrow disclosure." *Id.* at 1479. The disclosure must clearly describe **what is being invented**, and claims directed to an invention "distinct" from what is disclosed simply do not satisfy the written description requirement. *Id.* (citing *Lockwood v. American Airlines, Inc.* 107 F.3d 1565, 1572 (Fed. Cir. 1997) (emphasis added)).

In *Gentry Gallery*, the patent at issue disclosed that the recliner controls should be on a "console" between two recliners in a sectional sofa. *Gentry Gallery*, 134 F.3d at 1479. Because locating the controls anywhere but on the console was "outside the stated purpose of the invention[,]" the Court held that "when viewed in its entirety, the disclosure is limited to sofas in which the recliner control is located on the console" and that the disclosure failed to support claims in which the recliner controls were located elsewhere. *Id. See also PIN/NIP*, 304 F.3d at 1247-48 (holding claim invalid for lack of written description where entire specification indicated that invention was a mixture of two chemicals, but claim encompassed use of two chemicals separately).

In *LizardTech, Inc. v. Earth Resource Mapping, Inc*., 424 F.3d 1336 (Fed. Cir. 2005), the patent claims were directed to a method for creating a particular type of coefficient array known as a "seamless DWT" array. The Federal Circuit observed that while the claim language was drafted broadly and generically, "there [was] no support for such a broad claim in the specification," which was "directed at describing a particular method for creating a seamless DWT, as opposed to using the disfavored, nonseamless prior art, and it teaches only that method of creating a seamless array." *Id.* at 1344-45. Considering the patent in context, the court observed that a person of skill in the art "would not understand Lizardtech to have

invented a method for making a seamless DWT, except by" the method described in the specification. *Id*. at 1345. The court therefore held the broad claims invalid for failure to meet the written description requirement. *Id.* at 1346. The Federal Circuit quoted the Supreme Court's directive that "nothing can be more just and fair, both to the patentee and the public, that the former should understand, and correctly describe, just what he has invented, and for what he claims a patent." *Id.* (quoting *Merrill v. Yeomans*, 94 U.S. 568 (1876)).

Likewise, in this case, the '738 patent is directed solely to a CTA VCT. Every disclosed embodiment is CTA; no alternatives are taught or suggested. The patents incorporated by reference in the '738 patent directly reject OPA and/or stress CTA as an improvement over OPA. The person of ordinary skill in the art reading the '738 patent thus is led to the inescapable conclusion that the '738 patent is directed to a CTA system and not an OPA system. *See* Ex. 14, Kuhn I Decl. at ¶ 24. Read with the backdrop of the other cited BorgWarner patents, the '738 patent is another way to move the spool in a CTA system that further avoids engine oil pressure as much as possible.

If, as proposed by BorgWarner, the '738 patent claims cover OPA systems, that invention has not been "correctly describe[d]" in the specification. Such would be a classic case of "a broad claim [that] is invalid [because] the entirety of the specification clearly indicates that the invention is of a much narrower scope." *PIN/NIP*, 304 F.3d at 1248 (internal quotations omitted). Accordingly, if claims 10 and 11 are construed to cover OPA systems, they are invalid for failure to comply with the written description requirement of Section 112. *See*, *e.g*., *Lockwood*, 107 F.3d at 1572 ("One shows that one is 'in possession' of the invention by describing the invention, with all its claimed limitations, not that which makes it obvious."). An OPA system is not described in the '738 patent; to the contrary, it is collectively rejected.

2.     **BorgWarner's Later-Filed '725 Patent Demonstrates the Significant Modifications to Change the Disclosed CTA VCT Into An OPA System, and the '738 Patent Specification Has No Teaching or Suggestion of Such Modifications**

BorgWarner's own later-filed patent shows how different OPA systems are from CTA systems. BorgWarner's '725 patent is entitled "VCT System Utilizing Engine Oil Pressure For Actuation." The title itself clearly indicates that it is directed towards an OPA system in part. The '725 patent application was originally filed in September 1994, more than 16 months after the '738 patent was filed. The '725 patent discloses numerous modifications to previous VCT systems, such as the vane structure shown in the '804 patent and '738 patent. These modifications, which include re-routed hydraulic passages and new valve positions, are designed to permit engine oil pressure, rather than camshaft torque pulsations, to serve as the main energy source for actuation at certain times to create the phase shift. Ex. 14, Kuhn I Decl. at ¶ 26. The '738 patent neither discloses nor suggests any such modifications. Ex. 14, Kuhn I Decl. at ¶ 27.

