

FIG. 19

According to BW and its expert, the components in the area circumscribed by the red line are "internal" to the VCT mechanism, BW Brief at 18, while the ends of the spool are somehow "external" to the VCT mechanism. *Id.* at 20. As noted above, BW did not make the same remarks in distinguishing Strauber as it did in distinguishing the '659 patent, which uses the DPCS approach. In sum, BW's prosecution remarks regarding Strauber simply had nothing to do with fluid pressure on the ends of the spool.

Moreover, contrary to BW's assertions, the intrinsic record contains several references to the term "VCT mechanism," that confirm Hitachi's view of this term. These include *several of BW's own prior art patents,* which show conclusively that a "VCT mechanism" is the camshaft-mounted vane (or piston-cylinder) structure with a flow path through the spool valve,

*not* including the MOG.[9]  For example, both U.S. Patent Nos. 5,218,935 and 5,184,578 (latter incorporated by reference in the background of the '738 patent) state that "[a] preferred embodiment of *a camshaft mounted hydraulic VCT mechanism* uses one or more radially extending vanes which are circumferentially fixed relative to the camshaft and which are receivable in cavities of a sprocket housing that is oscillatable on the camshaft." ('578 patent at 2:15-21 and '935 patent at 2:21-26) (emphasis added).[10]  All of these statements demonstrate that "VCT mechanism" is the camshaft mounted structure that is actuated (rotated) to change the phase.[11]  That simply is not true for the MOG.  Kuhn Declaration at ¶¶ 24-33.

No legitimate question exists that the person of ordinary skill in the art would plainly understand "VCT mechanism" to mean a *camshaft mounted* vane (or piston cylinder) structure that is actuated and rotated relative to the camshaft, and *not* the *MOG*.  Kuhn Decl. at ¶¶ 24-33.

As discussed above, this structure is exactly where the oil flows in the '738 patent to create a phase shift.  Moreover, in the same PTO response distinguishing Strauber, BW discussed the Linder prior art patent (Ex. 24), which discloses another CTA-type VCT.  In those remarks, BW stated that Linder's "VCT uses camshaft torque energy to alternately

---

[9]  In all of the embodiments in the '738 patent, the spool valve is located within the camshaft mounted vane housing structure.  That is, the entire spool valve is physically within the VCT mechanism.  *See, e.g.*, Figures 12 and 13 of the '738 patent.

[10]  The '935 patent goes on to describe a closed-loop control system "for a *VCT mechanism*" in which "[t]he *VCT mechanism is then actuated* by the stepper motor movement which changes its position relative to a crankshaft," "the control objective of the present invention is to have the *VCT mechanism at the phase angle* given by the set point 35 with the spool 100 stationary in its null position," "the *VCT mechanism is at the correct phase* and the phase rate of change is zero," and in the control algorithm "the *dynamic state of the VCT mechanism* is used to accomplish this result. ('935 patent at 4:1-11) (emphasis added).

[11]  Other BW patents incorporated by reference in to the '738 patent background are consistent with these kinds of statements.  *See* '023, patent, at 7:57-62; 8:7-12 (stating that, with one piston cylinder retracting while other piston cylinder extending, the variable camshaft timing mechanism causes camshaft to change phase relative to the crankshaft); '804 patent, at 8:63-68 and 9:13-18 (same).

pressurize two opposing chambers [7,8] in the *VCT mechanism*" and that an activating solenoid

must turn on and off "if the *mechanism is to actuate* to vary the phase of the camshaft." Ex. 12

at 4-5 (emphasis added).  Just like the VCT mechanism in the BW patents, the person of

ordinary skill in the art would readily recognize this to be the camshaft-mounted structure, not

the MOG.[12]  Kuhn Decl. at ¶¶ 29-31.[13]

    It is well established that prior art cited in a patent constitutes intrinsic evidence for

claim construction purposes.  *See, e.g.*, *V-Formation, Inc. v. Benetton Group SPA*, 401 F.3d

1307, 1311 (Fed. Cir. 2005) ("[P]rior art cited in a patent or cited in the prosecution history

of the patent constitutes intrinsic evidence"); *Kumar v. Ovonic Battery Co.*, 351 F.3d 1364,

1368 (Fed. Cir. 2003) (citing prior Federal Circuit cases supporting same).[14]  Recently, the

---

[12]  Several BW patents/publications not incorporated by reference also demonstrate BW's consistency in using the term "VCT mechanism" to refer to a camshaft mounted assembly.  *See* U.S. Patent No. 5,289,805 at 2:22-27 (listing Quinn as inventor and stating in Background of the Invention that a "preferred embodiment of a *camshaft mounted hydraulic VCT mechanism* uses one or more radially extending vanes which are circumferentially fixed relative to the camshaft and which are receivable in cavities of a sprocket housing that is oscillatable on the camshaft") (emphasis added); U.S. Patent No. 5,657,725 at 2:15-17 (stating in Summary of the Invention that "[t]he current invention addresses the problems previously discussed by using the engine oil pump pressure as one source of energy for *actuating the VCT mechanism*") (emphasis added); *id.* at 2:35-38 (stating, in Summary of the Invention, "[i]f the valve is moved in a direction opposite to that of the original movement, the pressurized and vented actuation elements are reversed, *causing a phase shift of the VCT mechanism*.") (emphasis added); *id.* at 2:60-67 (stating in Summary of the Invention that "[t]he VCT mechanism will shift toward the advanced position" or "[t]he VCT mechanism will shift towards the retard position in a similar manner" based on the movement of the control valve to direct flow); Butterfield, "*A Unique Approach to Design of a VCT Mechanism*" (discussing camshaft mounted VCT mechanism, Ex. 17).

[13]  BW's statement (Brief at 18) that "[w]ithout the spool valve and main oil gallery, variable camshaft timing could not be achieved" is completely disingenuous.  Without a camshaft, crankshaft, or a timing chain connecting the two, variable camshaft timing would not be achieved either.  That does not mean that those items are part of the "VCT mechanism."  The MOG does not rotate nor is it camshaft mounted and, thus, is not part of the "VCT mechanism."  Kuhn Declaration at ¶¶ 24-33.

