IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| HITACHI, LTD., and HITACHI AUTOMOTIVE PRODUCTS (USA), INC.,<br><br>Plaintiffs,<br><br>v.<br><br>BORGWARNER INC., and BORGWARNER MORSE TEC INC.,<br><br>Defendants. | Civil Action No. 05-048-SLR |
| BORGWARNER INC.,<br><br>Counterclaimant,<br><br>v.<br><br>HITACHI, LTD., and HITACHI AUTOMOTIVE PRODUCTS (USA), INC.,<br><br>Counterdefendants. | |

**DECLARATION OF DR. THOMAS G. LIVERNOIS
IN SUPPORT OF PLAINTIFFS' RESPONSIVE MARKMAN BRIEF**

I, Thomas G. Livernois, declare as follows:

1. I received a Ph.D. from the University of Michigan in 1991, a Master of Science degree from Michigan State University in 1986, and a Bachelor of Science degree (with honor) from Michigan Technological University in 1984, all in Electrical Engineering. Since completing my Ph.D., the majority of my professional career has involved the analysis, design, testing, and development of automotive electrical and electronics systems, including powertrain, safety, and chassis components and systems.

2.   I have over 14 years of automotive industry experience working for OEM's, Tier 1 suppliers, and as a technical consultant. During this period, I have held various positions related to automotive electrical and electronic system product design. My responsibilities have included numerous system level analyses of functional, regulatory, and electromagnetic compatibility issues, fuel system electrostatic discharge (ESD) concerns, and light truck drivetrain component and system failure modes, including systems interactions between engine, transmission, and chassis control systems.

3.   I have published eight articles in refereed engineering journals using methods that are applicable to electromagnetic modeling of electrical devices and systems and presented at several conferences and seminars. I have taught electromagnetics-related electrical engineering classes at Lawrence Technological University in Southfield, Michigan and at the University of Michigan at both the Dearborn and Ann Arbor campuses.

4.   I have been a Senior Managing Engineer at Exponent, Inc. since October 2003, prior to which I was an independent consultant for approximately one year. In my present position, I perform engineering analysis and consulting in the following areas: (1) functional, environmental, and electromagnetic compatibility testing and evaluation at the vehicle, system, and component levels; (2) survivability and robustness analysis of electrical and electronic components and systems; (3) electrostatic discharge phenomena and associated system design mitigation techniques; (4) thermal issues in electrical and electronics systems; and (5) control systems.

5.   I am a member of the Institute of Electrical and Electronic Engineers (IEEE), the Society of Automotive Engineers (SAE), the American Society of Mechanical Engineers

(ASME), the Industrial Advisory Board for Lawrence Technological University, and a registered Professional Engineer in the State of Michigan.

6. I have reviewed U.S. Patent No. 5,497,738, the patents that it cites, and the prosecution history. I have also reviewed Hitachi's and BorgWarner's Opening Claim Construction Briefs.

7. For the following discussion, the person of ordinary skill in the art would be a person having a Bachelors of Science in either mechanical or electrical engineering and at least 3 years of relevant work experience in engine component design or a person having an advanced degree in either mechanical or electrical engineering with at least one year of relevant work experience in the design and development of internal combustion engines and/or their subsystems. This is the definition found in Mr. Kuhn's declaration of October 23, 2006, with which I concur.

I. CALCULATING STEP OF CLAIM 10

8. As generally understood by the person of ordinary skill in the art, variable camshaft timing components ("VCTs") are used to change the angle of a camshaft relative to a crankshaft to a desired angle to improve engine performance.

9. As shown in the '738 patent, an engine control unit ("ECU") sends a control signal to an actuator, such as a variable force solenoid, to move a spool in a spool valve body. This will direct oil flow from one chamber (vane recess or piston cylinder) to the other. The purpose of sending the control signal is so that the VCT will change the phase angle of the camshaft relative to the crankshaft to a desired relative phase angle.

10. Claim 10 recites, in part, "said engine control unit further issuing an electrical signal corresponding to said phase angle." Because the purpose of the phase change is to reach a desired relative phase angle, the signal sent from the ECU corresponds to the desired relative

3

angle. BorgWarner's proposed claim construction is consistent in this respect. BorgWarner's Brief at 24. Therefore, the person of ordinary skill in the art would interpret "said phase angle" to refer to the desired relative phase angle. This also is consistent with the specification of the '738 patent and the '578 patent that is referenced in the '738 patent specification. The '578 patent discusses sending a correction signal to the solenoid (a PWM solenoid in the case of the '578 patent), so that the camshaft will reach the desired relative phase angle. '578 patent at 5:3-9; 7:21-30; and 2:34-37. As understood by the person of ordinary skill in the art, the correction signal corresponds to the desired relative phase angle.

11.    I do not believe that the person of ordinary skill in the art would interpret the term "said phase angle" to be "*present* relative angle." Sending a signal from the ECU corresponding to the *present* phase angle between the camshaft and crankshaft would be meaningless because the VCT would not change to the desired angle, thus defeating its purpose.

