IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| HITACHI, LTD., and HITACHI AUTOMOTIVE PRODUCTS (USA), INC., <br><br>        Plaintiffs, <br><br>        v. <br><br>BORGWARNER INC., and BORGWARNER MORSE TEC INC., <br><br>        Defendants. <br><br>BORGWARNER INC., <br><br>        Counterclaimant, <br><br>        v. <br><br>HITACHI, LTD., and HITACHI AUTOMOTIVE PRODUCTS (USA), INC., <br><br>        Counterdefendants. | Civil Action No. 05-048-SLR |

**DECLARATION OF ROBERT KUHN IN SUPPORT
OF PLAINTIFFS' RESPONSIVE MARKMAN BRIEF**

I, Robert Kuhn, declare as follows:

1.  I have been retained by the firm of Foley & Lardner LLP, which represents Plaintiffs Hitachi Ltd. and Hitachi Automotive Products (USA), Inc. (collectively "Hitachi") in this case, as an expert in variable camshaft timing ("VCT") systems. My expertise related to this case includes knowledge in the design and operation of VCTs; hydraulic control systems in automobiles; knowledge of the design and operation of spool valves, and related control systems, in hydraulic control systems in automobiles; and knowledge of the overall design, component

interaction and operation of automotive engines, including variable camshaft timing components, and various aspects of the engine control unit and other devices commonly used in automobiles.

2.  I joined Exponent in 2003. Exponent is a technical consulting firm. I am currently employed as a Managing Engineer in Exponent's Vehicle Engineering Practice. While working for Exponent I have been retained as a consultant for a variety of design and development projects relating to vehicle engines and their sub-systems including base engine hydraulics, fuel system management, exhaust systems, and camshaft/valvetrain system durability. Prior to joining Exponent, I was employed by DaimlerChrysler in a number of engineering and supervisory positions within the Activity Vehicle (Jeep) platform. My most recent assignment was as Supervisor, Liberty Vehicle Development and Synthesis. My responsibilities included overall vehicle performance and durability testing, engine system to vehicle integration, and coordination/resolution of engine system related vehicle issues affecting performance, durability, and reliability. While at DaimlerChrysler, I also received two patents for the design of two different hydraulic/mechanical vehicle systems and worked within the Large Car Platform engine development group doing base engine durability and development testing.

3.  Prior to joining DaimlerChrysler in 1995, I worked for the Ford Motor Company as an engine development engineer responsible for base engine durability and performance development. In this position, I was involved in developing and testing gasoline engine components including but not limited to camshafts, engine valves, timing chains, and camshaft driven balance shaft systems. During this assignment, I also was involved in testing and evaluating the effects of camshaft to crankshaft phase angle changes on engine performance as well as testing and evaluating prototype engine components and systems.

2

4. Throughout my career, I have been involved with all aspects of the engine design and development processes, including design, testing, assembly, and teardown analysis of complete engine assemblies and various subsystems. I personally was involved in the design and development of the camshaft/balance shaft system used in the Ford V10 modular engine. This included testing various designs, implementing and testing design improvements, and measuring and evaluating camshaft torsional fluctuations to optimize system durability. While at Ford and Chrysler, I also was responsible for evaluating the effects of camshaft timing (*i.e.*, phase angle of the camshaft relative to the crankshaft) on engine power, emissions, and driveability. I also was responsible for testing the performance of various intake manifold, exhaust manifold, and camshaft timing combinations in several different configurations of engines including I4, V6, and V10 cylinder arrangements. As a part of these duties, I was involved in creating engine performance maps at various combinations of engine speeds and loads. These maps were used to provide closed loop control for other engine subsystems such as fuel injection and ignition systems during engine dynamometer durability testing of the engine. These maps were later incorporated into the vehicle level calibration used by the engine control unit to control engine performance.

