## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| HITACHI, LTD. and HITACHI AUTOMOTIVE PRODUCTS (USA), INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 05-048-SLR |
| BORGWARNER INC. and BORGWARNER MORSE TEC INC., | ) ) ) | |
| Defendants. | ) ) | PUBLIC VERSION |
| BORGWARNER INC., | ) ) | |
| Counterclaimant, | ) ) | |
| v. | ) ) | |
| HITACHI, LTD. and HITACHI AUTOMOTIVE PRODUCTS (USA), INC., | ) ) ) | |
| Counterdefendants. | ) ) | |

## RESPONSIVE CLAIM CONSTRUCTION BRIEF OF
## BORGWARNER INC. AND BORGWARNER MORSE TEC INC.

*OF COUNSEL:*

SIDLEY AUSTIN BROWN & WOOD, LLP
Hugh A. Abrams
Thomas D. Rein
Lisa Schneider
Marc A. Cavan
Lara V. Hirshfeld
10 South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

Original Dated: October 23, 2006
Redacted Date: October 31, 2006

Richard K. Herrmann (I.D. #405)
Mary B. Matterer (I.D. #2696)
MORRIS JAMES, HITCHENS &
WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE 19801
(302) 888-6800
mmatterer@morrisjames.com
*Attorneys for BorgWarner Inc. and
BorgWarner Morse TEC Inc.*

# TABLE OF CONTENTS

I.      Hitachi's Approach to Claim Construction Is Legally Erroneous.........................................2

II.     Nothing in the Claim Language, Specification, or Prosecution History
        Limits Claims 10 and 11 to Cam Torque Actuated Systems. ................................................4

III.    Hitachi's Representation That CTA and OPA Are "Starkly Different" Is a
        Fiction. ..................................................................................................................................7

IV.     Hitachi's Proposed Constructions Should Be Rejected in Favor of
        BorgWarner's .......................................................................................................................11

        A.      The Preamble Is Not a Limitation in the Claim and Should Not Be
                Used to Limit the Claim to CTA Vane Actuation Systems ....................................11

                1.      Mere Recitation of Structural Elements in the Preamble of
                        a Method Claim Does Not Convert the Preamble into a
                        Limitation.....................................................................................................11

                2.      If the Court Were to Find That the Preamble Limits the
                        Claim, Hitachi's Restrictive Constructions Are Contrary to
                        the Specification and Prosecution History...................................................14

                        a.      The Phrase "In an Internal Combustion Engine
                                Having a Variable Camshaft Timing System for
                                Varying the Phase Angle of a Camshaft Relative to
                                a Crankshaft" Is Not Limited to CTA Vane
                                Actuation.........................................................................................14

                        b.      The Phrase "A Method of Regulating the Flow of
                                Hydraulic Fluid" Is Not Limited to CTA Vane
                                Actuation Systems ..........................................................................15

                                1.      Hitachi Misreads the Prosecution History
                                        Statements Regarding "Controlling the Flow
                                        of Oil Internal and External to the VCT
                                        Mechanism." .......................................................................15

                                2.      Hitachi Misreads the Specification
                                        Statement Regarding Oil Flow............................................18

3.    The Prosecution History Statements and Figures of the '738 Patent Cannot Add Additional Limitations to the Asserted Claims. ...............................................................19

c.    Hitachi's Construction of the Term "Source" Directly Contradicts the Specification and Claims........................21

d.    The Phrase "A Means for Transmitting Rotary Movement from Said Crankshaft to a Housing"............................24

B.    Hitachi's Construction of the "Calculating Step" Reads Out the Preferred Embodiment of Closed Loop Control.....................................................28

C.    Hitachi's Construction of a "Vented Spool" Is Contrary to the Patent Specification .............................................................31

D.    The Phrase "Means for Transmitting Rotary Movement to Said Camshaft"...................................................................................34

E.    Hitachi's Construction of the Inlet and Return Lines Is Contrary to the Plain Language of the Claim and the Specification.........................................35

F.    Hitachi's Limitation of the Signals and Variable Force Solenoid to "Non-PWM" Reads Out the Preferred Embodiment .............................................36

G.    Terms in Claim 11 ...............................................................................39

1.    The Phrase "Armature Being *Connected* to Said Spool"............................39

2.    The Phrase "Armature to Exert a Force" ...................................................39

3.    The Term "Air Gap" ...............................................................................39

V.    Conclusion ..............................................................................................40

## TABLE OF AUTHORITIES

### CASES

*ACTV, Inc. v. Walt Disney Co.,*
    346 F.3d 1082 (Fed. Cir. 2003)......................................................................25

*Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.,*
    154 F.3d 1345 (Fed. Cir. 1998)......................................................................14

*ADE Corp. v. KLA-Tencor Corp.,*
    288 F. Supp. 2d 590 (D. Del. 2003)...............................................................14

*Altiris, Inc. v. Symantec Corp.,*
    318 F.3d 1363 (Fed. Cir. 2003)......................................................................12

*Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.,*
    340 F.3d 1298 (Fed. Cir. 2003)................................................................21, 31

*Asyst Techs., Inc. v. Empak, Inc.,*
    268 F.3d 1364 (Fed. Cir. 2001)......................................................................35

*Bayer AG v. Schein Pharm., Inc.,*
    129 F. Supp. 2d 705 (D.N.J. 2001), *aff'd*, 301 F.3d 1306 (3d Cir. 2002)................2, 17, 23

*Beckson Marine, Inc. v. NFM, Inc.,*
    144 Fed. Appx. 862 (Fed. Cir. 2005) (unpublished)........................................26

*Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.,*
    246 F.3d 1368 (Fed. Cir. 2001)......................................................................12

*Bristol-Myers Squibb Co. v. Immunex Corp.,*
    86 F. Supp. 2d 447 (D.N.J. 2000) ...................................................................11

*Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.,*
    334 F.3d 1294 (Fed. Cir. 2003)...............................................................4, 25, 37

*Cardiac Sci., Inc. v. Koninklijke Philips Elecs. N.V.,*
    No. Civ. 03-1064 DWF/RLE, 2006 WL 1050629 (D. Minn. Apr. 20, 2006) ....................3

*Cook Biotech Inc. v. ACell, Inc.,*
    460 F.3d 1365 (Fed. Cir. 2006)........................................................................7

*Digital Biometrics, Inc. v. Identix, Inc.,*
    149 F.3d 1335 (Fed. Cir. 1998)......................................................................22

*Eaton Corp. v. Rockwell Int'l Corp.*,
    323 F.3d 1332 (Fed. Cir. 2003)..................................................................................12

*EMI Group N. America, Inc. v. Cypress Semiconductor Corp.*,
    68 F. Supp. 2d 421 (D. Del. 1999)............................................................................11

*Freeman v. Gerber Prods. Co.*,
    357 F. Supp. 2d 1290 (D. Kan. 2005), *on remand from*,
    120 Fed. Appx. 322 (Fed. Cir. 2005) (unpublished).............................................26

*Globespanvirata, Inc. v. Texas Instrument, Inc.*,
    No. Civ. 03-2854 (GEB), 2005 WL 984346 (D.N.J. Apr. 7, 2005) ............................4, 12

*Hockerson-Halberstadt, Inc. v. Converse Inc.*,
    183 F.3d 1369 (Fed. Cir. 1999)................................................................................25

*ICN Pharms., Inc. v. Geneva Pharms. Tech. Corp.*,
    272 F. Supp. 2d 1028 (C.D. Cal. 2003) ....................................................................12

*In re Cruciferous Sprout*,
    301 F.3d 1343 (Fed. Cir. 2002)................................................................................27

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
    381 F.3d 1111 (Fed. Cir. 2004)................................................................................13

*Intel Corp. v. Broadcom Corp.*,
    172 F. Supp. 2d 478 (D. Del. 2001)..........................................................................11

*Int'l Visual Corp. v. Crown Metal Mfg. Co.*,
    991 F.2d 768 (Fed. Cir. 1993)....................................................................................3

*Inverness Medical Switz. GmbH v. Warner Lambert Co.*,
    309 F.3d 1373 (Fed. Cir. 2002)................................................................................20

*Johns Hopkins Univ. v. CellPro, Inc.*,
    152 F.3d 1342 (Fed. Cir. 1998)................................................................................34

*Kemin Foods, L.C. v. Pigmentos Vegetales del Centro S.A. de C.V.*,
    301 F. Supp. 2d 970 (S.D. Iowa 2004) ......................................................................3

*Laitram Corp. v. Cambridge Wire Cloth Co.*,
    863 F.2d 855 (Fed. Cir. 1988)....................................................................................3

*Lighting World, Inc. v. Birchwood Lighting, Inc.*,
    382 F.3d 1354 (Fed. Cir. 2004)..........................................................................21, 31

*N. Telecom, Inc. v. Datapoint Corp.,*
   908 F.2d 931 (Fed. Cir. 1990)...................................................................................22

*N. Telecom Ltd. v. Samsung Elecs. Co.,*
   215 F.3d 1281 (Fed. Cir. 2000)...................................................................................20

*Nat'l Recovery Techs., Inc. v. Magnetic Separation Sys., Inc.,*
   166 F.3d 1190 (Fed. Cir. 1999)...................................................................................10

*Nazomi Commc'ns, Inc. v. Arm Holdings, PLC,*
   403 F.3d 1364 (Fed. Cir. 2005)...................................................................................10

*Omega Eng'g, Inc. v. Raytek Corp.,*
   334 F.3d 1314 (Fed. Cir. 2003)...................................................................................20

*On Demand Mach. Corp. v. Ingram Indus., Inc.,*
   442 F.3d 1331 (Fed. Cir. 2006)...................................................................................12

*Pause Tech., LLC v. TiVo, Inc.,*
   419 F.3d 1326 (Fed. Cir. 2005)...................................................................................25

*Pharmacia & Upjohn Co. v. Ranbaxy Pharms., Inc.,*
   274 F. Supp. 2d 597 (D.N.J. 2003), *aff'd in part, rev'd in part on other grounds,*
   85 Fed. Appx. 205 (Fed. Cir. 2003)..............................................................................3

*Phillips v. AWH Corp.,*
   415 F.3d 1303 (Fed. Cir. 2003)............................................................................10, 22

*Rambus Inc. v. Infineon Techs. AG,*
   318 F.3d 1081 (Fed. Cir. 2003)...................................................................................21

*ResQNet.com, Inc. v. Lansa, Inc.,*
   346 F.3d 1374 (Fed. Cir. 2003)....................................................................................3

*SanDisk Corp. v. Memorex Prods., Inc.,*
   415 F.3d 1278 (Fed. Cir. 2005)...................................................................................20

*SDS USA, Inc. v. Ken Specialties, Inc.,*
   107 F. Supp. 2d 574 (D.N.J. 2000)..............................................................................11

*Serrano v. Telular Corp.,*
   111 F.3d 1578 (Fed. Cir. 1997)...................................................................................20

*STX, Inc. v. Brine, Inc.,*
   37 F. Supp. 2d 740 (D. Md. 1999)...............................................................................14

