# EXHIBIT 18

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

HITACHI, LTD. and HITACHI AUTOMOTIVE )
PRODUCTS (USA), INC., )
)
        Plaintiffs, )
)
    v. )
)   Civil Action No. 05-048-SLR
)
BORGWARNER INC., )
and BORGWARNER MORSE TEC INC., )
)
        Defendants. )
_____ )
) **EXPERT REPORT**
BORGWARNER INC., ) **OF WILLIAM B. RIBBENS**
) **REGARDING VALIDITY**
        Counterclaimant, ) **OF U.S. PATENT NO.**
) **5,497,738**
    v. )
)
HITACHI, LTD., and HITACHI AUTOMOTIVE )
PRODUCTS (USA), INC. )
)
        Counterdefendants. )
_____ )

1.  I previously submitted a report regarding infringement of U.S. Patent No. 5,497,738 ("the '738 patent), on September 6, 2006. A listing of my qualifications is provided in that report.

2.  I have been asked by attorneys for BorgWarner to review the reports provided by Hitachi submitted by Robert Kuhn and Thomas Livernois challenging the validity of U.S. Patent No. 5,497,738. I have also been asked to present my responses to these reports.

3.  I reviewed the Kuhn and Livernois reports, as well as the exhibits and materials provided with such reports. I have also reviewed and relied on the materials discussed in this report.

4.  In any invalidity analysis, it is important to consider the various features that get combined in the asserted claims. The '738 patent applies to a vane type VCT system which utilizes a closed loop control system based upon measurements of crankshaft and camshaft angular position from which a calculation is made of the instantaneous camshaft phase in an ECU. The control permits continuous positioning of the spool within its mechanical constraint and is not limited to a set of fixed positions. It achieves this positioning by means of a variable force solenoid in which a force of electromagnetic origin varies in proportion to current through the solenoid coil. This force, which is substantially independent of armature axial position, is balanced by the force of a spring. The spool is functionally connected to the armature and moves with it, and is vented such that there are no forces due to differential oil pressure acting on the spool ends.

5.  I have noted, in reviewing the Kuhn and Livernois reports, that there is no single reference that is alleged to anticipate the asserted claims of the '738 patent (*i.e.*, Hitachi is not urging a lack of novelty based on § 102). All of the invalidity arguments presented in the Kuhn and Livernois reports are based upon obviousness (*i.e.*, § 103 invalidity arguments).

6.   I have been informed by attorneys for BorgWarner that issued patents are presumed valid. 35 U.S.C. § 282. This means that, in the present case, the burden of proof of invalidity is on Hitachi. I have been informed by attorneys for BorgWarner that the burden that Hitachi must meet is one of "clear and convincing evidence." I have also been informed that in the process of conducting an obviousness invalidity analysis, the prior art must be evaluated with regard to the combination of the features discussed above in a control system for VCT. It cannot be done by selectively choosing components from various references using the '738 patent itself as a roadmap or guide. I am further informed that an obviousness-based invalidity argument requires evaluation of each of the references for all of its teachings including any teachings away from the invention. Finally, I have been informed that the burden of showing invalidity is especially difficult when the infringer attempts to rely on prior art that was before the patent examiner during prosecution, and that a heavy burden applies when the infringer relies on references that are cumulative to the art cited to the Patent Office.

7.   The Kuhn report outlines various combinations of references, but it does not explain how the specific combinations are to be made. Neither does this report describe what modifications must be made to the primary references in order for the secondary references to be used with them. Nor does it explain how the necessary modifications are suggested in the art.

8.   For example, in section VII, H of the Kuhn report, it is suggested that a simple substitution of an "electric actuator" as described in Kawamoto '843 can be substituted for the hydraulic actuator of the Quinn '578 patent thereby rendering '738 obvious.

2

9.  However, the Kuhn report fails to describe the necessary modifications that would be required for this combination or where those specific modifications are taught or suggested in the prior art. For example, the spool in '578 would have to be vented in order to replace the hydraulic actuator with a variable force solenoid ("VFS"). This modification with the suggested combination comes from working backward from the '738 patent using hindsight. The combination and the others proposed in the Kuhn report would not have been obvious to one of ordinary skill in the early 1990s, when the '738 patent inventors came up with their invention.

10. I have been informed by attorneys for Borg Warner that any invalidity analysis must consider the prosecution history and the prior art that was cited. This art provides a frame work for what was known at the time the application was filed and for what was before the examiner when considering the application. I have been asked by attorneys for BorgWarner to consider the prior art reviewed by the examiner during the prosecution history of the '738 patent. I have been informed that the '738 patent claims priority to the '935 patent as a parent application meaning that the examiner had the '935 prosecution history and its prior art within that file.

11. The '738 patent incorporates by reference a number of patents (*e.g.*, USP 5,002,023 (the "'023 patent), USP 5,184,578 (the "'578 patent"), USP 5,107,804 (the "'804 patent"), and USP 5,172,659 (the "'659 patent"), all of which were available to the examiner to be applied, if desired. Because these prior patents are incorporated as references, the '738 patent disclosure inherits the disclosures and features recited in such patents. The shortcoming of these patents relative to the inventive features of '738 are identified clearly in the 'background of the invention' portion of the '738 specification. Generally these earlier patents can be described as having differential pressure type control system in which the axial position of a spool valve is

3

determined by the balance of oil pressure forces on the spool. This spool valve in the '578 patent is, in effect, an actuator in a closed loop control system which regulates camshaft phase.

12. One of the difficulties encountered by such a differential pressure control system (DPCS) is the dependence of the spool position on the engine oil pressure. This variation of spool valve with the normal variation of engine oil pressure adversely affects the actuator calibration.

13. The '738 patent offers a significant advance over the DPCS type control by removing the influence of differential oil pressure on actuator calibration in a VCT control system. It achieves this advantage (as well as others explained in the summary of the invention section of the '738 specification) by utilizing a variable force solenoid to control the position of a vented spool. The vented spool in the '738 patent does not have differential pressure (*e.g.*, due to oil) across it.

14. The variable force solenoid (as pointed out in the '738 patent) has the capability of being positioned continuously along its axis (within mechanical constraints). The force of electromagnetic origin varies relatively little (ideally not at all) with armature axial position. This feature permits the armature and its connected spool to be positioned very precisely by balancing the electromagnetic force against the force of a linear spring. Since the spool of the spool valve is functionally connected to the VFS armature, the former is also very precisely positioned within the spool valve body.

15. The vented spool involves a configuration in which there is no pressurized oil acting on either external land end of the spool. One relatively straightforward way of achieving this venting is to provide an oil drain passage outside of the spool but within the spool valve body leading to the crank case.

4

16. It is perhaps worthwhile to discuss a solenoid-actuated valve as it is used in the '738 patent, as well as in the prior art references. A solenoid is an electromechanical energy conversion device that receives an electrical input and generates a mechanical output. As used in the '738 patent, the mechanical output is a force and a displacement that moves the spool in a spool valve.

17. The '738 specification identifies 2 types of variable force solenoid structure: 1) variable gap and 2) variable area. The common binary state solenoids (i.e., on/off) are normally of the variable gap type. This type solenoid is typically constructed in such a way that the air gap between an end of the armature and the ferromagnetic core is variable whereas the other end of the armature maintains a constant overlap with the core material within which it can slide. When energized by an electric current through a coil (that essentially surrounds the armature), an electromagnetic force is created on the armature that is of a direction that tends to reduce the air gap. The magnitude of this force varies inversely with the square of the gap distance.

18. Normally, the armature is held against a mechanical stop such that the air gap is created. As the excitation current is increased from zero, there is initially no armature movement. When the current reaches a value that the electromagnetic force exceeds the bias force of the spring, the armature begins to move so as to reduce the gap. However, since the electromagnetic force is an inverse quadratic function of the gap, the armature accelerates toward the core, thereby abruptly reducing the gap to zero. As long as the spring has a linear spring rate, there is no stable intermediate position for the armature between its two mechanical stops. This variable gap solenoid is, consequently, a binary state device in which the armature is in one of two positions depending upon whether the excitation current is greater than or less than a threshold valve. Of course, in practice, there is hysteresis in the binary state characteristics.

5

19. It should be noted that the variable gap type of solenoid can be operated with a PWM type of excitation. It is this combination solenoid/excitation that is called PWM solenoid. For example, the Butterfield 659 patent teaches the use of such a PWM solenoid for controlling hydraulic pressure in a differential pressure control system (e.g., see col. 7, ll. 34-38 as well as fig. 19). Here, the term solenoid is used to describe an electromagnetic actuator and valve assembly. By opening and closing the valve at a suitably high frequency, the effective oil pressure output from this solenoid and valve assembly is proportional to the PWM excitation duty cycle. This type of PWM solenoid operated valve assembly was well known as a pressure or flow regulating actuator before the filing date of the '738 patent (e.g., see *Understanding Automotive Electronics*, pp. 5-36 to 5-42).

20. On the other hand, the variable area type of solenoid is constructed with an essentially constant air gap and variable armature/core overlap. It is this type of solenoid that is used in the preferred embodiment of the '738 patent. It has the property that the force of electromagnetic origin is substantially independent of the armature axial position. This force on the armature varies in proportion to the current through the coil, and therefore it is termed variable force solenoid.

21. The independence of the force on the armature with distance means that this displacement, when acting against a linear spring, allows for very precise armature positioning. Further, since the armature and spool are functionally connected, corresponding precise spool positioning is achieved.

6

22. At the time of the '738 filing, variable force solenoids were known in other areas. In fact, the examiner cited and relied on the Hendrixon patent (USP 5,000,420) as a listed reference. Hendrixon uses the term 'solenoid valve with a variable force motor' and describes a solenoid in which the armature position is precisely determined by the balance between an electromagnetic force and a linear spring. Both the PTO Examiner and the applicants for the '738 patent agreed that Hendrixon is an example of a variable force solenoid.

23. The Hendrixon VFS achieves a force characteristic in which the armature displacement varies substantially linearly with current (see col. 2, ll. 28-34). This is achieved via a carefully designed structure in which a ferromagnetic ball resides within a cylindrical pole piece of the electromagnet. The opposite pole piece is a section of a conic structure having a concave spherical end the axis of which passes through the center of the ferromagnetic ball.

24. In his examination of the disclosure that led to the '738 patent, the examiner had many references with teachings that are similar to those of the prior art brought forward by Hitachi. It is my opinion that the references relied on by Kuhn and Livernois do not provide any new teachings that are not found in the prior art cited by the examiner. Further, it is my opinion that Hitachi has not come forward with any combination of references not available from the cited art.

25. For example, the examiner had the Imai '289 patent which incorporates an actuator of a "known current proportional type" that is connected to the spool of a spool valve (see col. 4, lines 24-27). Furthermore, although the VCT system disclosed in '289 has a controller, it is an open loop controller. There is no disclosure of sensing means for determining the phase angle

7

difference between the camshaft and crankshaft position as would be required for closed loop control as taught by '738. Although Imai has a crank angle sensor to determine rpm and a airflow meter to determine load, there is no camshaft sensor from which camshaft phase can be determined. Furthermore, there is no need for closed loop control with the system operation as disclosed in '289.

26. Various prior art references cited by Hitachi allegedly invalidating the '738 patent are similar to the Imai '289 patent including Hara, Tsuruta, Bruss, and Kawamoto. These references teach the use of a solenoid in which the armature displacement is proportional to the current through the coil. However, none discloses a closed loop system as taught by the '738 patent. There is no mention in Hara, Tsuruta or Kawamoto of determining the relative camshaft and crankshaft position measurements, which are fundamental to closed loop control. Although Bruss discloses sensors for measuring camshaft position, and a reference signal that indicates a maximum possible angular displacement of the camshaft (not the crankshaft), there is no disclosure of the computation of camshaft phase in an ECU nor is there a generation of an actuator control signal corresponding to this phase as required by '738.

