## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

HITACHI, LTD. and HITACHI AUTOMOTIVE
PRODUCTS (USA), INC.,

          Plaintiffs,

    v.

BORGWARNER INC.,
and BORGWARNER MORSE TEC INC.,

          Defendants.

_____

BORGWARNER INC.,

          Counterclaimant,

    v.

HITACHI, LTD., and HITACHI AUTOMOTIVE
PRODUCTS (USA), INC.,

          Counterdefendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 05-048-SLR

## BORGWARNER INC. AND BORGWARNER MORSE TEC INC.'S MOTION TO FILE SUR-REPLY CLAIM CONSTRUCTION BRIEF

       Pursuant to Civil Local Rule 7.1.3(c)(2), Defendant BorgWarner Morse TEC Inc. and Defendant/Counterclaimant BorgWarner Inc. (collectively, "BorgWarner") hereby request an order granting BorgWarner leave to file a short Sur-Reply Claim Construction Brief in the form attached as Exhibit A to this Motion. BorgWarner states as follows in support of its request.

       A sur-reply brief is necessary to address new issues improperly raised by Hitachi, Ltd. and Hitachi Automotive Products (USA), Inc. (collectively, "Hitachi") for the first time in

their Responsive Claim Construction Brief.  Delaware Civil Local Rule 7.1.3(c)(2) specifies that "the party filing the opening brief shall not reserve material for the reply brief which should have been included in a full and fair opening brief." *See also United States v. Fleetwood Enters., Inc.*, 702 F. Supp. 1082, 1091 n.25 (D. Del. 1988) ("sand-bagging" by withholding arguments for reply leads to "added and unnecessary work for the Court"); *Bayer AG v. Schein Pharm., Inc.*, 129 F. Supp. 2d 705, 716 (D.N.J. 2001), *aff'd*, 301 F.3d 1306 (Fed. Cir. 2002) (striking portions of reply brief which raised new issues for the first time).

Here, the parties were required to submit a Joint Claim Construction Statement that set forth the parties' proposed constructions for the various claim terms.  Although this statement was submitted to the Court with the parties' opening claim construction briefs, pursuant to Paragraph 5 of the Scheduling Order, the parties had exchanged their positions in Preliminary Claim Construction documents prior to the filing of the opening briefs.  Thus, Hitachi should have addressed BorgWarner's proposed constructions in its Opening Claim Construction Brief so that the parties could make a full and thorough presentation of the issues to the Court.  However, in its Responsive Claim Construction Brief, Hitachi has submitted, for the first time, new arguments regarding BorgWarner's proposed constructions that could have, and should have, been made in its opening brief.  Hitachi has also submitted, for the first time with its reply, new extrinsic evidence in the form of expert declarations.

Hitachi's new arguments include at least the following:

• Hitachi now contends that BorgWarner's construction of the claim term "source" in claim 10 of U.S. Patent No. 5,497,738 ("the '738 patent") is inconsistent with the preamble "regulating" phrase in the preferred cam-torque actuated ("CTA") embodiment;

- Hitachi now contends that claim 10 must be limited to CTA like claim 1 because of an amendment during the prosecution history to a "unified invention;"

- Hitachi has included newly-filed expert declarations, which opine on claim construction issues for the first time, and raised new arguments regarding the prosecution history of the '738 patent, including new arguments about the Strauber reference and statements made about it during prosecution, new arguments about the Linder reference and statements made about it during prosecution, and revised arguments about what is included in the "VCT mechanism" referenced in the prosecution history;

- Hitachi advances new arguments regarding the "allowing and blocking" limitation in claim 10;

- Hitachi addresses the preferred embodiment for the "variable force solenoid" and closed-loop control system of claim 10 for the first time and cites numerous passages from an extrinsic expert declaration that was only filed with Hitachi's reply;

- Hitachi now contends that BorgWarner's construction for the term "connected" in claim 11 is inconsistent with the specification of the '738 patent;

- Hitachi advances new arguments regarding the term "air gap" in claim 11 and appears to have changed its construction regarding the length of the air gap.

All of this could have, and should have, been raised in Hitachi's Opening Claim Construction Brief so that BorgWarner would have had a full and fair opportunity to respond. Hitachi should not be rewarded for saving arguments for its reply. Accordingly, BorgWarner should be allowed to file a sur-reply brief (in the form attached hereto as Exhibit A) to respond to

Hitachi's previously undisclosed positions. Alternatively, the Court should strike Hitachi's new arguments and its expert declarations.

Dated: November 3, 2006

Richard K. Herrmann (I.D. #405)
Mary B. Matterer (I.D. #2696)
MORRIS, JAMES, HITCHENS & WILLIAMS
222 Delaware Avenue, 10th Floor
Wilmington, DE 19801
(302) 888-6800

Hugh A. Abrams (*pro hac vice*)
Thomas D. Rein (*pro hac vice*)
Lisa A. Schneider (*pro hac vice*)
Marc A. Cavan (*pro hac vice*)
Lara (Fleishman) Hirshfeld (*pro hac vice*)
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-7000

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| HITACHI, LTD. and HITACHI AUTOMOTIVE<br>PRODUCTS (USA), INC.,              ) | |
|        ) | |
|     Plaintiffs,           ) | |
|        ) | |
|   v.             ) | |
|        ) | Civil Action No. 05-048-SLR |

HITACHI, LTD. and HITACHI AUTOMOTIVE
PRODUCTS (USA), INC.,               )
                                   )
            Plaintiffs,             )
                                   )
      v.                    )   Civil Action No. 05-048-SLR
                                   )
BORGWARNER INC.,                   )
and BORGWARNER MORSE TEC INC.,   )
                                   )
            Defendants.          )
_____ )
                                   )
BORGWARNER INC.,                   )
                                   )
            Counterclaimant,      )
                                   )
      v.                    )
                                   )
HITACHI, LTD., and HITACHI AUTOMOTIVE
PRODUCTS (USA), INC.,               )
                                   )
            Counterdefendants.   )

**LOCAL RULE 7.1.1 STATEMENT FOR
<u>MOTION TO FILE SUR-REPLY CLAIM CONSTRUCTION BRIEF</u>**

Pursuant to Local Rule 7.1.1, counsel for Defendants BorgWarner Inc. and BorgWarner Morse Tec Inc. states that a reasonable effort has been made to reach agreement with opposing counsel on the matters set forth in Defendants Motion to File Sur-Reply Claim Construction Brief, but that no agreement was reached on those matters.

