# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| HITACHI, LTD. and HITACHI AUTOMOTIVE PRODUCTS (USA), INC., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) Civil Action No. 05-048-SLR |
| BORGWARNER INC., and BORGWARNER MORSE TEC INC., | ) |
| | ) |
| Defendants. | ) |
| | ) |
| BORGWARNER INC., | ) **EXPERT REPORT** |
| | ) **OF WILLIAM B. RIBBENS** |
| Counterclaimant, | ) **REGARDING INFRINGEMENT** |
| | ) **OF U.S. PATENT NO. 5,497,738** |
| v. | ) |
| | ) |
| HITACHI, LTD., and HITACHI AUTOMOTIVE PRODUCTS (USA), INC. | ) |
| | ) |
| Counterdefendants. | ) |
| | ) |

The following is a written report, submitted pursuant to Federal Rule 26(a)(2), detailing the subject matter areas and opinions upon which I may testify in this litigation if called upon to do so:

## I. Background and Qualifications

After receiving the Ph.D. in electrical engineering in 1965 at the University of Michigan, I remained at that institution first as a research engineer and then as a faculty member of the Electrical Engineering and Computer Science Department (1969). In 1976, I joined the newly formed Vehicular Electronics Laboratory (VEL) at the University of Michigan and was named VEL Director two years later. I remained in that position until I retired from the University in 2000. At the present time, I am a consultant to the aerospace and automotive industries.

In my position as VEL Director, I conducted research and supervised graduate student research in addition to teaching various undergraduate and graduate courses. The research, which for the most part was funded by the automotive industry, was primarily in the area of automotive electronics. The major topics included electronic engine control for minimizing exhaust emissions and for optimizing fuel economy. My C.V., which is attached as exhibit 1, lists most of my publications and presents a summary of some of the research projects conducted by VEL. It was during my tenure as VEL Director that I published the first edition of my book "Understanding Automotive Electronics," which is currently in its sixth edition. This book has been translated into several languages and is widely read.

In the 1992-93 time period, I was personally involved in research and teaching involving electronic engine controls. I taught courses that involved design of control systems, and I was familiar with the various components used in engine control systems. I was also familiar with

the various types of electromechanical actuators in use at the time, such as solenoids, drivers for solenoids, stepper motors, and the electronic control units used in vehicles.

My research and consulting have resulted in numerous patents. The following is a partial list of the patents on which my name appears as inventor or co-inventor:

1. U.S. Patent No. 5,200,899: Method and System for Detecting the Misfire of an Internal Combustion Engine Utilizing Angular Velocity Fluctuations, April 6, 1993.

2. U.S. Patent No. 5,239,473: Method and System of Detecting Misfire of an Internal Combustion Engine Utilizing Velocity Fluctuations, August 24, 1993.

3. U.S. Patent No. 5,278,760: Method and System for Detecting the Misfire of an Internal Combustion Engine utilizing Engine Torque Nonuniformity, January 11, 1994.

4. U.S. Patent No. 6,643,569: Method and System for Detecting a Failure or Performance Degradation in a Dynamic System Such as a Flight Vehicle, March 28, 2002.

5. U.S. Patent No. 6,890,041 B1: Antilock Braking Systems Employing a Sliding Mode Observer Based Estimation of Differential Wheel Torque, May 10, 2005.

6. US 2005/0045768 A1: Stabilization of a Drogue Body, March 3, 2005.

3

## II.  Compensation

My compensation is at the rate of $200/hr. for preparation, review of materials and report writing as well as $400/hr. for deposition or trial testimony.  My compensation is in no way dependent upon the outcome of this lawsuit.  Moreover, I have no investment interest in BorgWarner Inc.

## III.  Materials Reviewed and Relied Upon

In preparing the opinions and discussion outlined in this report, I reviewed and considered documents and materials that I understand were produced over the course of the case thus far, including documents and materials cited in this report.  A listing of the materials, information and data reviewed and/or relied upon for my analysis and this report is included as Exhibit 2.  For example, I reviewed U.S. Patent 5,497,738 ("the '738 patent") and its prosecution history, as well as certain interrogatory responses, deposition testimony, deposition exhibits, production documents and physical products.  I may rely upon the materials in Exhibit 2 and/or additional materials to rebut arguments raised by Hitachi.

## IV.  Overview of Expected Testimony

If asked by attorneys for BorgWarner to testify at trial I would expect that my testimony would generally cover one or more of the following topics:

- my experience and qualifications regarding automotive and/or electronics technology;

- an overview of how engines operate, including the control systems used with engines and valve timing systems as well as a general overview of control systems;

- a summary description of '738 patent disclosure including the problem addressed by this patent and its solutions;

- a discussion of the disclosure in the patents incorporated by reference in the '738 patent, including the development of the control system described and claimed in the '738 patent;

- a review of relevant portions of the prosecution history of the '738 patent, including a technical explanation of cited prior art references;

- a discussion of the technology relevant to the issues in the case, including explanation of one or more of the following concepts: (1) closed loop control systems versus open loop control systems; (2) vane type VCT actuation systems versus helical actuation systems; (3) on-off control versus continuous control; (4) solenoids, solenoid valves, solenoid valves that control hydraulic systems; (5) hydraulic valve fluid flow control; (6) direct current, alternating current and pulse width modulation as electronic signals; (7) differential pressure control of a hydraulic valve; (8) variable force solenoids; (9) stepper motors; (10) spool valves and the venting of a spool valve; (11) electronic control units (or electronic control modules) in automobiles.

- my opinion of claim construction in the form of how a person of ordinary skill in the art would understand and interpret the claims of the '738 patent;

- a review of the claim construction as proposed by both the plaintiffs and the defendant;

- a description of the accused VCT system and components;

- a discussion of observations, measurements, analysis, simulation studies and experimental evidence in support of my opinions;

- a literal infringement analysis of the asserted claims 10 and 11 of the '738 patent;

- an analysis of infringement under the doctrine of equivalents; and

- rebuttal to arguments raise by Hitachi; I expect to provide a separate report that addresses the contentions of Hitachi relating to alleged invalidity of the '738 patent.

## V.  Level of Ordinary Skill in the Art

In my view, a person of ordinary skill in the art ("POSA") at the time of the invention of the '738 patent (i.e., 1993) would have at least a B.S. in mechanical engineering, electrical engineering, physics or a related discipline, with one or more years of design, test and analysis ex-

perience in the field of automotive electronic engine/drive train control. It is, of course, also possible that an individual without a 4-year engineering degree could acquire the necessary skill in the art from experience and/or from technical school training. Nevertheless, I believe the pertinent "art" is electronic engine control, specifically, electronic control of a variable camshaft timing system in an engine. I had skill in this pertinent art in the time period of the invention (1992-93).

## VI.  '738 Patent and Background of Variable Valve Timing

The U.S. Patent & Trademark Office issued the '738 patent on March 12, 1996.  It issued from an application which was filed on May 3, 1993.  The named inventors on the '738 patent are Edward C. Siemon and Stanley B. Quinn.

The '738 patent is directed to variable valve timing in a 4-stroke/cycle reciprocating internal combustion (IC) engine (such as is used to power most automobiles).  All IC engines operate fundamentally as air pumps in which the air pumped into the engine is mixed with fuel. The mixture of fuel is compressed and ignited such that heat energy is released which enables the engine to produce mechanical power.  The combustion products pass out of the engine as exhaust.  The pumping of intake air/fuel mixture into the engine and exhaust out from the engine is controlled by a set of valves (in any 4-stroke IC engine).  The performance of the engine as a pump is expressed by the so-called volumetric efficiency.

There is at least one valve that controls intake and at least one valve that controls exhaust for each cylinder in a 4-stroke/cycle IC engine.  These valves are operated by a structure that includes at least one so-called camshaft, upon which eccentric lobes drive components that move the valves.  The opening and closing of the valves, in relationship to the crankshaft angular position within the 720° of a given engine cycle, is termed camshaft timing or phase.  The maximum displacement of the valves by the eccentric cam lobes is termed the "valve lift."  The performance of the engine, in terms of its power output, fuel economy and exhaust emissions, is influenced by camshaft phase as well as valve lift.  The '738 patent teaches a method of variable valve timing via a process of varying (and controlling) camshaft phase relative to crankshaft phase.

7

The camshaft(s) in an engine is coupled mechanically to the crankshaft such that it rotates at half the crankshaft angular speed. In most modern engines this coupling is via a chain or belt and a sprocket on the crankshaft and a separate sprocket on each camshaft.

The valve timing for a conventional engine is fixed by the relative angular position of the crankshaft and camshaft. This timing is set during engine manufacture by the relative sprocket angular positions when the timing chain/belt is installed. For such engines, the timing remains essentially fixed throughout the engine 'lifetime.'

IC engines with variable valve timing or phase (*i.e.*, VCT) include a structure that allows the relative angular position of the camshaft and crankshaft to be varied (under electronic control). This variable relative angular position determines the crankshaft angular position within each engine cycle at which the valves open and close. That is, it determines valve phase within each engine cycle. Variable camshaft timing existed prior to the '738 patent and, in fact, there are prior art references to VCT systems cited during the prosecution of the '738 patent.

All of the accused VCT systems that are at issue in the present lawsuit achieve variable camshaft phasing by separating the camshaft and drive assembly into two parts that can rotate relative to one another. In each of these, the sprocket housing consists of a "body" into which recesses are machined or otherwise formed. Concentric with this housing axis is a second part that includes a structure having vanes that are interposed within the recesses. The camshaft is mechanically connected to this second part. These two parts are rotatable relative to one another within the range of travel of any given vane within each recess. An exemplary illustration of such a structure can be found on page EC-744 of Def Ex. 26, which illustrates a Hitachi VCT system in a 2004 Nissan Altima automobile. This exemplary illustration is used by Nissan in its automotive service manuals to describe the operation of the VCT system in its automobiles (See

8

"Nissan Manuals – IVT Control System" binder). The camshaft instantaneous phase is determined by the relative angular position of a vane within its associated recess.

In actual VCT operation, the recesses are filled with a fluid (*i.e.*, engine oil). The angular position of the camshaft relative to the housing is determined by the relative amounts of fluid on either side of the vane within the recess. Since the camshaft phase is determined by this relative angular position, the camshaft phase is determined by this relative amount of fluid on either side of the vane.

In essence, the spaces on either side of any vane and the corresponding portion of its recess form a pair of chambers each of which is filled with fluid. The camshaft phase is advanced (relative to the crankshaft) by adding an amount of fluid to one of these chambers and removing a like amount from the other. The camshaft phase is retarded (relative to the crankshaft) by reversing the process. The '738 patent teaches (among other things) variable camshaft phase or timing by controlling the flow of fluid (oil) into and out of these two chambers within each recess in the sprocket housing.[1] Control of this flow of engine oil is achieved by regulating the axial position of a spool valve. The spool valve position, in turn, is determined by a type of solenoid valve which is driven by a signal from the Engine Control Unit (ECU), which is also sometimes referred to as an electronic control module (ECM). The '738 patent teaches the use of a variable force solenoid (discussed in more detail later in this report). The combination variable force solenoid/spool valve along with the housing/vane assembly described above regulates camshaft phase under ECU control.

