# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

HITACHI, LTD. and HITACHI AUTOMOTIVE
PRODUCTS (USA), INC.,

        Plaintiffs,

    v.

BORGWARNER INC.,
and BORGWARNER MORSE TEC INC.,

        Defendants.

BORGWARNER INC.,

        Counterclaimant,

    v.

HITACHI, LTD., and HITACHI AUTOMOTIVE
PRODUCTS (USA), INC.

        Counterdefendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 05-048-SLR

**EXPERT REPORT
OF WILLIAM B. RIBBENS
REGARDING VALIDITY
OF U.S. PATENT NO.
5,497,738**

1.  I previously submitted a report regarding infringement of U.S. Patent No. 5,497,738 ("the '738 patent), on September 6, 2006. A listing of my qualifications is provided in that report.

2.  I have been asked by attorneys for BorgWarner to review the reports provided by Hitachi submitted by Robert Kuhn and Thomas Livernois challenging the validity of U.S. Patent No. 5,497,738. I have also been asked to present my responses to these reports.

3.  I reviewed the Kuhn and Livernois reports, as well as the exhibits and materials provided with such reports. I have also reviewed and relied on the materials discussed in this report.

4.  In any invalidity analysis, it is important to consider the various features that get combined in the asserted claims. The '738 patent applies to a vane type VCT system which utilizes a closed loop control system based upon measurements of crankshaft and camshaft angular position from which a calculation is made of the instantaneous camshaft phase in an ECU. The control permits continuous positioning of the spool within its mechanical constraint and is not limited to a set of fixed positions. It achieves this positioning by means of a variable force solenoid in which a force of electromagnetic origin varies in proportion to current through the solenoid coil. This force, which is substantially independent of armature axial position, is balanced by the force of a spring. The spool is functionally connected to the armature and moves with it, and is vented such that there are no forces due to differential oil pressure acting on the spool ends.

5.  I have noted, in reviewing the Kuhn and Livernois reports, that there is no single reference that is alleged to anticipate the asserted claims of the '738 patent (*i.e.*, Hitachi is not urging a lack of novelty based on § 102). All of the invalidity arguments presented in the Kuhn and Livernois reports are based upon obviousness (*i.e.*, § 103 invalidity arguments).

1

6. I have been informed by attorneys for BorgWarner that issued patents are presumed valid. 35 U.S.C. § 282. This means that, in the present case, the burden of proof of invalidity is on Hitachi. I have been informed by attorneys for BorgWarner that the burden that Hitachi must meet is one of "clear and convincing evidence." I have also been informed that in the process of conducting an obviousness invalidity analysis, the prior art must be evaluated with regard to the combination of the features discussed above in a control system for VCT. It cannot be done by selectively choosing components from various references using the '738 patent itself as a roadmap or guide. I am further informed that an obviousness-based invalidity argument requires evaluation of each of the references for all of its teachings including any teachings away from the invention. Finally, I have been informed that the burden of showing invalidity is especially difficult when the infringer attempts to rely on prior art that was before the patent examiner during prosecution, and that a heavy burden applies when the infringer relies on references that are cumulative to the art cited to the Patent Office.

7. The Kuhn report outlines various combinations of references, but it does not explain how the specific combinations are to be made. Neither does this report describe what modifications must be made to the primary references in order for the secondary references to be used with them. Nor does it explain how the necessary modifications are suggested in the art.

8. For example, in section VII, H of the Kuhn report, it is suggested that a simple substitution of an "electric actuator" as described in Kawamoto '843 can be substituted for the hydraulic actuator of the Quinn '578 patent thereby rendering '738 obvious.

2

9. However, the Kuhn report fails to describe the necessary modifications that would be required for this combination or where those specific modifications are taught or suggested in the prior art. For example, the spool in '578 would have to be vented in order to replace the hydraulic actuator with a variable force solenoid ("VFS"). This modification with the suggested combination comes from working backward from the '738 patent using hindsight. The combination and the others proposed in the Kuhn report would not have been obvious to one of ordinary skill in the early 1990s, when the '738 patent inventors came up with their invention.

10. I have been informed by attorneys for Borg Warner that any invalidity analysis must consider the prosecution history and the prior art that was cited. This art provides a frame work for what was known at the time the application was filed and for what was before the examiner when considering the application. I have been asked by attorneys for BorgWarner to consider the prior art reviewed by the examiner during the prosecution history of the '738 patent. I have been informed that the '738 patent claims priority to the '935 patent as a parent application meaning that the examiner had the '935 prosecution history and its prior art within that file.

11. The '738 patent incorporates by reference a number of patents (*e.g.*, USP 5,002,023 (the "'023 patent), USP 5,184,578 (the "'578 patent"), USP 5,107,804 (the "'804 patent"), and USP 5,172,659 (the "'659 patent"), all of which were available to the examiner to be applied, if desired. Because these prior patents are incorporated as references, the '738 patent disclosure inherits the disclosures and features recited in such patents. The shortcoming of these patents relative to the inventive features of '738 are identified clearly in the 'background of the invention' portion of the '738 specification. Generally these earlier patents can be described as having differential pressure type control system in which the axial position of a spool valve is

3

determined by the balance of oil pressure forces on the spool. This spool valve in the '578 patent is, in effect, an actuator in a closed loop control system which regulates camshaft phase.

12. One of the difficulties encountered by such a differential pressure control system (DPCS) is the dependence of the spool position on the engine oil pressure. This variation of spool valve with the normal variation of engine oil pressure adversely affects the actuator calibration.

13. The '738 patent offers a significant advance over the DPCS type control by removing the influence of differential oil pressure on actuator calibration in a VCT control system. It achieves this advantage (as well as others explained in the summary of the invention section of the '738 specification) by utilizing a variable force solenoid to control the position of a vented spool. The vented spool in the '738 patent does not have differential pressure (*e.g.*, due to oil) across it.

14. The variable force solenoid (as pointed out in the '738 patent) has the capability of being positioned continuously along its axis (within mechanical constraints). The force of electromagnetic origin varies relatively little (ideally not at all) with armature axial position. This feature permits the armature and its connected spool to be positioned very precisely by balancing the electromagnetic force against the force of a linear spring. Since the spool of the spool valve is functionally connected to the VFS armature, the former is also very precisely positioned within the spool valve body.

15. The vented spool involves a configuration in which there is no pressurized oil acting on either external land end of the spool. One relatively straightforward way of achieving this venting is to provide an oil drain passage outside of the spool but within the spool valve body leading to the crank case.

4

16. It is perhaps worthwhile to discuss a solenoid-actuated valve as it is used in the '738 patent, as well as in the prior art references. A solenoid is an electromechanical energy conversion device that receives an electrical input and generates a mechanical output. As used in the '738 patent, the mechanical output is a force and a displacement that moves the spool in a spool valve.

17. The '738 specification identifies 2 types of variable force solenoid structure: 1) variable gap and 2) variable area. The common binary state solenoids (i.e., on/off) are normally of the variable gap type. This type solenoid is typically constructed in such a way that the air gap between an end of the armature and the ferromagnetic core is variable whereas the other end of the armature maintains a constant overlap with the core material within which it can slide. When energized by an electric current through a coil (that essentially surrounds the armature), an electromagnetic force is created on the armature that is of a direction that tends to reduce the air gap. The magnitude of this force varies inversely with the square of the gap distance.

18. Normally, the armature is held against a mechanical stop such that the air gap is created. As the excitation current is increased from zero, there is initially no armature movement. When the current reaches a value that the electromagnetic force exceeds the bias force of the spring, the armature begins to move so as to reduce the gap. However, since the electromagnetic force is an inverse quadratic function of the gap, the armature accelerates toward the core, thereby abruptly reducing the gap to zero. As long as the spring has a linear spring rate, there is no stable intermediate position for the armature between its two mechanical stops. This variable gap solenoid is, consequently, a binary state device in which the armature is in one of two positions depending upon whether the excitation current is greater than or less than a threshold valve. Of course, in practice, there is hysteresis in the binary state characteristics.

5

19. It should be noted that the variable gap type of solenoid can be operated with a PWM type of excitation. It is this combination solenoid/excitation that is called PWM solenoid. For example, the Butterfield 659 patent teaches the use of such a PWM solenoid for controlling hydraulic pressure in a differential pressure control system (e.g., see col. 7, ll. 34-38 as well as fig. 19). Here, the term solenoid is used to describe an electromagnetic actuator and valve assembly. By opening and closing the valve at a suitably high frequency, the effective oil pressure output from this solenoid and valve assembly is proportional to the PWM excitation duty cycle. This type of PWM solenoid operated valve assembly was well known as a pressure or flow regulating actuator before the filing date of the '738 patent (e.g., see *Understanding Automotive Electronics*, pp. 5-36 to 5-42).

20. On the other hand, the variable area type of solenoid is constructed with an essentially constant air gap and variable armature/core overlap. It is this type of solenoid that is used in the preferred embodiment of the '738 patent. It has the property that the force of electromagnetic origin is substantially independent of the armature axial position. This force on the armature varies in proportion to the current through the coil, and therefore it is termed variable force solenoid.

21. The independence of the force on the armature with distance means that this displacement, when acting against a linear spring, allows for very precise armature positioning. Further, since the armature and spool are functionally connected, corresponding precise spool positioning is achieved.

6

22. At the time of the '738 filing, variable force solenoids were known in other areas. In fact, the examiner cited and relied on the Hendrixon patent (USP 5,000,420) as a listed reference. Hendrixon uses the term 'solenoid valve with a variable force motor' and describes a solenoid in which the armature position is precisely determined by the balance between an electromagnetic force and a linear spring. Both the PTO Examiner and the applicants for the '738 patent agreed that Hendrixon is an example of a variable force solenoid.

23. The Hendrixon VFS achieves a force characteristic in which the armature displacement varies substantially linearly with current (see col. 2, ll. 28-34). This is achieved via a carefully designed structure in which a ferromagnetic ball resides within a cylindrical pole piece of the electromagnet. The opposite pole piece is a section of a conic structure having a concave spherical end the axis of which passes through the center of the ferromagnetic ball.

24. In his examination of the disclosure that led to the '738 patent, the examiner had many references with teachings that are similar to those of the prior art brought forward by Hitachi. It is my opinion that the references relied on by Kuhn and Livernois do not provide any new teachings that are not found in the prior art cited by the examiner. Further, it is my opinion that Hitachi has not come forward with any combination of references not available from the cited art.

25. For example, the examiner had the Imai '289 patent which incorporates an actuator of a "known current proportional type" that is connected to the spool of a spool valve (see col. 4, lines 24-27). Furthermore, although the VCT system disclosed in '289 has a controller, it is an open loop controller. There is no disclosure of sensing means for determining the phase angle

7

difference between the camshaft and crankshaft position as would be required for closed loop control as taught by '738. Although Imai has a crank angle sensor to determine rpm and a airflow meter to determine load, there is no camshaft sensor from which camshaft phase can be determined. Furthermore, there is no need for closed loop control with the system operation as disclosed in '289.

