## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

HITACHI, LTD. and HITACHI
AUTOMOTIVE PRODUCTS (USA), INC.,

       Plaintiffs,

       v.

BORGWARNER INC. and BORGWARNER
MORSE TEC INC.,

       Defendants.

_____

BORGWARNER INC.,

       Counterclaimant,

       v.

HITACHI, LTD. and HITACHI
AUTOMOTIVE PRODUCTS (USA), INC.,

       Counterdefendants.

**REDACTED PUBLIC
VERSION**

Civil Action No. 05–048–SLR

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
## FOR SUMMARY JUDGMENT THAT THE BUTTERFIELD ARTICLE
## IS NOT PRIOR ART UNDER 35 U.S.C. §§ 102(a) OR 102(b)

ASHBY & GEDDES LLP
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654–1888

*Attorneys for Plaintiff Hitachi, Ltd. and
Hitachi Automotive Products (USA), Inc.*

*Of Counsel:*

Kenneth E. Krosin
Michael D. Kaminski
Pavan K. Agarwal
C. Edward Polk
Mary M. Calkins
Liane M. Peterson
FOLEY & LARDNER LLP
Washington Harbour
3000 K Street, N.W., Suite 500
Washington, D.C. 20007-5143
(202) 672-5300

William J. Robinson
Foley & Lardner LLP
2029 Century Park East, Suite 3500
Los Angeles, CA 90067
(310) 277-2223

Dated: November 13, 2006
175114.1

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ..................................................................................... 1

II.  SUMMARY OF ARGUMENT ................................................................. 1

III. STATEMENT OF FACTS ....................................................................... 2

   A.  The "Publicity" Reason For The Article And BW's Planning Of Its
       Distribution ...................................................................................... 2

   B.  The September 24, 1991 IMECHE Seminar............................................ 4

       1.   IMECHE's Publicizing Of The Seminar ....................................... 4

       2.   BW's And IMECHE's Public Dissemination Of The
            Butterfield Article And Its Contents At The Seminar ................... 6

            a.   Public Dissemination Of The Butterfield Article To
                 IMECHE And At The IMECHE Seminar ......................... 6

            b.   Public Dissemination Of The Contents Of The
                 Article Via BW's Oral And Slide Presentation At
                 IMECHE .................................................................... 7

       3.   IMECHE's Post-Seminar Shelving, Cataloging And
            Indexing Of The Butterfield Article ............................................. 8

            a.   The Butterfield Article Was Available On The
                 Shelves At IMECHE Sometime Near October 1991 .......... 8

            b.   The Butterfield Article Was Indexed And Computer
                 Cataloged In 1991 ........................................................ 12

                 (1)   The Reference Librarian Card Index ..................... 12

                 (2)   The Searchable Computer Database
                       (CAIRS) ........................................................... 13

   C.  At Least One Member Of The Interested Public Obtained A Copy
       Of The Butterfield Article Near The Time BW Filed The '738
       Patent Application With The USPTO...................................................... 15

IV.  BW'S SUMMARY JUDGMENT MOTION SHOULD BE DENIED ................ 16

   A.  The Summary Judgment Standard ......................................................... 16

       1.   BW's Issue-Based Motion For Summary Judgment Is
            Inappropriate Under Rule 56 ..................................................... 16

# TABLE OF CONTENTS

**Page**

2.     Even If Appropriate, BW's Motion Should Be Denied Because There Are Genuine Issues Of Material Fact .................. 17

B.     The Butterfield Article Is Prior Art ........................................... 18

    1.     The Publication Standard .............................................. 18

    2.     Record Evidence Establishes That The Butterfield Article Meets The Publication Standard ...................................... 19

        a.     BW's Intent To Publicize The Butterfield Article Is Significant .......................................................... 19

        b.     The Butterfield Article Is Prior Art Because Of Its Dissemination At The IMECHE Seminar ........................ 20

        c.     The Butterfield Article Is Prior Art Because Of Its Shelving, Indexing And Cataloging By IMECHE ............ 21

        d.     The Fact That A Member Of The Public Obtained A Copy Of The Butterfield Article Near The Time BW Filed The '738 Patent Application With The USPTO Helps Confirm Publication ................................... 24

V.     BW'S EVIDENTIARY OBJECTIONS ARE MISPLACED ............................... 25

A.     The Computer Print-Out From The IMECHE Database Is Admissible Under The Business Records Exception Of FED. R. EVID. 803(6) .......................................................................... 25

B.     The Computer Print-Out From The IMECHE Database Is Admissible Under FED. R. EVID. 1002 ...................................... 28

C.     Rogers And Claxton Were Competent To Testify About IMECHE's Standard Practices And Procedures ........................ 29

D.     BW's Other Evidentiary Objections Relating To Credibility Underscore The Inappropriateness Of Summary Judgment .................... 32

VI.     CONCLUSION ................................................................... 33

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*A. B. Dick Co. v. Burroughs Corp.,*
   798 F.2d 1392 (Fed. Cir. 1986) ............................................................. 16

*Am. Stock Exchange, LLC v. Mopex, Inc.,*
   250 F. Supp.2d 323 (S.D.N.Y. 2003) .......................................... 20, 22-23

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ............................................................... Passim

*Angino v. Nationwide Mut. Fire Ins. Co.,*
   NO. CIV. 1:CV-04-2673, 2006 WL 89198 (M.D. Pa. Jan 11, 2006) ........... 17

*Bruckelmyer v. Ground Heaters, Inc.,*
   445 F.3d 1374 (Fed. Cir. 2006) ............................................................ 18

*Coffman v. Fed. Labs.,*
   171 F.2d 94 (3d Cir. 1949) .................................................................. 17

*Connelly v. Wolf, Block, Schorr & Solis-Cohen,*
   463 F. Supp. 914 (E.D. Pa. 1978) ........................................................ 17

*Constant v. Advanced Micro-Devices, Inc.,*
   848 F.2d 1560 (Fed. Cir. 1988) ........................................................... 24

*Diamond Triumph Auto Glass, Inc. v. Safelite Glass Corp.,*
   441 F. Supp.2d 695 (M.D. Pa. 2006) .................................................... 31

*DirecTV, Inc. v. Reyes,*
   No. 03 C 8056, 2006 WL 533364 (N.D. Ill. March 1, 2006) ................... 27

*Fuentes v. Perskie,*
   32 F.3d 759 (3d Cir. 1994) .................................................................. 18

*Gucci America, Inc. v. Ashley Reed Trading, Inc.,*
   No. 00 CV 6041, 2003 WL 22327162 (S.D.N.Y. Oct. 10, 2003) .............. 32

*In re Cronyn,*
   890 F.2d 1158 (Fed. Cir. 1989) ........................................................... 18

*In re Denslow,*
   104 B.R. 761 (E.D. Va. 1989) .............................................................. 26

# TABLE OF AUTHORITIES

**Page(s)**

*In re Exide Techs.*,
   340 B.R. 222 (D. Del. 2006) ..................................................... 28

*In re Gulph Woods Corp.*,
   84 B.R. 961 (E.D. Pa. 1988) ..................................................... 29

*In re Hall*,
   781 F.2d 897 (Fed. Cir. 1986)......................................... 18, 20, 22

*In re Klopfenstein*,
   380 F.3d 1345 (Fed. Cir. 2004)..................................................... 21

*In re Sol Bergman Estate Jewelers, Inc.*,
   225 B.R. 896 (6th Cir. 1998) ..................................................... 29

*Massachusetts Inst. of Tech. v. AB Fortia*,
   774 F.2d 1104 (Fed. Cir. 1985)..................................................... 20

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)..................................................... 18

*MLMC, Ltd. v. Airtouch Comm., Inc.*,
   No. 990781-SLR, 2001 WL 1414269 (D. Del. Nov. 1, 2001) ................... 24

