# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| HITACHI, LTD. and HITACHI AUTOMOTIVE PRODUCTS (USA), INC., | ) )  ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| | ) Civil Action No. 05-048-SLR |
| BORGWARNER INC., and BORGWARNER MORSE TEC INC., | ) ) ) |
| Defendants. | ) |
| | ) |
| BORGWARNER INC., | ) **PUBLIC VERSION** |
| Counterclaimant, | ) ) |
| v. | ) ) |
| HITACHI, LTD., and HITACHI AUTOMOTIVE PRODUCTS (USA), INC., | ) ) ) |
| Counterdefendants. | ) |

## DECLARATION OF LISA A. SCHNEIDER IN SUPPORT OF BORGWARNER'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT OF NO WILLFUL INFRINGEMENT

*OF COUNSEL:*

SIDLEY AUSTIN BROWN & WOOD, LLP
Hugh A. Abrams
Thomas D. Rein
Lisa Schneider
Marc A. Cavan
Lara V. Hirshfeld
10 South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

Original Date:   November 13, 2006
Redacted Date:  November 20, 2006

Richard K. Herrmann (I.D. #405)
Mary B. Matterer (I.D. #2696)
MORRIS JAMES, HITCHENS & WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE  19801
(302) 888-6800
mmatterer@morrisjames.com
*Attorneys for BorgWarner Inc. and BorgWarner Morse TEC Inc.*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| HITACHI, LTD. and HITACHI AUTOMOTIVE PRODUCTS (USA), INC., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) Civil Action No. 05-048-SLR |
| BORGWARNER INC. and BORGWARNER MORSE TEC INC., | ) |
| | ) FILED UNDER SEAL |
| Defendants. | ) |
| | ) |
| BORGWARNER INC., | ) |
| | ) |
| Counterclaimant, | ) |
| | ) |
| v. | ) |
| | ) |
| HITACHI, LTD. and HITACHI AUTOMOTIVE PRODUCTS (USA), INC., | ) |
| | ) |
| Counterdefendants. | ) |

## DECLARATION OF LISA A. SCHNEIDER IN SUPPORT OF BORGWARNER'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT OF NO WILLFUL INFRINGEMENT

Lisa A. Schneider, under penalty of perjury declares as follows:

1.      I am a member in good standing of the Bar of the State of Illinois and a partner at the law firm of Sidley Austin LLP, counsel to defendant BorgWarner in the above action.

2.      I submit this declaration in support of defendant BorgWarner's Opposition to Plaintiffs' Motion for Summary Judgment of No Willful Infringement.

3.      Attached hereto as Exhibit 1 is a true and correct copy of the cited pages of the January 19, 2006 Rule 30(b)(6) deposition of Toshihiro Inuzuka.

4.      Attached hereto as Exhibit 2 is a true and correct copy of the cited pages of the January 10, 2006 deposition of Seiji Suga.

5.      Attached hereto as Exhibit 3 is a true and correct copy of a document produced bearing Bates labels HIT0443345-46.

6.      Attached hereto as Exhibit 4 is a true and correct copy of a document produced bearing Bates labels BW 0102229-38.

7.      Attached hereto as Exhibit 5 is a true and correct copy of a document produced bearing Bates labels HIT 0443129-31.

8.      Attached hereto as Exhibit 6 is a true and correct copy of a document produced bearing Bates labels HIT 0443462-83.

9.      Attached hereto as Exhibit 7 is a true and correct copy of the cited pages of the April 25, 2006 deposition of Philip Mott.

10.     Attached hereto as Exhibit 8 is a true and correct copy of the cited pages of the January 12, 2006 deposition of Robert T. Sharpe.

11.     Attached hereto as Exhibit 9 is a true and correct copy of a document produced bearing Bates labels BW 0102301-33.

12.     Attached hereto as Exhibit 10 is a true and correct copy of a document produced bearing Bates labels HIT 0443164-235.

13.     Attached hereto as Exhibit 11 is a true and correct copy of a document produced bearing Bates label HIT 029805.

14.     Attached hereto as Exhibit 12 is a true and correct copy of the cited pages of the transcript of the June 29, 2006 teleconference before Special Master C.J. Seitz.

15.     Attached hereto as Exhibit 13 is a true and correct copy of letter dated July 28, 2006 from Mary B. Matterer to Special Master C.J. Seitz.

16.     Attached hereto as Exhibit 14 is a true and correct copy of a letter dated August 11, 2006 from Mary B. Matterer to Special Master C.J. Seitz.

17.     Attached hereto as Exhibit 15 is a true and correct copy of a letter dated August 31, 2006 from Special Master C.J. Seitz to Steven J. Balick and Richard K. Herrmann.

18.     Attached hereto as Exhibit 16 is a true and correct copy of the table of contents of the Expert Report of Robert Kuhn, P.E. on the Invalidity of U.S. Patent No. 5,497,738.

19.     Attached hereto as Exhibit 17 is a true and correct copy of the table of contents of the Expert Report of Dr. Thomas G. Livernois, P.E. on Invalidity of U.S. Patent No. 5,497,738.

20.     Attached hereto as Exhibit 18 is a true and correct copy of the cited pages of the January 19, 2006 Rule 30(b)(6) deposition of Taro Kashima.

21.     Attached hereto as Exhibit 19 is a true and correct copy of the cited pages of the January 20, 2006 continued deposition of Taro Kashima.

22.     Attached hereto as Exhibit 20 is a true and correct copy of a document produced bearing Bates label HIT0441310.

23.     Attached hereto as Exhibit 21 is a true and correct copy of the Declaration of Seiji Suga.

3

24.    Attached hereto as Exhibit 22 is a true and correct copy of a document produced bearing Bates label HIT 001599.

25.    Attached hereto as Exhibit 23 is a true and correct copy of the cited pages of the November 17, 2005 deposition of Yoshinori Ichinosawa.

26.    Attached hereto as Exhibit 24 is a true and correct copy of a document marked as defendants' deposition exhibit 15.

27.    Attached hereto as Exhibit 25 is a true and correct copy of Defendants' Fifth Supplemental Response to Plaintiff Hitachi, Ltd.'s Interrogatory No. 6.

28.    Attached hereto as Exhibit 26 is a true and correct copy of Defendants' First Set of Document Requests (Nos 1-25) to Plaintiffs Hitachi, Ltd. and Unisia North America, Inc.

29.    Attached hereto as Exhibit 27 is a true and correct copy of a document produced bearing Bates label Plaintiffs Hitachi, Ltd.'s and Unisia North America, Inc.'s Supplemental Response to Defendants' Interrogatory No. 1.

30.    Attached hereto as Exhibit 28 is a true and correct copy of the cited pages of the October 6, 2005 deposition of Yoshinori Ichinosawa.

31.    Attached hereto as Exhibit 29 is a true and correct copy of the cited pages of the January 17, 2006 Rule 30(b)(6) deposition of Shinichi Uchida.

32.    Attached hereto as Exhibit 30 is a true and correct copy of the Third Discovery Order.

33.    Attached hereto as Exhibit 31 is a true and correct copy of a letter dated January 18, 2006 from Mary B. Matterer to Special Master C.J. Seitz.

4

34.     Attached hereto as Exhibit 32 is a true and correct copy of a letter dated January 20, 2006 from Tiffany Geyer Lydon to Special Master C.J. Seitz.

35.     Attached hereto as Exhibit 33 is a true and correct copy of the cited pages of the January 20, 2006 teleconference before Special Master C.J. Seitz.

36.     Attached hereto as Exhibit 34 is a true and correct copy of the Declaration of Yoshihisa Matsushita.

37.     Attached hereto as Exhibit 35 is a true and correct copy of letter dated February 1, 2006 from Mary B. Matterer to Special Master C.J. Seitz.

38.     Attached hereto as Exhibit 36 is a true and correct copy of the cited pages of the February 7, 2006 teleconference before Special Master C.J. Seitz.

39.     Attached hereto as Exhibit 37 is a true and correct copy of the cited pages of the October 7, 2005 deposition of Tochiro Ichikawa.

40.     Attached hereto as Exhibit 38 is a true and correct copy of the cited pages of the May 19, 2006 Rule 30(b)(6) deposition of Scott McBroom.

41.     Attached hereto as Exhibit 39 is a true and correct copy of the cited pages of the January 10, 2006 Rule 30(b)(6) deposition of Seiji Suga.

42.     Attached hereto as Exhibit 40 is a true and correct copy of Defendants' Fourth Notice of Deposition of Plaintiffs.

43.     Attached hereto as Exhibit 41 is a true and correct copy of the table of contents of the Expert Report of Dr. Thomas G. Livernois, P.E. on Invalidity of U.S. Patent No. 5,497,738.

44.     Attached hereto as Exhibit 42 is a true and correct copy of the table of exhibits of the Expert Report of Robert Kuhn, P.E. on the Invalidity of U.S. Patent No. 5,497,738.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  November 8, 2006        By: _____

Lisa A. Schneider

6

# EXHIBIT 1

# EXHIBIT REDACTED
# IN ITS ENTIRETY

# EXHIBIT 2

# EXHIBIT REDACTED
# IN ITS ENTIRETY

# EXHIBIT 3

# EXHIBIT REDACTED
# IN ITS ENTIRETY

# EXHIBIT 4

# EXHIBIT REDACTED
# IN ITS ENTIRETY

# EXHIBIT 5

# EXHIBIT REDACTED
# IN ITS ENTIRETY

# EXHIBIT 6

# EXHIBIT REDACTED
# IN ITS ENTIRETY

# EXHIBIT 7

# EXHIBIT  REDACTED
# IN  ITS  ENTIRETY

# EXHIBIT 8

# EXHIBIT  REDACTED
# IN  ITS  ENTIRETY

# EXHIBIT 9

# EXHIBIT REDACTED
# IN ITS ENTIRETY

# EXHIBIT 10

# EXHIBIT REDACTED
# IN ITS ENTIRETY

# EXHIBIT 11

# EXHIBIT REDACTED
# IN ITS ENTIRETY

# EXHIBIT 12

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


HITACHI, LTD., and UNISIA        )
NORTH AMERICA, INC.,             )
                                 )
            Plaintiffs,          )
                                 )   Civil Action No.
v.                               )   1:05-cv-00048-SLR
                                 )
BorgWarner, INC.,   and          )
BorgWarner MORSE TECH, INC.,     )
                                 )
            Defendants.          )


            Special Master Teleconference taken
pursuant to notice at the law offices of Connolly,
Bove, Lodge & Hutz, 1007 North Orange Street, 9th
Floor, Wilmington, Delaware, beginning at 3:05 p.m. on
Thursday, June 29, 2006, before Kurt A. Fetzer,
Registered Diplomate Reporter and Notary Public.

BEFORE:  SPECIAL MASTER C.J. SEITZ, ESQUIRE

APPEARANCES:

        JOHN G. DAY, ESQUIRE
        ASHBY & GEDDES
          222 Delaware Avenue
          Wilmington, Delaware  19899
              -and-
        MICHAEL D. KAMINSKI, ESQUIRE
        EDWARD POLK, ESQUIRE
        FOLEY & LARDNER
          3000 K Street, N.W.
          Washington, D.C.   20007
          for the Plaintiff Hitachi Ltd.
------------------------------------------------------
            WILCOX & FETZER, LTD.
  1330 King Street - Wilmington, Delaware 19801
              (302) 655-0477
              www.wilfet.com

Hitachi, Ltd. and Unisia North America, Inc.     v. Borgwarner, Inc. and Borgwarner Morse Tech, Inc.
Teleconference     C.A. # 1:05-cv-00048-SLR     June 29, 2006

Page 22

1    If not, my request is that you do so that
2  everybody will understand what Hitachi's position is.
3  Okay?
4        MR. KAMINSKI: Okay.
5        MR. POLK: You Honor, this is Ed Polk. I
6  just want to make sure one thing is clear.
7        We have thousands of documents that we
8  have produced that go to this issue. I mean, are we
9  supposed to somehow summarize those? I mean, they all
10 relate to our independent development defense. So how
11 are we supposed to incorporate those documents into an
12 interrogatory response? Because they're all going to
13 be documents that we rely upon.
14       SPECIAL MASTER SEITZ: Mr. Polk, I don't
15 think we're looking to incorporate those documents in.
16       I think what the point of an interrogatory
17 would be would be so that you set your position which
18 you will have to explain to the judge or the jury
19 eventually anyway down in an interrogatory response so
20 that everybody knows what your position is.
21       MR. POLK: Okay. I'm just making sure. I
22 was misunderstanding maybe that, you know, if we don't
23 detail all of our documents that we now can't rely on
24 those documents.

Page 23

1        MR. KAMINSKI: We will see how it goes and
2  maybe put a reservation clause in there.
3        SPECIAL MASTER SEITZ: I don't understand.
4  Wait a minute. I don't understand the reservation
5  clause comment that you just made.
6        MR. KAMINSKI: Well, what Ed is saying is
7  that we're going to tell the story in the
8  interrogatory and we could also say that, you know,
9  here are some exemplary documents and there may be
10 others that are related to it that we produced because
11 what Ed's concern is do we have to pull out every
12 single document that relates to this and somehow weave
13 it into the story or else we're precluded at trial?
14       Now, I never thought -- is that right?
15       MR. POLK: Yes. That's right.
16       MR. KAMINSKI: So I don't think that's
17 what is intended because I have never seen that.
18       SPECIAL MASTER SEITZ: That's not what is
19 intended.
20       But I also wouldn't want to see you answer
21 the interrogatory by just doing a Rule 33(d).
22       MR. KAMINSKI: Right. No. No. No,
23 nothing like that, Your Honor.
24       MR. ABRAMS: This is Hugh Abrams.

Page 24

1        As far as what's intended, I mean I don't
2  believe that Mr. Kaminski is going to put thousands of
3  documents into evidence at trial and we're now getting
4  to the end of discovery. We are supplementing our
5  interrogatory responses to say here is what our
6  position is, these are the documents that relate to it
7  and we're going to rely on.
8        I don't understand why Mr. Kaminski can't
9  do that at this point too, that Hitachi can say here's
10 our position on independent development, these are the
11 documents that relate to it and this is what we're
12 going to rely on.
13       MR. DAY: This is John Day. I don't think
14 Judge Robinson requires that level of specificity in
15 interrogatory responses, so I don't know why we would
16 be held to that burden.
17       SPECIAL MASTER SEITZ: Well, I think we're
18 exhausting rational thought on this point and this is
19 what we're going to do.
20       You're going to go back, Mr. Abrams, and
21 if you don't have a sufficient interrogatory, you're
22 going to cast another one. But the point of the
23 interrogatory is to lock Hitachi down to what their
24 position is on independent development of these

Page 25

1  components. It's not necessary to set forth every
2  document that they're going to rely on in support of
3  this. When it comes time to do the pretrial order,
4  you will have plenty of notice of what documents
5  they're going to rely on.
6        So we're going to take a step at a time.
7  I hope everybody understands. That's my ruling.
8        Let's move on to the next point.
9        MR. REIN: Thank you, Your Honor.
10       MR. ABRAMS: Point number 3 is the
11 Honda-Ford stipulations and discovery. I will address
12 that.
13       The first point is the Honda declaration
14 for Mr. Suga. There is a gap in this between what
15 Hitachi says, when Hitachi says they have no
16 knowledge, which is what the representation was at the
17 hearing, and Mr. Suga's declaration saying that they
18 have some knowledge, but they don't currently know the
19 details.
20       SPECIAL MASTER SEITZ: Mr. Abrams, let me
21 stop you right there.
22       Mr. Kaminski, are you addressing this?
23       MR. KAMINSKI: Yes, I am.
24       SPECIAL MASTER SEITZ: I thought the

7 (Pages 22 to 25)

4c47c399-cf60-47ba-a023-e0464649e563

# EXHIBIT 13

# MORRIS, JAMES, HITCHENS & WILLIAMS LLP

222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19801
(302) 888-6800
Facsimile (302) 571-1750
www.morrisjames.com

Mary B. Matterer
(302) 888-6960
mmatterer@morrisjames.com

Mailing Address
P.O. Box 2306
Wilmington, DE 19899-2306

July 28, 2006

**VIA EMAIL AND HAND DELIVERY**
Collins J. Seitz, Jr., Esq.
Connolly Bove Lodge & Hutz LLP
The Nemours Building
1007 North Orange Street
Wilmington, DE 19801

Re:   *Hitachi Ltd. et al. v. BorgWarner, Inc. et al.,*
      D. Del., C.A. No. 05-048-SLR

Dear Special Master Seitz:

At the June 29, 2006 hearing, Hitachi was ordered to respond to BorgWarner's interrogatory on independent development. Through that interrogatory (which formalized an earlier written request), BorgWarner asked Hitachi to "explain in detail the development of each of the accused VCT components (including ECUs with VCT modules)," and "provide a complete description of how and when Hitachi developed the VCT components that are made at each Hitachi facility, including Sawa, Gunma and HAP Plants." (*See* June 1, 2006 Ltr. to M. Kaminski; BorgWarner Interrogatory No. 22). As the Special Discovery Master advised at the hearing, Hitachi was to respond in a way that would allow BorgWarner to "lock Hitachi down to what their position is on independent development of these components." (June 29, 2006 Hearing Trans., pp. 24-25).