In sum, the '725 patent confirms that the disclosure in the '738 patent is not directed to OPA systems.

3.     **The Supplying Step Was First Added During Prosecution, And BorgWarner Wants It Interpreted in a Way That Contradicts What the Original Specification Taught**

The "supplying step" was not found in original application claim 11 (which later became claim 10 of the '738 patent). BorgWarner made the following amendments to application claim 11 during prosecution when the PTO Examiner required BorgWarner to "amend the claims to a ***unified invention***" (emphasis added, the other pending claims were application claims 1-10) and to address certain obviousness concerns he had:

> 11.     (Amended)     In an internal combustion engine
> having a variable camshaft timing system for varying the phase

> angle of a camshaft relative to a crankshaft, a method of regulating the flow of hydraulic fluid <u>from a source to a means for transmitting rotary movement from said crankshaft to a housing, the method comprising the steps of:</u>
>
> . . . .
>
> <u>supplying hydraulic fluid from said source through said spool valve to a means for transmitting rotary movement to said camshaft, said spool valve selectively allowing and blocking flow of hydraulic [fluid] through an inlet line and return lines</u> . . . .

Ex. 11, Prelim. Amd., 11/23/93, p. 2.[9]

Compliance with the written description requirement is particularly important in considering such amendments:

> The written description requirement and its corollary, the new matter prohibition of 35 U.S.C. § 132, both serve to ensure that the patent applicant was in full possession of the claimed subject matter on the application filing date. When the applicant adds a claim or otherwise amends his specification after the original filing date, as Brandon did in this case, the new claims or other added material must find support in the original specification.

*TurboCare*, 264 F.3d at 1118.

The original application for the '738 patent only disclosed a CTA system, which changed the phase by cam torque pulsations, and purposely did not use oil flowing from the main engine oil gallery ("MOG") to change the phase.

Indeed, the original filing limited MOG oil to be used only to initially fill up the recesses and to provide make-up oil for leakage. And, even in those instances, the original

---

[9]    As outlined in Section III.A above, BorgWarner's amendments to claim 10 during prosecution transformed it from a claim directed to electronic control and moving a spool in a spool valve, to an overall method for changing the phase, including controlling the hydraulic flow to the actuating mechanism and transmitting rotary movement to the camshaft.

specification stated that oil flow from the MOG *bypassed the spool*.  Ex. 14, Kuhn I Decl. at ¶

18 (emphasis added).  The original filing could not be clearer that the spool valve did not

regulate oil flow from the MOG: "The flow of make-up oil *does not affect*, and is *not affected*

*by*, the operation of electromechanical actuator 201."  (Ex. 1 at 9:47-50, emphasis added).

Simply put, spool 200 sliding in spool valve body 198 of the '738 patent does not allow or

block oil flow from the MOG.[10]  Indeed, a bypass line 220a is connected directly to the inlet

line 182 to prevent any regulation of MOG oil.  *Id.* at 8:20-24.  This is shown in the portion of

Figure 19 reproduced below:



In short, the originally disclosed embodiments *specifically avoided* using the spool

valve for "selectively allowing and blocking flow of hydraulic [fluid] through an inlet line and

return lines," as recited in claim 10 as to fluid received from the MOG.

---

[10]    Claim 10 is directed to a series of steps for creating a phase change.  As part of
this method, the supplying step supplies the oil that makes the phase change occur.  The
very initial filling up the piston-cylinders/vane recesses or providing make-up oil for
leakage is not the flow that makes the phase change occur.  The camshaft torque
pulsations creates such flow.  Ex. 14, Kuhn I Decl. at ¶ 9.