[14]  Furthermore, "[w]hen prior art that sheds light on the meaning of a term is cited by the patentee, it can have particular value as a guide to the proper construction of the term, because

Federal Circuit also stated that incorporation by reference of another patent's disclosure "leads to the conclusion that the patentee's definition of the claim term . . . was intended to refer to the same structures" as in the incorporated disclosure. *Cook Biotech Inc. v. Acell Inc.*, 460 F.3d 1365, 1377-78 (Fed. Cir. 2006) (cited in BW's Brief at n.3).

It is not surprising that BW fails to cite a shred of documentary evidence supporting its asserted interpretation that the VCT mechanism includes the MOG. As is frequently the case in its Brief, BW's position is based almost exclusively on attorney argument, with citation to its expert's testimony. However, BW cannot use extrinsic evidence, such as expert testimony, to contradict the intrinsic record. *See Phillips*, 415 F.3d at 1318. BW's position on "VCT mechanism" should be rejected.

### 3. BW's Incorrect Construction Of "Variable Camshaft Timing System" [Preamble] Underscores Its Improper MOG "Source" Construction

BW's construction of this term, by which it tries to cover both CTA-type and OPA-type VCTs, completely disregards the intrinsic record. The specification states that the '738 patent is directed to a "system *of the type* in which the position of the camshaft is circumferentially varied relative to the position of a crankshaft *in reaction to torque reversals experienced by the camshaft during its normal operation*," *i.e.*, only a CTA-type VCT. '738 patent at 1:13-18 (emphasis added).[15] Not only does the '738 patent provide that the invention is a CTA VCT, but that the prior art VCT patents incorporated by reference into the '738 patent

---

it may indicate not only the meaning of the term to persons skilled in the art, but also that the patentee intended to adopt that meaning." *Arthur A. Collins, Inc. v. Northern Telecom Ltd.*, 216 F.3d 1042, 1045 (Fed. Cir. 2000).

[15] This statement is found in the Field of the Invention. The USPTO has stated that the Field of the Invention should be a "statement of the field of art to which the invention pertains" and further, that "the statement should be directed to the subject matter of the claimed invention." MPEP § 608.01(c)(1).

expressly reject OPA-type VCTs in favor of CTA-type VCTs.[16]    Such incorporation is

significant given BW's consistent reliance on material allegedly incorporated  into the '738

patent(e.g., Brief at 3).

BW also tries to avoid limiting its claims to CTA VCT systems by arguing that the

preamble of Claim 10 is not a limitation – notwithstanding the extensive prosecuting history

that demonstrates just the opposite, and particularly where BW amended the preamble to

overcome the PTO Examiner's obviousness rejections.[17]    *See* Hitachi's Opening Claim

Construction Brief (D.I. 264) at 13-15.    BW's amendments to the preamble provide the

antecedent basis for numerous limitations in the body of Claim 10.[18]    While BW would

---

[16]  For example, BW's prior art '023 patent states that: (i) BW's system does not require
external energy for its operation (1:47-60), (ii) engine oil "does not have to flow through the
main lubricating pump during the short interval in which the phase adjustment must take place"
(*id.*, at 2:27-30), and (iii) "the actuation rate of the variable camshaft timing arrangement is not
limited by the capacity of the engine oil pump" (*id.*, at 2:19-23 and 30-35).  *See also* '804
patent at 2:44-56; '578 patent at 1:52-60; '659 patent at 1:20-30 & 3:4-9.  Each statement
rejects OPA-type systems.  It should be noted that BW incorrectly contends that every aspect of
the four BW patents are incorporated by reference in the '738 patent for any possible purpose.
An incorporation by reference cannot be used to change the invention.  *See Modine Mfg. v.
ITC*, 75 F.3d 1545, 1553 (Fed. Cir. 1996), *abrogated on other grounds, Festo Corp. v.
Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 234 F.3d 558 (Fed. Cir. 2000) (en banc).
As otherwise discussed in this brief, BW's reliance on selective statements from the prior BW
patents to contradict the '738 patent disclosure is an obvious attempt to change the invention of
the '738 patent to cover the accused device.  Hitachi's reference to the prior BW patents is
entirely consistent with the '738 patent disclosure.

[17]  For example, BW amended the preamble to recite "regulating" oil flow from a "source" to
create a phase change and the supplying step in the body of Claim 10 refers back to "said
source" (*i.e.*, "supplying hydraulic fluid from said source").  BW also argued repeatedly to the
PTO that Claim 10 distinguished over the Strauber reference, an argument tied to the
"regulating the flow of oil" terminology in the preamble.  *See* Response of 6/30/94 at 4;
Response of 11/7/94 at 3; Appeal Brief of 5/24/95 at 8.

[18]  BW's reliance on *Schumer v. Laboratory Computer Systems, Inc.*, 308 F.3d 1304 (Fed. Cir.
2002) and *Intirtool, Ltd. v. Texar Corp.*, 369 F.3d 1289 (Fed. Cir. 2004) is unavailing.  Neither
case involved recitations in the claim body referring back to terms in the preamble.  Neither
case involved a clear prosecution record showing that amendments were made to intertwine the
body and preamble so that both recited the invention, as well as clear prosecution remarks
directed to controlling oil flow to distinguish the prior art (matching the preamble recitation

obviously like to, it cannot simply disregard these amendments and statements made to secure allowance of the '738 patent. The preamble of Claim 10 is a substantive claim limitation.

Further, BW's own interpretation of the preamble belies its argument that "[t]he body of Claim 10 [] specifies all of the limitations of the claimed method." BW Brief at 13. For example, the phrase "means for transmitting rotary movement from said crankshaft to said housing" was specifically added to the preamble during prosecution. BW interprets this limitation to include numerous components not recited in the body of the claim, such as the camshaft sprocket, crankshaft sprocket and timing chain or belt. Thus, the preamble is not merely redundant to the body of the claim, as BW argues.