## II.    VARIABLE FORCE SOLENOID LIMITATION OF CLAIM 10

12.    I believe that the person of ordinary skill in the art would conclude that the variable force solenoid in claim 10 of the '738 patent is a solenoid driven by a non-PWM, current control signal from the ECU with the force applied by the solenoid varying proportionally with the magnitude of the current control signal.

13.    PWM voltage control is a digitally compatible technique for controlling electrical devices such as motors, lights, and solenoids. A PWM voltage signal generally consists of distinct, successive signals having a fixed period, with each signal residing at a maximum value ($V_0$) typically anywhere between 0% and 100% (or nearly 100%) of the signal period and at zero for the remainder of the signal period. The ratio of time at maximum value to the total signal period is referred to as the "duty cycle." In general, the duty cycle can change from period to period in an unpredictable way, resulting in a pseudo-random PWM signal.

4

14. A PWM voltage signal is a discrete valued (*i.e.* on/off), time-varying voltage signal. The signal is energized for a predetermined period of time and is cut-off for a predetermined period of time. In other words, there are preset "on" periods and preset "off" periods. A PWM voltage source, $V_S(t)$, is exemplified in Figure 1 below:



**Figure 1: PWM voltage signal waveform.**

15. As understood by the person of ordinary skill in the art, a PWM solenoid is a solenoid driven by a PWM signal. The term PWM refers to the solenoid's driving signal.

16. The background in the '738 patent discusses PWM solenoids, including various problems that they present. As the background describes, the PWM solenoids are driven by a PWM input signal. The background of the '738 patent refers to the "*PWM duty cycle* required to achieve a null position of the spool." '738 patent at 2:45-47. This refers to the input driving signal to the solenoid. The background further states that the "solenoid cycles through its full stroke with every *PWM pulse*." *Id.* at 2:50-51. The "PWM pulse" is again the input driving signal that causes the solenoid to cycle.

17. The person of ordinary skill in the art reading the '738 patent would find it quite clear that instead of a PWM signal, the '738 patent stresses using a control signal from an electronic control unit ("ECU") that is produced by a current source: "When the relationship between spool position and *control signal (solenoid current)* is independent of engine oil

pressure, any problems associated with oil pressure or its fluctuation are eliminated." '738 patent, at 3:19-21 (emphasis added). This excerpt from the specification is unambiguous about the use of a control current (of varying magnitude) as opposed to a PWM signal to control the solenoid used in the disclosed invention. The '738 patent further states that the variable force solenoid is "controlled by the current from the ECU." '738 patent, at 3:34-35. Again, this is clear and unambiguous statement that the invention uses current control instead of PWM control. The remaining discussions in the patent all refer to the current. See, for example, '738 patent, at 7:51-53 and 65-67; 8:29-34. A person of ordinary skill in the art would understand that the '738 patent differentiates over the class of PWM solenoids as a whole. The '738 patent specifically talks about the driving signal – current control for variable force solenoids – as opposed to PWM solenoids that use PWM driving signals.

18. A current control signal of varying magnitude is illustrated in Figure 2 below:



Figure 2: Current control signal waveform.

19. The foregoing graph shows a hypothetical changing current control signal of varying magnitude. For clarity, three exemplary magnitudes have been indicated.

20. As compared to the PWM voltage signal, the current control signal is a current signal of varying magnitude as shown in Figure 2. By comparison, as shown in Figure 1 above, the PWM voltage signal is either on ($V_0$) or off (0V). The duty cycle of the PWM voltage signal changes over time. The current control signal has no such duty cycle.

21. The '738 patent does not mention using PWM voltage control as part of the invention. Furthermore, the words "volt," "volts," "voltage," etc. are not found anywhere in the entire document. In contrast, specific teachings of current control are found throughout the '738 patent. Therefore, it is my opinion that, to the person of ordinary skill in the art, the '738 patent covers the use of current control to control the solenoid, and clearly and unambiguously distinguishes this approach from the use of a PWM voltage source.

7

22. The '738 patent states that the "preferred embodiment employs a closed loop feedback system, such as the one disclosed in U.S. Patent No. 5,184,578, which corrects for any phase angle error." '738 patent at 3:13-16. While the '578 patent discloses a PWM solenoid that has a PWM input signal, there are two reasons why the '738 patent does not incorporate this feature, including the driving signal.

23. First, the "closed loop feed back system" identified in the '578 patent is block 108, which does not include the PWM solenoid. As explained in the '738 patent, this closed loop feedback system "corrects for any phase angle error." '738 patent at 3:15-16. Such phase angle errors may be caused by a variety of factors, including torque pulsations in a cam-torque actuated VCT. '578 patent, at 3:65-4:58. Thus, a person of ordinary skill in the art would understand that reference to the "closed loop feed-back system" in the '738 patent is solely to adjust the input signal to whatever type of solenoid is used in the VCT. The format of the input driving signal to the solenoid is determined by the type of solenoid. The "closed loop feedback system" does not control the particular format of the input driving signal.