5. During my career, I also have spent a considerable amount of time supervising the buildup and evaluation of prototype and development engines in test and fleet vehicles. This type of activity has afforded me a substantial amount of experience in evaluating engine calibrations and the electrical and electronic systems required for these engines to operate reliably in the field. These systems include camshaft sensors, crankshaft sensors, variable induction systems, engine oiling systems, fuel injection and ignition systems, and various closed loop monitoring systems such as O2 sensors and turbocharger wastegate systems.

6.  During the past 22 years, I also have built, and continue to build, engines for my own competitive and personal vehicles, including race, vintage, and street vehicles. I am a member of the Society of Automotive Engineers ("SAE"), The American Society of Mechanical Engineers (ASME), and hold a professional engineering license in the state of Michigan.

7.  During the last three years, I have been retained as a consultant on a number of engine-related issues including alternate fuel use, engine system field performance, and engine system design and validation practices.

8.  I believe that the person of ordinary skill in the art with regard to the subject matter of the '738 patent would be a person having a Bachelors of Science in either mechanical or electrical engineering and at least 3 years of relevant work experience in engine component design or a person having an advanced degree in either mechanical or electrical engineering with at least one year of relevant work experience in the design and development of internal combustion engines and/or their subsystems.

9.  I have reviewed U.S. Patent No. 5,497,738 ("the '738 patent"), the patents it cites, and its prosecution history. I have also reviewed Hitachi's and BorgWarner's opening claim construction briefs.

I.  **BORGWARNER'S DISCLAIMER OVER THE STRAUBER PATENT ("REGULATING" PHRASE IN PREAMBLE AND "SUPPLYING" STEP)**

10. I have reviewed the '738 patent and its prosecution history, including BorgWarner's statements in the prosecution history distinguishing its "invention" from the Strauber patent (U.S. Patent No. 5,012,774).

11. On three separate occasions during prosecution, BorgWarner argued to the U.S. Patent and Trademark Office ("PTO") that: "The Strauber et. al. system controls the flow of oil both internal and external to the VCT mechanism. The present invention, however, controls the

4

flow of oil internal to the VCT mechanism only." Response of 6/30/94; Response of 11/7/94, and Appeal Brief of 5/24/95.

12. BorgWarner's statements are directed to the following limitations in claim 10: (a) *"regulating the flow* of hydraulic fluid from a source" and (b) "supplying hydraulic fluid from said source through said spool valve to a *means for transmitting rotary movement to said camshaft*, said spool valve selectively *allowing and blocking flow of hydraulic fluid through an inlet line and through return lines*" (emphasis added). These limitations are directed to the control of oil flow for carrying out a phase change.

13. As understood by the person of ordinary skill in the art, the Strauber patent teaches a traditional oil pressure actuated ("OPA") VCT system, which creates a phase changes by controlling oil flow both internal to the VCT mechanism (in and out of working chambers) and external to the VCT mechanism (including from the MOG).

### A. Controlling Flow of Oil "Both Internal and External to the VCT Mechanism" Includes Control of Oil Flow From the MOG

14. Strauber controls the flow of oil, including oil flow from the MOG, into and out of first and second working chambers (15, 16), using a movable spool 17. For example, to bring the angular positions of the camshaft and crankshaft to their initial "retard" position, spool 17 is positioned to allow oil to flow from the MOG into first working chamber 16, while simultaneously allowing oil to drain from second working chamber 15 back to the engine oil circuit/sump.

15. Conversely, to bring the angular positions of the camshaft and crankshaft into the "advance" position, spool 17 is positioned to allow oil to flow from the MOG into second working chamber 15, while simultaneously allowing oil to drain from first working chamber 16 back to the engine oil circuit/sump.

16. To create a phase change, Strauber's VCT system controls oil flowing from the main engine oil circuit, including the main oil galley ("MOG"). BorgWarner relied on this external MOG oil flow as the basis to distinguish its invention from the Strauber patent during prosecution of the '738 patent.