*Storage Tech. Corp. v. Cisco Sys., Inc.,*
    329 F.3d 823 (Fed. Cir. 2003) ...................................................................20, 21

*Tehrani v. Hamilton Med., Inc.,*
    331 F.3d 1355 (Fed. Cir. 2003)...........................................................................13

*TI Group Automotive Sys. (N. Am.), Inc. v. VDO N. Am., L.L.C.,*
    375 F.3d 1126 (Fed. Cir. 2004)....................................................................21, 31

*United States v. Fleetwood Enters.,*
    702 F. Supp. 1082 (D. Del. 1988)...................................................................2, 17

*Vanguard Prods. Corp. v. Parker Hannifin Corp.,*
    234 F.3d 1370 (Fed. Cir. 2000).........................................................................20

*Vitronics Corp. v. Conceptronic, Inc.,*
    90 F.3d 1576 (Fed. Cir. 1996)............................................................................29

## STATUTES and RULES

35 U.S.C. § 112........................................................................................10, 34

37 C.F.R. § 1.57..............................................................................................7

Delaware Local Rule 7.1.3(c)(2) .................................................................2, 17

## MISCELLANEOUS

*Manual of Patent Examining Procedure ("MPEP")*, § 2163.07(b) .................................7

*Webster's Third New Int'l Dictionary of the English Language Unabridged*
    480 (1993) ................................................................................................39

Hitachi stands the claim construction process on its head. Hitachi does not look first to the claim language, next to the specification, and then to the prosecution history, even though Hitachi admits this is the proper procedure for claim construction (Hitachi Br. at pp. 16-17). Instead, Hitachi starts with a discussion of irrelevant extrinsic evidence, including commercial embodiments of VCT systems (which Hitachi incorrectly describes) and press releases and publications that post-date the filing of the '738 patent by more than a decade. Only after considering this irrelevant extrinsic evidence does Hitachi look to the '738 patent specification and claims, and then only to those portions that allegedly "confirm" Hitachi's already distorted and limited reading of the claim language.

Using this clearly improper approach to claim construction in its effort to manufacture an artificial noninfringement defense, Hitachi makes multiple attempts to read the limitation of "cam torque" into the asserted claims, which contain no such limitation. Hitachi's entire argument is predicated on the fallacy that the asserted claims are limited to systems in which all "energy" is "internally supplied," though again the terms "energy" and "internally supplied" do not appear in the claims. Hitachi's argument also erroneously assumes that cam torque actuated systems rely on an internally supplied energy source. In fact, cam torque actuated ("CTA") systems, just like oil pressure actuated ("OPA") systems, rely on *externally* supplied, pressurized oil to cause the vanes of a VCT system to rotate. In an OPA system, the oil is pressurized directly by the oil pump, which is rotated by operation of the engine. In a CTA system, the oil is pressurized by camshaft torque pulses, which are generated by operation of the engine. In *both* cases, the oil is moved *by an oil pump* through a main oil gallery ("MOG"), which is the enclosed passage for transportation of lubricating oil that extends from the engine oil crankcase. And, in *both* cases, the energy to pressurize the oil is supplied by the engine,

1

which is "*external*" to the VCT system.    (Ribbens Validity Rpt. (Ex. 18 to Supplemental Declaration of Mary Matterer ("Suppl. Matterer Decl.")) at ¶ 122).    Thus, there simply is no external/internal distinction between the two systems.  When the Court focuses on what is truly germane – *i.e.*, the actual language of the asserted '738 patent claims and the relevant intrinsic evidence – it is apparent that Hitachi's proposed constructions inject additional limitations that are improper.

Apparently recognizing the deficiencies of its characterization of "external v. internal," Hitachi served rebuttal expert reports just within the past week which jettison this argument and instead inject, for the first time, entirely new claim construction arguments. Hitachi's expert reports initially took *no* position on the correctness of Hitachi's or BorgWarner's positions – they attempted to apply the claims to the prior art using both Hitachi's and BorgWarner's constructions.  Yet, in their rebuttal expert reports, Hitachi's experts offer opinions on claim constructions for the first time, which raises the specter that Hitachi may attempt to back-door newly minted claim construction arguments in its cross response brief.  To the extent that Hitachi raises new claim construction positions for the first time in its reply brief, they should be rejected.[1]

## I.    Hitachi's Approach to Claim Construction Is Legally Erroneous.

As noted above, even before discussing the claims of the '738 patent, Hitachi delves into an extended discussion of other patents and commercial embodiments.  Hitachi then

---

[1] *See* Delaware Local Rule 7.1.3(c)(2)("the party filing the opening brief shall not reserve material for the reply brief which should have been included in a full and fair opening brief"); *see also United States v. Fleetwood Enters., Inc.*, 702 F. Supp. 1082, 1091 n.25 (D. Del. 1988) ("sand-bagging" by withholding arguments for reply leads to "added and unnecessary work for the Court"); *Bayer AG v. Schein Pharm., Inc.*, 129 F. Supp. 2d 705, 716 (D.N.J. 2001), *aff'd*, 301 F.3d 1306 (3d Cir. 2002) (striking portions of reply brief which raised new issues for the first time).

tries to read limitations into the '738 patent claims *from those later, unrelated patents and the parties' commercial embodiments of a VCT system.* Adoption of Hitachi's approach would constitute clear legal error. It is black-letter law that elements found in a commercial embodiment, but not in the patent, are not to be read into the claims. *See, e.g., Int'l Visual Corp. v. Crown Metal Mfg. Co.*, 991 F.2d 768, 771-72 (Fed. Cir. 1993) (court "incorrectly construed the claims to require a plastic housing" by "erroneous[ly]" focusing on commercial embodiment); *Laitram Corp. v. Cambridge Wire Cloth Co.*, 863 F.2d 855, 865 (Fed. Cir. 1988) (limitation from the commercial embodiment cannot be read into patent claims); *Cardiac Sci., Inc. v. Koninklijke Philips Elecs. N.V.*, No. Civ. 03-1064 DWF/RLE, 2006 WL 1050629, at *17 (D. Minn. Apr. 20, 2006) (improper to import the commercial embodiment of the patent into claim construction); *Kemin Foods, L.C. v. Pigmentos Vegetales del Centro S.A. de C.V.*, 301 F. Supp. 2d 970, 981 (S.D. Iowa 2004) (improper to consider the patentee's "commercial embodiment of the patent in determining claim meaning"). It is equally true that limitations cannot be injected from unrelated patents. *See, e.g., Pharmacia & Upjohn Co. v. Ranbaxy Pharms., Inc.*, 274 F. Supp. 2d 597, 607 n.12 (D.N.J. 2003) ("[W]e cannot allow the claim construction of the [patent-in-suit] to be based upon . . . unrelated other patents."), *aff'd in part, rev'd in part on other grounds*, 85 Fed. Appx. 205 (Fed. Cir. 2003) (unpublished).

Moreover, the operative question for the Court is how one of skill in the art would have understood claims 10 and 11 of the '738 patent at the time the invention was made – *i.e.*, 1993. *See, e.g., ResQNet.com, Inc. v. Lansa, Inc.*, 346 F.3d 1374, 1378 (Fed. Cir. 2003) ("A fundamental principle for discerning the usage of claim language is the ordinary and accustomed meaning of the words amongst artisans of ordinary skill in the relevant art *at the time of invention*." (emphasis added)). Rather than focusing on this time period, Hitachi relies on an

unrelated patent published in 2006 (Hitachi Br. at p. 1), a 2005 press release (Hitachi Br. at p. 22, n.26), and product literature from 2006 (Hitachi Br. at p. 38, n.55). Hitachi does not (and cannot) explain how these materials assist the Court in determining how one of skill would have understood the claims in 1993. Such after-the-fact extrinsic evidence is properly ignored in the claim construction analysis. *See, e.g., Brookhill-Wilk 1, LLC. v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1299 (Fed. Cir. 2003) (the court "consulted a number of unrelated and non-contemporaneous authorities . . . . dated well after the [patent-in-suit], [which] do not reflect the meanings that would have been attributed to the words in dispute by persons of ordinary skill in the art as of the grant of the [patent-in-suit], and for those reasons are not considered" in claim construction analysis); *Globespanvirata, Inc. v. Texas Instrument, Inc.*, No. Civ. 03-2854 (GEB), 2005 WL 984346, at *3 (D.N.J. Apr. 7, 2005) (extrinsic evidence, such as dictionaries, "published after the patent issued may not accurately reflect the meaning of a term to a person of ordinary skill in the art as of the grant of the patent, and therefore should not be considered in a claim construction analysis" (internal citation omitted)).

## II.     Nothing in the Claim Language, Specification, or Prosecution History Limits Claims 10 and 11 to Cam Torque Actuated Systems.

As explained in BorgWarner's Opening Claim Construction Brief, nothing in independent claim 10 or dependent claim 11 requires the use of cam torque for actuation of the vanes. By contrast, non-asserted claim 1 expressly recites "torque reversals" in two different parts of the claim. ('738 patent, col. 9, lines 63-64 ("said camshaft being subject to torque reversals during rotation thereof"), col. 10, lines 13-14 ("being reactive to torque reversals in said camshaft")). Claims 10 and 11 are simply not so limited.

The specification does not compel a different result. While the *preferred embodiment* of the vane actuation system involves the use of cam torque reversals, nothing in the

4

specification of the '738 patent limits claims 10 and 11 to that preferred embodiment. Contrary to Hitachi's assertion that the "invention" was "uniformly and unambiguously *defined* as a VCT that used camshaft torque reversals" (Hitachi Br. at 21 (emphasis added) (citing statement in "field of the invention")), the '738 patent specification indicates that the invention is broader. The specification does not say, as Hitachi suggests, that the claims are limited to CTA; it merely states that the field of invention "*relates to*" the use of torque reversals in the preferred embodiment. Nowhere does the patent say that other methods of pressurizing the oil to push the lobes cannot be used, and as Hitachi admits, other methods were well known in the art. In truth, the "field of the invention" (col. 1, lines 24-27),[2] "summary of the invention" (col. 2, lines 57-60),[3] and "objects" of the invention (col. 3, lines 58-64)[4] sections in the specification all make clear that the invention more broadly relates to a control system utilizing a variable force solenoid and vented spool to vary the timing of the camshaft relative to the crankshaft, and not only to a system that uses cam torque reversals to actuate the vanes in the system.

---

[2] '738 patent, col. 1, lines 24-27: "More specifically, the present invention relates to a control system which utilizes a variable force solenoid to directly control the position of a fully vented spool valve which is a[ ] useful part of the hydraulic system." Nothing in this text supports Hitachi's limitation of "the" hydraulic system to a CTA-only vane actuation system and exclusion of other vane actuation system, such as OPA.

[3] '738 patent, col. 2, lines 57-60: "The present invention provides an improved method and apparatus for controlling the position of a vented spool in a hydraulic control valve." Again, nothing in this text supports Hitachi's limitation of "a" hydraulic control valve to a CTA vane actuation system and exclusion of an OPA vane actuation system.