27. If the disclosure of a proportional-type solenoid either by itself or in combination with an open loop controller were to be the bases of the rejection of the application leading to the '738 patent, then Imai could have been used for this purpose with the conventional VCT systems shown in the cited art, such as the Butterfield '659 patent. The Hara, Tsuruta, Kawamoto and Bruss references, which are combined with other references, add nothing new to an alleged invalidity allegation over Imai in combination with the cited references.

8

28. Another point made by Dr. Livernois in his report that I disagree with is on page 24, para. 92. Dr. Livernois states that "[i]n order to provide the spool positions shown in Figures 3 and 5 (which allow for 3 positions), the electromagnetic actuator must be of the proportional type rather than an on-off type." That is not necessarily so. A 3-position spool valve can readily be accomplished with a pair of variable gap (*i.e.*, binary state) solenoids and centering springs. The springs can be arranged such that when neither solenoid is activated, the spool is in a center position. This pair of solenoids can be arranged such that when one is activated it moves the spool to one of its 3 positions (*e.g.*, left of center) and when the other is activated it moves to the opposite position (*e.g.*, off center to the right). Thus, one of skill would recognize that Bruss does not inherently teach a proportional solenoid. Also, the Bruss spool valve is moved against a pair of different sized springs that are in series between a plate, so that "three defined positions of the slide [spool] can be obtained" (col. 3, line 67 - col. 3, line 1). Thus, the positions are achieved by the use of the two springs, and possibly two binary state solenoids acting in tandem. It is not necessary that Bruss use a proportional solenoid.

29. The Butterfield '659 patent was another reference cited by the examiner during the '738 prosecution. This patent discloses all of the basic structure of the variable camshaft timing system. It differs significantly from the '738 patent in the actuator means and structure. Unlike the '738 VCT system, it utilizes a differential pressure type actuator to move the spool rather than a variable force solenoid connected to the vented spool as taught by '738. The differential pressure (acting on a piston assembly) is achieved by varying the pressure on one side of the piston assembly via a PWM solenoid. The examiner recognized that the '659 patent did not anticipate the '738 patent owing to the important differences recited above. The invalidity

9

arguments proposed by Hitachi offer nothing new over the rejection arguments made by the examiner with respect to the '659 reference in combination with various references that show different types of proportional solenoids and/or spool valves.

30. The application that led to the '738 patent discussed various prior art references including a differential pressure actuator as part of a differential pressure control system (DPCS). I am assuming that these references were considered to be known and understood by a person of ordinary skill in the art. Of particular interest is a VCT system disclosed in the '578 patent (cited in the application for '738) that taught closed loop control, albeit for a DPCS. Other references cited by and applied by the examiner that disclose closed loop control include Linder '477 and Kano '360. That is, the examiner knew of the use of closed loop control in a VCT and did not reject '738 either on the basis of anticipation (§ 102) or obviousness (§ 103), in combination with other references.

31. The examiner also had available to him prior art references showing a "proportional solenoid valve." For example the Imai '289 patent makes reference to such a valve (see col. 4 ll. 24-27). Imai discusses: "an actuator 55 is of a known current proportional type in which the axial motion of the valve spool varies in proportion to the electrical current supplier to the actuator 55." *Id.* This particular reference has an open loop control with only two camshaft phase positions based upon engine load. The examiner did not reject the '738 application either on anticipation grounds or on the basis of the alleged obviousness (§ 103) of a proportional solenoid valve reference in combination with any other available reference (e.g. Quinn '578). This description of a proportional solenoid valve in Imai is nearly identical to the description of a proportional solenoid valve in the prior art references proposed by Hitachi, such as Hara.

10

32. The examiner also had available to him (as a cited reference) the Kano '360 patent which showed an actuator based upon a pair of on-off solenoid valves that yield a "linear output." This actuator is incorporated into a "linear control" VCT system. Of course, this type of linear solenoid is not the claimed combination of '738. For that reason, the mere use of the term "linear" in conjunction with a solenoid, as found in some of the Hitachi references (e.g., the Butterfield article, Kawamoto) does not provide a description of a variable force solenoid as used in the '738 patent.

33. It should be noted that other types of actuators than the VFS were known at the time of the '738 application filing. These include, for example, stepper motors. The Karpis '141 patent, which shows motor driven actuation in a VCT, was cited in the '738 patent and available to the examiner. The examiner recognized that motor driven valves are different from solenoid driven valves. Electric motors and solenoids are alike only in that they produce a mechanical output from an electrical input. However, they operate in fundamentally different ways both in terms of the electrical input signal and the mechanical output. In the prosecution, the Examiner was provided with pages from the Wiley Engineer's Desk Reference that explain the difference between "motor actuators" and "solenoid valves."

34. As discussed above, a solenoid (either variable gap or variable area) produces as an output the displacement in response to an electromechanical force along an axial direction of the armature. This armature can be attached directly to another structure such as the spool valve in a VCT actuation mechanism causing a corresponding displacement of that spool.

11

35. An electric motor is also an electromechanical device, but its output is the rotation of a shaft in response to an electromechanical torque. To be useful in VCT actuation (i.e., displacement of the spool), the rotary motion must be converted to the required linear displacement via some mechanism (e.g., helical gear set).

36. The input to a solenoid is an electrical signal that can be characterized by the current through its coil or its terminal voltage. In the case of a variable force solenoid (of the variable area type) the instantaneous electromechanical force on the armature increases in proportion to the current. In an idealized model, this force is proportional to the square of the current. Although there are multiple forms of excitation of a variable force solenoid ("VFS"), at least one excitation is a steady current that corresponds to a desired axial displacement of the armature. That is to say, a VFS is a direct current to force actuator having the capability to be a direct current to displacement transducer.

37. A motor, on the other hand is a variable rate actuator in which the rate of change of the rotor angular displacement varies with input signal. For certain types of d-c electric motors, the rotor speed varies with input voltage. However, the relationship between speed and voltage is highly dependent upon the load characteristics. For use in a VCT actuator, the electric motor would be operated by a controller until the desired displacement of the spool was achieved. That is to say, in practice, to achieve a desired spool displacement, a separate controller with spool displacement measurement would be required in order to precisely regulate the spool to its desired position. Thus an electric motor can not be directly substituted for a solenoid. Rather, a different actuator system requiring a major redesign of the actuator would be required. Although this discussion is based on the DC motor, there are many types of motors (e.g., brushless DC

motor or stepper motor) that would have the same limitations as the DC motor in terms of direct substitution for a solenoid.

38. The examiner also had references available showing a vented spool in a VCT system. For example, the Butterfield '659 patent which was cited in '738 shows a vented spool as an alternative embodiment (see Fig. 21). Although this reference shows a vented spool, it is in the context of a DPCS VCT system. It was not viewed (by the examiner) to invalidate '738 either by anticipation or by obviousness in combination with any other set of references.

39. The Kuhn report argues that '738 is invalid by obviousness with various combinations of references. None of these combinations of references offers anything new over what was available to and used by the examiner in the prosecution of the '738 patent.

40. Kuhn's and Livernois's reports on invalidity offer various combinations of references in an attempt to argue that the asserted claims of the '738 patent were obvious. Each primary reference of a proposed combination had missing elements, thus precluding that reference from anticipating the '738 patent. Kuhn and Livernois argue that the missing elements are found in various secondary references whose combination, they argue, makes '738 obvious.

41. Assuming arguendo that such combinations are consistent with the legal standards for a § 103 invalidity argument, the combinations offer nothing new over the references used by the examiner in the prosecution of the '738 patent. I have been told by attorneys for BorgWarner that the methods used by Kuhn and Livernois of selecting various features from secondary references to achieve their obviousness argument in combination with the primary references, without identifying the motivation or teaching to make this combination, are, in fact,

13

inconsistent with legal standards. I have been informed that it is not appropriate to use the asserted claims of the '738 patent as a blueprint to go back and search out various features in different references.

42. Another issue in dispute between the parties of this lawsuit involves the power source for moving the camshaft/vane assembly relative to the housing. Hitachi's consultants discuss at length camshaft torque pulse activation (CTA) and oil pressure activation (OPA). But they fail to note that during the prosecution of the '738 patent, the examiner rejected the claims using references for both CTA and OPA. For example, at least one embodiment of the Butterfield '659 reference was CTA. The Strauber '774 reference is an example of OPA. There is no doubt that either of these activation methods are capable of moving the camshaft as required for variable camshaft phasing.

43. Another major issue of dispute involves the statement in the prosecution history regarding whether the Strauber patent "controls the flow of oil both internal and external to the VCT mechanism," in contrast to the invention that "controls the flow of oil internal to the VCT mechanism only." For this issue, however, Hitachi has not clearly identified what "internal to the VCT mechanism" means. In the applicants' response to the first PTO office action, they assert that "Further, the Strauber et al. system controls the flow of oil both internal to and external to the VCT mechanism. The present invention controls the flow of oil internal to the VCT mechanism only." Apparently Hitachi is asserting that "controls internal" was a disclaimer of non-CTA-type VCT systems, but I disagree.

14

44. A careful examination of this statement by the applicants reveals that it relates to control of fluid flow, not to the issue of supplying the energy to move the camshaft. Strauber differs significantly from the '738 patent because it discloses a common on-off solenoid that permits control of a spool only between two positions. Strauber also describes a system in which oil is present on external ends of a spool and flows through passages at these ends. In Strauber, oil is present on the left end of the spool and in the radial bore 35 through which it flows when the spool (called a "piston" in the '774 patent) is in its initial position as shown in Figure 1. Oil is also present on the external end of the spool when the spool is in its working position (not shown in the figures). Oil must flow down the center passage of the spool when the system is changing phase, and thus there may be pressure that develops due to viscous flow that could appear on the end of the spool. The amount of pressure developed during phase change would depend upon the oil viscosity and the size of the central passageway though which it must flow. The '738 patent discloses an oil flow control system (as part of a VCT) in which the oil flows only within internal lands and not along external ends of the spool. This is perhaps the reason the applicants made the statement about "internal to the VCT mechanism."

45. Strauber is significantly different than the '738 patent and could have been distinguished on numerous points. For example, Strauber is an open loop system with two positions for camshaft phasing, as contrasted with the continuously adjustable closed loop system of the '738 disclosure. Furthermore, if the applicants had disclaimed OPA-type VCT systems by the above statement, then the examiner would not have continued to apply Strauber after the response to the first office action. This is because the Examiner combined several references (Butterfield '659, Linder, Strauber and Hendrixon) to reject the claims. If the applicants had "disclaimed"

CTA systems with the above comments, Strauber would no longer have been relevant, as it is an OPA system. However, the Examiner continued to reject the claims based on Strauber, which indicates that the Examiner considered the claims to cover OPA systems.

46. Another feature of the '738 patent is the use of a variable force solenoid (VFS) to move the vented spool. The examiner had available to him during the '738 prosecution at least one reference showing a VFS in a solenoid-activated spool valve assembly. That reference was the Hendrixon '420 patent, and it was applied by the examiner.