Dated: November 3, 2006

Richard K. Herrmann (I.D. #405)
Mary B. Matterer (I.D. #2696)
MORRIS, JAMES, HITCHENS & WILLIAMS
222 Delaware Avenue, 10th Floor
Wilmington, DE 19801
(302) 888-6800

Hugh A. Abrams (*pro hac vice*)
Thomas D. Rein (*pro hac vice*)
Lisa A. Schneider (*pro hac vice*)
Marc A. Cavan (*pro hac vice*)
Lara (Fleishman) Hirshfeld (*pro hac vice*)
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-7000

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| HITACHI, LTD. and HITACHI AUTOMOTIVE PRODUCTS (USA), INC., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| BORGWARNER INC., and BORGWARNER MORSE TEC INC., | ) Civil Action No. 05-048-SLR ) ) |
| Defendants. | ) ) |
| BORGWARNER INC., | ) ) |
| Counterclaimant, | ) ) |
| v. | ) ) |
| HITACHI, LTD., and HITACHI AUTOMOTIVE PRODUCTS (USA), INC., | ) ) ) |
| Counterdefendants. | ) |

**ORDER**

This ___ day of _____, 2006, the Court having considered Defendants BorgWarner Inc. and BorgWarner Morse Tec Inc.'s Motion to File Sur-Reply Claim Construction Brief (the "Motion") and the other papers submitted in connection therewith,

IT IS HEREBY ORDERED that the Motion is GRANTED and that BorgWarner Inc. and BorgWarner Morse Tec Inc.'s Sur-Reply Claim Construction Brief, attached to the Motion, is deemed filed as of the date of this Order.

_____
Chief Judge Sue L. Robinson

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| HITACHI, LTD. and HITACHI AUTOMOTIVE PRODUCTS (USA), INC., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) Civil Action No. 05-048-SLR |
| BORGWARNER INC., and BORGWARNER MORSE TEC INC., | ) ) ) |
| Defendants. | ) ) |
| BORGWARNER INC., | ) ) |
| Counterclaimant, | ) ) |
| v. | ) ) ) |
| HITACHI, LTD., and HITACHI AUTOMOTIVE PRODUCTS (USA), INC., | ) ) ) |
| Counterdefendants. | ) ) |

## SUR-REPLY CLAIM CONSTRUCTION BRIEF OF
## BORGWARNER INC. AND BORGWARNER MORSE TEC INC.

*OF COUNSEL:*

SIDLEY AUSTIN BROWN & WOOD, LLP
Hugh A. Abrams
Thomas D. Rein
Lisa Schneider
Marc A. Cavan
Lara V. Hirshfeld
10 South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

Richard K. Herrmann (I.D. #405)
Mary B. Matterer (I.D. #2696)
MORRIS, JAMES, HITCHENS &
WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE 19801
(302) 888-6800
mmatterer@morrisjames.com
*Attorneys for BorgWarner Inc. and*
*BorgWarner Morse TEC Inc.*

Dated: November 3, 2006

## TABLE OF CONTENTS

I.    HITACHI'S POSITION THAT THE RECESSES IN THE VANE HOUSING ARE THE "SOURCE" OF OIL IN CLAIM 10 IS NOT DEFENSIBLE. ...........................1

    A.    Nothing In The Preamble Of Claim 10 Requires The Oil From The Source To Be Regulated On Its Way Out Of The Source. ...................................1

    B.    Nothing In The Prosecution History Changes The Proper Interpretation Of "Source" Or Limits Claims 10 and 11 To Cam-Torque Actuation.........................3

        1.    Hitachi's arguments regarding a "unified" invention are without merit. ...................................................................................................3

        2.    The prosecution history statements regarding Strauber are not "clear and unambiguous" and do not limit the scope of claims 10 and 11...................................................................................................5

    C.    Hitachi's Argument Regarding The "Spool Valve Selectively Allowing And Blocking Flow Of Hydraulic Fluid Through An Inlet Line And Through Return Lines" Is Without Merit. ............................................12

II.    HITACHI'S CONTENTION THAT THE SPECIFICATION DISCLAIMED A PWM INPUT SIGNAL TO THE VARIABLE FORCE SOLENOID IS DIRECTLY CONTRADICTED BY THE PREFERRED EMBODIMENT OF THE '738 PATENT............................................................................................14

III.    HITACHI'S CONTENTION THAT "CONNECTED" IN CLAIM 11 REQUIRES A PHYSICAL ATTACHMENT IS WITHOUT MERIT...............................................17

IV.    NOTHING REQUIRES THE "AIR GAP" IN CLAIM 11 TO EXTEND THE LENGTH OF THE ARMATURE. ...................................................................18

V.    CONCLUSION...........................................................................................19

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Am. Cyanamid Co. v. United States Surgical Corp.*,
    833 F. Supp. 92 (D. Conn. 1992)..................................................................1

*Bayer AG v. Schein Pharm., Inc.*,
    129 F. Supp. 2d 705 (D.N.J. 2001), *aff'd*, 301 F.3d 1306 (3d Cir. 2002)...........1

*Inverness Medical Switz. GmbH v. Warner Lambert Co.*,
    309 F.3d 1373 (Fed. Cir. 2002)................................................................11

*Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*,
    75 F.3d 1545 (Fed. Cir. 1996)................................................................11

*N. Telecom Ltd. v. Samsung Electrics Co.*,
    215 F.3d 1281 (Fed. Cir. 2000)...............................................................10