---

[1] Vane-type VCT is not the only actuation system that can be used in connection with variable cam timing control; for example, helical devices have been used. Helical systems have drawbacks, however, such as they require more space, can be more expensive, and are potentially less reliable and more prone to error than vane-type VCT. It is my opinion that helical systems are not covered by the claims of the '738 patent.

Modern automotive engines are controlled by an ECU partly in order to achieve stringent government mandated exhaust emissions and fuel economy standards.  A typical modern ECU is a microprocessor -- or microcontroller-based digital control system -- that receives signals from various sensors and generates signals to various actuators.  In essence, it is a unified control system that incorporates various individual control systems integrated into a single digital system. The VCT system is but one of the control systems implemented via the ECU in combination with sensors and actuators.

A control system can be either "open loop" (also referred to as "feed forward") or "closed loop."  The ECU in an open-loop control system issues a signal to an actuator based upon some sort of model about how the control signal reacts to the actuator and upon sensor measurements. In an open-loop control system, no comparison is made of the actual variable being controlled with its desired value.  Many of the cited prior art references in the '738 patent, and the references relied upon by Hitachi, incorporate open-loop control.  For example, automotive engine fuel control, particularly as was applied in the early days of exhaust emission control, operates at times in open loop.  Typically, an estimate of mass air flow into the engine is obtained from sensor measurements.  The desired fuel delivery to achieve a stoichiometric mixture is calculated. Then the signal is generated that is sent to the actuator (fuel injector) to deliver the correct amount of fuel.  In open loop, there is no feedback (e.g., from Exhaust Gas Oxygen (or EGO) sensor) to the controller.

By contrast, a closed-loop system makes a direct comparison of the actual and desired values for the controlled variable.  The actual value for this variable is obtained by measurement using one or more sensors in combination with signal processing (if necessary) to obtain the measured value from the raw sensor signal(s).  The process of using measurement of the con-

trolled variable to regulate it to the desired value is called "feedback." In such a feedback closed-loop control system, the desired value for the controlled variable is often called the "set point" for the controller.

Typically, the structure of a closed-loop control system includes a controller which receives as its input a signal representing the error (or difference between desired and actual values of the controlled variable). This input is obtained by means of one or more sensors from which the actual value of this controlled variable is obtained. The '738 patent teaches that the desired value of the controlled variable (i.e., camshaft phase) is determined in the ECU. See, e.g., U.S. Patent No. 5,184,578, which is incorporated by reference into the '738 patent. This desired value is a function of engine operating conditions. A POSA would understand that a table or MAP of values for desired camshaft phase could be determined, for example, during the engine control development period by a process known as "engine mapping." The optimum camshaft phase is normally determined empirically as a function of operating conditions (e.g., RPM and load), and the samples of the desired camshaft phase are then stored in the ECU memory for use during normal operation. Typically, the desired camshaft phase is determined during normal engine operation by a table look-up and interpolation operation as would be understood by a POSA. Such calculations are routine parts of engine electronic control. Examples of such calculations are described in U.S. Patent No. 5,184,578, which is incorporated by reference in the '738 patent specification. See also, e.g., Ribbens, UNDERSTANDING AUTOMOTIVE ELECTRONICS.

The error between desired and actual camshaft phase is transformed by the control (according to the control logic) into a signal that is sent to the actuator. Many types of control logic are potentially suitable for regulating the camshaft phase. One of the simplest of these is the so-called limit cycle or on/off controller. This type control is best suited for switched actuators

11

(e.g., furnace controllers). Limit-cycle control is found in some of the prior art to the '738 (e.g., Strauber).

If, on the other hand, the actuator in a closed-loop control system is continuously adjustable over a range of values, then other control logic options are available. For example, the controller may use so-called proportional control. In this case, the signal sent to the actuator is proportional to the error. One disadvantage to proportional control is a steady-state offset error between desired and actual values of the controlled variable.

This disadvantage is removed by including integral control in which a multiple of the integral of the error is combined with the proportional, yielding a so-called proportional-integral (*i.e.*, PI) control law. Unfortunately, PI control often has undesirable dynamic response (sometimes even unstable behavior). This undesirable dynamic behavior can be corrected using some form of compensation filter. This compensation could, for example, be to include a term that is proportional to the time derivative of the error yielding proportional-integral-differential (*i.e.*, PID) control. It might also be in the form of a filter that adds phase shift to the signal sent to the actuator (called lead compensation). All of the above control theory as implemented in the '738 patent would be understood by a POSA. The '578 patent, which is incorporated by reference into the specification of the '738 patent, describes implementation of proportional-integral control.

The '738 patent teaches closed-loop control of camshaft phase in which measurements of the actual phase are compared with the desired value. Closed-loop control, itself, is not new to the '738 patent. There were patents disclosing this that are incorporated by reference in the '738 specification: *e.g.*, U.S. Patent No. 5,184,578 and the parent application for the '738 patent, which issued as U.S. Patent No. 5,218,935. For example, in col. 3, ll. 13-16 of the '738 patent specification, reference is made to the '578 patent as a "closed loop feedback system." Each of

these incorporated references utilizes a closed-loop feedback control system to regulate a spool valve for controlling the movement of oil into and out of the chambers of a VCT actuators described above.

The '738 patent teaches a method of closed loop control of a vane-actuated VCT system with a different type of actuator for controlling the spool valve position. Specifically, the '738 patent teaches the use of a vented spool that is driven by a variable force type of solenoid. The preferred embodiment uses a so-called variable-area solenoid. This solenoid has the unique property that the force exerted on the armature is substantially independent of axial position. An analysis of an ideal model for this type of solenoid is given in the Appendix, where it is shown that the force is ideally independent of position.

If the force in this variable force type solenoid is balanced against a spring having essentially a constant spring rate, extremely precise positioning of the armature and the vented spool can be achieved that is substantially independent of engine oil pressure. Moreover, the calibration of this variable force/vented spool actuator is stable and independent of oil pressure; i.e, fluid pressure is eliminated from direct application against the external ends of the spool valve.

The teaching of the '738 patent with regard to the spool valve/solenoid contrasts with that of the patents cited above which are incorporated by reference in the '738 patent. Each of the incorporated patents presented problems with VCT systems. For example, both the '578 and U.S. Patent No. 5,172,659 patents supply oil under pressure to either external ends of the spool valve. In these patents, spool valve position is controlled by regulating pressure differential across these external faces. Pressure differential in these patents is obtained via a hydraulic valve that is operated by a PWM type of solenoid -- that is, a solenoid which switches from one position to the other through a full stroke of travel for each cycle (see, e.g., '738 patent, col. 2, lines

13

48-51: "During operation, the [PWM] solenoid cycles through its full stroke with every PWM pulse."). There are numerous references in the '738 file history pointing out the advantages of the continuously adjustable spool position for the variable force solenoid relative to the binary position of the PWM type of solenoid.

The '738 patent is a significant improvement over these VCT systems which use differential pressure type actuators. The '738 patent describes a system with a stable actuator calibration regardless of oil pressure, even during engine start. The ECU can command a "known" spool valve position at any time since the solenoid force is balanced by a spring of fixed spring rate rather than by variable oil pressure.

The '738 patent is also an advance over the '935 patent, which used a stepping motor to position the spool working against oil pressure. Unlike the '738 patent, the stepping motor of the '935 patent must work against a variable hydraulic pressure to achieve the desired position. The combination of variable force solenoid and vented spool as taught by the VCT system of the '738 patent permits the spool to be positioned correctly at any time.

The '738 patent also teaches the control of oil movement by a spool valve assembly in combination with a specific type of solenoid, which the inventors call a variable force solenoid, and a spring acting on the spool valve. This type of solenoid is also known as a variable area solenoid. ('738 patent, col. 8, lines 36-39.) The variable force solenoid/spool valve/spring assembly (as taught by '738) is a system such that the spool valve axial displacement when driven by a steady or d-c current is ideally proportional to the square of that current within the limits placed by mechanical stops. This characteristic of a variable force solenoid permits control of the spool valve by regulating the current. The variable force solenoid has the capability to position the armature continuously by varying the amplitude of a steady current, although the arma-

14

ture can also be positioned continuously by varying the characteristics of other types of excitation wave forms (e.g., PWM), as explained in the Appendix.

A POSA reading the '738 patent would also understand that control of the spool valve position is also possible with time varying current. For example, excitation of the coil circuit by a variable duty cycle periodic voltage pulse wave form can regulate spool valve position. Such a waveform can, for example, have zero volts for a portion of a cycle and non-zero (e.g. 12-14 volts) for the remaining portion. The duty cycle would be known to one of ordinary skill in the art to be the ratio of the non-zero time interval to the period of the periodic pulse voltage wave form. For such a periodic signal, the instantaneous current that flows is determined by the voltage level as well as the circuit electrical parameters (e.g. resistance and inductance). A waveform of this type is known as pulse width modulated (PWM).

The current that flows in response to a variable duty cycle signal results in a force that has a non-zero average component in combination with a periodic component. The corresponding armature displacement has a steady or d-c component superposed on a time varying component. If the frequency of this periodic signal is sufficiently high, the time varying component of the armature and spool displacement is relatively insignificant. At the same time the steady component is a function of the duty cycle.

In practice, the position of the spool in a spool valve assembly incorporating a variable force solenoid can be controlled by varying the duty cycle of a periodic pulse voltage signal as described above. The excitation frequency must simply be high enough that the time varying displacement is negligible. It has been shown experimentally (see Appendix) that the spool position can be controlled by varying the duty cycle of a PWM signal applied to a representative Hitachi solenoid/spool valve assembly.

15

The '738 patent teaches the closed-loop control of camshaft phase. For instance, closed loop control is incorporated by reference in the specification (e.g., see col. 3, ll. 13-15) where reference is made to closed-loop control of the '578 patent.

Feedback for this control system of the instantaneous camshaft phase is obtained via a pair of sensors, one on the crankshaft and one on the camshaft. The control law recited in the '578 patent incorporates a proportional control, although it would be understood to a POSA that other choices could be used in the '738 patent (e.g., PID, *etc.*). In the '738 patent, the controller (ECU) generates a signal that is sent to the variable force solenoid/spool valve actuator that is a function of the error (*i.e.*, difference between desired and actual camshaft phase). The actuator responds to the signal in such a way that oil flows into one of the recess chambers associated with each vane and out of the other chamber. This movement of oil (under spool valve control) is such that the vane, as well as the connected camshaft, moves relative to the crankshaft in a direction that reduces the error. Under steady conditions, the error is reduced essentially to zero (*i.e.*, actual and desired camshaft phase values are identical).

An example embodiment of such a control system is shown schematically in Figure 19 of the '738 patent. This embodiment depicts a VCT system including: a source of pressurized engine oil in the main oil gallery (MOG); the spool valve with its movable spool mechanically linked to the variable force solenoid; interconnecting lines; and the vane housing system consisting of the sprocket body and the movable cylinder with vanes. Also shown is the engine control unit (ECU) with its electrical connection to the solenoid. The spool valve body has machined grooves and oil passageways as required to control the flow of engine oil.

16

When the engine is first started, oil (under pressure) flows from the MOG source through the passageways of the spool valve to fill the various lines as well as the cylinders in the camshaft control actuator. In particular the chambers on either side of the vanes are filled.