26. Various prior art references cited by Hitachi allegedly invalidating the '738 patent are similar to the Imai '289 patent including Hara, Tsuruta, Bruss, and Kawamoto. These references teach the use of a solenoid in which the armature displacement is proportional to the current through the coil. However, none discloses a closed loop system as taught by the '738 patent. There is no mention in Hara, Tsuruta or Kawamoto of determining the relative camshaft and crankshaft position measurements, which are fundamental to closed loop control. Although Bruss discloses sensors for measuring camshaft position, and a reference signal that indicates a maximum possible angular displacement of the camshaft (not the crankshaft), there is no disclosure of the computation of camshaft phase in an ECU nor is there a generation of an actuator control signal corresponding to this phase as required by '738.

27. If the disclosure of a proportional-type solenoid either by itself or in combination with an open loop controller were to be the bases of the rejection of the application leading to the '738 patent, then Imai could have been used for this purpose with the conventional VCT systems shown in the cited art, such as the Butterfield '659 patent. The Hara, Tsuruta, Kawamoto and Bruss references, which are combined with other references, add nothing new to an alleged invalidity allegation over Imai in combination with the cited references.

8

28. Another point made by Dr. Livernois in his report that I disagree with is on page 24, para. 92. Dr. Livernois states that "[i]n order to provide the spool positions shown in Figures 3 and 5 (which allow for 3 positions), the electromagnetic actuator must be of the proportional type rather than an on-off type." That is not necessarily so. A 3-position spool valve can readily be accomplished with a pair of variable gap (*i.e.*, binary state) solenoids and centering springs. The springs can be arranged such that when neither solenoid is activated, the spool is in a center position. This pair of solenoids can be arranged such that when one is activated it moves the spool to one of its 3 positions (*e.g.*, left of center) and when the other is activated it moves to the opposite position (*e.g.*, off center to the right). Thus, one of skill would recognize that Bruss does not inherently teach a proportional solenoid. Also, the Bruss spool valve is moved against a pair of different sized springs that are in series between a plate, so that "three defined positions of the slide [spool] can be obtained" (col. 3, line 67 - col. 3, line 1). Thus, the positions are achieved by the use of the two springs, and possibly two binary state solenoids acting in tandem. It is not necessary that Bruss use a proportional solenoid.

29. The Butterfield '659 patent was another reference cited by the examiner during the '738 prosecution. This patent discloses all of the basic structure of the variable camshaft timing system. It differs significantly from the '738 patent in the actuator means and structure. Unlike the '738 VCT system, it utilizes a differential pressure type actuator to move the spool rather than a variable force solenoid connected to the vented spool as taught by '738. The differential pressure (acting on a piston assembly) is achieved by varying the pressure on one side of the piston assembly via a PWM solenoid. The examiner recognized that the '659 patent did not anticipate the '738 patent owing to the important differences recited above. The invalidity

9

arguments proposed by Hitachi offer nothing new over the rejection arguments made by the examiner with respect to the '659 reference in combination with various references that show different types of proportional solenoids and/or spool valves.

30. The application that led to the '738 patent discussed various prior art references including a differential pressure actuator as part of a differential pressure control system (DPCS). I am assuming that these references were considered to be known and understood by a person of ordinary skill in the art. Of particular interest is a VCT system disclosed in the '578 patent (cited in the application for '738) that taught closed loop control, albeit for a DPCS. Other references cited by and applied by the examiner that disclose closed loop control include Linder '477 and Kano '360. That is, the examiner knew of the use of closed loop control in a VCT and did not reject '738 either on the basis of anticipation (§ 102) or obviousness (§ 103), in combination with other references.

31. The examiner also had available to him prior art references showing a "proportional solenoid valve." For example the Imai '289 patent makes reference to such a valve (see col. 4 ll. 24-27). Imai discusses: "an actuator 55 is of a known current proportional type in which the axial motion of the valve spool varies in proportion to the electrical current supplier to the actuator 55." *Id.* This particular reference has an open loop control with only two camshaft phase positions based upon engine load. The examiner did not reject the '738 application either on anticipation grounds or on the basis of the alleged obviousness (§ 103) of a proportional solenoid valve reference in combination with any other available reference (e.g. Quinn '578). This description of a proportional solenoid valve in Imai is nearly identical to the description of a proportional solenoid valve in the prior art references proposed by Hitachi, such as Hara.

32. The examiner also had available to him (as a cited reference) the Kano '360 patent which showed an actuator based upon a pair of on-off solenoid valves that yield a "linear output." This actuator is incorporated into a "linear control" VCT system. Of course, this type of linear solenoid is not the claimed combination of '738. For that reason, the mere use of the term "linear" in conjunction with a solenoid, as found in some of the Hitachi references (e.g., the Butterfield article, Kawamoto) does not provide a description of a variable force solenoid as used in the '738 patent.

33. It should be noted that other types of actuators than the VFS were known at the time of the '738 application filing. These include, for example, stepper motors. The Karpis '141 patent, which shows motor driven actuation in a VCT, was cited in the '738 patent and available to the examiner. The examiner recognized that motor driven valves are different from solenoid driven valves. Electric motors and solenoids are alike only in that they produce a mechanical output from an electrical input. However, they operate in fundamentally different ways both in terms of the electrical input signal and the mechanical output. In the prosecution, the Examiner was provided with pages from the Wiley Engineer's Desk Reference that explain the difference between "motor actuators" and "solenoid valves."

34. As discussed above, a solenoid (either variable gap or variable area) produces as an output the displacement in response to an electromechanical force along an axial direction of the armature. This armature can be attached directly to another structure such as the spool valve in a VCT actuation mechanism causing a corresponding displacement of that spool.

11

35. An electric motor is also an electromechanical device, but its output is the rotation of a shaft in response to an electromechanical torque.  To be useful in VCT actuation (i.e., displacement of the spool), the rotary motion must be converted to the required linear displacement via some mechanism (e.g., helical gear set).

36. The input to a solenoid is an electrical signal that can be characterized by the current through its coil or its terminal voltage.  In the case of a variable force solenoid (of the variable area type) the instantaneous electromechanical force on the armature increases in proportion to the current. In an idealized model, this force is proportional to the square of the current. Although there are multiple forms of excitation of a variable force solenoid ("VFS"), at least one excitation is a steady current that corresponds to a desired axial displacement of the armature.  That is to say, a VFS is a direct current to force actuator having the capability to be a direct current to displacement transducer.

37. A motor, on the other hand is a variable rate actuator in which the rate of change of the rotor angular displacement varies with input signal.  For certain types of d-c electric motors, the rotor speed varies with input voltage.  However, the relationship between speed and voltage is highly dependent upon the load characteristics.  For use in a VCT actuator, the electric motor would be operated by a controller until the desired displacement of the spool was achieved.  That is to say, in practice, to achieve a desired spool displacement, a separate controller with spool displacement measurement would be required in order to precisely regulate the spool to its desired position.  Thus an electric motor can not be directly substituted for a solenoid.  Rather, a different actuator system requiring a major redesign of the actuator would be required.  Although this discussion is based on the DC motor, there are many types of motors (e.g., brushless DC

12

motor or stepper motor) that would have the same limitations as the DC motor in terms of direct substitution for a solenoid.

38. The examiner also had references available showing a vented spool in a VCT system. For example, the Butterfield '659 patent which was cited in '738 shows a vented spool as an alternative embodiment (see Fig. 21). Although this reference shows a vented spool, it is in the context of a DPCS VCT system. It was not viewed (by the examiner) to invalidate '738 either by anticipation or by obviousness in combination with any other set of references.

39. The Kuhn report argues that '738 is invalid by obviousness with various combinations of references. None of these combinations of references offers anything new over what was available to and used by the examiner in the prosecution of the '738 patent.

40. Kuhn's and Livernois's reports on invalidity offer various combinations of references in an attempt to argue that the asserted claims of the '738 patent were obvious. Each primary reference of a proposed combination had missing elements, thus precluding that reference from anticipating the '738 patent. Kuhn and Livernois argue that the missing elements are found in various secondary references whose combination, they argue, makes '738 obvious.

41. Assuming arguendo that such combinations are consistent with the legal standards for a § 103 invalidity argument, the combinations offer nothing new over the references used by the examiner in the prosecution of the '738 patent. I have been told by attorneys for BorgWarner that the methods used by Kuhn and Livernois of selecting various features from secondary references to achieve their obviousness argument in combination with the primary references, without identifying the motivation or teaching to make this combination, are, in fact,

13

inconsistent with legal standards. I have been informed that it is not appropriate to use the asserted claims of the '738 patent as a blueprint to go back and search out various features in different references.

42. Another issue in dispute between the parties of this lawsuit involves the power source for moving the camshaft/vane assembly relative to the housing. Hitachi's consultants discuss at length camshaft torque pulse activation (CTA) and oil pressure activation (OPA). But they fail to note that during the prosecution of the '738 patent, the examiner rejected the claims using references for both CTA and OPA. For example, at least one embodiment of the Butterfield '659 reference was CTA. The Strauber '774 reference is an example of OPA. There is no doubt that either of these activation methods are capable of moving the camshaft as required for variable camshaft phasing.

43. Another major issue of dispute involves the statement in the prosecution history regarding whether the Strauber patent "controls the flow of oil both internal and external to the VCT mechanism," in contrast to the invention that "controls the flow of oil internal to the VCT mechanism only." For this issue, however, Hitachi has not clearly identified what "internal to the VCT mechanism" means. In the applicants' response to the first PTO office action, they assert that "Further, the Strauber et al. system controls the flow of oil both internal to and external to the VCT mechanism. The present invention controls the flow of oil internal to the VCT mechanism only." Apparently Hitachi is asserting that "controls internal" was a disclaimer of non-CTA-type VCT systems, but I disagree.

14

44. A careful examination of this statement by the applicants reveals that it relates to control of fluid flow, not to the issue of supplying the energy to move the camshaft. Strauber differs significantly from the '738 patent because it discloses a common on-off solenoid that permits control of a spool only between two positions. Strauber also describes a system in which oil is present on external ends of a spool and flows through passages at these ends. In Strauber, oil is present on the left end of the spool and in the radial bore 35 through which it flows when the spool (called a "piston" in the '774 patent) is in its initial position as shown in Figure 1. Oil is also present on the external end of the spool when the spool is in its working position (not shown in the figures). Oil must flow down the center passage of the spool when the system is changing phase, and thus there may be pressure that develops due to viscous flow that could appear on the end of the spool. The amount of pressure developed during phase change would depend upon the oil viscosity and the size of the central passageway though which it must flow. The '738 patent discloses an oil flow control system (as part of a VCT) in which the oil flows only within internal lands and not along external ends of the spool. This is perhaps the reason the applicants made the statement about "internal to the VCT mechanism."