*New Hampshire Fire Ins. Co. v. Perkins*,
   30 F.R.D. 382 (D. Del. 1962) ..................................................... 17

*New Jersey Auto. Ins. Plan v. Sciarra*,
   103 F. Supp.2d 388 (D.N.J. 1998)..................................................... 17

*Patsakis v. Eastern Orthodox Found.*,
   No. 04-1662, 2006 WL 2087513 (W.D. Pa. May 17, 2006) ................... 17

*Remington Arms Co. v. Liberty Mut. Ins. Co.*,
   810 F. Supp. 1420 (D. Del. 1992) ..................................................... 29

*SRI Int'l v. Internet Security Sys., Inc.*,
   No. 04-1199 SLR, 2006 WL 2949142 (D. Del. Oct. 17, 2006)........... 18, 20, 22-23

*Testa v. Janssen*,
   492 F. Supp. 198 (W.D. Pa. 1980)..................................................... 17

*TypeRight Keyboard Corp. v. Microsoft Corp.*,
   374 F.3d 1151 (Fed. Cir. 2004) ..................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

*U.S. v. Baker,*
    458 F.3d 513 (6th Cir. 2006) ................................................................ 26

*U.S. v. Diebold, Inc.,*
    369 U.S. 654 (1962) ........................................................................... 17

*U.S. v. Hutson,*
    821 F.2d 1015 (5th Cir. 1987) ............................................................ 26


## FEDERAL: STATUTES, RULES, REGULATIONS, CONSTITUTIONAL PROVISIONS

35 U.S.C. § 102(a) ...........................................................................Passim

35 U.S.C. § 102(b) ...........................................................................Passim

FED. R. CIV. P. 30(b)(6) .....................................................................31-32

FED. R. CIV. P. 56 .......................................................................1, 16-17

FED. R. EVID. 803(6) .........................................................................25-26

FED. R. EVID. 1001(3) ..........................................................................29

FED. R. EVID. 1002 ..............................................................................28

FED. R. EVID. 1004(1) ..........................................................................29


## OTHER AUTHORITIES

Engineering News (July 1991)...................................................................5

Engineering News, No. 79 (September 1991) ...........................................5, 13

Engineering News, No. 87 (May 1992)..........................................................6

MERRIAM-WEBSTER DICTIONARY (2006) ...............................................23

## I.    INTRODUCTION

Plaintiffs Hitachi Ltd. and Hitachi Automotive Products (USA), Inc. (collectively, "Hitachi") oppose the improper partial summary judgment motion of Defendants, BorgWarner Inc. and BorgWarner Morse Tec Inc. (collectively, "BW"), which only seeks resolution of a single issue, *i.e.*, whether the Butterfield Article is prior art under 35 U.S.C. §§ 102(a) or 102(b). BW's "summary judgment" motion is improper because it only seeks to remove one out of numerous patents and other prior art in Hitachi's invalidity defense and, thus, neither disposes of any claim or defense.

Moreover, this article, which was written by BW employee Roger Butterfield ("Butterfield"), was presented at a technical conference by another BW employee and then catalogued and made available to the public at a technical library, prior to the filing of the '738 patent. It therefore constitutes prior art under 35 U.S.C. §§ 102(a) and/or 102(b). BW's motion thus should be denied on both procedural and substantive grounds.

## II.    SUMMARY OF ARGUMENT

*First,* Rule 56 contemplates motions that will dispose of a claim or defense, not merely subordinate issues. BW's motion does not meet this standard. Instead, BW merely seeks a ruling on the prior art status of a single reference. Hitachi has identified, however, numerous prior art references that invalidate the '738 patent. Accordingly, BorgWarner's motion is procedurally flawed.

*Second*, assuming *arguendo* that the motion is proper, it is substantively flawed. For this Court to grant summary judgment in favor of BW that the Butterfield Article is not prior art, it must determine that there are no genuine issues of material fact. There is no legitimate factual dispute that the Butterfield Article was in the public domain at a

time to constitute prior art to the '738 patent. At a minimum, however, there are genuine issues of material fact regarding the actual date that the Butterfield Article was available to the public and thus the prior art date.

The evidence demonstrates that the date is either: (a) September 24, 1991 (the day it was presented and handed out at a technical seminar sponsored by the Institute of Mechanical Engineers ("IMECHE")); (b) shortly after October 24, 1991 (the day it was received in IMECHE's library); or (c) September 17, 1992 (the latest possible date the article was entered into the searchable computer database at the IMECHE library). The particular date is one for the jury to resolve, which will determine whether the Butterfield Article is prior art under Section 102(a) and/or under Section 102(b). Thus, legally and factually, summary judgment is improper.

## III.    STATEMENT OF FACTS

### A.    The "Publicity" Reason For The Article And BW's Planning Of Its Distribution

REDACTED

Unlike the rest of the industry, BW focused its efforts on camshaft-torque activated ("CTA") VCT systems, rather than traditional oil-pressure activated ("OPA") VCTs. To this end, BW obtained several early patents covering its CTA technology, including U.S. Patent No. 5,107,804 listing Butterfield as one of the

---

[1] Deposition testimony will be cited herein in the form "page:line," with the following transcript abbreviations: "Butterfield I": the 11/14/05 deposition of BW employee Roger Butterfield; "Butterfield II": the 1/17/06 deposition of Roger Butterfield; "REDACTED": the 1/20/06 deposition of BW employee REDACTED; "Rogers": the 1/24/06 deposition of Sara Rogers; "Claxton": the 1/24/06 deposition of Michael Claxton. Rogers and Claxton are IMECHE library employees, with nearly forty years of combined service. Relevant portions of these transcripts are attached as Ex. 15-19, respectively.

inventors.[2]  BW filed the '804 patent application with the U.S. Patent & Trademark Office ("PTO") on June 11, 1991.

Shortly thereafter, BW identified an opportunity    **REDACTED**    for its VCT system (Butterfield II 122:2-7).  In particular, BW identified a technical seminar being hosted by IMECHE in September 1991.  IMECHE is a technical organization headquartered in London, England, with a membership in 1991 (and still today) of about 75,000 - 80,000 engineers, scientists and other business professionals (Claxton 13:11-13; Rogers 20:13-21:10).

**REDACTED**

The publicity plan was for BW to write an article, submit it to IMECHE and then give a presentation (including slides) to publicize to potential customers when BW's VCT system would be available for testing (Butterfield II 123:17-20; Butterfield Article, Ex. 2, at 4).

**REDACTED**

---

[2]  Notably, the '804 patent is incorporated by reference into the '738 patent.  *See* '738 patent at 1:31-67.

3

**REDACTED**                                    His article describes in

detail the VCT system disclosed in the '804 patent application, including modifications

that render the asserted claims of the '738 patent invalid.  Kuhn Invalidity Report, Ex. 1

at ¶¶ 56-71.

**REDACTED**

In fact, the very last paragraph of the Butterfield Article

informed BW's customers when the VCT system described in the article would be ready

for testing:

> The Morse VCT system offers significant advantages over
> other VCT systems including a wider range of travel, faster
> actuation rate, continuously variable capability and low oil
> consumption. ***The system is currently being tested and is***
> ***expected to be ready for prototyping for specific***
> ***applications by the first quarter of 1992.***

(Butterfield Article, HIT 0441383, Ex. 2 (emphasis added)).  The finished article was

submitted to IMECHE for distribution and presentation to the seminar attendees.

(Butterfield II 137:11-15 and 138:4-7; Rogers 49:16-20).