Hitachi's response to Interrogatory No. 22, however, provides little more than conclusory assertions and is almost completely devoid of any articulated evidentiary basis. Hitachi does not explain when, where and how it developed the specific systems that are accused of infringement, including how, when and where it developed the specific components produced at the Sawa, Gunma and HAP facilities. Apparently, Hitachi wants to paint with a broad brush at trial, without opening itself up to discovery that would test and potentially undermine its sweeping assertions. That would be unfair and should not be permitted.

The accused systems are closed-loop systems with a variable force solenoid. The '738 patent that discloses such a system was filed on May 3, 1993 and issued on March 12, 1996. Foreign counterpart patent applications, corresponding to the application for the '738 patent, were published as early as November 10, 1994 in Germany and on December 20, 1994 in Japan. Hitachi has never stated when it first saw a copy of the '738 patent or one of its foreign

Collins J. Seitz, Jr., Esq.                    MORRIS, JAMES, HITCHENS & WILLIAMS LLP
July 28, 2006
Page 2

counterparts, but has acknowledged that it was a rule at Hitachi to circulate patents on dynamic valves as soon as they issued. (Suga Dep. pp. 47-50). Hitachi also concedes that it learned of the '738 patent by at least December of 1998, but given the publication of the patent application in Japan in December 1994, it is likely that Hitachi engineers reviewed the patent as early as 1995.

In response to Interrogatory No. 22, Hitachi conclusorily asserts that it started developing the accused systems back in 1997 or 1998, and it provides two December 11, 1998 documents (HIT32-75) that generally reference commencement of projects in 1997 or 1998. But Hitachi has never identified any specific documents contemporaneous with the development work itself, and has provided no competent evidence to show what the source or impetus was for the closed-loop vane-type VCT systems that Hitachi eventually developed. Nor has Hitachi ever explained whether or to what extent its different facilities exchanged information in developing their specific components and systems. Even if, as Hitachi alleges, Hitachi's predecessor Unisia Jecs (now the Gunma facility) developed its systems without inspiration or input from the BorgWarner patent (and Hitachi has blocked BorgWarner's attempt to take discovery to see if this is so), that still does not mean that Hitachi's Sawa and HAP facilities developed their systems and components based solely on Unisia Jecs information and without any inspiration or knowledge learned from BorgWarner or the '738 patent.

Hitachi's interrogatory response is completely silent on development work at the Gunma and HAP facilities. In a recent letter responding to BorgWarner on this point, Hitachi pointed to nothing at Sawa and only had this to say about HAP: "BorgWarner has already deposed Scott McBroom from HAP who testified that HAP does not have (and did not have) its own R&D department for the ECUs that it sells to Nissan. Rather, for Nissan, HAP has always received its control specifications directly from Hitachi, Ltd. in Japan." In truth, however, Mr. McBroom, a CPA, knew absolutely nothing about the development of HAP's ECUs, as evidenced by the following testimony:

Q:    So you don't know what information the manufacturing and engineering
      community at HAP has regarding ECUs with VCT functionality that is sold by
      your company to Nissan. Right?

      Mr. Kaminski: Objection as to form.

           A:    Right.

      * * *

Q:    Did you make any attempt to determine whether the engineering personnel at
      HAP had any knowledge or information about ECUs with VCT modules or
      functionality?

           A:    No.

Collins J. Seitz, Jr., Esq.                          MORRIS, JAMES, HITCHENS & WILLIAMS LLP
July 28, 2006
Page 3

McBroom Dep. at 48-49. As best as we can tell, there is no record support whatsoever for Hitachi's assertion that HAP received its specifications from Hitachi, Ltd. and did not utilize information received from BorgWarner or the BorgWarner patent.

The purpose of discovery is to allow parties to test and get behind sweeping assertions. At the last hearing before the Special Discovery Master, Hitachi complained about BorgWarner's alleged failure to provide detailed responses to Hitachi's interrogatories. In response, BorgWarner has supplemented its interrogatory responses, including a 10 page response to Hitachi's Interrogatory No. 3 on BorgWarner's development of the patented invention. BorgWarner included citations to numerous documents in separate chronological categories that set forth the details of its development. As the Court advised in its initial Scheduling Order, dated June 8, 2005, at page 3: "The adequacy of all such interrogatory answers shall be judged by the level of detail each party provides; i.e., the more detail a party provides, the more detail a party shall receive." In contrast to BorgWarner's detailed explanations and citations to numerous relevant documents by Bates number, Hitachi has provided nothing more than conclusory assertions with minimal references to documents.

Hitachi was compelled to provide a response to Interrogatory No. 22 that "locked it down" on its independent defense, but Hitachi was unwilling or unable to provide any specifics. Having blocked all meaningful discovery, Hitachi should not be permitted to make sweeping assertions of independent development at trial. Discovery has now closed. The Special Discovery Master has made clear that there will be no more extensions. Because it failed to provide meaningful discovery on its alleged independent development, we would respectfully request that the Special Discovery Master recommend to Judge Robinson that Hitachi not be permitted to make sweeping statements at trial that it developed the accused systems before learning of the BorgWarner patent and/or without the use of any BorgWarner information. Hitachi should be limited to the specific documents it produced and the sworn testimony it provided on specifics in depositions -- nothing more.

Respectfully,

Mary B. Matterer

cc: Steven J. Balick, Esq. (via email)
    Michael D. Kaminski, Esq. (via email)

# EXHIBIT 14

## MORRIS, JAMES, HITCHENS & WILLIAMS LLP

222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19801
(302) 888-6800
Facsimile (302) 571-1750
www.morrisjames.com

Mary B. Matterer
(302) 888-6960
mmatterer@morrisjames.com

Mailing Address
P.O. Box 2306
Wilmington, DE 19899-2306

August 11, 2006

**VIA EMAIL AND HAND DELIVERY**
Collins J. Seitz, Jr., Esq.
Connolly Bove Lodge & Hutz LLP
The Nemours Building
1007 North Orange Street
Wilmington, DE 19801

Re:   *Hitachi Ltd. et al. v. BorgWarner, Inc. et al.*, D. Del., C.A. No. 05-048-SLR

Dear Special Discovery Master Seitz:

We write in further support of our letter of July 28, 2006 regarding Hitachi's vague and conclusory response to Interrogatory No. 22. Hitachi has made broad, sweeping statements in its interrogatory response and presumably wants to make such assertions at trial. In many cases, Hitachi's broad statements are not supported by documents or testimony and, in light of the discovery rulings to date, BorgWarner has been unable to test these statements. BorgWarner is concerned that, even if BorgWarner objects at trial, Judge Robinson will admit these statements because she will not be familiar with the discovery dispute and will assume BorgWarner had the opportunity to test Hitachi's allegations. This would be unfair and prejudicial to BorgWarner.

As you are aware, BorgWarner specifically sought design and development documents related to Hitachi's development of ECUs. *See, e.g.,* BorgWarner's Feb. 16 Letter. However, the Third Discovery Order did not compel Hitachi to produce that information or to produce any witnesses for deposition on that issue. *See* Third Discovery Order at 6. Later, when you learned that Hitachi may intend to rebut BorgWarner's copying charge with an independent development defense, you recognized the potential unfairness that could result from your discovery rulings and required Hitachi to make an election – it could either decide not to pursue an independent development defense or it would have to provide discovery. *See* Exhibit A at 150-52. When Hitachi opted for the latter, you required that it spell out its independent development defense in response to an interrogatory so that BorgWarner could "lock Hitachi down." Exhibit B at 24-25. But instead of laying out the facts on which it intends to rely to demonstrate independent development at each of the Hitachi facilities, Hitachi has responded with broad, sweeping assertions. Hitachi should not be permitted to take advantage of your discovery rulings limiting ECU discovery on the one hand and then have license to make conclusory, unsupported and untested statements at trial. Some protection should be provided to BorgWarner to avoid such unfairness.

Collins J. Seitz, Jr., Esq.　　　　　　　MORRIS, JAMES, HITCHENS & WILLIAMS LLP
August 11, 2006
Page 2

In response to BorgWarner's July 28 letter, Hitachi effectively admits that its prior response to Interrogatory No. 22 was inadequate by serving a supplemental response concurrently with its responsive August 8 letter.[1]  But this supplemental response does not alleviate the problems with Hitachi's prior response.  As explained in BorgWarner's July 28 letter, the primary problem with Hitachi's lack of disclosure concerns the parts developed at the Sawa and HAP facilities.  *See* BorgWarner's July 28 Letter at 2.  Yet, the supplemental interrogatory response served concurrently with Hitachi's August 8 letter fails to even mention the Sawa plant or the HAP facility and, instead, focuses entirely on Unisia Jecs.  This is particularly revealing given Hitachi's assertion that HAP and Unisia JECS were separate companies that did not exchange confidential information.  *See* Hitachi's August 8 Letter at 4; Hitachi Exhibit 3 at 8 ("HAP and Unisia JECS maintained separate business operations."; "HAP and Unisia JECS continued to operate as separate entities.").

Further, Hitachi's "evidence" of independent development at HAP, according to its August 8 letter, is that HAP does not have a research and development department and that HAP receives all of its ECU specifications from Hitachi, Ltd. in Japan (thus contradicting its earlier statement).  *See* Hitachi's August 8 Letter at 4-5.  The lack of a research and development department proves nothing.  Indeed, HAP would not need a research and development department if it simply copied from BorgWarner.  Moreover, Hitachi's reliance on the lack of a research and development department is at direct odds with other statements in its response.  *See, e.g.*, Hitachi Exhibit 3 at 6 ("HAP was a known expert in developing ECMS").  And, although Hitachi claims in letters that the HAP ECU specifications came from Japan, Hitachi has still provided no support for this assertion, in spite of the fact that BorgWarner clearly pointed out this deficiency in its July 28 letter.  *See* BorgWarner's July 28 Letter at 3.

Hitachi's allegations concerning the Sawa facility are similarly deficient.  Hitachi asserts that the ECUs sold by its Sawa plant "were developed long before any collaboration between HAP and BorgWarner."  Hitachi's August 8 at 2.  In support, Hitachi cites to a chart that has been marked at DX246.  *See* Hitachi Exhibit 7.  Of course, just because Hitachi has prepared a chart purporting to describe when Sawa began mass producing ECUs does not mean the chart is accurate.  Indeed, this chart is not even admissible evidence.  Federal Rule of Evidence 1006 provides for the use of summaries of voluminous writings at trial, but *only* if the underlying

---

[1]　　　Hitachi asserts that it has addressed all of BorgWarner's allegations of copying, as reflected in a table attached as Hitachi Exhibit 4.  That table, however, only contains a subset of the allegations in BorgWarner's interrogatory responses.  *Compare* Hitachi Exhibit 1 at 6 ("Hitachi witnesses admit that BorgWarner provided information relating to the electronic interface module, including specifications used to design an ECU for the BorgWarner product.") *with* Hitachi Exhibit 4 (not containing these allegations).  Furthermore, it demonstrates that Hitachi simply sidestepped some allegations.  *See, e.g.*, Hitachi Exhibit 4 at 3 (noting that BorgWarner asserts that the Hitachi patents do not disclose the accused system, yet responses do not even mention Hitachi patents).

Collins J. Seitz, Jr., Esq.                    MORRIS, JAMES, HITCHENS & WILLIAMS LLP
August 11, 2006
Page 3

documents are made available for inspection or copying. Here, to the best of BorgWarner's knowledge, those underlying documents have never been made available to BorgWarner.[2]

Finally, Hitachi alleges that each facility was developing products before it became aware of the '738 patent. Interestingly, in this part of its letter, Hitachi does not even mention HAP. And, its "proof" is premised on Hitachi's contention concerning when it learned of the '738 patent. Although Hitachi states in an interrogatory response that it first learned of the '738 patent in 1998 as a result of a prior art search, this response is directly contradicted by the Suga testimony that it was a rule to circulate patents in this technology area as soon as they issued. *See* Exhibit C at 48-49. In addition, the Inuzuka testimony Hitachi references is vague at best. When asked when he first learned of the patent, Inuzuka stated "[t]here is some ambiguity," that "the date that [he] had seen it is not clear" and that he didn't "have a clear recollection of it." Hitachi exhibit 8 at 20. When asked when Hitachi first learned of the patent, he testified "[i]t is as I had testified earlier." *Id.* at 21. Notably, Inuzuka was not even an employee of Hitachi at that time. Rather, he was an employee of Unisia JECS, which was then a competitor of Hitachi. *See id.* at 22-23.

Had discovery been allowed on Hitachi's independent development defense, BorgWarner would have had the opportunity to explore the inconsistencies in Hitachi's allegations and to uncover facts that rebut Hitachi's assertions. But since no such discovery was provided even in response to the your instruction that Hitachi should provide a response that "lock[s] Hitachi down," fairness dictates that Hitachi should be limited to the specific facts set forth in its interrogatory response that are based on record evidence. Sweeping, unsupported assertions should be precluded. Because the Special Discovery Master will not be conducting the trial, BorgWarner requests that an order be entered advising Judge Robinson of the situation and suggesting that Hitachi's proofs should be so limited.

Respectfully,

Mary B. Matterer

cc: Steven J. Balick, Esq. (via email)
    Michael D. Kaminski, Esq. (via email)

---

[2]    Hitachi asserts in its August 8 letter that HIT 0490252-357 shows the development of the hardware for these ECU models. *See* Hitachi's August 8 Letter at 4. These documents are in Japanese so it is difficult to assess the accuracy of this statement. However, it is highly unlikely that these documents are the sum total of information used to prepare DX246.

# EXHIBIT A

*Hitachi, LTD and Unisia North America, Inc.  v.*
*Borgwarner, Inc and Borgwarner Morse Tec, Inc*

*Hearing*
*May 22, 2006*

*Hawkins Reporting Service*
*715 N King Street*
*Suite 3*
*Wilmington, DE  19801*
*(302) 658-6697*

Original File 052206-LTXT, 160 Pages
Min-U-Script® File ID: 0985163482

**Word Index included with this Min-U-Script®**

Hitachi, LTD and Unisia North America, Inc.  v.
Borgwarner, Inc and Borgwarner Morse Tec, Inc

Mr. Rein.

[4] MR. REIN: Your Honor, the [7] deposition of Mr. Sharp, was extremely limited and [8] circumscribed. It was limited by Hitachi, counsel [9] to the specific agreement and we weren't [10] permitted to go or stray beyond that. In fact, [11] at the time we took the deposition, we did not [12] know that HAP made and sold BCUs that are used by [13] Nissan in their systems, we didn't even know [14] that.

[15] And so we have not had the [16] opportunity to explore how it was that HAP [17] developed the ECUs that now go into Nissan's [18] cars. We have not had the opportunity to take [19] that discovery. Did the information come from [20] Uchida Jeks as I think they want to argue or was [21] it developed based on the collaboration, and [22] that's what we want to explore.

[23] By the same token we have not had [24] the opportunity to depose anybody at Hitachi,

Page 148

[1] Limited because ECUs, we now know ECUs are made [2] in three places, there is the HAP facility, there [3] is the Saw facility in Japan, and there is the [4] Gunma facility in Japan. One of those facilities [5] was formally a Uchida Jeks facility, the other [6] two had nothing to do with Uchida Jeks.

[7] Did the other facilities that had [8] nothing to do with Uchida Jeks, did they develop [9] their ECUs based on information that was obtained [10] from Borgwarner? If so, that's a classic copying [11] case and we have not had an opportunity to [12] explore how each of those entities, how each of [13] those facilities develop the ECUs that go into [14] Nissan's cars, so it seems to me if they want to [15] defend against our copy claim by saying we didn't [16] use Borgwarner's information, sure Borgwarner [17] gave us that information which we didn't use it, [18] or we went with what Uchida Jeks came to the table [19] with, if they want to make that argument, they [20] should open themselves up to discovery so we can [21] explore all those two other facilities developed [22] the ECUs that they developed, otherwise they [23] should be precluded by defending our copying [24] claim, by arguing that they utilized Uchida Jeks

Page 149

[1] information and not anything they obtained from [2] Borgwarner.

[3] SPECIAL MASTER SEITZ: As I [4] understand, they produced the documents.

[5] MR. REIN: They only produced [6] collaboration agreements, they produced documents [7] that pertain to collaboration, they did not [8] produce any documents that showed how they [9] derived and developed the BCUs at HAP, they [10] didn't produce any documents that relate to how [11] they derived and developed the ECUs at each of [12] the other two facilities in Japan, nothing. [13] They say we don't have to produce those documents [14] because the third discovery order was limited to [15] a few financial documents and that the only [16] technical discovery they have been ordered to [17] provide is one representative specification.

[18] We have gotten no development [19] documents, nothing that shows the conception and [20] the development of the BCUs and VCT logic, those [21] that have the variable source solenoid that's at [22] issue here, nothing that shows that, we have had [23] no discovery on that issue.