Despite this clear teaching in the specification, BorgWarner's proposed claim interpretation covers precisely what the original disclosure rejected. In particular, BorgWarner now interprets "source" in claim 10 to be the MOG. To be consistent with the literal claim language, this means that the spool valve selectively allows and blocks flow from the MOG to the "means for transmitting rotary movement to the camshaft." That is entirely new matter, because the original disclosure not only failed to disclose such a step, it directly rejected it.

BorgWarner's proposed claim interpretation also seeks to cover an "inlet line" extending from the MOG to the spool valve, and return lines working on starkly different principles and oil flow from that disclosed in the specification. The original application does not support this interpretation. Specifically, the terms "inlet line" and "return lines" were added to claim 10 during prosecution as part of the "supplying" step.[11] The sole disclosure of "return lines" in the original application for changing phase are return lines 194,196 extending from the recesses/cylinders to spool valve 192. *See* Figures 19,20 and original claim 1. Ex. 14, Kuhn I Decl. at ¶ 15. The sole disclosure of the "inlet line" in the original application for changing the phase is one that extends between spool valve 192 and check valves 184,186, *not* from the MOG to the spool valve. *Id.*

Both *Gentry Gallery* and *PIN/NIP* involved situations where the patentee added claims during prosecution that were broader than the original disclosure. *Gentry Gallery*, 134 F.3d at 1479-81; *PIN/NIP*, 304 F.3d at 1247-48. BorgWarner's interpretation of the "supplying step" limitation that was added during prosecution even goes beyond these cases. BorgWarner's interpretation covers the spool valve allowing and blocking flow of oil from the MOG for

---

[11]     To be sure, original claim 1 recited (a) first and second return line means, each extending from one of the recesses (132a,132b) to the spool valve body (198), and (b) an inlet line means extending from the spool valve body to the recesses.

creating the phase shift.  But, the original specification expressly teaches that the spool valve does *not* allow and block the flow of MOG oil.  Further, the original specification taught that the invention used camshaft torque pulsations to change the phase, not engine oil pressure from the main engine oil circuit that BorgWarner's interpretation covers.  Consistent with being directed to a CTA system, the original specification further only disclosed an inlet line and return lines between the spool valve body and check valves to direct flow from one chamber to another in reaction to camshaft torque pulsations, rather than relying on pressurized oil flowing from the MOG to change the phase.

## V.     CONCLUSION

For each of the foregoing reasons, Hitachi respectfully requests that the Court grant summary judgment that claims 10 and 11 of the '738 patent are invalid for failure to satisfy the written description requirement under BorgWarner's interpretation of these claims.

ASHBY & GEDDES

*/s/ Tiffany Geyer Lydon*
_____
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Plaintiffs Hitachi, Ltd. and.*
*Hitachi Automotive Products (USA), Inc.*

*Of Counsel:*

Kenneth E. Krosin
Michael D. Kaminski
Pavan K. Agarwal
C. Edward Polk
Foley & Lardner LLP
3000 K Street, N.W., Suite 500
Washington, D.C. 20007–5109
(202) 672–5300

William J. Robinson
Foley & Lardner LLP
2029 Century Park East Blvd., Ste. 3500
Los Angeles, CA 90067-3021
(310) 277-2223

Dated: October 4, 2006
173876.1

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 4th day of October, 2006, the attached **PLAINTIFFS'**

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF**

**INVALIDITY FOR FAILURE TO MEET THE WRITTEN DESCRIPTION REQUIREMENT**

**OF 35 U.S.C. § 112 UNDER BORGWARNER'S PROPOSED CLAIM INTERPRETATION**

was served upon the following counsel of record in the manner indicated:

Richard K. Herrmann, Esquire                                    <u>HAND DELIVERY</u>
Morris, James, Hitchens & Williams LLP
222 Delaware Avenue, 10th Floor
P.O. Box 2306
Wilmington, DE  19801


Hugh A. Abrams, Esquire                                    <u>VIA FEDERAL EXPRESS</u>
Sidley Austin LLP
One South Dearborn Street
Chicago, IL  60603


                                        */s/ Tiffany Geyer Lydon*
                                        _____
                                        Tiffany Geyer Lydon

154486.1