BW also asserts that Claim 10 should not be limited to a CTA-type VCT based upon claim differentiation. Many reasons exist why claim differentiation – "a guide, not a rigid rule" – is not applicable here. *Curtiss Wright*, 438 F.3d at 1381. *First*, "claim drafters can use different words to cover the exact same subject matter." *Id.* at 1380 (citing *Tandon Corp. v. ITC*, 831 F.2d 1017, 1023 (Fed. Cir. 1987)). *Second*, Hitachi's interpretation of Claim 10 does not render Claim 1 redundant because Claim 1 contains limitations not found in Claim 10 (Claim 10 covers a method, while Claim 1 covers an apparatus and has features not found in Claim 10). This counsels against applying claim differentiation. *See Mycogen Plant Science, Inc. v. Monsanto Corp.*, 243 F.3d 1316, 1329 (Fed. Cir. 2001). *Third*, the intrinsic record trumps claim differentiation; claim differentiation cannot be used to broaden a claim beyond

---

"regulating the flow of oil . . .") In contrast to the present case, in *Intirtool*, the Court stated that the prosecution history did not show "clear reliance specifically on the preamble, rather than on the structural limitations set forth in the body." 369 F.3d at 1295. BW's citation to *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1371-72 (Fed. Cir. 2003) also is inapposite. The Court in *Altiris* never addressed any argument pertaining to the claim body having an antecedent basis in the preamble. The issue in *Altiris* was whether the preamble required a particular order of steps. Nothing like the present intrinsic evidence existed in *Altiris*.

the specification and prosecution history. *Tandon*, 831 F.2d at 1024; *Seachange*, 413 F.3d at 1368-75. *Fourth*, Claims 1 and 10 both must be directed to a CTA-type VCT because BW amended its claims during prosecution to cover a "unified invention" (see Preliminary Amendment and Examiner Interview Summary, Ex. 10) and repeatedly distinguished Strauber's OPA-type VCT during prosecution.

### 4.    BW's Incorrect Construction Of "Inlet Line" [Step 4b] Underscores Its Improper MOG "Source" Construction

As part of its effort to improperly construe "source" as including the MOG, BW tortures the definition of "inlet line" as a "line or conduit that allows passage of fluid *from the source* through the spool valve." (emphasis added). BW's Brief at 34.



If MOG 230 is the "source," however, its oil flow would be selectively allowed and blocked by the spool valve (i.e., spool 200 in spool valve body 198). The '738 patent, however, expressly states that oil flow from MOG 230 is *not* regulated in this way: "Inlet line 182 receives its pressurized fluid (engine oil) directly from main oil gallery ("MOG") 230 of the engine by way of conduit 230a, *bypassing vented spool 200*," and during a phase shift, "[t]he flow of make-up oil [from the MOG] *does not affect*, and is *not affected by*, the operation

of electromechanical actuator 201." '738 patent at 7:35-38, 9:47-50. These statements confirm

that MOG oil is used strictly for initially filling the vane chambers and make-up oil, and does

not create the phase change. Kuhn Decl. at ¶¶ 34-37. In short, oil from MOG 230 is not a

regulated flow in creating the phase change.[19]

### 5. BW's Incorrect Rewriting Of "Allowing" and "Blocking" [Step 4c] Underscores Its Improper MOG "Source" Construction

As part of its attempt to force together jigsaw puzzle pieces relative to "source" that

will never fit, BW rewrites Step 4c. Step 4c reads "said spool valve selectively allowing **AND**

blocking the flow of hydraulic fluid though and inlet and return lines;" (emphasis added)."

BW's proposed construction changes this to read "allowing **OR** blocking" (emphasis added;

BW's Brief at 33-34). While the difference at first blush may seem subtle, it is not. Changing

"and" to "or" allows BW to argue that the spool valve "allows" the MOG fluid to pass through

the valve at start-up and then later selectively "blocks" the fluid in the recesses as it passes back

and forth between the recesses as the timing is adjusted. The word "and" requires that the

spool valve both allow *and block* oil flow through the inlet line, which is exactly how the

preferred embodiment works. With the MOG defined as the "source" and the "inlet line"

extending between the MOG and spool valve, the spool valve never blocks this external oil

flow. For this reason, BW is forced to interpret the phrase "and blocking" out of the claim

language by arguing that "the valve 'selectively allows' fluid flow." Claims must be grounded

---

[19] BW also criticizes (Brief at 34) Hitachi's supposed "exact location" of the inlet and return lines "between a vane recess and the spool valve body." Hitachi's interpretation simply calls for the three lines to extend between the spool valve and "means for transmitting," consistent with the intrinsic record, including: (i) the '738 patent being directed to a CTA VCT, (ii) claims 1 and 10 being directed to a "unified invention," and (iii) the "supplying" step of Claim 10 reciting these terms being added during prosecution and needing support in the original specification. Noticeably, BW fails to cite anywhere in the specification where the "inlet line" and "return lines" are described or suggested as different from Hitachi's interpretation.

in the intrinsic record. *Curtiss Wright*, 438 F.3d at 1381; *On Demand*, 442 F.3d at 1340

(holding that claims cannot be broader than the invention described in the specification).

Furthermore, BW's interpretation is refuted by the prosecution history. As originally

filed, Claim 10 (original Application Claim 11) used the word "or" instead of the word "and."

Through a series of amendments aimed at bringing the claims to a "unified invention,"

however, BW removed the word "or" and inserted the word "and," as depicted in the following

chart:

| Original Claim 10 (Application Claim 11) | said controlling step utilizing an electromechanical actuator to vary the position of said vented spool whereby allowing *or preventing* flow of hydraulic fluid through said valve body |
|---|---|
| Preliminary Amendment dated 11/23/93 | said spool valve selectively allowing *or blocking* flow of hydraulic (sic) through an inlet line and through return lines |
| Amendment dated 6/30/94 | said spool valve selectively allowing *and blocking* flow of hydraulic fluid through an inlet line and through return lines |

Having changed the word "or" to "and" during prosecution, Claim 10 cannot now be

broadened as urged by BW. Rather, Hitachi's construction, with the "source" defined as fluid

already in the vane recesses (or piston cylinders) is the only interpretation that allows the spool

valve to selectively allow *and block* fluid flow through the inlet and return lines. Indeed,

Hitachi's interpretation is consistent with the entire intrinsic record.[20]   Furthermore, BW's

attempt to read "and" out of Claim 10 is improper, given the express claim language. *See, e.g.,*

*SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 885-88 (Fed. Cir. 2004) (stating that

---

[20]   In addition to all the evidence outlined above and in Hitachi's Opening Claim Construction Brief, the '738 Abstract is quite instructive: "The camshaft tends to change in reaction to pulses which it experiences during its normal operation, and it is permitted to change only in a given direction, either to advance or retard, *by selectively blocking or permitting the flow of hydraulic fluid*, preferably engine oil, through the return lines (194, 196) *from the recesses* by controlling the position of a vented spool (200) within a valve body (198) of a control valve (192)." The

in a claim, the term "and" "connotes a conjunctive list" and refusing to interpret "and" as "or" where patentee was not precluded from using "or" when drafting the claim).