24. Second, the '738 patent discloses that the variable force solenoid has advantages over a PWM solenoid: "[A] variable force solenoid only travels a short distance, as controlled by the current from the ECU, as opposed to the complete cycles which result from the use of a PWM solenoid." '738 patent at 3:34-37. A person of ordinary skill in the art therefore would understand the VCT disclosed in the '738 patent would use the "closed loop feedback system" in the '578 patent to control the input to a variable force solenoid, not a PWM solenoid. The variable force solenoid uses a current control input signal.

25. The '738 patent identifies problems with two prior art VCTs that use hydraulic pressure to move the spool (so-called "DPCS systems") under control of PWM solenoids. *See,*

U.S. Patent No. 5,172,659 and No. 5,184,578, referenced in the '738 patent at 2:1-13. One of these problems is that "the moving parts of the PWM solenoid typically used in a conventional DPCS create unwanted noise in the system" because "the solenoid cycles through its stroke with every PWM pulse." '738 patent at 2:48-51. The '738 patent then explains that these problems are overcome with a variable force solenoid, including based on the input driving signal to the solenoid. *See* '738 patent at 3:19-20 and 34-37. A person of ordinary skill in the art would understand this discussion to mean that the '738 patent has rejected the use of PWM voltage-controlled solenoids in favor of current-controlled variable force solenoids. That is, the variable force solenoid used a different driving signal (current control); not PWM.

26.  As understood by the person of ordinary skill in the art, neither the specification nor the claims of the '659 patent require the disclosed PWM solenoid to cycle through its full stroke. This simply is not the defining characteristic of a PWM solenoid. Furthermore, no limitations or requirements regarding the period of the PWM control signal or the solenoid full stroke response time are disclosed in the '659 patent. Therefore, as understood by the person of ordinary skill in the art, the '659 patent does not place limitations requiring that the armature move its full stroke with every PWM pulse. The '738 patent refers to a "full stroke" PWM solenoid in connection with discussing "a conventional DPCS." *See* '738 patent, at 2:48-53. This one statement mentions one situation of PWM solenoid control for an application where full stroke actuation is known to be problematic, but it does not necessarily require full stroke actuation for all PWM solenoids of the BorgWarner prior art patents. Moreover, the statement in the '738 Summary of the Invention stating that the variable force solenoid is controlled by current from the ECU goes directly to the driving signal of the solenoid, and differentiates over PWM solenoids whose defining characteristic is the use of a PWM driving signal.

9

27. The person of ordinary skill in the art also would understand that the references in the '659 patent and '578 patent to PWM pertain to the driving signal of the PWM solenoid. *See* '578 patent, at 5:7-9 and 7:21-25 and 30-38; '659 patent, at 2:7-18, 40-44 and 61-68; 7:34-47; and 10:41-55. BorgWarner's Opening Claim Construction Brief says the same thing, at p. 30 and p. 31, n.18. That is, the discussions in these patents to changing the duty cycles to change the fluid pressure on the ends of the spool are references to changing the duty cycle of the driving signal to the solenoid. This further demonstrates that, to the person of ordinary skill in the art, the '738 patent is differentiating over PWM solenoids as a class, including specifically based on the driving signal.

### III. AIR GAP LIMITATION OF CLAIM 11

28. Claim 11 recites in part "an air gap, said air gap separating said coil from said armature."

29. I believe that the person of ordinary skill in the art reviewing the '738 patent would understand that the "air gap" *separates* (*i.e.*, keeps apart) the coil from the armature. This air gap produces a space between the coil and armature. This is consistent with what is shown in Figure 19 of the '738 patent, where a gap extends for the overlap between the coil and armature. Based on the words of the claim, I believe that the person of ordinary skill in the art would understand that there is no magnetic material between the armature and coil. Having magnetic material between the coil and armature is the opposite of an air gap.

I declare under penalty of perjury that the foregoing is true and correct.

*[signature: Thomas G. Liv...]*

October 23, 2006        Thomas G. Livernois, Ph.D., P.E.

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of October, 2006, the attached **DECLARATION OF DR. THOMAS G. LIVERNOIS IN SUPPORT OF PLAINTIFFS' RESPONSIVE MARKMAN BRIEF** was served upon the following counsel of record in the manner indicated:

| | |
|---|---|
| Richard K. Herrmann, Esquire<br>Morris, James, Hitchens & Williams LLP<br>222 Delaware Avenue, 10th Floor<br>P.O. Box 2306<br>Wilmington, DE 19801 | **HAND DELIVERY** |
| Hugh A. Abrams, Esquire<br>Sidley Austin LLP<br>One South Dearborn Street<br>Chicago, IL 60603 | **VIA ELECTRONIC MAIL** |

/s/ *Tiffany Geyer Lydon*
_____
Tiffany Geyer Lydon

154486.1