17. A person of ordinary skill in the art reading the '738 patent prosecution history would readily understand that BorgWarner was distinguishing its CTA-type VCT (internal oil flow only) over an OPA-type VCT (internal and external oil flow that includes flow from the MOG/oil pump), as illustrated by the graphics below:



18. As the graphics show, the Strauber VCT controls oil flow from the MOG to create a phase shift, while the '738 system does not rely on oil flow from the MOG to create a phase change.

19. The '738 patent specifically states that oil flow from MOG 230 is unregulated, *i.e.*, unaffected by the operation of spool valve 192 (*i.e.*, moving spool 200 in spool valve body

6

198). In particular, MOG 230 provides an *unregulated* supply of initial fill oil ('738 patent at 7:35-38) and also provides an *unregulated* supply of make-up oil ('738 patent at 9:47-50). Unlike the Strauber VCT system, MOG 230 in the '738 patent does not provide the energy source or the pressurized oil flow to the working chambers of the VCT mechanism to create a phase change.

20. Strauber 's VCT system, on the other hand, is entirely dependent on oil flow from the MOG to the working chambers of the VCT mechanism to create a phase change. Based upon this fundamental difference in operation, a person of ordinary skill in the art would clearly and unmistakably understand that BorgWarner distinguished its CTA-type VCT (internal oil flow only) over Stauber's OPA-type VCT (internal and external oil flow, *i.e.*, including the MOG) when it told the PTO on three separate occasions: "[T]he Strauber et al. system controls the flow of oil both internal and external to the VCT mechanism. The present invention, however, controls the flow of oil internal to the VCT mechanism only."

21. I have reviewed BorgWarner's initial Claim Construction Brief, where it states that the disclaimer in the prosecution history relates to its prior differential pressure control system ("DPCS"), such as described in U.S. Patent No. 5,172,659. BorgWarner's Brief at 18-20. I disagree that a skilled artisan would read the prosecution history in the manner suggested by BorgWarner. I do not believe that BorgWarner's position is reasonable.

22. First, BorgWarner's repeated statement related to the Strauber patent alone, without any reference at all to BorgWarner's prior DPCS patents (*i.e.* "[T]he *Strauber et al. system* controls the flow of oil both internal and external to the VCT mechanism..."). Response of 6/30/94; Response of 11/7/94; and Appeal Brief of 5/24/95.

23. Second, Strauber is not like the prior DPCS systems disclaimed in the '738 patent specification. Instead, like the '738 patent structure, Strauber controls spool position using

7

a direct-acting electromechanical actuator, in particular a solenoid. This confirms to the person of ordinary skill in the art that BorgWarner's prosecution statement regarding Strauber was not related to a DPCS approach.

**B.  VCT Mechanism Does Not Include the MOG**

24. One skilled in the art reading the '738 patent and prosecution would understand the phrase "VCT mechanism" to mean the camshaft-mounted vane (or piston-cylinder) structure that includes the basic vane lobe/check valve structure (or piston cylinder structure) and flow path through the spool valve. In the '738 patent embodiments, the spool valve is positioned within the vane structure housing. As well understood by the person of ordinary skill in the art, the MOG is not part of the VCT mechanism in the '738 patent.

25. Numerous patents cited in the '738 patent and during prosecution confirm the nature of the "VCT mechanism," including the fact that the MOG is not part of the VCT mechanism. Such patents include several of BorgWarner's own prior patents. *See, e.g.,* U.S. Patent No. 5,184,578 at 2:15-24. For example, both the parent to the '738 patent (U.S. Patent No. 5,218,935) and U.S. Patent No. 5,184,578 (the latter incorporated by reference in the background of the '738 patent) state in their respective "Summary of the Invention" that "[a] preferred embodiment of a *camshaft mounted hydraulic VCT mechanism* uses one or more radially extending vanes which are circumferentially fixed relative to the camshaft and which are receivable in cavities of a sprocket housing that is oscillatable on the camshaft." ('578 patent at 2:15-21 and '935 patent at 2:21-26) (emphasis added).