[4] '738 patent, col. 3, lines 58-64: "Accordingly, it is an object of the present invention to provide an improved method and apparatus for controlling the operation of a hydraulic control valve of the vented spool type. It is a further object of the present invention to provide an improved method and apparatus for controlling the operation of a hydraulic control valve of the vented spool type in an automotive variable camshaft timing system." Again, "a hydraulic control valve" is described as the "vented spool type," which has no relevance to whether the vanes are actuated by a CTA or OPA system. Similarly, the language "an automotive variable camshaft timing system" is not limited, as Hitachi urges, to a CTA-only vane actuation system to the exclusion of a vane actuation system relying on OPA. The language includes both types of vane actuation systems.

The specification also makes clear that the discussion of the invention therein is not intended to be limiting.  As the specification specifically explains, the patent is "limited solely by the terms" of the claims themselves.  ('738 patent, col. 9, lines 56-58).  This is because, as the specification further indicates, "it will be apparent to those skilled in the art that suitable modifications, variations, and equivalents may be made without departing from the scope of the invention." (*Id.*, at col. 9, lines 54-56).

Further confirmation that the control system of the '738 patent is not limited to a specific vane actuation system can be found in the prosecution history.  There, the applicants specifically stated that "[f]or the present invention, the VCT system used may be ... *any* one which uses a proportional spool valve to regulate flow of engine oil to control the phase angle adjustment." (Appeal Br. (Matterer Decl. Ex. 11) at 4 (emphasis added)).  Thus, far from limiting the scope of the invention as Hitachi suggests, the applicants made it clear to the Patent and Trademark Office ("PTO") (and thus to the public at large) that their invention is directed to *any* control system using the claimed elements to regulate the flow of oil to adjust camshaft phase angle, whether the vane actuation system is OPA, CTA, or one combining aspects of both.

Hitachi is in no position to contend otherwise.  In its Opening Claim Construction Brief, Hitachi itself recognizes that the invention in the '738 patent is a "*control system*" that involves a variable force solenoid and a vented spool. (Hitachi Br. at p. 1; *see also id.* at p. 10 (admitting that the "present invention" of the '738 patent "relates to a *control system* which utilizes a variable force solenoid to directly control the position of a fully vented spool"), and p. 12 (admitting that the "patent describe[s] the invention" as being "a *control system* for moving a vented spool") (emphasis supplied)).[5]  Hitachi further admits, in its summary judgment brief on

---

[5] Hitachi's assertion that the '738 patent "gives no details of the electronic control system"

non-infringement, that "the allegedly new aspects of the invention were the details of the spool valve and the solenoid." (Hitachi SJ Br. (Noninfringement) at p. 5). This improvement in the *control system*, which relates to the spool valve and variable force solenoid, is applicable to OPA systems, CTA systems, and hybrid systems (Ribbens Validity Rpt. (Suppl. Matterer Decl. Ex. 18) at ¶ 121), again demonstrating that the asserted claims are not limited to any specific vane actuation system. Whether the vane actuation system of the overall VCT system has aspects of cam-torque actuation, oil-pressure actuation, or both, is of no consequence to the control system of the asserted claims of the '738 patent. The Court should reject Hitachi's attempt to shoe-horn such a restriction into the asserted claims.

### III. Hitachi's Representation That CTA and OPA Are "Starkly Different" Is a Fiction.

To support the fallacy that OPA systems are mutually exclusive and "starkly different" from so-called CTA systems, Hitachi relies on irrelevant extrinsic information. Even then, Hitachi presents only the extrinsic information which it believes fits its artificial construct. Hitachi conveniently ignores information undermining its position, including that:

- Hitachi has at least one OPA patent (*e.g.*, U.S. Patent No. 6,920,854)[6] which cites the '738 patent, thus refuting Hitachi's assertion that the '738 patent would have no relevance to OPA systems;

---

(Hitachi Br. at p. 10) is wrong. The '738 patent does more than point the reader to the '578 patent in passing – the '738 patent expressly incorporates by reference the '578 patent. "The information incorporated is as much a part of the application as filed as if the text was repeated in the application, and should be treated as part of the text of the application as filed." Manual of Patent Examining Procedure ("MPEP"), §2163.07(b); 37 C.F.R. § 1.57; *Cook Biotech Inc. v. ACell, Inc.*, 460 F.3d 1365, 1376 (Fed. Cir. 2006). The '578 patent provides extensive details on the control system to be used (*see* '578 patent (Matterer Decl. Ex. 2), col. 7, lines 21-38; col. 3, line 5 – col. 5, line 29; Figs. 1a-1f), and thus the '738 patent discloses these details as well.
[6] Suppl. Matterer Decl. Ex. 19.

- there is not a sharp divide between CTA and OPA systems, as evidenced by numerous BorgWarner patents (including patents cited in Hitachi's brief) directed at hybrid systems called "torsional assist" ("TA"), which combine elements of both CTA and OPA;[7]

- one BorgWarner patent that discloses hybrid CTA/OPA embodiments is the BorgWarner '725 patent, which Hitachi curiously relies on to argue that OPA and CTA are "starkly different";[8] and

- 

# REDACTED

[9]

Even more fundamentally, Hitachi ignores intrinsic evidence – which is clearly relevant to claim construction – undermining its position. For example, during prosecution of the '738 patent, the PTO Examiner cited OPA prior art, including Hitachi OPA patents, as "pertinent to the applicant's disclosure."[10] Notwithstanding this, Hitachi tells the Court both that the invention is limited to CTA systems and that there is a fundamental dichotomy and

---

[7] Notably, Hitachi cropped "TA," torsional assist, from its recitation of what the recent BW patent application discloses. (Hitachi Br. at p. 1). Moreover, the quote from the BW patent application is referring to the VCT *phaser*, which is the vane actuation system, not the control system.

[8] U.S. Patent No. 5,657,725 (Suppl. Matterer Decl. Ex. 20), col. 3, lines 13-18 ("The second embodiment of the present invention utilizes *both engine oil pressure* and *camshaft torque pulses* in combination as the source of energy for actuation." (emphasis added)).

[9] Hitachi's assertion that BorgWarner rejected OPA and was unable to produce a "viable" system is therefore wrong. *See, e.g.*, Suppl. Matterer Decl. Ex. 21 (Torsional Assist technical information); U.S. Patent No. 6,772,721 (Suppl. Matterer Decl. Ex. 22).

[10] *See, e.g.*, Office Action, dated January 4, 1994 (Suppl. Matterer Decl. Ex. 23), (citing Atsugi Unisia's U.S. Patent Nos. 5,201,289 and 5,150,671). Atsugi Unisia is a "predecessor company" of Hitachi, Ltd. (*See* Hitachi Br. at p. 7).

incompatibility between OPA and CTA systems. (Hitachi Br. at pp. 1, 3, 5-7).

Significantly, the PTO continued to maintain the rejections based on OPA art even *after* the supposed "unequivocal" disclaimer of OPA systems from all of the claims. Following the examiner's rejection over the Strauber patent, which even Hitachi contends is an OPA reference, the applicants made the "internal to the VCT mechanism" statement that Hitachi seizes on in its claim construction arguments. (*See* June 30, 1994 Reply to Office Action at 4 (Matterer Decl. Ex. 9)). The examiner, however, continued to reject the claims (including issued claim 10) over Strauber even after this statement was made. (*See* Aug. 1, 1994 Office Action at 2-3 (Suppl. Matterer Decl. Ex. 24)). Had the examiner thought that the applicants had limited the claims to a CTA system, this continued rejection over Strauber would have been unnecessary. Indeed, if CTA and OPA were fundamentally different as Hitachi contends (Hitachi Br. at pp. 1, 3, 5-7), the Strauber OPA reference would teach away from a CTA system. The fact that the Examiner never articulated any motivation to combine the cited OPA reference (Strauber) with CTA references confirms that he did not view the claim language to differentiate between CTA and OPA and that he did not consider the claims to be limited to CTA vane actuation systems.

Hitachi's conclusory assertion that there are "very significant structural and operational changes that must be made" to the disclosed preferred embodiment if it is to be used in an OPA system is equally flawed and not relevant to issues of claim construction. (Hitachi Br. at p. 21). For one thing, Hitachi fails to identify any "very significant" structural and operational changes that supposedly would be necessary to utilize OPA, much less explain why these alleged structural and operational changes would be "very significant" to one of skill in the art reading the '738 patent. For another, Hitachi says the exact opposite in moving for summary judgment of

9

no willful infringement.

REDACTED

[11]

Hitachi also admits in another summary judgment motion that "[u]sing engine oil pump pressure and external flow to change the phase and without internal check valves in the VCT was well known in the art at the time of filing of the '738 patent application," thereby undercutting Hitachi's bare allegation that the '738 patent does not enable OPA (Hitachi SJ Br. (Noninfringement) at p. 35). Not only are Hitachi's § 112 allegations relating to this claim term therefore incorrect, but they are not relevant to the claim construction issues at hand in any event. *See, e.g., Nazomi Commc'ns, Inc. v. Arm Holdings, PLC*, 403 F.3d 1364, 1368-69 (Fed. Cir. 2005) ("[I]t is essential to understand the claims before their breadth is limited for purposes of preserving validity. Otherwise the construing court has put the validity cart before the claim construction horse."); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (claims should be construed to preserve their validity, but validity analysis is not a regular component of claim construction); *Nat'l Recovery Techs., Inc. v. Magnetic Separation Sys., Inc.*, 166 F.3d 1190, 1196 (Fed. Cir. 1999) (separating claim construction and enablement inquiry). Alleged enablement or written description deficiencies are a separate inquiry from claim construction and are not relevant here.

In truth, there is nothing about a closed loop control system, a variable force solenoid, or a vented spool that makes them incompatible with an OPA system, a CTA system, or a hybrid system. Nowhere in Hitachi's voluminous submissions on claim construction and

---

[11] (Suppl. Matterer Decl. Ex. 25).

summary judgment does Hitachi even allege that a variable force solenoid and vented spool are somehow incompatible with an OPA system or a hybrid system.  That is because they are compatible.  (*See* Ribbens Validity Rpt. (Suppl. Matterer Decl. Ex. 18) at ¶ 121)).

## IV.    Hitachi's Proposed Constructions Should Be Rejected in Favor of BorgWarner's.

### A.    The Preamble Is Not a Limitation in the Claim and Should Not Be Used to Limit the Claim to CTA Vane Actuation Systems.

#### 1.    Mere Recitation of Structural Elements in the Preamble of a Method Claim Does Not Convert the Preamble into a Limitation.