47. The applicants agreed that Hendrixon disclosed a VFS. However the spool was not vented in the Hendrixon valve assembly as required in the '738 patent. As pointed out by the applicants in the appeal brief filed after the third PTO office action "Clearly, there is engine oil present in cavity 84 at control pressure which acts on spool land 62 and counteracts the force of the solenoid on spool land 60." That is to say, the actuator calibration depends upon oil pressure. The fact that the '738 patent was allowed in the light of VFS art shows that a reference showing a VFS in combination with other relevant art is not sufficient to invalidate the '738. The VFS art cited by Hitachi offers nothing new over that which was available to the examiner.

48. The Butterfield article is listed by Hitachi among its prior art references. I understand that Mr. Kuhn contends that this reference, as well as a couple of others would have been "highly significant" to the Examiner in analyzing claims 10 and 11 of the '738 patent. I disagree. For one thing, I have been informed that a reference is cumulative to other references if it "teaches no more than what a reasonable examiner would consider to be taught by the prior art already before the PTO." On this basis, I believe that the Butterfield reference is cumulative to the Imai

16

patent and the Butterfield '659 patent, both of which were cited in the '738 patent. The '659 patent teaches a VCT system in which a DPCS actuator is shown. The Butterfield reference does mention in one sentence that a linear proportional solenoid can be used as a possible actuator; however, the system disclosed in the Butterfield reference operates using a spool valve in which the solenoid force must work against oil pressure against the external ends of the spool, and the spool is not vented. Hence, critical features of the '738 patent are still missing. The Examiner also had the Kano reference that showed linear control, and the Examiner specifically cited the Hendrixon reference as showing "linear control." Thus, the Examiner had references teaching "linear" solenoid valves.

49. Hitachi appears to believe that any reference to the term linear proportional solenoid must necessarily refer to a VFS. I disagree with this inference for the following reasons. The term "linear solenoid valve" appears in the Hitachi patent JP 8-285,119. This reference clearly discloses an on-off (i.e. binary state) solenoid that has also been termed a PWM solenoid. The linearity achieved here is in the relationship between the control signal characteristics and the hydraulic output.

50. Another example of "linear control" via switched binary state solenoids is in the Kano '360 patent. This reference, which was cited in the '738 patent, shows an actuator constructed from the two on-off solenoids that are activated by variable duty cycle (i.e., PWM) signals. In this reference, the variable hydraulic pressure moves a piston structure axially, which motion is converted to rotary motion via a helical gear assembly.

17

51. The above examples illustrate that the terms "linear solenoid" or "linear solenoid valve" do not necessarily refer only to a VFS solenoid. All of these terms are context dependent for their meaning.

52. Hitachi contends that a VFS solenoid can be substituted for a PWM (*i.e.*, on-off) solenoid in a DPCS system. In one implementation, the VFS solenoid can be operated by a binary state variable duly cycle (PWM) signal. Of course, this implementation does not take advantage of its ability for the armature to be continuously adjusted. More importantly, the substitution of the VFS for the on-off solenoid still results in a DPCS system.

53. Another example of the use of a VFS in a DPCS system is found in an embodiment of the Rembold application (DE 4037 8211 Ar). This reference has been cited by Hitachi as a member of its set of VFS prior art references. However, this reference also offers nothing new over the Butterfield '659 patent which is also a DPCS VCT and was cited in '738 and used by the examiner. The Rembold reference shows that mere substitution of a VFS for an on-off solenoid in a DPCS still results in a DPCS system, and not the system claimed in the '738 patent.

54. Another reference cited by Hitachi is the Bruss '825 patent. Of course, this is not a vane type VCT system so it is not anticipatory of '738. In addition, the valve which controls camshaft angular position is not continuously adjustable. Rather, it has 3 positions that are determined by differential pressure. This differential pressure is, in turn, controlled by the state of two on-off (*i.e.*, binary state) solenoids.

55. Furthermore, unlike the '738 patent, in which control is achieved using the ECU, the Bruss system uses a counter as well as a reference signal indicative of a maximum angular camshaft displacement. There is no calculation of an instantaneous camshaft phase.

56. There is no explanation in the Kuhn report of what specific system is to be substituted for this system in the Bruss patent. Nor is there an explanation of the redesign of that system, or how Bruss is to be modified to allow use of the redesigned system. In addition there is no motivation shown in the Kuhn report for these redesigns and the combination of the two systems.

57. Even, if a VFS were somehow substituted for the two solenoid operated valves, the spool in Bruss is not vented. Rather it is moved through its three positions by differential pressure. That is Bruss teaches away from the '738 patent. There is no teaching or even suggestion of a VFS or a proportional valve in Bruss.

58. In addition, the Bruss reference is cumulative to Imai (which has a VFS in a VCT) and Hendrixon (which has a VFS) in combination with the '659 patent, all of which were available to the examiner.

59. Another reference offered by Kuhn as allegedly invalidating the '738 patent is the Kawamoto patent USP 4,862,843. However, this patent alone cannot anticipate the '738 patent because, among other deficiencies, it has a helical gear type, and is not a vane type VCT. Furthermore, there is no teaching of the measurement of instantaneous camshaft phase nor any mention of sensors. The only mention of a control is with respect to the preferred embodiment of fig. 1. However, this embodiment uses a pair of binary state solenoids in a DPCS actuation system. Differential pressure in chambers 61 and 62 move piston 59 to adjust the axial position of the

spool 30. There is considerable uncertainty in this patent about the exact nature of the spool movement. On the one hand, Kawamoto says the spool is continuously variable. On the other hand, in col. 5 ll. 15 and 16 he says, "The spool 30 is axially movable between 3 positions." In my opinion, three positions is not synonymous with continuously variable.

60. With respect to the embodiment of fig. 3 (the primary focus in Kuhn), Kawamoto states that an "electric actuator 70 serves to move the shaft 7 and hence the spool 30 into a desired axial position, i.e. one of the cutoff, supply and release positions referred to above . . ." One of the stated choices for this actuator is "a linear solenoid." However, as explained above the term linear solenoid doesn't necessarily imply a VFS. According to Livernois (para. 75), a linear solenoid (of the VFS type) requires a spring acting against the armature or the spool. There is no such spring in the embodiments or teachings of Kawamoto. The only spring present in the control portion of 843 acts on the sleeve 29.

61. At best Kawamoto is cumulative to Imai which teaches the use of a proportional solenoid valve. That is, Kawamoto adds nothing to the features of '738 that were available to the examiner.

62. Yet another reference that is supposed to invalidate the '738 patent according to Kuhn is the Hara '442 patent. I have been told by attorneys for Borg Warner that there is a possibility that this reference is not prior art based on the filing date. However, in the event it is shown to be prior art, I include it in this report.

63. This reference cannot by itself anticipate the '738 patent (as asserted by Kuhn) because among other reasons it is a helical type, not a vane type VCT system. In addition there is no

20

teaching of the calculation of camshaft phase angle from sensor measurements of camshaft and crankshaft angular positions. No camshaft sensor is provided.

64. Moreover, there is no teaching of closed loop control of camshaft phase. In fact, this patent only teaches a few phase values which do not require closed loop control.

65. In addition, although the spool has a vent 65 at the front through which oil must flow when the system is changing phase, there may be pressure developed due to viscous flow that could appear on the opposite end of the spool. The amount of pressure developed during phase change would depend upon the oil viscosity and the sizes of the passageways through which it must flow. This pressure could affect the calibration of the actuator if a VFS solenoid were to be used.

66. The Hara '442 patent is, I believe, cumulative to Imai. It teaches the use of a proportional solenoid valve and it does not disclose closed loop control of camshaft phase based upon measurements of camshaft and crankshaft angular positions.

67. The Kuhn report argues that the Butterfield '735 patent in combination with any variable force solenoid reference renders '738 invalid by obviousness. I have been informed by attorneys for BorgWarner that this reference may not be prior art because of Quinn inventions. However, for the purposes of this report and its associated analysis, I will assume that it is.

68. This reference is cumulative to the Butterfield '659 patent. It is the same type of vane VCT system. This reference shows two embodiments: 1) a DPCS actuated system and 2) a stepper motor actuated system. The DPCS embodiment is cumulative to the '659 patent. The stepper motor is not a solenoid valve. It is a different, typically much slower-acting actuation means

21

than any solenoid actuation. Moreover, the examiner already had stepper motor art in the Karpis '141 patent that was cited in the '738 patent. The examiner would have understood the difference between a solenoid and a stepper motor, as he also had the Wiley Desk Reference which describes the differences between a motor actuator and a solenoid valve.

69. The examiner would also have had a vented spool through the '659 cited reference. Figure 21 shows a DPCS type system in which oil pressure is removed from the end of the spool.

70. Another reference in the Kuhn invalidity report is known as the Ford Zeta sales. I have been informed that this may not be prior art but, for this report, I assume that it is. According to Kuhn, the Ford Zeta VCT system in combination with any of the VFS art would invalidate the '738 patent on obviousness (§ 103) grounds.

71. However, from reading the Butterfield deposition and the Borg Warner provided documents, it is clear that the Ford Zeta system was not a vane type VCT. Furthermore, it used a stepper motor to actuate the spool valve rather than a VFS solenoid. As explained above in the analysis of the Butterfield '735 patent, a stepper motor is different from a solenoid.

72. In his report, Kuhn has not identified the particular documents that describe a specific prototype or set of prototypes that were supplied to Ford. Consequently, it is not possible to respond in detail to his assertions that are based upon generalized testimony about work done with Ford.

73. The examiner had references that incorporated a stepper motor in a VCT system (e.g. see Karpis that was cited in the '738 patent). As stated above, the examiner had multiple references

showing VFS art. Thus, the Ford Zeta adds nothing new to art that was available to the examiner.

74. Yet another reference given by Kuhn in his report is the Schechter '443 patent. He asserts that this patent in combination with any VFS art renders '738 invalid on obviousness grounds. Although I am informed that this may not be prior art based on the filing date, I assume that it is prior art for this report.

The '443 patent shows a helical type rather than vane type VCT. There is no disclosure of closed loop control based upon sensors for measuring camshaft and crankshaft positions and calculation therefrom of camshaft phase in an ECU (which is also not shown). There is no discussion of the actuation means for moving the valve 36. Contrary to the assertion of Kuhn, the spool is not vented. The passage 80 is simply a drain and does not relieve pressure on the rear face of the spool. At best, this reference is cumulative to Imai which was available to the examiner.

75. There are three references, each of which in combination with any VFS art, are asserted by Kuhn to invalidate '738 by obviousness. These three (Quinn '578, Quinn '805 and Becker '804) can be dealt with together. All three of these are DPCS type VCT systems which is the specific prior art system distinguished in the '738 specification. The '578 and '804 were cited in '738 and the Quinn '805 is a continuation in part of the '578 and adds no relevant information to the '738. None of these references show a vented spool nor removal of pressure from the back of the spool.

23

76. Kuhn has suggested that for each of these references it would have been obvious to replace the hydraulic-based actuator with a VFS solenoid. However, in each of these references the only viable direct substitution would be to replace the PWM solenoid with a VFS solenoid. A VFS solenoid can be operated in a PWM manner by providing a binary state excitation (*i.e.*, an on-off voltage signal). At sufficiently low frequency, the VFS solenoid armature would move through its full stroke during each excitation cycle. However, this substitution would not yield the '738 invention. It would still be a DPCS system that is the prior art described in the '738 specification.

77. Any other use of a VFS solenoid (*e.g.*, using it at normal excitation frequencies) would require a redesign of the configurations of these references. Without the benefit of the '738 patent and its explanation of how to have VFS replace DPCS actuation, one of skill would not have been motivated or have the understanding to make this change. In addition, the examiner could have made the substitution suggested by Kuhn using these three references and Imai or Hendrixon. The fact that he did not suggests that the claims are not obvious in light of this proposed combination.