*SanDisk Corp. v. Memorex Prods., Inc.*,
    415 F.3d 1278 (Fed. Cir. 2005)................................................................11

*United States v. Fleetwood Enters., Inc.*,
    702 F. Supp. 1082 (D. Del. 1988).............................................................1

### STATUTES AND RULES

35 U.S.C. § 121 ...........................................................................................4

37 C.F.R. § 1.142 ........................................................................................4

D. Del. LR. 7.1.3(c)(2) ...............................................................................1

Defendant BorgWarner Morse TEC Inc. and Defendant/Counterclaimant BorgWarner Inc. (collectively, "BorgWarner") submit this sur-reply to respond to arguments that Hitachi improperly raised for the first time in its Responsive Claim Construction Brief regarding asserted claims 10 and 11 of U.S. Patent No. 5,497,738 ("the '738 patent"). As explained in the accompanying Motion, BorgWarner should be allowed to respond to the positions Hitachi improperly withheld until its reply. Alternatively, Hitachi's new claim construction positions and new expert declarations should be stricken.[1]

## I. HITACHI'S POSITION THAT THE RECESSES IN THE VANE HOUSING ARE THE "SOURCE" OF OIL IN CLAIM 10 IS NOT DEFENSIBLE.

As before, Hitachi's "source" differs from the only source identified in the specification of the '738 patent, the main oil gallery ("MOG") (230). (*See, e.g.,* BorgWarner Opening Br. at pp. 15-16; BorgWarner Resp. Br. at pp. 21-24). But now Hitachi has confirmed that many of its claim construction positions are premised entirely on its interpretation of the term "source" -- a source that changes from moment to moment based on the operation of the VCT system. Instead of creating a contrived definition of source and then interpreting the rest of claims 10 and 11 to coincide with its artificial construct, Hitachi should have started with the source that is specifically described in the specification (the MOG (230)), and then interpreted the remainder of the claim in accordance therewith. *See, e.g., Am. Cyanamid Co. v. United States Surgical Corp.*, 833 F. Supp. 92, 109 n.27 (D. Conn. 1992) ("[C]laims should be construed in a rational and practical manner, and their interpretation should lead to neither absurd nor

---

[1] *See* D. Del. LR 7.1.3(c)(2) ("the party filing the opening brief shall not reserve material for the reply brief which should have been included in a full and fair opening brief"); *see also United States v. Fleetwood Enters., Inc.*, 702 F. Supp. 1082, 1091 n.25 (D. Del. 1988) ("sand-bagging" by withholding arguments for reply leads to "added and unnecessary work for the Court"); *Bayer AG v. Schein Pharm., Inc.*, 129 F. Supp. 2d 705, 716 (D.N.J. 2001), *aff'd*, 301 F.3d 1306 (Fed. Cir. 2002) (striking portions of reply brief which raised new issues for the first time).

unjust results."). By failing to do so, Hitachi creates a house of cards. All of its new arguments, as explained below, lack merit and should be rejected.

### A.    Nothing In The Preamble Of Claim 10 Requires The Oil From The Source To Be Regulated On Its Way Out Of The Source.

Hitachi dismisses the fact that the MOG is the source of all oil in the vane housing because, in the preferred cam-torque actuated ("CTA") embodiment, the MOG simply supplies the initial-fill oil and makeup oil. (*See, e.g.,* Hitachi Resp. Br. at p. 3). Hitachi seems to believe that the claim requires something more, such as the regulation of the oil immediately as it leaves the source in order to cause a phase change. But nothing in the claim, specification or prosecution history requires anything of the like.

The preamble merely indicates that the claimed method is one that regulates the flow of oil that is transferred from a source to a means for transmitting rotary movement from a crankshaft to a housing. In no way does this tell one when that regulation occurs or how it occurs. Rather, the specifics of the "regulation" are described in the method steps of claim 10 that follow the preamble. Said another way, the preamble of claim 10 sets forth broad introductory language; the limitations of the claim that follow the preamble then specify how the oil from the source is regulated in the claimed VCT system.

What does this have to do with Hitachi's argument about the source? It is Hitachi's contention that the MOG cannot be the source because oil from the MOG is not *directly* regulated immediately as it leaves the MOG to cause a phase change in the preferred CTA embodiment of the '738 patent. But Hitachi's argument is fallacious because the claim does not require oil to be directly regulated immediately as it leaves the source. It merely requires oil that originates in the source to be regulated somewhere in the VCT system. And, as Hitachi concedes, in a CTA system, such as the preferred embodiment shown in the figures of the '738

patent, the MOG provides the oil that "eventually gets regulated." (Hitachi Resp. Br. at p. 3 (emphasis omitted)). Nothing more is required under the preamble of claim 10. In essence, Hitachi is attempting to change the preamble phrase from "regulating the flow of hydraulic fluid from a source to a means for transmitting rotary movement from said crankshaft to a housing" into the phrase "regulating the flow of hydraulic fluid *directly* from a source to a means for transmitting rotary movement from said crankshaft to a housing *in order to cause a phase change of the camshaft relative to the crankshaft*." Hitachi cannot rewrite the language of claim 10.

Consistent with the language of claim 10, the flow of oil out of the source, *i.e.,* the MOG, can be directly controlled by the variable force solenoid and spool valve (as in an oil-pressure actuated ("OPA") system), but it need not be (as in a CTA system). This is the only way to read the preamble of claim 10 to be consistent with the specification's clear definition of "source" as the MOG.

**B.    Nothing In The Prosecution History Changes The Proper Interpretation Of "Source" Or Limits Claims 10 and 11 To Cam Torque Actuation.**

**1.    Hitachi's arguments regarding a "unified" invention are without merit.**

Hitachi contends for the first time in its responsive brief that claim 1 and claim 10 of the '738 patent have to both be limited to CTA VCT systems -- even though claim 1 specifies CTA and claim 10 does not -- because the claims were amended during prosecution to cover a "unified invention." (Hitachi Resp. Br. at pp. 7, 20). Notably, Hitachi cites no authority (and BorgWarner is aware of none) to support its erroneous new position that amendments to make the claims cover a "unified invention" result in claims that are necessarily coextensive in scope.