With the spool valve held in its mid position by the variable force solenoid as depicted in Figure 19, there is no movement of oil. When the engine is running the vanes are held in a fixed position by the essentially incompressible oil that fills all chambers and passageways – a phenomenon known as hydraulic lock.

Continuing with the exemplary embodiment of Figure 19, to advance or retard the camshaft phase, the ECU sends a signal to the variable force solenoid causing the armature and the mechanically linked spool valve to move axially in the desired direction to achieve either an advanced or retarded camshaft phase change. Movement of the spool under ECU/variable force solenoid control is sufficient to connect hydraulically the central line with either the right or the left lines leading to the vane actuator in the sprocket housing. The resulting movement of oil permits the central cylinder and vanes, which are connected to the camshaft, to rotate in one direction or the other (depending upon which direction the spool valve moves). The feedback loop allows determining or measuring of the error or difference between the desired (or target) position of the camshaft and its actual position. When the camshaft has moved to the desired position the ECU commands the spool to move to its mid-position thereby blocking any further movement of oil. In this position the camshaft phase is held fixed to its new value by virtue of the hydraulic lock.

Control of camshaft phase begins with measurements of camshaft phase. These measurements are accomplished via a pair of sensors that measure: (1) crankshaft and (2) camshaft instantaneous angular positions (relative to a fixed reference on the engine). The sensor signals

17

are sent to the ECU where a calculation of camshaft phase is made (under program control). This measured camshaft phase is compared with the desired phase as determined in the ECU based upon other sensors used for normal electronic engine control. As noted in the '578 patent (col. 2, lines 11-13), the desired camshaft phase angle is predetermined for certain engine performance criteria. Any difference between the desired and actual camshaft phase results in a signal that is sent by the ECU to the variable force solenoid. This signal causes the spool valve to move so as to reduce the phase difference between actual and desired to essentially zero.

The variable force solenoid permits a continuous adjustment in spool valve position having the potential to regulate the rate of flow of oil. This variable flow rate establishes the rate of change of camshaft phase and is an element in determining the dynamics of the camshaft phase control system.

### VII(a).  Opinions Regarding Claim Construction Issues

I understand that patent claims are generally to be given their plain and ordinary mean-

ing, as they would be understood by a POSA reading the patent specification and considering

any relevant intrinsic evidence, such as the prosecution history and cited prior art.  I have been

asked to consider how a person of ordinary skill in the art would read claims 10 and 11 of the

'738 patent, and may testify regarding the same.  I understand that claims 10 and 11 are method

claims and recite steps in practicing the patented method.  I have read BorgWarner and Hitachi's

preliminary claim constructions, as well as their amended preliminary claim constructions.  I be-

lieve that the claim construction proposals BorgWarner is advancing are accurate, and I have

provided my comments on the various constructions below.

With respect to claim 10, I am informed that there is a dispute between the parties about

whether the preamble places any limitations on this claim.  Since the court has not yet made a

ruling on this issue, I will include the preamble in this discussion.

### *CLAIM 10*

*Preamble – "In an internal combustion engine having a variable camshaft timing*

*system for varying the phase angle of a camshaft relative to a crankshaft, a method of*

*regulating the flow of hydraulic fluid from a source to a means for transmitting rotary*

*movement from said crankshaft to a housing, comprising the steps of:"*

I believe that a POSA would readily understand that claim 10 is directed to a method of

controlling camshaft phase or its rotational position relative to the crankshaft by regulating the

flow of engine oil (under pressure).  From Hitachi's amended claim construction, it appears that

Hitachi contends that the term "variable camshaft timing system" is limited to a system in which

the angular position of a camshaft relative to a crankshaft is varied in reaction to camshaft torque

reversals. It is my opinion that a POSA would not limit the terms used in the preamble to the preferred embodiment of the invention (a camshaft torque actuated system). Nothing in the claim, specification or prosecution history requires that the claim be limited to the preferred embodiment. To the contrary, as discussed below, the applicants stated in the prosecution history that the claimed VCT system can be any system that uses the claimed variable force solenoid and a spool valve to regulate the flow of oil to control phase angle adjustment.

The preamble teaches the regulation of oil from a source to a means for transmitting rotary movement from the crankshaft to a housing. I believe that a POSA would understand that the source would be a point of origin in the engine that supplies oil, such as the oil crankcase or an oil gallery which receives oil under pressure from the oil pump.

A POSA reading the '738 patent would understand the "means for transmitting rotary movement from the crankshaft to a housing" to mean the structure shown in the '738 patent (or its equivalents) for performing the function of transmitting rotary movement from the crankshaft to a housing. Such structure is fundamentally required for any 4 stroke/cycle IC engine and includes, e.g., a crankshaft sprocket (connected to the crankshaft), a camshaft sprocket (connected to the camshaft), and a chain or belt wrapped around the crankshaft and camshaft sprockets to transmit rotary movement, or power, between the two shafts. The camshaft sprocket may be part of a housing on the camshaft which includes movable elements (such as a vane system) to permit the camshaft angular position to be varied relative to the camshaft sprocket. See, e.g., '738 patent, Figs. 1, 3-5; col. 4, line 62 – col. 5, line 20.

The term "housing" is often used to refer to an enclosure containing components necessary to perform a specific function. In the context of the '738 patent, I believe that a POSA would understand the term "housing" to mean a vane housing having recesses for receiving fluid.

20

The '738 patent specification (col. 1, lines 53-58) describes the vane having lobes within an enclosed housing as replacing the oppositely acting cylinders actuation system shown in several of the prior art references that are incorporated by reference (e.g., U.S. Patent No. 5,002,023). Thus, a POSA would understand that the specification of the '738 patent is using the term "housing" to refer specifically to a housing for a vane actuation system.

### Step 1 – "sensing the positions of said camshaft and said crankshaft"

A POSA would readily understand that "sensing the positions of said camshaft and said crankshaft" would refer to sensing the angular or rotational position of a camshaft and the angular or rotational position of a crankshaft in an engine. This involves the use of sensors for measuring crankshaft and camshaft angular position relative to a reference frame on the engine block and/or cylinder head.

### Step 2 – "calculating a relative phase angle between said camshaft and said crankshaft, said calculating step using an engine control unit for processing information obtained from said sensing step, said engine control unit further issuing a[n] electrical signal corresponding to said phase angle"

A POSA would understand that this step refers to the process of calculating or determining the relative phase angle between the crankshaft and one or more camshafts and calculating or determining the desired (or target) relative phase angle of the camshaft with respect to the crankshaft. This calculation would be done in the ECU (which is a form of microprocessor based digital control based upon signals from the sensors system), under program control. In addition, a POSA would understand that the ECU generates many control signals (e.g., for fuel injectors and for ignition timing) and that a separate output signal would be sent to the variable phase solenoid that corresponds to the phase angle. Many correspondences are possible depending on the dy-

21

namic characteristics of the controller. A POSA would understand from the teaching of the '738 patent that such signal could, e.g., correspond to the difference between the instantaneous camshaft phase and its desired value. In fact, such correspondence is necessary for the ECU to cause the phase to move to the desired value for any particular operating conditions.

The '578 patent, which is incorporated by reference into the specification of the '738 patent, describes the calculation of the actual phase angle difference based upon the sensed camshaft measurement pulses and sensed crankshaft measurement pulses. The ECU calculates, or determines, the set point or desired phase angle based upon engine operating criteria or conditions. The ECU then compares the actual angle with the desired set point and sends a signal with information representing the desired (or target) camshaft phase angle (or information corresponding to the desired position of the spool valve to either advance, retard or maintain the current camshaft phase angle by adjusting or controlling the flow of oil through the spool).

The '738 patent specification makes clear that the method of controlling camshaft phase employs a closed loop control system such as is taught in US Patent No. 5,184,578. ('738 patent, col. 3 lines 13-16). A POSA would recognize from the '738 specification in conjunction with the cited reference that the electrical signal coming from the ECU is an input to the actuator (i.e., variable force solenoid/spool valve) and is part of a closed-loop control system (see col. 3, ll. 13-15). In other words, the correspondence between the "electrical signal" and "the camshaft phase angle" is the correspondence between the input and the output of the closed loop control system. Whenever the actual and desired camshaft phase differ, this actuator input signal (from the ECU) will be such that the actuator will be moved to a position that causes adjustment of the camshaft phase to reduce this difference to essentially zero.

***Step 3a – "controlling the position of a vented spool slidably positioned within a spool valve body,"***

***Step 3b – "said controlling step being in response to said signal received from said engine control unit, said controlling step utilizing an electromechanical actuator to vary the position of said vented spool, said electromechanical actuator comprising a variable force solenoid"***

The camshaft phasing is controlled towards its desired value by fluid flow through the spool valve which is regulated by varying the position of the vented spool as determined by the closed loop control system.

I believe that a POSA would understand the term "variable force solenoid" to mean a solenoid that allows a proportional output that can vary continuously with the input electrical signal. This type of solenoid has the capability of an output displacement or force that can vary continuously (within the limits placed by mechanical stops) for a range of input electrical signals to the solenoid. In other words, a "variable force solenoid" has the capability to position the armature continuously by varying the amplitude of a steady current, although the armature can also be positioned continuously by varying the characteristics of other types of excitation wave forms (e.g., PWM). The variable force solenoid does not cycle through its full stroke with every PWM pulse.

A solenoid is a type of electromagnetic device consisting of a coil or electrical winding, a magnetic circuit that includes a movable element along its axis (often called an armature) upon which a force of electromagnetic origin is created in response to the electrical input. The displacement of the armature in response to an excitation current is determined by the balance between the electromagnetic force and the force of a spring. This latter force is essentially propor-

23

tional to armature displacement (within the limits placed by mechanical stops) since the spring rate is essentially constant. Moreover, the balance of forces on the armature is substantially independent of oil pressure. I confirmed (*see* Appendix) that the spool position can be made a function of the duty cycle of a PWM signal when applied to a variable force solenoid.

A POSA would understand that the term "vented spool" means a spool valve that has a vent or passage to permit fluid (such as air or oil) to flow to the outside of the valve to allow relief of pressure against the spool. In operation, the regions outside of either end of such a spool are vented to atmospheric pressure and the solenoid force is not working against oil pressure, which, if not relieved by venting, would affect actuator position calibration. Rather, as noted above, the solenoid armature force is balanced by a spring. Such an arrangement yields a stable position calibration for the solenoid actuator.

A POSA would understand that the term "spool valve body" refers to a body or hollow member that has a central passage for movement of the spool within it.

### Step 4a – "*supplying hydraulic fluid from said source through said spool valve to a means for transmitting rotary movement to said camshaft*,"

### Step 4b – "*said spool valve selectively allowing and blocking flow of hydraulic fluid through an inlet line and through return lines*"

A POSA would interpret this claim language to mean that engine oil is routed from a source of fluid, such as the main oil gallery, to the spool valve. Oil is then routed to the vane structure that allows adjustment of the angular position of the camshaft relative to the crankshaft. The flow of engine oil to this vane housing or "means for transmitting rotary movement to said camshaft" is regulated by the spool position relative to the spool valve body.