45. Strauber is significantly different than the '738 patent and could have been distinguished on numerous points. For example, Strauber is an open loop system with two positions for camshaft phasing, as contrasted with the continuously adjustable closed loop system of the '738 disclosure. Furthermore, if the applicants had disclaimed OPA-type VCT systems by the above statement, then the examiner would not have continued to apply Strauber after the response to the first office action. This is because the Examiner combined several references (Butterfield '659, Linder, Strauber and Hendrixon) to reject the claims. If the applicants had "disclaimed"

15

CTA systems with the above comments, Strauber would no longer have been relevant, as it is an OPA system. However, the Examiner continued to reject the claims based on Strauber, which indicates that the Examiner considered the claims to cover OPA systems.

46. Another feature of the '738 patent is the use of a variable force solenoid (VFS) to move the vented spool. The examiner had available to him during the '738 prosecution at least one reference showing a VFS in a solenoid-activated spool valve assembly. That reference was the Hendrixon '420 patent, and it was applied by the examiner.

47. The applicants agreed that Hendrixon disclosed a VFS. However the spool was not vented in the Hendrixon valve assembly as required in the '738 patent. As pointed out by the applicants in the appeal brief filed after the third PTO office action "Clearly, there is engine oil present in cavity 84 at control pressure which acts on spool land 62 and counteracts the force of the solenoid on spool land 60." That is to say, the actuator calibration depends upon oil pressure. The fact that the '738 patent was allowed in the light of VFS art shows that a reference showing a VFS in combination with other relevant art is not sufficient to invalidate the '738. The VFS art cited by Hitachi offers nothing new over that which was available to the examiner.

48. The Butterfield article is listed by Hitachi among its prior art references. I understand that Mr. Kuhn contends that this reference, as well as a couple of others would have been "highly significant" to the Examiner in analyzing claims 10 and 11 of the '738 patent. I disagree. For one thing, I have been informed that a reference is cumulative to other references if it "teaches no more than what a reasonable examiner would consider to be taught by the prior art already before the PTO." On this basis, I believe that the Butterfield reference is cumulative to the Imai

patent and the Butterfield '659 patent, both of which were cited in the '738 patent. The '659 patent teaches a VCT system in which a DPCS actuator is shown. The Butterfield reference does mention in one sentence that a linear proportional solenoid can be used as a possible actuator; however, the system disclosed in the Butterfield reference operates using a spool valve in which the solenoid force must work against oil pressure against the external ends of the spool, and the spool is not vented. Hence, critical features of the '738 patent are still missing. The Examiner also had the Kano reference that showed linear control, and the Examiner specifically cited the Hendrixon reference as showing "linear control." Thus, the Examiner had references teaching "linear" solenoid valves.

49. Hitachi appears to believe that any reference to the term linear proportional solenoid must necessarily refer to a VFS. I disagree with this inference for the following reasons. The term "linear solenoid valve" appears in the Hitachi patent JP 8-285,119. This reference clearly discloses an on-off (i.e. binary state) solenoid that has also been termed a PWM solenoid. The linearity achieved here is in the relationship between the control signal characteristics and the hydraulic output.

50. Another example of "linear control" via switched binary state solenoids is in the Kano '360 patent. This reference, which was cited in the '738 patent, shows an actuator constructed from the two on-off solenoids that are activated by variable duty cycle (i.e., PWM) signals. In this reference, the variable hydraulic pressure moves a piston structure axially, which motion is converted to rotary motion via a helical gear assembly.

17

51. The above examples illustrate that the terms "linear solenoid" or "linear solenoid valve" do not necessarily refer only to a VFS solenoid. All of these terms are context dependent for their meaning.

52. Hitachi contends that a VFS solenoid can be substituted for a PWM (*i.e.*, on-off) solenoid in a DPCS system. In one implementation, the VFS solenoid can be operated by a binary state variable duly cycle (PWM) signal. Of course, this implementation does not take advantage of its ability for the armature to be continuously adjusted. More importantly, the substitution of the VFS for the on-off solenoid still results in a DPCS system.

53. Another example of the use of a VFS in a DPCS system is found in an embodiment of the Rembold application (DE 4037 8211 Ar). This reference has been cited by Hitachi as a member of its set of VFS prior art references. However, this reference also offers nothing new over the Butterfield '659 patent which is also a DPCS VCT and was cited in '738 and used by the examiner. The Rembold reference shows that mere substitution of a VFS for an on-off solenoid in a DPCS still results in a DPCS system, and not the system claimed in the '738 patent.

54. Another reference cited by Hitachi is the Bruss '825 patent. Of course, this is not a vane type VCT system so it is not anticipatory of '738. In addition, the valve which controls camshaft angular position is not continuously adjustable. Rather, it has 3 positions that are determined by differential pressure. This differential pressure is, in turn, controlled by the state of two on-off (*i.e.*, binary state) solenoids.

55. Furthermore, unlike the '738 patent, in which control is achieved using the ECU, the Bruss system uses a counter as well as a reference signal indicative of a maximum angular camshaft displacement. There is no calculation of an instantaneous camshaft phase.

56. There is no explanation in the Kuhn report of what specific system is to be substituted for this system in the Bruss patent. Nor is there an explanation of the redesign of that system, or how Bruss is to be modified to allow use of the redesigned system. In addition there is no motivation shown in the Kuhn report for these redesigns and the combination of the two systems.

57. Even, if a VFS were somehow substituted for the two solenoid operated valves, the spool in Bruss is not vented. Rather it is moved through its three positions by differential pressure. That is Bruss teaches away from the '738 patent. There is no teaching or even suggestion of a VFS or a proportional valve in Bruss.

58. In addition, the Bruss reference is cumulative to Imai (which has a VFS in a VCT) and Hendrixon (which has a VFS) in combination with the '659 patent, all of which were available to the examiner.

59. Another reference offered by Kuhn as allegedly invalidating the '738 patent is the Kawamoto patent USP 4,862,843. However, this patent alone cannot anticipate the '738 patent because, among other deficiencies, it has a helical gear type, and is not a vane type VCT. Furthermore, there is no teaching of the measurement of instantaneous camshaft phase nor any mention of sensors. The only mention of a control is with respect to the preferred embodiment of fig. 1. However, this embodiment uses a pair of binary state solenoids in a DPCS actuation system. Differential pressure in chambers 61 and 62 move piston 59 to adjust the axial position of the

spool 30. There is considerable uncertainty in this patent about the exact nature of the spool

movement. On the one hand, Kawamoto says the spool is continuously variable. On the other

hand, in col. 5 ll. 15 and 16 he says, "The spool 30 is axially movable between 3 positions." In

my opinion, three positions is not synonymous with continuously variable.

60. With respect to the embodiment of fig. 3 (the primary focus in Kuhn), Kawamoto states that

an "electric actuator 70 serves to move the shaft 7 and hence the spool 30 into a desired axial

position, i.e. one of the cutoff, supply and release positions referred to above . . ." One of the

stated choices for this actuator is "a linear solenoid." However, as explained above the term

linear solenoid doesn't necessarily imply a VFS. According to Livernois (para. 75), a linear

solenoid (of the VFS type) requires a spring acting against the armature or the spool. There is no

such spring in the embodiments or teachings of Kawamoto. The only spring present in the

control portion of 843 acts on the sleeve 29.

61. At best Kawamoto is cumulative to Imai which teaches the use of a proportional solenoid

valve. That is, Kawamoto adds nothing to the features of '738 that were available to the

examiner.

62. Yet another reference that is supposed to invalidate the '738 patent according to Kuhn is the

Hara '442 patent. I have been told by attorneys for Borg Warner that there is a possibility that

this reference is not prior art based on the filing date. However, in the event it is shown to be

prior art, I include it in this report.

63. This reference cannot by itself anticipate the '738 patent (as asserted by Kuhn) because

among other reasons it is a helical type, not a vane type VCT system. In addition there is no

teaching of the calculation of camshaft phase angle from sensor measurements of camshaft and crankshaft angular positions. No camshaft sensor is provided.

64. Moreover, there is no teaching of closed loop control of camshaft phase. In fact, this patent only teaches a few phase values which do not require closed loop control.

65. In addition, although the spool has a vent 65 at the front through which oil must flow when the system is changing phase, there may be pressure developed due to viscous flow that could appear on the opposite end of the spool. The amount of pressure developed during phase change would depend upon the oil viscosity and the sizes of the passageways through which it must flow. This pressure could affect the calibration of the actuator if a VFS solenoid were to be used.

66. The Hara '442 patent is, I believe, cumulative to Imai. It teaches the use of a proportional solenoid valve and it does not disclose closed loop control of camshaft phase based upon measurements of camshaft and crankshaft angular positions.

67. The Kuhn report argues that the Butterfield '735 patent in combination with any variable force solenoid reference renders '738 invalid by obviousness. I have been informed by attorneys for BorgWarner that this reference may not be prior art because of Quinn inventions. However, for the purposes of this report and its associated analysis, I will assume that it is.

68. This reference is cumulative to the Butterfield '659 patent. It is the same type of vane VCT system. This reference shows two embodiments: 1) a DPCS actuated system and 2) a stepper motor actuated system. The DPCS embodiment is cumulative to the '659 patent. The stepper motor is not a solenoid valve. It is a different, typically much slower-acting actuation means

21

than any solenoid actuation. Moreover, the examiner already had stepper motor art in the Karpis '141 patent that was cited in the '738 patent. The examiner would have understood the difference between a solenoid and a stepper motor, as he also had the Wiley Desk Reference which describes the differences between a motor actuator and a solenoid valve.

69. The examiner would also have had a vented spool through the '659 cited reference. Figure 21 shows a DPCS type system in which oil pressure is removed from the end of the spool.

70. Another reference in the Kuhn invalidity report is known as the Ford Zeta sales. I have been informed that this may not be prior art but, for this report, I assume that it is. According to Kuhn, the Ford Zeta VCT system in combination with any of the VFS art would invalidate the '738 patent on obviousness (§ 103) grounds.

71. However, from reading the Butterfield deposition and the Borg Warner provided documents, it is clear that the Ford Zeta system was not a vane type VCT. Furthermore, it used a stepper motor to actuate the spool valve rather than a VFS solenoid. As explained above in the analysis of the Butterfield '735 patent, a stepper motor is different from a solenoid.

72. In his report, Kuhn has not identified the particular documents that describe a specific prototype or set of prototypes that were supplied to Ford. Consequently, it is not possible to respond in detail to his assertions that are based upon generalized testimony about work done with Ford.

73. The examiner had references that incorporated a stepper motor in a VCT system (e.g. see Karpis that was cited in the '738 patent). As stated above, the examiner had multiple references

showing VFS art. Thus, the Ford Zeta adds nothing new to art that was available to the examiner.