**REDACTED**

**B.**    **The September 24, 1991 IMECHE Seminar**

**1.**    **IMECHE's Publicizing Of The Seminar**

IMECHE advertised the camshaft seminar to its nearly 78,000 members on

several occasions before the September 24, 1991 seminar date (Rogers 53:15-19, 55:19-

56:2 and 65:25-66:24; Claxton 33:9-22).  For example, IMECHE advertised the seminar

in the July 1991 issue of Engineering News.[3]  The July 1991 advertisement read:

> **Camshaft Drives**
> Timing belts and roller chains are the main contenders for
> camshaft drives in IC engines.  Recent developments in the
> design and manufacture of belts and chains have allowed
> increased    life    and    quieter    reliable    performance.
> Providing a background to recent developments in this field
> and a look forward to the future performance requirements
> is an IMECHE HQ seminar billed for September 24.
> Designed to be of interest to all engineers involved in the
> design, specification, installation and maintenance of
> camshaft drives, the event will feature major European
> manufacturers of belts and chains, as well as engine
> designers and other equipment manufacturers. For more
> information, contact Maria Clarke on 071 973 1213.

Engineering News, (July 1991) (HIT 0445542, attached as Ex. 3).   IMECHE again

advertised the camshaft seminar in the September 1991 issue of Engineering News, only

days before the seminar took place:

> **Camshaft Drives**
> Recent developments and future performance requirements
> of belts and chains, the main contenders for camshaft drives
> in IC engines, will be the focus of an IMECHE HQ seminar
> slated for September 24.  More details from Maria Clarke
> on 071 973 1213.

Engineering News, p. 11 (September 1991), Ex. 4.[4]  The above advertisements would

have been distributed to nearly 78,000 members of IMECHE prior to the camshaft

seminar (Claxton 33:9-22; Rogers 16:9-11 and 18:6-10).   Thus, consistent with BW's

desire for publicity, IMECHE made the interested public well aware of the upcoming

---

[3] During the 1991 timeframe, Engineering News was an official publication of IMECHE
that was distributed to its entire membership (Rogers 16:9-11 and 18:6-10; Claxton 33:9-
22).

[4] Note that Exhibit 4 includes pages from IMECHE exhibits 3 and 10.

camshaft seminar, which did in fact occur on September 24, 1991. A contemporaneous IMECHE news publication noted that "[f]our of the papers and one third of the delegates for this event were from outside the UK." Engineering News, p.7 (May 1992) (Ex. 5); see also Rogers 59:15-60:7.

### 2. BW's And IMECHE's Public Dissemination Of The Butterfield Article And Its Contents At The Seminar

Deposition testimony from IMECHE representatives Rogers and Claxton, and from BW itself, establishes that the Butterfield Article and its contents were made available to the public in several ways. *First,* **REDACTED**

under IMECHE's standard practice, the Butterfield Article would have been given to each person attending the 1991 seminar (Rogers 49:16-20). *Second,* the contents of the article were made known to the conference attendees through **REDACTED** the 30 minute presentation by , including the slides shown during his presentation. **REDACTED** (Butterfield II 123:17-20; 214:2-215:12).

BW filed its application for the '738 patent nearly two years *after* the September 24, 1991 IMECHE seminar. Based upon dissemination of the Butterfield **REDACTED** Article and the presentation of its contents at the IMECHE seminar, the Butterfield Article qualifies as prior art under 35 U.S.C. §§ 102(a) and/or 102(b).

### a. Public Dissemination Of The Butterfield Article To IMECHE And At The IMECHE Seminar

**REDACTED**

The Butterfield Article was also distributed to the seminar attendees on September 24, 1991. Rogers, the current head of IMECHE's library, testified that its normal practice and procedure is to provide copies of seminar articles to registered participants (Rogers 49:11-20 and 50:5-51:2). Indeed, Rogers testified that the

IMECHE library gets copies of the materials presented at the seminars "because they *hand them out at the event.*" (Rogers 90:16-22) (emphasis added). Rogers testimony was confirmed by that of Claxton, a 33 year employee of the IMECHE library, who testified that he had no reason to believe that the seminars organized in the '90-92 timeframe were run any differently than they are today. (Claxton 35:11-16). Furthermore, as Rogers also stated, seminars do not usually proceed without at least fifteen attendees (Rogers 52:11-20). So, the article most likely was distributed to at least fifteen people interested in the field of camshaft timing.

Given that the IMECHE library has a copy of the Butterfield Article which is date stamped October 24, 1991, it is therefore reasonable to infer from this testimony that the article was, in fact, handed out at the September 24, 1991 seminar. BW's arguments to the contrary are simply an attempt to weigh the evidence on this point, which is improper on summary judgment.

### b. Public Dissemination Of The Contents Of The Article Via BW's Oral And Slide Presentation At IMECHE

BW, via **REDACTED**, presented the article to the audience at the IMECHE seminar (Butterfield II 123:12-124:6). The presentation included slides and lasted for about 30 minutes. (Butterfield II 139:3-8; *see also* BW 49664, attached as Ex. 6).

**REDACTED** slide presentation tracked the contents of the Butterfield Article. (BW 0049647 (outline of slides for IMECHE VCT presentation), attached as Ex. 7; *see also* Butterfield II at 124:4-131:8 (describing the contents of the IMECHE slides to include pictures of the valve shifted into different positions to create a phase shift, details of the spool valve, a control flow diagram, camshaft and crankshaft sensors, and photographs of the rotating VCT structure)). Butterfield, who was BW's 30(b)(6) deponent, confirmed

that

**REDACTED**

(Butterfield II 123:17-20; emphasis added).

### 3.    IMECHE's Post-Seminar Shelving, Cataloging And Indexing Of The Butterfield Article

After the seminar was finished, articles from the camshaft seminar (including the Butterfield Article) were sent to the IMECHE library for open, logical shelving in a section dedicated to seminar materials, listing on a searchable card system (similar to a traditional card catalogue system), and inputting into a searchable computer database called CAIRS. Thus, in 1991 (and at all times since), the Butterfield Article has been accessible to both IMECHE members and to the interested public (Rogers 23:21-24 and 71:10-73:21; Claxton 23:2-25:11 and 29:16-32:17).

#### a.    The Butterfield Article Was Available On The Shelves At IMECHE Sometime Near October 1991

In 1991 (like today), there was a section of the IMECHE library dedicated to materials presented at the various seminars from the mid-1980s to the present (Claxton 29:16-31:15; Rogers 39:11-43:12; 44:11-49:8; and 67:17-21; *see also* Ex. 8-9 (pictures showing IMECHE library shelves)). Papers presented at the September 1991 camshaft seminar are bound together in a booklet that bears the title and date of the seminar. Ex. 10 (copy of 1991 camshaft seminar booklet from the IMECHE library shelves).

In the 1991 timeframe (like today), IMECHE's seminar booklets were organized on the shelves by year and alphabetized within each year by the seminar title (Rogers 47:11-49:8 and 66:25-68:14). The seminar titles are descriptive of the subject matter presented at each seminar. (Rogers 48:10-14). Claxton testified that the "first important word in the title of the seminar or conference" is used to alphabetize the seminar

8

materials (Claxton 30:4-31:15).   Thus, the IMECHE seminar articles are logically grouped on the library shelves by year and common subject-matter.   The picture below depicts shelving in the IMECHE library reserved for seminar articles and journals.



The six vertical shelves next to the window contain seminar articles from 1986 (top shelf) through 1992 (bottom shelf).  Seminar materials from 1991 (highlighted by the yellow boxes) are located on the bottom two shelves.

In 1991, the Butterfield Article (relating to camshafts) would have been contained in the folder (shown below and highlighted in yellow) sitting in the IMECHE library labeled "A-Co." (Claxton 31:2-8 ("It would almost certainly be within that first full folder shown on the left: A-Co."); *see also* Rogers 46:22-47:5). In fact, the article was located in that folder at the time these photographs were taken, the day before the Claxton and Rogers depositions were taken. (Rogers 46:22-47:10).



Claxton, who has worked in the IMECHE library since 1973, testified that the above pictures are representative of how seminar materials, including the Butterfield Article, would have been arranged in the IMECHE library during the 1991-92 time frame. (Claxton 29:16-31:15). During the 1991 timeframe, Claxton had been employed in the IMECHE library for nearly twenty years.