[24] SPECIAL MASTER SEITZ: Mr. Polk, and

Page 150

[1] I'm a little skeptical that they're trying to [2] go back into some of the discovery that was [3] precluded in the BCUs with this request, but this [4] is where I would like to leave this one and you [5] can consider how you want to deal with it.

[6] I'm not going to order any [7] additional discovery on this point at this time, [8] but if there is going to be a defense at trial of [9] independent development or development through [10] some other means of ECUs that you're going to [11] assert, that's fairly within the scope of broad [12] discovery regardless of what I already ordered on [13] the BCU discovery just as a matter of fundamental [14] fairness, if you're going to rely on that as a [15] defense, you're going to have to open yourself up [16] to discovery on that.

[17] If you're not going to rely on [18] that as a defense, we don't have an issue, so [19] you're going to need to confer and then by Friday [20] let me know whether you intend to rely on that as [21] a defense, if you do, then I think we are going [22] to have to talk about some limited additional [23] discovery to [24] allow the man opportunity to rebut that claim.

Page 151

[1] MR. POLK: Your Honor, I'm a [2] little taken because this is the first I'm [3] hearing of some discovery from all these other [4] people, But I'm not clear on what we're asking [5] for.

[6] Mr. Rein already took the deposition [7] of a HAP individual last Friday. HAP does not [8] have — I mean, HAP, Kentucky, which is the [9] portion of HAP that deals with Nissan, doesn't [10] even have an R &

D department. They didn't [11] research and develop their own BCUs. They sell [12] the BCUs that come from Hitachi Japan.

[13] SPECIAL MASTER SEITZ: It's hard for [14] me to make an assessment right now about whether [15] the deposition was circumscribed or not. You [16] need to confer on this issue.

[17] But let me tell you, my bias is if [18] you're going to be using some of this as a [19] defense, there is going to have to be discovery [20] on the point. If you're going to not use it as a [21] defense, then we don't have an issue.

[22] MR. POLK: Your Honor, we'll ask [23] Hitachi again, but as Mr. Kaminski said, could [24] they tell us —. I don't know what they're looking

Page 152

[1] for. If they could tell us what they're [2] looking for, that's what I'm blind sided by.

[3] MR. KAMINSKI: My understanding of [4] what they're looking for and what you're saying [5] is we, need to provide evidence of independent [6] development about before we can use it as a [7] defense to their copying case.

[8] SPECIAL MASTER SEITZ: No, I'm not [9] saying you have to do anything, I'm saying if [10] you have made a strategic decision to rebut their [11] copying charge, you're going to, introduce, [12] evidence of some other development that you have [13] done outside the collaboration agreement or [14] otherwise, that that should be a ground for [15] discovery. It's only a matter of fundamental [16] fairness that they should be able to, inquire into [17] that.

[18] MR. KAMINSKI: Yes, Your Honor.

[19] SPECIAL MASTER SEITZ: Let's talk [20] about the scheduling order.

[21] The last one I have was submitted to [22] the Court on May 4th.

[23] MR. KAMINSKI: Actually, Your Honor, [24] we don't have a copy of that. We weren't

Page 153

[1] prepared for it.

[2] We only brought half a forest, not a [3] full forest.

[4] SPECIAL MASTER SEITZ: Well, sorry [5] to blind side you. And what I'll do, these [6] deadlines ought to be familiar with you as far as [7] what the subject is. So if we could, if you'd [8] just jot them down —

[9] MR. KAMINSKI: Yes, Your Honor.

[10] SPECIAL MASTER SEITZ: — as we [11] go, [11] through.

[12] MR. REIN: We have two copies, so I [13] can give them one.

# EXHIBIT B

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


HITACHI, LTD., and UNISIA )
NORTH AMERICA, INC., )
)
          Plaintiffs, )        Civil Action No.
)        1:05-cv-00048-SLR
v. )
)
BorgWarner, INC., and )
BorgWarner MORSE TECH, INC., )
)
          Defendants. )


          Special Master Teleconference taken
pursuant to notice at the law offices of Connolly,
Bove, Lodge & Hutz, 1007 North Orange Street, 9th
Floor, Wilmington, Delaware, beginning at 3:05 p.m. on
Thursday, June 29, 2006, before Kurt A. Fetzer,
Registered Diplomate Reporter and Notary Public.

BEFORE:  SPECIAL MASTER C.J. SEITZ, ESQUIRE

APPEARANCES:

        JOHN G. DAY, ESQUIRE
        ASHBY & GEDDES
           222 Delaware Avenue
           Wilmington, Delaware  19899
                   -and-
        MICHAEL D. KAMINSKI, ESQUIRE
        EDWARD POLK, ESQUIRE
        FOLEY & LARDNER
           3000 K Street, N.W.
           Washington, D.C.   20007
           for the Plaintiff Hitachi Ltd.
------------------------------------------------------
          WILCOX & FETZER, LTD.
   1330 King Street - Wilmington, Delaware 19801
               (302) 655-0477
               www.wilfet.com



WILCOX & FETZER LTD.
Registered Professional Reporters



24

1    As far as what's intended, I mean I don't

2    believe that Mr. Kaminski is going to put thousands of

3    documents into evidence at trial and we're now getting

4    to the end of discovery. We are supplementing our

5    interrogatory responses to say here is what our

6    position is, these are the documents that relate to it

7    and we're going to rely on.

8    I don't understand why Mr. Kaminski can't

9    do that at this point too, that Hitachi can say here's

10    our position on independent development, these are the

11    documents that relate to it and this is what we're

12    going to rely on.

13    MR. DAY: This is John Day. I don't think

14    Judge Robinson requires that level of specificity in

15    interrogatory responses, so I don't know why we would

16    be held to that burden.

17    SPECIAL MASTER SEITZ: Well, I think we're

18    exhausting rational thought on this point and this is

19    what we're going to do.

20    You're going to go back, Mr. Abrams, and

21    if you don't have a sufficient interrogatory, you're

22    going to cast another one. But the point of the

23    interrogatory is to lock Hitachi down to what their

24    position is on independent development of these



WILCOX & FETZER LTD.
Registered Professional Reporters

25

1  components. It's not necessary to set forth every

2  document that they're going to rely on in support of

3  this. When it comes time to do the pretrial order,

4  you will have plenty of notice of what documents

5  they're going to rely on.

6              So we're going to take a step at a time.

7  I hope everybody understands. That's my ruling.

8              Let's move on to the next point.

9              MR. REIN:  Thank you, Your Honor.

10             MR. ABRAMS:  Point number 3 is the

11 Honda-Ford stipulations and discovery. I will address

12 that.

13             The first point is the Honda declaration

14 for Mr. Suga. There is a gap in this between what

15 Hitachi says, when Hitachi says they have no

16 knowledge, which is what the representation was at the

17 hearing, and Mr. Suga's declaration saying that they

18 have some knowledge, but they don't currently know the

19 details.

20             SPECIAL MASTER SEITZ:  Mr. Abrams, let me

21 stop you right there.

22             Mr. Kaminski, are you addressing this?

23             MR. KAMINSKI:  Yes, I am.

24             SPECIAL MASTER SEITZ:  I thought the



# EXHIBIT C

# EXHIBIT  REDACTED

# EXHIBIT 15



**CONNOLLY BOVE LODGE & HUTZ LLP**

ATTORNEYS AT LAW

The Nemours Building
1007 North Orange Street
P.O. Box 2207
Wilmington DE 19899
TEL (302) 658 9141
FAX (302) 658 5614

Collins J. Seitz, Jr.
TEL         (302) 888-6278
FAX         (302) 255-4278
EMAIL       cseitz@cblh.com
REPLY TO    Wilmington Office

1990 M Street, NW, Suite 800
Washington DC 20036
TEL (202) 331 7111
FAX (202) 293 6229

Wells Fargo Center
South Tower, Suite 3150
355 South Grand Avenue
Los Angeles CA 90071
TEL (213) 787 2500
FAX (213) 687 0498

WEB www.cblh.com

August 31, 2006

**By Email**

Steven J. Balick, Esquire
John G. Day, Esquire
Ashby & Geddes
222 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899

Richard K. Herrmann, Esquire
Mary Matterer, Esquire
Morris James Hitchens & Williams
222 Delaware Avenue, 10th floor
P.O. Box 2306
Wilmington, DE 19899

Re:    *Hitachi Ltd. et al. v. BorgWarner Inc., et al.*
       C.A. No. 1:05-cv-00048-SLR

Dear Counsel:

        This is my decision on BorgWarner's July 28, 2006 letter request that I
"recommend to Judge Robinson that Hitachi not be permitted to make sweeping
statements at trial that it developed the accused systems before learning of the
BorgWarner patent and/or without the use of any BorgWarner information" and
that "Hitachi should be limited to the specific documents it produced and the
sworn testimony it provided on specifics in depositions – nothing more."
(emphasis in original). I have considered BorgWarner's July 28, 2006 letter,
Hitachi's August 8, 2006 letter response, and BorgWarner's August 11, 2006
letter reply, where BorgWarner again asks that I suggest to Chief Judge Robinson
that Hitachi's proofs at trial should be limited to "the specific facts set forth in its
interrogatory response that are based on record evidence."

        By way of background, on June 29, 2006, at a hearing on various
discovery issues, the parties argued at length about the completeness of Hitachi's
discovery responses relating to the independent development of Hitachi's VCT
system. BorgWarner claimed that Hitachi's response was insufficient, and asked
that Hitachi be required to provide additional sworn responses setting forth in

Steven J. Balick, Esquire
John G. Day, Esquire
Richard K. Herrmann, Esquire
Mary Matterer, Esquire
Page 2
August 31, 2006
------------------------------------------------

detail Hitachi's alleged independent development of its VCT actuators, solenoids, and ECU modules.[1]

     Counsel for Hitachi stated that Mr. Suga, Mr. Ichinosawa, and Mr. Ichikawa were each deposed for multiple days on various topics, including Hitachi's independent development of its actuator and solenoids. Hearing Transcript at 18-19. Hitachi's counsel also stated that Hitachi started selling VCT systems with ECU's sometime in 1999 – prior to the collaboration agreement between Hitachi and BorgWarner. *Id.* at 19. Hitachi argued that its interrogatory responses were sufficient, and it did not believe further discovery or supplementation was warranted. After argument, I ruled that Hitachi should supplement its response to BorgWarner Interrogatory three (addressing Hitachi's independent development defense), and provide additional factual detail such that BorgWarner could rely on the response as definitive for purposes of the position Hitachi would take at trial on the independent development of Hitachi's VCT system. *Id.* at 20-24.

     On July 20, 2006, Hitachi supplemented its response to BorgWarner's interrogatory three. In its July 28, 2006 letter, BorgWarner continues to maintain that Hitachi's response is insufficient to "lock Hitachi down" to its position on independent development. BorgWarner is concerned that Hitachi will offer "sweeping statements" at trial which are not based on the current discovery record. The appropriate remedy, according to BorgWarner, is to inform Chief Judge Robinson that Hitachi should be precluded from deviating at trial from the actual discovery record.

     I deny BorgWarner's request for the simple reason that I am not in the position of "advising" Chief Judge Robinson on how to conduct the trial of this case, and in particular whether particular evidence offered at trial should be admitted or precluded. The parties are represented by able counsel, who can present my discovery rulings to the Court on Hitachi's independent development defense, and the Court can decide the evidentiary issues.

     I do, however, make several observations, and will require Hitachi to take one further step to clarify the basis for its independent development defense. On August 8, 2006, Hitachi submitted an extensive response to BorgWarner's letter

---

[1] At the May 22, 2006 omnibus discovery hearing, I ruled that if Hitachi intended to rely on an independent development defense to rebut BorgWarner's claim that Hitachi copied BorgWarner's intellectual property, then Hitachi would have to provide further discovery on the issue. Hearing Transcript, p. 152. On May 30, 2006, Hitachi stated that it had elected to rely on the independent development defense.

Steven J. Balick, Esquire
John G. Day, Esquire
Richard K. Herrmann, Esquire
Mary Matterer, Esquire
Page 3
August 31, 2006
------------------------------------------------

request. The response elaborates further on Hitachi's independent development position. As part of its response, Hitachi also further supplemented its interrogatory response. Although BorgWarner takes issue with some alleged inconsistencies in Hitachi's response, it seems that those alleged inconsistencies are best left to cross-examination rather than discovery proceedings. I also note that typically, parties are limited to the positions they take in discovery responses, which are necessarily further limited by the factual record created in discovery proceedings. Thus, it is unlikely that Hitachi will be able to make "sweeping statements" about development of its VCT system which were not disclosed in the discovery process and based on the factual discovery record.

As part of the pretrial order process, Hitachi will have to set forth the documents it intends to rely upon at trial. To eliminate any ambiguity about what documents Hitachi intends to rely upon at trial to support its independent development defense, I will require Hitachi to list separately in the pretrial order the documents relating to its independent development defense. The separate listing should be done in a targeted way – meaning that Hitachi should only list those documents directly relevant to the issue, as opposed to a list that encompasses every document that might be tangentially related to independent development.

Yours very truly,

Collins J. Seitz, Jr.
Special Master

CJS,Jr./saj
(484858)

# EXHIBIT 16

Contains BorgWarner Confidential AEO Information

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| HITACHI, LTD., and HITACHI AUTOMOTIVE PRODUCTS (USA), INC. <br>            Plaintiffs, <br><br>       v. <br><br> BORGWARNER INC., and <br> BORGWARNER MORSE TEC INC., <br><br>        Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )      Civil Action No. 05-048-SLR |
| BORGWARNER INC., <br><br>        Counterclaimant, <br><br>       v. <br><br> HITACHI, LTD., and HITACHI AUTOMOTIVE PRODUCTS (USA), INC. <br><br>        Counterdefendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**EXPERT REPORT OF ROBERT KUHN, P.E. ON
THE INVALIDITY OF U.S. PATENT NO. 5,497,738**

Contains BorgWarner Confidential AEO Information

## TABLE OF CONTENTS

Page

TABLE OF EXHIBITS ................................................................................................ iv

I.     INTRODUCTION ...................................................................................... 1

II.    QUALIFICATIONS ................................................................................... 1

III.   MATERIALS REVIEWED ........................................................................ 4

IV.    SCOPE OF ASSIGNMENT ........................................................................ 5

V.     LEVEL OF ORDINARY SKILL IN THE ART ........................................ 7

VI.    OVERVIEW OF VCT TECHNOLOGY .................................................... 8

       A.     General Background ....................................................................... 8

       B.     Types and Characteristics of Variable Camshaft Timing Systems ........... 10

       C.     Technical Description of the '738 Patent ........................................ 11

VII.   CLAIMS 10 AND 11 OF THE '738 PATENT RECITE A COLLECTION
       OF WELL-KNOWN STEPS USING KNOWN COMPONENTS IN
       THEIR ORDINARY MANNER ................................................................ 16

       A.     Sensing and Calculating ............................................................... 16

       B.     Spool Valve and Electromechanical Actuator (Variable Force
              Solenoid) ..................................................................................... 17

       C.     The Phase Adjustment Actuator .................................................... 17

       D.     Prior Art Time Line ..................................................................... 18

VIII.  CLAIMS 10 AND 11 OF THE '738 PATENT ARE INVALID UNDER
       SECTIONS 102 AND 103 OF THE PATENT STATUTE ........................ 19

       A.     The Butterfield Article Renders Claim 10 of the '738 Patent
              Invalid ......................................................................................... 20

       B.     U.S. Patent No. 4,627,825 to Bruss et al. Renders Claim 10 of the
              '738 Patent Invalid ...................................................................... 25

       C.     U.S. Patent No. 4,862,843 to Kawamoto et al. Renders Claim 10 of
              the '738 Patent Invalid ................................................................. 30

i

Contains BorgWarner Confidential AEO Information

D.  U.S. Patent No. 5,263,442 to Hara Renders Claim 10 of the '738 Patent Invalid ...................................................................................................37

E.  U.S. Patent No. 5,361,735 to Butterfield et al. in Combination With Any of the Variable Force Solenoid Art Renders Claim 10 of the '738 Patent Invalid ...............................................................41

F.  Prior Sales of the Ford Zeta VCT in Combination With Any of the Variable Force Solenoid Art Renders Claim 10 of the '738 Patent Invalid ...................................................................................................46

G.  U.S. Patent No. 5,263,443 to Schechter in Combination With Any of the Variable Force Solenoid Art Renders Claim 10 of the '738 Patent Invalid .....................................................................................50

H.  U.S. Patent No. 5,184,578 to Quinn, Jr. et al. in Combination With Any of the Variable Force Solenoid Art Renders Claim 10 of the '738 Patent Invalid ...................................................................................54

I.  U.S. Patent No. 5,289,805 to Quinn, Jr. et al. in Combination With Any of the Variable Force Solenoid Art Renders Claim 10 of the '738 Patent Invalid ...................................................................................56

J.  U.S. Patent No. 5,107,804 to Becker et al. in Combination With Any of the Variable Force Solenoid Art Renders Claim 10 of the '738 Patent Invalid ...................................................................................57