**B.    BW's Constructions Of The "Means" Terms Are Incorrect**

**1.    BW's Attempt To Exclude The Check Valves And Other Elements From The "Means For Transmitting Rotary Movement To Said Camshaft" [Step 4b] Is Improper**

For the same reason that it contends that the MOG is the "source," BW contends that the check valves, camshaft torque pulsations, and the piston-cylinder structure is *not* included in the "means for transmitting rotary movement to said camshaft." These elements should be included, however, because they are essential in the disclosed embodiments for carrying out the function of rotating the camshaft. Section 112, ¶ 6, requires that the focus be on what is disclosed in the specification for performing the recited function. Thus, means-plus-function limitations under this section "shall be construed to cover the corresponding structure ... *described in the specification* and equivalents thereof." (emphasis added). The Federal Circuit has made clear that this is done by "look[ing] to the specification and identifying the corresponding structure for that function."[21]    This is the lynchpin of means-plus-function claims. The structure corresponding to the function "must be disclosed in the specification." *Medical Instr.*, 344 F.3d at 1220.

The "corresponding structure" for a means-plus-function limitation does *not* include alternative structures that could be used to carry out the function, but that are *not* actually

---

Abstract thus demonstrates that the regulated oil flow is from the vane recesses (or piston-cylinder), not the MOG.

[21]  *Medical Instr. and Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1210 (Fed. Cir. 2003); *J&M Corp. v. Harley Davidson, Inc.*, 269 F.3d 1360, 1367 (Fed. Cir. 2001) (stating that "[t]he literal scope of a properly construed means-plus-function limitation does not extend to all means for performing a certain function. Rather, the scope of such claim language is sharply limited to the structure disclosed in the specification and its equivalents").

disclosed in the patent specification and linked to carrying out the function.[22]  This is *precisely* what Hitachi has done in interpreting this claim element.  In contrast, BW argues in the abstract what might be possible, which is wrong.

*First*, regarding the use of camshaft torque pulsations for creating a phase change, the '738 patent specification states that "vane 160 is alternatingly urged in clockwise and counterclockwise directions by the torque pulsations in the camshaft 126 and *these torque pulsations tend to oscillate vane 160, and, thus, camshaft 126, relative to sprocket 132*." '738 patent at 9:7-10 (emphasis added).  Thus, camshaft torque pulsations are an *essential part* of the disclosed embodiment for carrying out the function of rotating the camshaft, and the embodiments disclosed in the '738 patent would not work without them.  Kuhn Decl. at 38-51.  BW's own expert admits that torque pulsations are a "feature of the preferred embodiment," Ribbens Expert Report at 20 and 37, but nevertheless asserts that torque pulsations are not part of Claim 10 because "other unasserted claims in the patent are specifically addressed to this feature of the preferred embodiment."  In essence, Dr. Ribbens' opinion argues claim differentiation, which has nothing to do with identifying the corresponding structure in the '738 patent specification that transmits rotary movement to the camshaft.

*Second*, check valves 184,186 also are a critical part of the disclosed structure for rotating the camshaft due to the internal oil circuit described in the '738 patent.  Kuhn Decl. at 38-51.  They are part of the actual "corresponding structure" that carries out the function.  BW's expert does not dispute that, for the disclosed embodiment, check valves are necessary.[23]

---

[22]  *Cross Medical Prods, Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1303-1304 (Fed. Cir. 2005) (rejecting inclusion of alternative, but undisclosed structure, for carrying out function as part of corresponding structure).

[23]  Ribbens' Report at 37 (stating that a person of ordinary skill in the art "would recognize that the check valves are only a feature of the specific embodiments of the present invention").

The '738 patent shows (Fig. 19) and describes (9:7-31) the interaction between check valves 184,186 and torque pulsations to control the flow within the internal oil circuit and, thereby, rotate the camshaft relative to the crankshaft. Kuhn Declaration at ¶¶ 38-51. In addition, the incorporated '023 patent (which the '738 patent relies upon for explaining the piston-cylinder embodiment, at 5:57-61) provides even greater detail on the interaction of the check valves and torque pulsations. *See, e.g.*, '023 patent Figures 12 & 13.[24] In light of this, BW's assertion (Brief at 33) that Hitachi's construction is "improper" because it is some sort of "attempt by Hitachi to further restrict the relevant function under the guise of corresponding structure" is utterly specious.

In addition, BW's prosecution disclaimer *excludes* systems that control oil flow internal and external to the VCT mechanism to change the phase (*e.g.*, OPA systems).[25] As explained in detail above, BW clearly and unmistakable disclaimed VCT systems that control oil flow both internal and external to the VCT mechanism based on its arguments over the prior art Strauber patent. As such, the corresponding structure for the "means for transmitting rotary movement to said camshaft" cannot cover such systems.

---

BW's expert goes on to argue that check valves are not "fundamentally required for the transmission of rotary movement to the camshaft," *i.e.*, suggesting that other structures could be used. This statement does not change *what the specification teaches* as structure for carrying out the function, which is the proper focus for Section 112, ¶ 6. *See J&M Corp.*, *Medical Instr.*, and *Medical Products*.

[24] BW's expert also opines that there are other systems that do not require check valves. This is irrelevant. There is no question that the check valves are a *required* feature of both embodiments *disclosed* in the '738 patent to make the camshaft rotate.