26. As another example, the parent '935 patent additionally states: *"The VCT mechanism is then actuated by the stepper motor movement which changes its position relative to a crankshaft…the control objective of the present invention is to have the VCT mechanism* at the phase angle given by the set point 35 with the spool 100 stationary in its null position. That

is, *the VCT mechanism* is at the correct phase and the phase rate of change is zero. A sophisticated control algorithm which utilizes the dynamic state of *the VCT mechanism* is used to accomplish this result." '935 patent at 4:1-11; emphasis added.

27.  The above quotations demonstrate that the "VCT mechanism" is the camshaft mounted vane lobe/check valve structure (or piston cylinder structure) and flow path through the spool valve. Stated another way, it is the actuating mechanism. There is no mention of the MOG as part of the VCT mechanism, and a person of ordinary skill in the art would understand that the MOG is not part of that mechanism.

28.  Other BorgWarner prior patents cited in the '738 patent confirm the nature of the "VCT mechanism" just as outlined above. *See* U.S. Patent No. 5,002,023 at 7:45-62 & 8:7-12 and U.S. Patent No. 5,107,804 at 8:51-68 and 9:13-18.

29.  BorgWarner also discussed during prosecution, U.S. Patent No. 5,056,477 to Linder, in the same response in which BorgWarner distinguished the Strauber patent. BorgWarner stated that Linder's "VCT uses camshaft torque energy to alternately pressurize *two opposing chambers [7,8] in the VCT mechanism*." 6/30/94 Response at 4 (emphasis added).

30.  BorgWarner also argued that an activating solenoid must turn on and off "if the *mechanism is to actuate* to vary the phase of the camshaft." 6/30/94 Response at 4-5 (emphasis added). Figure 1 of the Linder patent is shown below, with arrows and labeling added to show the relevant parts.



9

31. As would readily be understood by a skilled artisan, the "VCT mechanism" in Linder is the camshaft mounted piston-cylinder structure. The MOG is not part of this VCT mechanism. Instead, as understood by the person of ordinary skill in the art, the MOG is found in another part of the engine, external to the VCT mechanism. I have never seen or heard of the MOG being part of the camshaft.

32. Considered in its proper context and in view of the prosecution record created before the PTO distinguishing over the Strauber patent, BorgWarner's disclaimer is clear and unmistakable. Thus, a skilled artisan would understand that the claims of the '738 patent (including claims 10 and 11) do not cover a system that controls oil flow both internal and external (*i.e.*, from the MOG) to the VCT mechanism to create a phase change.

33. I disagree with BorgWarner's position that the MOG is part of the VCT mechanism. Nor would a person of ordinary skill in the art consider the MOG to be part of the VCT mechanism. In fact, the '738 patent specification is quite clear that the patent seeks to isolate the VCT mechanism from pressure fluctuations within the MOG while the VCT is in operation. The only point at which the VCT mechanism directly communicates with the MOG in a predictable manner is during initially filling of the VCT mechanism with oil. Once filled, the VCT mechanism is designed to operate independent of the oil pressure within the MOG to avoid having the VCT mechanism become another parasitic drag on the main engine oil pump and to avoid VCT operation with fluctuating oil pressure.

C.  **Source**

34. I am also of the opinion that a skilled artisan would not consider a MOG as the "source" in the context of claim 10 of the '738 patent. Claim 10 is directed to a method for changing the phase of a camshaft relative to a crankshaft and, in particular, a method for "regulating the flow of hydraulic fluid" during such a phase change.