Contrary to Hitachi's assertion, the preamble should not be construed as an affirmative limitation of the asserted claims.  Independent claim 10 is a method claim that recites five steps.  The preamble of claim 10 simply introduces the steps recited in the body of the claim. The preamble does not set forth any additional step, nor does it recite any structure not mentioned in the body of the claim.  The body of the claim fully sets forth the invention.  Hence, the preamble should not be regarded as a limitation.  *See, e.g., Intel Corp. v. Broadcom Corp.*, 172 F. Supp. 2d 478, 510-11 (D. Del. 2001) ("Nothing in the preamble is necessary to define [the] claim[, which] is fully defined by its elements and the limiting wherein clauses which follow them.  The court finds that the preamble language . . . is language of intended use and does not serve to limit the meaning of the claim."); *EMI Group N. Am., Inc. v. Cypress Semiconductor Corp.*, 68 F. Supp. 2d 421, 430 (D. Del. 1999) ("Preambles should not be construed as claim limitations . . . when the body of the claims fully sets forth the complete invention, and the preamble offers no distinct definition of any of the claims' limitations." (internal citation omitted)); *see also SDS USA, Inc. v. Ken Specialties, Inc.*, 107 F. Supp. 2d 574, 592-93 (D.N.J. 2000) ("where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention, the preamble is not a claim limitation"); *Bristol-Myers Squibb Co. v. Immunex Corp.*, 86

11

F. Supp. 2d 447, 450-51 (D.N.J. 2000) ("From examination of the patent, the [c]ourt finds that . . . 'the [disputed] phrase is a shorthand encapsulation of the advantages of the invention.' . . . The [c]ourt cannot transform a statement of objective into a structural limitation. . . . [The] patent's limitations stand alone; the preamble sections express only the intended use of the invention." (internal citation omitted)).

Also contrary to Hitachi's suggestion, the fact that the preamble of claim 10 introduces a structural element described in the body of the claim does not turn the preamble into a limitation. *See, e.g.*, *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1367, 1371-72 (Fed. Cir. 2003) (preamble not limiting even when it provided antecedent basis for terms used in claim body); *Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1371 (Fed. Cir. 2001) (holding that the preamble "[a] method for treating a patient suffering from a taxol-sensitive tumor comprising" did not limit the claim even though the body of the claim relied on the term "a patient" for antecedent basis); *Globespanvirata, Inc.*, 2005 WL 984346, at *8-10 (the fact that the body of the claim relies on the preamble for antecedent basis does not render the preamble limiting); *ICN Pharms., Inc. v. Geneva Pharms. Tech. Corp.*, 272 F. Supp. 2d 1028, 1045 (C.D. Cal. 2003) ("[E]ven though the preamble provides the antecedent bases for the 'T cell,' 'Th1 response,' and 'Th2 response' limitations, the body of the claim sets out the complete invention and the antecedent bases do not limit the claim any more than the terms do within the body of the claim. Thus, the preamble is not a limitation.").[12]

---

[12] The cases cited by Hitachi, *Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003) and *On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1343-44 (Fed. Cir. 2006) (Hitachi Br. at 20, nn.20-21), are distinguishable and do not compel a different result here. In *Eaton*, the preamble was found to be a limitation because without it, one of the steps "could not be performed," 323 F.3d at 1339, and in *On Demand*, the preamble language "high speed manufacture of a single copy book" was clear and used consistently in the body of the claim. 442 F.3d at 1344. By contrast, the steps of asserted claim 10 can be performed without

Nor does the fact that the preamble was amended during prosecution make it a limitation on the claim as Hitachi suggests. *See, e.g., Tehrani v. Hamilton Med., Inc.*, 331 F.3d 1355, 1363 (Fed. Cir. 2003) (finding that amendment to preamble did not restrict the claim). Here, the amendments to the preamble were made to address the Examiner's concerns about "unity of invention," and to avoid a restriction requirement, not to overcome prior art. The "obviousness concerns" expressed by the Examiner related to obviousness double patenting, which were addressed by (i) the amendment to claim priority to the previously-filed U.S. Patent No. 5,218,935, and (ii) the filing of a terminal disclaimer. (Appeal Brief (Matterer Decl. Ex. 11) at p. 2).

Hitachi does not dispute that the preamble here sets forth the intended use and function of the claimed steps – namely, a "method of regulating the flow of hydraulic fluid from a source to a means for transmitting rotary movement from said crankshaft to a housing." ('738 patent, col. 12, lines 1-3). The preamble introduces the claim as being related to a series of method steps for regulating the flow of lubricating oil from the main oil gallery (the only "source" referenced in the specification) to the recesses in the vane housing (where the oil is fed to adjust the camshaft angle relative to the crankshaft angle, without regard to whether the oil is pressurized by the oil pump (OPA) or camshaft torque (CTA)). Accordingly, the preamble is properly regarded not as a claim limitation, but as prefatory language which simply introduces the method steps recited thereafter. *See, e.g., Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1118 (Fed. Cir. 2004) ("Language in a preamble limits a claim where it breathes life and meaning into the claim, but not where it merely recites a purpose or intended use of the invention. In this case, we need not decide whether the preamble adds a limitation to the claim because we hold that it recites a purpose or intended use of the claimed filter assembly . . . ."

---

the preamble and are self-contained.

(internal citation omitted)); *ADE Corp. v. KLA-Tencor Corp.*, 288 F. Supp. 2d 590, 595 (D. Del. 2003) ("A preamble does not limit a patent claim where it 'simply states the intended use or purpose of the invention . . . .' Instead, the preambles merely convey to the reader the intended use and purpose of the invention." (internal citation omitted)).

Hitachi may believe that the preamble provides it with non-infringement arguments, but that is beside the point. "[T]he mere fact that a patentee [or, in this case, accused infringer] finds something useful in a claim preamble in the [patent] litigation does not alone justify treatment of a claim preamble as a limitation." *STX, Inc. v. Brine, Inc.*, 37 F. Supp. 2d 740, 752 (D. Md. 1999), *aff'd*, 211 F.3d 588 (Fed. Cir. 2000); *see also Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*, 154 F.3d 1345, 1350 (Fed. Cir. 1998) (concluding that the term "bearingless" in the preamble was not a limitation of the claim and rejecting accused infringer's non-infringement defense based on an argument that the accused product was not "bearingless").

> **2.    If the Court Were to Find That the Preamble Limits the Claim, Hitachi's Restrictive Constructions Are Contrary to the Specification and the Prosecution History.**
>
> **a. The Phrase "In an Internal Combustion Engine Having a Variable Camshaft Timing System for Varying the Phase Angle of a Camshaft Relative to a Crankshaft" Is Not Limited to CTA Vane Actuation.**

There is nothing in the plain language of this claim recitation that requires the angular position of the camshaft relative to the crankshaft to be varied "in reaction to camshaft torque reversals," as Hitachi urges. Nor is there any reason to import an additional limitation from the specification or prosecution history that limits the vane actuation system to which the control system is applied. As explained above, the specification and prosecution history both identify the invention as relating to a control system that uses a variable force solenoid for controlling the position of a vented spool without regard to whether the vane actuation system is CTA or OPA actuated. Hitachi's attempt to limit this preamble phrase to a CTA-only vane actuation system

14

should be rejected for the reasons provided above, and the claim language should be given its plain meaning as proposed by BorgWarner.

### b. The Phrase "A Method of Regulating the Flow of Hydraulic Fluid" Is Not Limited to CTA Vane Actuation Systems.

As explained in BorgWarner's opening claim construction brief, if the preamble is considered to be a claim limitation, this phrase should be construed according to its plain language to mean a series of method steps involving controlling the flow of hydraulic fluid (e.g., oil). Hitachi contends that this straightforward phrase should be construed to mean "[a] method of directing the flow of oil 'internal to the VCT mechanism only' i.e., internal to the VCT actuator, in order to change the phase angle of a camshaft relative to a crankshaft." (Hitachi Br. at p. 18). In doing so, Hitachi is clearly attempting to read limitations into the claim. This is improper.

### 1. Hitachi Misreads the Prosecution History Statements Regarding "Controlling the Flow of Oil Internal and External to the VCT Mechanism."

Hitachi distorts the meaning of a single statement made during prosecution (a distinction over the Strauber patent) in an attempt to limit all of the claims to CTA vane actuation (Hitachi Br. at pp. 22-23). As pointed out in BorgWarner's opening brief, Hitachi's interpretation of the prosecution history is hardly the only reasonable interpretation, and is anything but the "clear and unambiguous" disclaimer required to read the limitation into the claim that Hitachi proposes here. (*See* BorgWarner Opening Brief at pp. 17-20).

In fact, there is no basis whatsoever for Hitachi's contention that references to "internal" and "external" in the prosecution history refer to the "energy" source. The statements in the prosecution history upon which Hitachi relies (and which BorgWarner cited in its Opening Claim Construction Brief) refer to "controlling the flow of oil," not "energy" or "energy source." There is no mention of "energy" in the claims, specification, or prosecution of the '738 patent,

15

and Hitachi has identified none that is relevant.[13]

Even if Hitachi were correct that "internal" and "external" refer to the "energy" source, Hitachi's attempt to equate "internal" to CTA and "external" to OPA makes no sense. As noted above, *both* CTA and OPA rely on pressurized oil to move the vanes, and *both* CTA and OPA rely on *external* energy sources in the engine to pressurize the oil (Ribbens Validity Rpt. (Suppl. Matterer Decl. Ex. 18) at ¶ 122). Nothing supports Hitachi's artificial conclusion that energy from the oil pump is somehow "external" to the so-called VCT mechanism, while energy from camshaft torque, which is generated by the operation of the engine when camshaft lobes react to the force of valve springs, is somehow "internal" to the so-called VCT mechanism.

Even if Hitachi's "external/internal" interpretation did make sense in the abstract, it cannot be reconciled with the prosecution history. During prosecution, the applicants stated that Strauber controls the flow of oil "*both internal[ly] and external[ly]*." (*See, e.g.*, Matterer Decl. Ex. 9, at 4; Ex. 10, at 3; and Ex. 11, at 8).[14] If OPA means "external" and CTA means "internal," as Hitachi maintains, then Strauber would be both OPA and CTA. Yet, in its Opening Claim Construction Brief, Hitachi states that Strauber is an "OPA system" (Hitachi Br. at p. 23), which "use[s] an 'external energy' source." (Hitachi Br. at p. 3). Hitachi's internal/external distinction simply makes no sense and is inherently contradictory.

Moreover, the statement in the prosecution history relates to the flow of oil

---

[13] The '804 patent, which is incorporated by reference into the '738 patent, does use the term "external energy." However, this is in reference to a *separate, stand-alone hydraulic motor*, not using engine oil from an oil gallery or engine oil pump that is integral with the engine. Even if one were to accept Hitachi's arguments regarding the meaning of "external" (Hitachi Br. at pp. 1, 3-5, 7, 10, 14), they would relate only to a system that utilizes a separate, external hydraulic motor. No such system is at issue in the embodiments of the '738 patent or in this lawsuit.