78. Another reference in the Kuhn report, which Kuhn asserts in combination with any VFS art renders '738 invalid by obviousness, is the Smith '192 patent. This reference teaches a DPCS VCT system. It is similar to the prior art cited in the '738 specification and distinguished from the invention of the '738 patent. It has no vented spool and is cumulative to the '659, the Imai and Hendrixon.

79. Kuhn correctly identifies that this patent teaches closed loop control (see 2:22-23). However, he asserts that this loop is closed around camshaft phase. There is no direct teaching in '192 of closing the loop around camshaft phase via camshaft and crankshaft position measurements and calculation of phase. The loop could also be closed around a different performance variable. The specific closed loop feature is not the object of '192. Rather this patent features a "control valve with a flow area vs. spool valve position which is approximately hyperbolic (see 2:22-25).

80. Kuhn has presented a listing of vented spool art references. However these cannot be applied directly in most of the primary references he has given for his obviousness combinations. It is not possible at this time to provide a substantive response to these various combinations until it is known how the references are combined, what modifications are required for each vented spool reference to be combined with the corresponding primary reference and what the motivation is for making the combination.

81. An example of the "vented spool" art given in the Kuhn report is the Miura '885 patent. This patent teaches a simple on-off solenoid operated valve with a single inlet and return. The solenoid itself is a binary state solenoid.

82. This solenoid valve could not directly be used in a VCT system since it has only a single inlet and outlet and could not be used to advance and retard the camshaft phase. That is, it would not be possible with this valve to control the flow of oil (under pressure) to either side of a vane in a VCT actuator.

83. Kuhn has offered no explanation of how this valve either with or without modification could be used in any VCT primary reference. Even the substitution of a VFS solenoid for the on-off

25

solenoid does not yield a valve assembly that can be used in combination with any primary reference listed by Kuhn to make '738 obvious.

84. Another reference presented by Kuhn as representative of the vented spool art is the Akasaka '773 patent. The VCT system in this patent has a two position solenoid valve assembly. It has no teaching or disclosure of any closed loop control based on sensing camshaft and crankshaft positions and calculating the camshaft phase. The spool 28 does not permit two-way flow of oil and is not useful without major modification for use with any of the primary references listed by Kuhn. Until the details are presented of how this two-position solenoid valve is to be used with any given primary reference it is not possible to complete the present analysis.

85. The Barnes '947 patent is yet another example of the "vented spool" art given by Kuhn that can supposedly be combined with various primary references to invalidate '738 by obviousness. This is, in fact, a patent licensed to Cessna aircraft with application for flow control of a fluid under pressure. It is not a part of a VCT system. It discloses a proportional control valve in which fluid flow is controlled from a single source through a valve to a single outlet. For a given pressure source the volume flow rate varies in proportion to the current through the proportional solenoid coil.

86. Without a major redesign, which has not been explained by Kuhn, it could not be used in a vane type VCT. There is no motivation for the combination of this reference with any primary VCT reference. In fact it teaches away from the '738 patent.

87. The Getman '024 patent is another example of "vented spool" art according to Kuhn, who asserts that this reference could be combined with any of his primary references to invalidate '738 by obviousness.

88. How this reference is to be used in combination with a primary VCT reference is impossible to see. It is a manually-operated spool valve. Unless the driver is included in some bizarre cybernetic control system, this reference cannot be combined with any primary reference to yield a closed loop VCT system.

89. In a style similar to that used for the "vented spool" art, Kuhn along with Livernois have provided a list of references in the "variable force solenoid" art. These references, they assert, can provide missing VFS features when combined with various primary references. Kuhn asserts that the relevant combination render '738 invalid by obviousness.

90. Unfortunately, neither Kuhn nor Livernois explained how to combine the many VFS valves with any particular primary reference. In each case, major redesign (not explained by them) would be required so that the two systems could function together to achieve a VCT of the '738 type. Neither do they explain the motivation to make the combination.

91. It has been explained above with respect to the Butterfield article that the term "linear solenoid" does not necessarily imply a VFS. For example, the cited reference Kano '360 has "linear control" but this is achieved using binary state solenoids "operated under duly cycle control" (see 4:32).

92. Certain Hitachi's patents use the term "linear solenoid" or "linear" for systems that use binary state solenoids in which the armature operates over its full stroke for each excitation cycle. *See, e.g.*, JP 10-169,828, and JP 8-285,110.

93. The Kawamoto '843 patent uses the term "linear solenoid" but does not provide a description of the structure. Livernois at para. 75 asserts that there must be a spring acting on the armature/spool in order to have a proportional valve. In fact, Kawamoto does not have such a spring.

94. Rembold teaches that a VFS can be used to replace the PWM solenoid in his VCT system. However, this is still a DPCS-type of actuation and is teaching away from the '738 patent.

95. Another reference given by Kuhn/Livernois in the supposed VFS art is the Tsuruta '290 patent. Tsuruta teaches a three-position VCT (*i.e.*, 3 possible camshaft phases). There is no teaching of closed loop control as taught in '738 as there is no camshaft sensor from which camshaft instantaneous phase can be calculated in an ECU. The preferred embodiment of this patent uses a pair of binary state solenoid operated valves. The alternate embodiment incorporates a three-position spool that Livernois assumes is driven by a VFS. However there is no specific teaching of such a solenoid. The three positions of the spool can be achieved using a pair of binary solenoids acting in tandem. The first solenoid would be activated by the first current to achieve the position shown in fig. 8 resulting in a phase advance to the intermediate valve. The second binary state solenoid would be activated by the second current (supplied to the second coil) causing its armature which captures the first solenoid armature and moves the combined assembly. The "second control signal" would necessarily be greater in strength than

28

the first since it must work against a greater force. At the most, Tsuruta is cumulative to Imai which was available to the examiner. To the extent that the solenoid might be a VFS, it is also cumulative to Hendrixon.

96. The Barnes '947 patent is also suggested by Kuhn/Livernois as exemplary VFS art. The Barnes patent does teach a VFS. However, it is in the context of a fluid flow rate controlling actuator and is not within the VCT art. There is no hint or suggestion in this patent for combining it with the proffered primary reference. Furthermore, a POSA working in the VCT field would not, I believe, look to fluid flow control actuators for help in solving his problem. That is, there is no motivation for making the combination suggested by Kuhn/Livernois.

97. The Nishimiya '959 patent is yet another exemplary VFS art offered by Kuhn/Livernois. As in the case of Barnes this is outside of the field of VCT art and is simply a VFS actuated valve. It is cumulative to Hendrixon and contains no hint or suggestion of an application in a VCT. My same comments with respect to combinations in the Barnes analysis apply here as well.

The '332, '503 and '658 Everett patents are also asserted by Kuhn/Livernois as VFS art that can be combined with various primary references to invalidate '738 by obviousness. None of these three references are within or pertain directly to VCT systems. The '332 patent teaches a linear displacement solenoid and is not tied to any particular application such as spool valve displacement. The '503 patent teaches a linearly proportional solenoid that is coupled to a proportional spool valve. The '658 patent is an advance over the '332 in terms of linearity and calibration. It is not tied to any specific application. These three patents are cumulative to

Hendrixon in VFS art adding nothing new. There is no hint or suggestion that would motivate the combinations suggested by Kuhn/Livernois.

98. The Hutchings '196 patent is similarly offered by Kuhn/Livernois as VFS art that can supposedly be combined with various primary references to invalidate '738 by obviousness. This patent teaches a proportional solenoid controlled valve whose intended application is in fluid flow control. This reference is cumulative to Hendrixon.

99. The Lequesne IEEE Trans on Industry Applications article has been offered by Kuhn/Livernois as exemplary VFS art that, in combination with various primary references is supposed to render '738 invalid by obviousness. This article is primarily an analytical paper in which magnetic flux density is found by finite element solution of the magnetic vector potential equation for a specific solenoid configuration. Force is computed from the dyadic Maxwell stress tensor. Although this paper does offer help in improving solenoid design in achieving constant force vs. stroke, it is via optimization of parameters in a fixed structure. It offers little practically useful insight for arbitrary design configurations. There is no hint or suggestion in this paper that would motivate the combinations suggested by Kuhn/Livernois. This paper is, at most, cumulative to Hendrixon.

100.    Livernois, at para. 173, argues that the prior art references demonstrate the known interchangeability between hydraulics and electromechanical approaches to moving a spool. I have been informed that the legal standard for interchangeability of one component and a second is that the second can be directly substituted for the other in a system without affecting the performance of the system. For example, one type of electromechanical solenoid could be

substituted for another in a DPCS system. For instance, low frequency PWM excitation could drive a VFS and result in binary state operation as it would for a binary state on/off solenoid. Identical VCT system performance could be achieved by this substitution, but the system would continue to be a DPCS, and it would not achieve continuously variable positioning of the spool.

101.    I disagree with Livernois' suggestion that replacing an electrohydraulic actuation scheme with the electromechanical (VFS) would be one of simple interchangeability. These are different approaches to actuation and would require substantial redesign.

102.    Livernois points to the Butterfield article in which it is stated that "other methods [of controlling the VCT] could include a linear proportional solenoid . . ." However Butterfield was not thereby suggesting interchangeability. He was merely listing other actuation technologies. Moreover, if the Butterfield VCT system were redesigned somehow with VFS, it is still be DPCS actuation system lacking a vented spool.

103.    At para. 179, Livernois states that VFS was a well known alternative for other solenoids or stepper motor actuators. Although these are all actuators, each has its own set of performance characteristics. Each actuation application situation places performance requirements that may not be met acceptably by all of these choices. For example, the dynamic response requirements for a given application may well not be met by a stepper motor, but may be met with a VFS. As a result, they are not simply interchangeable.

104.    Livernois argues that there are several prior art references that teach sensing camshaft and crankshaft angular positions, calculating camshaft relative phase angle and issuing a control signal to reach the desired relative phase angle. While I agree that there is a set of prior art in

31

which closed loop control is applied to VCT systems, there is more to the '738 patent than simply adding closed loop control to an existing VCT. Moreover, the examiner had prior art references of closed loop control of a VCT system (e.g. '578 patent). In particular, he cited numerous references similar to the OEM design on the Renold camshaft phase controller. However, each of the references relied on by Livernois has a helical gear type, not a vane type VCT actuator. Each uses a DPCS controlled via binary state solenoids. This art discloses features which the examiner knew about and over which the '738 claims were allowed.

105.    For example, the Bauer '194 patent teaches a closed loop theory and only refers to the actuation structure by reference to patent 4,744,338. This reference is cumulative to Kano '360 which also shows closed loop control and was before the examiner.

106.    The Linder '477 patent is another prior art reference showing closed loop control at a VCT system. Although this patent teaches such closed loop control it doesn't specifically describe camshaft and crankshaft position measurements and the calculation from these of camshaft phase. Furthermore, it uses binary state, not VFS solenoids. This patent was cited by the PTO Examiner in the '738 patent.

107.    The Suga '106 patent is another example of closed loop control of a VCT system. However, this reference is not a vane type VCT. Rather it uses differential piston produced torque to rotate the camshaft 16 relative to the drive 10. It uses a binary state solenoid driven valve operated for predetermined period of time to advance or retard the camshaft (see 7:10-17).

108.    Another referenced listed by Livernois showing closed loop control of a VCT is the Quinn '578 patent. This patent which was cited in the '738 specification for its teaching of

32

closed loop control. However, the actuation is DPCS and was certainly well known to the examiner.