The basis for restriction of a patent to a single, or unified, invention is found in the statutory requirement that the United States Patent and Trademark Office ("the PTO") may

require an application to be "restricted" to one of "two or more independent and distinct inventions." 35 U.S.C. § 121. The restriction requirement is normally made before any office action on the merits. *See* 37 C.F.R. § 1.142. An entire chapter of the Manual of Patent Examining Procedure ("MPEP") is devoted to the requirement for restriction, and there are numerous types of claims of widely varying scope (for example, generic, combination, subcombination, process and product) that are permitted to remain in the same application after a requirement for restriction, under various conditions described in that chapter. (*See* MPEP, Chapter 8). Claims to a single, or unified, invention that remain after an amendment may include "claims directed to different embodiments or species that could fall within the scope of a generic claim." (MPEP § 806.04 (Second Suppl. Matterer Decl. Ex. 35)).[2]

There is no basis for Hitachi's contention that all claims to a "unified" invention must be limited to the CTA species of claim 1, and cannot include a broader, generic claim, such as claim 10 directed to a control system that is used in CTA, OPA or hybrid vane actuation systems. In fact, the prosecution history refutes this. Initially, the applicants were seeking broad claims (original claims 16-22) that were directed to hydraulic control systems in general, far broader than CTA VCT systems. (*See* Orig. Spec. claims 16-22 (Matterer Decl. Ex. 8)).[3] It was these broad claims that the applicants cancelled in response to an interview with the examiner in order to avoid a restriction requirement. As the applicants explained at the time, they cancelled these claims, not because they went beyond CTA VCTs, but because they went beyond combustion engine art. (Prelim. Amend. at 4 (Second Suppl. Matterer Decl. Ex. 33) (explaining

---

[2]    References to the "Second Suppl. Matterer Decl." are to the Second Supplemental Declaration of Mary B. Matterer in Support of the Sur-Reply Claim Construction Brief of BorgWarner Inc. and BorgWarner Morse TEC Inc., submitted concurrently herewith.

[3]    References to the "Matterer Decl." are to the Declaration of Mary B. Matterer in Support of the Opening Claim Construction Brief of BorgWarner and BorgWarner Morse TEC Inc.

that the examiner "requested that Claims 16-22 be cancelled because of their scope which exceeded that of combustion engine art"); *see also* Appeal Br. at 2 (Matterer Decl. Ex. 11) (explaining that the examiner had indicated that original claims 16-22 "should be cancelled, since their scope exceeded that of internal combustion engine art").

The "unified invention" amendment, namely, deleting original claims 16-22, which were not even limited to internal combustion engines, therefore does not mean that original claim 11 (issued claim 10) was somehow limited to CTA in the process. Quite the contrary, the applicants explained that the preliminary amendments to claim 11 (issued claim 10) were to provide "more detail," not to make issued claim 10 coextensive in scope with claim 1. (*See* Prelim. Amend. at 4; Appeal Br. at 2). Nothing -- not the words of the claim or the statements made about the claim when the claim was amended -- indicates that issued claim 10 was limited to CTA like claim 1.

> ### 2.    The prosecution history statements regarding Strauber are not "clear and unambiguous" and do not limit the scope of claims 10 and 11.

Both Hitachi's opening brief and its responsive brief place heavy reliance on the applicants' statements regarding Strauber "control[ling] the flow of oil both internal and external to the VCT mechanism" and the '738 patented invention "control[ling] the flow of oil internal to the VCT mechanism only." (6/30/94 Reply to Office Action at 4 (Matterer Decl. Ex. 9); 11/1/94 Reply to Office Action at 3 (Matterer Decl. Ex. 10); Appeal Br. at 8). Despite calling these a "clear and unambiguous disclaimer," Hitachi now offers new arguments that are inconsistent with the ones in its earlier brief. Like the old arguments, however, these new arguments are logically flawed.

In its reply, Hitachi jettisons its initial take that "control[ling] the flow internal to the VCT mechanism" relates to an "internal energy source" of camshaft torque actuation.

(Hitachi Opening Br. at pp. 1, 3, 7). While Hitachi repeats its argument that controlling the flow internal to the mechanism requires flow "back and forth" from one vane recess to the other, Hitachi places a brand new gloss on the Strauber patent by revising its earlier artist's rendition of Strauber. To this rendition, Hitachi adds an arrow in the general direction of the recess with a caption indicating that this somehow implies control of "internal" flow. (*Compare* sketch in Hitachi Opening Br. at p. 14, *with* sketch in Hitachi Resp. Br. at p. 11). Hitachi's gloss on Strauber, however, does not withstand scrutiny.

Under Hitachi's view of the prosecution history, simply supplying flow from the external main oil gallery and then into *one internal recess* is not enough for "internal" flow control. Rather, Hitachi contends that "controlling the flow internally" means having flow from one vane recess to the other vane recess in order to cause a phase change. (*See* Hitachi Resp. Br. at p. 8 ("[c]laim 10 itself shows that the oil flow is totally internal to the VCT mechanism because the oil flows *from one vane recess, through the spool valve, to the other vane recess*") (emphasis omitted and added); *id.* at p. 7 n.4 ("claimed regulation of oil *back and forth between the recesses* as the camshaft timing adjustments are made") (emphasis omitted and added)). If Hitachi's assertions are to be accepted at face value, then the Strauber patent, which was said in the prosecution history to "control the flow of oil both internal and external to the VCT mechanism," must have internal flow between the vane recesses (or so-called "working chambers" in Strauber) to cause a phase change. In fact, Strauber does no such thing.

According to Hitachi, Strauber is a "traditional" OPA system. (Hitachi Resp. Br. at p. 9). Also according to Hitachi, Strauber does *not* allow the flow of oil internally from working chamber to working chamber. (Hitachi Resp. Br. at p. 10). Instead, Strauber supplies oil from the external MOG to *only one* chamber to change the timing. (Hitachi Resp. Br. at pp.