24

A POSA would interpret Step 4a to mean that engine oil is routed from the source, e.g., main oil gallery, to the spool valve and then to the structure that allows the transfer of rotary movement (or power) to the camshaft. The structure for performing this function includes, for example, one or more vanes positioned within recesses in a housing connected to a camshaft sprocket, and equivalent structures. These vanes are actuated by fluid in such a way as to transmit rotary motion.

The '738 patent includes two structures for transmitting rotary movement to the camshaft: (1) a pair of oppositely-acting hydraulic piston/cylinders positioned on opposite sides of the longitudinal axis of the camshaft attached such that differential displacement of each piston relative to its cylinder varies the angular position of the camshaft relative to the housing, or (2) one or more vanes positioned on a camshaft within recesses in a housing such that the fluid quantity on either side of the vanes determines the angular position of the camshaft, and these structures or their equivalents could be used to carry out the claimed function. As I noted previously, the '738 patent also specifically states that the vane housing structure replaces the use of the structure having oppositely acting cylinders. Since claims 10 and 11 specifically recite the "housing," it is my opinion that the claim is limited to a vane actuation system.

A POSA would interpret Step 4b to consist of allowing fluid to flow through the spool valve or to block fluid flow through this valve. A POSA would further understand that there would be an inlet line consisting of at least one fluid conduit through which fluid flows from the source into the spool valve and at least two return lines or fluid conduits through which fluid flows from the vane housing through the spool valve. A POSA would further understand that the fluid flow is responsible for changing the relative position of a vane within a recess. This POSA would also understand that the actual physical tubing of fluid conduit corresponding to inlet or

25

return line changes during a period in which fluid is flowing depending upon whether camshaft phase is advancing or retarding. For example, there is a position of the spool valve for which no oil is flowing (i.e., hydraulic lock condition). With the spool valve in this position the camshaft phasing is fixed. There is also a range of spool valve positions for which engine oil is flowing within and to/from the actuator. In the specific exemplary embodiment of Figure 19, the engine oil is blocked for the spool valve at its mid-position.

> **_Step 5 – "transmitting rotary movement to said camshaft in such a manner as to vary the phase angle of said camshaft with respect to said crankshaft, said rotary movement being transmitted through a housing, said housing being mounted on said camshaft, said housing further being rotatable with said camshaft and being oscillatable with respect to said camshaft."_**

A POSA would interpret this element to mean that the flow of oil resulting from the spool valve movement from the blocked position causes a rotation in the structure that permits continuous variation of phase angle of the camshaft with respect to the crankshaft. This rotation in the vane housing permits a change in the camshaft phasing. When oil is flowing, there is relative rotational motion (in a direction determined by the relative position of the spool valve from its blocked position). Dynamic movement of the spool valve back and forth from its blocked position permits a corresponding dynamic relative rotation of the camshaft/housing assembly. That is to say, this spool valve camshaft assembly is capable of being oscillated with a wave form determined by the characteristics of the signal from the ECU to the spool valve. For example, a PWM signal, whose duty cycle oscillates back and forth about a mean value, produces a corresponding oscillatory response or change in camshaft phase angle.

26

### *CLAIM 11*

*"The method of claim 10 wherein said variable force solenoid comprises:*

*a coil, said coil being adapted to receive said electrical signal from said engine control unit;*

*an armature, said armature being substantially surrounded by said coil, said armature being connected to said spool, said coil, when energized, creating a magnetic field sufficient to cause said armature to exert a force upon said spool and induce movement in said spool, said movement corresponding to said signal from said engine control unit;*

*an air gap, said air gap separating said coil from said armature; and,*

*a housing, said housing providing an enclosure for said coil, said armature, and said air gap."*

A POSA would understand that the word "connected" as used in the above claim means that movement of the armature causes a corresponding movement of the spool. In operation, the armature and spool are held in functional contact by the balance of forces of (1) electromagnetic origin acting on the armature and (2) the opposing spring force acting directly on the vented spool.

A POSA would understand the claim phrase "said armature [exerts] a force upon said spool and [induces] movement in said spool, said movement corresponding to said signal from said engine control unit" to mean that the armature applies a force on the spool as a result of the signal from the engine control unit, and the armature causes corresponding movement of the spool.

The electromagnetic force acting on the armature and transmitted to the spool via the connection results from the electrical signal sent to the solenoid by the engine control unit and the corresponding movement of the spool/armature is determined by the balance between this electromagnetic force and the opposing spring force.

In addition, a POSA would understand "air gap" to mean a gap which separates the coil from the armature and may contain non-magnetic bearing material. See, e.g., '738 patent, col. 8, line 40. A POSA would understand that the term "air gap" has a meaning in the electromechanical field, including the solenoid art, as non-magnetic gap, and that it is not limited to only "air."

The theory of electromagnetic actuators explains that the generation of physically meaningful forces requires that the device must be built largely from ferromagnetic material (e.g., steel). This structure also has a portion of non-magnetic materials (e.g., air, brass, copper). Such non-magnetic materials must constitute a relatively short segment of any magnetic path. In essence, these materials constitute a "gap" in the otherwise ferromagnetic structure. Since these materials have essentially the same magnetic permeability as air, it is common practice to term these "air gaps."

28

### VII(b) – Additional Comments Regarding BorgWarner's Proposed Constructions

#### *"Vented spool"*

With respect to the claim term "vented spool," I believe that the spool valve itself has a number of individual portions and chambers, each of which can have its own pressure. From my reading of the '738 and its file history, I believe that the inventors intended venting to be done such that there is no net force acting on the spool from either oil or air pressure. The '738 patent teaches that the forces on the spool should consist of the electromechanical force of the variable force solenoid, the spring and any axial viscous forces resulting from spool motion within the body. For example, with respect to the particular embodiment of Figure 19, chambers 198a and 198c would be vented to prevent air or oil pressure from developing. If, for example, chamber 198a were not vented, then spool motion would change the pressure in this chamber resulting in an axial force. The resulting force would directly affect spool valve force/displacement calibration.

The venting function relates to relief of fluid pressure from the external ends of the spool (see, e.g., col. 8, line 24: venting the spool to atmosphere completes the objective of relieving pressure inside cavity 198a that acted on the end of the land in previous VCT systems). Thus, it is not essential that the spool have a passage along its axis.

#### *"Variable Force Solenoid"*

The variable force solenoid pertaining to the particular embodiment depicted in Figure 19 is identified as a variable area solenoid. (see, e.g., '738 patent, col. 8 lines 36-39). A POSA would understand this type of solenoid as one in which the armature can be positioned continuously along its axis (within the limits of mechanical stops), for the particular embodiment de-

picted schematically in Figure 19. The solenoid force is essentially proportional to the square of the current (for d-c excitation; see Appendix for analysis of an ideal variable force solenoid).

The typical solenoid called for in the particular embodiment as depicted in Figure 20 is a variable gap type solenoid. For steady excitation, this type of solenoid normally has two stable positions as set by mechanical stops.

### Section VII(e) – Additional Comments Regarding Hitachi's Proposed Constructions

I have also been asked to review and comment on Hitachi's proposed preliminary claim constructions.

The first four items listed on page 2 of the Hitachi amended proposal pertain to the preamble of claim 10. In the first of these, Hitachi proposes that in the "variable camshaft timing system" the "angular position of a camshaft relative to a crankshaft" must be "varied in reaction to camshaft torque reversals." There is no limitation in either claim 10 or 11 that the camshaft angular position be varied in response to camshaft torque reversals. Hitachi is attempting to impose a limitation that does not exist.

In the second item of Hitachi's amended proposal, Hitachi asserts that the method "direct[s] the flow of oil internal to the VCT mechanism only." It is unclear to me what Hitachi means by this term. Presuming *arguendo* that this "mechanism" includes only the vane housing structure, I disagree with this assertion. A simple examination of the preferred embodiment depicted in Figure 19 shows that the '738 patent teaches control of the flow of oil external to this "mechanism." For example, the solenoid/spool valve controls the flow of engine oil from the MOG to the above "mechanism" during engine start in order to fill this "mechanism." Hitachi reads a similar limitation into the second item on page 2 of its proposal, and I also disagree with that construction as explained below. In the third item on page 2 of Hitachi's amended proposal

30

there is an interpretation on the word "source." Hitachi asserts that the source can be only "a re-
cess on one side of certain of the lobes of a vane in a housing . . . and pressurized primarily by
camshaft torque." I do not believe that a POSA reading the '738 patent, and its specification and
file history, would interpret the claims in this manner. In fact, the specific, preferred embodi-
ment of Figure 19 shows clearly that the MOG is a "source." Further clarification of "source"
comes from claim 4 where it is identified as the MOG (*i.e.*, element 230 of Figure 19).    A
POSA would not accept this interpretation since it is too restrictive and is contradicted by the
specification which refers specifically to the MOG as a "source." (See, e.g., claim 4, referring to
"source" as '230' (MOG)).

Hitachi appears to be suggesting that the preamble of claim 10 requires that oil be deliv-
ered from a source (*e.g.*, oil pump) to the chain or belt. Perhaps Hitachi is asserting that the '738
patent teaches a means for lubricating a belt or chain. I seriously doubt that anyone reading the
'738 patent would believe that this is what is taught or meant. To the contrary, the '738 patent
teaches that timing belts (in contrast to metal timing chains) are typically used in oil free envi-
ronments (see col. 3, lines 45-49). Reading the remaining claim elements (particularly the last
one) makes it clear that the oil is delivered to a means for transmitting the normal engine rotary
movement to the housing and that the housing upon receiving the oil from the spool valve and
sending oil along a return line varies camshaft phase relative to the crankshaft. (It should be
noted that the Hitachi VCT does exactly that in that oil from the MOG is directed to one of two
chambers via the spool valve and directs return line oil to a drain).

The sixth item on page 2 of Hitachi's amended proposal requires that "the electrical sig-
nal" be a "current control signal." Nothing in the '738 patent requires the "electrical signal" to be

a "current control signal." Whatever the term "current control" refers to, the electrical signal is simultaneously characterized by terminal voltage and current through the solenoid coil.

The seventh item on page 2 of the Hitachi amended proposal attempts to interpret "a vented spool" as requiring "an internal passage passing through each end of the spool and leading to atmosphere to eliminate any influence on spool movement due to oil pressure" and "an annular recess allowing the flow of oil."

I believe that a POSA reading the '738 patent specification would appreciate that the spool is "vented" in the sense that it is able to relieve pressure that is built up between the two ends. Without venting, such pressure could build up between the spool ends and affect actuator calibration. "Vented" spool does not mean that the spool must have "an internal passage passing through each end of the spool." A POSA would understand that what is important is venting to atmospheric pressure, not the physical configuration of the "vent." And the asserted claims do not require any specific physical configuration of the vent. The vented spool is not required to have "an internal passage passing through each end of the spool," and a POSA would understand that a spool is vented so long as the spool is vented to atmospheric pressure.

In addition, there is no requirement that a "vented spool" have "an annular recess allowing the flow of oil." A vented spool must be vented and must allow the flow of oil, but nothing in the '738 patent or prosecution history mandates that "an annular recess" must be present for the structure to be considered a "vented spool." The spool necessarily includes an internal land or passage for the flow of oil from the source through the spool valve. Otherwise, the flow of oil would not be controlled by the spool valve. However, this internal land is not part of the vent structure, which relieves pressure from the external ends of the spool.