74. Yet another reference given by Kuhn in his report is the Schechter '443 patent. He asserts that this patent in combination with any VFS art renders '738 invalid on obviousness grounds. Although I am informed that this may not be prior art based on the filing date, I assume that it is prior art for this report.

The '443 patent shows a helical type rather than vane type VCT. There is no disclosure of closed loop control based upon sensors for measuring camshaft and crankshaft positions and calculation therefrom of camshaft phase in an ECU (which is also not shown). There is no discussion of the actuation means for moving the valve 36. Contrary to the assertion of Kuhn, the spool is not vented. The passage 80 is simply a drain and does not relieve pressure on the rear face of the spool. At best, this reference is cumulative to Imai which was available to the examiner.

75. There are three references, each of which in combination with any VFS art, are asserted by Kuhn to invalidate '738 by obviousness. These three (Quinn '578, Quinn '805 and Becker '804) can be dealt with together. All three of these are DPCS type VCT systems which is the specific prior art system distinguished in the '738 specification. The '578 and '804 were cited in '738 and the Quinn '805 is a continuation in part of the '578 and adds no relevant information to the '738. None of these references show a vented spool nor removal of pressure from the back of the spool.

23

76. Kuhn has suggested that for each of these references it would have been obvious to replace the hydraulic-based actuator with a VFS solenoid. However, in each of these references the only viable direct substitution would be to replace the PWM solenoid with a VFS solenoid. A VFS solenoid can be operated in a PWM manner by providing a binary state excitation (*i.e.,* an on-off voltage signal). At sufficiently low frequency, the VFS solenoid armature would move through its full stroke during each excitation cycle. However, this substitution would not yield the '738 invention. It would still be a DPCS system that is the prior art described in the '738 specification.

77. Any other use of a VFS solenoid (*e.g.,* using it at normal excitation frequencies) would require a redesign of the configurations of these references. Without the benefit of the '738 patent and its explanation of how to have VFS replace DPCS actuation, one of skill would not have been motivated or have the understanding to make this change. In addition, the examiner could have made the substitution suggested by Kuhn using these three references and Imai or Hendrixon. The fact that he did not suggests that the claims are not obvious in light of this proposed combination.

78. Another reference in the Kuhn report, which Kuhn asserts in combination with any VFS art renders '738 invalid by obviousness, is the Smith '192 patent. This reference teaches a DPCS VCT system. It is similar to the prior art cited in the '738 specification and distinguished from the invention of the '738 patent. It has no vented spool and is cumulative to the '659, the Imai and Hendrixon.

24

79. Kuhn correctly identifies that this patent teaches closed loop control (see 2:22-23). However, he asserts that this loop is closed around camshaft phase. There is no direct teaching in '192 of closing the loop around camshaft phase via camshaft and crankshaft position measurements and calculation of phase. The loop could also be closed around a different performance variable. The specific closed loop feature is not the object of '192. Rather this patent features a "control valve with a flow area vs. spool valve position which is approximately hyperbolic (see 2:22-25).

80. Kuhn has presented a listing of vented spool art references. However these cannot be applied directly in most of the primary references he has given for his obviousness combinations. It is not possible at this time to provide a substantive response to these various combinations until it is known how the references are combined, what modifications are required for each vented spool reference to be combined with the corresponding primary reference and what the motivation is for making the combination.

81. An example of the "vented spool" art given in the Kuhn report is the Miura '885 patent. This patent teaches a simple on-off solenoid operated valve with a single inlet and return. The solenoid itself is a binary state solenoid.

82. This solenoid valve could not directly be used in a VCT system since it has only a single inlet and outlet and could not be used to advance and retard the camshaft phase. That is, it would not be possible with this valve to control the flow of oil (under pressure) to either side of a vane in a VCT actuator.

83. Kuhn has offered no explanation of how this valve either with or without modification could be used in any VCT primary reference. Even the substitution of a VFS solenoid for the on-off

25

solenoid does not yield a valve assembly that can be used in combination with any primary reference listed by Kuhn to make '738 obvious.

84. Another reference presented by Kuhn as representative of the vented spool art is the Akasaka '773 patent. The VCT system in this patent has a two position solenoid valve assembly. It has no teaching or disclosure of any closed loop control based on sensing camshaft and crankshaft positions and calculating the camshaft phase. The spool 28 does not permit two-way flow of oil and is not useful without major modification for use with any of the primary references listed by Kuhn. Until the details are presented of how this two-position solenoid valve is to be used with any given primary reference it is not possible to complete the present analysis.

85. The Barnes '947 patent is yet another example of the "vented spool" art given by Kuhn that can supposedly be combined with various primary references to invalidate '738 by obviousness. This is, in fact, a patent licensed to Cessna aircraft with application for flow control of a fluid under pressure. It is not a part of a VCT system. It discloses a proportional control valve in which fluid flow is controlled from a single source through a valve to a single outlet. For a given pressure source the volume flow rate varies in proportion to the current through the proportional solenoid coil.

86. Without a major redesign, which has not been explained by Kuhn, it could not be used in a vane type VCT. There is no motivation for the combination of this reference with any primary VCT reference. In fact it teaches away from the '738 patent.

26

87. The Getman '024 patent is another example of "vented spool" art according to Kuhn, who asserts that this reference could be combined with any of his primary references to invalidate '738 by obviousness.

88. How this reference is to be used in combination with a primary VCT reference is impossible to see. It is a manually-operated spool valve. Unless the driver is included in some bizarre cybernetic control system, this reference cannot be combined with any primary reference to yield a closed loop VCT system.

89. In a style similar to that used for the "vented spool" art, Kuhn along with Livernois have provided a list of references in the "variable force solenoid" art. These references, they assert, can provide missing VFS features when combined with various primary references. Kuhn asserts that the relevant combination render '738 invalid by obviousness.

90. Unfortunately, neither Kuhn nor Livernois explained how to combine the many VFS valves with any particular primary reference. In each case, major redesign (not explained by them) would be required so that the two systems could function together to achieve a VCT of the '738 type. Neither do they explain the motivation to make the combination.

91. It has been explained above with respect to the Butterfield article that the term "linear solenoid" does not necessarily imply a VFS. For example, the cited reference Kano '360 has "linear control" but this is achieved using binary state solenoids "operated under duly cycle control" (see 4:32).

92. Certain Hitachi's patents use the term "linear solenoid" or "linear" for systems that use binary state solenoids in which the armature operates over its full stroke for each excitation cycle. *See, e.g.,* JP 10-169,828, and JP 8-285,110.

93. The Kawamoto '843 patent uses the term "linear solenoid" but does not provide a description of the structure. Livernois at para. 75 asserts that there must be a spring acting on the armature/spool in order to have a proportional valve. In fact, Kawamoto does not have such a spring.

94. Rembold teaches that a VFS can be used to replace the PWM solenoid in his VCT system. However, this is still a DPCS-type of actuation and is teaching away from the '738 patent.

95. Another reference given by Kuhn/Livernois in the supposed VFS art is the Tsuruta '290 patent. Tsuruta teaches a three-position VCT (*i.e.*, 3 possible camshaft phases). There is no teaching of closed loop control as taught in '738 as there is no camshaft sensor from which camshaft instantaneous phase can be calculated in an ECU. The preferred embodiment of this patent uses a pair of binary state solenoid operated valves. The alternate embodiment incorporates a three-position spool that Livernois assumes is driven by a VFS. However there is no specific teaching of such a solenoid. The three positions of the spool can be achieved using a pair of binary solenoids acting in tandem. The first solenoid would be activated by the first current to achieve the position shown in fig. 8 resulting in a phase advance to the intermediate valve. The second binary state solenoid would be activated by the second current (supplied to the second coil) causing its armature which captures the first solenoid armature and moves the combined assembly. The "second control signal" would necessarily be greater in strength than

28

the first since it must work against a greater force. At the most, Tsuruta is cumulative to Imai which was available to the examiner. To the extent that the solenoid might be a VFS, it is also cumulative to Hendrixon.

96. The Barnes '947 patent is also suggested by Kuhn/Livernois as exemplary VFS art. The Barnes patent does teach a VFS. However, it is in the context of a fluid flow rate controlling actuator and is not within the VCT art. There is no hint or suggestion in this patent for combining it with the proffered primary reference. Furthermore, a POSA working in the VCT field would not, I believe, look to fluid flow control actuators for help in solving his problem. That is, there is no motivation for making the combination suggested by Kuhn/Livernois.

97. The Nishimiya '959 patent is yet another exemplary VFS art offered by Kuhn/Livernois. As in the case of Barnes this is outside of the field of VCT art and is simply a VFS actuated valve. It is cumulative to Hendrixon and contains no hint or suggestion of an application in a VCT. My same comments with respect to combinations in the Barnes analysis apply here as well.

The '332, '503 and '658 Everett patents are also asserted by Kuhn/Livernois as VFS art that can be combined with various primary references to invalidate '738 by obviousness. None of these three references are within or pertain directly to VCT systems. The '332 patent teaches a linear displacement solenoid and is not tied to any particular application such as spool valve displacement. The '503 patent teaches a linearly proportional solenoid that is coupled to a proportional spool valve. The '658 patent is an advance over the '332 in terms of linearity and calibration. It is not tied to any specific application. These three patents are cumulative to

Hendrixon in VFS art adding nothing new. There is no hint or suggestion that would motivate the combinations suggested by Kuhn/Livernois.

98. The Hutchings '196 patent is similarly offered by Kuhn/Livernois as VFS art that can supposedly be combined with various primary references to invalidate '738 by obviousness. This patent teaches a proportional solenoid controlled valve whose intended application is in fluid flow control. This reference is cumulative to Hendrixon.

99. The Lequesne IEEE Trans on Industry Applications article has been offered by Kuhn/Livernois as exemplary VFS art that, in combination with various primary references is supposed to render '738 invalid by obviousness. This article is primarily an analytical paper in which magnetic flux density is found by finite element solution of the magnetic vector potential equation for a specific solenoid configuration. Force is computed from the dyadic Maxwell stress tensor. Although this paper does offer help in improving solenoid design in achieving constant force vs. stroke, it is via optimization of parameters in a fixed structure. It offers little practically useful insight for arbitrary design configurations. There is no hint or suggestion in this paper that would motivate the combinations suggested by Kuhn/Livernois. This paper is, at most, cumulative to Hendrixon.

100.    Livernois, at para. 173, argues that the prior art references demonstrate the known interchangeability between hydraulics and electromechanical approaches to moving a spool. I have been informed that the legal standard for interchangeability of one component and a second is that the second can be directly substituted for the other in a system without affecting the performance of the system. For example, one type of electromechanical solenoid could be

substituted for another in a DPCS system. For instance, low frequency PWM excitation could drive a VFS and result in binary state operation as it would for a binary state on/off solenoid. Identical VCT system performance could be achieved by this substitution, but the system would continue to be a DPCS, and it would not achieve continuously variable positioning of the spool.