The IMECHE representatives testified that the Butterfield Article would have been shelved shortly after the library received the seminar materials. (Rogers 72:2-13 ("Probably a few days after we'd received the seminar."); Claxton 31:16-32:2 (testifying that the article would have been shelved "immediately" after receiving a date stamp)). The date stamp placed on the Butterfield Article by IMECHE (shown below and highlighted in yellow) indicates that the IMECHE library received the article on October 24, 1991. (Rogers 73:25-74:23).



Based on this date stamp and IMECHE testimony, the Butterfield Article would have been shelved sometime near October 24, 1991. (Rogers 72:2-13; Claxton 31:16-32:2). To locate the camshaft seminar materials, and thus the Butterfield Article, from just the logical indexing on the library shelves alone, an interested member of the public needed only to go to the 1991 shelves and locate the folder containing the seminar materials beginning with the letter "C" (for "Camshaft"). (Rogers 67:22-68:14). Even if

this person was not aware that the seminar took place in 1991,[5] he or she would only have

had to look through the "C" folders on less than 10 shelves because the seminar materials

only go back to the mid-1980s.

### b.    The Butterfield Article Was Indexed And Computer Cataloged In 1991

#### (1)    The Reference Librarian Card Index

The interested public also would have been made aware of the 1991 camshaft

seminar, and thus the Butterfield Article, through an indexing system used by IMECHE

to identify previous seminars.   (Claxton 31:16-32:17).[6]   In the 1991 timeframe, the

IMECHE library had a manual index system (similar to a basic card catalog) listing, on

one or more index cards, all seminars held in a particular year.[7]  *Id.*  Thus, in 1991, the

reference librarian would have had a few index cards listing the seminars hosted from the

mid-1980s until 1991.  (Claxton 32:3-17).

With this indexing in place, a member of the interested public searching for

seminar materials on camshafts only needed to go to the reference librarian and ask for it.

The reference librarian only would have had to look through a few index cards to identify

the 1991 camshaft seminar.  Armed with this knowledge from the reference librarian, any

---

[5]  As noted above, members of the interested public were certainly apprised of the 1991 camshaft seminar.  *First*, IMECHE advertised the camshaft seminar to its nearly 78,000 members at least twice before the seminar occurred.  *Second*, the seminars were indexed on a manual card catalog type system, explained in the following section.  Thus, a member of the interested public could have gone straight to the 1991 shelves and located the Butterfield Article through reasonable diligence.

[6]  BW confuses IMECHE's card system with its CAIRS database.  BW Br. at 5-6.  These were two separate systems used by the IMECHE library to index seminars and papers.

[7]  While BW argues that there was no evidence provided about the manual card system used by IMECHE (BW Br. at 5-6), the deposition testimony demonstrates the contrary.

member of the interested public needed then only to go to the section of the library housing seminar materials and simply look for the relevant year (1991) and the relevant letter of the alphabet ("C" for camshaft). Through minimal effort, he or she would have then found the Butterfield Article. In the 1991 timeframe, the entire camshaft seminar booklet, which includes the Butterfield Article, was available to interested members of the public who either visited the library or called and requested copies via mail. (Claxton 19:9-25:20).

### (2)     The Searchable Computer Database (CAIRS)

In addition to the card indexing, the Butterfield Article was catalogued in a searchable computer database called CAIRS. *See* Engineering News p. 5 (Sept. 1991) (HIT 0445541, Ex. 4) ("A unique IMECHE database affords access to all Institution published materials since 1983, be it conference paper, seminar, proceedings or journal."). IMECHE used the CAIRS system from 1984 through 2002. (Rogers 28:24-29:7; Claxton 11:2-17). As discussed below, the Butterfield Article was published in CAIRS sometime during 1991, making the document publicly accessible more than a year before BW filed the '738 patent application on May 3, 1993.

CAIRS contained detailed information on, *inter alia*, the seminar papers presented at IMECHE seminars. For instance, the 1991 instruction manual for entering data into CAIRS[8] shows that the database operator would have entered information such as the author of the paper (*e.g.*, Roger Butterfield), the title of the paper (*e.g.*, A unique approach to design of a VCT mechanism), and the associated seminar (*e.g.*, Camshaft

---

[8] Operation of the CAIRS system is based upon testimony from IMECHE witnesses and from manuals contained in a "past procedures" folder maintained by IMECHE in the ordinary course of business (Rogers 27:3-28:12 and 32:23-35:12).

drives: a European seminar). (HIT 445513-17, Ex. 11; *see also* Rogers 28:13-29:25 and

32:23-35:12). The abstract for the Butterfield Article in CAIRS reads as follows:

> The Morse [*i.e.* BW] VCT system offers significant advantages over other VCT systems including a wider range of travel, faster actuation rate, continuously variable capability and low oil consumption. The system is currently being tested and is expected to be ready for prototyping for specific applications by the first quarter of 1992.

A computer printout from the IMECHE library computer database indicates that the

Butterfield Article was published sometime in 1991. This printout, with the relevant portion

highlighted in yellow, is shown below:



In the 1991-92 timeframe, CAIRS was searchable by the reference librarian for

anyone who called or visited the IMECHE library, including both members and non-

members of IMECHE. (Rogers 72:22-73:13; Claxton 24:3-17). The reference librarian

14

could search different fields in CAIRS, including subject, title and keywords. (HIT 0445526-34, Ex. 12; *see also* Claxton 18:21-19:7; Rogers 73:14-21 and 81:2-18). The CAIRS system thus allowed access to the Butterfield Article to any member of the interested public through reasonable diligence. And, as noted above, the database printout (highlighted in yellow) identifies the publication date for the Butterfield Article as 1991. Based on this evidence, the Butterfield Article was publicly accessible more than a year before BW filed the '738 patent application.[9]

### C. At Least One Member Of The Interested Public Obtained A Copy Of The Butterfield Article Near The Time BW Filed The '738 Patent Application With The USPTO

During 1993, BW was involved in an interference between Butterfield and Jean Melchior, an independent inventor. Melchior introduced the Butterfield Article as an exhibit during a deposition of Butterfield in August 1993. Butterfield II 139:22-141:15. While it is uncertain whether Melchior obtained his copy of the Butterfield Article directly from someone who attended IMECHE's 1991 camshaft seminar or from the IMECHE library,[10] there is little doubt that the Butterfield Article was, in fact, publicly

---

[9] BW focuses much of its attention on the CAIRS database due to a question over the date that the Butterfield Article was actually entered into the CAIRS system. In particular, a screenshot from IMECHE's database (Ex. 13) shows a catalogue date of September 17, 1992. BW argues that this is the earliest date that the Butterfield Article was entered into CAIRS. Rogers testified, however, that September 17, 1992 is the date that the record either was added into CAIRS *or* the date the record was modified. (Rogers 70:7-12). The "1991" publication date on the database printout suggests, however, that September 17, 1992 is the date that the record was modified. *See also* HIT 0445513, Ex. 11 (identifying this date as the "Entry/*mod* date") (emphasis added). Because a jury must resolve this factual issue, summary judgment is improper.

[10] Melchior has indicated that he cannot assist on this issue due to a license agreement with BW. *See* 2/16/06 email correspondence between Polk and Melchior, Ex. 20. In his absence, it would be appropriate to draw an adverse inference that Melchior's testimony

available. The use of the Butterfield Article in a 1993 deposition helps to confirm that this article was either handed out at the 1991 seminar or, alternatively, accessible via the IMECHE library per the normal practice and procedure of IMECHE in making seminar materials available to the public shortly after the 1991 camshaft seminar.