K.  U.S. Patent No. 5,207,192 to Smith in Combination With Any of the Variable Force Solenoid Art Renders Claim 10 of the '738 Patent Invalid ...................................................................................59

IX.  ANY MISSING CLAIM ELEMENTS ARE FOUND IN THE PRIOR ART WITH A MOTIVATION OR SUGGESTION TO COMBINE ...................61

A.  Sensing and Calculating Steps ...........................................................61

B.  Vented Spool ...................................................................................62

C.  Variable Force Solenoid ...................................................................65

D.  Phase Adjustment Actuator ...............................................................66

X.  CLAIM 11 OF THE '738 PATENT IS INVALID OVER THE PRIOR ART ...................................................................................................69

XI.  CLAIMS 10 AND 11 ARE INVALID UNDER HITACHI'S CLAIM CONSTRUCTION ...............................................................................70

ii

Contains BorgWarner Confidential AEO Information

    A.   The Butterfield Article.................................................70

    B.   The Prior Art BorgWarner Patents and Ford Zeta Sales ..........................72

XII.  THE '738 PATENT DOES NOT PROVIDE WRITTEN DESCRIPTION SUPPORT TO ONE OF ORDINARY SKILL IN THE ART TO CARRY OUT THE METHOD OF CLAIMS 10 AND 11 WITHOUT USING CAM TORSIONALS AS THE PRIMARY SOURCE OF ENERGY ...........................73

XIII.  THE '738 PATENT DOES NOT TEACH OR ENABLE ONE OF ORDINARY SKILL IN THE ART TO CARRY OUT THE RECITATION OF "REGULATING THE FLOW OF HYDRAULIC FLUID FROM A SOURCE TO A MEANS FOR TRANSMITTING ROTARY MOVEMENT FROM A CRANKSHAFT TO A HOUSING" UNDER HITACHI'S CLAIM CONSTRUCTION................................................76

XIV.  PRIOR ART NOT DISCLOSED DURING PROSECUTION WAS HIGHLY SIGNIFICANT TO THE '738 PATENT .............................77

    A.   The Butterfield Article.................................................77

    B.   The Butterfield Patent................................................79

    C.   The Bruss Patent......................................................80

# EXHIBIT 17

CONTAINS BW CONFIDENTIAL AEO INFORMATION

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| HITACHI, LTD., and HITACHI AUTOMOTIVE PRODUCTS (USA), INC.,<br>　　　　　　　　　Plaintiffs,<br><br>　　　　v.<br><br>BORGWARNER INC., and<br>BORGWARNER MORSE TEC INC.,<br><br>　　　Defendants.<br>_____<br><br>BORGWARNER INC.,<br><br>　　　　Counterclaimant,<br><br>　　　　v.<br><br>HITACHI, LTD., and HITACHI AUTOMOTIVE PRODUCTS (USA), INC.,<br><br>　　　Counterdefendants. | Civil Action No. 05-048-SLR |

## EXPERT REPORT OF DR. THOMAS G. LIVERNOIS, P.E. ON INVALIDITY OF U.S. PATENT NO. 5,497,738

CONTAINS BW CONFIDENTIAL AEO INFORMATION

## TABLE OF CONTENTS

Page

TABLE OF EXHIBITS ................................................................................iv

I.     INTRODUCTION ..........................................................................1

II.    QUALIFICATIONS ........................................................................1

III.   MATERIALS REVIEWED ..............................................................3

IV.    SCOPE OF ASSIGNMENT ............................................................4

V.     LEVEL OF ORDINARY SKILL IN THE ART ..................................6

VI.    SOLENOIDS ................................................................................6

       A.   Introduction ......................................................................6

       B.   Solenoid Technology ..........................................................7

VII.   PROPOSED INTERPRETATIONS BY THE PARTIES .......................8

       A.   Proposed Claim Definition of Variable Force Solenoid ............8

       B.   Proposed Claim Definition of Sensing Step ..........................9

       C.   Proposed Claim Definition of Calculating Step ......................9

       D.   Proposed Definitions of Claim 11 ......................................10

VIII.  PRIOR ART DEMONSTRATES THAT NUMEROUS DEVICES,
       INCLUDING SOLENOIDS, WERE AVAILABLE TO THE PERSON
       OF ORDINARY SKILL IN THE ART TO CONTROL HYDRAULIC
       VALVES ....................................................................................11

IX.    SEVERAL PRIOR ART REFERENCES DISCLOSE A VARIABLE
       FORCE SOLENOID TO MOVE A SPOOL IN A VCT ......................12

       A.   U.S. Patent No. 5,263,442 to Hara ....................................13

       B.   The Butterfield Article ......................................................16

       C.   U.S. Patent No. 4,862,843 to Kawamoto ............................18

       D.   German Patent Document No. 40 37 824 To Rembold ..........21

       E.   U.S. Patent No. 4,627,825 To Bruss et al. ..........................23

i

CONTAINS BW CONFIDENTIAL AEO INFORMATION

    F.     U.S. Patent No. 5,203,290 to Tsuruta ...............................................26

X.    SEVERAL PRIOR ART REFERENCES TEACH THE USE OF A
    VARIABLE FORCE SOLENOID TO CONTROL A HYDRAULIC
    VALVE...............................................................................................29

    A.     U.S. Patent No. 4,524,947 to Barnes ......................................29

    B.     U.S. Patent No. 4,278,959 To Nishimiya .................................31

    C.     U.S. Patent No. 4,463,332 to Everett........................................33

    D.     U.S. Patent No. 4,835,503 to Everett........................................35

    E.     U.S. Patent No. 5,202,658 to Everett et al.................................37

    F.     U.S. Patent No. 5,232,196 to Hutchings et al. ...........................39

    G.     Lequesne, "Finite-Element Analysis of a Constant-Force Solenoid
         for Fluid Control," IEEE Transactions on Industry Applications,
         Vol. 24, No. 4, July/August 1988 ............................................41

XI.    THE PRIOR ART DEMONSTRATES A KNOWN
    INTERCHANGEABILITY AMONG COMPONENTS TO MOVE
    SPOOLS IN VCTS........................................................................43

    A.     The Prior Art Demonstrates the Known Interchangeability
         Between Hydraulic-Based Approaches and Electromechanical
         Approaches to Move a Spool in a VCT......................................43

    B.     The Prior Art Demonstrates the Known Interchangeability Among
         Various Electromechanical Approaches to Move a Spool in a VCT ........45

XII.    SEVERAL PRIOR ART REFERENCES TEACH SENSING
    CAMSHAFT AND CRANKSHAFT POSITIONS, CALCULATING THE
    RELATIVE PHASE ANGLE, AND ISSUING A CONTROL SIGNAL
    TO REACH THE DESIRED RELATIVE PHASE ANGLE...................47

    A.     *OEM Design*, Etc. on Renold Device .........................................49

    B.     U.S. Patent No. 4,627,825 to Bruss ..........................................50

    C.     U.S. Patent No. 4,909,194 to Bauer...........................................52

    D.     U.S. Patent No. 5,056,477 to Linder .........................................54

    E.     U.S. Patent No. 5,178,106 to Suga ...........................................56

CONTAINS BW CONFIDENTIAL AEO INFORMATION

F.  U.S. Patent No. 5,184,578 to Quinn et al. and U.S. Patent No. 5,289,805 to Quinn ................................................................. 57

G.  U.S. Patent No. 5,170,755 to Kano ........................................... 58

H.  U.S. Patent No. 5,209,202 to Maurer ........................................ 59

I.  U.S. Patent No. 5,245,968 to Kolias et al. ................................ 62

J.  Japanese Patent Publication No. 63-112U ................................ 64

K.  German Patent Number 40 37 824 To Rembold ....................... 65

L.  Butterfield Article ........................................................................ 66

XIII.  LACK OF DISCLOSURE CONCERNING PARTICULAR ASPECTS OF SENSING/CALCULATING STEPS OF CLAIM 10 OF THE '738 PATENT ........................................................................................ 68

# EXHIBIT 18

# EXHIBIT REDACTED
# IN ITS ENTIRETY

# EXHIBIT 19

# EXHIBIT  REDACTED
# IN  ITS  ENTIRETY

# EXHIBIT 20

# EXHIBIT REDACTED
# IN ITS ENTIRETY

# EXHIBIT 21

# EXHIBIT REDACTED
# IN ITS ENTIRETY

# EXHIBIT 22

# EXHIBIT REDACTED
# IN ITS ENTIRETY

# EXHIBIT 23

# EXHIBIT REDACTED
# IN ITS ENTIRETY

# EXHIBIT 24

# EXHIBIT  REDACTED
# IN  ITS  ENTIRETY

# EXHIBIT 25

# EXHIBIT REDACTED
# IN ITS ENTIRETY

# EXHIBIT 26

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

HITACHI, LTD., and UNISIA NORTH    )
AMERICA, INC.,    )
    )
    Plaintiff,    )
    )    Civil Action No. 05-048-SLR
    v.    )
    )
BORGWARNER INC.,    )
and BORGWARNER MORSE TEC INC.,    )
    )
    Defendants.    )
_____)
    )
BORGWARNER INC.,    )
    )
    Counterclaimant,    )
    )
    v.    )
    )
HITACHI, LTD., and UNISIA NORTH    )
AMERICA, INC.    )
    )
    Counterdefendants.    )

**DEFENDANTS' FIRST SET OF DOCUMENT REQUESTS (NOS. 1-25) TO**
**PLAINTIFFS HITACHI, LTD. AND UNISIA NORTH AMERICA, INC.**

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Defendants

BorgWarner Inc., and BorgWarner Morse TEC Inc., hereby request that Plaintiffs Hitachi, Ltd.,

and Unisia North America, Inc., within thirty (30) days, or such other time as is mutually agreed

upon, respond to the following Requests, and produce the documents and things identified

below for inspection and copying at the offices of Sidley Austin Brown & Wood LLP, 10 South

Dearborn Street, Chicago, IL, 60603, or other mutually agreeable time and place, subject to the

following definitions and instructions.

## DEFINITIONS

In the document requests appearing below, the following definitions shall apply:

A.    "Hitachi" as used herein shall mean plaintiff Hitachi, Ltd., any corporate affiliates, including plaintiff Unisia North America, Inc., and any parent or parents, subsidiaries, domestic or foreign, partners, officers, directors, successors, predecessors, assigns, and the employees, attorneys and agents of any and all of them.

B.    "Defendants" or "BorgWarner" as used herein shall mean BorgWarner Inc., and BorgWarner Morse TEC Inc.

C.    The term "patent-in-suit" or "the '738 patent" shall mean U.S. Patent No. 5,497,738.

D.    The term "variable camshaft timing components" as used herein shall include, without limitation, components used, or which can be used, in a system for controlling the timing of the opening and closing of an intake valve and/or exhaust valve (or for controlling the position of a camshaft relative to the position of a crankshaft or another camshaft) in an internal combustion engine, such components including without limitation (1) camshaft sprockets capable of being hydraulically adjusted (e.g., sprockets with body vanes), (2) camshaft position sensors, (3) variable timing control solenoids and solenoid valves, (4) variable timing control systems and related components, (5) camshaft phase adjustment systems, and (6) electronic control units, and software and hardware contained therein; that have been, are, or are currently planned to be made, used, prototyped, sold, offered or intended for sale in the United

2

States, or imported or exported by or on Hitachi's behalf, or imported into the United States as part of an engine or vehicle system.

E.    The term "concerning" means comprising, relating to, referring to, reflecting, describing, evidencing or constituting.

F.    The term "prosecution history" shall mean proceedings before the United States Patent and Trademark Office, including any interview, correspondence or other materials, whether or not included in the prosecution file history maintained at the United States Patent and Trademark Office.

G.    The term "date of conception" shall mean the earliest date that Hitachi contends the patented invention was conceived.

H.    "Documents" as used herein is employed in the broadest possible sense and means without limitation any written, printed, typed, stored, photographed, recorded or otherwise reproduced communication, compilation or reproduction including computer or electronically generated or stored information or data whether assertedly privileged or not and including all copies of drafts of any document which differs in any respect from the original.

I.    "Communications" includes, without limitation, every manner or means of statement, utterance, notation, disclaimer, transfer or exchange of information of any nature whatsoever, by or to whomever, whether oral or written, or whether face-to-face, by telephone, mail, personal delivery or otherwise, including but not limited to, letters, correspondence, conversations, memoranda, dialogue, discussions, meetings, interview, consultations, agreements and other understandings.

J... "Person" shall refer to any natural person, firm, association, partnership, corporation, group, organization, or other form of legal business entity.

K.    "And" means "and/or." "Or" means "and/or." The plural of any word used herein includes the singular and the singular includes the plural. The masculine gender of any word used herein includes the feminine and the neuter. The past tense of a verb used herein includes the present tense and the present tense includes the past tense.

L.    "Any," "all," "each" or "every" means any and all, each and every.

M.    The terms "make," "use," "sell," "offer to sell," and "import" each assume the broadest possible meaning given those terms under U.S.C. § 154 and 35 U.S.C. §271(a).

N.    The term "prior art" means any patent publication, document, tangible thing, or event falling within any of the classes of information set forth in 35 U.S.C. §102 or §103 or 37 C.F.R. §1.56.

## GENERAL INSTRUCTIONS

Please comply with the following instructions:

A.    All documents that respond, in whole or in part, to any portion of the requests below are to be produced in their entirety, including all attachments and enclosures.

B.    All documents shall be produced either in the order and in the manner that they are kept in the usual course of business or shall be organized and labeled to correspond with the categories of this Request. The documents shall be produced with a copy of their original file folder, binder or other cover or container unless that is not possible. Whenever a

4

document or group of documents is removed from a file folder, binder, file drawer, file box, notebook, or other cover or container, a copy of the label or other means of identification of such cover or other container shall be attached to the document.

C.    Any documents called for herein that Defendants withhold from discovery on a claim of privilege or work-product shall be identified on a log prepared in compliance with Federal Rule of Civil Procedure 26(b)(5).

D.    Notwithstanding any claim that a document is protected from disclosure, any document so withheld must be produced with the portion claimed to be protected excised.

E.    Hitachi is advised that this Request is a continuing one and required further and supplemental prompt production by Hitachi in accordance with the Federal Rules of Civil Procedure, whenever Hitachi acquires, makes or discovers additional responsive documents, between the time of initial production and the conclusion of the trial in this action.

## REQUESTS FOR PRODUCTION

1.    Documents sufficient to identify any variable camshaft timing components, as defined in the Definitions herein, and all engine systems and/or vehicles using or intending to use those variable camshaft timing components.

2.    Documents sufficient to identify any variable camshaft timing components, as defined in the Definitions herein, and all engine systems and/or vehicles using or intending to use those variable camshaft timing components as part of an engine or vehicle system for Nissan Motors ("Nissan"), including without limitation, the Nissan 3.5L V-6 engine and/or the 2004 Nissan Altima.

5

3.    Documents sufficient to identify any variable camshaft timing components, as defined in the Definitions herein, and all engine systems and/or vehicles using or intending to use those variable camshaft timing components as part of an engine or vehicle system for Ford Motor Company ("Ford"), including without limitation, the Ford Duratec engine (2.5 L V-6 and 3.0L V-6), and Jaguar X-type vehicles, including the Jaguar XJ6.

4.    Documents sufficient to show the structure and operation of any variable camshaft timing components, as defined in the Definitions herein.

5.    All documents concerning the design of any variable camshaft timing components, as defined in the Definitions herein.

6.    All documents concerning the development of any variable camshaft timing components, as defined in the Definitions herein.

7.    All communications between Hitachi and any other person concerning the design of any variable camshaft timing components, as defined in the Definitions herein, including any customers and/or potential customers for such components, including without limitation Nissan Motors and Ford Motor Company.

8.    All documents concerning any work, research, development or testing done by Hitachi on any variable camshaft timing components, as defined in the Definitions herein.

9.    All documents concerning any work, research, development or testing done by a third-party at Hitachi's direction or on Hitachi's behalf on any variable camshaft timing components, as defined in the Definitions herein.

6

10.     All documents concerning the conception of any variable camshaft timing components that Hitachi contends to be invalidating prior art to the '738 patent, either alone or in combination with other prior art.

11.     All documents concerning the reduction to practice of any variable camshaft timing components that Hitachi contends to be invalidating prior art to the '738 patent, either alone or in combination with other prior art.

12.     All documents or inventor notebooks concerning any work, research, development or testing done by or for Hitachi on any variable camshaft timing components, as defined in the Definitions herein, that are the subject of any patents and/or patent applications filed by Hitachi in Japan or elsewhere in the world.

13.     All engineering drawings, manufacturing specifications, product specifications or design specifications for any variable camshaft timing components, as defined in the Definitions herein.

14.     All correspondence, contracts, or agreements (whether with actual or prospective manufacturers, suppliers, customers or any other person) concerning any variable camshaft timing components, as defined in the Definitions herein.

15.     Documents sufficient to identify the supplier or suppliers of any parts and/or materials of any variable camshaft timing components, as defined in the Definitions herein.