[25] Both the corresponding structure can be limited by disclaimer, as well as the range of equivalents under 35 U.S.C. § 112, ¶ 6. *See J&M Corp.*, 269 F.3d at 1367-68 (finding that intrinsic record demonstrated that a single clamp structure cannot be an equivalent under § 112, ¶ 6 to the corresponding structure that was a dual clamp structure); *Signtech USA v. Vutek, Inc.*, 174 F.3d 1352, 1357-58 (Fed. Cir. 1999) (holding that a means-plus-function limitation did not cover structure disclaimed in the specification).

*Third*, relative to the piston-cylinder structure, BW's entire justification for excluding a preferred embodiment (the piston-cylinder structure shown in Figures 1-9), is based on its interpretation of "housing," discussed *infra*. BW's plain attempt to exclude certain prior art cited in this case by Hitachi should be rejected.

### 2. BW's Attempt To Include "Housing" In The "Means For Transmitting Rotary Movement From Said Crankshaft To Said Housing" [Preamble] Is Improper

BW improperly attempts to include "housing" as part of the corresponding structure for the "means for transmitting rotary movement from said crankshaft to said housing." The "housing" cannot properly be part of the structure because the claim expressly requires that rotary movement be transmitted from the crankshaft *to the housing*. As a matter of logic, it would be inconsistent with this language to include the housing as part of the structure that transmits rotary movement *to the housing*. *See* Kuhn Declaration at ¶¶ 52-53 (opining that a skilled artisan would not include the "housing" as part of the required structure).

Limitations written in means-plus-function format are strictly interpreted according to Section 112, ¶ 6. The term "means" is a short-hand way to refer to the corresponding structure that carries out the function. This corresponding structure cannot include the components being acted upon as part of the function itself.[26] *O.I. Corp. v. Tekmar Co.*, 115 F.3d 1576, 1581 (Fed. Cir. 1997). Accordingly, the "housing" – a structure being acted upon by the "means" – cannot be part of the corresponding structure.

---

[26] Hitachi recognizes that its interpretation of this phrase results in a claim limitation that does not match the intrinsic evidence. That is the subject of Hitachi's separate motion for invalidity under 35 U.S.C. § 112, ¶ 1 (D.I. 272). However, Hitachi's interpretation is based on the express claim language and the strictures of the statute for interpreting means-plus-function claims. When only one reasonable interpretation exists, it must be followed. *Process Control Corp. v. HydReclaim Corp.*, 190 F.3d 1350, 1357 (Fed. Cir. 1999).

**C.    BW Improperly Excludes The Piston-Cylinder Embodiment From
Its Construction Of "Housing" [Preamble]**

In an effort to avoid prior art, BW limits "housing" to the vane embodiment of Figures

10-20 disclosed in the '738 patent, excluding the embodiment of Figures 1-9.  Hitachi's

definition of "housing" includes both embodiments in the '738 patent.  BW's ostensible

justification for its interpretation is that the specification describes the vane embodiment

structure as a "housing," but not the piston-cylinder embodiment.[27]  The real reason, of course,

is to avoid the prior art.

BW is factually wrong, however.  In discussing the piston-cylinder embodiment, the

'738 patent specification states that "[t]he sprocket 30 has an arcuate hydraulic body 46 bolted

thereto and the hydraulic body 46, which *houses certain of the hydraulic components of the*

*associated hydraulic control system*."  '738 patent at 5:38-45 (emphasis added).   This

component houses the piston-cylinders, check valves, *etc.  See* Figures 7-9.  Simply put, there

is no basis for excluding the opposed-piston embodiment from Claim 10, or for BW's assertion

that the specification "never uses" the term to refer to the piston cylinder system (Brief at 22).

**D.    BW's Attempt to Rewrite The Single "Calculating" Step [Step 2a]
Into Two Separate Calculations Should Be Rejected**

Claim 10 recites as its second step "*calculating a relative phase angle* between said

camshaft and said crankshaft, said calculating step using an engine control unit for processing

information obtained from said sensing step, said engine control unit further issuing a electrical

signal corresponding to *said phase angle*" (emphasis added).  BW agrees that "said phase

---

[27]  BW never properly explains its justification for limiting this particular term to only one of
the embodiments, based simply on the express use of the term "housing" for one of them, but
then arguing that numerous other terms are not limited by the specification.

angle" in this step refers to the *desired* relative phase angle.[28]  Thus, to be definite under 35 U.S.C. § 112, ¶ 2 and consistent with "said phase angle," the term "calculating a relative phase angle" in the claim must mean calculating a *desired* relative phase angle.[29]

Disregarding the *plain claim words*, and its own admission as to what angle is "said phase angle," BW's construction of "calculating *a* relative phase angle" requires *two separate and distinct* calculations, *i.e.*, (1) calculating a *current* phase angle and (2) calculating a *desired* phase angle, where the two calculations are carried out entirely independently from one another.  There is no basis, however for BW's injection of a second calculating step into Claim 10.  As the Federal Circuit has explained, "we do not permit courts to redraft claims."  *Process Control*, 190 F.3d at 1357.

BW's attempt to justify its "two-step" calculation on the assertion that such "determinations are described in the '578 patent" is sheer sophistry.  As discussed in Hitachi's Claim Construction Brief, the '738 specification provides no guidance whatsoever for the claimed calculation, stating merely that the "ECU receives signals from sensors corresponding to camshaft and crankshaft positions and utilizes this information to calculate a relative phase angle" (3:10-13).  The "calculation" is never again mentioned, much less explained.[30]  While

---

[28]  BW's Claim Construction states that the "[ECU] outputs an electronic signal with information representing or designed to lead to the *desired (or target)* relative camshaft phase angle."  Joint Claim Construction Statement (emphasis added).  As BW fully recognizes, sending a signal from the ECU corresponding to the *present* phase angle between the camshaft and crankshaft would be meaningless, because the VCT would not change its angle.  The purpose of the VCT is to change the phase angle to a desired phase angle that provides the best engine performance.  Livernois Decl. at ¶¶ 9-11.

[29]  Section 112, ¶ 2 provides that "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."  The reference to "said phase angle" must have antecedent basis in the claim.

[30]  The written description in the '738 patent also does not identify the camshaft and crankshaft sensors.  While Fig. 19 shows elements 207a and 207b, the written description does not discuss them.