35. In the context of a phase change and as part of the supplying step, claim 10 recites that the spool allows and blocks fluid flow through the spool valve. If the "source" is the MOG, the spool must selectively allow and block fluid flow from MOG. As detailed above, however, the '738 patent clearly discloses that the spool moving in the spool valve does not regulate oil flow from MOG 230, *i.e.*, oil flow from the MOG is not selectively allowed and blocked by the spool valve. Rather, MOG 230 only provides an *unregulated* (*i.e.*, not regulated by the spool valve) supply of initial fill and make-up oil. This is consistent with BorgWarner's disclaimer that its "invention" controls the flow of oil "internal to the VCT mechanism only," *i.e.*, oil flow from the MOG (which is external to the VCT mechanism) is not controlled by the spool valve.

36. In the '738 patent, the only oil flow that is selectively allowed and blocked for creating a phase change is the oil flow between the vane recesses or the piston cylinders. For example, the Abstract of the '738 patent states that a phase change occurs "in reaction to pulses which it experiences during its normal operation, and it is permitted to change only in a given direction, either to advance or retard, by *selectively blocking or permitting the flow of hydraulic fluid*, preferably engine oil, through the return lines (194, 196) *from the recesses* by controlling the position of a vented spool (200) within a valve body (198) of a control valve (192)." The rest of the specification is consistent with this passage from the Abstract. *See, e.g.*, '738 patent at 1:36-42 (indicating for the opposed-piston embodiment the "selective[] transfer of hydraulic fluid from one of the cylinders to the other, or vice versa, to thereby advance or retard the circumferential position on of a camshaft relative to a crankshaft"). Reading the intrinsic record, a skilled artisan would interpret the "source" in claim 10 as a supply volume of oil located in either of the vane recesses or piston cylinders.

11

37. Claim 4 recites a conduit means 230a for transferring "engine lubricating oil from a pressurized lubricating oil source (230)." As understood by the person of ordinary skill in the art, this oil flow is separate from the oil flow that creates a phase change. In addition, claim 4 recites that this lubricating oil is transferred to a control means and back again "in response to said torque reversals of said camshaft." This would not make any sense to the person of ordinary skill in the art, as there is no explanation in the '738 patent as to how such a flow is created by internal camshaft torque pulsations.

## II. MEANS FOR TRANSMITTING ROTARY MOVEMENT TO SAID CAMSHAFT

38. I have been advised by Hitachi's counsel that, for a claim written in means-plus-function format, the corresponding structure is determined by looking to the specification and identifying the corresponding structure that carries out the stated function. I have reviewed the '738 patent specification to identify the structure disclosed that performs the function of "transmitting rotary movement to the camshaft." Based upon my review, the corresponding structure disclosed in the '738 patent for carrying out this function includes (a) the sides of the lobes in the vane (or piston-cylinder) and the corresponding adjacent areas of the housing opposite to the supply volume sides of other lobes in the vane (or piston-cylinder); and (b) check valves that upon the axial movement of the annular recess of the spool, permit oil from the supply volumes to flow unidirectionally into the components of (a) such that cam torque pulsations may rotate the vanes to change the phase angle of the camshaft relative to the crankshaft, or equivalents under § 112, ¶ 6.

39. In particular, the structure disclosed in the specification that performs the function of "transmitting rotary movement to said camshaft" includes both camshaft torque pulsations and check valves, because they are necessary in the actual embodiments to transmit rotary movement to the camshaft (*i.e.*, rotate the camshaft relative to the crankshaft).

12

40.  The '738 patent teaches a system of oil lines and check valves that effectively isolate the engine oil pump from the internal oil circuit within the VCT mechanism, using camshaft torque pulsations to direct oil flow to make the camshaft rotate. The structure disclosed in the specification that performs the function of "transmitting rotary movement to said camshaft" necessarily includes both camshaft torque pulsations and check valves, which are necessary in the actual embodiments to transmit rotary movement to the camshaft (*i.e.*, rotate the camshaft relative to the crankshaft).

41.  As shown for example in Figures 19 and 20, floating balls 184b, 186b within check valves 184, 186 permit oil flow in one direction, while blocking oil flow in the other direction. Check valves 184 and 186 are required so that the VCT mechanism can both advance and retard the camshaft using camshaft torque pulsations that create an internal hydraulic pressure differential between different vane recesses (or flow between piston-cylinders).