[14] In moving for summary judgment, Hitachi acknowledges that Strauber controls the flow of oil "both internal[ly] and external[ly]" (Hitachi SJ Brief (Noninfringement) at pp. 32-33 (emphasis added)), but this acknowledgement was conspicuously absent from Hitachi's Opening Claim Construction Brief.

internal to the VCT "*mechanism*," not the VCT system. The term "VCT mechanism" is not used in the claims, the specification or elsewhere in the prosecution history.[15] It is far from clear what was meant by this term, and certainly Hitachi's construction cannot be correct. For example, Hitachi excludes the spool valve from the "VCT mechanism," but this is clearly necessary to effectuate a change in phase angle.[16]

To understand the statements made during prosecution about "controlling the flow of oil internal and external to the VCT mechanism," it is helpful to understand the real distinction the applicants were making over the Strauber patent. Strauber describes a system in which oil is present on external ends of a spool and flows through passages at these ends. In Strauber, oil is present on the end of the spool and along the central passage (36) through which oil flows when the spool (called a "piston" in the '774 patent) is in its initial position as shown in Figure 1. Oil is also present on the external end of the spool, and flows along the central, internal passage, when the spool is in its working position (not shown in the figures). (*See, e.g.*, U.S. Patent No. 5,012,774 ("the '774 patent" or "Strauber patent") (Suppl. Matterer Decl. Ex. 26), Fig. 1; col. 3, line 36-col. 4, line 5; Ribbens Validity Rpt. (Suppl. Matterer Decl. Ex. 18) at ¶ 44)). In contrast,

---

[15] Although Hitachi does not make this argument in its Opening Claim Construction Brief and in its initial expert reports, Hitachi's rebuttal expert reports, which were served on the night of October 19, 2006, argue that earlier BorgWarner patents use the term "VCT mechanism." To the extent Hitachi seeks to rely on those arguments in reply, they should be disregarded. *See* Delaware Local Rule 7.1.3(c)(2)( "The party filing the opening brief shall not reserve material for the reply brief which should have been included in a full and fair opening brief."); *Fleetwood Enters., Inc.*, 702 F. Supp. at 1091 n.25; *Bayer AG*, 129 F. Supp. 2d at 716, *aff'd*, 301 F.3d 1306 (striking portions of reply brief which raised new issues for the first time). In any event, those earlier patents use the term "VCT mechanism" to discuss various aspects of the VCT system, but there is no discussion concerning control of fluid "external or internal" to the "mechanism."

[16] In its Opening Claim Construction Brief, Hitachi equated "VCT mechanism" with "VCT actuator," which it defined as consisting of only the "vane lobe/check valve mechanism." (Hitachi Br. at 23). Hitachi did not include the "flow path through the spool valve." To the extent Hitachi seeks to morph its interpretation of "VCT mechanism" in its response brief, that would demonstrate that even Hitachi cannot decide what it means, thus confirming the inherent ambiguity of the term.

the '738 patent eliminates oil pressure against the external ends of the spool valve and instead discloses an oil flow control system (as part of a VCT) in which the oil flows within internal lands of the spool valve and to the vane housing.    The '738 specification and prosecution repeatedly emphasize the importance of removing fluid pressure from the external ends of the spool, *not* removing pressurized oil from the internal lands of the spool or the vanes, which would render the VCT system inoperative.  (*See, e.g.*, '738 patent, col. 1, lines 36-67; col. 2, lines 1-47; col. 3, lines 15-49; col. 8, lines 2-35; *see also, e.g.*, Orig. Spec. at col. 1, line 27- col. 4, line 2; col. 5, line 3- col. 6, line 3; col. 14, line 21- col. 15, line 20 (Matterer Decl. Ex. 8); Ribbens Validity Rpt. (Suppl. Matterer Decl. Ex. 18) at ¶ 44; *see also* discussion in opening BorgWarner Claim Construction Brief at pp. 19-20).

As BorgWarner pointed out in its Opening Claim Construction Brief, the applicants' remark that the invention "controls the flow of oil internal to the VCT mechanism only" is more properly viewed as reiterating the scope of the claims as drafted and emphasizing one of the key differences between the VCT system of the '738 patent and the DPCS prior art – namely, that the claimed system uses a variable force solenoid and vented spool and does not balance against external oil pressure on the ends of the spool valve.  Had BorgWarner wanted to disclaim OPA systems in claim 10, or had the PTO Examiner required such a disclaimer in claim 10, BorgWarner could have simply said that Strauber does not use "cam torque reversals," which is the express language in non-asserted claim 1 that limits claim 1 to CTA vane actuation.

### 2.    Hitachi Misreads the Specification Statement Regarding Oil Flow.

Hitachi also misapprehends the statement in the '738 specification that the flow of oil from the main oil gallery "bypasses" the spool (Hitachi Br. at 23, citing '738 patent, col. 8, lines 17-18).  When examined in its context in the specification, that statement distinguishes the

flow of oil in prior art differential pressure control systems ("DPCS") where the oil traveled

down an "internal" passage in the center of the spool.  ('738 patent, col. 8, lines 18-19).  As in

these systems, Strauber has oil traveling down an internal passage in the center of the spool.

(*See, e.g.*, Strauber '774 patent (Suppl. Matterer Decl. Ex. 26) at Fig. 1).  Oil flow in the '738

patent is different, as the applicants explained.  But "by-passing" a central passage in the spool

does *not* mean, as Hitachi seems to suggest, that the '738 patent lacks oil passing through the

spool valve.  Rather, in the '738 patent, oil passes through the internal lands of the spool valve,

and oil from the main oil gallery is "controlled" by the internal lands on the spool.  The flow of

oil in Figure 19 of the '738 patent is shown in yellow in the drawing below:



FIG. 19

3.   **The Prosecution History Statements and Figures of the
     '738 Patent Cannot Add Additional Limitations to the
     Asserted Claims.**

As explained in BorgWarner's Opening Claim Construction Brief, prosecution

history statements can only limit a claim if an applicant has clearly and unambiguously

disavowed claim scope. *See, e.g., Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324-26 (Fed. Cir. 2003); *N. Telecom Ltd. v. Samsung Elecs. Co.*, 215 F.3d 1281, 1293-95 (Fed. Cir. 2000); *Vanguard Prods. Corp. v. Parker Hannifin Corp.*, 234 F.3d 1370, 1372 (Fed. Cir. 2000); *Serrano v. Telular Corp.*, 111 F.3d 1578, 1584 (Fed. Cir. 1997); *see also* BorgWarner Opening Brief at pp. 15-17. Contrary to Hitachi's contention, no such disclaimer has been made here. Hitachi's proposed interpretation of the prosecution history is, at best, only one of two or perhaps more reasonable interpretations. And, when a prosecution statement is open to several reasonable interpretations, there can be no disclaimer. *See SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1288 (Fed. Cir. 2005) (where patentee's reading of the prosecution argument is "at least reasonable," there is no "'clear and unmistakable surrender'" of claim meaning (internal citation omitted)); *Inverness Med. Switzerland GmbH v. Warner Lambert Co.*, 309 F.3d 1373, 1382 (Fed. Cir. 2002); *N. Telecom*, 215 F.3d at 1293-95.

Moreover, even if the Court were to conclude that the prosecution history statement refers to using cam torque reversals as Hitachi contends (and it does not), that still would not help Hitachi. At most, the statement would apply to issued claim 1, which (unlike claim 10) specifies that the "control means" is "reactive to torque reversals in [the] camshaft." ('738 patent, col. 10, lines 13-14). The Federal Circuit has made clear that even when a prosecution history statement "appears to limit claim scope, it cannot do so absent some claim language referring to [the proposed limitation]." *Storage Tech. Corp. v. Cisco Sys., Inc.*, 329 F.3d 823, 832 (Fed. Cir. 2003) (holding that a prosecution statement that in the invention "as recited in claims 1, 11 and 18, the instance of network policy and the policy identification information are both cached" did not limit the scope of claim 1 "absent some claim language referring to the caching of the instance of network policy"). When a "prosecution history

20

statement describes generally the features of the claimed invention and erroneously suggests that the independent claims include a [particular feature], . . . [t]he applicants' inaccurate statement cannot override the claim language itself, which controls the bounds of the claim." *Id.*; *see also, e.g., Rambus Inc. v. Infineon Techs. AG*, 318 F.3d 1081, 1089-90 (Fed. Cir. 2003) (concluding that a prosecution history statement that four independent claims, and the related dependent claims, were directed to a device with three specific limitations did not limit independent claim 26, which only recited one of the limitations, because the "imprecise statement in the prosecution history" was not correct in suggesting that all three features appeared in each of the claims).

It is likewise improper for Hitachi to limit the claim to CTA because the figures of the '738 patent depict a preferred CTA embodiment. The Federal Circuit has made clear that "the scope of the claims is not limited to particular embodiments depicted in the figures or described in the written description." *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1365 (Fed. Cir. 2004) ("the fact that the patentee has not included figures depicting . . . other orientations is not sufficient to limit the claim language to the particular orientation depicted in the figures."); *see also Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1306-07 (Fed. Cir. 2003) ("[T]he mere fact that the patent drawings depict a particular embodiment of the patent does not operate to limit the claims to that specific configuration." (internal citations omitted)); *TI Group Automotive Sys. (N. Am.), Inc. v. VDO N. Am., L.L.C.*, 375 F.3d 1126, 1136 (Fed. Cir. 2004) (same). Hitachi's attempt to read structures from the figures of the '738 patent into the asserted claims should thus be rejected.

### c. Hitachi's Construction of the Term "Source" Directly Contradicts the Specification and Claims.

As noted in BorgWarner's Opening Claim Construction Brief (at pp. 17-18), Hitachi's interpretation of "source" as "a supply volume of oil located in a recess on one side of

certain of the lobes of a vane in a housing (or piston-cylinder) and pressurized primarily by camshaft torque" (Hitachi Br. at pp. 24-25) cannot be correct. Acceptance of Hitachi's proposed construction of the "source" as both of the "recesses" in the vane housing, which is central to Hitachi's entire proposed construction of the claim as limited to CTA vane actuation, would contradict the express words of the claims and specification, which are the most important forms of intrinsic evidence. *See, e.g., Phillips*, 415 F.3d at 1315 (the Federal Circuit has "long emphasized the importance of the specification in claim construction"); *Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1344 (Fed. Cir. 1998) (the "actual words of the claim are the controlling focus" of the claim construction inquiry).

Both issued claim 4 and application claim 16, which are part of the original disclosure,[17] reference a conduit for transferring lubricating oil from a pressurized source '230,' the MOG (main oil gallery). ('738 patent, col. 11, lines 12-16; Orig. Spec. p. 24 (claim 16)). The main oil gallery is the main conduit or passage for lubricating oil from the oil pump to the various components throughout the engine. The MOG is the only source of oil described in the patent specification. The specification never refers to the internal recesses in the vane housing as a "source" for oil. As claim 4 of the '738 patent makes clear, "pressurized oil" can be and is delivered from the MOG source to the control means "and back again." ('738 patent, col. 11, lines 14-16; *see also* col. 7, lines 34-36 ("engine oil" is fed into the vane housing "directly from main oil gallery ('MOG') 230 of the engine")). Relatedly, original application claim 16 teaches that the "source of hydraulic fluid" is '230' (the MOG), and fluid flows from this source to the

---

[17] Because both issued claim 4 and application claim 16 are part of the original disclosure, they are part of the specification. *See, e.g., N. Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 938 (Fed. Cir. 1990) ("The original claims as filed are part of the patent specification.").

vane actuators (160a and 160b). With this clear disclosure, there should be no dispute that the MOG is the "source" referred to in the asserted claims of the '738 patent.