109.    The Kano '755 patent is also given by Livernois as exemplary of closed loop control of a VCT system. This patent is very similar to Kano '360 which was cited by the examiner and applied during the '738 prosecution. This reference teaches control via a pair of binary state solenoids operating as PWM (variable duly cycle) control. The Kano '755 is at best cumulative to Kano '360.

110.    The Maurer '202 and Kolias '968 and JP 63-112 references offered by Livernois as teaching closed loop control of a VCT are each standard closed loop control systems. They are cumulative to Kano and Linder which were cited in '738.

111.    The Rembold DE 40 37 824 A1 German patent application is also given by Livernois as exemplary of closed loop control of VCT systems. However, as described earlier in this report, Rembold does not disclose closed loop control based upon sensing crankshaft and camshaft angular positions and calculating camshaft phase from these measurements. Rather, Rembold describes the DPCS actuation system that is used in a VCT application (as well as in others).

112.    In para. 263, Livernois asserts that there is a lack of disclosure concerning calibration errors. In particular, he observes that the '805 patent identifies difficulties associated with the '578 patent approach to VCT control: 1) phase measuring inaccuracies at engine startup and 2) incorrect sensor pulse detection when phase has been advanced beyond a certain point leads to gross errors in calculating camshaft phase.

113.    However, there is prior art available to a POSA that teaches self calibration of a VCT system. The Van Vuuran '640 patent teaches a method of self calibration. This reference explains that comparison of measured phase with known valves associated with dwell permits a phase error correction (or sensor self calibration) to be done.

114.    In addition, the Suga 5,117,785 patent teaches a locking mechanism that could prevent the incorrect phase measurement by holding the camshaft in a known position at engine start. A POSA would understand that various mechanisms are available. Thus, the lack of disclosure of the problems identified above would not limit the ability of a POSA to practice the '738 patent.

115.    At para. 229, Kuhn asserts that the written description of the '738 is inadequate for a POSA to practice the methods of claims 10 and 11 without using cam torque as an energy source. In making this assertion Kuhn makes a distinction between CTA and CPA. There is an implication in the Hitachi position that somehow OPA was unknown to the inventors of the '738 patent. This is simply not true. OPA systems for VCT were well known to the inventors. In the background section of '738 specification, the '02 and '578 patents are described and incorporated by reference into '738. The background section of the specification for the '023 patent describes prior art VCT systems that rely on "a separate hydraulic motor operated by engine lubricating oil." However, this actuating arrangement consumes significant additional energy (1:36-39). Figure 13 of this reference shows a return line 118 from a spool valve or a pressure regulator valve 116 that returns oil to the oil sump. I have been told by BorgWarner's lawyers that Hitachi stated in their motion papers that "using engine oil pump pressure and external flow to change the phase and without internal check valves in the VCT was well known in the art at the time of the filing of the '738 patent application." Hitachi is saying that OPA

34

systems were well known in the art, and thus one of skill in the art would understand the operation of those systems.

116.    In writing claims 10 and 11, the inventors recognized that their method could be applied to OPA based VCT systems as well as CTA based systems, or to hybrid systems (in which the energy to move the camshaft comes partly from oil pressure and partly from cam torque). The physical origin of the energy to pressurize the oil (be in the oil pump or cam torque reversals) was simply not relevant to the method steps of the claimed invention. The '738 patent clearly teaches that the main oil gallery delivers pressurized oil to the vane actuator – both at engine start up and continuously to provide make up oil. For example, claim 16 from the originally-filed specification clearly teaches that a "source of hydraulic fluid under pressure" is the MOG '230' and that hydraulic fluid is delivered from this source to the vane housing. (Original application, p. 24, claim 16).

117.    In para. 237, Kuhn asserts that the '738 patent does not teach or enable one to practice the invention (claims 10 and 11) under Hitachi's claim construction, in which a source can only be viewed as a recess/cylinder and the means in the preamble refers to only a sprocket and chain. Although I believe this claim construction ignores the fact that claims 10 and 11 can read on an OPA system, I assume that construction for this analysis. Kuhn asserts that "there is no disclosure of or even a need to also regulate flow from a source to a sprocket and chain . . ." I agree; Hitachi's proposed construction is contrary to the specification and the preferred embodiment. The specification describes the use of a belt in addition to a chain, 5:8-9 and 18-19, and a POSA would understand that oil would not be supplied to a belt for belt-driven camshafts.

35

118.    Reading the above claim recitation in the manner urged by Hitachi is, in fact, inconsistent with every description contained in the '738 patent specification and prosecution history.  In no embodiment of the '738 patent does oil flow from a source (taking either Hitachi's or BorgWarner's construction of "source") to a chain or belt.  One of skill in the automotive art would understand that a chain that is used with a camshaft and crankshaft must be lubricated, and that such lubrication typically occurs by the splashing of oil from the crankcase onto the chain.  One of skill in the art would understand that all chain driven camshafts typically have oil supplied to the chain in this manner, including those systems described in the '738 patent.

119.    If the oil flowed from the source to the chain or belt, instead of to the vane housing, camshaft phasing could not be effectuated.  The vanes would not be moved and the claimed phasing of the camshaft could not be accomplished.  Thus, the preamble's recited goal of "varying the phase angle of a camshaft relative to a crankshaft" would not be accomplished, and the steps in the body of the claim would not be performed.

120.    I believe that one of skill would either view the language in the preamble of the claim as simply introductory and non-limiting or conclude that the corresponding structure for the means for transmitting rotary movement in the preamble includes the vane housing and recesses in the housing.  This is where the fluid has to go for the contemplated adjustment of camshaft phase to be accomplished.

121.    I believe that asserted claim 10 and 11 are directed to a novel control system representing an improved VCT system.  That improvement involves using a variable force solenoid and a vented spool (in a closed loop VCT).  This improvement is applicable to OPA systems, CTA

36

systems, and hybrid systems. There is nothing about the addition of a variable force solenoid and vented spool that makes them incompatible with an OPA system. The system described in claims 10 and 11 of the '738 patent is fully compatible with an OPA system, a CTA system, or a hybrid system.

122. I have been informed by the BorgWarner lawyers that Hitachi asserts that CTA does not rely on flow from the main engine oil circuit to provide energy to create the phase shift. Both CTA and OPA use pressurized oil to actuate or move the vanes. The only difference is that the oil is pressurized in OPA with an oil pump, which is operated by the engine, while in CTA the oil is pressurized by camshaft torsional energy, which is also generated by the engine. Borrowing terminology from BorgWarner, TA (torsional assist) is a hybrid, which incorporates aspects of both. All of these VCT systems use oil flow from the main engine oil circuit of MOG. If pressurized oil were not present in the VCT systems, the oil would not cause the vanes to move. In my view, Hitachi is relying on a distinction about how the oil is pressurized, but, in my opinion, that is immaterial to the '738 patent or the asserted claims. The ultimate energy source is engine combustion.

123. Vane type VCT systems, such as disclosed in the '738 patent, would not operate without oil pressure in the vane recesses. In other words, if there were zero oil pressure in the vane recesses, the VCT system as taught by the '738 patent would not operate to change camshaft phase.

124. I have been informed that Hitachi admits that "using engine oil pump pressure and external flow to change the phase and without internal check valves in the VCT was well known

37

in the art at the time of filing of the '738 patent application." I agree that one of skill would know how to utilize engine oil pump pressure in connection with the system disclosed in the '738 patent.

125.    In my opinion, the check valves shown in the figures of the '738 patent are not fundamental to the function of transmitting rotary movement to the camshaft relative to the crankshaft. They are merely part of a specific embodiment, but are not fundamental to the function of transmitting rotary movement. The key structures for performing this function are the actuators in the vane housing on the camshaft. This function could not be performed if the vane actuators were absent.

126.    I have reviewed materials (including, for example, BW 0131213-55) relating to BorgWarner's commercial embodiment, which I have been informed is marked with the '738 patent. From what I have reviewed, I believe that BorgWarner's commercial VCT product employs a hybrid torsional assist technology and, in my view, claims 10 and 11 of the '738 patent read on BorgWarner's product.

127.    I have been informed by attorneys for BorgWarner that Hitachi has raised a challenge to asserted claims 10 and 11 of the '738 patent based on grounds of 35 U.S.C. sec. 112. I understand that this section relates to the requirement that the patent specification contain a "written description" of the invention, which enables one of skill to make and use the invention. I have been informed that to meet the written description requirement, the disclosure must convey with reasonable clarity to those skilled in the art that the inventor was in possession of the invention.

38

128.    Based upon the disclosure if the '738 patent, including the patents incorporated by reference into the specification of the '738 patent, in my view, the inventors had possession of the invention claimed in claims 10 and 11. I think the plain language of the claims and the claim constructions urged by BorgWarner are consistent with the invention that Dr. Stan Quinn and Mr. Ed Siemon possessed and disclosed in the '738 patent. See my initial report on infringement, in which I comment on BorgWarner's claim constructions, for the specification cites in support of the various claim elements contained in claims 10 and 11. I believe that any POSA intending to develop a VCT system who had the 738 patent before him would be able to practice the invention regardless of whether this were to be a CTA or OPA (or hybrid system). All of the main features are clearly explained. The use of a VFS actuated vented spool valve is clearly explained in the 738 patent such that the POSA could develop the necessary structure. The use of crankshaft and camshaft sensors for measuring the angular positions of the engine component would be understood by a POSA from the '738 description. The method of calculating instantaneous camshaft phase from these position measurements would be known to a POSA. The structure for the means for transmitting rotary motion of the camshaft relative to the housing is readily understood from the many drawings (e.g., figs 10-20).

129.    From these descriptions in the 738 patent, the VCT system development would proceed in a manner similar to other new automotive technology. The determination of desired camshaft phase would come from a normal engine control development program including, perhaps, engine mapping on a dynamometer. The development of a control law for the system would be a normal engineering effort that would be understood by a POSA for a given set of performance requirements (typically from an automotive OEM).

39

130.    The POSA would further understand that if his design were for an OPA, the source could

be the MOG. He would understand that inlet and return lines connecting the actuation

mechanism (in the housing) would be required. The plumbing details would come from the

system structure as well as the system performance requirements.

131.    The type of excitation of the VFS would be a designer's choice. He could elect to use DC

excitation or variable duty cycle excitations described in my report on infringement.

132.    I am informed by attorneys for BorgWarner that discovery may not yet be complete.

There may be, for example, additional depositions to be taken and there may be additional

documents and materials produced by Hitachi or third parties. My opinions might possibly be

affected by such sources or by additional arguments made by Hitachi. In addition, I have been

informed that the Court has not yet construed the legal meaning of the claims. Consequently, I

reserve the right to submit a supplemental report or reports. I may also be asked to prepare a

rebuttal report in the light of new information, and I reserve the right to prepare such a report.

Attorneys for BorgWarner have told me that I may also be called upon to testify about

matters: (1) raised on direct or cross-examination at trial; (2) necessary to rebut any other

matters that the Court allows Hitachi to introduce or rely upon; (3) otherwise raised at trial by

counsel or the Court in relation to matters set forth in this report. In addition to the items

identified above, my testimony may also be based, in part, upon the trial testimony of fact

witnesses and other expert witnesses.

If called to testify before the Court and/or a jury, I may also rely on demonstratives and

samples to help illustrate and explain the opinions and matters disclosed in this report. I was

asked by attorneys for BorgWarner to identify a list of demonstratives exhibits that I may use in

aid of my testimony.  This following is a representative, non-exhaustive list:

(i) demonstrative(s) explaining how the combination(s) of references suggested by Kuhn and/or
    Livernois fails to render the asserted claims obvious;
(ii) demonstrative(s) explaining the lack of a motivation to combine;
(iii) demonstrative(s) explaining the inappropriateness of hindsight in an obviousness challenge;
(iv) demonstrative(s) explaining secondary considerations of non-obviousness;
(v) demonstrative(s) explaining the prior art that was before the Patent Office;
(vi) demonstrative(s) explaining the state of the art at the time the application for the '738 patent
    was filed;
(vii) demonstrative(s) explaining how the '738 patent satisfies § 112, and
(viii) demonstrative(s) explaining how each of the references relied on by Hitachi lacks one or
    more elements of the asserted claims.