9-10).  No oil flows internally from one chamber to the other chamber to cause a phase change.  (*Id.*).  Thus, under Hitachi's own construction and interpretation, Strauber does not have any "internal" flow control.  At best, Strauber has "external" flow control *only*.  But the applicants said that Strauber "controls the flow of oil internal[ly] and external[ly]."  Accordingly, Hitachi's interpretation of "internal and external" simply cannot be correct.

Hitachi's construction also completely ignores the context in which the prosecution history statements were made.  In the initial January 4, 1994 Office Action, the examiner cited the prior art Linder patent as showing, among other things, "a solenoid valve 24 to control the flow of the working fluid between two chambers 7 and 8."  (1/4/94 Office Action at 2 (Suppl. Matterer Decl. Ex. 23)).[4]  The examiner then cited Strauber "to further show" a "solenoid to operate a spool valve to control the flow of the working fluid."  (1/4/94 Office Action at 3).  The examiner reiterated this in the August 1, 1994 Office Action, when he stated that Strauber was being relied upon "solely to teach a solenoid operated spool valve to control the flow of the working fluid which includes all the detailed elements as claimed."  (8/1/94 Office Action at 2-3 (Suppl. Matterer Decl. Ex. 24)).  Thus, the examiner was relying on Strauber for its solenoid operated spool valve, not for anything else.

It was in response to these rejections that the applicants made the statements regarding "control[ling] the flow of oil internal and external" and "control[ling] the flow of oil internal to the VCT mechanism only."  (6/30/94 Reply to Office Action at 4; 11/1/94 Reply to Office Action at 3; Appeal Br. at 8).  These statements were made to respond to the examiner's assertion that Strauber discloses a solenoid operated spool valve that controls the flow of oil.

---

[4]  References to the "Suppl. Matterer Decl." are to the Supplemental Declaration of Mary B. Matterer in Support of the Responsive Claim Construction Brief of BorgWarner and BorgWarner Morse TEC Inc.

Notwithstanding Hitachi's conjecture that the statements related to controlling "the flow of oil between the internal parts of the actuator," (Hitachi Opening Br. at p. 14), the applicants clearly were not making a statement concerning vane actuation. Rather, when considered in context, it is apparent that the applicants' statement related only to how the flow of oil is controlled through the solenoid operated spool valve, not to CTA or OPA actuation of the vanes of a VCT system as Hitachi contends.

This is reinforced by looking at the applicants' other statement regarding Strauber. Specifically, the applicants also explained the difference between the Strauber "common ('on-off' only) solenoid to control a spool of a two-position only system" as compared to the claimed invention, which uses "a variable force solenoid to control the position of a spool of a continuously variable system." (6/30/94 Reply to Office Action at 4; 11/1/94 Reply to Office Action at 3; Appeal Br. at 8). Thus, all the applicants' statements were about solenoid operated spool valves, not vane actuation. Indeed, the applicants even began their remarks by stating that "[t]he present invention relates to the use of a variable force solenoid in a VCT system to position a spool valve and the use of a lever arrangement to amplify the force applied to the spool valve" and that "[c]omments related to those subjects *alone* [were] as follows." (6/30/94 Reply to Office Action at 3 (emphasis added)).

BorgWarner's position, which contrasts the control or the passage of flow through the external and internal lands of the spool valve in Strauber as compared to through the internal lands of the spool valve only in the '738 patent, is consistent with the internal/external versus internal only distinction made in the prosecution history. BorgWarner's position is also consistent with the key distinction BorgWarner made over the prior art (such as Strauber) in both the specification and the prosecution history, namely, removing flow from the "external ends" of

the spool valve, and allowing flow to proceed along the internal lands only. This method of directing the flow of oil avoids problems arising from the influence of oil pressure against the external ends of the spool, which would otherwise need to be accounted for and balanced by the variable force solenoid.

The real distinction being made about "internal only" ('738 patent) as opposed to "internal and external" (Strauber) is illustrated in the following figures, where oil is represented in orange. As shown, oil flows along the internal and external *lands* of the Strauber spool valve, but only along the internal *lands* of the spool in the preferred embodiment of the '738 patent:



FIG. 19

9

(U.S. Patent No. 5,012,774 (Strauber), Fig. 1 (numbers removed, figure modified to show only relevant portions in color, labels added); '738 patent, Fig. 19 (coloring and labels added)).  In this context, the distinction between Strauber and the '738 patent makes sense and is consistent with the statements made in the patent and prosecution history, as pointed out in BorgWarner's earlier briefs.  Because, at a minimum, BorgWarner's interpretation of the prosecution history is reasonable, there is no clear and unambiguous disclaimer along the lines suggested by Hitachi. *See SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1288 (Fed. Cir. 2005) (where patentee's reading of the prosecution argument is "at least reasonable," there is no "clear and unmistakable surrender" of claim meaning).[5]

This is especially apparent in light of Hitachi's inability to advance a single, coherent explanation of the phrase "VCT mechanism" and what the applicants meant by their statements.  In its opening brief and proposed claim construction statement, Hitachi asserted that the "VCT mechanism" is the "VCT actuator," which it defined as consisting only of the "vane lobe/check valve mechanism."  (Hitachi Opening Br. at pp. 22, 23).  Now, Hitachi contends that the "VCT mechanism" is the "camshaft-mounted vane (or piston-cylinder) structure *with a flow path through the spool valve*, not including the MOG."  (Hitachi Resp. Br. at pp. 14-15 (emphasis added and omitted)).  Hitachi also, for the first time in its reply brief, cites to a number of BorgWarner patents, and a newly-filed expert declaration, as defining what is meant by a

---

[5] Hitachi's new contention that the applicants should have made the "external/internal" comments in relation to U.S. Patent No. 5,172,659 ("Butterfield" or "the '659 patent") if the distinction was over systems that had oil on the external ends of the spool, rather than only along internal lands, is without merit. (Hitachi Resp. Br. at pp. 12-13, 14).  With respect to Butterfield, the applicants focused on the lever (stroke amplifier) during the prosecution because that is the aspect of Butterfield upon which the examiner focused.  (*See, e.g.,* 1/4/94 Office Action at 3; 6/30/94 Reply to Office Action at 2, 4; 8/1/94 Office Action at 2-3; 11/1/94 Reply to Office Action at 2; 12/5/94 Office Action at 2-3 (Second Suppl. Matterer Decl. Ex. 34); Appeal Br. at 7).