32

Further, Hitachi's claim construction proposal imposes a limitation that the spool move-
ment occur "while eliminating any influence on spool movement to oil pressure." The '738 pat-
ent claims have no such limitation, and it is clear from the '738 patent specification that the pur-
pose of venting the spool is to remove the influence of oil pressure on actuator calibration. A
POSA would recognize Hitachi's reading as an attempt to impose a physical impossibility. Hi-
tachi's assertion is contradictory to the '738 patent teaching. There is no description (or even
suggestion) in any of the '738 patent embodiments of a system for which oil or fluid dynamics
are not a factor in spool movement. As long as the spool valve moves (which necessarily occurs
to achieve variable valve timing), the oil temperature and pressure influence at least the viscous
friction forces which in turn influence dynamic motion of the spool (though these forces do not
affect static calibration). Additionally, the preferred embodiment of the '738 patent controls the
flow of oil by using an annular recess to allow the flow of oil. Oil flow along that passage is
necessarily going to have at least some influence on the spool (though this influence should be
negligible). Hitachi's interpretation excludes the preferred embodiment of the '738 patent.

In the ninth item on page 2 and the first item on page 3 of Hitachi's amended proposal,
Hitachi also attempts to place a number of limitations on the term "electromechanical actuator"
and/or "variable force solenoid" that are not justified by the '738 patent claims, specification or
file history. Hitachi asserts that the electromechanical device is used to change the position of
the vented spool "in response to the a current signal received from the ECU." The '738 patent
teaches that an electrical signal is sent from the ECU to the solenoid actuator. A POSA would
understand that such a signal can be represented by the current through the solenoid or the termi-
nal voltage across the solenoid terminals. These two variables are related by the circuit dynam-
ics.

Hitachi's amended claim construction proposal seeks to require that the "variable force solenoid" be "driven by a non-PWM, current control signal from the ECU with the force applied by the solenoid proportionally varying with the magnitude of the current control signal." I do not believe a POSA would read the claim in this way for at least the following reasons.

The '738 patent identifies two types of variable force solenoids, each of which is used in a different embodiment: 1) a variable area solenoid and 2) a variable gap solenoid (col. 8, ll. 36-59). The variable area type solenoid is constructed such that the area of overlap between the armature and the ferromagnetic core increases with the increasing armature displacement. The inductance of the coil current is an increasing function of this overlap area. Analysis of an idealized model for such a solenoid shows that the force resulting from a d-c current through the coil is proportional to the square of the current and is in a direction that tends to increase the overlap (see appendix). Of course, with any practical solenoid, this idealized behavior would not be observed. However, for this type of solenoid, if the force of electromagnetic origin is balanced by a spring, the armature position can be varied continuously by varying the current. The '738 patent teaches the use of this type of solenoid for the specific embodiment depicted in Figure 19.

A POSA would understand that the variable area type of solenoid can also be operated with a PWM excitation, and this is contemplated by the '738 patent and the patents which the '738 patent incorporates by reference. For example, the '578 patent teaches closed loop control with a PWM signal from the ECU. With PWM excitation the armature for this type of solenoid has a steady average or mean value with a time varying "ripple" oscillation. If the excitation frequency is sufficiently high then the mean displacement is an increasing function of the PWM duty cycle and the "ripple" is insignificant. A POSA would have appreciated that using a PWM reduces hysteresis effects that would otherwise occur with the use of a d-c signal.

34

This influence of frequency on armature dynamic motion is readily demonstrated using a simulation model, such as presented in Appendix A. See, e.g., Fig. A-4, which shows that ripple is a tiny fraction of the mean displacement.

The other type of solenoid identified in the '738 patent (i.e., variable gap) is constructed such that the overlap area between the armature and core is constant but the gap between the armature and core is variable. A POSA would understand that the electromagnetic force is an inverse quadratic function of the gap and is in a direction that tends to reduce the gap.

The '738 patent teaches this type of solenoid in the embodiment shown in Figure 20 in which the armature is connected to a spring. If this spring is linear (i.e., linear force/displacement relationship), then a steady current cannot be used to control the armature position at points intermediate between mechanical stops because the structure is unstable. This type of solenoid is normally used as a 2-position electromechanical actuator, in which the two armature positions are fixed by mechanical stops. However this type of solenoid can be operated with various excitations other than the d-c.

A POSA would understand that this variable gap solenoid is often driven by a PWM signal. For sufficiently high excitation frequency, the armature displacement is proportional to duty cycle and the "ripple" is negligible.

Finally, Hitachi is misusing the term "PWM solenoid" from the description of the prior art in the specification of the '738 patent in an attempt to exclude all PWM signals. As expressly stated in the '738 patent specification (col. 2, lines 48-52), the term "PWM solenoid" is being used to describe the "PWM solenoid typically used in a conventional DPCS." That type of "PWM solenoid" operates by cycling "through its full stroke with every PWM pulse." This description relates to a fully on-fully off solenoid that is actuated through its full stroke with every

PWM pulse. In contrast, the variable force solenoid of the '738 patent does not move through a full stroke with every PWM pulse (of sufficiently high excitation frequency) or other type of input signal. However, the specification does not exclude the use of a PWM pulse signal to the variable force solenoid.

Turning to Hitachi's other proposals, the second item on page 3 of Hitachi's amended proposal offers a claim construction that seeks to limit the "source of hydraulic fluid" to an "internal recess/cylinder." As I stated above, the '738 patent makes clear that the "source" is the MOG, or at a minimum, that the source can be the MOG.

Hitachi further asserts that the spool valve is controlling the flow of hydraulic fluid (engine oil) "internal to the VCT mechanism only," but Hitachi does not define which components constitute the "VCT mechanism." The term "VCT mechanism" is not used in the '738 patent. I understand that the file history includes references made by the applicants to the flow of oil internal only to the VCT mechanism, but there is no indication of what was meant by this term. The vane housing with its recesses, the vanes, the spool valve, all fluid conduits and the MOG are necessary to achieve variable camshaft timing. Consequently, all of these components may be considered to constitute components of a "VCT mechanism." "VCT mechanism" cannot just be the vane housing as Hitachi appears to contend (see, e.g., second box on page 3 of Hitachi's amended proposed constructions), because other components, such as the spool valve, are necessary for variable valve timing to be achieved.

Hitachi's proposed construction also ignores other interpretations of the prosecution history statements. As noted in the specification of the '738 patent, fluid pressure is removed from the external ends of the spool, but allowed to pass along the internal lands of the spool. Thus, a reasonable interpretation of the statements made by applicants is that in the patented invention

fluid is supplied, or controlled, only along the internal lands of the spool, and fluid is not supplied, or controlled, against the external ends of the spool.

The third item on page 3 of Hitachi's proposal offers a claim construction for the phrase "a means for transmitting rotary movement to said camshaft." Hitachi asserts in its amended proposal that this means element requires that oil must "flow unidirectionally" into the sides of the lobes such that "cam torque pulsations" "rotate the vanes." (See, e.g., third item of page 3 of Hitachi's amended claim construction proposal). I do not believe a POSA would read such a limitation into the asserted claims, in light of the '738 patent specification and file history. I do not believe there is any limitation in asserted claims 10 and 11 relating to the presence of "cam torque" reversals in the VCT system. By contrast, other unasserted claims in the patent are specifically addressed to this feature of the preferred embodiment. See, e.g., Claim 1, col. 10, lines 12-15.

In addition, Hitachi urges that "check valves" be included in the structure required for "means for transmitting rotary movement." A POSA would recognize that the check valves are only a feature of specific embodiments of the present invention and are not required fundamentally for the transmission of rotary movement to the camshaft.

In its amended claim construction proposal, Hitachi seeks to impose limitations on the language of claim 11 that I do not believe would be the understanding of a POSA. As I stated above, I do not believe "connected" requires "physical[ ] attach[ment]." The armature need not be physically connected to the spool as long as the two are operationally connected for controlled movement. I also believe that a POSA would find there to be an "air gap separating said coil from said armature" so long as there is a gap in the otherwise ferromagnetic material separating the coil and the armature that contains non-magnetic bearing material. A POSA would recognize

37

that the non-magnetic bearing material need not be air during operation, but would still be termed an "air gap."

After reviewing Hitachi's amended proposed claim constructions, it appears to me that Hitachi is no longer proposing certain claim constructions. However, should Hitachi attempt to reintroduce its earlier proposed constructions, I reserve the right to explain why such would not be the understanding of a POSA.

For example, the sixth item on page 2 of Hitachi's initial proposal attempted to put a limitation on the phrase "an electrical signal corresponding to said phase angle" as meaning "a control current signal having a one-to-one relationship with said phase angle." Nowhere in the '738 patent specification or prosecution history does this statement or implication of such a limitation appear. Hitachi's proposed construction requiring "a one-to-one correspondence between this electrical signal and camshaft phase" is also unclear and ambiguous. Normally a one-to-one correspondence implies a topological mapping done by a single valued function. A simple interpretation of this construction would appear to suggest that the electrical signal must be an analog of the measured phase angle. How this analog signal is supposed to operate the actuator to achieve the objective stated in the '738 patent of controlling camshaft phase to a desired value is unclear. A POSA would understand that the electrical signal from the ECU to the actuator under closed loop control causes the spool to move such that the error between instantaneous and desired camshaft phase is reduced to essentially zero.

In Hitachi's initial claim construction proposal, it also asserted that claim 11 requires a one-to-one relationship between the armature force and the signal sent by the ECU. It appears that Hitachi is no longer asserting this argument, but if Hitachi attempts to return to it, I do not agree with such construction. This proposed limitation is ambiguous because it does not make

clear what variable or variables in the signal bear a one-to-one relationship to force. There is no such limitation in the claim, and none is required by the '738 patent specification or file history. The simplest interpretation of the Hitachi proposed construction would seem to imply that the solenoid is a linear analog actuator. I do not believe a POSA would construe claim 11 in this way.

Another example is Hitachi's assertion in its initial claim construction proposal that the vane-type VCT must be a "dual vane structure." Hitachi appears to no longer assert this argument, but if Hitachi attempts to return to it, I do not agree a POSA would find the claims limited to only a structure with two vanes. A dual vane structure is presented in '738 as a specific embodiment, but a POSA would understand that a different number of vanes could be used. Typically, the number of vanes would be a designer's choice, just as the number of cylinders in an engine is a designer's choice for a given application. A three- or four-vaned structure would be an equivalent structure to the vane structure disclosed in the '738 patent. For example, the '578 patent, which is incorporated by reference into the specification of the '738 patent, states that "one or more radially extending vanes" can be used (col. 2, line 17).