101.    I disagree with Livernois' suggestion that replacing an electrohydraulic actuation scheme with the electromechanical (VFS) would be one of simple interchangeability. These are different approaches to actuation and would require substantial redesign.

102.    Livernois points to the Butterfield article in which it is stated that "other methods [of controlling the VCT] could include a linear proportional solenoid . . ." However Butterfield was not thereby suggesting interchangeability. He was merely listing other actuation technologies. Moreover, if the Butterfield VCT system were redesigned somehow with VFS, it is still be DPCS actuation system lacking a vented spool.

103.    At para. 179, Livernois states that VFS was a well known alternative for other solenoids or stepper motor actuators. Although these are all actuators, each has its own set of performance characteristics. Each actuation application situation places performance requirements that may not be met acceptably by all of these choices. For example, the dynamic response requirements for a given application may well not be met by a stepper motor, but may be met with a VFS. As a result, they are not simply interchangeable.

104.    Livernois argues that there are several prior art references that teach sensing camshaft and crankshaft angular positions, calculating camshaft relative phase angle and issuing a control signal to reach the desired relative phase angle. While I agree that there is a set of prior art in

31

which closed loop control is applied to VCT systems, there is more to the '738 patent than simply adding closed loop control to an existing VCT. Moreover, the examiner had prior art references of closed loop control of a VCT system (e.g. '578 patent). In particular, he cited numerous references similar to the OEM design on the Renold camshaft phase controller. However, each of the references relied on by Livernois has a helical gear type, not a vane type VCT actuator. Each uses a DPCS controlled via binary state solenoids. This art discloses features which the examiner knew about and over which the '738 claims were allowed.

105.    For example, the Bauer '194 patent teaches a closed loop theory and only refers to the actuation structure by reference to patent 4,744,338. This reference is cumulative to Kano '360 which also shows closed loop control and was before the examiner.

106.    The Linder '477 patent is another prior art reference showing closed loop control at a VCT system. Although this patent teaches such closed loop control it doesn't specifically describe camshaft and crankshaft position measurements and the calculation from these of camshaft phase. Furthermore, it uses binary state, not VFS solenoids. This patent was cited by the PTO Examiner in the '738 patent.

107.    The Suga '106 patent is another example of closed loop control of a VCT system. However, this reference is not a vane type VCT. Rather it uses differential piston produced torque to rotate the camshaft 16 relative to the drive 10. It uses a binary state solenoid driven valve operated for predetermined period of time to advance or retard the camshaft (see 7:10-17).

108.    Another referenced listed by Livernois showing closed loop control of a VCT is the Quinn '578 patent. This patent which was cited in the '738 specification for its teaching of

closed loop control. However, the actuation is DPCS and was certainly well known to the examiner.

109.    The Kano '755 patent is also given by Livernois as exemplary of closed loop control of a VCT system. This patent is very similar to Kano '360 which was cited by the examiner and applied during the '738 prosecution. This reference teaches control via a pair of binary state solenoids operating as PWM (variable duly cycle) control. The Kano '755 is at best cumulative to Kano '360.

110.    The Maurer '202 and Kolias '968 and JP 63-112 references offered by Livernois as teaching closed loop control of a VCT are each standard closed loop control systems. They are cumulative to Kano and Linder which were cited in '738.

111.    The Rembold DE 40 37 824 A1 German patent application is also given by Livernois as exemplary of closed loop control of VCT systems. However, as described earlier in this report, Rembold does not disclose closed loop control based upon sensing crankshaft and camshaft angular positions and calculating camshaft phase from these measurements. Rather, Rembold describes the DPCS actuation system that is used in a VCT application (as well as in others).

112.    In para. 263, Livernois asserts that there is a lack of disclosure concerning calibration errors. In particular, he observes that the '805 patent identifies difficulties associated with the '578 patent approach to VCT control: 1) phase measuring inaccuracies at engine startup and 2) incorrect sensor pulse detection when phase has been advanced beyond a certain point leads to gross errors in calculating camshaft phase.

113.    However, there is prior art available to a POSA that teaches self calibration of a VCT system. The Van Vuuran '640 patent teaches a method of self calibration. This reference explains that comparison of measured phase with known valves associated with dwell permits a phase error correction (or sensor self calibration) to be done.

114.    In addition, the Suga 5,117,785 patent teaches a locking mechanism that could prevent the incorrect phase measurement by holding the camshaft in a known position at engine start. A POSA would understand that various mechanisms are available. Thus, the lack of disclosure of the problems identified above would not limit the ability of a POSA to practice the '738 patent.

115.    At para. 229, Kuhn asserts that the written description of the '738 is inadequate for a POSA to practice the methods of claims 10 and 11 without using cam torque as an energy source. In making this assertion Kuhn makes a distinction between CTA and CPA. There is an implication in the Hitachi position that somehow OPA was unknown to the inventors of the '738 patent. This is simply not true. OPA systems for VCT were well known to the inventors. In the background section of '738 specification, the '02 and '578 patents are described and incorporated by reference into '738. The background section of the specification for the '023 patent describes prior art VCT systems that rely on "a separate hydraulic motor operated by engine lubricating oil." However, this actuating arrangement consumes significant additional energy (1:36-39). Figure 13 of this reference shows a return line 118 from a spool valve or a pressure regulator valve 116 that returns oil to the oil sump. I have been told by BorgWarner's lawyers that Hitachi stated in their motion papers that "using engine oil pump pressure and external flow to change the phase and without internal check valves in the VCT was well known in the art at the time of the filing of the '738 patent application." Hitachi is saying that OPA

34

systems were well known in the art, and thus one of skill in the art would understand the operation of those systems.

116.    In writing claims 10 and 11, the inventors recognized that their method could be applied to OPA based VCT systems as well as CTA based systems, or to hybrid systems (in which the energy to move the camshaft comes partly from oil pressure and partly from cam torque). The physical origin of the energy to pressurize the oil (be in the oil pump or cam torque reversals) was simply not relevant to the method steps of the claimed invention. The '738 patent clearly teaches that the main oil gallery delivers pressurized oil to the vane actuator – both at engine start up and continuously to provide make up oil. For example, claim 16 from the originally-filed specification clearly teaches that a "source of hydraulic fluid under pressure" is the MOG '230' and that hydraulic fluid is delivered from this source to the vane housing. (Original application, p. 24, claim 16).

117.    In para. 237, Kuhn asserts that the '738 patent does not teach or enable one to practice the invention (claims 10 and 11) under Hitachi's claim construction, in which a source can only be viewed as a recess/cylinder and the means in the preamble refers to only a sprocket and chain. Although I believe this claim construction ignores the fact that claims 10 and 11 can read on an OPA system, I assume that construction for this analysis. Kuhn asserts that "there is no disclosure of or even a need to also regulate flow from a source to a sprocket and chain . . ." I agree; Hitachi's proposed construction is contrary to the specification and the preferred embodiment. The specification describes the use of a belt in addition to a chain, 5:8-9 and 18-19, and a POSA would understand that oil would not be supplied to a belt for belt-driven camshafts.

35

118.    Reading the above claim recitation in the manner urged by Hitachi is, in fact, inconsistent with every description contained in the '738 patent specification and prosecution history. In no embodiment of the '738 patent does oil flow from a source (taking either Hitachi's or BorgWarner's construction of "source") to a chain or belt. One of skill in the automotive art would understand that a chain that is used with a camshaft and crankshaft must be lubricated, and that such lubrication typically occurs by the splashing of oil from the crankcase onto the chain. One of skill in the art would understand that all chain driven camshafts typically have oil supplied to the chain in this manner, including those systems described in the '738 patent.

119.    If the oil flowed from the source to the chain or belt, instead of to the vane housing, camshaft phasing could not be effectuated. The vanes would not be moved and the claimed phasing of the camshaft could not be accomplished. Thus, the preamble's recited goal of "varying the phase angle of a camshaft relative to a crankshaft" would not be accomplished, and the steps in the body of the claim would not be performed.

120.    I believe that one of skill would either view the language in the preamble of the claim as simply introductory and non-limiting or conclude that the corresponding structure for the means for transmitting rotary movement in the preamble includes the vane housing and recesses in the housing. This is where the fluid has to go for the contemplated adjustment of camshaft phase to be accomplished.

121.    I believe that asserted claim 10 and 11 are directed to a novel control system representing an improved VCT system. That improvement involves using a variable force solenoid and a vented spool (in a closed loop VCT). This improvement is applicable to OPA systems, CTA

systems, and hybrid systems. There is nothing about the addition of a variable force solenoid and vented spool that makes them incompatible with an OPA system. The system described in claims 10 and 11 of the '738 patent is fully compatible with an OPA system, a CTA system, or a hybrid system.

122.    I have been informed by the BorgWarner lawyers that Hitachi asserts that CTA does not rely on flow from the main engine oil circuit to provide energy to create the phase shift. Both CTA and OPA use pressurized oil to actuate or move the vanes. The only difference is that the oil is pressurized in OPA with an oil pump, which is operated by the engine, while in CTA the oil is pressurized by camshaft torsional energy, which is also generated by the engine. Borrowing terminology from BorgWarner, TA (torsional assist) is a hybrid, which incorporates aspects of both. All of these VCT systems use oil flow from the main engine oil circuit of MOG. If pressurized oil were not present in the VCT systems, the oil would not cause the vanes to move. In my view, Hitachi is relying on a distinction about how the oil is pressurized, but, in my opinion, that is immaterial to the '738 patent or the asserted claims. The ultimate energy source is engine combustion.

123.    Vane type VCT systems, such as disclosed in the '738 patent, would not operate without oil pressure in the vane recesses. In other words, if there were zero oil pressure in the vane recesses, the VCT system as taught by the '738 patent would not operate to change camshaft phase.

124.    I have been informed that Hitachi admits that "using engine oil pump pressure and external flow to change the phase and without internal check valves in the VCT was well known

in the art at the time of filing of the '738 patent application." I agree that one of skill would know how to utilize engine oil pump pressure in connection with the system disclosed in the '738 patent.

125.    In my opinion, the check valves shown in the figures of the '738 patent are not fundamental to the function of transmitting rotary movement to the camshaft relative to the crankshaft. They are merely part of a specific embodiment, but are not fundamental to the function of transmitting rotary movement. The key structures for performing this function are the actuators in the vane housing on the camshaft. This function could not be performed if the vane actuators were absent.

126.    I have reviewed materials (including, for example, BW 0131213-55) relating to BorgWarner's commercial embodiment, which I have been informed is marked with the '738 patent. From what I have reviewed, I believe that BorgWarner's commercial VCT product employs a hybrid torsional assist technology and, in my view, claims 10 and 11 of the '738 patent read on BorgWarner's product.