## IV.    BW'S SUMMARY JUDGMENT MOTION SHOULD BE DENIED

### A.    The Summary Judgment Standard

#### 1.    BW's Issue-Based Motion For Summary Judgment Is Inappropriate Under Rule 56

BW's motion for summary judgment is procedurally flawed, as it does not seek to completely resolve a claim or even a defense. Instead, it seeks to resolve an issue that only relates to one of several items of prior art that Hitachi will rely upon to invalidate the '738 patent. Specifically, BW seeks only to resolve whether the Butterfield Article is "prior art" under Section 102(a) or 102(b) of the Patent Act.

Under Third Circuit law, summary judgment is limited to disposing of claims only, and not parts of claims or defenses. Indeed, the Court of Appeals has held that:

> The other rule to be considered in this connection is Rule 56. That Rule covers summary judgment, that is, those situations in which a court can enter a judgment based on the pleadings and affidavits filed which indicate that a party is entitled to a judgment as a matter of law. We have examined subsection (a) of the Rule in the light of subsection (d) of the same Rule and agree with the Second and Seventh Circuits that the Rule "*does not contemplate a summary judgment for a portion of a single claim in suit. Neither does any other rule of the Rules of Civil Procedure so contemplate, as far as we are aware.* A partial summary judgment, as the instant one is termed, under the circumstances before us is a misnomer."

would be unfavorable to BW. *Accord A. B. Dick Co. v. Burroughs Corp.*, 798 F.2d 1392, 1400 & n.9 (Fed. Cir. 1986).

*Coffman v. Fed. Labs.*, 171 F.2d 94, 98 (3d Cir. 1949) (emphasis added, quotation omitted); *see also Patsakis v. Eastern Orthodox Found.*, No. 04-1662, 2006 WL 2087513, at *5 (W.D. Pa. May 17, 2006); *Angino v. Nationwide Mut. Fire Ins. Co.*, NO. CIV. 1:CV-04-2673, 2006 WL 89198, at *2 (M.D. Pa. Jan 11, 2006); *New Jersey Auto. Ins. Plan v. Sciarra*, 103 F. Supp.2d 388, 396 (D.N.J. 1998); *Testa v. Janssen*, 492 F. Supp. 198, 204 (W.D. Pa. 1980); *Connelly v. Wolf, Block, Schorr & Solis-Cohen*, 463 F. Supp. 914, 919 (E.D. Pa. 1978); *New Hampshire Fire Ins. Co. v. Perkins*, 30 F.R.D. 382, 384-85 (D. Del. 1962). BW's attempt via Rule 56 to resolve one small *issue* relating to Hitachi's invalidity defense, rather than the complete invalidity defense itself, is procedurally defective. BW's summary judgment motion, thus, does not comport with the procedural requirements of Rule 56 and must be denied on that basis alone.

### 2.    Even If Appropriate, BW's Motion Should Be Denied Because There Are Genuine Issues Of Material Fact

On summary judgment, the court must view the facts and inferences therefrom in the light most favorable to the nonmoving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). To determine whether there are any genuine issues of material fact, the court must look to the applicable substantive law to ascertain what factual issues are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual issue is genuine if the evidence is such that a reasonable finder of fact could return a verdict for the non-moving party. *Id.* Thus, before the court can find there are no genuine factual issues, the court essentially must be satisfied that no reasonable trier of fact could find for the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Anderson*, 477 U.S. at 249. In so doing, a court must resolve conflicting evidence in favor of the nonmovant, not engage in credibility determinations and draw all

reasonable inferences in favor of the nonmovant -- in this case Hitachi.  *See Fuentes v. Perskie*, 32 F.3d 759, 762 n.1 (3d Cir. 1994).

### B.    The Butterfield Article Is Prior Art

#### 1.    The Publication Standard

The "printed publication" bars of Sections 102(a) and 102(b) are "grounded on the principle that once an invention is in the public domain, it is no longer patentable to anyone." *SRI Int'l v. Internet Security Sys., Inc.*, No. 04-1199 SLR, 2006 WL 2949142, at *4 (D. Del. Oct. 17, 2006).  "The touchstone in determining whether a reference constitutes a 'printed publication' ... is 'public accessibility.'" *Id.* (quoting *In re Hall*, 781 F.2d 897, 899 (Fed. Cir. 1986)).

A reference is said to be publicly accessible "upon a satisfactory showing that such a document has been disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence, can locate it and recognize and comprehend therefore the essentials of the claimed invention without need of further research or experimentation." *Id.* (quoting *Bruckelmyer v. Ground Heaters, Inc.*, 445 F.3d 1374, 1378 (Fed. Cir. 2006)).  "The determination of whether a reference is a 'printed publication' ... involves a case-by-case inquiry into the facts and circumstances surrounding the reference's disclosure to persons of skill in the art." *Id.* (quoting *In re Cronyn*, 890 F.2d 1158, 1161 (Fed. Cir. 1989)).

Although BW would like this Court to believe that the public never had access to the Butterfield Article, that is not true, as should be abundantly clear from the detailed factual discussion *supra*.  The Federal Circuit has identified numerous factors relevant to determining if an article was publicly available, including whether there was an oral presentation and dissemination of the article to the interested public, and whether there

was a means for the interested public to locate the article through reasonable diligence. All of these factors have been met, so that the only reasonable conclusion to be drawn is that the Butterfield Article was made available to the public more than a year before BW filed the '738 patent application.

### 2. Record Evidence Establishes That The Butterfield Article Meets The Publication Standard

#### a. BW's Intent To Publicize The Butterfield Article Is Significant

BW fully intended to, and actually did, make the interested public aware of the Butterfield Article well before the '738 application was filed. As described *supra*, the evidence is incontrovertible that the sole reason BW had Butterfield write the article, and had **REDACTED** present it with slides at the IMECHE seminar, was **REDACTED** and to educate the public about BW's newly developed VCT system described in the article. Thus, the record contains sufficient evidence for a jury to conclude that BW, aided by IMECHE, took deliberate steps to place the Butterfield Article in the public domain. BW succeeded in accomplishing this goal.

BW's clear desire to make the Butterfield Article **REDACTED** is relevant evidence that must be considered in determining whether this article was made available to the public.[11] Likewise, from BW's intent in submitting the paper to IMECHE, it is

---

[11]  *See SRI Int'l*, 2006 WL 2949142, at *6 ("Although there is no direct evidence of record as to Mr. Porras's intent in submitting the Live Traffic paper to the ISOC … certainly it is logical to infer that the Live Traffic paper was meant to be, and was, in the public domain."); *Am. Stock Exchange, LLC v. Mopex, Inc.*, 250 F. Supp.2d 323, 330 at n. 14 (S.D.N.Y. 2003) ("There is no question that the purpose of the SEC's Public Reference Room was to make documents filed with the SEC available to the public …").

logical to infer that the Butterfield Article was meant to be and, in fact, was in the public domain.

### b.    The Butterfield Article Is Prior Art Because Of Its Dissemination At The IMECHE Seminar

The evidence demonstrates that the Butterfield Article was distributed at the 1991 seminar. As Rogers testified, it was and continues to be common practice for all articles presented at a seminar to be distributed to the participants. IMECHE's normal practice and procedure of distributing the seminar articles to conference attendees is credible evidence that the Butterfield Article is a "printed publication."[12] As IMECHE's Rogers described, seminars do not usually proceed without at least fifteen attendees. Hence, it reasonably can be inferred that the article was distributed to at least fifteen people interested in the field of camshaft timing at the IMECHE camshaft seminar on or around September 24, 1991.

Based upon this evidence, a reasonable jury could and should conclude that the Butterfield Article was publicly available as of September 24, 1991. *See Massachusetts Inst. of Tech. v. AB Fortia*, 774 F.2d 1104 (Fed. Cir. 1985). Furthermore, the evidence **REDACTED** demonstrates that the content of the Butterfield Article also was disseminated via      's slide presentation. Such oral and slide presentations to skilled artisans in the field of camshaft timing underscore the fact that the Butterfield Article was publicly disseminated. *Accord In re Klopfenstein*, 380 F.3d 1345, 1350-52 (Fed. Cir. 2004). Summary judgment therefore should be denied. *See TypeRight Keyboard Corp. v.*

---

[12] *See Hall*, 781 F.2d at 899 (holding that routine library practice showed that a graduate thesis received in November should be given a critical date of no later then February of the following year).