16.     Documents sufficient to show the location(s) where any variable camshaft timing components, as defined in the Definitions herein, are and/or were made.

7

17.     All documents concerning Hitachi's reasons and motivations for developing and seeking to market any variable camshaft timing components, as defined in the Definitions herein.

18.     All advertising and promotional materials, sales brochures, catalogs, data books, customer presentations and any documents relating thereto concerning any variable camshaft timing components, as defined in the Definitions herein.

19.     Organizational charts showing all personnel who at any time had responsibilities concerning any variable camshaft timing components, as defined in the Definitions herein.

20.     All United States or foreign patents or patent applications Hitachi owns or owned concerning any variable camshaft timing components, as defined in the Definitions herein, whether abandoned, pending or granted.

21.     All United States or foreign patents or patent applications Hitachi licenses to others, or has taken licenses under, concerning variable camshaft timing components, as defined in the Definitions herein.

22.     All articles, abstracts, and other publications concerning any variable camshaft timing components, as defined in the Definitions herein.

23.     Documents concerning the revenues, unit sales, gross sales, net profits, gross profits, fixed costs, variable costs, and sales prices attributable to any variable camshaft timing components, as defined in the Definitions herein, on an annual basis from January 31, 1999, to the present.

8

24.    All documents concerning sales, profit and marketing projections and/or business or strategic plans for any variable camshaft timing components, as defined in the Definitions herein.

25.    Any meeting minutes or notes, including but not limited to board and/or internal meeting minutes or other meeting minutes or notes, or other documents of Hitachi, relating to variable camshaft timing components, the patent-in-suit, or any actual or potential litigation relating thereto, including patent or intellectual property department reviews, studies and/or evaluations of the patent in suit.

Dated: April 25, 2005

Respectfully submitted,

Richard K. Herrmann (I.D. #405)
Lewis H. Lazarus (I.D. #2374)
Morris James Hitchens & Williams LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE 19899
(302) 888-6800

Hugh A. Abrams *(pro hac vice)*
Marc A. Cavan *(pro hac vice)*
Hillary A. Mann *(pro hac vice)*
Sidley Austin Brown & Wood, LLP
10 South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

*Attorneys for BorgWarner Inc., and BorgWarner Morse Tec Inc.*

9

## CERTIFICATE OF SERVICE

Hillary Mann, an attorney, hereby certifies that she caused a true and correct copy of the foregoing document, Defendants' First Set of Document Requests (Nos. 1-25) to Plaintiffs Hitachi, Ltd. and Unisia North America, Inc. to be served on the following counsel of record in the manner specified:

**By E-mail with confirmation copy by Overnight Courier**

Michael D. Kaminski, Esq.
Pavan K. Agarwal, Esq.
FOLEY & LARDNER LLP
3000 K Street, N.W. Suite 500
Washington, D.C. 20007-5109
Phone: (202) 672-5300
Fax: (202) 672-5399
mkaminski@foley.com
pagarwal@foley.com

Steven J. Balick
John G. Day
ASHBY & GEDDES
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19899
Phone: (302) 654-1888
Fax: (302) 654-2067
sbalick@ashby-geddes.com
jday@ashby-geddes.com

Dated: April 25, 2005

Hillary A. Mann

CHI 3186512v.1

# EXHIBIT 27

# EXHIBIT REDACTED IN ITS ENTIRETY

# EXHIBIT 28

# EXHIBIT  REDACTED
# IN  ITS  ENTIRETY

# EXHIBIT 29

# EXHIBIT REDACTED
# IN ITS ENTIRETY

# EXHIBIT 30

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| HITACHI, LTD., and UNISIA NORTH AMERICA, INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 05-048-SLR |
| BORGWARNER, INC., and BORGWARNER MORSE TECH, INC., | ) ) ) | |
| Defendants. | ) | |

## THIRD DISCOVERY ORDER

The Special Master, having received on February 16, 2006 the final submissions from the parties, and having heard argument on BorgWarner, Inc.'s and BorgWarner Morse Tech, Inc.'s (collectively "BorgWarner") request for additional discovery from Hitachi, Ltd., and Unisia North America, Inc. (collectively "Hitachi") relating to (1) variable timing components; (2) electronic control units; and (3) sales or offers for sale to Ford Motor Company and General Motors Corporation, IT IS ORDERED as follows:

1.    Variable Timing Components Discovery.

BorgWarner has requested further discovery relating to variable timing components ("VTC") that Hitachi sells to its customers. According to BorgWarner, although Hitachi has provided discovery directed to the solenoid and actuator, the VCT system includes the following components for which no discovery has been provided - cam angle sensors, crank angle sensors, engine control units ("ECU's"), crankshafts, camshafts, sprocket chains connecting sprockets, oil pumps, supply lines, wiring harnesses for the ECU, battery, and other sensors such as the air flow sensor, temperature

sensor, and throttle position sensor. If Hitachi sells any of the foregoing "VTC components," then BorgWarner requests that Hitachi provide summary data on the sales of these components, including data covering the profitability of these components if such data exists. BorgWarner claims that the foregoing information is needed by its expert to factor these sales into her damages analysis.

Hitachi responds that the patent at issue is directed to a narrower range of VTC components. In their sales and marketing literature, Hitachi and BorgWarner describe their variable camshaft timing systems as "an actuator and a solenoid," and only separately describe the expanded list of components BorgWarner now claims are part of its definition of VCT components. Hitachi also points out that in BorgWarner's definitions accompanying its discovery requests, BorgWarner did not identify any of the additional components as part of its VCT system. Hitachi also argues that many of the additional components are not part of the patent claims, such as wiring harnesses and the battery, and, according to Hitachi, far exceed any reasonable definition of VCT components. Hitachi therefore resists discovery relating to VCT components other than the solenoid and actuator.

To narrow the dispute and to assess the burdensomeness of BorgWarner's request, the Special Master asked Hitachi to determine what components in BorgWarner's expanded list Hitachi sells to its customers. Hitachi responded that, after a "good faith investigation," it sells the following components to the following automobile manufacturers: (1) Nissan – actuators, solenoids, cam angle sensors, crank sensors, ECU's, oil pumps, piston oil jets, air flow sensors, temperature sensors, and throttle

position sensors; (2) Honda – actuators, solenoids, oil pumps, piston oil jets, and air flow sensors; and (3) Ford – actuators, solenoids.

After BorgWarner reviewed Hitachi's list, BorgWarner dropped its request for information relating to the "piston oil jet," but continues to press its request for information relating to oil pumps and sensors (air flow, temperature, and throttle position). BorgWarner claims that the "oil pump" is a patent claim element, and therefore is relevant to the damages analysis. The sensors, according to BorgWarner, are relevant to a "convoyed sales" damage claim because the sensors are likely sold along with Hitachi's ECU and therefore work together with the VCT system.

As with any discovery dispute, I start with the proposition that the standards for discovery are liberal, and the moving party is entitled not just to evidence that would be admissible at trial, but evidence that is likely to lead to the discovery of evidence that would be admissible at trial. Balanced against the presumption of liberality of discovery, however, are the common sense principles of proportionality and law of diminishing returns. The Special Master must consider whether the search for discoverable information would impose an undue financial or work-related burden on the party responding to the discovery, and also consider how relevant the requested information is to the issues in the proceedings.

The dispute between BorgWarner and Hitachi has been narrowed to Nissan and Honda sales information relating to oil pumps and sensors for engines where Hitachi has also sold its VCT system. I find that the oil pump and sensor sales information is potentially relevant to at least BorgWarner's convoyed sales damages claim. Information related to the oil pump is relevant because it is a recited element of the patent claims. I

3

also find that information requested is of sufficient importance to cause Hitachi to

undertake the time and expense of producing the requested information. Therefore,

Hitachi shall produce to BorgWarner, in summary form, its sales, cost, and profit

information, to the extent that such information is kept by Hitachi in the ordinary course

of business, for those vehicles/engines where Hitachi also sells its VCT system. To the

extent possible, Hitachi shall identify the sales by the vehicle or type of engine. If

Hitachi does not keep cost and profit information for oil pumps and sensors in the

ordinary course of business, it shall provide what information it has relating to the

profitability of these parts.

By requiring the production of financial information related to the oil pump and

sensors for vehicles/engines where Hitachi also sells its VCT system, I express no

opinion on whether BorgWarner is legally entitled to recover those sales as part of its

claim for damages. That determination rests solely with the District Court. I have

merely held that at this stage of the proceedings, BorgWarner has made the required

showing under the liberal discovery standards for production of the requested

information.

    2.    <u>Electronic Control Unit Discovery</u>.

BorgWarner requests discovery relating to Hitachi's ECU's. According to

BorgWarner, the ECU is expressly recited in the patent at issue (claim 10) as part of the

method of controlling the operation of a variable camshaft timing system in an engine.

BorgWarner contend that it needs financial information related to ECU's so BorgWarner

can include the sales in its royalty base calculation. Discovery relating to the technical

aspects of Hitachi's ECU will also, according to BorgWarner, enable it to establish

Hitachi's specific intent to encourage indirect infringement (inducing infringement and contributory infringement). BorgWarner therefore asks for a broad scope of discovery relating to Hitachi's ECU's, including technical and financial information for ECU's sold for use in engines incorporating Hitachi's VCT technology, as well as in engines without Hitachi's VCT technology. According to BorgWarner, it needs this latter category of information to determine the price differential (and therefore the value of the VCT module) between ECU devices with and without the VCT software module.

Hitachi resists ECU discovery on several grounds. First, Hitachi contends that it has already provided technical information on ECU's that incorporate a software module used in conjunction with Hitachi's VCT system. Second, Hitachi claims that much of the financial information requested by BorgWarner is irrelevant because it is directed to ECU's that are not used in conjunction with Hitachi's VCT system. Perhaps most emphatically, Hitachi has submitted the Iida Declaration, which states in essence that the burden of searching for the information is time-consuming and expensive. According to Mr. Iida, the VCT control module is such an insignificant part of the ECU (the ECU controls many other engine functions) that Hitachi should not have to incur several months of time and expense to locate and review information that is a small part of the ECU function and therefore marginally relevant at best.

The Special Master has considered the arguments of the parties, and believes that some technical and financial information relating to Hitachi's ECU's should be provided. The ECU is a claim element, and the software module integrated with Hitachi's VCT system is arguably relevant to damages, either based on an entire market value rule or as a defined element of the patent claim. I do, however, recognize Hitachi's argument that

5

the ECU performs much broader functions. Hitachi has made a showing that it would be unfairly burdened if ordered to provide all discovery sought by BorgWarner relating to Hitachi's ECU's. Therefore, the Special Master will require Hitachi to provide the following limited discovery:

(a)     Hitachi shall provide BorgWarner complete representative specifications for ECU's sold to Nissan that contain VCT modules used in conjunction with Hitachi's VCT system ("Nissan ECU's").

(b)     Hitachi shall produce documents relating to the operation of the VCT modules used in the Nissan ECU's for Nissan vehicles or engines imported into the United States.

(c)     Hitachi shall provide sales, cost, and profit information for Nissan ECU's as kept by Hitachi in the ordinary course of business.

(d)     Hitachi shall produce marketing information relating to Hitachi's sale of Nissan ECU's.

(e)     To the extent that Hitachi prices ECU's differently based on whether the ECU contains a VCT module, Hitachi shall produce summary financial information sufficient for BorgWarner to determine the price differential between ECU's with and without the VCT module.

Subject to Hitachi's good faith compliance with this order, BorgWarner's remaining requests for discovery relating to ECU's, including its request for a Rule 30(b)(6) deposition, are denied.

6

3.   Discovery Relating to Sales and Offers for Sale to Ford
     and General Motors.

BorgWarner also argues that it is entitled to a supplemental answer to Interrogatory One because Hitachi's witnesses recently disclosed in depositions that Hitachi is selling or offering for sale Variable Crankshaft Timing Components ("VCT components") to Ford Motor Company ("Ford") for a "D35" engine, and has offered VCT components for sale to General Motors Corporation ("General Motors"). Following supplementation, BorgWarner has asked that Hitachi stipulate that the VCT components offered for sale to Ford and General Motors are materially the same as those in the Nissan and other Ford engines. BorgWarner also asks for documents relating to the sales or offers for sale related to the Ford D35 engine and sales or offers for sale to General Motors. According to BorgWarner, the information is relevant to its infringement allegations as well as its damages claims.

Hitachi claims that, although it has been awarded a contract to sell the VCT system for the Ford D35 engine, it has not yet started actual manufacture of any of the VCT components to be used in the Ford D35 engine. Hitachi also claims that it has only offered VCT components for sale to General Motors, and has not been awarded a contract. Because the "method" claimed in the patent has not been carried out, according to Hitachi, there has been no direct infringement, and therefore contributory or inducing infringement cannot exist. Therefore, discovery should not be ordered at this time.

Even though there has been no actual sale of a VCT device for the Ford D35 engine or to General Motors, the standard for discovery is, as noted previously, liberal. BorgWarner has made a sufficient showing that documents relating to offers for sale as well as actual sales are potentially relevant to BorgWarner's infringement allegations.

7

The technical documents, which should reveal the VCT system sold or offered for sale, could provide further support for BorgWarner's infringement claims. The pricing information would also be relevant to BorgWarner's damage claims, and may provide meaningful information for use by BorgWarner's expert in calculating lost profits or a reasonable royalty. Finally, Hitachi has not demonstrated that obtaining the requested information would cause any undue burden. Therefore, the Special Master will require Hitachi to provide discovery as follows:

(a)    Hitachi shall supplement its response to BorgWarner's Interrogatory One relating to the Ford D35 engine and the offer for sale to General Motors.

(b)    In the absence of a stipulation between the parties that the VCT components offered for sale to Ford and General Motors are materially the same as those in the Nissan and other Ford engines, Hitachi shall produce all design and technical information relating to the VCT system sold to Ford or offered for sale to General Motors.

(c)    Hitachi shall produce all sales solicitation materials and all financial information related to the sale of VCT systems for the Ford D35 engine and the offer for sale of VCT systems to General Motors.

_____
Special Master

Dated: February 27, 2006

# EXHIBIT 31

# MORRIS, JAMES, HITCHENS & WILLIAMS LLP

222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19801
(302) 888-6800
Facsimile (302) 571-1750
www.morrisjames.com

Mary B. Matterer
(302) 888-6960
mmatterer@morrisjames.com

Mailing Address
P.O. Box 2306
Wilmington, DE 19899-2306

January 18, 2006

**VIA EMAIL AND HAND DELIVERY**

Collins J. Seitz, Jr., Esq.
Connolly Bove Lodge & Hutz LLP
The Nemours Building
1007 North Orange Street
Wilmington, DE 19801

Re: *Hitachi Ltd. et al. v. BorgWarner, Inc. et al.,*
D. Del., C.A. No. 05-048-SLR

Dear Special Discovery Master Seitz:

Given the impending discovery cut-off date of January 27th, BorgWarner respectively requests the immediate assistance of the Special Discovery Master regarding the following outstanding discovery disputes. Plaintiffs have failed to produce documents fundamental to the damages and liability aspects of the pending litigation.

- First, Hitachi has produced almost no documentation relating to the costs and profitability of its VCT components, and yet wants to introduce at trial testimony on profitability of its VCT components.
- Second, Hitachi has unilaterally decided to withhold documentation within its possession and control relating to the technical and financial aspects of VCT components supplied by Hitachi to Honda, thereby frustrating BorgWarner's development of its infringement case and damages analysis pertaining to VCT components for Honda.
- Third, Hitachi has produced precious few license agreements related to automotive parts, which are potentially significant to the determination of a reasonable royalty rate.
- Fourth, Hitachi has failed to produce sales and revenue information for Electronic Control Units (ECUs) that Hitachi sells to Nissan, which control the operation of the VCT components Hitachi also sells to Nissan.
- Finally, Hitachi has withheld additional materials including VCT samples and forecasts that are necessary for liability and damages purposes.

Collins J. Seitz, Jr., Esq.                          MORRIS, JAMES, HITCHENS & WILLIAMS LLP
January 18, 2006
Page 2

      Because of these discovery deficiencies, and because depositions of Hitachi's customers (including Nissan which is represented by Hitachi's counsel) have yet to be scheduled, BorgWarner is also separately filing a motion with the Court to adjust the schedule for the submission of expert reports to allow sufficient time to obtain this needed discovery and incorporate it into Expert Reports. Through this letter motion, however, BorgWarner seeks only assistance in its ongoing discovery disputes.

1.    <u>Hitachi's Financial Documentation</u>

      BorgWarner, along with guidance from BorgWarner's damages expert, has observed significant gaps in Hitachi's production of financial documents. To date, BorgWarner has received only a single "profitability analysis" on VCT components undertaken for a part of the 2005 time period. This analysis provides results without any underlying support (e.g., the cost data used and the methodology for allocating costs for each cost category). BorgWarner needs this information in order to analyze and test this "profitability analysis." After such documentation is produced, BorgWarner will also require a competent 30(b)(6) deposition witness who is able to explain Hitachi's manner of preparing its profitability analysis, as well as how Hitachi collects, maintains, and allocates the underlying cost data.