'738 patent references the prior art '578 patent for details of the "closed loop feedback system" ('738 patent at 3:14), the '578 patent does not confirm which relative angle – present or desired – must be meant in the calculating step of Claim 10 of the '738 patent.  So there are no "determinations" in the '578 patent that justify the two-step calculation.  BW's lengthy, but citation-free, discussion at p. 4 of its Brief of how the ECU works and how the "map" is programmed by the manufacturers is simply what BW wished the '578 patent described.  The entire disclosure of the '578 patent relative to any "map" is "[a] predetermined set point dictates the desired camshaft phase angle for certain engine performance criteria" ('578 patent at 2:10).  There is *nothing* in the '578 patent that describes that set point, much less an entire "map" of set points.

Accordingly, BW's construction should be rejected in favor of Hitachi's construction, which follows the plain claim words and is consistent with the specification, including the reference to the '578 patent.  *See* Livernois Decl. at ¶¶ 8-11.  While BW attacks Hitachi's construction as incomplete (Brief at 23), that construction is as complete as BW's actual, and not wished-for, disclosure.

### E.    BW's "Vented Spool" Construction [Step 3a] Is Completely Improper

BW's revisionist approach to claim construction extends even to the simplest mechanical aspect of the system: the spool valve.  At the outset, the valve gets its name because it has a part that looks like an empty thread spool sliding inside a cylinder.  The sliding part is the "spool" and the cylinder in which it slides is the "body."  The combination of the spool and body form the valve.

Notwithstanding this simple structure, BW tries to change the actual recitation "vented spool" into "vented spool *valve*" so that it can improperly expand its claims.  This construction

is improper for two reasons:  (a) it equates "spool" and "spool valve"; and (b) it places the vent anywhere in the valve, rather than in the spool.

Regarding the difference between "spool" and "spool valve," Claim 10 recites controlling the position of "a vented spool" that is "slidably positioned *in a spool valve body*" and an electromechanical actuator varying the position of the "vented spool."  Moreover, the specification repeatedly refers to "vented spool 200" as the moving piece within body 198. '738 patent at 7:19-21, 31-33; 46-48, and 51-53; Abstract.   The "spool valve" is the *combination* of the "spool" and "spool valve body."   Therefore, "spool" *cannot* be simply replaced with "spool valve" as BW repeatedly suggests.[31]  The plain claim words require the *spool* to be vented, *i.e.*, have a passage.  *See* BW Brief at 25, n. 15.[32]

Regarding the "vent" aspect in the spool, the specification confirms the plain claim words, showing a vent 198d *in spool 200*.  Even BW's selectively cropped statement at column 8, lines 23-27 of the specification supports Hitachi's proposed interpretation.  According to this statement, the purpose of venting the spool is to relieve pressure on the ends of the spool. This is achieved "via vent 198d," *i.e.*, the structure is a vent *in the spool*.  Further, in its Japanese counterpart application to the '738 patent, BW confirmed that a vented spool is a spool with an exhaust hole:  "The present invention provides an improved method and apparatus for controlling the position of a spool having an exhaust hole or a liquid exhausting spool (*vented*

---

[31] If BW's interpretation were accepted (*i.e.*, spool being the same as spool valve), the claim term "supplying hydraulic fluid from said source through said spool valve" would mean that fluid is supplied through the spool itself.  No such disclosure in the '738 patent supports such a position.

[32] Moreover, having a passage through the spool ensures that both ends of the spool are at the same pressure at all times.  Simply having an opening in the spool valve body means that one end of the spool can be at a different pressure than the other end.  Kuhn Decl. at ¶¶ 56-59.

*spool*), in a hydraulic control valve."[33]    As such, BW's assertion that Hitachi's proposed construction "does not comport with the intrinsic evidence" is simply nonsense.

Additionally, BW's construction, which places the "vent" merely somewhere in the valve structure, rather than in the spool itself, fails to account for the numerous specification statements stressing that the oil pressure has no effect on spool movement and that spool position depends *only* on armature force and spring force. *See* '738 patent at 8:9-15; 29 and 60-66. BW's Brief at 19 stresses these statements as reflecting the '738 invention.

Hitachi's claim construction, which places the vent in the spool, captures the direct specification statements – a control system that is "completely independent" of hydraulic pressure and a system with "the oil pressure variable eliminated."[34]    Hitachi's claim construction simply means that no oil pressure influence is on the ends of the spool. Hitachi's argument is also consistent with the prosecution history, particularly, BW's arguments regarding entirely avoiding engine oil pressure in arguing patentability over a prior art reference to Hendrixon (U.S. Patent No. 5,000,420). BW described how engine oil pressure acts on the spool to counteract the force of the solenoid on the spool. BW stated that "Given the presence of engine oil [on the face of the spool], the Hendrixon *et al.* invention could not have expected the problems caused by a VCT system dependent upon engine oil pressure." (*See* Appeal Brief, p. 10; Hitachi Opening Brief Ex. 14). In view of this, it is outlandish for BW to assert

---

[33] Ex. 25, Japanese Patent Application Publication No. 6-346707, paragraph [0014] (emphasis added). A patentee's statements in prosecuting counterpart foreign patent applications are quite relevant to claim construction. *See Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1374 (Fed. Cir. 2005).

[34] The specification statements constitute a clear disclaimer. *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001). Moreover, even aside from a disclaimer, "when the scope of the invention is clearly stated in the specification, and is described as the advantage and distinction of the invention, it is not necessary to disavow

(Brief at 26) that "there is no claim language or intrinsic evidence that supports Hitachi's construction."

BW's assertion that Hitachi's construction "could" exclude all of the embodiments (Brief at 27) completely fails in light of the specification, which shows the vent in the spool itself and which discuses, as cited at p. 19 of BW's Brief, how oil pressure in the cavity is relieved, leaving *only* the forces of the armature and spring on the spool to affect movement of the spool. Hitachi's construction is consistent with the embodiments.