42.  For example, to rotate vane 160 (and hence camshaft 126) in a counterclockwise direction, the spool is moved to the right to unblock return line 194. Upon movement of spool 200 to the right, torque pulsations in camshaft 126 will pump oil out of recess 132a and rotate lobe 160a in a counterclockwise direction. Oil in recess 132a then flows through branch line 188, return line 194, inlet line 182, and into opposed recess 132b. Check valve 184 helps direct oil flow from recess 132a and branch line 188 to return line 194, through spool valve 192, and into inlet line 182. From there, check valve 186 allows oil in the inlet line to flow into branch line 190, which feeds into recess 132b. This oil flow allows vane 160, and therefore camshaft 126, to rotate in a counterclockwise direction. Thus, the oil in this entirely "internal" oil circuit flows from one recess to the other through interaction of the vane lobes, recesses, check valves and camshaft torque pulsations.

43.  The camshaft torque pulsations are also necessary to make the camshaft rotate for both the vane and opposed-piston embodiments -- the only two embodiments described in the '738 patent. '738 patent at 5:57-67 & 9:7-31. Oil pressure from the MOG is not used to rotate the camshaft to change the phase. For example, to change the phase angle between the camshaft and crankshaft, vane 160 (vane 160 is fixed to camshaft 126) is rotated relative to housing 132 (which is attached to the crankshaft). '738 patent at 6:7-25. The '738 patent specification states that "vane 160 is alternatingly urged in clockwise and counterclockwise directions *by the torque pulsations* in the camshaft 126 and these torque pulsations tend to oscillate vane 160, and, thus, camshaft 126, relative to sprocket 132." '738 patent at 9:7-10 (emphasis added). The specification, thus, links the camshaft torque pulsations as being essential for transmitting rotary movement to the camshaft.

44.  Other BorgWarner patents, such as U.S. Patent No. 5,002,023 patent (which the '738 patent relies upon for explaining the piston-cylinder embodiment, at 5:57-61) provide further detail on the interaction of the check valves and torque pulsations for rotating the camshaft. *See, e.g.,* '023 patent Figures 12 and 13.

45.  There is no question that the embodiments (vane and opposed-piston) disclosed in the '738 patent simply would not work without these check valves and torque pulsations.

46.  Below, I illustrate the vane embodiment of Figure 19 without the check valves or the passages that they reside in:

14



FIG. 19

47.     Without the check valves or their associated passages, oil from MOG 230 would flow into the right part of the vane recesses (132a, 132b), called the "non-active" side in the patent, but not into the left part (called the "active" side) of these recesses during the initial fill of the VCT mechanism with pressurized oil. In addition, movement of the spool 200 between the advance and retard positions would eventually result in equivalent hydraulic pressure existing on both parts of the vane recesses, *i.e.*, on both the active and non-active sides of the recesses. At this point, the mechanism would be in a hydraulically locked state in which camshaft torque pulsations could no longer create a controlled flow of oil between recesses 132a and 132b. Thus, no phase angle change could be made to occur.

48.     Below is a diagram of the '738 patent removing the check valves, but keeping the oil flow lines associated with the check valves:



FIG. 19

49.     In the above embodiment, oil from MOG 230 can now flow into both sides of the vane recesses (132a, 132b) during the initial fill. However, now all areas of the mechanism are in direct hydraulic communication with one another regardless of the spool valve position. Once again, the system would eventually become hydraulically locked and, thus, unable to vary the angular position between the camshaft and crankshaft. Certainly, the embodiments disclosed in the '738 patent would not work without the check valves. They are essential for rotating the camshaft in both embodiments of the '738 patent.

50.     In addition, based upon BorgWarner's disclaimer of the Strauber patent, and the teachings in the '738 patent discrediting OPA systems (including the prior patents incorporated

16

into the '738 patent specification), a skilled artisan reading the prosecution history would understand that the required corresponding structure would not cover OPA systems that rely on pressurized oil flow from the MOG to create the phase change.