Hitachi claims that BorgWarner's construction cannot be correct because the '738 patent, in Hitachi's view, does not disclose or enable the transfer of pressurized oil to the vane actuator. But this is untrue. In *all* of the embodiments of the '738 patent, pressurized oil is necessarily supplied to the vane actuator from the main oil gallery at some point during operation. Oil must be supplied to both CTA and OPA systems at engine start up, and a "continuous" supply of make-up oil is provided to the vane actuator. ('738 patent, col. 9, lines 44-45).[18] *See supra*, at page 19 (drawing of Fig. 19 showing the flow of oil, in yellow, from the MOG).[19]

Significantly, Hitachi's construction requires that the oil be "pressurized *primarily* by camshaft torque." (Hitachi Br. at p. 18 (emphasis added)). The fact that Hitachi included "wiggle room" in its construction demonstrates Hitachi's appreciation that the system disclosed in the '738 patent does in fact rely on oil pressure generated by means *other than camshaft torque* – namely, from the engine oil pump or main oil gallery. The qualifying language used by Hitachi also further undermines Hitachi's attempt to draw a strict dividing line between CTA and OPA. If CTA and OPA were indeed mutually exclusive and if the '738 patent utilized CTA, and CTA only, as Hitachi alleges, there would be no need for such a qualifier.

---

[18] Hitachi admitted as much in its opening brief. (Hitachi Br. at 23).

[19] In Hitachi's recently-served rebuttal expert reports, Hitachi's expert makes the new assertion that the "source" in claim 10 is "for effecting a phase change." This new claim construction argument is untimely and should be rejected. *Bayer*, 129 F. Supp. 2d at 716 (D.N.J. 2001). In any event, the claim does not say that the "source" effects a phase change, and nowhere in the '738 patent does it say that the claimed "source" is the source for effecting a phase change. The claimed "source" is the source for oil, nothing more.

Not only does Hitachi's proposed construction exclude from the meaning of "source" the one structure (*i.e.*, the main oil gallery ('MOG')) that the intrinsic evidence explicitly refers to as "source," but Hitachi also attempts to rewrite the claim language. Hitachi's Opening Claim Construction Brief states that the "recesses" are the "source<u>s</u>" (Hitachi Br. at p. 33, n.43 (emphasis added)), but the claim specifies a "source," not multiple source<u>s</u>. Hitachi's contorted suggestion that the "source" of oil is the transient supply in the recess on one side of the vane housing – that is, until the "source" flip-flops to the other side, and back again – finds no support in the intrinsic evidence of the '738 patent. Nothing in the specification supports having a changing "source." This is further evidence that Hitachi is urging an erroneous construction.

### d.    The Phrase "A Means for Transmitting Rotary Movement from Said Crankshaft to a Housing"

The recitation in the preamble is "a method of regulating the flow of hydraulic fluid *from a source to a means for transmitting rotary movement* from said crankshaft *to a housing*." ('738 patent, col. 12, lines 3-6 (emphasis added)). Hitachi concludes that the "means" part of this recitation is limited to a chain or belt (and sprocket), and Hitachi then interprets the entire recitation as meaning that oil is splashed from the source *onto a belt or chain* and associated sprocket for purposes of lubrication of the chain, not control of camshaft phase angle or actuation of a vane in a VCT system. Contradicting its own argument, the "source," under this construction, would have to be the crankcase, or main supply of oil.

Although not mentioned in its Opening Claim Construction Brief, Hitachi seeks this construction in an attempt to boot-strap it into a finding of invalidity in a recently filed summary judgment motion on the alleged grounds that there is no written description in the '738 patent to support a claim directed to supplying oil to a chain or belt. (*See* Hitachi SJ Br. (§ 112 Regulating)). The two positions are inherently contradictory. By Hitachi's own admission,

Hitachi's reading of this claim recitation leads to a construction that is "nonsensical." (Hitachi SJ Br. (§ 112 (Regulating)) at p. 8, n.5). And, as Hitachi further acknowledges in its motion for summary judgment of invalidity, nothing in the '738 patent describes, relates to, or supports Hitachi's nonsensical interpretation of this claim recitation. (*See* Hitachi SJ Br. (§ 112 (Regulating)) at p. 8, stating that "the '738 patent does *not* teach regulating oil flow from a 'source' to the chain/belt" (emphasis in original)). Hitachi even states in its summary judgment brief that supplying oil to a belt would be contrary to the express teachings of the '738 specification. (*Id.* at pp. 7-8, citing Hitachi's technical expert, Mr. Robert Kuhn, (Kuhn II Decl., at ¶¶ 15-17)). Hitachi's concession that its construction lacks support in the specification should be reason enough for the Court to dismiss Hitachi's proposed construction.

Hitachi's proposed construction of this claim recitation also ignores the context of the surrounding claim language and the rest of the claim. Hitachi's reading of the claim term in isolation is improper. *See, e.g., Pause Tech., LLC v. TiVo, Inc.*, 419 F.3d 1326, 1331 (Fed. Cir. 2005) (proper patent claim construction requires interpretation of the entire claim in context, not single element in isolation); *Hockerson-Halberstadt, Inc. v. Converse Inc.*, 183 F.3d 1369, 1374 (Fed. Cir. 1999) (same); *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088-90 (Fed. Cir. 2003) ("While certain terms may be at the center of the claim construction debate, the context of the surrounding words of the claim also must be considered . . . ."); *Brookhill-Wilk*, 334 F.3d at 1299 (same).

BorgWarner's construction, by contrast, properly considers the claim recitation in the context of the remainder of the claim, the specification, and the prosecution history. *See, e.g., Pause Tech., LLC*, 419 F.3d at 1331. The corresponding structure for performing the recited function of transmitting rotary movement includes the crankshaft sprocket, a camshaft sprocket,

and a timing chain or timing belt wrapped around the crankshaft sprocket and camshaft sprocket, with a housing connected to the camshaft sprocket, and equivalents thereof. (*See, e.g.,* '738 patent, col. 4, line 63 (crankshaft sprocket); col. 5, line 1 (camshaft sprocket); col. 5, line 4 (chain); col. 5, lines 8-9 (timing belt); col. 6, lines 8-9, 53-57 (housing); col. 10, line 13 (housing); Figs. 1-5, 10-20). The asserted claims relate to a control system for a variable camshaft timing system using a vane actuator. The oil does not flow *onto a chain or belt* as part of the VCT system,[20] but rather it flows from the source (main oil gallery) *into the vane housing*. In order to adjust camshaft phasing, oil must be delivered into the vane housing, which is either formed integral with the sprocket or is attached to the sprocket and thus forms part of the means for transmitting rotary movement from the crankshaft to the housing. Without a housing having a sprocket either integral or attached, there would be no transmission of rotary movement to the housing.

Hitachi criticizes BorgWarner's proposed construction, complaining that "housing can[not] be part of the corresponding structure for the 'transmitting' [ ] function" (Hitachi Br. at p. 26), but Hitachi never explains why. Other courts have analyzed analogous claim language and found acted-upon structures to be included as part of the corresponding structure. For example, with respect to one patent involving a windowpane "hingedly connected" to a mounting flange, the court construed "means hingedly connecting" as a means-plus-function limitation, and the function was defined as "hingedly connecting." *Beckson Marine, Inc. v. NFM, Inc.*, 144 Fed. Appx. 862, 865-66 (Fed. Cir. 2005) (unpublished). The corresponding structure was construed to include not only the structure doing the "connecting," but also the structure being connected – namely, the windowpane. *Id.* Similarly, here, the corresponding structure for performing the function of

---

[20] The '738 patent specification, in fact, explains that the belt is oil free ('738 patent, col. 3, lines 47-50), and this was reiterated during prosecution. (Appeal Br. (Matterer Decl. Ex. 11) at p. 11). A chain, by contrast, could be oiled, and although not explicitly stated in the '738 patent, one of skill in the art, reading the '738 patent, would understand that a chain would be lubricated by oil.

transmitting rotary movement can include the structure being rotated – *i.e.*, the housing. *See also Freeman v. Gerber Prods. Co.*, 357 F. Supp. 2d 1290, 1301 (D. Kan. 2005), *on remand from*, 120 Fed. Appx. 322, 327-28 (Fed. Cir. 2005) (unpublished) (in means-plus-function clause "selectively maintaining said closure in covering relation with said container," the container being covered was construed to be part of the corresponding structure).

Hitachi's criticism is also unpersuasive because it would apply with equal force to Hitachi's own construction. Hitachi's brief equates "sprocket" with "housing." (Hitachi Br. at pp. 25-26 (equating "sprocket" with "[housing]" three times in block quote)). Employing Hitachi's logic, if the "housing" cannot play a role in performing the function, neither can the "sprocket." In truth, the "sprocket" and housing, which are integral, are both part of the structure involved in transmitting rotary movement to the housing. If the housing were not part of the structure for transmitting rotary movement, then the housing would not be rotated.

Hitachi's proffered nonsensical construction serves to underscore that the preamble should be regarded as prefatory language which simply introduces the body of the claim – *i.e.*, the steps to be performed to practice the claimed method. However, if the preamble is regarded as a limitation, it cannot be construed in the manner urged by Hitachi because that would render the five steps in the body of the claim utterly meaningless. *Cf. In re Cruciferous Sprout*, 301 F.3d 1343, 1349 (Fed. Cir. 2002) (concluding that proposed claim construction of preamble terms would render a dependent claim meaningless and thus rejecting proposed construction). If the preamble is regarded as a limitation, Hitachi's construction should be rejected in favor of BorgWarner's proposed construction, which is straightforward and harmonizes the preamble with the body of the claim so that it makes sense as a whole.

**B.**    **Hitachi's Construction of the "Calculating Step" Reads Out the Preferred Embodiment of Closed Loop Control.**

Despite acknowledging that Borg Warner's construction is taught and disclosed in the '578 patent, Hitachi contends that "the specification provides no guidance" on the correct construction of this claim step. (Hitachi Br. at p. 27). This, of course, is wrong, because the '578 patent is incorporated by reference into the '738 patent.[21] But even if this were true, Hitachi's position would fail. Lacking more specific guidance, one of skill in the art would look to what is known in the art. And here, Hitachi is proposing a construction that is completely at odds with what Hitachi itself considers to be a "well known control method." Borg Warner's construction, on the other hand, is in accord with this well understood method.