Dated:  October 19, 2006

_William B Ribbens_

William B. Ribbens

# EXHIBIT 19



US006920854B2

(12) **United States Patent**
Komaki

(10) Patent No.: **US 6,920,854 B2**
(45) Date of Patent: **Jul. 26, 2005**

(54) **VARIABLE VALVE ACTUATION APPARATUS FOR INTERNAL COMBUSTION ENGINE**

(75) Inventor: **Yusaku Komaki**, Tochigi (JP)

(73) Assignee: **Hitachi, Ltd.**, Tokyo-to (JP)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **10/899,073**

(22) Filed: **Jul. 27, 2004**

(65) **Prior Publication Data**
US 2005/0028773 A1 Feb. 10, 2005

(30) **Foreign Application Priority Data**
Aug. 8, 2003 (JP) ......................... 2003-289671

(51) Int. Cl.⁷ ............................................. F01L 1/34
(52) U.S. Cl. ............................ 123/90.17; 123/90.16; 123/90.15; 464/161
(58) Field of Search ......................... 123/90.17, 90.16; 464/161

(56) **References Cited**
U.S. PATENT DOCUMENTS

5,184,581 A   *   2/1993   Aoyama et al.   .........   123/90.31

| 5,497,738 A | * | 3/1996 | Siemon et al. | ............. | 123/90.17 |
| 6,250,266 B1 | * | 6/2001 | Okui et al. | ............. | 123/90.17 |
| 6,311,654 B1 | * | 11/2001 | Ushida et al. | ............. | 123/90.17 |
| 6,457,447 B1 | * | 10/2002 | Sato et al. | ............. | 123/90.17 |
| 2001/0039933 A1 | * | 11/2001 | Sato et al. | ............. | 123/90.17 |

FOREIGN PATENT DOCUMENTS

JP   2001-329811 A   11/2001

* cited by examiner

Primary Examiner—Thomas Denion
Assistant Examiner—Kyle M. Riddle
(74) Attorney, Agent, or Firm—Foley & Lardner LLP

(57) **ABSTRACT**

A VVA apparatus includes drive-input and intake-side transmission sprockets provided to an intake-side phase alteration device, an exhaust-side transmission sprocket provided to the exhaust-side phase alteration device, a reduced-diameter portion provided to a housing of the exhaust-side phase alteration device between a housing main body and the exhaust-side transmission sprocket, and a torsion coil spring arranged between the housing and vane rotor of the exhaust-side phase alteration device to bias the two in the advance direction. The torsion coil spring is disposed on the outer periphery of the reduced-diameter portion to have a reduced diameter when the phase is changed from the phase at engine start.

**20 Claims, 3 Drawing Sheets**



## FIG.1



**U.S. Patent**    Jul. 26, 2005    Sheet 2 of 3    US 6,920,854 B2

# FIG.2



## FIG.3



## FIG.4



US 6,920,854 B2

1

# VARIABLE VALVE ACTUATION APPARATUS FOR INTERNAL COMBUSTION ENGINE

## BACKGROUND OF THE INVENTION

The invention of the present application relates to a variable valve actuation (VVA) apparatus for an internal combustion engine, which controls the opening/closing timing of intake and exhaust valves in accordance with the engine operating conditions.

A typical VVA apparatus for an internal combustion engine is disclosed in Japanese document P2001-329811A. The VVA apparatus comprises phase alteration devices arranged at the front ends of intake and exhaust camshafts, respectively, to which torque of a crankshaft is transmitted through a chain. The intake-side phase alteration device comprises in a housing a drive-input sprocket or rotator for directly transmitting thereto torque of the crankshaft through the chain and an intake-side transmission sprocket or rotator which is a member separate and distinct from the drive-input sprocket. On the other hand, the exhaust-side phase alteration device comprises in a housing an exhaust-side transmission sprocket or rotator having the same outer diameter as that of the intake-side transmission sprocket. The chain is looped between the two transmission sprockets.

Since the camshaft of the four-cycle engine rotates at the 1:2 ratio with respect to the rpm of the crankshaft, the outer diameter (number of teeth) of the drive-input sprocket of the phase alteration device is determined by the outer diameter (number of teeth) of a crankshaft-side sprocket. Thus, the outer diameter of the drive-input sprocket cannot be reduced freely, whereas the size of the two transmission sprockets can be reduced up to a point by simply setting the outer diameters (numbers of teeth) to the same-value. Therefore, when adopting the above VVA apparatus, even with engine layout having the intake and exhaust camshafts disposed relatively close to each other, torque of the crankshaft can be transmitted to the intake-side and exhaust-side phase alteration devices.

A vane rotor integrated with the exhaust camshaft is relatively rotatably accommodated in the housing of the exhaust-side phase alteration device wherein the transmission sprocket is arranged on the outer periphery. The vane rotor comprises vanes protuberantly arranged on the outer periphery to divide an inside space of the housing into advance and retard chambers. Selective supply/discharge of working fluid from the advance and retard chambers is carried out suitably to produce relative rotation between the housing and the vane rotor. With such so-called vane-type phase alteration device, however, the vane rotor is often put back to its retard position by alternating torque of the camshaft at engine stop or start where the pressure of working fluid is low. Thus, application of the phase alteration device to the exhaust side as-is can impair smooth engine start. Therefore, in the VVA apparatus, a spiral spring serving as a return spring is arranged at the front end of the exhaust-side phase alteration device to bias the vane rotor to its advance position, whereby the vane rotor is put back to its advance position by a biasing force of the spiral spring at engine stop or start.

## SUMMARY OF THE INVENTION

With the VVA apparatus disclosed in Japanese document P2001-329811A, however, since the spiral spring is arranged at the front end of the exhaust-side phase alteration device, the front-end portion of the exhaust-side phase

2

alteration device protrudes forward by the length of an installation space of the spiral spring, increasing the block length of the engine in its entirety, leading to lowered vehicle mountability thereof.

It is, therefore, an object of the invention of the present application to provide a VVA apparatus for an internal combustion engine, which allows smooth engine start without increasing the axial length of an exhaust-side phase alteration device and contributes to enhancement in vehicle mountability of the engine provided with such phase alteration device.

The invention of the present application provides generally a variable valve actuation (VVA) apparatus for an internal combustion engine, which comprises: an intake camshaft which drives an intake valve; an exhaust camshaft which drives an exhaust valve; an intake-side phase alteration device arranged at one end of the intake camshaft, the intake-side phase alteration device changing a relative rotation phase between a crankshaft and the intake camshaft; an exhaust-side phase alteration device arranged at one end of the exhaust camshaft, the exhaust-side phase alteration device changing a relative rotation phase between the crankshaft and the exhaust camshaft; a drive-input rotator provided to the intake-side phase alteration device, the drive-input rotator receiving a torque of the crankshaft; an intake-side transmission rotator provided to the intake-side phase alteration device, the intake-side transmission rotator being disposed closer to the intake camshaft than the drive-input rotator, the intake-side transmission rotator being smaller in outer diameter than the drive-input rotator, the intake-side transmission rotator rotating together with the drive-input rotator; an exhaust-side transmission rotator which receives a torque of the intake-side transmission rotator, the exhaust-side transmission rotator being the same in outer diameter as the intake-side transmission rotator; a reduced-diameter portion arranged between the exhaust-side phase alteration device and the exhaust-side transmission rotator; and a biasing member which biases the exhaust camshaft to an advance direction with respect to the crankshaft, the biasing member having a reduced diameter when a phase of the exhaust-side phase alteration device is changed from its phase at engine start.

## BRIEF DESCRIPTION OF THE DRAWINGS

The other objects and features of the invention of the present application will become apparent from the following description with reference to the accompanying drawings, wherein:

FIG. 1 is a sectional view taken along the line 1—1 in FIG. 2 and showing an embodiment of a VVA apparatus for an internal combustion engine according to the invention of the present application;

FIG. 2 is a schematic front view showing the VVA apparatus with a VTC cover removed;

FIG. 3 is an end view seen from the line 3—3 in FIG. 1; and

FIG. 4 is a view similar to FIG. 3, seen from the line 4—4 in FIG. 1.

## DETAILED DESCRIPTION OF THE INVENTION

Referring to the drawings, a description will be made about a VVA apparatus for an internal combustion engine embodying the invention of the present application.

Referring to FIG. 1, the engine comprises intake and exhaust camshafts 1, 2 supported on a cylinder block 3.

US 6,920,854 B2

3

Crank cams, not shown, are integrally mounted to camshafts 1, 2 so as to drive engine valves or intake and exhaust valves of cylinders in accordance with rotation of camshafts 1, 2.

Intake-side and exhaust-side phase alteration devices 4, 5 are mounted to camshafts 1, 2 at the front ends so as to control the relative rotation phase between a crankshaft, not shown, and camshafts 1, 2 in accordance with the engine operating conditions. Intake-side phase alteration device 4 comprises a housing 6 and a drive-input sprocket or rotator 7 formed therewith. Torque of the crankshaft is transmitted to housing 6 through a chain 8 (see FIG. 2) looped over drive-input sprocket 7. Since drive-input sprocket 7 rotates at the 1:2 ratio with respect to rotation of a crankshaft-side sprocket, drive-input sprocket 7 has an outer diameter set so that the number of teeth is twice as large as that of the crankshaft-side sprocket.

In the illustrative embodiment, intake and exhaust camshafts 1, 2 are disposed parallel and close to each other. Transmission of torque from the crankshaft is carried out from housing 6 of intake-side phase alteration device 4 (refer hereafter to as "intake-side housing 6") to a housing 9 of exhaust-side phase alteration device 5 (refer hereafter to as "exhaust housing 9") through a chain 10 (see FIG. 2). Specifically, an intake-side transmission sprocket or rotator 11 having small outer diameter than that of drive-input sprocket 7 is formed with intake-side housing 6 in the position closer to intake camshaft 1 than drive-input sprocket 7. And an exhaust-side transmission sprocket or rotator 12 having the same outer diameter (number of teeth) as that of intake-side transmission sprocket 11 is formed with exhaust-side housing 9 in the axial position corresponding to sprocket 11. Chain 10 is looped between intake-side and exhaust-side transmission sprockets 11, 12.

Intake-side and exhaust-side phase alteration devices 4, 5 are controlled in rotation by the hydraulic pressure, and have substantially the same structure. Therefore, first, the structure of intake-side phase alteration device 4 will be described, followed by a description about the structure of exhaust-side phase alteration device 5, principally, the structural difference between the two.

Referring to FIGS. 1 and 3, intake-side phase alteration device 4 comprises intake-side housing 6 having drive-input sprocket 7 and intake-side transmission sprocket 11 formed on the outer periphery, a vane rotor 15 integrally coupled to intake camshaft 1 by a cam bolt 14 and having intake-side housing 6 assembled thereto to relatively be rotatable as required, and a hydraulic-pressure supply/discharging means or device 16 for supplying/discharging working fluid to ensure relative rotation between vane rotor 15 and intake-side housing 6 in accordance with the engine operating conditions.