"VCT mechanism." (Hitachi Resp. Br. at pp. 15-16). But those patents, and the expert's declaration, also confirm that the term "VCT mechanism," which is never used in the claims of the '738 patent at issue, has a meaning that varies based on the context. For example, Hitachi cites to U.S. Patent No. 5,218,935 ("the '935 patent"), which states that "[t]he VCT mechanism is then actuated by the stepper motor movement which changes its position relative to a crankshaft." ('935 patent, col. 4, lines 1-3 (Matterer Decl. Ex. 6)). The only device "actuated" by the stepper motor movement is the spool valve, not the vane actuator.

Even if the Court considers Hitachi's latest interpretation of the prosecution history to be reasonable (which it is not), the shift in Hitachi's position between its two briefs reinforces that there is no clear and unambiguous disclaimer. If the prosecution history were so clear, Hitachi would have urged its current position in its opening brief, which addressed Strauber and the prosecution history statements at length. (*See, e.g.,* Hitachi Opening Br. at pp. 14-15, 20-23, 31). If it were so clear, Hitachi's reply brief would not have required two newly-filed expert declarations to explain its shifting positions. Because it is not clear and unambiguous, the prosecution history statement regarding Strauber does not limit the scope of claims 10 and 11. *See, e.g., Inverness Med. Switz. GmbH v. Warner Lambert Co.*, 309 F.3d 1373, 1382 (Fed. Cir. 2002); *N. Telecom Ltd. v. Samsung Elecs. Co.*, 215 F.3d 1281, 1293-95 (Fed. Cir. 2000).[6]

---

[6] Hitachi's contention that the prior art patents incorporated by reference into the '738 patent specification can somehow limit the scope of asserted claim 10 to a CTA VCT system is also without merit. (Hitachi Resp. Br. at pp. 17-18). Hitachi accuses BorgWarner of selectively pointing to material in the incorporated patents, but that is precisely what Hitachi does in arguing that the incorporated patents somehow disavow OPA systems in the '738 patent. The very case Hitachi cites makes clear that even if the incorporated patents disavowed OPA, they do not limit the scope of claims 10 and 11 of the '738 patent. *Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1553 (Fed. Cir. 1996), *abrogated on other grounds*, *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 234 F.3d 558 (Fed. Cir. 2000) (en banc) (stating that

**C.    Hitachi's Argument Regarding The "Spool Valve Selectively Allowing And Blocking Flow Of Hydraulic Fluid Through An Inlet Line And Through Return Lines" Is Without Merit.**

In its response brief, Hitachi accuses BorgWarner of attempting to change the words of claim 10 with its construction of the "allowing and blocking" limitation. But BorgWarner intended its construction to follow the plain language of the claim and mean that the spool valve must allow and block the flow of fluid. In light of Hitachi's newly raised arguments, BorgWarner is willing to change the word "or" to "and" in its proposed construction to conform more closely to the plain language of the claim.

But Hitachi still misses the point. Hitachi contends that "the word 'and' requires that the spool valve both allow *and block* oil flow <u>through the inlet line</u>." (Hitachi Resp. Br. at p. 21 (original emphasis in italics, underlined emphasis added)). Hitachi makes this argument in order to assert that the MOG cannot be the source of oil because it contends that the spool valve never blocks the flow of fluid from the MOG in the preferred CTA embodiment.[7] In advancing this position, Hitachi is once again distorting the plain meaning of claim 10 and failing to harmonize the claim with the preferred CTA embodiment, which has a MOG source.

The claim requires a spool valve that is capable of "selectively allowing and blocking the flow of hydraulic fluid through an inlet line and through return lines." ('738 patent, col. 12, lines 23-25). Hitachi wishes that the claim required the spool valve to be capable of "selectively allowing and blocking the flow of hydraulic fluid through an inlet line and

---

"incorporation by reference does not convert the invention of the incorporated patent into the invention of the host patent"). BorgWarner has properly relied on the incorporated patents for what is specifically incorporated into the '738 patent disclosure, namely, the closed-loop control system from U.S. Patent No. 5,184,578 as described below.

[7]    The specification states that, in the preferred embodiment, the inlet from the MOG bypasses "vented spool 200." However, as explained in BorgWarner's responsive brief, the MOG inlet does *not* bypass the spool valve, or the internal lands in the spool valve; instead, it just bypasses the internal passage along the center of the spool itself. (*See* BorgWarner Resp. Br. at pp. 18-19).

*selectively allowing and blocking the flow of hydraulic fluid* through return lines." But that is not what the claim says. The claimed "allowing and blocking" can be satisfied in a wide variety of ways. It is satisfied if the spool valve allows and blocks the flow of hydraulic fluid through returns lines alone, if it allows and blocks through an inlet line alone, if it allows though an inlet line and blocks through return lines, if it blocks through an inlet line and allows through return lines, or if it allows and blocks through both an inlet and return lines. It can also be satisfied if an inlet line and/or return lines are indirectly allowed or blocked. All the spool valve has to do is allow *and* block the flow of fluid so that fluid can flow through these lines.