## VIII.  The Accused Engine Systems Utilizing Hitachi VCT Products

I have been asked to analyze Hitachi-supplied VCT components and documents. I base the following description on the materials, information, drawings, testimony I have reviewed and upon my own observations of and measurements made on a sample VCT actuator as listed in the appendix. I also understand from reading deposition testimony, letters from Hitachi's counsel, and stipulations entered by the parties, that the VCT products supplied by Hitachi to Ford, Nissan, and Honda, operate in materially the same manner. Although there are many vehicles employing the Hitachi variable camshaft timing control system (VTC) as listed in Def. Ex. 15, the structure and operation of all of the accused systems can be described by a single exemplary system. I have also reviewed BorgWarner's responses to Hitachi's Interrogatories Nos. 1 and 2, which set forth the details of BorgWarner's infringement contentions (see, e.g., Defendants' Third Supplemental Response to Hitachi's Interrogatory No. 2). BorgWarner's discussion and the documents identified in those responses, as amended, are hereby incorporated for reference.

An exemplary VTC system is depicted, for instance, in Def. Ex. 13B. (See also Def. Ex. 12). A system overview is presented on page HIT001599. (See also HIT 001490). This figure shows a partial cutaway drawing of what appears to be a 4 cylinder, inline, 4 stroke/cycle IC engine with dual overhead camshafts 4 valves/cylinder. One camshaft is shown with a fixed drive sprocket and the other with a VTC. The camshafts are driven via a toothed belt through a belt tensioning mechanism. Also shown in this figure is the solenoid/valve combination which receives an electrical signal from the control unit. Also shown in this figure are the crankshaft and camshaft sensors and the cam signal plate that provides signals from which the camshaft phase relative to the crankshaft is determined, as well as engine RPM. Other inputs to the control unit include engine load in the form of its torque output and engine temperature as obtained from a

·sensor mounted on the engine. This figure comes from a shop manual for a Nissan automobile and exemplifies the use and operation of a Hitachi VTC in an automobile according to the deposition testimony of Raymond Hughes.

Also shown in the control unit block is a 3-D graph called target angle MAP. This MAP refers to a section of memory in which is stored the desired camshaft phase angle as a function of RPM (denoted n in the graph) and engine load or torque. Typically, such a map contains a set of target angle values (*i.e.*, desired camshaft angles) at specific discrete values for torque and RPM. The Target Angle MAP receives an engine revolution calculation (as determined from the crank angle signal) and an engine load signal. The data in this MAP along is used to find the desired camshaft phase angle.

The actual camshaft phase is calculated or determined in a block labeled phase difference detection. The output of this block is compared with the desired phase angle and sent to a block labeled control, the output of which is a signal from the engine control unit that is use to adjust the position of the solenoid. A variable duty cycle (PWM) signal is sent to the solenoid to cause movement of the spool to allow fluid to flow to either the advance or retard chambers or to maintain the present position. This movement of the vane results in advance or retard of the phase angle difference so as to cause the actual phase and the target phase angles to eventually become the same.

A detailed drawing of the solenoid/spool valve, actuator structure, and camshaft is in defendant's exhibit 13 (*e.g.*, page HIT001592). This figure is a partial cutaway view of the VTC actuator, solenoid valve and fluid flow. There is a line connecting the solenoid to an oil source, in this case the oil pump/sump combination. There are two lines (labeled drain) which allow oil passing through the spool valve to return to the oil reservoir, where it is available as input to the

41

oil pump. Two other lines connect the spool valve to camshaft grooves. From one of these grooves oil is routed to the advance chamber and the other to the retard chamber via passage-ways in the camshaft and vane actuator body.

The vane actuator structure consists of a body into which recesses have been formed and a vane assembly attached to the camshaft, which can rotate about the common axis within the limits placed by the relative sizes of the recesses and vanes. This latter structure is mechanically fixed to the camshaft. There is also a spring loaded pin (called stopper pin) that, when engaged, locks the vane assembly to the body.

For steady camshaft phase the solenoid valve positions the spool valve to block any fluid flow through either of the two lines between the camshaft and the spool valve. Under this condi-tion the vane and body relative angular position is fixed, being held by hydraulic lock. Of course, this spool valve position is established by the solenoid valve in response to the electrical signal from the ECM.

For advancing the camshaft phase the ECM sends the solenoid valve a signal that causes the spool valve to move such that there is a passageway from that valve to the camshaft via the corresponding passageway to the camshaft. That passageway becomes an inlet to the actuator through which oil flows into the advance chamber. At the same time the other passageway be-tween the camshaft and the spool valve is opened to a drain line via an internal passageway in the spool valve. This passageway is a return line through which oil from the retard chamber passes. As long as the spool valve is in this position the advance chamber fills and the retard chamber empties, resulting in an angular movement of the vane/camshaft assembly to advance the camshaft phase. See, e.g., Nissan manual and Hughes deposition testimony.

For retarding the camshaft phase the solenoid moves the spool valve such that the input oil (from the pump) is directed to the other passageway between the valve and the camshaft. In this case, the oil coming from the spool valve is directed to the retard chamber. This passageway is an inlet to the vane actuator structure.

At the same time the spool valve directs oil coming from the advance chamber to the other drain line via the second passageway between the camshaft and the spool valve. This passageway is a return line. The camshaft vane/camshaft will continue to move relative to the body in a direction that retards camshaft phase as long as the spool valve is in the retard position. Then, once the camshaft phase has reached the desired value (i.e., target angle) the spool valve is moved (in response to the electrical signal from the ECU) to the blocked position. The determination that the camshaft phase has reached the desired position is made by the feedback loop in the control system. All of the above description of the operation of a typical VTC system in actual engine operation is confirmed by the Hughes deposition. I have reviewed a binder of service manuals that relate to Nissan vehicles having the accused systems, and I have reviewed the VCT portion of service manuals relating to Ford, Mazda and Honda. These VCT systems appear to have configurations like the exemplary Nissan system using Hitachi-supplied VCT components discussed in this report and appear to confirm the above functioning. I have been informed by attorneys for BorgWarner that copies of such binder (called "Nissan Manuals – IVT Control System") will be provided to Hitachi when my report is served, and that the portions of service manuals relating to Ford, Mazda and Honda were previously produced at, e.g., BW135207-52.

## IX. Infringement

I have been asked to conduct an infringement analysis of whether the engine systems employing the Hitachi-supplied VCT components infringe claims 10 and/or 11 of the '738 patent. I used the same exemplary part and model number as in the previous section of this report as part of my infringement analysis. From reading the depositions of Hitachi personnel and other witnesses and reviewing materials listed in exhibit 2, I have concluded that the same structural components are found in all of the accused systems and that they all function in the same basic way.

I understand that BorgWarner contends that Hitachi infringes claims 10 and 11, literally and/or under the doctrine of equivalents, by the sale of VCT components to Nissan, Ford and/or Honda. I have been informed by attorneys representing BorgWarner that BorgWarner contends that the manufacture, use, sale, importation, and/or offer for sale (hereinafter "supply") of components by Hitachi to Nissan for use in the following Nissan engines and associated vehicles, which are manufactured, used, sold, imported, and/or offered for sale in the United States by Nissan, constitutes direct, contributory and/or induced infringement of claims 10 and 11:

| Engine | Model | Vehicle | Model Years |
|---|---|---|---|
| **VQ** | | | |
| VQ35DE | Nissan | 350Z | 2003-06 |
| VQ35DE | Nissan | Altima | 2002-06 |
| VQ35DE | Infiniti | FX35 | 2003-06 |
| VQ35DE | Infiniti | G35 Coupe | 2003-06 |
| VQ35DE | Infiniti | G35 Sedan | 2003-06 |
| VQ35DE | Infiniti | M35 | 2006 |
| VQ35DE | Nissan | Maxima | 2002-06 |
| VQ35DE | Nissan | Murano | 2003-06 |
| VQ35DE | Nissan | Pathfinder | 2003-04 |
| VQ35DE | Nissan | Quest | 2004-06 |
| VQ40DE | Nissan | X-Terra | 2005-06 |
| VQ40DE | Nissan | Frontier | 2005-06 |
| VQ40DE | Nissan | Pathfinder | 2005-06 |
| | | | |

44

| VK | | | |
|---|---|---|---|
| VK45DE | Infiniti | FX45 | 2003-06 |
| VK45DE | Infiniti | Q45 | 2002-06 |
| VK45DE | Infiniti | M45 | 2006 |
| | | | |
| QR | | | |
| QR25DE | Nissan | Altima | 2002-06 |
| QR25DE | Nissan | Frontier | 2005-06 |
| QR25DE | Nissan | Sentra | 2002-06 |
| | | | |
| QG | | | |
| QG18DE | Nissan | Sentra | 2003-06 |

I understand that BorgWarner contends that the supply of components by Hitachi to Ford and/or Mazda for use in the following Duratec 30 and Duratec 35 engines and associated vehicles, which are manufactured, used, sold and/or offered for sale in the United States by Ford and/or Mazda, constitutes infringement of claims 10 and 11:

| Engine | Model | Vehicle | Model Years |
|---|---|---|---|
| Duratec30 | | | |
| Duratec30 | Mazda | Mazda6 (sedan) | 2003-06 |
| Duratec30 | Mazda | Mazda6 (wagon) | 2003-06 |
| Duratec30 | Ford | Fusion | 2003-06 |
| Duratec30 | Ford | Mercury Milan | 2003-06 |
| Duratec30 | Ford | Lincoln Zephyr | 2003-06 |
| | | | |
| Duratec35 | | | |
| Duratec35 | Mazda | CX7 | 2006 |
| Duratec35 | Ford | Lincoln Zephyr | 2006 |
| Duratec35 | Ford | MKX | 2006 |
| Duratec35 | Ford | Freestyle | 2006 |
| Duratec35 | Ford | 500 | 2006 |
| Duratec35 | Ford | Mercury Montego | 2006 |

I understand that BorgWarner contends that the supply of components by Hitachi to Honda and/or Acura for use in the following K20A, K24A and 2.3L/I4 engines and associated

45

vehicles, which are manufactured, used, sold and/or offered for sale in the United States by Honda and/or Acura, constitutes infringement of claims 10 and 11:

| Engine | Model | Vehicle | Model Years |
|--------|-------|---------|-------------|
| K20A3 | Honda | Civic R (and/or Civic Si) | 2002-05 |
| K24A1 | Honda | CRV | 2002-06 |
| K24A4 | Honda | Accord | 2003-06 |
| 2.3L, I4 | Acura | RDX | 2006 |

I have conducted my infringement evaluation with regard to the Hitachi VCT systems that are supplied for use in these engines and/or vehicles.

### Claim 10

The Hitachi continuous VTC system[2] is a variable camshaft timing system used in the internal combustion engines identified in the above charts. In my opinion, claim 10 of the '738 patent is literally infringed by use of the Hitachi continuous VTC system. Hitachi's continuous VTC components are designed specifically for use in engine systems that support VTC (e.g., engines that have camshaft and crankshaft sensors and have an ECU which enables VTC functionality). I am not aware of any purpose Hitachi's continuous VTC components serve other than functioning in connection with engine sensors and a vehicles ECU to effectuate variable camshaft timing. To the extent the court were to find an element of claim 10 missing from the accused Hitachi products, in my opinion there would be only an insignificant or insubstantial difference between the claim language and the Hitachi continuous VTC system. Each of the Hitachi continuous VTC components performs substantially the same function in the accused engines, in substantially the same way, to achieve substantially the same result as the variable cam-

---

[2] Hitachi calls its VCT system "Variable Timing Components." Therefore, in this section I use the term "VTC."

shaft timing components used in the system claimed in method claim 10 of the '738 patent. I understand from attorneys for BorgWarner that this is a common test for the doctrine of equivalents.