127.    I have been informed by attorneys for BorgWarner that Hitachi has raised a challenge to asserted claims 10 and 11 of the '738 patent based on grounds of 35 U.S.C. sec. 112. I understand that this section relates to the requirement that the patent specification contain a "written description" of the invention, which enables one of skill to make and use the invention. I have been informed that to meet the written description requirement, the disclosure must convey with reasonable clarity to those skilled in the art that the inventor was in possession of the invention.

38

128.   Based upon the disclosure if the '738 patent, including the patents incorporated by reference into the specification of the '738 patent, in my view, the inventors had possession of the invention claimed in claims 10 and 11. I think the plain language of the claims and the claim constructions urged by BorgWarner are consistent with the invention that Dr. Stan Quinn and Mr. Ed Siemon possessed and disclosed in the '738 patent. See my initial report on infringement, in which I comment on BorgWarner's claim constructions, for the specification cites in support of the various claim elements contained in claims 10 and 11. I believe that any POSA intending to develop a VCT system who had the 738 patent before him would be able to practice the invention regardless of whether this were to be a CTA or OPA (or hybrid system). All of the main features are clearly explained. The use of a VFS actuated vented spool valve is clearly explained in the 738 patent such that the POSA could develop the necessary structure. The use of crankshaft and camshaft sensors for measuring the angular positions of the engine component would be understood by a POSA from the '738 description. The method of calculating instantaneous camshaft phase from these position measurements would be known to a POSA. The structure for the means for transmitting rotary motion of the camshaft relative to the housing is readily understood from the many drawings (e.g., figs 10-20).

129.   From these descriptions in the 738 patent, the VCT system development would proceed in a manner similar to other new automotive technology. The determination of desired camshaft phase would come from a normal engine control development program including, perhaps, engine mapping on a dynamometer. The development of a control law for the system would be a normal engineering effort that would be understood by a POSA for a given set of performance requirements (typically from an automotive OEM).

130.    The POSA would further understand that if his design were for an OPA, the source could be the MOG.  He would understand that inlet and return lines connecting the actuation mechanism (in the housing) would be required.  The plumbing details would come from the system structure as well as the system performance requirements.

131.    The type of excitation of the VFS would be a designer's choice.  He could elect to use DC excitation or variable duty cycle excitations described in my report on infringement.

132.    I am informed by attorneys for BorgWarner that discovery may not yet be complete. There may be, for example, additional depositions to be taken and there may be additional documents and materials produced by Hitachi or third parties.  My opinions might possibly be affected by such sources or by additional arguments made by Hitachi.  In addition, I have been informed that the Court has not yet construed the legal meaning of the claims.  Consequently, I reserve the right to submit a supplemental report or reports.  I may also be asked to prepare a rebuttal report in the light of new information, and I reserve the right to prepare such a report.

Attorneys for BorgWarner have told me that I may also be called upon to testify about matters:  (1) raised on direct or cross-examination at trial; (2) necessary to rebut any other matters that the Court allows Hitachi to introduce or rely upon; (3) otherwise raised at trial by counsel or the Court in relation to matters set forth in this report.  In addition to the items identified above, my testimony may also be based, in part, upon the trial testimony of fact witnesses and other expert witnesses.

If called to testify before the Court and/or a jury, I may also rely on demonstratives and samples to help illustrate and explain the opinions and matters disclosed in this report.  I was

40

asked by attorneys for BorgWarner to identify a list of demonstratives exhibits that I may use in

aid of my testimony. This following is a representative, non-exhaustive list:

(i) demonstrative(s) explaining how the combination(s) of references suggested by Kuhn and/or
Livernois fails to render the asserted claims obvious;
(ii) demonstrative(s) explaining the lack of a motivation to combine;
(iii) demonstrative(s) explaining the inappropriateness of hindsight in an obviousness challenge;
(iv) demonstrative(s) explaining secondary considerations of non-obviousness;
(v) demonstrative(s) explaining the prior art that was before the Patent Office;
(vi) demonstrative(s) explaining the state of the art at the time the application for the '738 patent
was filed;
(vii) demonstrative(s) explaining how the '738 patent satisfies § 112, and
(viii) demonstrative(s) explaining how each of the references relied on by Hitachi lacks one or
more elements of the asserted claims.

Dated: October 19, 2006

William B. Ribbens

41

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

HITACHI, LTD. and HITACHI AUTOMOTIVE )
PRODUCTS (USA), INC., )
                                    )
            Plaintiffs, )
                                    )
    v. )       Civil Action No. 05-048-SLR
                                    )
BORGWARNER INC., )
and BORGWARNER MORSE TEC INC., )
                                    )
            Defendants. )

BORGWARNER INC., )    **SUPPLEMENTAL**
)    **EXPERT REPORT**
)    **OF WILLIAM B. RIBBENS**
)    **REGARDING**
)    **INFRINGEMENT**
         Counterclaimant, )    **OF U.S. PATENT NO.**
)    **5,497,738**
    v. )
)
HITACHI, LTD., and HITACHI AUTOMOTIVE )
PRODUCTS (USA), INC. )
)
         Counterdefendants. )
)

1.    I previously submitted a report regarding infringement of U.S. Patent No. 5,497,738 ("the

'738 patent), on September 6, 2006, and a report regarding validity of the '738 patent on October

19, 2006. A listing of my qualifications is provided in the earlier infringement report.

2.    I have been asked by attorneys for BorgWarner to review the declarations of Toshiro

Ichikawa and Yoshinori Ichinosawa that were submitted with Hitachi's motion for summary

judgment of noninfringement on October 4, 2006. Those declarations were submitted after I had

submitted my expert report on the issue of infringement on September 6, 2006. I have been

asked to provide this supplemental report on the issue of infringement to address the issues

raised in those declarations. In addition, Hitachi's experts, Kuhn and Livernois, submitted expert

reports and declarations on the claim construction issues, and expert reports on the infringement

issues, that were not submitted until after I provided my initial infringement report. I have now

had a chance to review those reports and have a much better understanding of Hitachi's position

with regard to claim construction and infringement. I have been asked to provide this

supplemental report to address those additional issues. If called to testify at trial, I will testify as

follows.

3.    Mr. Ichinosawa confirms in his declaration that "unless otherwise indicated, all of the

accused engines having Hitachi's VCTs [variable camshaft timing systems] share certain

common features discussed" in his declaration. (Ichinosawa Decl., ¶4). Mr. Ichinosawa

confirms that all of the accused engines having Hitachi's VCTs adjust the rotational phase of the

camshaft relative to the crankshaft by either advancing or retarding the angular position of the

camshaft relative to the crankshaft. (Ichinosawa Decl., ¶2). The illustrations of the Hitachi VCT

systems included in Mr. Ichinosawa's declaration confirm that each of the accused engines

1

having Hitachi's VCTs include a crankshaft, camshaft, VCT actuator, solenoid valve, cam angle sensor, and crank angle sensor. (Ichinosawa Decl., ¶4). A VCT actuator is mounted on one end of the intake camshaft. (Ichinosawa Decl., ¶6). The VCT actuator has a housing with a sprocket and a vane rotor that is integral with camshaft and rotatable relative to the housing. (Ichinosawa Decl., ¶7). The sprocket of the housing is connected by a chain to the crankshaft sprocket such that rotation of the crankshaft causes the housing and therefore the camshaft to rotate. (Ichinosawa Decl., ¶7). All of these statements are consistent with my understanding of the accused Nissan, Ford and Honda engines and with the statements in my earlier infringement report.

4.    Mr. Ichinosawa confirms in his declaration that each of the accused engines having Hitachi's VCTs have oil flowing from the main oil gallery (labeled "MOG") to the housing in the VCT actuator to vary the angular position of the camshaft relative to the crankshaft. (Ichinosawa Decl., ¶9). The vane housing has recesses, or hydraulic chambers, that receive oil from the main oil gallery to cause the transfer of power from the housing to the vanes. (Ichinosawa Decl., ¶¶12-14).

5.    As I stated in my earlier infringement report (p. 46), I am not aware of any purpose Hitachi's VCTs serve other than functioning in connection with engine sensors and a vehicle ECU to implement variable camshaft timing. The change in phase angle is caused by rotation of a vane relative to the housing with pressurized oil. Oil is "supplied" to the vane housing from a "source" of oil, which is an oil gallery or conduit for passage of oil from the crankcase. Whether the oil is pressurized by an oil pump that is operated by the engine, or is pressurized by camshaft torque fluctuations that are created by operation of the engine, has no relevance to the method

recited in claim 10 of the '738 patent. The method of pressurization of the oil for vane actuation is not recited in the claim and is not relevant to the performance of the function of variation of the camshaft timing. Whether the oil travels to the vane housing directly from the main oil gallery, or travels to the vane housing after residing in a separate vane housing, is not relevant to the performance of the function of variation of the camshaft timing. Where the oil travels when it leaves the vane housing is not relevant to the performance of the function of variation of the camshaft timing. Further explanation of these points is found in my initial infringement report at pages 46-47.

6.      In his declaration, ¶¶16-20, Mr. Ichinosawa describes the lock pin mechanism that prevents relative rotation of the vanes with respect to the housing until adequate oil pressure builds in the system. In my opinion, this aspect of the accused system is not relevant to the method described in claim 10 of the '738 patent. Both oil pressure actuated ("OPA") and camshaft torque actuated ("CTA") vane actuation systems require sufficient pressure in the oil in order to allow relative rotation of the vanes with respect to the housing. In a CTA system, at start-up, the oil must fill the housing so that there is a fluid coupling between the vanes and the housing. In order to change the phase, or rotate the vanes relative to the housing, the camshaft must provide sufficient torsionals so that the system can operate effectively. The statements in the '738 patent relating to "start-up" (see, e.g., col. 2, lines 21-31) relate to control over the position of the *spool valve*, not the ability to pressurize the oil for rotation of the vanes relative to the housing. The criticism of the prior art differential pressure control system ("DPCS") in the specification of the '738 patent relates to the lack of oil pressure at start-up *against the back side of the spool*, which means that "the position of the spool valve is unknown" (col. 2, lines 25-26).

3

These comments relate to the control system logic, not the pressurization of the oil in the vane housing to change the phase angle.

7.    Mr. Ichinosawa confirms in his declaration that each of the accused engines using the Hitachi VCTs has at least one camshaft angle sensor ("cam angle sensor") and at least one crankshaft angle sensor ("crank angle sensor") that generate signals that are sent to a "VTC Control Unit." (Ichinosawa Decl., ¶¶21-22). Calculation of the instant or actual camshaft phase angle is done in the VTC Control Unit based on signals from the crank angle and cam angle sensors. (Ichinosawa Decl., ¶¶21-24). The engine speed is determined from the crank angle sensor. (Ichinosawa Decl., ¶23). The ECU, or VTC Control Unit, also determines a desired or target phase angle as a function of engine operating conditions, such as engine load and temperature. (Ichinosawa Decl., ¶¶22-23). The ECU generates an electrical signal that is responsive to the calculated instantaneous camshaft phase. (Ichinosawa Decl., ¶25). These statements of Mr. Ichinosawa are consistent with my earlier infringement report (p. 47).