*Microsoft Corp.*, 374 F.3d 1151, 1159 (Fed. Cir. 2004) (stating that party was "entitled to a trial" where fact issues existed regarding "printed publication" of a reference by distribution at a trade show).

Faced with its own actions in placing the Butterfield Article in the public domain -- and demonstrating the factual issues that render summary judgment inappropriate -- BW argues that the testimony of its own witness should be believed over that of Rogers, a completely disinterested witness. BW even resorts to misquoting the testimony of its own witness **REDACTED**,[13] and argues that the Butterfield Article was *not* handed out at the IMECHE seminar. BW Br. at 6-8. When questioned about the article, however, had no knowledge of whether IMECHE handed it out to the conference attendees ( **REDACTED** 250:2-10). More fundamentally, it is axiomatic that the weighing of such evidence and witness credibility is for the jury and not something that can be decided on summary judgment. At this stage, all reasonable inferences must be drawn in Hitachi's favor. As such, **REDACTED** 's imprecise testimony cannot support summary judgment. *See Anderson*, 477 U.S. at 249 ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.").

### c.   The Butterfield Article Is Prior Art Because Of Its Shelving, Indexing And Cataloging By IMECHE

As discussed *supra*, the Butterfield Article was available to the public by being logically shelved in a folder in the IMECHE library, indexed on a card system and

---

[13]     **REDACTED**

catalogued in a searchable computer database called CAIRS. Those acts are sufficient to make the Butterfield Article a "printed publication" within the meaning of Sections 102(a) and 102(b). *In re Hall*, 781 F.2d 897, 899 (Fed. Cir. 1986) (holding that evidence of library's general practice for shelving, indexing and cataloging was "competent" and "persuasive" evidence of accessibility).

*First*, as to the logical shelving arrangement, the case law makes clear that such an act is publication where, as here, a reasonably diligent person could have found the article on these shelves. *See Am. Stock Exchange*, 250 F. Supp.2d at 329 ("The need to flip through hundreds of documents, although time-consuming, clearly falls within the bounds of 'reasonable diligence.' Surely, if a single copy of a doctoral dissertation maintained in one university library has been found to be 'publicly accessible,' *see In re Hall*, 781 F.2d at 899-900, so too is an application that is indexed in the Reference Room – the most logical place to look for prior art."). *See also SRI Int'l*, 2006 WL 2949142 at *6 (finding "browsing a few folders on plaintiff's FTP site" to be within the bounds of reasonable diligence). The shelving of the Butterfield Article in the IMECHE library (by year and seminar title) is thus sufficient evidence to establish publication. Indeed, like *SRI*, "[t]his is especially the case considering that the names of the folders themselves provided some guidance." 2006 WL 2949142, at *5.

*Second*, indexing on IMECHE's card system also establishes publication because a member of the interested public searching for seminar materials on camshafts needed only go to the reference librarian and ask. The reference librarian only would have had to look through a small number of index cards to find the 1991 camshaft seminar. From there, all it would have required for a member of the public to get the Butterfield Article

was to walk to the section of the library housing seminar materials and simply look for the relevant year (1991) and the relevant letter of the alphabet ("C" for camshaft). With this very minimal effort, the Butterfield Article would have been quickly located. *See, e.g., Am. Stock Exchange*, 250 F. Supp.2d at 329 (finding that browsing hundreds of documents in a public search room to be within the bounds of reasonable diligence); *SRI Int'l*, 2006 WL 2949142 at *6 (finding "browsing a few folders on plaintiff's FTP site" to be within the bounds of reasonable diligence).

*Third*, as with the indexing, the computer cataloging also establishes publication. In *SRI Int'l*, this Court found that an alphabetical listing of sub-folders on a computer "could be considered an 'index' as that term is commonly defined ..." 2006 WL 2949142, at *5 n.15 (*citing* MERRIAM-WEBSTER DICTIONARY (2006)). Similarly, a reasonable jury reasonably could conclude that the computer cataloging in the CAIRS database is an "index" so as to establish publication.

As discussed, BW's response to the evidence is to argue about a single issue of material fact, *i.e.*, the date (1991 or 1992) the Butterfield Article was actually input into the CAIRS database. Such an attempt to weigh the evidence only underscores the inappropriate nature of the summary judgment BW seeks and it must be rejected. *See Anderson*, 477 U.S. at 249. Moreover, the actual date that the article was put into CAIRS has little bearing on the other means that the article was made available to the public, *i.e.*, the shelving and card indexing. Again, a reasonable jury could conclude, based on all the documentary evidence and witness testimony, that the Butterfield Article was publicly accessible more than a year before BW filed the '738 patent application.

**d.    The Fact That A Member Of The Public Obtained A Copy Of The Butterfield Article Near The Time BW Filed The '738 Patent Application With The USPTO Helps Confirm Publication**

As described above, a copy of the Butterfield Article was used during a deposition of Butterfield in August 1993 in an interference proceeding. This fact would support an inference that the Butterfield Article was either handed out at the 1991 seminar or accessible via the IMECHE library per the normal practice and procedure of IMECHE in making seminar materials available to the public shortly after the seminar. *Accord MLMC, Ltd. v. Airtouch Comm., Inc.*, No. 990781-SLR, 2001 WL 1414269, at *3 (D. Del. Nov. 1, 2001) ("The court determines on a case-by-case basis from the totality of the facts whether a document is sufficiently disseminated to the interested public to be a printed publication.").

While the Federal Circuit has held that evidence of such routine practice alone can be sufficient proof that a reference was made publicly accessible, accessibility "goes to the issue of whether interested members of the relevant public could obtain the information if they wanted to." *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1569 (Fed. Cir. 1988). The fact that one person obviously wanted to, and did, obtain the article at issue strengthens the likelihood that a jury could find publication.

\*    \*    \*    \*    \*    \*    \*    \*

In sum, the evidence is overwhelming that the Butterfield Article was accessible to the interested public more than a year before BW filed the '738 patent because (1) the Butterfield Article was                    **REDACTED**

distributed to the seminar attendees on or about September 24, 1991; (2) BW itself presented the article to the seminar attendees (including a slide presentation) on

September 24, 1991; (3) the date-stamp on the camshaft seminar booklet shows that the IMECHE library received the Butterfield Article on October 24, 1991 and IMECHE testimony establishes that the article would have been shelved in a logical manner within a few days of October 24, 1991; (4) shortly after the seminar, the reference librarian had a relatively few number of index cards identifying IMECHE seminars (including the camshaft seminar) from the mid-1980s thru 1991; (5) the Butterfield Article was catalogued sometime in 1991 in a searchable computer system known as CAIRS, which contained information regarding each seminar paper, including the author, title and associated seminar; and (6) a reasonably diligent member of the public (Melchior) did, in fact, obtain a copy of the Butterfield Article, thus providing evidence that it was available to the public. Summary judgment is inappropriate in view of such evidence.

## V.    BW'S EVIDENTIARY OBJECTIONS ARE MISPLACED

### A.    The Computer Print-Out From The IMECHE Database Is Admissible Under The Business Records Exception Of FED. R. EVID. 803(6)

To establish the "business records exception" under FED. R. EVID. 803(6), Hitachi must show that the computer printout was (1) made by a declarant with knowledge sufficient to accurately input data on the Butterfield Article into CAIRS, (2) the declarant inputted the data into CAIRS contemporaneously, (3) the data was input into CAIRS in the regular course of IMECHE's business, and (4) records in the CAIRS database were kept regularly by IMECHE. Testimony from IMECHE establishes each of these facts.