      In addition, BorgWarner requires similar cost data for VCT components dating back to when sales of the alleged infringing products began. The cost data BorgWarner seeks should include standard costs and variances, as well as any accounting procedures and policies used by Hitachi. More, specifically, BorgWarner seeks Hitachi's costs on a monthly and yearly basis, both standard and actual, broken out separately for the following categories: costs of materials, processing costs, other administrative and overhead costs, sales and marketing costs and any taxes. BorgWarner additionally seeks from Hitachi the price of all VCT components included in these cost breakdowns, either as individual components (e.g., VCT actuator and solenoid) or as a single unit. Further, BorgWarner needs all profit and loss statements maintained by the Atsugi Plant, which is where Hitachi manufactures its VCT components. This information is needed to test and verify Hitachi's so-called 2005 "profitability analysis" for VCT components. According to recent deposition testimony, Hitachi prepared its profit and loss statements on an annual basis.

      In the alternative, if Hitachi refuses to provide such information, it should be precluded from introducing any evidence related to the costs and profitability of VCT sales. Hitachi should not be permitted to shield its cost information and then introduce a self-serving "profitability analysis."

Collins J. Seitz, Jr., Esq.                    MORRIS, JAMES, HITCHENS & WILLIAMS LLP
January 18, 2006
Page 3

2.    Honda Information

        To BorgWarner's dismay, Hitachi's counsel informed BorgWarner during a meet
and confer yesterday (January 16) that contrary to prior representations, Hitachi has for several
years been selling VCT components to Honda for engines made or imported into the US.
BorgWarner also just recently learned that Hitachi likely has commitments from Honda to
supply VCT components to additional engines in the next few months.  Hitachi has stonewalled
BorgWarner on the financial and technical front to the point where BorgWarner has insufficient
evidence, both in terms of documents and deposition testimony, for its infringement case and
damages analysis related to Honda parts.

        a.    Financial Information

        As BorgWarner raised in the January 6th teleconference, BorgWarner still needs
information on Hitachi's VCT sales to Honda similar to what has been produced for its Nissan
and Ford sales.  In particular, BorgWarner requires a chart for Honda sales like that provided in
Exhibit A1 of Hitachi's Third Supplemental Interrogatory Response (attached hereto as Tab 1)
for its Nissan and Ford sales.  This chart should provide the following information for VCT
actuators, solenoids, cam angle sensors and crank angle sensors sold to Honda in a vane-type
VCT system: model number, Honda Vehicle/Engine using such VCT system, and years of
production.  If Hitachi is not willing to provide such a chart, BorgWarner requires, at a
minimum, documentation sufficient to permit BorgWarner to prepare such a chart.  BorgWarner
also requires financial documentation reflecting the date of sale, units sold, the price and the
location of the buyer for all VCT components identified in this chart.  Such documentation
should be similar to reports previously provided for VCT components sold to Nissan.  After we
obtain this documentation, BorgWarner will require a competent 30(b)(6) witness to testify on
behalf of Hitachi pertaining to Honda parts.  Hitachi is unlikely to provide all information
BorgWarner needs.  Consequently, BorgWarner is simultaneously seeking information directly
from Honda pursuant to a subpoena.  This is, however, no excuse for Hitachi to withhold
relevant information within its possession and control.

        b.    Technical Information

        Nor has BorgWarner received sufficient documentation and testimony from
Hitachi on the technical side to allow us to present our infringement case for VCT components
used in Honda engines and/or vehicles.  BorgWarner requires the immediate production of this
technical information, including without limitation all drawings, specifications and physical
samples.  After the production of such documentation, BorgWarner will need to conduct a
30(b)(6) deposition of Hitachi pertaining to the structure and operation of such VCT systems.
Alternatively, if Hitachi will stipulate that any such VCT systems are materially the same and

Collins J. Seitz, Jr., Esq.                     MORRIS, JAMES, HITCHENS & WILLIAMS LLP
January 18, 2006
Page 4

work the same way as those supplied to Ford and Nissan, BorgWarner is willing to forego a
deposition as to the technical operation of the Honda VCT components.

   3.    Hitachi Licenses

            In order to determine a reasonable royalty, our damages experts need to examine
Hitachi licenses related to automotive parts.  To date, Hitachi has produced only a handful of
licenses.  All Hitachi licenses must be produced.

   4.    Documentation Related to Electronic Control Units (ECU)

            During yesterday's 30(b)(6) deposition of Hitachi, BorgWarner learned that
Hitachi sells Electronic Control Units (ECUs) to Nissan in connection with the sale of other VCT
components (e.g., solenoid and VCT bodies) for the engines identified in Hitachi's Third
Supplemental Interrogatory Response, Exhibit A1.  Accordingly, BorgWarner now requires the
following information from Hitachi related to these ECUs:

   •   Sales summary (available from Hitachi's database) that identifies the following
       information for these ECUs: model number, Nissan Vehicle/Engine using such
       ECU, the date of sale, units sold, the price and facility where the ECU was sold.
       Such documentation should be similar to reports previously provided for VCT
       components (e.g., solenoid, VCT actuator, and sensors) sold to Nissan.
   •   Specifications in Hitachi's possession for the ECUs and other VCT components
       sold to Nissan for each specific VCT system identified in Exhibit A1.
   •   Any copyright notices and registrations for the software utilized in these ECUs.
       (This is to show that Hitachi authored the software, not Nissan).

   5.    Miscellaneous Deficiencies

            In addition to the foregoing, there are many remaining discovery deficiencies that
have been identified in recent depositions, some examples of which are the following:

   •   Hitachi has yet to produce physical samples of components referenced in
       Hitachi's Third Supplemental Interrogatory Response, Exhibit A1 for the Ford
       Duratec 30 Engine (unless Hitachi will stipulate that they function materially the
       same as the VCT component samples provided for the Nissan Engines identified
       in Exhibit A1).
   •   Internal forecasts (both one and three year forecasts), customer forecasts, and
       forecasts from third party providers.  Hitachi's counsel has suggested that all

Collins J. Seitz, Jr., Esq.                    MORRIS, JAMES, HITCHENS & WILLIAMS LLP
January 18, 2006
Page 5

forecasts had been produced, but Hitachi's recent witnesses have confirmed that
they have not even been collected.

- Any long term agreements and purchase orders for the future supply of VCT
  components.    These are important to identify infringing sales and quantify
  damages.

- Documentation sufficient to allow BorgWarner to cross reference between
  internal Hitachi VCT part numbers and internal customers' part numbers.
  Hitachi's counsel has agreed to produce such documentation, but it is important
  that it be produced promptly.

In recent depositions we have specifically requested several other documents and
expect to learn of additional documents in the damages depositions this week and next.  We
respectfully reserve the right to seek your assistance in obtaining such documents if Hitachi
refuses to produce them voluntarily.  Addressing the above issues, however, would take us far in
terms of completing our liability and damages analysis.  Thus, BorgWarner would be grateful for
the opportunity to discuss this further during the telephone conference scheduled for today.

Respectfully,

Mary B. Matterer

cc: Steven J. Balick, Esq. (via email)
    Michael D. Kaminski, Esq. (via email)

# TAB 1

# EXHIBIT  REDACTED

**Contains Hitachi Highly Confidential Information**

# EXHIBIT A1

# EXHIBIT  REDACTED

# EXHIBIT 32

# ASHBY & GEDDES

ATTORNEYS AND COUNSELLORS AT LAW

222 DELAWARE AVENUE

P. O. BOX 1150

WILMINGTON, DELAWARE 19899

TELEPHONE
302-654-1888

FACSIMILE
302-654-2067

January 20, 2006

Collins J. Seitz, Jr., Esquire
Connolly Bove Lodge & Hutz LLP
1007 North Orange Street
PO Box 2207
Wilmington, Delaware 19899-2207

BY HAND DELIVERY AND
ELECTRONIC MAIL

Re:  *Hitachi, Ltd. v. BorgWarner Inc., et al.,*
     C.A. No. 05-48-SLR

Dear Special Master Seitz:

This letter sets forth Hitachi's response to BorgWarner's January 18, 2006 letter regarding the discovery cut-off date and various discovery disputes.

BorgWarner's complaints are rather surprising, as many of them can be addressed simply by looking at Hitachi's production and responses. It is apparent from BorgWarner's letter that BorgWarner is not actually reviewing Hitachi's production before complaining about the alleged lack of documents, and is not actually reading Hitachi's objections and statements in connection with both depositions and written discovery responses. For various points that BorgWarner asserts, a simple meet and confer would have resolved the point.

Not surprisingly, BorgWarner's letter fails to note the numerous deficiencies in BorgWarner's own document production that have yet to be resolved. Hitachi will detail these deficiencies and other outstanding issues in a separate letter.

Contrary to BorgWarner's assertions, there is simply no reason to extend fact discovery or the period for expert reports. As detailed below, the information requested by BorgWarner either does not exist, has already been produced, or is not relevant to the case.

1.   Hitachi's Financial Documentation

Throughout discovery, Hitachi has cooperated with BorgWarner in promptly producing financial documents, often even before responses were due. In fact, much of Hitachi's financial document production was retrieved from electronic databases, contrary to the parties' agreement that electronic discovery was to be limited to particular email collection, as reflected in the Scheduling Order. BorgWarner's assertions that Hitachi has intentionally withheld production of financial documents are baseless.

Collins J. Seitz, Jr., Esquire
January 20, 2006
Page 2

It is apparent from BorgWarner's letter that it has reviewed Hitachi's production in various respects and simply refuses to believe that Hitachi does not have certain categories of financial documents, despite sworn deposition testimony that such documents do not exist. In addition, it is apparent that BorgWarner's attorneys are retracing the same ground as already covered in previous financial depositions. Indeed, in the depositions conducted this week and last week, Mr. Rein took hours retracing the same topics and documents that were previously covered in the Osaka depositions in November and Hitachi's interrogatory responses following those depositions. The only rational conclusion to be drawn from this conduct is that he either failed to review the transcripts of those depositions (taken by his partner, Lisa Schneider), or that he wanted another "bite at the apple" from Hitachi's witnesses. This latter conclusion is the more likely, since Mr. Rein asked questions that clearly could have been but were not asked in Osaka.

For example, BorgWarner complains about receiving a single "profitability analysis" of VCT components for a portion of 2005. As Hitachi has repeatedly confirmed, this is Hitachi's only profitability analysis for VCT components. When requested by BorgWarner to update this analysis to include information from October 2005, Hitachi promptly did so. BorgWarner also complains that the analysis was provided "without any underlying support." Directly to the contrary, Hitachi previously produced the underlying support (HIT 479467-500). The information provided in those documents includes both the underlying cost data and a detailed explanation of the methodology used for calculating and allocating the costs. There is no need for yet another 30(b)(6) deponent. Hitachi provided extensive testimony on the profitability analysis, and Hitachi has produced an "explanation sheet" for the underlying cost information.

BorgWarner also requests cost data for VCT components going back to when sales of the alleged infringing products began. BorgWarner's request demonstrates that it did not bother reviewing Hitachi's production before complaining about this alleged deficiency. Hitachi has provided extensive cost information for VCT components from 1999 throughout 2005 (including on a monthly basis) where it retains that information. See UGC 8596A-9439. These documents were pulled from electronic databases, well beyond what the parties actually agreed to do and beyond the requirements of the Court's Scheduling Order. Beyond such documents, Hitachi does not have such cost information.

BorgWarner also has requested profit and loss statements maintained by Hitachi's Atsugi plant, and notes that "[a]ccording to recent deposition testimony, Hitachi prepared its profit and loss statements on an annual basis." BorgWarner is correct in stating that Hitachi maintains profit and loss statements on an annual basis. In fact, Hitachi produced these very profit and loss statements (HIT 441238-49) and they were covered in the Osaka depositions. Yet further, Hitachi has produced extensive profit and loss statements from UGC (a U.S. subsidiary that sells VCT components to Ford and Nissan North America).

In sum, contrary to BorgWarner's assertions, Hitachi already has produced all of the financial documents requested by BorgWarner, to the extent such documents exist and even beyond the agreed-upon limitations on electronic discovery. BorgWarner's argument that Hitachi should be precluded from introducing evidence on profitability therefore is entirely baseless.

Collins J. Seitz, Jr., Esquire
January 20, 2006
Page 3

2.    Honda Information

In its January 18 letter, BorgWarner mischaracterizes the issue of Hitachi's VCT sales to Honda. BorgWarner's statement that "Hitachi has for several years been selling VCT components to Honda for engines made or imported into the US" is incorrect in several important respects.

*First,* BorgWarner's reference to sales "for several years" refers to Hitachi's sale of VCT components to Honda for the Civic Type-R engine, a specialty automobile engine manufactured *in the United Kingdom,* not in the United States. Hitachi's understanding is that only a few thousand of these engines were manufactured in the U.K. yearly and that some were imported into the United States, although Hitachi has no idea of when this occurred or how many.

*Second,* Hitachi only began selling VCT components to Honda for engines made at Honda America for this single model automobile engine in October 2005. These sales are understood to total less than 10K units. Thus, these sales are *de minimis* when viewed in comparison to Hitachi's total worldwide sales of VCT components, which are in the millions. Yet further, production in the U.S. does not equal sales to U.S. consumers that will carry out the accused method. This recent development does not justify additional discovery on all of Hitachi's Honda activities in Japan, which would be burdensome. Further, BorgWarner's reference to possible products for possible future automobiles that may be sold at some point is irrelevant. Hitachi has not yet provided parts for such automobiles. No alleged infringement can possibly exist until such vehicles are sold and driven by consumers.

*Third,* Hitachi has provided BorgWarner with deposition testimony on the structure and operation of its VCT components sold to Honda (see Ichinosawa testimony on Defendants' Exhibit 13).

*Fourth,* beyond the *de minimis* sales noted above, Hitachi has reiterated many times now in sworn deposition testimony that when it sells VCTs to Honda in Japan, Hitachi does not know where Honda sells the vehicles in which those VCTs are installed. Under such circumstances, Hitachi cannot possibly be liable for infringement of BorgWarner's patent. Based on BorgWarner's own allegations, Hitachi can only be potentially liable for indirect infringement, *i.e.,* contributory infringement or actively inducing others to infringe the method at issue. Since Hitachi does not sell or offer to sell VCT components to Honda Japan in the United States, there can be no contributory infringement under 35 U.S.C. § 271(c). Similarly, as Hitachi has no knowledge that its VCT components sold to Honda Japan are ultimately exported by Honda Japan to the U.S., there can be no inducement to infringe the U.S. patent at issue in this case (which requires performing a method in the U.S.). *Warner-Lambert Co. v. Apotex Corp.,* 316 F.3d 1348, 1364 (Fed. Cir. 2003) (stating that "[p]roof of actual intent to cause the acts which constitute the infringement is a necessary prerequisite to finding active inducement.").

*Fifth,* BorgWarner has no excuse for waiting to raise the issue regarding sales to Honda Japan until only a few weeks before the close of fact discovery (which has already been extended once by two weeks). Eight months ago, on May 25, 2005, Hitachi served its responses and

Collins J. Seitz, Jr., Esquire
January 20, 2006
Page 4

objections to BorgWarner's First Set of Document Requests. In that pleading, Hitachi made the following general objection:

> 7. Hitachi and UNAI object to these requests to the extent that they purport to cover products manufactured and sold outside of the United States without being imported or being known to be imported into the United States by Hitachi or UNAI. To the extent that documents are produced regarding such categories of products, this is not an admission regarding their relevance.

In those same responses and objections, Hitachi also objected to the definition of "variable camshaft timing components" as purporting "to cover all exports of Hitachi, without regard to destination, known or unknown. Yet further, Hitachi and UNAI do not know all engines or vehicles that are imported into the United States by a party other than Hitachi or UNAI." Thereafter, before any depositions took place, Hitachi provided a chart to BorgWarner listing the parts and vehicles subject to its objections. No Honda part was identified. While BorgWarner asked deposition questions about the technical aspects of Hitachi's VCT components sold Honda (over objection), they never asked for financial information on sales of those components to Honda Japan until very recently.

In sum, there is no need for further discovery on Hitachi's sales of VCT components to Honda Japan because (1) Hitachi's sales of VCTs for use in the Civic Type R engine made in the U.K. were *de minimis* and Hitachi has no knowledge of the amount of those engines exported to the U.S., (2) Hitachi's sales of VCTs to Honda Japan are neither relevant nor likely to lead to the discovery of relevant evidence because such sales cannot be the basis for any patent infringement liability in this case, and (3) BorgWarner's failure to seek an order compelling this discovery until the end of fact discovery should not be permitted, given that BorgWarner knew eight months ago that Hitachi objected to its production. BorgWarner's strategy to do so now is solely for "dramatic" purposes and should be downplayed.

3.    <u>Hitachi Licenses</u>

Hitachi has no idea why BorgWarner is raising this issue of general automotive part licenses now. Prior to BorgWarner's Document Request No. 57, the response to which is not even due until January 23, BorgWarner's requests for production have been directed to license agreements for VCT components (*see, e.g.*, BW Request Nos. 14, 21, 37). In response to the earlier requests, Hitachi produced license agreements, such as one with Denso related to VCT components. Upon receipt of BorgWarner's new Request No. 57, Hitachi has been investigating the existence and relevance of additional license agreements for other automotive parts and will timely produce them.