**F.    BW's Construction Of The Solenoid Terms Is Erroneous**

    **1.    BW's Construction Of "Variable Force Solenoid" [Step 3c]
        Is Completely Inconsistent With The Intrinsic Evidence**

        **a.    The PWM Issue**

The primary issue relative to "Variable Force Solenoid" ("VFS") is whether it can be driven by a pulse width modulation ("PWM") signal.  As discussed in Hitachi's Claim Construction Brief, the '738 patent stressed that the VFS had advantages over a "PWM solenoid" ('738 patent at 3:37),[35] including being driven by a current control signal from the ECU, so that "the position of spool [was] readily ascertainable based on solenoid current alone"

---

explicitly a different scope." *On Demand*, 442 F.3d at 1331.  Indeed, "[c]laims cannot be of broader scope than the invention set forth in the specification." *Id.*

[35] The patent describes how PWM solenoids have particular problems, including asserting that such solenoids have complete or full cycles, and says that a variable force solenoid solves them (*see* col. 2-3).  Nothing in the specification suggests using a PWM driving signal.  Thus, a variable force solenoid cannot be a PWM solenoid, and "variable force solenoid" in the claims must be interpreted accordingly.  *See SciMed*, 242 F.3d at 1341 (stating that claims must be construed appropriately when the specification makes clear that a particular structure is the invention, even if "the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question").

('738 patent at 8:33-35). Hitachi's construction excludes solenoids driven by PWM signals (and requires that the control signal be a current signal[36]).

Notwithstanding what its patent states, BW boldly asserts (Brief at 30) – with no citation to any intrinsic evidence -- that VFS include solenoids with PWM pulse inputs ("[T]he preferred embodiment[] of the … '738 patent[] … use[s] solenoids that are driven by PWM *input* signals.) BW also argues (Brief at 29) that a "PWM solenoid" really has nothing to do with the input signal and instead only refers to the "PWM" *output* and cycling through its full stroke.

BW's attempt to obfuscate should be rejected, particularly its reference to a "PWM output." An *input* signal[37] is applied to the two ends of a solenoid coil (a mere coil of wire), and a magnetic field is produced by that coil that acts upon an armature. The defining characteristic of a "*PWM* solenoid" is that it uses a PWM *driving* signal. Livernois Decl. at ¶¶ 12-27. The PWM pulse is the *input* driving signal that causes the solenoid to cycle. Livernois Decl. at ¶¶ 12-27. The '738 patent is consistent. In discussing PWM solenoids, the patent refers to the "PWM duty cycle" (2:45-46) and states that the "solenoid cycles through its full stroke with every *PWM pulse*." *Id.* at 2:50-51. In sum, there can be no legitimate debate that

---

[36] The current control aspect is based on the description of the "control signal" (the signal sent from the ECU that drives the solenoid) as being solenoid current. '738 patent at 3:19-21. It is also based on the disclaimer in the patent that "[t]he use of a variable force solenoid armature only travels a short distance, as controlled by current from the ECU, as opposed to complete cycles which result from the use of a PWM solenoid." (Id. at 3:34-37; emphasis added). As understood by the person of ordinary skill in the art, BW's disclaimer was directed to the input driving signal. Livernois Decl. at ¶¶ 12-27.

[37] As BW admits, in the prior art patents being distinguished, U.S. Patents No. 5,184,578 and No. 5,172,659, their discussions as to PWM and duty cycles refer to the *input* driving signal. *See* BW's Brief at p. 30; 31, n. 18.

(1) "PWM" in the patent refers to an input signal and (2) the VFS in the '738 patent does not use an PWM signal.

The '738 patent directly disclaimed PWM solenoids from VFS solenoids.    The Summary of the Invention in the patent states that "[t]he use of a *variable force solenoid* armature only travels a short distance, as controlled by current from the ECU, *as opposed to* complete cycles which result from the use of a *PWM solenoid.*"   (*Id.* at 3:34-37; emphasis added).   It also equates control signal with solenoid current.   '738 patent at 3:19-20.   These statements clearly would be understood by the person of ordinary skill in the art as referring to using current control as the driving signal for the inventive variable force solenoid.   Livernois Decl. at ¶¶ 12-27.

BW apparently recognizes that a disclaimer occurred, as it tries to limit the effect by focusing on the "as opposed to complete cycles" language.   Thus, its VFS construction states that "the solenoid does not, in normal operation, cycle through its *full stroke with every PWM pulse.*"   By this language, BW attempts to somehow limit the disclaimer to a particular subclass of PWM solenoids (*e.g.*, those that cycle through their full stroke with every pulse).

The problem with BW's approach, however, is that if the second part of the statement is a disclaimer, the first part of the statement (defining how the variable force solenoid works differently from the PWM solenoid) should be part of the same disclaimer.   Moreover, as noted *supra*, the '738 patent distinguishes over PWM solenoids, and BW's attempt to somehow limit the disclaimer to a particular subclass of PWM solenoids (*e.g.*, those that cycle through their full stroke with every pulse) must fail.   *See Atofina v. Great Lakes Chemical Corp.*, 441 F.3d 991, 997-98 (Fed. Cir. 2006) (rejecting patentee's argument that its disclaimer of metal oxides

should be limited to a particular subclass of metal oxides because that is all the prior art at issue showed).

BW also tries to justify its construction by relying on the statement in the Summary in the '738 patent that the "preferred embodiment employs a closed loop feedback system, such as shown in U.S. Patent No. 5,184,578, which corrects for any phase angle error." *Id.* at 3:13-16. BW's Brief at 30. BW's argument is wrong for many reasons.

*First*, the PWM solenoid is not part of the "closed loop feedback system," as the following part of Fig. 11 of the '578 patent (below) readily shows.



The specification states that block 108 is a "closed loop feedback system" and block 106 is a solenoid "preferably of the pulse width modulated [PWM] type." '578 patent at 7:21-25. The '578 patent also shows that when BW wants to identify a PWM solenoid, it knows how to do so.

*Second*, the quoted statement at issue is found immediately before the clear statements that the VFS uses current control. *See* col. 3. Therefore, BW's interpretation requires that statements in the Summary be read to contradict one another. The quoted statement is readily understood in context, *i.e.*, closed loop feedback control refers to processing the information from the crankshaft and camshaft sensors and the desired relative phase angle to determine the appropriate control signal. Livernois Decl. at ¶¶ 12-27. By contrast, the type of solenoid,

PWM or VFS, determines the format of the control signal, PWM or current control, to drive the solenoid.  *See* '738 patent at 3:34-37; *see also* Livernois Decl. at ¶¶ 12-27.