51. BorgWarner clearly and unmistakably disclaimed VCTs that control oil flow both internal and external to the VCT mechanism based on their arguments over the prior art Strauber patent. As such, a skilled artisan reading the patent and prosecution would understand that the corresponding structure for the "means for transmitting rotary movement to said camshaft" does not include a system, such as an OPA system, that controls oil flow from the external MOG as part of creating a phase change between the camshaft and crankshaft.

### III. MEANS FOR TRANSMITTING ROTARY MOVEMENT FROM SAID CRANKSHAFT TO SAID HOUSING (PREAMBLE LIMITATION)

52. Claim 10 includes a second means limitation requiring structure that transmits rotary movement from the crankshaft to the housing. The '738 patent specification states that the crankshaft is attached to housing 132 via endless roller chain 138. '738 patent, at 6:7-24. Housing 132 includes a sprocket. *See id.* & claim 1. Endless roller chain 138 (or a belt, as a disclosed alternative to the chain) and the outer sprocket attached to the housing is the structure that transmits "rotary movement" from the crankshaft to the housing. The housing itself is not included as part of the structure that carries out the function.

53. Based upon a literal reading of the claim language, a skilled artisan would not include the housing as part of the structure that transmits rotary movement *to the housing*. This would be nonsensical as the housing would be transmitting rotary movement to itself. The person of ordinary skill in the art would not include the housing as part of the structure that transmits rotary movement to the housing.

17

## IV. HOUSING

54. Based on the '738 patent and the patents it incorporates in its background, the person of ordinary skill in the art would conclude that the "housing" in claim 10 refers to both the vane and opposed-piston embodiments.

55. The vane embodiment includes a housing ('738 patent at 1:53-58) and the piston embodiment includes a housing ('738 patent at 5:38-45). In both instances, the housing is mounted on a camshaft and is rotatable with and oscillatable relative to the camshaft. The figures depict this feature.

## V. VENTED SPOOL

56. The '738 patent states that the "vented spool" is designed to "eliminate" pressure-induced forces from acting on spool 200. To this end, the '738 patent teaches a spool 200 having an internal vent passage 198d. '738 patent at 8:23-27 & Fig. 19. This is consistent with the claim language requiring a vented spool.

57. As understood by the person of ordinary skill in the art, spool 200 is a distinct structure from spool valve body 198. Placing a vent in spool valve body 198 is not the same as a vented spool, *i.e.*, a vent in the spool. Placing a vent in the spool valve body would not fully achieve the goal of eliminating pressure-induced forces from acting on spool 200.

58. For example, having an internal passage extending through the spool ensures that both ends of the spool are at the same pressure at all times. Simply having an opening in the spool valve body means that one end of the spool can be at a different pressure than the other end, potentially resulting in unpredictable spool movement.

59. The '738 patent structure removes such unpredictability by including an internal passage extending through the entire length of spool 200.

I declare under penalty of perjury that the foregoing is true and correct.

October 23, 2006

_____
Robert Kuhn, P.E.

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of October, 2006, the attached **DECLARATION OF ROBERT KUHN IN SUPPORT OF PLAINTIFFS' RESPONSIVE MARKMAN BRIEF** was served upon the following counsel of record in the manner indicated:

| | |
|---|---|
| Richard K. Herrmann, Esquire<br>Morris, James, Hitchens & Williams LLP<br>222 Delaware Avenue, 10th Floor<br>P.O. Box 2306<br>Wilmington, DE 19801 | HAND DELIVERY |
| Hugh A. Abrams, Esquire<br>Sidley Austin LLP<br>One South Dearborn Street<br>Chicago, IL 60603 | VIA ELECTRONIC MAIL |

/s/ Tiffany Geyer Lydon
_____
Tiffany Geyer Lydon

154486.1