As Hitachi's expert witness, Mr. Kuhn, acknowledges, for a continuous VCT system, the "most common and direct approach, well known to the person of ordinary skill in the art, was to use electronic closed loop control." (Kuhn Invalidity Report (Suppl. Matterer Decl. Ex. 27) at ¶ 136). Mr. Kuhn describes this "well-known control method" as involving the following steps: (1) sensing camshaft and crankshaft positions using camshaft and crankshaft sensors, (2) calculating the *present relative phase angle based upon those sensed positions* using an ECU, (3) calculating the *desired relative phase angle* with the ECU *based upon engine operating conditions*, and (4) issuing a control signal to the VCT to move the camshaft towards the desired relative phase angle. (*Id.* at ¶ 136 (emphasis supplied); *see also* ¶¶ 105, 120). Instead of calculating the *present "relative phase angle" based upon sensed positions*, Hitachi proposes that the calculating step in claim 10 "calculate a desired angle using the sensed

---

[21] Hitachi's experts have confirmed that BorgWarner's proposed construction for the "calculating step" finds support in the '738 patent specification. As noted, the '738 patent incorporates by reference the '578 patent, and Hitachi's experts, Kuhn and Livernois conclude that claim 10 of the '738 patent reads on the '578 patent. (*See* Claim Charts attached to Kuhn Expert Report reading claim 10 on the '578 patent (Suppl. Matterer Decl. Ex. 28) at p. 44).

information." The plain language of the claim, however, requires a step of "calculating a *relative phase angle* between said camshaft and said crankshaft" and specifies that the "engine control unit [ECU] issu[e] an electrical signal *corresponding* to said phase angle." ('738 patent, col. 12, lines 8-13 (emphasis added)).

"Said phase angle" is defined in the claim as the relative phase angle, and the relative phase angle has two components – the existing phase angle and the desired one. Yet, Hitachi's construction picks only one of the two – the desired phase angle – and contends that the electrical signal must correspond to this phase angle. But the claim is broader. It can just as well be met if the signal corresponds to the other component of the relative phase angle – the existing phase angle, or if it is otherwise designed to lead to the target phase angle in some other way. Indeed, under what Hitachi itself calls "the common approach," the signal tells the system to either advance or retard so that the present actual angle can become the desired angle. Nothing more is required under the claim language here.

Under Hitachi's flawed construction, the signal is sent from the ECU based only on the actual angle calculation, which means that the system is not making any comparison between the actual and the desired angle to determine whether or not the system needs to be adjusted. Hitachi's construction thus reads *on* the type of open loop systems present in the prior art, which simply outputs a signal based on a determination of only the current angle, and reads *out* the preferred embodiment of the '738 patent because no comparison is made between the actual and the desired phase angle, which is the essence of closed loop control. Because it reads out the preferred embodiment, Hitachi's proposed construction should be rejected. *See, e.g., Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583-84 (Fed. Cir. 1996) (interpretation

which reads out preferred embodiment in specification "is rarely, if ever, correct and would require highly persuasive evidentiary support, which is wholly absent in this case").

Unlike Hitachi's artificially narrow construction, BorgWarner's construction is true to the language and intent of the claim limitation, and is entirely consistent with Hitachi's own expert's description of a "well known control method," *i.e.*, closed-loop control. Under BorgWarner's construction, the electrical signal must have information representing or designed to lead to the desired (or target) relative phase angle. This is consistent with the specification which simply indicates that after calculating the relative phase angle ('738 patent, col. 12, lines 8-9), the engine control unit ("ECU") issues an "electrical signal corresponding to said phase angle." ('738 patent, col. 12, lines 11-13). In other words, the ECU tells the system to either "advance" from the actual angle toward the target angle, or "retard" from the actual angle toward the target angle, or "hold position" because the actual angle equals the target angle. The signal "corresponds" to the actual angle as well as the desired angle because it relates to what is known as the "error," or whether the actual angle equals the target angle. The incorporated '578 patent describes the closed loop system and how it "feeds back" an "error" signal to correct for error. ('578 patent, col. 7, lines 28-30; *see also* Fig. 1b -- error $e_o$ 32, and col. 4, lines 34-44). BorgWarner's proposed construction of "electrical signal corresponding to said phase angle" – *i.e.*, "signal with information representing or designed to lead to the desired (or target) relative camshaft phase angle"[22] – comports with this disclosure.

_____

[22] Hitachi's misstates BorgWarner's proposed construction. (Hitachi Br. at p. 27). BorgWarner's construction is that the sent "signal corresponds to the desired angle, *or is designed to lead to the desired angle*," because it represents either an advance or retard signal from the current angle. Hitachi omitted from the text of its brief the italicized portion of BorgWarner's proposed construction.

C.     **Hitachi's Construction of a "Vented Spool" Is Contrary to the Patent Specification.**

The asserted claims call for a vented spool.  Erroneously attempting to limit the claims to what is shown in a figure depicting the preferred embodiment, Hitachi suggests that this requires:  "(a) an internal passage passing through each end of the spool and leading to atmosphere to eliminate any influence on spool movement due to oil pressure, and (b) an annular recess allowing the flow of oil."  (Hitachi Br. at pp. 19, 28).  But there is no basis for limiting the claims to what is depicted in the drawings.  *See Lighting World, Inc.,* 382 F.3d at 1365; *TI Group Automotive Sys.*, 375 F.3d at 1136; *Anchor Wall Sys.*, 340 F.3d at 1306-07.

Nor does the specification or prosecution history compel such a result.  The purpose of the vented spool in the claims of the '738 patent is to relieve pressure against the external ends of the spool.  As explained in the specification, the venting function simply "complete[s] the objective of relieving pressure in the cavity 198a [in Fig. 19] which acted on the end of the land 200a [of the spool] in previous VCT systems."  ('738 patent, col. 8, lines 25-27).  The specification and prosecution history both emphasize the removal of external pressure against the external ends of the spool valve, without reference to how that result is accomplished and without mandating any specific physical configuration.  (*See, e.g.*, '738 patent, col. 3, lines 18-25, lines 46-47; *see also* col. 3, lines 1-2; Appeal Br. at pp. 3-4 ("the hydraulic force on one end of the spool" is eliminated)).  All that matters it that precise control over the position of the spool can be achieved insofar as external oil pressure is removed from the ends of the spool.

In Figure 19, the spool requires a passage down the center in order to allow venting of the area behind the spool.  In the following reproduction of Figure 19 of the '738 patent, the area that is "vented" has been colored orange:

31



FIG. 19

As can be seen from this drawing, the only manner in which the square area behind the spool (identified by 198a) can be vented is by a passage down the central axis of the spool, unless a passage were extended through the spool valve body in another direction. Thus, a passage down the center of the spool is the most efficient manner to vent the preferred embodiment, but that does not mean the claim should be limited to only the specific configuration of the preferred embodiment.

Indeed, Hitachi's proposed construction ignores that Figure 13 of the '738 patent shows a portion of the "vent" that is *not* connected to the spool. In the following reproduction of Figure 13 of the '738 patent, the vented areas are again colored orange. The retainer on the back of the spring (202) includes an opening, which is necessary to allow "venting" of the spool to atmosphere. Hitachi's construction would read out this embodiment of the patent, which Hitachi itself refers to as the "actual construction of the VCT system" (Hitachi Br. at p. 12), because under Hitachi's construction the vent cannot be separate from the spool.



vent

FIG. 13

When reduced to its essence, Hitachi's argument regarding "vented spool" is really a red herring. Hitachi argues that "vented" modifies "spool" and not "spool valve body." (Hitachi Br. at pp. 28-29). BorgWarner agrees. However, a spool can be vented without meeting Hitachi's arbitrary physical requirement that it must have an "*internal passage passing through each end of the spool*." (Hitachi Br. at pp. 19, 28 (emphasis added)). By way of analogy, in order to "vent" a kitchen range or stove, it is not necessary that the stove have an "internal passage passing through each end" of it. Rather, one would regard the stove as "vented" if it has a vent or opening that leads out of the kitchen. Kitchen stoves are commonly vented by a hood that sits above the stove and is not directly connected to the stove. The key purpose of such a vent is to prevent build-up of gas and odors in the kitchen. Similarly, here, the key purpose of the "vented spool" is to prevent the build-up of pressure or fluid inside the *valve body* where it can act against the end of the spool.

Hitachi's additional proposed requirement that the "vented spool" "eliminate *any influence on spool movement due to oil pressure*" (Hitachi Br. at pp. 19, 28 (emphasis added)) goes well beyond anything required by the disclosure or prosecution of the '738 patent. Such

construction would read out every embodiment of the '738 patent because, at some level, oil flow may affect spool movement in ways other than by acting on the external ends of the spool – such as by acting along the internal lands of the spool valve. Hitachi's construction therefore cannot be correct. *Johns Hopkins Univ. v. CellPro, Inc.*, 152 F.3d 1342, 1355 (Fed. Cir. 1998) ("A patent claim should be construed to encompass at least one disclosed embodiment in the written description."). The Court should adopt BorgWarner's construction that "vented spool" means that the spool "has a vent or opening to permit fluid (such as oil or air) to flow to the outside of the valve to allow relief of pressure against the spool."

### D.    The Phrase "Means for Transmitting Rotary Movement to Said Camshaft"

For the reasons stated in BorgWarner's opening brief, this phrase should be construed according to § 112, ¶ 6, and the corresponding structure for performing the function of transmitting rotary movement includes the housing, recesses, and vanes shown in the specification, as well as equivalents thereof. (*See, e.g.*, '738 patent, col. 6, lines 8-9, 53-57 (housing); col. 10, line 3 (housing); col. 6, lines 35-42 (recesses); col. 6, lines 25-30 (vanes); *see also* Ribbens Infringement Rpt. (Matterer Decl. Ex. 17) at pp. 24-25). These are the components that transmit rotary movement to the camshaft. Once again, in an attempt to limit the claims to CTA actuation, Hitachi includes the check valves (Hitachi Br. at pp. 35-36). But the check valves shown in the figures are not involved in performing the function of transmitting rotary movement. (*See* Ribbens Infringement Rpt. (Matterer Decl. at Ex. 17) at p. 37; Ribbens Validity Rpt. (Suppl. Matterer Decl. at Ex. 18) at ¶ 125). All that is required to cause the transmission of rotary movement to the vanes is pressurized oil in the recesses in the housing. It is not relevant to the claim whether the oil is pressurized by an oil pump (OPA) or by camshaft torque fluctuations (CTA). The check valves are ancillary to this function and one of skill would recognize that the check valves and cam torque

34

actuation are only a feature of specific preferred embodiments and are not required for the transmission of rotary movement.[23]

**E.    Hitachi's Construction of the Inlet and Return Lines Is Contrary to the Plain Language of the Claim and the Specification.**

The plain language of the asserted claims requires the following:  (1) supplying hydraulic fluid from the source through the spool valve to a means for transmitting rotary movement to said camshaft; (2) the spool valve selectively allowing and blocking flow through an inlet line; and (3) the spool valve selectively allowing and blocking flow through return lines. The specification shows fluid being supplied from the source (or mail oil gallery 230), through the internal lands of the spool valve, to the vane actuator.  As shown in a colored drawing of Fig. 19, *supra* on page 19, the oil travels from the source through the spool valve to the vane actuator.