Referring to FIG. 3, intake-side housing 6 comprises four partition walls 17 of trapezoidal section equidistantly formed with the peripheral wall to protrude radially inward from the inner periphery. Drive-input sprocket 7 and intake-side transmission sprocket 11 are axially distantly arranged on the rear-side outer periphery of the peripheral wall of intake-side housing 6.

Vane rotor 15 comprises a rotor main body 21 disposed in the center of intake-side housing 6 and having an outer peripheral surface with which the front ends of partition walls 17 make slide contact, four vanes 22 protruding radially outward from rotor main body 21, and a shank 23 extending from one side of rotor main body 21 toward intake camshaft 1. Each vane 22 is disposed between adjacent partition walls 17 of intake-side housing 6 to divide a space

4

between partition walls 17 into advance and retard chambers 24, 25. Shank 23 is arranged through intake-side housing 6 to be coupled to intake camshaft 1, and serves to rotatably support housing 6 at the through-portion.

Formed in the center of the front face of vane rotor 15 is a connection hole 27 in which a supply/discharge rod 26 as will be described later is engaged relatively rotatably and through which working fluid is supplied/discharged from advance and retard chambers 24, 25.

Supply/discharge rod 26 is formed with the inside of a VTC cover 28 mounted to the front end of a cylinder head to protrude axially, and has inner passages 28a, 28b formed therethrough to fluidly communicate with advance and retard chambers 24, 25, respectively.

Referring to FIG. 1, hydraulic-pressure supply/discharge means 16 comprises first and second hydraulic passages 29, 30 for supplying/discharging working fluid from advance and retard chambers 24, 25 of intake-side phase alteration device 4, third and fourth hydraulic passages 129, 130 for supplying/discharging working fluid from advance and retard chambers 124, 125 of exhaust-side phase alteration device 5, an intake-side electromagnetic switching valve 33 for switching first and second hydraulic passages 29, 30 to one of a supply passage 31, a drain passage 32, and a holding position, and an exhaust-side electromagnetic switching valve 133 for switching third and fourth hydraulic passages 129, 130 to one of a supply passage 131, a drain passage 132, and a holding position. An oil pan 34 is arranged on the bottom of the engine, and an oil pump 35 is arranged to supply working fluid in oil pan 34. An electronic control unit (ECU) 36 serves to control electromagnetic switching valves 33, 133.

Exhaust-side phase alteration device 5 comprises exhaust-side housing 9, a vane rotor 115, hydraulic-pressure supply/discharge means 16 shared with intake-side phase alteration device 4, and a torsion coil spring 38 serving as a return spring for biasing vane rotor 115 and exhaust-side housing 9 to their advance positions.

Referring to FIGS. 1 and 4, vane rotor 115 comprises a rotor main body 121 disposed in the center of exhaust-side housing 9, four vanes 122 protruding radially outward from rotor main body 121, and a shank 123 extending from rotor main body 121 toward exhaust camshaft 2. The end face of shank 123 is coupled to an end of exhaust camshaft 2 by a cam bolt 114. Formed in the center of the front face of vane rotor 115 is a connection hole 127 in which a supply/discharge rod 126 protuberantly formed with the inside of VTC cover 28 is engaged relatively rotatably.

Referring to FIG. 1, exhaust housing 9 comprises a housing main body 39 for accommodating vanes 122 of vane rotor 115, a transmission block 40 having an outer periphery formed with exhaust-side transmission sprocket 12, and a reduced-diameter portion 41 extending axially from housing main body 39 to couple main body 39 to transmission block 40. Referring to FIG. 4, housing main body 39 comprises four partition walls 117 of trapezoidal section equidistantly formed with the peripheral wall to protrude radially inward from the inner periphery, defining advance and retard chambers 124, 125 on both sides of each vane 122 of vane rotor 115. Advance and retard chambers 124, 125 fluidly communicate with inner passages 128a, 128b formed through supply/discharge rod 126, respectively, and are connected therethrough to third and fourth hydraulic passages 129, 130 of hydraulic-pressure supply/discharge means 16.

Shank 123 of vane rotor 115 is arranged through reduced-diameter portion 41 and transmission block 40 of exhaust-

US 6,920,854 B2

| 5 | 6 |

side housing 9 to be coupled to exhaust camshaft 2, and serves to rotatably support housing 9 at the through portion. Torsion coil spring 38 is arranged on the outer periphery of reduced-diameter portion 41 of exhaust-side housing 9. Torsion coil spring 38 has on the side of housing main body 39 a first end 38a engaged with reduced-diameter portion 41, and on the side of transmission block 40 a second end 38b arranged through a slot 42 circumferentially formed in reduced-diameter portion 41 and engaged with shank 123 of vane rotor 115.

Torsion coil spring 38 is assembled in such a way as to have maximally increased diameter when exhaust-side phase alteration device 5 is in the phase state at engine start, i.e. maximum advance phase state, and to have decreased diameter, when the phase is changed therefrom to the advance direction after engine start, by relative rotation between exhaust-side housing 9 and vane rotor 115. The side face of first end 38a of torsion coil spring 38 slidably makes contact with the side face of housing main body 39, thereby preventing torsion coil spring 38 from being tipped. This ensures achievement of stable spring characteristics of torsion coil spring 38 at all times.

Transmission block 40 of exhaust-side housing 9 is engaged over the front end of reduced-diameter portion 41, and fixed by a bolt or tightening means 43 from the axial direction. Since exhaust-side transmission sprocket 12 is larger in diameter than torsion coil spring 38, the apparatus can easily be assembled by mounting torsion coil spring 38 to reduced-diameter portion 41, then fixing transmission block 40 by bolt 43.

A lubricating-fluid supply passage, not shown, is arranged to always supply lubricating fluid to drive-input sprocket 7 and intake-side and exhaust-side transmission sprockets 11, 12 in which chains 8, 10 are involved.

Referring to FIG. 1, a lock mechanism 50 serves to lock intake-side housing 6 and vane rotor 15 in their maximum retard positions at engine stop and the like, whereas a lock mechanism 51 serves to lock exhaust-side housing 9 and vane rotor 115 in their maximum advance positions at engine stop and the like.

Operation of the illustrative embodiment will be described. When the operating engine stops, the hydraulic pressure of hydraulic-pressure supply/discharge means 16 reduces gradually. Then, intake-side and exhaust-side phase alteration devices 4, 5 undergo force to vary vane rotors 15, 115 to their retard positions by alternating torque of camshaft 1, 2, i.e. fluctuating torque due to profile of a crank cam and force of a valve spring.

Then, with intake-side phase alteration device 4, vane rotor 15 is put back to its retard position by force of alternating torque, and locked in its maximum retard position by lock mechanism 50.

On the other hand, with exhaust-side phase alteration device 5, force of torsion coil spring 38 operates against alternating torque to put vane rotor 115 back to its advance position. And when vane rotor 115 is put back to its maximum advance position, exhaust-side phase alteration device 5 is locked therein by lock mechanism 51 in the same manner as intake-side phase alteration device 4.

Therefore, at engine restart, intake-side and exhaust-side phase alteration devices 4, 5 are both in the state suitable for engine restart.

When the engine is started, torque of the crankshaft is transmitted to drive-input sprocket 7 through chain 8, then to intake-side housing 6, which is further transmitted from intake-side transmission sprocket 11 through chain 10 to exhaust-side transmission sprocket 12. With this, intake-side and exhaust-side housings 6, 9 rotate synchronously under torque of the crankshaft. At the initial stage of engine start, since intake-side phase alteration device 4 and exhaust-side phase alteration device 5 are maintained in the maximum retard position and in maximum advance position, respectively, intake camshaft 1 and exhaust camshaft 2 open and close the engine valves at the retard timing and at the advance timing, respectively.

After engine start, when operation of electromagnetic switching valve 33 causes fluid communication of intake-side supply passage 31 and drain passage 32 with advance and retard chambers 25, 124 and fluid communication of exhaust-side supply passage 131 and drain passage 132 with retard and advance chambers 125, 124, vane rotors 15, 115 of intake-side and exhaust-side phase alteration devices 4, 5 are rotated to the maximum advance position and the maximum retard position, respectively. With this, intake camshaft 1 and exhaust camshaft 2 open and close the engine valves at the advance timing and at the retard timing, respectively.

In the illustrative embodiment, intake-side and exhaust-side phase alteration devices 4, 5 are disposed close to each other at the front ends of camshafts 1, 2. Particularly, drive-input sprocket 7 of intake-side housing 6 includes a large protrusion toward exhaust-side housing 9. However, reduced-diameter portion 41 located between housing main body 39 and exhaust-side transmission sprocket 12 (transmission block 40) is provided to exhaust housing 9 in the position corresponding to the protrusion of drive-input sprocket 7 of intake-side housing 6, thus securing an annular space of some axial width over the outer periphery of reduced-diameter portion 41.

In the illustrative embodiment, using the annular space over the outer periphery of reduced-diameter portion 41, torsion coil spring 38 for biasing vane rotor 115 to the advance direction is arranged therein, allowing prevention of an inconvenience that exhaust-side phase alteration device 5 protrudes greatly axially forward due to installation of the return spring. The reason why torsion coil spring 38 can be arranged in reduced-diameter portion 41 is that not only torsion coil spring 38 is large in axial length and relatively small in radial deformation amount, but also it is disposed to have reduced diameter when the phase is changed from the phase at engine start. Specifically, since torsion coil spring 38 have maximum outer diameter at engine start, preliminary simple setting of torsion coil spring 38 to prevent its interference with drive-input sprocket 7 in this initial state allows sure prevention of an inconvenience that torsion coil spring 38 interferes with drive-input sprocket 7 during operation of exhaust-side phase alteration device 5.

In the illustrative embodiment, therefore, the axial length of exhaust-side phase alteration device 5 can be reduced to thereby shorten the axial length of the whole engine block including phase alteration device 5, resulting in enhanced vehicle mountability of the apparatus.

Further, in the illustrative embodiment, torsion coil spring 38 is disposed on the outer periphery of reduced-diameter portion 41, there is an advantage that excessive deformation of torsion coil spring 38 in the reduced-diameter direction can be restricted by reduced-diameter portion 41.

Still further, in the illustrative embodiment, since lubricating fluid is supplied to sprockets 7, 11, 12, not only the engaged portions between sprockets 7, 11, 12 and chains 8, 10 can surely be lubricated, but also torsion coil spring 38

US 6,920,854 B2

7

can be lubricated by lubricating fluid splashed by sprockets 7, 11, 12. This allows achievement of smooth flexible deformation of torsion coil spring 38 and prevention of characteristic variations thereof due to abrasion and abrasion powder from being produced.

As described above, according to the invention of the present application, since the torsion coil spring serving as a return spring is arranged in an annular space formed over the outer periphery of the reduced-diameter portion located between the housing main body of the exhaust-side phase alteration device and the exhaust-side transmission rotator, an installation space of the return spring does not protrude forward from the exhaust-side phase alteration device. The reason why the torsion coil spring can be arranged on the outer periphery of the reduced-diameter portion is that the torsion coil spring is disposed to have reduced diameter when the phase is changed from the phase at engine start, and thus does not interfere with the drive-input rotator of the intake-side phase alteration device, which faces the reduced-diameter portion. Therefore, the axial length of the apparatus in its entirety can be reduced, resulting in enhanced vehicle mountability thereof. Moreover, since the torsion coil spring is arranged on the outer periphery of the reduced-diameter portion, there is an advantage that excessive deformation of the torsion coil spring in the reduced-diameter direction can be restricted by the reduced-diameter portion.