The specification confirms this. It explains that, in the preferred embodiment, the spool valve selectively allows *and* blocks the flow of fluid through return lines 194 and 196. (*See, e.g.,* '738 patent, col. 7, lines 20-30 (explaining how the lands of the spool in the spool valve will "block the exit of hydraulic fluid from return line 196," from "return line 194," or from "both return lines 194 and 196"); col. 9, lines 7-41 (explaining how the movement of the spool in the spool valve can "block" and "unblock" return lines 194 and 196)). Flow from the MOG source is allowed through the spool valve and through "[i]nlet line 182," but there is no disclosure that it is directly blocked. Indeed, even under Hitachi's erroneous definitions of the terms "source" and "inlet line" (which place the source in a recess in the vane housing, and the inlet line only between the spool valve body and the "means for transmitting rotary movement to the camshaft"), the flow through the inlet line (which would be "inlet line 182" in the preferred embodiment) is not directly blocked by the spool valve -- the lands of the spool in the spool valve never block "inlet line 182." It would therefore be legal error to adopt Hitachi's position and interpret claim 10 to require that the spool valve has to directly allow and block the flow of fluid through an inlet line *and* directly allow and block the flow of fluid through return lines.

13

There is no way to square such a construction with the specification, even under Hitachi's convoluted construction of "source."

## II. HITACHI'S CONTENTION THAT THE SPECIFICATION DISCLAIMED A PWM INPUT SIGNAL TO THE VARIABLE FORCE SOLENOID IS DIRECTLY CONTRADICTED BY THE PREFERRED EMBODIMENT OF THE '738 PATENT.

In contrast to its opening brief, where it devoted less than a single page to the construction of the term "variable force solenoid," Hitachi devotes nearly four pages in its response brief to making arguments that could have, and should have, been raised in its opening brief to support its contention that the claimed "variable force solenoid" cannot be driven by a pulse-width modulated ("PWM") non-current input signal. Most egregiously, Hitachi addresses the preferred embodiment of the '738 patent for the first time in its reply brief and cites numerous passages from an extrinsic expert declaration that was only supplied with Hitachi's reply.

As stated in the expert report accompanying BorgWarner's Opening Brief, one of skill in the art would recognize that the claimed "variable force solenoid" could be operated with PWM excitation, as well as direct current, and would recognize that PWM excitation would reduce hysteresis effects that would otherwise occur with the use of a direct current signal. (Ribbens Infringement Report (Matterer Decl. Ex. 17)) at pp. 34-36). Although the applicants distinguished their invention over specific differential pressure control systems that utilized a solenoid with an on/off output, they certainly did not *disclaim* the use of any solenoid using a PWM signal as Hitachi contends.

This necessarily follows from the concession made in Hitachi's Response Brief. There, Hitachi acknowledges, as it must, that the '738 patent states unequivocally that "[t]he preferred embodiment employs a closed-loop feedback system, such as the one disclosed in U.S. Pat. No. 5,184,578, which corrects for any phase angle error." ('738 patent, col. 3, lines 13-16;

14

Hitachi Resp. Br. at p. 35).  The closed loop feedback system described in the '578 patent, and incorporated into the preferred embodiment of '738 patent, makes clear that the output from the closed loop control system -- and hence, the input to the variable force solenoid in claims 10 and 11 of the '738 patent -- is a PWM signal.  Hitachi's construction, therefore, reads out the preferred embodiment's use of a PWM signal.

Also for the first time in its reply brief, Hitachi acknowledges that in the '578 patent, "block 108 is a 'closed loop feedback system.'"  (Hitachi Resp. Br. at p. 35).  And, as the '578 patent explains, the output of this closed loop system is a PWM signal -- "solenoid 106, preferably of the pulse width modulated type (PWM), [controls pressure] *in response to a control signal from a closed loop feedback system 108*, which is shown schematically in Fig. 11."  ('578 patent, col. 7, lines 21-25 (Matterer Decl. Ex. 2)).  Numerous figures from the '578 patent are in accord, showing that the output from the closed loop feedback system 108 is a "PWM Duty Cycle."  For example, as shown below, Figures 1b and 1c from the '578 patent both show the closed loop feedback system 108 (the number 108 is pointed toward the entire figure) and a "PWM Duty Cycle" output from the closed loop system:



('578 patent, Figs. 1b and 1c (caption added).  *See also* Fig. 1d).  Figure 11, a portion of which is

shown below, further shows that the closed loop control system (box 108) feeds a signal directly

to solenoid 106:



## FIG. 11

('578 patent, portion of Fig. 11).  Given the incorporation of the closed loop control system of the

'578 patent into the preferred embodiment of the '738 patent, the Court should reject Hitachi's

attempt to erroneously exclude the preferred embodiment (solenoids that are driven by a PWM

input signal) from the definition of a "variable force solenoid."

The distinction made in the '738 patent over the so-called "PWM solenoid" in the

'578 patent was far more limited.  As expressly stated in the '738 patent specification, the term

"PWM solenoid" was being used to define "the PWM solenoid *typically used in a conventional

DPCS.*"  ('738 patent, col. 2, lines 48-50 (emphasis added)).  In the '578 patent, the "PWM Duty

Cycle" output from the closed loop control system is sent to such a "PWM solenoid," which is an

on/off solenoid that cycles through its full stroke with every PWM input pulse, and controls

hydraulic pressure in a DPCS system via the on-off pulsations of the solenoid.  ('578 patent, col.

7, lines 21-24, lines 30-38).

In contrast, in the '738 patent, the "PWM Duty Cycle" output from the closed loop control system is sent to a so-called "variable force solenoid" that does not cycle through its full stroke with every PWM input pulse, but only travels a short distance and directly controls the position of the spool valve. ('738 patent, col. 3, lines 34-37). In other words, the variable force solenoid of the '738 patent eliminates the *hydraulic pressure* against the end of the spool and *directly controls* the position of the spool valve in response to the input signal. But the output from the closed loop control system, and hence the input to the solenoid, is a PWM signal in both cases. Nothing in the specification or prosecution history of the '738 patent supports Hitachi's contention that there was a disclaimer of employing a PWM *input* signal to the solenoid.