The Hitachi continuous VTC system varies the camshaft phase angle (relative to the crankshaft), by regulating the flow of hydraulic fluid (engine oil) from a source (crankcase with an oil pump) to a means for transmitting rotary movement from said crankshaft to a housing. The housing in the Hitachi product is the VTC actuator. It transmits rotary motion to the camshaft. The housing is integral with the camshaft sprocket, which is connected to the crankshaft via a chain and sprockets on the camshaft and crankshaft. Differential angular displacement of the camshaft relative to the crankshaft is accomplished by the vane housing actuator assembly resulting in variable camshaft phasing.

The rotary motion of the camshaft sprocket (on the vane actuator body) is transferred to the vane assembly by hydraulic fluid in the recesses of the actuator body or housing, comprising the steps of:

1. The Hitachi continuous VTC system utilizes a pair of sensors which generate signals that are sent to the VTC control unit (see, e.g., Hitachi 001490 of exhibit 12). One of these sensors contains information from which crankshaft angular position can be measured. The other sensor signal has information from which the camshaft angular position can be determined.

2. The calculation of the instant or actual camshaft phase angle is done in the VTC control unit (a portion of the engine control unit). This calculation step uses the signals from the crankshaft and camshaft sensors. The ECU also determines a desired (or target) phase angle as a function of engine operating conditions. These conditions include, for example, engine load and engine speed. Then, based on the calculated and target phase angle, the ECU generates an electrical signal responsive to the error, or difference between the target and actual phase angles, that is sent to the solenoid. See, for example, Deposition of Yoshinori Ichinosawa and exhibits 13 and 14.

3. The position of the vented spool is controlled by the signal that is sent from the ECU. See, for example, Hughes deposition and exhibit 229 as well as the appendix to this re-

47

port. The combination of the solenoid and spool valve is an electromechanical actuator and the solenoid is a variable force solenoid.

4.  In the Hitachi VTC system, as implemented in the above-identified engines and vehicles, oil from the engine oil pump is supplied to the spool valve. Then, depending upon the activation of the variable force solenoid by the signal from the ECU, the spool valve selectively blocks the flow of oil or allows it to flow to the one or the other of two passageways (lines) connecting the spool valve and vane actuator assembly (i.e., inlet line). The other passageway acts as a return line. Either of these lines is alternatively an inlet or a return depending upon the spool valve position. (Note: this interpretation of the inlet and return lines is confirmed by Raymond Hughes of Nissan; see deposition page 35.) With the spool valve moved in one direction from the blocked position oil is supplied to the advance chamber and flows out of the retard chamber, with the spool valve moved in the opposite direction, the oil flows are reversed.

5.  The oil flowing into or out of each chamber applies a torque to the vane/camshaft assembly that results in the transmission of rotary movement to the vane and camshaft relative to the actuator body (see, e.g., Hughes deposition and exhibit 229). Since the body is linked by a chain to the crankshaft, this rotary movement varies the camshaft phase angle with respect to the camshaft. The actuator constitutes a housing which rotates with the crankshaft (because of the chain drive connection) and the camshaft and is capable of oscillation relative to the housing by means of the vane. The spool valve motion adjusts the position of the vane relative to the housing by the addition or removal of oil (see Appendix to this report).

48

### Claim 11

In my opinion, claim 11 of the '738 patent is literally infringed by use of the Hitachi continuous VTC system. To the extent the court were to find an element of claim 11 missing from the accused Hitachi products, in my opinion there would be only an insignificant or insubstantial difference between the claim language and the Hitachi continuous VTC system. Each of the Hitachi continuous VTC components performs substantially the same function in the accused engines, in substantially the same way, to achieve substantially the same result as the variable camshaft timing components used in the system claimed in method claim 11 of the '738 patent. I understand from attorneys for BorgWarner that this is a common test for the doctrine of equivalents.

For the claim 11 infringement analysis, reference is made to the deposition of Mr. Ichikawa of Hitachi and the associated exhibits (for example, Ex. 17A). This latter exhibit is a drawing of a representation Hitachi solenoid/spool valve assembly.

The laboratory measurements made on a representative Hitachi solenoid confirm that it is a variable force solenoid (see Appendix).

1. The Hitachi solenoid includes a coil which can be seen from exhibit 17A as identified by the handwritten letter C. It should be noted that the drawing also includes a letter C that was printed with the drawing.

2. The Hitachi solenoid has an armature as identified by the letter A on Ex. 17A. The armature can be seen from Ex. 17A to substantially be surrounded by the coil. When energized by an electric current a force of electromagnetic origin is exerted on the armature that is sufficient to move the armature against a restoring force exerted by the spring. Movement of the armature results in movement of the spool which has been identified by the letter S in Ex. 17A. The movement of the spool results from a signal from the ECU.

3. There is an air gap between the coil and the armature.

4. There is a housing that provides an enclosure for the coil, armature and air gap that has been shaded pink on Ex. 17A.

49

**X.    Further Comments on Hitachi's Proposed Constructions and Infringement Either Literally or Under the Doctrine of Equivalents.**

I have also been asked to consider infringement under the doctrine of equivalents and whether the accused systems infringe the asserted claims literally or under the doctrine of equivalents if one were to accept *arguendo* Hitachi's proposed claim constructions. I understand from discussions with attorneys that a system may infringe under the doctrine of equivalents, even if there is no literal infringement, if there is only an insubstantial difference between the accused method and the method specified in the asserted claims. I further understand that the U.S. Supreme Court has stated that one way of determining whether the accused system infringes under the doctrine of equivalents is if it performs substantially the same function, in substantially the same way, to achieve substantially the same result.

It is my understanding that there is a dispute between the parties to this lawsuit over whether the preamble is a limitation of the claim. For the present analysis, I assume that the court adopts the Hitachi position that it is a limitation.

*[preamble]*

It is within the scope of the Hitachi claim construction that the preamble to claim 10 reads on the Hitachi VCT under the doctrine of equivalents in that it performs the same function that is regulating the flow of hydraulic fluid from a source to a vane actuator. In addition, it performs this function in substantially the same way by controlling the oil flow from the source to the housing by positioning a spool valve based on an electrical signal sent to a variable force solenoid, and the position of the spool valve allows the passage of oil from the source to that actuator. The electrical signal is representative of the relationship of the desired phase angle and the instantaneous phase angle of the camshaft relative to the crankshaft based on closed loop

50

control. Further, it achieves the same result (i.e., varying camshaft phase relative to the crank-shaft).

*["calculating..." step]*

Hitachi's construction appears to me to be exactly what is done in the accused engine systems. The ECU in the '738 patent calculates the desired relative phase angle from a MAP or look-up table stored in the control module based on engine operating conditions, such as load and speed.

*["... electrical signal corresponding to said phase shift" of step 2]*

This phrase is a portion of the second step of claim 10 and pertains to the electrical signal that is sent to the variable force solenoid actuator. The structure of this signal is such that it causes the spool that is associated with the actuator to move in a direction that will cause flow of oil such that the position of the camshaft is varied in the direction of the desired value. The desired phase is a function of load and RPM.

Hitachi's initial proposed construction limited this to a signal having "a one-to-one relationship with said phase angle." This construction appears to be a topological mapping from a domain (phase angle φ) to a range space (electrical signal υ) as depicted below:



Topological mapping φ ⟶ υ one-to-one

Such a mapping is characterized by a functional relationship which is not necessarily bidirectional where neither domain space nor range space is necessarily a convex set.

An interesting example function having a one-to-one relationship or correspondence to phase φ is as follows:

let       $\delta = K(\phi - \phi_d) + 0.5$

where    $\phi$ = instantaneous camshaft phase

$\phi_d$ = desired value phase

$K$ = function (which could be a constant)

and let   $\upsilon = F_s(t, \delta)$

defined on the domain $0 \le \delta \le 1$

The function $F_s$ satisfies

$$F_s = V_s \qquad 0 \le \frac{t}{T} < \delta$$

$$= 0 \qquad \delta < \frac{t}{T} \le 1$$

Furthermore, the periodic extension of this function is given by:

$$F_s(t + nT) = F_s(t)$$

If $t$ is time and T is a period of time (e.g. T = 1/300 second) and if δ is a duty cycle, then this function describes the Hitachi PWM signal that is supplied to the VCT actuator by the ECU.

This PWM signal (satisfying the Hitachi proposed construction for this element) when applied to the variable force solenoid actuator, causes the spool valve to move in such a way that oil under pressure is supplied via an inlet line to the vane actuator and directs an equal amount of fluid from the vane actuator to a drain. The movement of this oil causes the camshaft to move relative to the crankshaft until φ = φd and δ = 0.5 (*i.e.*, 50% duty cycle).

Thus, the Hitachi VCT system reads on this second claim element by the doctrine of equivalents because it performs substantially the same function (*i.e.*, generating an electrical signal – PWM) in the same way (i.e., generated by the ECU in response to a calculated phase) having the same result (i.e., a one-to-one relationship to said phase angle).

52

*["spool" of step 3]*

The Hitachi amended proposed construction for this phrase states that the spool has "an internal passage passing through each end of the spool and leading to atmosphere to eliminate any influence on spool movement due to oil pressure." Should the court adopt this proposed construction, the Hitachi VCT would infringe literally or under the doctrine of equivalents. The function performed by a vented spool (as made clear by the '738 specification and file history) is to relieve pressure differentials across the spool due either to hydraulic fluid or air. According to the Hitachi construction, this is achieved by a passageway through the spool which allows pressure differentials and/or flow of hydraulic fluid. Although there is no limitation in claims 10 or 11 or in the specification regarding such a passage, it would have the function of relieving pressure differentials across the spool. According to the specification and as explained in the file history, venting the spool achieves the result of stabilizing the actuator calibration.

The Hitachi variable force solenoid actuator provides a vent for the spool leading to atmospheric pressure. This venting has the result of relieving differential pressures across the spool (thereby stabilizing the actuator calibration).

Thus, in the event the court adopts the Hitachi proposed construction, the Hitachi VCT system infringes the second claim element under the doctrine of equivalents in that it performs the same function (i.e., relieving pressure differential across the piston) in substantially the same way (i.e., providing a passageway from the end of the piston to a region of atmospheric pressure) achieving the same result (i.e., stabilizing actuator calibration).

*["a spool valve body" of step 3]*

The Hitachi amended proposed construction "a housing in which the vented spool axially moves " describes the Hitachi spool valve.

53

*["a variable force solenoid" of step 3]*

The Hitachi proposed construction asserts that the claimed solenoid is controlled by a control current signal received from the ECU. The Hitachi construction further asserts that "the magnitude of the control current signal as received from the ECU being varied to vary the current applied to the solenoid" which is utterly redundant. There is no limitation in claim 10 that the signal sent from the ECU to the solenoid be characterized by a current. However should the court adopt this construction, it is true that the instantaneous force developed in the Hitachi solenoid is an increasing function of current.

The Hitachi solenoid is a variable force solenoid (of the variable area type) to which a PWM signal is applied. The current has a periodic wave form whose peak amplitude varies with the duty cycle of the PWM signal. Moreover, the mean value of the current (*i.e.*, d-c component) increases with increasing duty cycle.