8.    Mr. Ichinosawa states that "the accused engines do not calculate the desired relative phase angle between the camshaft and the crankshaft using the sensed position of the camshaft." (Ichinosawa Decl., ¶24). The block diagram shown in paragraph 21 of Mr. Ichinosawa's declaration is inconsistent with his statement. The block diagram shows "cam angle signal" being sent to both the "phase difference detection" block and to the "engine revolution calculate" block. The block diagram then shows a signal being sent from the "engine revolution calculate" block to the "Target Angle Map" block, where the Target Angle is determined from a table that includes "N" or the engine revolution (r.p.m.) rate. Thus, the block diagram appears to indicate that the cam angle signal may be used in some manner in determining the Target Angle.

4

9.      As noted in my earlier infringement report, I have reviewed the deposition testimony of

Mr. Raymond Hughes of Nissan North America, who testified on behalf of Nissan concerning

the structure and operation of the Hitachi VCTs in the Nissan engines. Mr. Hughes testified that

one function of the cam angle sensor involves the fuel injector pulse duration (Hughes Dep., p.

40). Mr. Hughes also indicated that the fuel injector pulse information is one part of the sensor

information used to determine the target or desired phase angle (Hughes Dep., p. 42-43). Thus,

Nissan's witness indicates that the cam angle sensor information may be used in some manner in

determining the target phase angle. I understand from Mr. Ichinosawa's deposition that there are

no material differences between the accused Nissan systems and the accused Ford systems with

regard to this operation of the control unit (Ichinosawa Dep., 11/17/05, p. 183-88). I also

understand that Hitachi has stipulated that there are no material differences between any of the

accused systems for Nissan, Ford and Honda with regard to the operation of the control unit.

10.     For purposes of this opinion, I have been asked to assume that Mr. Ichinosawa is correct

and the cam angle sensor information is *not* used in the determination of the target angle. Under

that assumption, it is still my opinion that the accused engines using the Hitachi VCTs perform

the equivalent of the calculating step of claim 10 of the '738 patent. As I stated in my earlier

infringement report (p. 51), the accused systems perform at least the equivalent of what is

described in the '738 patent. The ECU in the '738 patent (inherited from the '578 patent)

calculates the desired (or target) phase angle from a MAP or look-up table stored in the control

module based on engine conditions. Thus, the Hitachi VCTs perform the same, or substantially

the same, function (i.e., determining the desired or target phase angle for specified engine

conditions) in the same, or substantially the same way (i.e., by using a MAP or look-up table in

5

an ECU control module), to achieve the same, or substantially the same, result (i.e., provide a target phase angle for comparison with the actual phase angle), as the calculating step of claim 10 of the '738 patent.

11.    I have also reviewed the declaration of Mr. Toshiro Ichikawa that was submitted with Hitachi's motion for summary judgment of noninfringement.  Mr. Ichikawa describes a "representative solenoid valve design" for the Hitachi solenoid valves "accused of infringement." (Ichikawa Decl., ¶¶3-4).  Mr. Ichikawa confirms that the accused solenoid valves operate under the direction of an engine control unit ("ECU") and include a spool and a "valve body," or "housing formed around the spool." (Ichikawa Decl., ¶¶5-6).  Mr. Ichikawa confirms that the position of the spool within the valve body is adjusted by a signal sent to the solenoid from the ECU.  (Ichikawa Decl., ¶11).  These statements of Mr. Ichikawa are consistent with my earlier infringement report (p. 47-49).

12.    Mr. Ichikawa states that the solenoid valves in the accused engines are "driven using a pulse-width modulation ('PWM') voltage signal, which is a series of on-off voltage pulses." (Ichikawa Decl., ¶18).  Mr. Ichikawa further states that the solenoid valves in the accused engines are "not driven by a non-PWM, current control signal from the ECU." (Ichikawa Decl., ¶19).  As I stated in my earlier infringement report (p. 34), a person of ordinary skill in the art ("POSA") would understand that the variable force solenoid of the '738 patent can be operated with a PWM excitation.  The variable force solenoid has the capability to position the armature continuously by varying the amplitude of a steady current or by varying the characteristics of other types of excitation waveforms.

6

13.     I disagree with Dr. Livernois's opinion that the '738 patent provides a "clear and unambiguous statement that the invention uses current control instead of PWM control." (Livernois Infringement Report, ¶28).  One of ordinary skill in the art would understand that PWM is a euphemism for a particular waveform.  Normally the term PWM, when applied to an electrical signal, refers to a binary state variable duty cycle voltage as would be understood by a POSA.  A POSA would understand that to achieve a binary state variable duty cycle current waveform, the terminal voltage would be infinite at each current discontinuity.  The current that flows through the solenoid coil in a Hitachi VCT actuator in response to PWM excitation is determined by the impedance characteristics of the associated electrical circuit.  There is nothing in col. 3, lines 19-21, or col. 3, lines 34-35, of the '738 patent, that rules out PWM voltage excitation for the purpose of controlling the spool position.  This paragraph of the specification is discussing the relative benefit of a VFS solenoid actuated spool valve over a DPCS (differential pressure control system).  In the VFS vented spool actuator case, the spool position is independent of engine oil pressure.  Moreover, the spool position is uniquely determined by the control signal, which can be represented by the solenoid current as well as by the coil terminal voltage.  The spool position is determined by the balance of the force of electromagnetic origin against the spring force.  This balance is achieved regardless of whether the excitation is a d-c current or the current that flows in response to a PWM voltage excitation (as long as the excitation frequency is high enough).  Current and voltage are simply concepts (having the potential to make circuit analysis linear) that describe the same electrical signal.  Hitachi's own VTC descriptions make this very point.  For example, Hitachi's "VTC description" document repeatedly describes PWM control as "control of time duration of current supply."  (VTC

7

Description, HIT480122-23). However, should the Court adopt the Hitachi position that the '738 patent somehow teaches current control, Hitachi would still infringe under the doctrine of equivalents. As is well known to a POSA from the theorems of Thevenin and of Norton, any source of electric current can be characterized by an equivalent voltage source with a corresponding equivalent source impedance. Any controlled current can be replaced by a corresponding controlled voltage by the Thevenin theorem. Thus, the Hitachi signal is the equivalent to the claimed controlled current in that it achieves the same or substantially the same function (i.e., control of the current through the coil), in the same or substantially the same way (i.e., by supplying an electrical signal from the ECU characterized either by a current source or an equivalent voltage source), and achieves the same or substantially the same result (i.e., control of the position of the spool).

14.    Dr. Livernois makes the point that "the words 'volt,' 'volts,' 'voltage," etc. are not found anywhere in the entire document" of the '738 patent. (Livernois Infringement Report, ¶31). A POSA would understand that "current" and "voltage" are both referring to the same electrical signal. Moreover, a careful reading of claim 10 reveals that the variable being controlled is the "position of the vented spool." This position is regulated by "said signal received from said ECU." A POSA would recognize that this voltage can be characterized by the terminal voltage across the coil as well as the current through it. The characteristics of "said signal" need only be such that the spool position is controlled by "said signal" and is substantially independent of oil pressure. Such position can be controlled by a variety of signals that could include a d-c signal or a PWM voltage. As was shown in my infringement report, a PWM voltage at sufficiently high frequency results in a current waveform consisting of a steady (i.e., d-c) component with a

8

relatively small time varying part at the excitation frequency. It was further shown that the position of the spool is determined by the duty cycle of the PWM voltage. The Patent and Trademark Office ("PTO") Examiner evaluating the '738 patent, in rejecting the claims of the '738 patent, specifically stated that "[a]ll solenoid valves are of the variable force type by nature, which depend upon the voltage or current change delivered to the solenoids." (Office Action dated August 1, 1994, p. 3). The Examiner applied the Linder patent, which uses the term "current" (see Linder U.S. Patent No. 5,056,477, col. 5, line 56), as well as the Strauber patent, which describes the control device as applying a "voltage" and the voltage is being switched on and off (see Strauber U.S. Patent No. 5,012,774, col. 3, lines 15-35). The applicants distinguished the variable force solenoid from the prior art Linder and Strauber as not being a common "on-off" two position variety; in other words, the common two position solenoids of the prior art that operate through their full stroke to one of the two positions with each PWM pulse. In contrast, the variable force solenoid does not move through its full stroke with every pulse, i.e., it is not a two position solenoid, but varies across a range of positions. The '738 patent states that the variable force solenoid only travels short distances, and not the full, complete cycles ('738 patent, col. 3, lines 34-36).

15.    At a minimum, the PWM voltage signal of the accused systems is at least the equivalent of the claimed signal because it performs the same or substantially the same function (i.e., it is a signal by the ECU carrying information that represents the intended position of the spool to cause the actuator to move to the desired angle by advancing or retarding), in the same or substantially the same way (i.e., in the form of an electrical signal that will cause the spool to move the desired position for advance or retard), and achieves the same or substantially the same

9

result (i.e., the spool is caused to move to the appropriate position). Dr. Livernois has identified

numerous so-called differences in the theoretical aspects of a PWM voltage signal and a current

signal. None of these differences are relevant to the signal claimed in the '738 patent, which has

the sole purpose of causing the spool to move in one of two directions in order to cause the vane

actuator to move in an advance or retard direction.

16.    As I noted in my earlier infringement report (pp. 14-15 and Appendix), the claimed

variable force solenoid has the capability to position the armature continuously by varying the

amplitude of a steady current or by varying the characteristics of other types of excitation

waveforms. A person of ordinary skill in the art reading the '738 patent specification would

understand that the position of the spool in a spool valve assembly incorporating a variable force

solenoid can be controlled by varying the duty cycle of a periodic pulse voltage signal. (p. 15).

Hitachi's accused devices utilize a PWM input signal, and that solenoid is, at a minimum, at least

the equivalent of the claimed variable force solenoid. The solenoid in Hitachi's system performs

substantially the same function (i.e., positioning an armature in response to an input signal), in

substantially the same way (i.e., the armature moves over very short distances and not its full

stroke for each PWM cycle), and, it achieves substantially the same result (i.e., the armature

directly controls the position of a spool valve in response to the input signal).

17.    Mr. Ichikawa states that the spool is a "solid structure and does not have an internal

passage." (Ichikawa Decl., ¶9). Mr. Ichikawa confirms that the spool valve body "includes drain

ports so that oil draining from the advance and retard chambers drain back to the engine oil

sump." (Ichikawa Decl., ¶8). The drawing of the solenoid valve included with Mr. Ichikawa's

declaration omits the engine block in which the solenoid valve is held and which provides the

10

passages for the oil to flow to the sump. With these passages, pressure at either end of the spool is substantially the same and is substantially the crankcase or oil sump pressure.