*First,* Claxton (who has worked in the IMECHE library for about 33 years) testified that "it would have been the information staff" who created the record in CAIRS regarding the Butterfield Article. *Second,* the date on the database record was automatically generated by the CAIRS system, so there is no doubt that the date is

25

contemporaneous with the input of the data. *See* HIT 0445513, Ex. 11 (stating that the "[s]ystem automatically fills in today's date"). *Third,* Rogers testified that the computer printout of the data in Olib (the IMECHE library's current computer system into which CAIRS data had been transferred) was created and maintained as part of IMECHE's regular business (Rogers 62:14-17 and 69:4-18).

Despite this evidence clearly establishing the "business records" exception, BW makes a host of arguments that the computer printout from the IMECHE database is inadmissible hearsay, none of which has any merit. BW Br. at 14-17. BW initially argues that "neither witness testified as to the identify of the individual who entered the catalogue date into the computer system ... [t]his fact alone counsels against the admissibility of the screen shot." *Id.* at 15. Rule 803(6) has no such requirement. "The party advocating admissibility is not required to produce the 'person with knowledge' who made the record." *In re Denslow,* 104 B.R. 761, 764-75 & n. 9 (E.D. Va. 1989).[14]

The testimony establishes such knowledge, however. At the time of her deposition, Rogers had been the head of library services at IMECHE for about six months and had previously been an information officer with the library for about five years.

---

[14]    *Denslow* cites the legislative history of Rule 803(6) stating that: "It is the understanding of the committee that the use of the phrase person with 'knowledge' *is not intended to imply that the party seeking to introduce the memorandum, report, record, or data compilation must be able to produce, or even identify, the specific individual upon whose first-hand knowledge the memorandum, report, record, or data compilation was based.*") (emphasis added). *See also U.S. v. Baker,* 458 F.3d 513, 518 (6th Cir. 2006) ("[I]t is not necessary that the person laying the foundation for the introduction of the business record have personal knowledge of their preparation ... [a]ll that is required of the witness is that he or she be familiar with the record-keeping procedures of the organization."); *U.S. v. Hutson,* 821 F.2d 1015, 1020 (5th Cir. 1987) (for admission of computer records under business records exception, there is no requirement that the witness laying the foundation "be the one who entered the data into the computer or be able to attest personally to its accuracy.").

(Rogers 9:2-15). She had worked with the CAIRS database everyday for almost two years. (Rogers 76:7-77:17). Rogers personally transferred the data from CAIRS into Olib. (Rogers 76:7-16). She was (and is) familiar with both CAIRS and Olib (Rogers 76:7-77:17) and with the practices and procedures of the library in general (Rogers 10:3-13:10). Rogers is certainly someone familiar with the record-keeping procedures of IMECHE. *See DirecTV, Inc. v. Reyes*, No. 03 C 8056, 2006 WL 533364, at *9 (N.D. Ill. March 1, 2006) ("Reyes' objection that Ms. Sichler was not employed by DirecTV at the time the account information was entered into the computer system is overruled, because the business records exception does not require the qualified witness to have personal knowledge of the record's creation.").

Next, BW argues that "neither witness testified that the declarant had the knowledge to make accurate statements or made the statements as part of his or her regular business activity." BW Br. at 15. This also is wrong. As noted above, Claxton testified that it would have been input by someone on the information staff at IMECHE. (Claxton 39:8-18). In addition, Rogers testified that it would have been input and maintained as part of IMECHE's regular business. (Rogers 62:14-17 and 69:4-18).

BW also argues that "neither witness testified that the declarant recorded the statements contemporaneously with the actions that were subject of the screen shot." Again, this argument lacks merit. As noted, the date on the database record was automatically generated by the CAIRS system, rather than being input by the operator. (HIT 0445513, Ex. 11). As such, there is no question that September 17, 1992 is the actual date on which an IMECHE employee most likely modified the record for the Butterfield Article in the CAIRS database.

Next, BW argues that there is some confusion regarding the September 17, 1992 date reflected in the database records. BW Br. at 15-16. As discussed, this is a factual question properly left for resolution by the jury. *See Anderson*, 477 U.S. at 249; *accord In re Exide Techs.*, 340 B.R. 222, 243 (D. Del. 2006) ("Questions concerning the reliability, accuracy or completeness of a document go to the weight of the evidence, not its admissibility.").

Finally, BW argues that the screen shot came from Olib, the current IMECHE database rather than the predecessor CAIRS database. This is misleading. Although Olib was implemented in 2000, the information contained in the previous CAIRS database was transferred into Olib and thus the current database contains the same information originally input into CAIRS. (Rogers 91:16-20). Indeed, Rogers testified that she transferred the data between CAIRS and Olib. (Rogers 76:7-16 and 91:16-20).

**B.    The Computer Print-Out From The IMECHE Database Is Admissible Under FED. R. EVID. 1002**

BW's next evidentiary challenge is based upon the "best evidence" rule. In particular, BW objects to the computer printout arguing that it is not the "original" and that Hitachi cannot explain what happened to the original. BW Br. at 16-17. BW's arguments, once again, are misplaced.

FED. R. EVID. 1001(3) states that "[i]f data are stored in a computer or similar device, any printout or other output readable by sight, shown to reflect the data accurately, is an 'original.'" As such, the "original" has already been produced in this case and used extensively by both parties during the IMECHE depositions. This "original" was never lost or destroyed and nothing has been re-created from the "original." The present situation is no different from taking a paper contract and moving

28

it from one file cabinet to another. Put differently, the question is not whether the computer database is the original (that is merely the means of storing the data), but whether the data is "original." According to the plain language of Rule 1001(3), the print-out from IMECHE's database is the "original."

Moreover, FED. R. EVID. 1004(1) states that the "original" is not required if the "originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith." Even assuming that database printout (Ex. 13) is not the "original" under FED. R. EVID. 1001(3), Rule 1004(1) makes the printout from Olib an acceptable substitute. *See, e.g., In re Sol Bergman Estate Jewelers, Inc.*, 225 B.R. 896, 903 (6th Cir. 1998). In any event, resort to Rule 1004(1) is unnecessary because the plain language of Rule 1001(3) makes the computer print-out from the current database the "original." *See In re Gulph Woods Corp.*, 84 B.R. 961, 965 (E.D. Pa. 1988) (admitting computer printouts from database as "originals" under Rule 1001(3)).[15]

C.    **Rogers And Claxton Were Competent To Testify About IMECHE's Standard Practices And Procedures**

BW simply dismisses the testimony of Rogers and Claxton under the erroneous premise that neither had personal knowledge as to any of the facts to which they testified. There is no justification for doing so.

---

[15] This Court has further noted that the question of whether or not a party has offered sufficient evidence to prove the contents of evidence lost or destroyed under Rule 1004(1) goes to the weight of the evidence and thus is a matter for the finder of fact to decide. *Remington Arms Co. v. Liberty Mut. Ins. Co.*, 810 F. Supp. 1420, 1422-23, 1427-28 (D. Del. 1992) (denying summary judgment due to issue of triable fact with respect to existence and contents of missing policies). As noted, however, nothing has been lost or destroyed. IMECHE produced the "originals" and BW's arguments to the contrary simply are misplaced.

*First*, Rogers currently is in charge of the IMECHE library. (Rogers 9:2-15). She is familiar with the practices and procedures from her personal experience at the library and through interaction with other employees. For example, when she joined IMECHE, she worked with the CAIRS database for almost two years. (Rogers 76:7-77:17). During that time, "most of [her] daily activities would have involved using the CAIRS system." (*Id.* at 77:11-17). She testified that CAIRS did not change from 1991 until it was replaced years later. (*Id.* at 79:7-13). In fact, she was able to confirm that the 1991 instructions for entering items into CAIRS (Ex. 11) followed the same procedures that she used with CAIRS in 2000. (*Id.* 79:14-19). Ms. Rogers' testimony about the earlier practices of IMECHE also was based on information contained in the past procedures folder maintained by IMECHE in its ordinary course of business. (Rogers 27:3-28:12).