BorgWarner's complaint is also inconsistent with its own document production. BorgWarner has produced no license agreements for other automotive parts, even though Phillip Mott, one of its executives, testified that such licenses exist. BorgWarner's automotive license agreements are just as relevant to determining a reasonable royalty as Hitachi license agreements. (As noted earlier, this is just one of BorgWarner's deficiencies, and Hitachi is providing a separate letter on this matter.)

Collins J. Seitz, Jr., Esquire
January 20, 2006
Page 5


4.    Documentation Related to Electronic Control Units (ECUs)

BorgWarner alleges that it needs information on Hitachi's ECUs because Hitachi sells this component "in connection with the sale of other VCT components." That is flat out wrong. Hitachi's witnesses have testified that a completely separate Hitachi division handles ECUs, including an entirely different sales force and design department. Sales of ECUs has nothing to do with the sale of VCT components (which witnesses from both sides repeatedly have testified comprise actuators and solenoids). Indeed, Hitachi was selling ECUs long before it became involved in the VCT business. Hitachi simply does not understand BorgWarner's request for technical specifications. Hitachi already has produced technical information on its ECUs relating to VCT control. BorgWarner can fully assess the issue of liability for such ECUs with this information. BorgWarner is merely trying to throw into the damages the proverbial "kitchen sink" in an effort to unfairly burden Hitachi.

As to damages, sales of ECUs add nothing of relevance and their production would be onerous and highly prejudicial. The ECU provides the electronic control for the entire automobile. It is indeed the "brains" for the whole automobile. The VCT control is a miniscule part. The patent at issue is really about VCT components -- the solenoid valve and the VCT actuator -- and damages claims should be assessed accordingly. Damages should not be based on peripheral components, such as the ECU, simply because such components interact with the VCT. Contrary to BorgWarner's assertion, ECU sales are not tied to the VCT component sales. BorgWarner's position is akin to claiming damages on the price of a microprocessor where the patent covers a computer monitor, because the patent mentions that data is sent from the microprocessor to the monitor.

On the other hand, the burden imposed on Hitachi to search for and collect all the sales information requested by BorgWarner relating to ECUs is enormous. Hitachi estimates that it could easily take a month to identify and obtain the sales documents sought by BorgWarner.

Producing sales information on Hitachi's ECUs also would be quite prejudicial. The price of the ECU itself is much greater than the price of the VCT components. BorgWarner obviously wants to inflate its damage base by pointing to peripheral components, where no reasonable reason exists to do so. In light of the nominal and miniscule portion of the control that relates to the VCT, BorgWarner's newest attempt to burden Hitachi should be rejected.

5.    Miscellaneous Deficiencies

a.    Samples

BorgWarner asks for samples of VCT products for the Ford Duratec 30 engine. Hitachi already produced representative samples of its VCT components, including for the Ford Duratec 30 and Nissan engines. In fact, BorgWarner introduced these sample VCT actuators in a prior deposition as Defendants' Deposition Exhibits 30-33 and asked questions about them. *See* Ichinosawa November 17, 2005 transcript. Thus, Hitachi does not completely understand what BorgWarner's complaint is regarding the samples, but is certainly willing to address further reasonable requests.

Collins J. Seitz, Jr., Esquire
January 20, 2006
Page 6

      b.    Internal Forecasts

Hitachi has produced a huge volume of financial documents, including all its past sales, BorgWarner now seeks electronically-kept internal sales forecasts that add essentially no relevance beyond what has been produced, creates an enormous burden on Hitachi, and goes beyond the parties' express agreement on electronic discovery.

First, Hitachi already has produced its sales data as well as longer term planning data, long term forecasts, profit and loss statements and underlying cost information that it retains (which, as explained above, BorgWarner has apparently not bothered reviewing), that BorgWarner already has questioned Hitachi's witnesses about. Together with the extensive sales information that has been provided, the sales forecasts simply are not needed.

Second, the sales forecasts are kept in purely electronic form in an enormous main frame computer where Hitachi keeps data on some 15000 parts that it provides to its customers. The database contains listings of automobiles, and under each automobile is an identification of thousands of parts for that automobile. As a Hitachi witness already state has testified, it takes some 30-40 people months to generate the information for this sales forecasts database. The VCT parts would be an enormous task, requiring development of an appropriate program to pick out particular components, performing individual searches for each specific component (about 70 components), and formatting the output, and manipulating the data to be in a readable and useable format. Hitachi estimates that it would take weeks to pull out the VCT data from the database and provide this kind of report.

Third, as previously mentioned, the parties agreed at the beginning of this case (reflected in the Scheduling Order) that electronic discovery would be limited to e-mails. Notwithstanding this agreement, Hitachi has produced electronic sales information in the form of purchase orders, sales information, profits and losses and underlying cost data. Now BorgWarner seeks to impose a new enormous burden on Hitachi to data mine its huge electronic database.

For all of these reasons, BorgWarner's request should be rejected.

      c.    Long Term Agreements and Purchase Orders

Hitachi repeatedly has advised BorgWarner that it produced all relevant long term agreements. Customer purchase orders older than three months are only kept on back-up tapes, from which it would take at least a week to extract the necessary data. Moreover, Hitachi already has produced sales reports which accumulate the pertinent information, so that producing the purchase orders would add nothing of relevance. In addition, Hitachi has produced general sales agreements and UGC blanket purchase orders.

      d.    Cross-references

With respect to a cross reference between Nissan and Hitachi part numbers, Hitachi already has produced this information at HIT 446749-446845. A cursory review and translation of the

Collins J. Seitz, Jr., Esquire
January 20, 2006
Page 7

spreadsheets would have indicated that one of the columns in the spreadsheet represents Hitachi internal part numbers and another column represents Nissan internal part numbers.

Regarding two Ford VCT components, Hitachi hereby provides a cross reference between the Hitachi (Unisia) and Ford part numbers for the VCT actuator and solenoid:

| Unisia Part Number | Ford Part Number |
|---|---|
| B13025 42501 | 3M4E-6C524-BF |
| C23S796 0001 | 3M4E-6B297-AE |

Respectfully,

Tiffany Geyer Lydon

SJB/dmf
165831.1

c     Richard K. Herrmann, Esquire (via electronic mail)
      Hugh A. Abrams, Esquire (via electronic mail)
      Kenneth E. Krosin, Esquire (via electronic mail)

# EXHIBIT 33

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

HITACHI, LTD., and UNISIA          )
NORTH AMERICA, INC.,               )
                                   )
           Plaintiffs,             )
                                   )     Civil Action No.
     v.                            )     1:05-cv-00048-SLR
                                   )
BORGWARNER, INC., and              )
BORGWARNER MORSE TECH, INC.,       )
                                   )
           Defendants.             )

           Special Master Teleconference taken pursuant
to notice at the law offices of Connolly, Bove,
Lodge & Hutz, 1007 North Orange Street, 9th Floor,
Wilmington, Delaware, beginning at 2:35 p.m. on Friday,
January 20, 2006, before Patricia L. Shelton, Registered
Professional Reporter and Notary Public.


BEFORE:  SPECIAL MASTER C.J. SEITZ, ESQ.

APPEARANCES:

          TIFFANY GEYER LYDON, ESQ.
          ASHBY & GEDDES
             222 Delaware Avenue
             Wilmington, Delaware  19899
                  - and -
          KENNETH E. KROSIN, ESQ.
          MICHAEL D. KAMINSKI, ESQ.
          FOLEY & LARDNER
             3000 K Street, N.W.
             Washington, D.C.  20007
             for the Plaintiff Hitachi, Ltd.


                     Continued...


               WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
               (302) 655-0477



WILCOX & FETZER LTD.
Registered Professional Reporters
COPY

10

1   assumption that he's making here that Hitachi maintains

2   cost data down to the VCT component level going back in

3   time.  I indicated in the -- not the last conference that

4   we had, but the one before that, that assumption is

5   unfounded.

6        The profitability analysis that was provided

7   for a portion of 2005 that does have some cost data is

8   the new development at Hitachi.  Prior to that time,

9   Hitachi simply has not maintained cost data in the manner

10  for which Mr. Rein would like to have it -- in other

11  words, broken down into these various direct, indirect

12  invariable costs -- for each of its 15,000 products.

13  They did not have that kind of information available.

14       Hitachi has provided everything that it has

15  in its files relating to costs.  And his repeated

16  suggestions and accusations that Hitachi in some way is

17  intentionally withholding this information is simply not

18  correct.  And he doesn't have any basis for asserting

19  that Hitachi is withholding that information.

20       Hitachi has provided everything that it has

21  and has, I would say, gone overboard in trying to comply

22  with its discovery obligations in this case, including

23  going back, where feasible, into some of its electronic

24  data where it wouldn't be overly burdensome to get that

1   you've agreed and, you know, letting the evidence be what

2   it is and using that universe as it exists.

3            SPECIAL MASTER SEITZ:  Okay.  Thank you very

4   much.

5            Here's what we're going to do on this topic:

6   No. 1, Hitachi is going to find someone with knowledge on

7   the business side of the cost data, and they are going to

8   file a declaration with me that explains in detail what

9   cost data does and does not exist for VCT components.

10  And I'm not limiting that to 2005.  I want a complete

11  affidavit that swears or declares as to what cost data

12  does exist for any of the years within the statute of

13  limitations for infringement for VCT components.  That's

14  No. 1.

15           No. 2, I'm going to require Hitachi's

16  attorneys to identify where in the production cost

17  information is.  So, if you will, provide to BorgWarner's

18  attorneys a letter identifying by Bates number where cost

19  information exists in the production.

20           And, No. 3, after Hitachi files its expert

21  report in this case, either I or, if the District Court

22  is monitoring proceedings at this point in time instead

23  of me, will recommend on application of BorgWarner that

24  the Court consider reopening discovery limited to cost

# EXHIBIT 34

# EXHIBIT REDACTED
# IN ITS ENTIRETY

# EXHIBIT 35

# EXHIBIT REDACTED IN ITS ENTIRETY

# EXHIBIT 36

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

HITACHI, LTD., and UNISIA         )
NORTH AMERICA, INC.,              )
                                  )
                 Plaintiffs,      )
                                  )    Civil Action No.
v.                                )    1:05-cv-00048-SLR
                                  )
BORGWARNER, INC., and             )
BORGWARNER MORSE TECH, INC.,)
                                  )
                 Defendants.      )

          Special Master Teleconference taken
pursuant to notice at the law offices of Connolly, Bove,
Lodge & Hutz, 1007 North Orange Street, 9th Floor,
Wilmington, Delaware, beginning at 3:00 p.m. on Tuesday,
February 7, 2006, before Kathleen White Palmer,
Registered Merit Reporter and Notary Public.

BEFORE:  SPECIAL MASTER C.J. SEITZ, ESQUIRE

APPEARANCES:

          JOHN G. DAY, ESQUIRE
          ASHBY & GEDDES
             222 Delaware Avenue
             Wilmington, Delaware  19899
                    -and-
          KENNETH E. KROSIN, ESQUIRE
          PAVAN K. AGARWAL, ESQUIRE
          MICHAEL d. KAMINSKI, ESQUIRE
          LIANE M. PETERSON, ESQUIRE
          FOLEY & LARDNER
             3000 K Street, N.W.
             Washington, D.C.  20007
             for the Plaintiff Hitachi Ltd.
-----------------------------------------------------
                WILCOX & FETZER
   1330 King Street - Wilmington, Delaware 19801
                (302) 655-0477



WILCOX & FETZER LTD.
Registered Professional Reporters
COPY

9

```
1   was inaccurate.  That was reflected in the Matsushita

2   declaration.

3               SPECIAL MASTER SEITZ:  The declaration is

4   dated January 31st.

5               MR. KROSIN:  Right.

6               SPECIAL MASTER SEITZ:  When was it

7   submitted to me?

8               MR. KROSIN:  Well, it would have been -- it

9   may have been like the next day -- oh, I'm sorry.  We

10  just gave it to BorgWarner?  Okay, Your Honor.  I

11  misspoke a minute ago.  I thought that we had provided

12  the Matsushita declaration to you, and apparently we had

13  only served it on BorgWarner.

14              SPECIAL MASTER SEITZ:  That's not what

15  troubles me.  What troubles me is that as of the 31st,

16  and probably before that when you were drafting this

17  affidavit, you knew that representations you had made

18  were not correct, and I would have expected some kind of

19  letter from counsel immediately informing me about the

20  fact that those representations weren't correct.  What

21  troubles me is I had to wait and learn about it from your

22  adversary.

23              So I'm going to just express that

24  disappointment and say in the future it would seem to me
```



1    incumbent on counsel when a representation turns out to

2    be incorrect, at least the way I practice, the obligation

3    on the attorneys is to bring that information to the

4    tribunal immediately rather than temporize on it.  That's

5    an expectation I think most counsel would agree with.

6           So as I understand it, you are going to

7    produce the cost data.  You are aiming to get that to the

8    other side next week, and at their choice, if they ask

9    for a witness to be made available for additional

10   deposition, you will agree to do that and you will have

11   to agree to do that at their convenience, meaning if it's

12   a witness from Japan, you'll have to bring them over

13   here.

14           MR. KROSIN:  Absolutely, Your Honor.  Just

15   to clarify, the two categories, we have electronic data.

16   We hope to be getting that data very soon, sometime this

17   week.  We will make that data available to BorgWarner's

18   counsel as soon as it comes in.  The hard copies, that's

19   what we expect to have next week sometime.  As soon as we

20   get that in, we will produce that to BorgWarner's

21   counsel.

22           I guess the third thing that I would state,

23   Your Honor, is that I sincerely apologize for not having

24   communicated the situation to you, and I guess first only

1  have submitted the declaration from Mr. Matsushita to

2  BorgWarner's counsel and not having sent to you some kind

3  of communication advising you that we had learned that

4  this data did exist.

5           SPECIAL MASTER SEITZ:  Okay.  On the issue

6  of sanctions, I'm going to reserve decision on that for

7  now.

8           MR. KROSIN:  Thank you, Your Honor.

9           SPECIAL MASTER SEITZ:  Okay.  Mr. Rein?

10          MR. REIN:  Yes.  Your Honor, I just wanted

11  to get a couple clarifications on what we are going to

12  get.

13          As far as the electronic data is concerned,

14  are we going to get that in electronic form?

15          MR. KROSIN:  Yes.  We will produce that to

16  you in electronic form.

17          MR. REIN:  Okay.  Now, another issue that

18  always causes delay is the fact that their documents are

19  expected to be in Japanese.  To the extent that you have

20  translations and your people were able to understand what

21  the documents are and it was explained to them what the

22  fields are in English, we would appreciate receiving that

23  information, as well.

24          MR. KROSIN:  Okay.  Tom, to the extent that



**WILCOX & FETZER LTD.**
Registered Professional Reporters

# EXHIBIT 37

# EXHIBIT  REDACTED
# IN  ITS  ENTIRETY

# EXHIBIT 38

# EXHIBIT  REDACTED
# IN  ITS  ENTIRETY

# EXHIBIT 39

# EXHIBIT REDACTED IN ITS ENTIRETY

# EXHIBIT 40

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

HITACHI, LTD., and UNISIA NORTH ) 
AMERICA, INC., )
 )
       Plaintiff, )
 )      Civil Action No. 05-048-SLR
       v. )
 )
BORGWARNER INC., )
and BORGWARNER MORSE TEC INC., )
 )
       Defendants. )
_____ )
 )
BORGWARNER INC., )
 )
       Counterclaimant, )
 )
       v. )
 )
HITACHI, LTD., and UNISIA NORTH )
AMERICA, INC. )
 )
       Counterdefendants. )

## DEFENDANTS' FOURTH NOTICE OF DEPOSITION OF PLAINTIFFS

PLEASE TAKE NOTICE that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil

Procedure, and the Local Rules of this Court, commencing at a time and place to be mutually

agreed upon by counsel, Defendants BorgWarner Inc. and BorgWarner Morse TEC Inc.

("BorgWarner"), by and through its counsel, will take the deposition upon oral examination, of

Plaintiffs Hitachi, Ltd. and Unisia North America, Inc. ("Hitachi"), through one or more

officers, directors, managing agents or other persons who consent to testify on Hitachi's behalf

with regard to the deposition topics set forth in Schedule A (attached hereto).

The depositions will take place under oath and before a duly authorized notary public, or other person authorized by law to administer oaths.  The depositions will be recorded by stenographic means by a court reporter and by audio and visual means by a videographer.  No later than five (5) business days prior to the deposition, you are requested to set forth in writing the identity of each witness who will testify in response to this notice and the matters on which the person will testify.