*Third*, if using PWM was really the preferred embodiment in the '738 patent, as BW suggests, it would only make sense that the detailed description of the preferred embodiments mention PWM for the inventive solenoid.  The '738 detailed description, however, nowhere mentions using PWM to drive the solenoid; instead, every reference is consistent with non-PWM (current) control.[38]  Livernois Decl. at ¶¶ 12-27.

### b.    The Proportionality Issue

BW's proffered construction also states that the variable force solenoid "allows a proportional output, or movement of the armature, that can vary continuously."  BW's explanation on pages 28-29 of its Brief does not clarify whether "movement of the armature" also is proportional to the input.  To the extent that BW's construction reads out the proportionality requirement, it is completely erroneous.  The intrinsic record dictates that the variable force solenoid have an output proportional to its input.  *See generally* '738 patent at 7:51-53; 8:31-36.

### 2.    BW's Construction of "Connected" [Claim 11] Is Disconnected From The Intrinsic And Extrinsic Evidence

Claim 11 states that the armature is "connected to said spool."  BW's proffered construction of "connected" as not requiring physical attachment is wrong for several reasons.  *First*, BW's own cited ordinary meanings undercut its position.  BW argues that the ordinary meaning of "connected" is "to join, fasten, or link together usu[ally] by means of something intervening."  BW's Brief at 37.  To "join" or "fasten" two physical objects means to physically

---

[38]  By contrast, the '578 and '659 patents repeatedly discuss PWM and varying the duty cycle of the input driving signal to the solenoid.

attach them.  A "link" for two physical objects is no different.  Claim 11 refers to a structural relationship between the armature and spool, not a functional relationship, as BW's interpretation suggests.

*Second*, even if one accepts BW's argument that the spool and armature are not physically attached in one embodiment in the specification, the specification differentiates between physical objects that are "connected" and objects that "bear against."  *Compare* '738 patent at 7:46-47 (stating for Figure 19 that armature "bears against" spool) *with* 8:54-55 (stating for Figure 20 that lever arrangement 201e "connects" armature 201b with spool extension 200c).  Although the specification describes two separate embodiments ("connected" and "bears against"), BW claimed only one, *i.e.*, "connected."

At no time does the specification refer to a structure in which the armature bears against the spool as being "connected."  It only refers to the structures as being connected where they are physically attached.  This difference in wording is very significant.[39]  As such, the term "connected" cannot be interpreted to mean "bears against."  Rather, the armature and spool must be physically attached, as asserted in Hitachi's proposed construction.[40]

### 3.    BW's Construction of "Air Gap" [Claim 11] Is Erroneous

Claim 11 recites an air gap with "said air gap separating said coil from said armature."  BW's construction is a "gap that separates the coil from the armature and may contain non-magnetic material."  BW's interpretation suffers from incompleteness relative to the length of

---

[39] *See Bell Atlantic Network Services, Inc. v. Covad Comm. Group, Inc.*, 262 F.3d 1258, 1272-73 (Fed. Cir. 2001) (finding significant that specification used terms "rate" and "mode" differently, so recited "plurality of different modes" could not be satisfied by plurality of different rates).

[40] At the very least, if BW's definition is accepted, it should be made clear that two objects, in normal engine operation, cannot become apart from one another.

the gap and contradicts the plain understanding of the term, especially as understood in the context of the intrinsic record.

A gap is a space. The air gap *separates* the coil from the armature according to the plain words of the claim. It is the structure that necessarily keeps apart the coil and armature so that the armature can actually move. As such, it necessarily has to extend *the length of any overlap between these two components*.[41]  Hitachi's proffered construction makes that aspect explicit and also states that the gap cannot have magnetic material in it, which BW does not dispute in view of its various references to non-magnetic material (Brief at 39).   As such, it completely comports with Figure 19 and the associated discussion in the '738 patent. *See* '738 patent at 8:39-41.

## III.    CONCLUSION

For each and all of the foregoing reasons, as well as the reasons set forth in Plaintiffs' Opening Claim Construction Brief, Hitachi respectfully submits that the Court should adopt Hitachi's proposed interpretations of the disputed terms in claims 10 and 11 of the '738 patent.

---

[41]  The ordinary meaning of "separate" is "To keep apart or divide, as by an intervening barrier, space, etc.: *to separate two fields by a fence*."  *Webster's Encyclopedic Unabridged Dictionary of the English Language* 1301 (1989).  Even BW admits that a gap must extent "across" or "between" two objects (Brief at 38-39).

ASHBY & GEDDES

/s/ Tiffany Geyer Lydon

_____
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. # 3950)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Plaintiffs Hitachi, Ltd. and
Hitachi Automotive Products (USA), Inc.*

*Of Counsel:*

Kenneth E. Krosin
Michael D. Kaminski
Pavan K. Agarwal
C. Edward Polk
Mary M. Calkins
Liane M. Peterson
Foley & Lardner LLP
3000 K Street, N.W., Suite 500
Washington, D.C. 20007–5109
(202) 672–5300

William J. Robinson
Foley & Lardner LLP
2029 Century Park East Blvd., Ste. 3500
Los Angeles, CA 90067-3021
(310) 277-2223

Dated:  October 23, 2006
174440.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 23rd day of October, 2006, the attached **PLAINTIFFS'**

**RESPONSIVE CLAIM CONSTRUCTION BRIEF** was served upon the following counsel of

record in the manner indicated:

Richard K. Herrmann, Esquire                                                    <u>HAND DELIVERY</u>
Morris, James, Hitchens & Williams LLP
222 Delaware Avenue, 10th Floor
P.O. Box 2306
Wilmington, DE  19801


Hugh A. Abrams, Esquire                                                    <u>VIA ELECTRONIC MAIL</u>
Sidley Austin LLP
One South Dearborn Street
Chicago, IL  60603


*/s/ Tiffany Geyer Lydon*
_____
Tiffany Geyer Lydon

154486.1