According to the plain language of the claim, the "inlet line" need only extend from the source to (or through) the spool valve, and the "return lines" need only extend from the vane housing to (or through) the spool valve.  Hitachi's proposed construction alters the language of the claim by requiring the inlet line to extend from the source to the vane housing, and the inlet line to be connected to one of the two return lines.  Nothing in the plain language of the claim requires the additional limitations urged by Hitachi.

Hitachi criticizes BorgWarner's construction as "contradict[ing] the disclosed embodiments."  (Hitachi Br. at p. 34).  Yet, it is Hitachi's construction that ignores the express

---

[23] Although the check valves in the preferred embodiment may play a role in enabling other structures (*i.e.*, the vane housing) to perform the function of transmitting rotary movement to the camshaft, that does not make the check valves part of the corresponding structure.  *See, e.g.*, *Asyst Techs., Inc. v. Empak, Inc.*, 268 F.3d 1364,1371 (Fed. Cir. 2001) ("The corresponding structure to a function set forth in a means-plus-function limitation must actually perform the recited function, not merely enable the pertinent structure to operate as intended.  [By way of example, a]n electrical outlet enables a toaster to work, but the outlet is not for that reason considered part of the toaster.").

words of the specification. Claim 4, which was part of the disclosure in the originally filed specification, expressly states that fluid travels from a "pressurized lubricating oil source (230)" to the vane housing and back again. ('738 patent, col. 22, lines 14-16). Original application claim 16 also clearly teaches that the "source of hydraulic fluid" is '230' (the MOG), and that fluid flows from this source to the vane actuators (160a and 160b). Hitachi's construction contravenes this supporting disclosure. Hitachi's proposed construction also ignores the start-up conditions in which oil must travel from the source, or main oil gallery, to the vane housing, in order for the VCT system to function. As set forth in the plain language of the claim, an inlet line extends from the source to (or through) the spool valve, and return lines extend from the vane housing back to (or through) the spool valve.

In truth, Hitachi is again trying to import a limitation from a figure in the specification into the claim, even though the claim language is broader and is perfectly consistent with the specification. Hitachi also argues that the prosecution history supports its proposed construction because the "supplying step" was added by amendment (Hitachi Br. at p. 34). But nothing in the prosecution history references the inlet line or return lines, or provides any support for Hitachi's attempts to limit the claim. Hitachi should not be permitted to inject a limitation into the claim. BorgWarner's proposed construction, which accords with the plain language of the claim and the specification, should be adopted.

F.    **Hitachi's Limitation of the Signals and Variable Force Solenoid to "Non-PWM" Reads Out the Preferred Embodiment.**

Hitachi's proposed construction of "variable force solenoid" is based on a misreading of the intrinsic evidence. The '738 patent specification describes a "PWM Solenoid" as a solenoid that "cycles through its full stroke with every PWM pulse." ('738 patent, col. 2, lines 50-51). The specification expressly contrasts this with the variable force solenoid, stating

36

that the variable force solenoid does not travel through a complete cycle with every pulse ('738 patent, col. 3, lines 34-37). BorgWarner's proffered construction accords with this disclosure.

Far from disclaiming PWM input signals, the '738 patent disclosure fully incorporates such signals. As stated, the '738 patent specification and prosecution history refer to the incorporated '578 patent as the preferred embodiment for the closed-loop control feedback system, and the '578 patent refers to the input signal to the solenoid as PWM. ('578 patent, col. 7, lines 21-25). The '578 patent describes the details of the control system, and Fig. 1d shows the control signal as a "PWM duty cycle." ('578 patent, col. 5, lines 5-10).

Hitachi's reliance on unrelated BorgWarner patents and sales literature to support its contrived construction is unavailing. First, this extrinsic evidence is irrelevant to claim construction.[24] Second, the cited external evidence does not support Hitachi's position. None of this evidence states that a variable force solenoid is not operated by a PWM input signal. To the contrary, BorgWarner's patents explain that PWM is simply a control of current, and a variable force solenoid can be controlled by PWM. For instance, BorgWarner's U.S. Patent No. 6,807,931, which includes '738 patent inventor, Dr. Stanley Quinn, as an inventor, states that:

> [P]ulse-width Modulation (PWM) provides a varying force or pressure by changing the timing of on/off pulses of current or fluid pressure. [A] [s]olenoid is an electrical actuator which uses electrical current flowing in a coil to move a mechanical arm. *Variable force solenoid (VFS) is a solenoid whose actuating force can be varied, usually by PWM of supply current. VFS is opposed to an on/off (all or nothing) solenoid.*

('931 patent (Suppl. Matterer Decl. Ex. 29), col. 11, lines 23-30 (emphasis added)).

---

[24] After-the-fact extrinsic evidence (*e.g.*, from 2005-06 (Hitachi Br. at pp. 1, 22, 38)) is irrelevant to what one of skill in the art would have understood the '738 patent claims to mean in 1993. *See, e.g., Brookhill-Wilk*, 334 F.3d at 1299 ("unrelated and non-contemporaneous authorities" should not be considered in the claim construction analysis).

Hitachi's proposed construction that the variable force solenoid of the '738 patent necessarily be "current-driven, not PWM driven" is similarly misconceived. Not only is Hitachi's construction unfounded, as it is based on irrelevant extrinsic evidence, but Hitachi's construction is also inherently confused. Hitachi ignores that a solenoid can be both "current-driven" *and* "PWM-driven," and yet its proposed construction assumes that these terms are mutually exclusive. Hitachi's own documents refute Hitachi's attempt to manufacture a rigid distinction between "current driven" and "PWM-driven."

REDACTED

[25] Further, Hitachi's published patent application US 2005/0257762, entitled "Variable Camshaft Timing Control System of Internal Combustion Engine," explains that in Hitachi's VCT system, "the axial position of spool 36 is controlled by way of *pulse-width modulated (PWM) control* for the exciting *current* (or the control pulse signal) applied to coil 38b of electromagnetic solenoid 38." (US 2005/0257762 application (Suppl. Matterer Decl. Ex. 31), p. 5, paragraph 0031 (emphasis added)). Hitachi's own documents thus confirm that PWM is *not* separate from "current control signal."

Hitachi's criticism of BorgWarner's proposed construction also rings hollow because Hitachi's experts, Kuhn and Livernois, have concluded that asserted claim 10 reads on the incorporated '578 patent, *using BorgWarner's proposed claim construction*. (Suppl. Matterer Decl. Ex. 27, at ¶¶ 168-69 and 175-76, and Ex. 32 at ¶¶ 222-26). Hitachi's experts have thus

---

[25] (HIT480121-131 (Suppl. Matterer Decl. Ex. 30), at HIT480123 (emphasis added)).

admitted that BorgWarner's construction finds support in the '738 patent specification because the '738 patent specification incorporates the '578 patent by reference.

### G.    Terms in Claim 11

#### 1.    The Phrase "Armature Being *Connected* to Said Spool"

Hitachi's attempt to limit "connection" to only physical connection is improper. First, the plain meaning of "connection" implies more than only "*physical* connection." Indeed, "connected" means "to join, fasten or link together usu[ally] by means of something intervening." *Webster's Third New Int'l Dictionary of the English Language Unabridged* 480 (1993) (Matterer Decl. Ex. 12). This implies more than just "physical" connection. The '738 patent specification also provides clear support for more than only "physical" connection. Figure 19, for instance, shows that the armature 201b abuts the spool extension 200c. No "physical connection" is shown or contemplated – they are simply connected/abutted to allow operation. Hitachi's speculation that a "bump or the like during engine operation" (Hitachi Br. at p. 39) might have an impact on the connection finds no support in the '738 patent and is sheer speculation. Such after-the-fact attorney argument, unsupported by competent technical analysis and without foundation in the '738 patent, cannot be relied upon to read in an additional limitation to the plain language of the claim.

#### 2.    The Phrase "Armature to Exert a Force"

Hitachi seeks to import a requirement that the force in dependent claim 11 be "proportionally related." This restriction finds no support in the plain language of this dependent claim, and Hitachi provides no legitimate reason to read in such a requirement.

#### 3.    The Term "Air Gap"

Hitachi's proposed construction seeks to add the requirement that "air" must be in the gap during operation. (Hitachi Br. at p. 20). Significantly, however, Hitachi's opening claim

39

construction brief is silent on this aspect of Hitachi's proposed construction. Hitachi does not even try to justify this additional requirement. To be sure, Hitachi says that the "air gap cannot have magnetic bearing material." (Hitachi Br. at p. 40). BorgWarner agrees, and that language is part of BorgWarner's proffered construction. (*See* BorgWarner Opening Brief at pp. 38-39). However, the added requirement urged by Hitachi that the non-magnetic bearing material, in particular, *must be "air"* is unsupported by the intrinsic and relevant extrinsic evidence. Hitachi provides no justification for this requirement, and it should be omitted from the construction of this claim term.

## V.    Conclusion

For the foregoing reasons and the reasons discussed in BorgWarner's Opening Claim Construction Brief, BorgWarner's proposed constructions for the disputed claim terms of asserted claims 10 and 11 of the '738 patent should be adopted.

Dated: October 23, 2006

Richard K. Herrmann (I.D. #405)
Mary B. Matterer (I.D. #2696)
222 Delaware Avenue, 10th Floor
Wilmington, DE 19801
(302) 888-6800

Hugh A. Abrams (*pro hac vice*)
Thomas D. Rein (*pro hac vice*)
Lisa A. Schneider (*pro hac vice*)
Marc A. Cavan (*pro hac vice*)
Lara (Fleishman) Hirshfeld (*pro hac vice*)
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-7000

## CERTIFICATE OF SERVICE

I hereby certify that on October 31, 2006, I caused the following document, **REDACTED VERSION OF THE RESPONSIVE CLAIM CONSTRUCTION BRIEF OF BORGWARNER INC. AND BORGWARNER MORSE TEC INC.** to be electronically filed with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

Steven J. Balick, Esq.
John G. Day, Esq.
Tiffany Geyer Lydon, Esq.
ASHBY & GEDDES
222 Delaware Avenue, 17th Floor
Wilmington, DE  19801


Additionally, I hereby certify that on October 31, 2006, I caused the foregoing document to be served via email on the following non-registered participants:

Michael D. Kaminski, Esq.
Pavan K. Agarwal, Esq.
Liane M. Peterson
FOLEY & LARDNER LLP
3000 K Street, N.W., Suite 500
Washington, D.C.  20007-5109
mkaminski@foley.com
pagarwal@foley.com
lpeterson@foley.com


_____ /s/ Mary B. Matterer_____
Mary B. Matterer (I.D. #2696)
MORRIS, JAMES, HITCHENS & WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19801
(302) 888-6800
mmatterer@morrisjames.com
  Attorneys for Defendants and Counterclaimant,
  BORGWARNER INC., and
  BORGWARNER MORSE TEC INC.