Further, since lubricating fluid supplied to the sprockets is splashed to the torsion coil spring by rotation of the sprockets, the torsion coil spring can surely be lubricated without arranging an exclusive lubrication mechanism for lubricating the torsion coil spring. This allows not only achievement of a smooth reduction and enlargement of the diameter of the torsion coil spring, but also prevention of characteristic variations due to abrasion and abrasion powder from being produced.

Still further, tipping of the end of the torsion coil spring can be restricted by the side face of the housing main body of the exhaust-side phase alteration device, maintaining stable spring characteristics of the torsion coil spring at all times.

Furthermore, a biasing force of the torsion coil spring in the advance direction can surely be provided between the housing of the exhaust-side phase alteration device and the vane rotor with the torsion coil spring arranged on the outer periphery of the reduced-diameter portion. Moreover, the structure of the slot circumferentially formed in the reduced-diameter portion is very simple and facilitates mounting of the torsion coil spring, allowing manufacturing of the apparatus at low cost.

Further, after the torsion coil spring is disposed on the outer periphery of the reduced-diameter portion and engaged with the reduced-diameter portion and the shank of the vane rotor, the exhaust-side transmission rotator can be mounted to the reduced-diameter portion, providing excellent assembling workability.

Having described the invention of the present application in connection with the illustrative embodiment, it is noted that the invention of the present application is not limited thereto, and various changes and modifications can be made without departing from the scope of the invention of the present application. By way of example, in the illustrative embodiment, intake-side phase alteration device 4 includes a hydraulically actuated so-called vane-type device in the same way as exhaust-side phase alteration device 5. Optionally, intake-side phase alteration device 4 may include a device of other type such as electromagnetic type.

8

Moreover, in the illustrative embodiment, the drive-input rotator and the intake-side and exhaust-side transmission rotators include sprockets 7, 11, 12 engaged with chains 8, 10. Optionally, the rotators may include pulleys frictionally engaged with belts.

The entire teaching of Japanese Patent Application P2003-289671 filed Aug. 8, 2003 are hereby incorporated by reference.

What is claimed:

1. A variable valve actuation (VVA) apparatus for an internal combustion engine, comprising:

an intake camshaft which drives an intake valve;

an exhaust camshaft which drives an exhaust valve;

an intake-side phase alteration device arranged at one end of the intake camshaft, the intake-side phase alteration device changing a relative rotation phase between a crankshaft and the intake camshaft;

an exhaust-side phase alteration device arranged at one end of the exhaust camshaft, the exhaust-side phase alteration device changing a relative rotation phase between the crankshaft and the exhaust camshaft;

a drive-input rotator provided to the intake-side phase alteration device, the drive-input rotator receiving a torque of the crankshaft;

an intake-side transmission rotator provided to the intake-side phase alteration device, the intake-side transmission rotator being disposed closer to the intake camshaft than the drive-input rotator, the intake-side transmission rotator being smaller in outer diameter than the drive-input rotator, the intake-side transmission rotator rotating together with the drive-input rotator;

an exhaust-side transmission rotator which receives a torque of the intake-side transmission rotator, the exhaust-side transmission rotator being the same in outer diameter as the intake-side transmission rotator;

a reduced-diameter portion arranged between the exhaust-side phase alteration device and the exhaust-side transmission rotator; and

a biasing member which biases the exhaust camshaft to an advance direction with respect to the crankshaft, the biasing member having a reduced diameter when a phase of the exhaust-side phase alteration device is changed from its phase at engine start.

2. The VVA apparatus as claimed in claim 1, wherein the biasing member comprises a torsion coil spring.

3. The VVA apparatus as claimed in claim 1, wherein the drive-input rotator comprises a drive-input sprocket, wherein the drive-input sprocket receives the torque through a chain.

4. The VVA apparatus as claimed in claim 3, wherein the drive-input sprocket rotates at a 1:2 ratio with respect to rotation of the crankshaft.

5. The VVA apparatus as claimed in claim 1, wherein the intake-side transmission rotator comprises an intake-side transmission sprocket, and the exhaust-side transmission rotator comprises an exhaust-side transmission sprocket having the same number of teeth as that of the intake-side transmission sprocket, wherein the exhaust-side transmission sprocket receives the torque through a chain looped between the two sprockets.

6. The VVA apparatus as claimed in claim 1, wherein the drive-input rotator, the intake-side transmission rotator, and the exhaust-side transmission rotator comprise sprockets engaged with chains, and wherein the apparatus further

US 6,920,854 B2

<table>
<tr><td>9</td><td>10</td></tr>
</table>

comprises a supply passage serving to supply lubricating fluid to the sprockets.

7. A variable valve actuation (VVA) apparatus for an internal combustion engine, comprising:

an intake camshaft which drives an intake valve;

an exhaust camshaft which drives an exhaust valve;

an intake-side phase alteration device arranged at one end of the intake camshaft, the intake-side phase alteration device changing a relative rotation phase between a crankshaft and the intake camshaft;

an exhaust-side phase alteration device arranged at one end of the exhaust camshaft, the exhaust-side phase alteration device changing a relative rotation phase between the crankshaft and the exhaust camshaft, the exhaust-side phase alteration device comprising a housing and a vane rotor rotating together with the exhaust camshaft and mounted to the housing to be rotatable relatively, the vane rotor comprising vanes protuberantly arranged on an outer periphery and dividing an inside space of the housing into advance and retard chambers, wherein the housing and the vane rotor are rotated relatively by selectively supplying and discharging a working fluid from the advance and retard chambers;

a drive-input rotator arranged in a housing of intake-side phase alteration device, the drive-input rotator receiving a torque of the crankshaft;

an intake-side transmission rotator arranged in a housing of the intake-side phase alteration device, the intake-side transmission rotator being disposed closer to the intake camshaft than the drive-input rotator and being smaller in diameter than the drive-input rotator;

an exhaust-side transmission rotator arranged in the housing of the exhaust-side phase alteration device in a position corresponding to the intake-side transmission rotator, the exhaust-side transmission rotator having the same outer diameter as that of the intake-side transmission rotator and receiving a torque of the intake-side transmission rotator;

a reduced-diameter portion provided to the housing of the exhaust-side phase alteration device between a main body of the housing for accommodating the vanes and the exhaust-side transmission rotator, the reduced-diameter portion corresponding to the drive-input rotator; and

a return spring arranged between the housing and vane rotor of the exhaust-side phase alteration device to bias the two in an advance direction, the return spring comprising a torsion coil spring, the torsion coil spring being disposed on an outer periphery of the reduced-diameter portion to have a reduced diameter when a phase is changed from a phase at engine start.

8. The VVA apparatus as claimed in claim 7, wherein the torsion coil spring has one end with a side face slidably making contact with a side face of the main body of the housing of the exhaust-side phase alteration device.

9. The VVA apparatus as claimed in claim 7, further comprising a shank arranged through the reduced-diameter portion of the exhaust-side phase alteration device to protrude from the vane rotor, wherein the reduced-diameter portion is formed with a circumferential slot, the torsion coil spring having one end engaged with the reduced-diameter portion and another end engaged with the shank through the slot.

10. The VVA apparatus as claimed in claim 9, wherein the exhaust-side transmission rotator comprises a member sepa-

rate and distinct from the reduced-diameter portion, wherein the apparatus further comprises a tightening device which couples the exhaust-side transmission rotator to the reduced-diameter portion.

11. The VVA apparatus as claimed in claim 7, wherein the intake-side phase alteration device comprises a housing and a vane rotor rotating together with the intake camshaft and mounted to the housing to be rotatable relatively, the vane rotor comprising vanes protuberantly arranged on an outer periphery and dividing an inside space of the housing into advance and retard chambers, wherein the housing and the vane rotor are rotated relatively by selectively supplying and discharging a working fluid from the advance and retard chambers.

12. The VVA apparatus as claimed in claim 7, further comprising an intake-side electromagnetic switching valve selectively supplying and discharging the working fluid from the advance and retard chambers of the intake-side phase alteration device.

13. The VVA apparatus as claimed in claim 12, further comprising an exhaust-side electromagnetic switching valve selectively supplying and discharging the working fluid from the advance and retard chambers of the exhaust-side phase alteration device.

14. The VVA apparatus as claimed in claim 13, further comprising an oil pump supplying oil in an oil pan to the intake-side electromagnetic switching valve and the exhaust-side electromagnetic switching valve.

15. The VVA apparatus as claimed in claim 7, further comprising a VTC cover, an intake-side supply/discharge rod provided to the VTC cover and supplying and discharging the working fluid from the advance and retard chambers of the intake-side phase alteration device, and an exhaust-side supply/discharge rod provided to the VTC cover and supplying and discharging the working fluid from the advance and retard chambers of the exhaust-side phase alteration device.

16. The VVA apparatus as claimed in claim 7, further comprising an intake-side lock mechanism provided to the intake-side phase alteration device, the lock mechanism serving to lock the intake-side housing and the vane rotor in their maximum retard positions at engine stop.

17. The VVA apparatus as claimed in claim 7, further comprising an exhaust-side lock mechanism provided to the exhaust-side phase alteration device, the lock mechanism serving to lock the exhaust-side housing and the vane rotor in their maximum advance positions at engine stop.

18. The VVA apparatus as claimed in claim 7, wherein the torsion coil spring has a housing-side end engaged with the reduce-diameter portion, and an exhaust-camshaft-side end arranged through a slot circumferentially formed in the reduced-diameter portion and engaged with the vane rotor.

19. The VVA apparatus as claimed in claim 7, wherein the torsion coil spring is constructed to put back the vane rotor of the exhaust-side phase alteration device to its maximum advance position at engine stop.

20. A variable valve actuation (VVA) apparatus for an internal combustion engine, comprising:

an intake camshaft which drives an intake valve;

an exhaust camshaft which drives an exhaust valve;

an intake-side phase alteration device arranged at one end of the intake camshaft, the intake-side phase alteration device changing a relative rotation phase between a crankshaft and the intake camshaft;

an exhaust-side phase alteration device arranged at one end of the exhaust camshaft, the exhaust-side phase alteration device changing a relative rotation phase

US 6,920,854 B2

11

between the crankshaft and the exhaust camshaft, the exhaust-side phase alteration device comprising a housing and a vane rotor rotating together with the exhaust camshaft and mounted to the housing to be rotatable relatively, the vane rotor comprising vanes protuberantly arranged on an outer periphery and dividing an inside space of the housing into advance and retard chambers, wherein the housing and the vane rotor are rotated relatively by selectively supplying and discharging a working fluid from the advance and retard chambers;

a drive-input rotator arranged in a housing of intake-side phase alteration device, the drive-input rotator receiving a torque of the crankshaft;

an intake-side transmission rotator arranged in a housing of the intake-side phase alteration device, the intake-side transmission rotator being disposed closer to the intake camshaft than the drive-input rotator and being smaller in diameter than the drive-input rotator;

an exhaust-side transmission rotator arranged in the housing of the exhaust-side phase alteration device in a

12

position corresponding to the intake-side transmission rotator, the exhaust-side transmission rotator having the same outer diameter as that of the intake-side transmission rotator and receiving a torque of the intake-side transmission rotator;

a reduced-diameter portion arranged in the housing of the exhaust-side phase alteration device between a main body of the housing for accommodating the vanes and the exhaust-side transmission rotator, the reduced-diameter portion corresponding to the drive-input rotator; and

means, arranged between the housing and vane rotor of the exhaust-side phase alteration device, for biasing the two in an advance direction, the biasing means comprising a torsion coil spring, the torsion coil spring being disposed on an outer periphery of the reduced-diameter portion to have a reduced diameter when a phase is changed from a phase at engine start.

* * * * *