### III.   HITACHI'S CONTENTION THAT "CONNECTED" IN CLAIM 11 REQUIRES A PHYSICAL ATTACHMENT IS WITHOUT MERIT.

Hitachi now argues that BorgWarner's proposed construction for "connected," namely, that there is an operational connection such that movement of the armature causes a corresponding movement of the spool, cannot be squared with the specification of the '738 patent. (Hitachi Resp. Br. at p. 37). Hitachi points to the statement from the specification that in Figure 20, "[l]ever arrangement 201e connects armature 201b with spool extension 200c." ('738 patent, col. 8, lines 54-55). Hitachi contends that this statement proves that the term "connected" means a physical attachment because that is what is shown in Figure 20. However, in its opening brief, Hitachi contended that Figures 19 and 20 both show a "physical connection" (Hitachi Opening Br. at pp. 38-39), and as BorgWarner has explained, in Figure 19, there is a connection, but no physical attachment -- a point Hitachi does not dispute.

In fact, the term "connected" is used in the specification in a number of different ways. Hitachi is attempting to use the description of one embodiment in the specification as a means to limit claim 11 to cover only that embodiment and only that usage of the word

"connect." But the specification and claims use the term "connected" and "connection" in a broader, more generic manner that does not necessarily require a physical, fixed attachment between the two "connected" components. For example, the specification uses the term "connection" in the context of a "chain drive connection" between two sprockets. ('738 patent, col. 5, line 63-67). The two sprockets are not "physically attached" to one another. Instead, the chain drive "connects" the two sprockets by bearing against the teeth of each sprocket to operationally connect the sprockets and cause the transmission of power. Similarly, the specification uses "connected" to describe the hydraulic connection or link between the recesses (132a, 132b) and the check valves (184, 186) in the preferred embodiment of the '738 patent. ('738 patent, col. 7, lines 1-4). The check valves and recesses are not physically touching or physically attached -- there is merely a "connection" or linkage between the valves and recesses. Claim 5 also refers to "hydraulically connecting" two recesses. ('738 patent, col. 11, lines 17-26). In such a case, the recesses are not physically attached to one another -- they are connected via hydraulic fluid. In all of these cases, including the embodiment shown in Figure 19, where the armature "bears against" the spool, and in Figure 20, where a complex lever arrangement "connects" the armature to the spool, there is a "connection," even though the two connected parts are not necessarily physically attached.[8]

## IV.   NOTHING REQUIRES THE "AIR GAP" IN CLAIM 11 TO EXTEND THE LENGTH OF THE ARMATURE.

Hitachi states that it believes that the claimed "air gap" in claim 11 has to extend

---

[8] Hitachi also ignores that claim 11, which is the claim at issue with regard to the term "connected," does not cover the lever embodiment of Figure 20 under its proposed claim constructions. In its recitations, claim 11 expressly requires that an "air gap" separate the armature from the coil. ('738 patent, col. 12, lines 44-45). Under Hitachi's proposed construction of the "air gap" limitation, claim 11 only covers Figure 19, not Figure 20, because Figure 20 does not show an "air gap" that extends "the length of the armature," as Hitachi contends it must. Thus, the "connection" based on the lever arrangement of Figure 20 described in the specification has no relevance to the interpretation of claim 11.

the length of the armature (Hitachi Opening Br. at p. 40), or at least the length of any overlap between the solenoid coil and armature (Hitachi Resp. Br. at p. 38).  The Court should reject Hitachi's attempt to read in this length specification for the air gap.  All that claim 11 requires is that the air gap "separate[s] [the] coil from [the] armature." ('738 patent, col. 12, lines 43-44).  The air gap does not have to have any specific length.

Moreover, Hitachi's construction is directly contradicted by the drawing of Figure 19.  In Figure 19, the coil is marked as element 201a, the armature as 201b, and the gap is marked as 201c.  Quite clearly, the gap 201c extends only along a *portion* of the armature 201b, and not the "entire length of the armature," as required by Hitachi's proposed claim construction.  To borrow Hitachi's phrase, Hitachi's statement that its construction "completely comports with Figure 19" is nothing but "sheer sophistry." (Hitachi Resp. Br. at pp. 28, 38).

## V.    CONCLUSION

For the above reasons, and for those set forth in its previous claim construction briefs, BorgWarner respectfully requests that the Court adopt BorgWarner's proposed claim constructions.

Dated:  November 3, 2006

Richard K. Herrmann (I.D. #405)
Mary B. Matterer (I.D. #2696)
MORRIS, JAMES, HITCHENS & WILLIAMS
222 Delaware Avenue, 10th Floor
Wilmington, DE 19801
(302) 888-6800

Hugh A. Abrams (*pro hac vice*)
Thomas D. Rein (*pro hac vice*)
Lisa A. Schneider (*pro hac vice*)
Marc A. Cavan (*pro hac vice*)
Lara (Fleishman) Hirshfeld (*pro hac vice*)
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-7000

## CERTIFICATE OF SERVICE

I hereby certify that on November 3, 2006, I caused the following document, **BORGWARNER INC. AND BORGWARNER MORSE TEC INC.'S MOTION TO FILE SUR-REPLY CLAIM CONSTRUCTION BRIEF**, to be electronically filed with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

Steven J. Balick, Esq.
John G. Day, Esq.
Tiffany Geyer Lydon, Esq.
ASHBY & GEDDES
222 Delaware Avenue, 17th Floor
Wilmington, DE 19801


Additionally, I hereby certify that on November 3, 2006, I caused the foregoing document to be served via email and overnight courier on the following non-registered participants:

Michael D. Kaminski, Esq.
Pavan K. Agarwal, Esq.
Liane M. Peterson
FOLEY & LARDNER LLP
3000 K Street, N.W., Suite 500
Washington, D.C. 20007-5109
mkaminski@foley.com
pagarwal@foley.com
lpeterson@foley.com


      */s/ Mary B. Matterer*
Mary B. Matterer (I.D. #2696)
MORRIS, JAMES, HITCHENS & WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19801
(302) 888-6800
mmatterer@morrisjames.com
Attorneys for Defendants and Counterclaimant,
BORGWARNER INC., and
BORGWARNER MORSE TEC INC.