Thus, if the court were to adopt the Hitachi proposed claim construction with respect to the "variable force solenoid" recited in step 3, the Hitachi VCT system would infringe this element under the doctrine of equivalents. It (1) achieves the same function of utilizing an electromechanical actuator in the form of a variable force solenoid to drive the spool valve which eliminates the influence on spool movement due to oil pressure; and (2) it does this in substantially the same way (*i.e.*, response to a PWM signal sent to the variable force solenoid from the ECU) to (3) achieve substantially the same result (*i.e.*, controlling the position of a vented spool).

*["supplying hydraulic fluid" . . ." inlet line and through return lines" of step 4]*

The Hitachi proposed construction for this portion of the 4th element of claim 10 seeks to limit the supply of oil to the internal recesses/cylinders without specifying where such recesses might be. Hitachi further interprets the spool valve "as part of the supply" (of hydraulic fluid)

54

and that this spool valve selectively passes and blocks the flow of oil from the source to the means of transmitting rotary movement to the camshaft where in this flow control is "internal to the VCT mechanism only." Should the court adopt this language, the Hitachi VCT system still infringes either literally or under the doctrine of equivalents. The Hitachi system receives oil under pressure from the MOG/oil pump, which, in turn, receives oil from the oil pan or crankcase. The latter may be considered a recess in the ordinary meaning of that word. The Hitachi system selectively passes or blocks the flow of oil. Moreover, for reasons given above, this supply of oil and the selective passing or blocking of oil are internal to what one could consider the "VCT mechanism."

*["a means for transmitting rotary movement. . ." of step 4]*

The Hitachi proposed construction for this phrase asserts that the function being performed by this means claim is transmitting rotary movement to the camshaft. A POSA would understand from a reading of the specification that the rotary motion in this case is the differential angular displacement of the camshaft relative to the camshaft drive sprocket which moves synchronously with the crankshaft. This POSA would realize that the result of this differential relative angular movement is variable camshaft phasing.

Hitachi further asserts that the corresponding structure includes at least two components, the first of which is either a piston-cylinder structure (as exemplified in Figure 2) or a dual vane structure (as exampled in Figure 19). A POSA would recognize that having two vanes is only by way of illustration. In principle, any number of vanes could be used (even a single vane) as long as that number of associated recesses was compatible with the maximum desired angular displacement of the camshaft relative to the sprocket/body of the actuator. As stated earlier in this report, the number of vanes/recesses is a designer's choice, and a housing with any number of

vanes/recesses would be the structural equivalent of a two-vane housing. Of course, the geometry and the maximum rotation angle places a practical upper bound on the number of vanes that will fit in a housing.

The second structural component recited in the Hitachi proposed construction is oil pressure. Hitachi asserts that this oil pressure is _only_ created by reaction to torque reversals to transmit the necessary rotary movement. This is equivalent to asserting that the pressure in the actuator recess is exactly zero whenever the camshaft torque is zero (i.e., when all followers are in a position away from the associated cam lobe). This assertion is a virtual physical impossibility. A POSA would recognize that the oil pressure in the recesses will necessarily be non-zero and will in fact be a function of the oil pressure supplied by the oil pump from a MOG during the process of filling the recess. The instantaneous oil pressure in the recesses will be a combination of pressure due to camshaft torque pulsations, as well as pressure due to other engine operating factors such as engine oil pressure.

Should the court adopt the proposed Hitachi construction, it must necessarily be within the realm of physical possibility. In this event, the Hitachi VCT system would still infringe the last element of claim 10. The Hitachi VCT actuators all have 3 or 4 vane/recess structures. These perform the same function (i.e., transmitting rotary movement of the camshaft). This function is performed in substantially the same way (i.e., due to differential pressure across each vane). A POSA would recognize that the number of vanes is a designers choice based upon the torque required to cause the rotary movement. This POSA would also recognize that the pressure differential across each vane is a combination of components due to 1) engine oil pressure and 2) camshaft torque pulsations.

The Hitachi proposed construction further asserts that the corresponding structure requires inlet and return lines as defined in an earlier proposed construction. My response to this assertion is given in regards to that earlier construction.

A POSA would recognize that the result of the means clause in this element of claim 10 is a variable camshaft phase relative to the crankshaft which is also the result of the Hitachi VCT.

*["said spool valve selectively allowing and blocking. . ." of step 4]*

The final Hitachi proposed construction under claim 10 relates to the final element. This construction has been "stated in the construction for the overall phrase above." My response is the same as it is for the earlier phrase.

Thus if any subset of the Hitachi proposed construction for the elements of claim 10 is adopted by the court, the Hitachi VCT system infringes claim 10 literally or under the doctrine of equivalents.

## Claim 11

*["connected"]*

The Hitachi amended proposed construction for this term which appears in the 2nd step of claim 11 is "physically attached." There is no such limitation in claim 11 for this term, nor is there any such limitation either explicitly or implicitly in the specification. However, if the court were to adopt this proposed construction, the Hitachi VCT solenoid/spool valve assembly meets this interpretation. In the Hitachi solenoid spool valve assembly, there is a spring that forces the spool against the armature. This forced contact would be understood by a POSA to maintain substantially permanent contact between the solenoid armature and the spool. The result of this contact is that the spool moves substantially with the armature as though the two were fastened

or bound together. In the exemplary embodiment depicted in Figure 19 the armature bears against an extension of the spool (via 200c). The armature and spool maintain contact (*i.e.*, are connected) by a spring (much like that in the Hitachi VCT). The result of the "connection" is that the spool moves substantially with the armature (i.e., as do the Hitachi corresponding components). Thus the Hitachi armature/spool/spring assembly performs the same function in substantially the same way with substantially the same result (i.e., substantial synchronous movement of the armature spool).

   *["air gap"]*

   Hitachi's proposed construction seeks to require that "air" be the non-magnetic bearing material. In a magnetic flux circuit, any non-magnetic material has essentially the same magnetic permeability as air and can properly be referred to as an air gap. Such a region would perform substantially the same function, in substantially the same way as air, to achieve substantially the same result. Hence, Hitachi's accused system would meet this element, as construed by Hitachi, either literally or under the doctrine of equivalents.


## XI. Summary of Opinions

   In the course of preparing this report, I have reached a number of conclusions and have disclosed several opinions. After reviewing all materials provided to me, studying the patent in suit (as well as its file history) and conducting studies on a sample of an accused product, I have reached the opinions that use of the Hitachi VCT system infringes claims 10 and 11 of the '738 patent literally and/or under the doctrine of equivalents. Also, accepting Hitachi proposed claim constructions purely as a basis for analysis, I concluded that the Hitachi VCT system would infringe the '738 patent either literally or under the doctrine of equivalents.

In addition, I have reviewed the proposed claim construction from both Hitachi and BorgWarner. I find that I agree with the BorgWarner proposed claim constructions with the clarifying comments provided above, and I disagree with much of the Hitachi proposed constructions, as explained above in Sections VII(b) and VII(c).

## XII. Other Testimony

I am informed by attorneys for BorgWarner that discovery may not yet be complete. There may be, for example, additional depositions to be taken and there may be additional documents and materials produced by Hitachi or third parties. My opinions might possibly be affected by such sources or by additional arguments made by Hitachi. In addition, I have been informed that the Court has not yet construed the legal meaning of the claims. Consequently, I reserve the right to submit a supplemental report or reports. I may also be asked to prepare a re-buttal report in the light of new information, and I reserve the right to prepare such a report.

Attorneys for BorgWarner have told me that I may also be called upon to testify about matters: (1) raised on direct or cross-examination at trial; (2) necessary to rebut any other matters that the Court allows Hitachi to introduce or rely upon; (3) otherwise raised at trial by counsel or the Court in relation to matters set forth in this report. In addition to the items identified above, my testimony may also be based, in part, upon the trial testimony of fact witnesses and other expert witnesses.

If called to testify before the Court and/or a jury, I may also rely on demonstratives and samples to help illustrate and explain the opinions and matters disclosed in this report. I was asked by attorneys for BorgWarner to identify a list of demonstratives exhibits that I may use in aid of my testimony. This following is a representative, non-exhaustive list.

(i) demonstrative(s) explaining how internal combustion engines operate;

(ii) demonstrative(s) explaining the functioning of an internal combustion engine without Variable Camshaft Timing (VCT) components;

(iii) demonstrative(s) explaining the functioning of an engine with a VCT;

(iv) demonstrative(s) explaining the use of sensors in an engine;

(v) demonstrative(s) explaining the role of an ECU/ECM in an engine;

(vi) demonstrative(s) explaining the functioning and advantages and disadvantages of a DPCS system;

(vii) demonstrative(s) explaining the functioning and advantages and obstacles of a VCT which does not balance against external fluid pressure;

(viii) demonstrative(s) explaining what a solenoid is;

(ix) demonstrative(s) explaining the functioning of a two-position, or on-off solenoid;

(x) demonstrative(s) explaining a variable force solenoid;

(xi) demonstrative(s) regarding a closed-loop system with a variable force solenoid;

(xii) demonstrative(s) explaining simple examples of open loop and closed-loop systems;

(xiii) demonstrative(s) explaining differences between open-loop and closed loop systems;

(xiv) demonstrative(s) explaining the disclosures of the '738 patent and patents incorporated by reference;

(xv) demonstrative(s) explaining the functioning of vane-type VCT systems versus other systems (e.g., helical systems or systems that use pistons/cylinders)

(xvi) demonstrative(s) explaining Hitachi's variable force solenoid;

(xvii) demonstrative(s) explaining the functioning of Hitachi-supplied components;

(xviii) demonstrative(s) explaining the use of Hitachi-supplied components in infringing systems;

(xix) demonstrative(s) explaining my observations, analyses and calculations regarding Hitachi-supplied components;

(xx) demonstrative(s) explaining infringement, literally and/or under the doctrine of equivalents

(xxi) demonstrative(s) explaining the differences between the '738 patent and asserted prior art;

(xxii) demonstrative(s) explaining the advantages of the '738 patented system;

(xxiii) demonstrative(s) in support of BorgWarner's claim construction proposals;

(xxiv) demonstrative(s) addressing Hitachi's claim construction proposals; and

(xxv) blow-ups or enlargements of documents or materials cited in this report or reviewed in preparation of this report or any rebuttal or supplemental report I may submit.

## XIII. Listing of Other Cases In Which Testimony Has Been Given As an Expert In Last Four Years

Automotive Technologies v. BMW of N. America et al, 01-CV-71700-07, E.D. Michigan (Southern Division) [consulted for Automotive Technologies, who was represented by Baniak, Pine & Gannon]

Gordon Howard Assoc. Inc. & Pacific Insight Electronics Corp. v. Payment Protection Systems, Inc., 02-CV-D-0517 (MJW), D. Colo. [consulted for Payment Protection Systems, Inc., who was represented by Burns, Doane, Swecker & Mathis]

Arctic Cat Inc. v. Injection Research Specialists Inc. & Pacer Industries Inc., 01-CV-543 (MJD/RLE), D. Minn. [consulted for Injection Research Specialists Inc., who was represented by McDermott, Will & Emery]

61

Dated:  September 6, 2006

William B. Ribbens