18.     As I explained in my earlier infringement report (pp. 29, 32), the venting function of the spool relates to relief of fluid pressure from the external ends of the spool (see '738 patent, col. 8, line 24: venting the spool to atmosphere completes the objective of relieving pressure inside cavity 198a that acted on the end of the land in previous VCT systems). A POSA would understand that what is important is venting to avoid differential pressure across the spool, not the physical configuration of the "vent." The "drains" located on each of the axial ends of the spool serve the function of allowing the relief of fluid pressure from the external ends of the spool by draining each side of the spool to an area of common pressure, or essentially no differential pressure. Each of the drains provides a path for oil and/or air that might act against the ends of the spool. The result is the relief of any differential pressure across the spool (thereby stabilizing actuator calibration)(see my earlier infringement report, p. 53). Thus, should the court adopt the Hitachi construction of the claim, and require the presence of an internal passage through each end of the spool, the Hitachi VCTs infringe the vented spool element under the doctrine of equivalents because the drains at each end of the spool perform the same or substantially the same function (*i.e.*, relief of differential pressure across the spool); they perform that function in the same or substantially the same way (*i.e.*, by providing a passageway from each end of the spool to a region of common pressure); and, they achieve the same or substantially the same result (*i.e.*, elimination of any pressure differential across the spool).

19.     Mr. Ichikawa identifies axial grooves, or openings, in the valve body that form a pathway between the valve body and the spool, which permit oil to flow into the solenoid portion.

11

(Ichikawa Decl., ¶13). Mr. Ichikawa identifies a diagonal passage in the Hitachi solenoid that is supplied to Honda that has a "primary purpose" of allowing oil to flow into the solenoid portion. (Ichikawa Decl., ¶¶14-15). This passage connects to the "drain" and also serves as part of the venting function that I described in the above paragraph.

20.    Mr. Ichikawa states in his declaration that oil flow forces "can also affect spool position." (Ichikawa Decl., ¶12). I understand that Hitachi has proposed a claim construction that the internal passage through the spool must "eliminate any influence on spool movement due to oil pressure." As I stated in my earlier infringement report (p. 33), Hitachi's proposed construction attempts to impose a physical impossibility. As long as the spool moves, there will be at least the viscous friction forces, which in turn influence dynamic motion of the spool (though these forces do not affect static calibration). Should the court adopt Hitachi's construction, it is my opinion that drain passages in the Hitachi solenoid valve are at least the equivalent of the passage shown through the center of the spool in Figs. 19 and 20 of the '738 patent. Both systems allow for pressure relief from the outside ends of the spool, while oil advance and retard passages described by Mr. Ichikawa that pass through internal lands on the spool provide the same forces on the spool provided by the oil flowing through the internal lands shown in Figs. 19 and 20 of the '738 patent. Both structures have similar influence of oil on the spool position and the structures are equivalent.

21.    Mr. Ichikawa's declaration confirms that the accused Hitachi VCTs supply hydraulic fluid from a source of oil through a spool valve to a vane actuator. (Ichikawa Decl., ¶7). As I noted above, whether the oil used to cause a phase change is pressurized by an oil pump that is operated by the engine, or is pressurized by camshaft torque fluctuations that are created by

operation of the engine, has no relevance to the method recited in claim 10 of the '738 patent and, specifically, the step involved in supplying oil. The method of pressurization of the oil for vane actuation is not recited in the supplying step (or elsewhere in the claim) and is not relevant to the performance of the function of variation of the camshaft timing. Whether the oil travels to the vane housing directly from the main oil gallery, or travels to the vane housing after residing in a separate vane housing, is not relevant to the performance of the function of variation of the camshaft timing. Where the oil travels when it leaves the vane housing is not relevant to the performance of the function of variation of the camshaft timing. The Hitachi system for supplying oil from a source through a spool valve to a vane housing is therefore, at a minimum, the equivalent of the claimed system. In the figures of the '738 patent, oil flows from the main oil gallery into the vane housing. During operation of the engine, this oil is allowed and blocked at various points by the spool valve, and oil flows to the recesses on opposite sides of the vanes in the vane housing.

22.    In his Rebuttal Report, Hitachi's expert, Kuhn, states that I agree that check valves are part of the preferred embodiment of the '738 patent (Kuhn Rebuttal Rept., ¶98, 104). Mr. Kuhn then criticizes my position that the camshaft torque pulsations and check valves are not fundamentally necessary to make the camshaft rotate (Kuhn Rebuttal Rept., ¶111). The claim limitation at issue recites "means for transmitting rotary movement to said camshaft." This limitation is simply referring to the housing, vanes disposed in the housing, and fluid coupling between the housing and vanes that together transmit rotary movement from the housing to the camshaft. Nothing further is required to transmit rotary movement. Contrary to Mr. Kuhn's position (Kuhn Rebuttal Rept., ¶112), the specific claim limitation at issue does *not* include

13

rotation to "effect a phase change." Rather, it simply states transmitting rotary movement without any reference to changing phase. Only by *adding* the limitation "to effect a phase change," is Mr. Kuhn able to make an argument that camshaft torque pulsations and check valves are a "necessary part of both embodiments disclosed in the '738 patent." (Kuhn Rebuttal Rept., ¶112). For this reason, it is my opinion that the housing, vanes and fluid connection between the housing and vanes in all of the accused Hitachi VCTs is the equivalent of the claimed limitation.

23.    Mr. Ichikawa's declaration confirms that the accused Hitachi solenoid valves have interior passages that allow oil to flow from the engine oil pump to either the advance chamber or to the retard chamber of the vane housing. (Ichikawa Decl., ¶7). As shown in the illustration included with Mr. Ichinosawa's declaration, the advance/retard chambers that allow oil to flow to and from the vane housing are connected through the solenoid valve to drain passages that return oil to the sump or oil crankcase. (Ichinosawa Decl.,¶4). I have reviewed the testimony of the Nissan witness, Mr. Raymond Hughes, who testified that the Hitachi solenoid valves, as used in the accused Nissan vehicles, include inlet and return lines. (Hughes Dep., p. 34-35). Mr. Hughes, at his deposition, colored the inlet lines orange and the return lines yellow on the page from the Nissan manual that illustrates the hydraulic control system, which is reproduced below. (Hughes Dep., p. 34-35; DX229, p. EC-148). Mr. Hughes confirmed that the same lines act as both inlet and return lines depending upon what function is being performed (advancing the timing or retarding the timing). (Hughes Dep., p. 34-35).



24.    Under Hitachi's proposed claim construction, the Hitachi VCTs are at least the equivalent of the claimed inlet and return lines.  In these systems, oil from a source (the main oil gallery) is supplied to the vane housing by flowing through an inlet line and the oil returns to the sump by flowing through one of two return lines that are opened and closed responsively to selective axial movement of the annular recess in the spool.  In addition, inlet and return lines are attached between the spool valve body and the vane actuator.  Moreover, under the Hitachi claim construction, these inlet and return lines perform the same or substantially the same function (i.e., allow the passage of oil from a source to a vane actuator), in the same or substantially the same way (i.e., by forming a fluid conduit between the source and the actuator that is opened and closed by movement of a spool valve), to achieve the same or substantially the same result (i.e., supply of fluid from a source to an actuator).  Under the Hitachi claim construction, the supply of oil must be as part of a phase angle change, which is true of the accused Hitachi VCTs.

25.    Mr. Ichikawa states that the armature in the Hitachi solenoid valves is not "physically attached" to the spool.  (Ichikawa Decl., ¶17).  I understand that Hitachi is seeking a construction

of the claim that requires the armature to be physically attached to the spool. As I explained in

my initial infringement report (p. 27), a POSA would understand the word "connected" as used

in the claim would mean that the movement of the armature causes a corresponding movement in

the spool. In operation, the armature and spool are held in functional contact by the balance of

forces of (1) electromagnetic origin acting on the armature and (2) the opposing spring force

acting directly on the vented spool. In my opinion, under Hitachi's construction, the Hitachi

VCTs are at least the equivalent of the claimed "connection." The spring force and the magnetic

force cause the armature and spool to move together, or be held in functional contact, in

operation of the device. The Hitachi armature/spool/spring assembly thus performs substantially

the same function as the claimed "connected" armature and spool (*i.e.*, attachment so that

adjustment of the armature can cause adjustment of the position of the spool), in substantially the

same way (*i.e.*, through physical contact), to achieve substantially the same result (*i.e.*,

movement of the armature effectively resulting in corresponding movement of the spool). I note

that in the embodiment shown in Fig. 19 of the '738 patent the armature and spool are not

physically attached, but merely biased together.

26.     Mr. Ichikawa states, in his declaration, that the front and rear core of the solenoid, which

are made of "magnetic" materials, extend between the armature and the coil. (Ichikawa Decl.,

¶17). Mr. Ichikawa also states, in his declaration, that axial grooves in the valve body permit oil

to flow into the solenoid portion of the valve. (Ichikawa Decl., ¶13). I understand that Hitachi

has proposed a construction of claim 11 in which there is a "fixed space or gap in the structure

between the coil and armature, extending the length of the armature, with magnetic bearing

material between the coil and the armature, and with air in the gap during operation." It is my

16

opinion that, under Hitachi's construction of claim 11, the Hitachi VCTs have at least the equivalent of the "air gap" limitation in claim 11. An "air gap" does not exclude all magnetic bearing materials, and is not necessarily limited to "air," since non-ferromagnetic material has essentially the same permeability as air. The gap formed in the Hitachi valve is at least the equivalent of the air gap in claim 11 because it performs the same or substantially the same function (i.e., provide a reluctance or non-magnetic break in the magnetic flux circuit), in the same or substantially the same way (i.e., by having a segment that is non-magnetic in the magnetic flux circuit), to achieve the same or substantially the same result (i.e., results in a variable force solenoid as characterized in the '738 patent).

27.    The '738 patent specification discloses a conduit extending from the source (or MOG) through the spool valve and to the vane housing chambers for actuation of the vanes. (See '738 patent, Fig. 19, col. 7 lines 35-38.) Figure 19 discloses inlet lines 220a and 230a, which pass fluid from the source through line 182 to the vane housing. (See '738 patent, Fig. 19.) The specification also describes return lines 194 and 196 that allow the flow of fluid from the vane housing to the spool valve. (See '738 patent, col. 9 lines 15-41.) In addition, Figure 13 of the '023 patent (incorporated by reference into the '738 patent) describes a further return line 118 from the spool valve (or pressure regulator valve 116) that returns oil to a oil sump or oil gallery, thus completing the flow path to the MOG.

Dated: November 13, 2006

*William B. Ribbens*

William B. Ribbens