*Second*, Claxton has worked continuously with IMECHE since 1971 and continuously with the library since 1973. (Claxton 7:10-12:5). During the 1991 timeframe, he was a librarian -- a position he still holds today. (*Id.* at 9:4-10:3). He began using CAIRS when it was first implemented by the library in the early 1980s. (Claxton 10:12-11:17). He confirmed that the library used CAIRS from early 1980 until it was replaced in the early 2000s. (*Id.*) Claxton also confirmed his personal knowledge of how seminar papers were entered into the CAIRS system and the practices and procedures of the library in general during the early 1990s. (Claxton 9:11-16, 11:18-12:5 and 15:14-17:8). He too was able to confirm that the 1991 instructions for entering items into CAIRS (Ex. 11), and the other manuals produced by IMECHE, accurately reflect the procedures for entering items into CAIRS in the 1991 timeframe. (Claxton 14:4-25:12). Claxton testified that he was "[v]ery familiar with the CAIRS books side of the software.

In general terms [he] also know[s] how the papers database worked." (Claxton 11:21-
12:5). Although Claxton did not himself input the Butterfield Article into the CAIRS
database, he testified that he worked with the persons (HIT 445539, Ex. 14) responsible
for this task on a day-to-day basis and roughly understood what they did (Claxton 25:21-
27:11).

Third, both witnesses were deposed as Rule 30(b)(6) witnesses on behalf of
IMECHE as an organization. As such, portions of their testimony were based upon the
institutional knowledge of IMECHE, including persons working in other departments.
(Rogers 19:2-8.). The law is clear that a Rule 30(b)(6) witness does not "merely speak
for his own personal knowledge, but is 'speaking for the corporation.'" *Diamond
Triumph Auto Glass, Inc. v. Safelite Glass Corp.*, 441 F. Supp.2d 695, 723 (M.D. Pa.
2006) (quotation omitted). They testified as to the organizational knowledge of IMECHE
(Rogers 22:5-18), including past procedures as described in IMECHE's historical
business records (Rogers 27:3-28:12).[16] There is nothing in the record suggesting that

---

[16] For example, Ms. Rogers spoke with employees currently working on the IMECHE
Events staff who would have general, historical knowledge of the practices and
procedures regarding seminars and article distribution, and library employees who could
verify the practices and procedures regarding cataloging of articles presented at seminars.
While Rogers may not have spoken to someone in the Events Department who was at
IMECHE in 1991 and actually responsible for organizing the 1991 camshaft seminar,
there is no requirement that she do so. As courts have recognized, "a corporation has a
life beyond that of mortals. Moreover, it can discharge its 'memory,' *i.e.* employees, and
they can voluntarily separate themselves from the corporation. Consequently, it is not
uncommon to have a situation, as in the instant case, where a corporation indicates that it
no longer employs individuals who have memory of a distant event or that such
individuals are deceased ... These problems do not relieve a corporation from preparing
its Rule 30(b)(6) designee to the extent matters are reasonably available, whether from
documents, past employees, or other sources." *U.S. v. Taylor*, 166 F.R.D. 356, 361
(M.D.N.C. 1996). Certainly, IMECHE possesses historical knowledge gained from its

her conversations with others at IMECHE were limited to one particular topic, as argued by BW.

In sum, BW's arguments regarding the competency of the designated IMECHE witnesses fall well short of their intended mark and should be dismissed.  The witness' testimony was based on their own personal knowledge, their combined nearly 40 years of employment with the IMECHE library, and interaction and discussion with other employees over this nearly 40 years of service. *Accord Gucci America, Inc. v. Ashley Reed Trading, Inc.*, No. 00 CV 6041, 2003 WL 22327162, at *3 (S.D.N.Y. Oct. 10, 2003) ("Because Rule 30(b)(6) witnesses testify on the corporation's behalf, courts routinely hold that such deponents need not have personal knowledge on a given subject, so long as they are able to convey the information known to the corporation.").  In any event, Rogers and Claxton were competent to testify about the practices and procedures of IMECHE based upon their lengthy service with the library, interaction with other IMECHE employees during this lengthy service and information contained in the "past procedures" folder maintained by IMECHE in the ordinary course of its business.

### D.    BW's Other Evidentiary Objections Relating To Credibility Underscore The Inappropriateness Of Summary Judgment

Finally, BW argues that **REDACTED** 's testimony regarding whether the Butterfield Article was handed out at the seminar contradicts the testimony of Rogers. On this issue, BW essentially asks this Court yet again to weigh the evidence, which is improper on summary judgment. *See Anderson*, 477 U.S. at 249.   **REDACTED**  is a current BW employee, *i.e.*, an interested party whose bias may cloud his recollection of the events of fifteen

---

past procedures folder (Rogers 27:3-28:12 & 32:23-35:12) and from the interaction between its current and past employees (Claxton 25:21-27:11).

years ago. Rogers, conversely, is a completely disinterested third party. The jury would

certainly be entitled to credit Rogers' testimony (and Claxton) over that of **REDACTED**.

      Furthermore, **REDACTED** did not testify that the Butterfield Article was not distributed at

the 1991 seminar. He merely stated that his presentation materials (*i.e.*, his slides and

presentation outline) were not distributed. He had no knowledge of whether IMECHE

handed out the seminar materials. This testimony is perfectly consistent with Rogers'

testimony that the seminar materials (*i.e.*, papers written for presentation) would have

been handed out to the seminar attendees, a very typical procedure followed by technical

organizations that host technical seminars.

## REDACTED

      Obviously, BW intended that the contents of the article be made

public. BW's attempt to rewrite history to turn the article into a private work to avoid

patent invalidity should be rejected.

## VI.   CONCLUSION

      For each and all of the foregoing reasons, Hitachi respectfully submits that BW's

summary judgment motion should be denied.

                 ASHBY & GEDDES

                 */s/ Tiffany Geyer Lydon*
                 _____
                 Steven J. Balick (I.D. #2114)
                 John G. Day (I.D. #2403)
                 Tiffany Geyer Lydon (ID #3950)
                 222 Delaware Avenue, 17th Floor
                 P.O. Box 1150
                 Wilmington, DE 19899
                 (302) 654-1888

                 *Attorneys for Plaintiff Hitachi, Ltd. and*
                 *Hitachi Automotive Products (USA), Inc.*

*Of Counsel:*

Kenneth E. Krosin
Michael D. Kaminski
Pavan K. Agarwal
C. Edward Polk
Mary M. Calkins
Brett C. Martin
Liane M. Peterson
FOLEY & LARDNER LLP
Washington Harbour
3000 K Street, N.W., Suite500
Washington, D.C. 20007-5143
(202) 672-5300

William J. Robinson
Foley & Lardner LLP
2029 Century Park East, Suite 3500
Los Angeles, CA 90067
(310) 277-2223

Dated: November 13, 2006
175114.1

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of November, 2006, the attached **REDACTED PUBLIC VERSION OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT THAT THE BUTTERFIELD ARTICLE IS NOT PRIOR ART UNDER 35 U.S.C. §§ 102(a) OR 102(b)** was served upon the following counsel of record in the manner indicated:

Richard K. Herrmann, Esquire                                      HAND DELIVERY
Morris, James, Hitchens & Williams LLP
222 Delaware Avenue, 10th Floor
P.O. Box 2306
Wilmington, DE  19801


Hugh A. Abrams, Esquire                                         VIA ELECTRONIC MAIL
Sidley Austin LLP
One South Dearborn Street
Chicago, IL  60603




                                                    */s/ Tiffany Geyer Lydon*
                                                    _____
                                                    Tiffany Geyer Lydon

154486.1