Dated: November 4, 2005

Richard K. Herrmann (I.D. #405)
Lewis H. Lazarus (I.D. #2374)
Mary B. Matterer (I.D. #2696)
Morris James Hitchens & Williams LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE 19899
(302) 888-6800

Hugh A. Abrams (pro hac vice)
Marc A. Cavan (pro hac vice)
Lara V. Fleishman (pro hac vice)
Lisa A. Schneider (pro hac vice)
Sidley Austin Brown & Wood, LLP
10 South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

Attorneys for BorgWarner Inc., and
BorgWarner Morse Tec Inc.

2

## SCHEDULE A

## DEFINITIONS

A.    "Hitachi" as used herein shall mean plaintiff Hitachi, Ltd., any corporate affiliates, including plaintiff Unisia North America, Inc., and any parent or parents, subsidiaries, domestic or foreign, partners, officers, directors, successors, predecessors, assigns, and the employees, attorneys and agents of any and all of them.

B.    "Defendants" or "BorgWarner" as used herein shall mean BorgWarner Inc., and BorgWarner Morse TEC Inc.

C.    The term "patent-in-suit" or "the '738 patent" shall mean U.S. Patent No. 5,497,738.

D.    The term "variable camshaft timing components" as used herein shall include, without limitation, components used, or which can be used, in a system for controlling the timing of the opening and closing of an intake valve and/or exhaust valve (or for controlling the position of a camshaft relative to the position of a crankshaft or another camshaft) in an internal combustion engine, such components including without limitation:

(1) camshaft sprockets capable of being hydraulically adjusted (e.g., sprockets with body vanes), (2) camshaft position sensors, (3) variable timing control solenoids and solenoid valves, (4) variable timing control systems and related components, (5) camshaft phase adjustment systems, and (6) electronic control units, and software and hardware contained therein;

3

that have been, are, or are currently planned to be made, used, prototyped, sold, offered or intended for sale in the United States, or imported or exported by or on Hitachi's behalf, or imported into the United States as part of an engine or vehicle system.

E.    The term "concerning" means comprising, relating to, referring to, reflecting, describing, evidencing or constituting.

F.    "Documents" as used herein is employed in the broadest possible sense and means without limitation any written, printed, typed, stored, photographed, recorded or otherwise reproduced communication, compilation or reproduction including computer or electronically generated or stored information or data whether assertedly privileged or not and including all copies of drafts of any document which differs in any respect from the original.

G.    "And" means "and/or." "Or" means "and/or." The plural of any word used herein includes the singular and the singular includes the plural. The masculine gender of any word used herein includes the feminine and the neuter. The past tense of a verb used herein includes the present tense and the present tense includes the past tense.

H.    "Any," "all," "each" or "every" means any and all, each and every.

I.    The terms "make," "use," "sell," "offer to sell," and "import" each assume the broadest possible meaning given those terms under U.S.C. § 154 and 35 U.S.C. §271(a).

4

## DEPOSITION TOPICS

1.    The unit and dollar volumes (on a monthly basis) of Hitachi's sales in the U.S. that are attributable to variable camshaft timing components.

2.    The costs to Hitachi (on a per unit basis) that are associated with variable camshaft timing components that Hitachi offers for sale in the U.S.

3.    Hitachi's pricing of variable camshaft timing components (either singly or in connection with other components), and the manner in which Hitachi establishes its prices.

4.    The commercial success or popularity of variable camshaft timing components sold in the U.S.

5.    Alternatives to variable camshaft timing components.

6.    Customary royalty rates in the automotive industry.

7.    The percentage of Hitachi's sales that involve variable camshaft timing components.

8.    Market share breakdown by manufacturer in the field of variable camshaft timing components.

9.    Customer comments or feedback regarding variable camshaft timing components.

10.    Identification of the types of financial documents created and/or maintained by Hitachi and the persons responsible for such documents.

5

11.    Hitachi's contentions as to the proper measure of damages in this case if Hitachi is found liable of infringement of the patent-in-suit.

12.    An explanation of the data reflected on the spreadsheets produced by Hitachi as HIT 439568 – 590; HIT 439591 – 630; and HIT 439631-678 (the "Hitachi spreadsheets").

13.    An explanation of the documents or data used to calculate the numbers reflected on the Hitachi spreadsheets.

14.    The method for calculating the numbers on the Hitachi spreadsheets.

15.    Hitachi's profits and losses statements regarding variable camshaft timing components that Hitachi offers for sale in the U.S.


Richard K. Herrmann (I.D. #405)
Mary B. Matterer (I.D. #2696)
MORRIS, JAMES, HITCHENS & WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19801
302.888.6800
mmatterer@morrisjames.com

Attorneys for Defendants and Counterclaimant,
BORGWARNER INC., and
BORGWARNER MORSE TEC INC.

CH1 3366283v.1

6

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of November, 2005, I electronically filed the foregoing document, **DEFENDANTS' FOURTH NOTICE OF DEPOSITION OF PLAINTIFFS**, with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

Steven J. Balick, Esq.
John G. Day, Esq.
ASHBY & GEDDES
222 Delaware Avenue, 17th Floor
Wilmington, DE 19801

Additionally, I hereby certify that on the 4th day of November, 2005, the foregoing document was served via email and overnight mail on the following non-registered participants:

Michael D. Kaminski, Esq.
Liane Peterson, Esq.
FOLEY & LARDNER LLP
3000 K Street, N.W., Suite 500
Washington, D.C. 20007-5109
mkaminski@foley.com
lpeterson@foley.com

Richard K. Herrmann (#405)
Mary B. Matterer (I.D. #2696)
MORRIS, JAMES, HITCHENS & WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19801
302.888.6800
mmatterer@morrisjames.com

Attorneys for Defendants and Counterclaimant,
BORGWARNER INC., and
BORGWARNER MORSE TEC INC.

3

# EXHIBIT 41

CONTAINS BW CONFIDENTIAL AEO INFORMATION

### TABLE OF EXHIBITS

| Exhibit No. | Title |
|---|---|
| 1. | U.S. Patent No. 5,497,738 to Siemon (Exhibit 1) |
| 2. | Curriculum Vitae of Thomas G. Livernois (Exhibit 2) |
| 3. | List of Materials Reviewed (Exhibit 3) |
| 4. | Hitachi Proposed Claim Construction (Exhibit 4) |
| 5. | BorgWarner Proposed Claim Construction (Exhibit 5) |
| 6. | U.S. Patent No. 3,225,619 to Schaefer (Exhibit 6) |
| 7. | U.S. Patent No. 3,727,487 to Forster et al. (Exhibit 7) |
| 8. | U.S. Patent No. 3,754,482 to Sanders et al. (Exhibit 8) |
| 9. | U.S. Patent No. 3,900,822 to Hardwick et al. (Exhibit 9) |
| 10. | U.S. Patent No. 4,579,145 to Leiber et al. (Exhibit 10) |
| 11. | U.S. Patent No. 4,522,371 to Fox et al. (Exhibit 11) |
| 12. | U.S. Patent No. 4,635,683 to Nielsen (Exhibit 12) |
| 13. | Gray, C., "A Review of Variable Engine Valve Timing", SAE Technical Paper Series # 880386, International Congress and Exposition, Detroit, Michigan, February 29-March 4, 1988, pp. 1-12 (Exhibit 13) |
| 14. | U.S. Patent No. 4,988,074 to Najmolhoda (Exhibit 14) |
| 15. | U.S. Patent No. 4,947,893 to Miller et al. (Exhibit 15) |
| 16. | U.S. Patent No. 5,000,420 to Hendrixon et al. (Exhibit 16) |
| 17. | U.S. Patent No. 5,110,087 to Studtmann et al. (Exhibit 17) |
| 18. | U.S. Patent No. 5,400,678 to Jain et al. (Exhibit 18) |
| 19. | Henke, "Proportional Hydraulic Valves Offer Power, Flexibility," Control Engineering (April 1981) (Exhibit 19) |
| 20. | Claim Chart -Variable Force Solenoid Art Discussed in Sections IX and X (Exhibit 20) |

iv

**CONTAINS BW CONFIDENTIAL AEO INFORMATION**

| EXHIBIT No. | TITLE |
|---|---|
| 21. | U.S. Patent No. 5,263,442 to Hara (Exhibit 21) |
| 22. | Butterfield, "A Unique Approach to Design of a VCT Mechanism" (Exhibit 22) |
| 23. | U.S. Patent No. 4,862,843 to Kawamoto (Exhibit 23) |
| 24. | German Patent Document No. 40 37 824 to Rembold (with translation) (Exhibit 24) |
| 25. | U.S. Patent No. 4,627,825 to Bruss et al. (Exhibit 25) |
| 26. | U.S. Patent No. 5,203,290 to Tsuruta (Exhibit 26) |
| 27. | U.S. Patent No. 4,524,947 to Barnes (Exhibit 27) |
| 28. | U.S. Patent No. 4,278,959 to Nishimiya (Exhibit 28) |
| 29. | U.S. Patent No. 4,463,332 to Everett (Exhibit 29) |
| 30. | U.S. Patent No. 4,835,503 to Everett (Exhibit 30) |
| 31. | U.S. Patent No. 5,202,658 to Everett (Exhibit 31) |
| 32. | U.S. Patent No. 5,232,196 to Hutchings (Exhibit 32) |
| 33. | Lequesne, "*Finite-Element Analysis of a Constant-Force Solenoid for Fluid Flow Control*," IEEE Transactions on Industry Applications, Vol. 24, No. 4 (July/August 1988) (Exhibit 33) |
| 34. | U.S. Patent No. 4,787,345 to Thoma (Exhibit 34) |
| 35. | U.S. Patent No. 5,172,660 to Hampton (Exhibit 35) |
| 36. | U.S. Patent No. 5,361,735 to Butterfield et al. (Exhibit 36) |
| 37. | BW 0055516 (discussing spool velocity as good approximation of the spool valve actuator requirements to obtain the appropriate VCT response) (Exhibit 37) |
| 38. | BW 0051545 – BW 0051559 (Airpax technical sales materials showing that several of its off-the-shelf stepper motors met the spool velocity requirements) (Exhibit 38) |
| 39. | BW11098-11102 (October 1992 memorandum noting requirement of total stroke of 7mm) (Exhibit 39) |
| 40. | Japanese Patent Publication No. 63-112 (with translation) (Exhibit 40) |

CONTAINS BW CONFIDENTIAL AEO INFORMATION

| Exhibit No. | Title |
|---|---|
| 41. | U.S. Patent No. 4,601,266 to Oldfield (Exhibit 41) |
| 42. | U.S. Patent No. 4,762,097 to Baker (Exhibit 42) |
| 43. | Claim Chart - Sensing and Calculating Art (Exhibit 43) |
| 44. | "Fuel Reductions through Camshaft Phase Control," *OEM Design, Applied Technology* (September 1985) (Exhibit 44) |
| 45. | "Towards the Clean Car Engine," *Engineering: The Design Council's Magazine for Engineers* (November 1985) (Exhibit 45) |
| 46. | David Scott, "Camshaft Phase Adjuster Varies Valve Timing," *Automotive Engineering* (July 1986) (Exhibit 46) |
| 47. | "Camshaft Controller Improves Engine Flexibility," *Design Engineering* (September 1985) (Exhibit 47) |
| 48. | U.S. Patent No. 4,909,194 to Bauer (Exhibit 48) |
| 49. | U.S. Patent No. 5,056,477 to Linder (Exhibit 49) |
| 50. | U.S. Patent No. 5,178,106 to Suga (Exhibit 50) |
| 51. | U.S. Patent No. 5,184,578 to Quinn et al. (Exhibit 51) |
| 52. | U.S. Patent No. 5,289,805 to Quinn, Jr. et al. (Exhibit 52) |
| 53. | U.S. Patent No. 5,170,755 to Kano (Exhibit 53) |
| 54. | U.S. Patent No. 5,209,202 to Maurer (Exhibit 54) |
| 55. | 1/18/06 Dep. Tr. of Roger Butterfield at 179-80 (Exhibit 55) |
| 56. | U.S. Patent No. 5,245,968 to Kolias et al. (Exhibit 56) |
| 57. | 2/6/06 Dep. Tr. of Stanley B. Quinn, Jr. (Exhibit 57) |

# EXHIBIT 42

Contains BorgWarner Confidential AEO Information

## TABLE OF EXHIBITS

| Exhibit No. | Title |
|---|---|
| 1. | Curriculum Vitae of Robert Kuhn (Exhibit 1) |
| 2. | List of Materials Reviewed (Exhibit 2) |
| 3. | U.S. Patent No. 5,497,738 (Exhibit 3) |
| 4. | Dresner & Barkan, A Review and Classification of Variable Valve Timing Mechanisms, SAE Technical Paper 890674 (1989) (Exhibit 4) |
| 5. | HIT 001409-10 (Exhibit 5) |
| 6. | U.S. Patent No. 4,627,825 to Bruss et al. (Exhibit 6) |
| 7. | U.S. Patent No. 5,012,774 to Strauber et al. (Exhibit 7) |
| 8. | U.S. Patent No. 5,056,477 to Linder et al. (Exhibit 8) |
| 9. | U.S. Patent No. 5,002,023 to Butterfield et al. (Exhibit 9) |
| 10. | U.S. Patent No. 4,159,024 to Getman (Exhibit 10) |
| 11. | U.S. Patent No. 5,184,578 to Quinn, Jr. et al. (Exhibit 11) |
| 12. | 1/17/06 Dep. Tr. of Roger Butterfield et al. (Exhibit 12) |
| 13. | U.S. Patent No. 4,524,947 to Barnes et al. (Exhibit 13) |
| 14. | U.S. Patent No. 4,862,843 to Kawamoto et al. (Exhibit 14) |
| 15. | U.S. Patent No. 5,263,442 to Hara (Exhibit 15) |
| 16. | German Patent No. DE 40 37 824 to Rembold (Exhibit 16) |
| 17. | U.S. Patent No. 5,203,290 to Tsuruta (Exhibit 17) |
| 18. | U.S. Patent No. 5,107,804 To Becker et al. (Exhibit 18) |
| 19. | U.S. Patent No. 5,172,659 to Butterfield et al. (Exhibit 19) |
| 20. | U.S. Patent No. 5,361,735 to Butterfield et al. (Exhibit 20) |

**Contains BorgWarner Confidential AEO Information**

| Exhibit No. | Title |
|---|---|
| 21. | U.S. Patent No. 5,207,192 to Smith (Exhibit 21) |
| 22. | U.S. Patent No. 5,289,805 to Quinn, Jr. et al. (Exhibit 22) |
| 23. | U.S. Patent No. 5,645,017 to Melchior (Exhibit 23) |
| 24. | BorgWarner's Claim Interpretation (Exhibit 24) |
| 25. | Hitachi's Claim Interpretation (Exhibit 25) |
| 26. | Claim Chart comparing each of these references to claim 10 based on BorgWarner's claim interpretation is attached as Exhibit 26. |
| 27. | Claim Chart comparing these references to claim 10 based on Hitachi's claim interpretation is attached as Exhibit 27 |
| 28. | "A Unique Approach to Design of a VCT Mechanism" (HIT 0441379-83) by Roger Butterfield ("Butterfield Article") (Exhibit 28) |
| 29. | U.S. Patent No. 5,012,773 to Akasaka et al. (Exhibit 29) |
| 30. | U.S. Patent No. 5,263,443 to Schechter (Exhibit 30) |
| 31. | German Patent No. DE 39 22 962 (Exhibit 31) |
| 32. | U.S. Patent No. 5,046,460 to Butterfield et al. (Exhibit 32) |
| 33. | Lequesne, *Finite-Element Analysis of a Constant-Force Solenoid for Fluid Flow Control*, IEEE Transactions on Industry Applications, Vol. 24, No. 4, July/August 1988 (Exhibit 33) |
| 34. | BorgWarner's responses and supplemental responses to Hitachi's Interrogatory No. 22 (Exhibit 34) |
| 35. | U.S. Patent No. 5,036,885 to Miura (Exhibit 35) |
| 36. | Prior Art Timeline (Exhibit 36) |
| 37. | U.S. Patent No. 4,858,572 to Shirai et al. (Exhibit 37) |
| 38. | U.S. Patent No. 2,861,557 to Stolte (Exhibit 38) |
| 39. | U.S. Patent No. 4,463,332 to Everett (Exhibit 39) |
| 40. | U.S. Patent No. 4,278,959 to Nishimiya et al. (Exhibit 40) |
| 41. | U.S. Patent No. 4,835,503 to Everett (Exhibit 41) |

Contains BorgWarner Confidential AEO Information

| EXHIBIT No. | TITLE |
|---|---|
| 42. | U.S. Patent No. 5,202,658 to Everett et al. (Exhibit 42) |
| 43. | U.S. Patent No. 5,232,196 to Hutchings et al. (Exhibit 43) |
| 44. | U.S. Patent No. 5,657,725 to Butterfield et al. (Exhibit 44) |
| 45. | U.S. Patent No. 5,000,420 to Hendrixon (Exhibit 45) |
| 46. | Ford "Zeta" Documents (BW 0058701-12) (Exhibit 46) |
| 47. | U.S. Patent No. 5,218,935 to Quinn, Jr. et al. (Exhibit 47) |