## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| HITACHI, LTD. and HITACHI AUTOMOTIVE PRODUCTS (USA), INC., | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) Civil Action No. 05-048-SLR |
| BORGWARNER INC., and BORGWARNER MORSE TEC INC., | ) ) ) |
| Defendants. | ) ) |
| BORGWARNER INC., | ) ) **PUBLIC VERSION** |
| Counterclaimant, | ) ) ) |
| v. | ) ) ) |
| HITACHI, LTD., and HITACHI AUTOMOTIVE PRODUCTS (USA), INC., | ) ) ) |
| Counterdefendants. | ) ) |

## COMBINED DECLARATION OF MARY B. MATTERER
## IN SUPPORT OF BORGWARNER'S OPPOSITIONS TO
## PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT

*OF COUNSEL:*
SIDLEY AUSTIN BROWN & WOOD, LLP
Hugh A. Abrams
Thomas D. Rein
Lisa Schneider
Marc A. Cavan
Lara V. Hirshfeld
10 South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

Richard K. Herrmann (I.D. #405)
Mary B. Matterer (I.D. #2696)
MORRIS JAMES, HITCHENS &
WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE 19801
(302) 888-6800
mmatterer@morrisjames.com
*Attorneys for BorgWarner Inc. and
BorgWarner Morse TEC Inc.*

Original Date: November 13, 2006
Redacted Date: November 20, 2006

I, Mary B. Matterer, do hereby declare and say as follows:

1.    I am a member in good standing of the Bar of the State of Delaware and a partner at the law firm of Morris, James, Hitchens & Williams LLP, counsel to Defendant BorgWarner Morse TEC Inc. and Defendant/Counterclaimant BorgWarner Inc. (collectively "BorgWarner") in the above action.

2.    I submit this declaration in support of BorgWarner's Oppositions to:

a.    Plaintiffs' Motion for Summary Judgment of Invalidity Under 35 U.S.C. § 112, ¶ 1 Based on the "Regulating" Recitation of Claim 10 Under Plaintiffs' Claim Construction;

b.    Plaintiffs' Motion for Summary Judgment of Invalidity For Failure to Meet the Written Description Requirement of 35 U.S.C. § 112, ¶ 1 Under BorgWarner's Claim Interpretation; and

c.    Plaintiffs' Motion for Summary Judgment of Non-Infringement of the '738 Patent.

3.    Attached hereto as Exhibit 1, submitted under seal, is a true and correct copy of the Expert Report of Robert Kuhn, P.E. on the Invalidity of U.S. Patent No. 5,497,738.

4.    Attached hereto as Exhibit 2 is a true and correct copy of the BorgWarner Sur-Reply Claim Construction Brief, D.I. 298, attachment A.

5.    Attached hereto as Exhibit 3 is a true and correct copy of the prosecution history of the '738 patent, at BW 2076-2393.

6.    Attached hereto as Exhibit 4, submitted under seal, is a true and correct copy of Kuhn Exhibit 26, Comparison of Prior Art References Against Claim 10 Under BorgWarner's Interpretation.

7.    Attached hereto as Exhibit 5, submitted under seal, is a true and correct copy of HIT 48 (with translation attached).

8.    Attached hereto as Exhibit 6, submitted under seal, is a true and correct copy of BW 136921-35.

9.    Attached hereto as Exhibit 7, submitted under seal, is a true and correct copy of the cited pages of the January 11, 2006 deposition of Yoshinori Ichinosawa.

10.    Attached hereto as Exhibit 8, submitted under seal, is a true and correct copy of the cited pages of the January 17, 2006 deposition of Shinichi Uchida.

11.    Attached hereto as Exhibit 9, submitted under seal, is a true and correct copy of the cited pages of the January 12, 2006 deposition of Noriomi Hosaka.

12.    Attached hereto as Exhibit 10, submitted under seal, is a true and correct copy of the cited pages of the January 11, 2006 deposition of Ed Abernethy.

13.    Attached hereto as Exhibit 11, submitted under seal, is a true and correct copy of the cited pages of the October 6, 2005 deposition of Yoshinori Ichinosawa.

14.    Attached hereto as Exhibit 12 is a true and correct copy of Figures depicting explaining the prosecution statements regarding Strauber.

15.    Attached hereto as Exhibit 13 is a true and correct copy of a portion of Nissan service manual.

16.    Attached hereto as Exhibit 14 is a true and correct copy of the Mazda 6 Service Manual.

17.    Attached hereto as Exhibit 15, submitted under seal, is a true and correct copy of the cited pages of the January 31, 2006 deposition of Raymond Hughes.

18.     Attached hereto as Exhibit 16, submitted under seal, is a true and correct copy of the cited pages of the November 17, 2005 deposition of Yoshinori Ichinosawa.

19.     Attached hereto as Exhibit 17 is a true and correct copy of the June 30, 2006 Joint Stipulation, D.I. 231.

20.     Attached hereto as Exhibit 18 is a true and correct copy of the July 18, 2006 Joint Stipulation, D.I. 239.

21.     Attached hereto as Exhibit 19 is a true and correct copy of U.S. Patent No. 5,056,477 (Linder *et al.*).

22.     Attached hereto as Exhibit 20, submitted under seal, is a true and correct copy of the cited pages of the October 7, 2005 deposition of Toshiro Ichikawa.

23.     Attached hereto as Exhibit 21, submitted under seal, is a true and correct copy of HIT 480122-34.

24.     Attached hereto as Exhibit 22 is a true and correct copy of U.S. Patent Application No. 2005/0257762 (Sawada).

25.     Attached hereto as Exhibit 23, submitted under seal, is a true and correct copy of the cited pages of the August 4, 2006 deposition of Toshiro Ichikawa.

26.     Attached hereto as Exhibit 24 is a true and correct copy of Defendants' Exhibit 229, Nissan Manuals.

27.     Attached hereto as Exhibit 25, submitted under seal, is a true and correct copy of the cited pages of the November 18, 2005 deposition of Toshiro Ichikawa.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated:  November 13, 2006

Mary B. Matterer

# EXHIBIT 1

# EXHIBIT  REDACTED
# IN  ITS  ENTIRETY

# EXHIBIT 2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| HITACHI, LTD. and HITACHI AUTOMOTIVE PRODUCTS (USA), INC., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) Civil Action No. 05-048-SLR |
| BORGWARNER INC., and BORGWARNER MORSE TEC INC., | ) ) ) |
| Defendants. | ) ) |
| BORGWARNER INC., | ) ) ) |
| Counterclaimant, | ) ) |
| v. | ) ) ) |
| HITACHI, LTD., and HITACHI AUTOMOTIVE PRODUCTS (USA), INC., | ) ) ) |
| Counterdefendants. | ) ) |

## SUR-REPLY CLAIM CONSTRUCTION BRIEF OF
## BORGWARNER INC. AND BORGWARNER MORSE TEC INC.

*OF COUNSEL:*

SIDLEY AUSTIN BROWN & WOOD, LLP
Hugh A. Abrams
Thomas D. Rein
Lisa Schneider
Marc A. Cavan
Lara V. Hirshfeld
10 South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

Dated: November 3, 2006

Richard K. Herrmann (I.D. #405)
Mary B. Matterer (I.D. #2696)
MORRIS, JAMES, HITCHENS &
WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE 19801
(302) 888-6800
mmatterer@morrisjames.com
*Attorneys for BorgWarner Inc. and
BorgWarner Morse TEC Inc.*

**TABLE OF CONTENTS**

I.     HITACHI'S POSITION THAT THE RECESSES IN THE VANE HOUSING
       ARE THE "SOURCE" OF OIL IN CLAIM 10 IS NOT DEFENSIBLE. ...........................1

       A.     Nothing In The Preamble Of Claim 10 Requires The Oil From The Source
              To Be Regulated On Its Way Out Of The Source. ...................................................1

       B.     Nothing In The Prosecution History Changes The Proper Interpretation Of
              "Source" Or Limits Claims 10 and 11 To Cam-Torque Actuation..........................3

              1.     Hitachi's arguments regarding a "unified" invention are without
                     merit. ..................................................................................................................3

              2.     The prosecution history statements regarding Strauber are not
                     "clear and unambiguous" and do not limit the scope of claims 10
                     and 11.................................................................................................................5

       C.     Hitachi's Argument Regarding The "Spool Valve Selectively Allowing
              And Blocking Flow Of Hydraulic Fluid Through An Inlet Line And
              Through Return Lines" Is Without Merit. ............................................................12

II.    HITACHI'S CONTENTION THAT THE SPECIFICATION DISCLAIMED A
       PWM INPUT SIGNAL TO THE VARIABLE FORCE SOLENOID IS
       DIRECTLY CONTRADICTED BY THE PREFERRED EMBODIMENT OF
       THE '738 PATENT...............................................................................................................14

III.   HITACHI'S CONTENTION THAT "CONNECTED" IN CLAIM 11 REQUIRES
       A PHYSICAL ATTACHMENT IS WITHOUT MERIT. .................................................17

IV.    NOTHING REQUIRES THE "AIR GAP" IN CLAIM 11 TO EXTEND THE
       LENGTH OF THE ARMATURE. .................................................................................18

V.     CONCLUSION...................................................................................................................19

## TABLE OF AUTHORITIES

### CASES

*Am. Cyanamid Co. v. United States Surgical Corp.*,
    833 F. Supp. 92 (D. Conn. 1992)..........................................................................1

*Bayer AG v. Schein Pharm., Inc.*,
    129 F. Supp. 2d 705 (D.N.J. 2001), *aff'd*, 301 F.3d 1306 (3d Cir. 2002)...........1

*Inverness Medical Switz. GmbH v. Warner Lambert Co.*,
    309 F.3d 1373 (Fed. Cir. 2002)..........................................................................11

*Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*,
    75 F.3d 1545 (Fed. Cir. 1996)............................................................................11

*N. Telecom Ltd. v. Samsung Electrics Co.*,
    215 F.3d 1281 (Fed. Cir. 2000)..........................................................................10

*SanDisk Corp. v. Memorex Prods., Inc.*,
    415 F.3d 1278 (Fed. Cir. 2005)..........................................................................11

*United States v. Fleetwood Enters., Inc.*,
    702 F. Supp. 1082 (D. Del. 1988).........................................................................1

### STATUTES AND RULES

35 U.S.C. § 121 ............................................................................................................4

37 C.F.R. § 1.142 ........................................................................................................4

D. Del. LR. 7.1.3(c)(2) ................................................................................................1

Defendant BorgWarner Morse TEC Inc. and Defendant/Counterclaimant BorgWarner Inc. (collectively, "BorgWarner") submit this sur-reply to respond to arguments that Hitachi improperly raised for the first time in its Responsive Claim Construction Brief regarding asserted claims 10 and 11 of U.S. Patent No. 5,497,738 ("the '738 patent"). As explained in the accompanying Motion, BorgWarner should be allowed to respond to the positions Hitachi improperly withheld until its reply. Alternatively, Hitachi's new claim construction positions and new expert declarations should be stricken.[1]

## I.    HITACHI'S POSITION THAT THE RECESSES IN THE VANE HOUSING ARE THE "SOURCE" OF OIL IN CLAIM 10 IS NOT DEFENSIBLE.

As before, Hitachi's "source" differs from the only source identified in the specification of the '738 patent, the main oil gallery ("MOG") (230). (*See, e.g.,* BorgWarner Opening Br. at pp. 15-16; BorgWarner Resp. Br. at pp. 21-24). But now Hitachi has confirmed that many of its claim construction positions are premised entirely on its interpretation of the term "source" -- a source that changes from moment to moment based on the operation of the VCT system. Instead of creating a contrived definition of source and then interpreting the rest of claims 10 and 11 to coincide with its artificial construct, Hitachi should have started with the source that is specifically described in the specification (the MOG (230)), and then interpreted the remainder of the claim in accordance therewith. *See, e.g., Am. Cyanamid Co. v. United States Surgical Corp.*, 833 F. Supp. 92, 109 n.27 (D. Conn. 1992) ("[C]laims should be construed in a rational and practical manner, and their interpretation should lead to neither absurd nor

---

[1] *See* D. Del. LR 7.1.3(c)(2) ("the party filing the opening brief shall not reserve material for the reply brief which should have been included in a full and fair opening brief"); *see also United States v. Fleetwood Enters., Inc.*, 702 F. Supp. 1082, 1091 n.25 (D. Del. 1988) ("sandbagging" by withholding arguments for reply leads to "added and unnecessary work for the Court"); *Bayer AG v. Schein Pharm., Inc.*, 129 F. Supp. 2d 705, 716 (D.N.J. 2001), *aff'd*, 301 F.3d 1306 (Fed. Cir. 2002) (striking portions of reply brief which raised new issues for the first time).

unjust results."). By failing to do so, Hitachi creates a house of cards. All of its new arguments, as explained below, lack merit and should be rejected.

### A.  Nothing In The Preamble Of Claim 10 Requires The Oil From The Source To Be Regulated On Its Way Out Of The Source.

Hitachi dismisses the fact that the MOG is the source of all oil in the vane housing because, in the preferred cam-torque actuated ("CTA") embodiment, the MOG simply supplies the initial-fill oil and makeup oil. (*See, e.g.,* Hitachi Resp. Br. at p. 3). Hitachi seems to believe that the claim requires something more, such as the regulation of the oil immediately as it leaves the source in order to cause a phase change. But nothing in the claim, specification or prosecution history requires anything of the like.

The preamble merely indicates that the claimed method is one that regulates the flow of oil that is transferred from a source to a means for transmitting rotary movement from a crankshaft to a housing. In no way does this tell one when that regulation occurs or how it occurs. Rather, the specifics of the "regulation" are described in the method steps of claim 10 that follow the preamble. Said another way, the preamble of claim 10 sets forth broad introductory language; the limitations of the claim that follow the preamble then specify how the oil from the source is regulated in the claimed VCT system.

What does this have to do with Hitachi's argument about the source? It is Hitachi's contention that the MOG cannot be the source because oil from the MOG is not *directly* regulated immediately as it leaves the MOG to cause a phase change in the preferred CTA embodiment of the '738 patent. But Hitachi's argument is fallacious because the claim does not require oil to be directly regulated immediately as it leaves the source. It merely requires oil that originates in the source to be regulated somewhere in the VCT system. And, as Hitachi concedes, in a CTA system, such as the preferred embodiment shown in the figures of the '738

2

patent, the MOG provides the oil that "eventually gets regulated." (Hitachi Resp. Br. at p. 3 (emphasis omitted)). Nothing more is required under the preamble of claim 10. In essence, Hitachi is attempting to change the preamble phrase from "regulating the flow of hydraulic fluid from a source to a means for transmitting rotary movement from said crankshaft to a housing" into the phrase "regulating the flow of hydraulic fluid *directly* from a source to a means for transmitting rotary movement from said crankshaft to a housing *in order to cause a phase change of the camshaft relative to the crankshaft*." Hitachi cannot rewrite the language of claim 10.

Consistent with the language of claim 10, the flow of oil out of the source, *i.e.*, the MOG, can be directly controlled by the variable force solenoid and spool valve (as in an oil-pressure actuated ("OPA") system), but it need not be (as in a CTA system). This is the only way to read the preamble of claim 10 to be consistent with the specification's clear definition of "source" as the MOG.

### B. Nothing In The Prosecution History Changes The Proper Interpretation Of "Source" Or Limits Claims 10 and 11 To Cam Torque Actuation.

#### 1. Hitachi's arguments regarding a "unified" invention are without merit.

Hitachi contends for the first time in its responsive brief that claim 1 and claim 10 of the '738 patent have to both be limited to CTA VCT systems -- even though claim 1 specifies CTA and claim 10 does not -- because the claims were amended during prosecution to cover a "unified invention." (Hitachi Resp. Br. at pp. 7, 20). Notably, Hitachi cites no authority (and BorgWarner is aware of none) to support its erroneous new position that amendments to make the claims cover a "unified invention" result in claims that are necessarily coextensive in scope.

The basis for restriction of a patent to a single, or unified, invention is found in the statutory requirement that the United States Patent and Trademark Office ("the PTO") may

3

require an application to be "restricted" to one of "two or more independent and distinct inventions." 35 U.S.C. § 121. The restriction requirement is normally made before any office action on the merits. *See* 37 C.F.R. § 1.142. An entire chapter of the Manual of Patent Examining Procedure ("MPEP") is devoted to the requirement for restriction, and there are numerous types of claims of widely varying scope (for example, generic, combination, subcombination, process and product) that are permitted to remain in the same application after a requirement for restriction, under various conditions described in that chapter. (*See* MPEP, Chapter 8). Claims to a single, or unified, invention that remain after an amendment may include "claims directed to different embodiments or species that could fall within the scope of a generic claim." (MPEP § 806.04 (Second Suppl. Matterer Decl. Ex. 35)).[2]

There is no basis for Hitachi's contention that all claims to a "unified" invention must be limited to the CTA species of claim 1, and cannot include a broader, generic claim, such as claim 10 directed to a control system that is used in CTA, OPA or hybrid vane actuation systems. In fact, the prosecution history refutes this. Initially, the applicants were seeking broad claims (original claims 16-22) that were directed to hydraulic control systems in general, far broader than CTA VCT systems. (*See* Orig. Spec. claims 16-22 (Matterer Decl. Ex. 8)).[3] It was these broad claims that the applicants cancelled in response to an interview with the examiner in order to avoid a restriction requirement. As the applicants explained at the time, they cancelled these claims, not because they went beyond CTA VCTs, but because they went beyond combustion engine art. (Prelim. Amend. at 4 (Second Suppl. Matterer Decl. Ex. 33) (explaining

---

[2] References to the "Second Suppl. Matterer Decl." are to the Second Supplemental Declaration of Mary B. Matterer in Support of the Sur-Reply Claim Construction Brief of BorgWarner Inc. and BorgWarner Morse TEC Inc., submitted concurrently herewith.

[3] References to the "Matterer Decl." are to the Declaration of Mary B. Matterer in Support of the Opening Claim Construction Brief of BorgWarner and BorgWarner Morse TEC Inc.

4

that the examiner "requested that Claims 16-22 be cancelled because of their scope which exceeded that of combustion engine art"); *see also* Appeal Br. at 2 (Matterer Decl. Ex. 11) (explaining that the examiner had indicated that original claims 16-22 "should be cancelled, since their scope exceeded that of internal combustion engine art").

The "unified invention" amendment, namely, deleting original claims 16-22, which were not even limited to internal combustion engines, therefore does not mean that original claim 11 (issued claim 10) was somehow limited to CTA in the process. Quite the contrary, the applicants explained that the preliminary amendments to claim 11 (issued claim 10) were to provide "more detail," not to make issued claim 10 coextensive in scope with claim 1. (*See* Prelim. Amend. at 4; Appeal Br. at 2). Nothing -- not the words of the claim or the statements made about the claim when the claim was amended -- indicates that issued claim 10 was limited to CTA like claim 1.

### 2. The prosecution history statements regarding Strauber are not "clear and unambiguous" and do not limit the scope of claims 10 and 11.

Both Hitachi's opening brief and its responsive brief place heavy reliance on the applicants' statements regarding Strauber "control[ling] the flow of oil both internal and external to the VCT mechanism" and the '738 patented invention "control[ling] the flow of oil internal to the VCT mechanism only." (6/30/94 Reply to Office Action at 4 (Matterer Decl. Ex. 9); 11/1/94 Reply to Office Action at 3 (Matterer Decl. Ex. 10); Appeal Br. at 8). Despite calling these a "clear and unambiguous disclaimer," Hitachi now offers new arguments that are inconsistent with the ones in its earlier brief. Like the old arguments, however, these new arguments are logically flawed.

In its reply, Hitachi jettisons its initial take that "control[ling] the flow internal to the VCT mechanism" relates to an "internal energy source" of camshaft torque actuation.

5

(Hitachi Opening Br. at pp. 1, 3, 7). While Hitachi repeats its argument that controlling the flow internal to the mechanism requires flow "back and forth" from one vane recess to the other, Hitachi places a brand new gloss on the Strauber patent by revising its earlier artist's rendition of Strauber. To this rendition, Hitachi adds an arrow in the general direction of the recess with a caption indicating that this somehow implies control of "internal" flow. (*Compare* sketch in Hitachi Opening Br. at p. 14, *with* sketch in Hitachi Resp. Br. at p. 11). Hitachi's gloss on Strauber, however, does not withstand scrutiny.

Under Hitachi's view of the prosecution history, simply supplying flow from the external main oil gallery and then into *one internal recess* is not enough for "internal" flow control. Rather, Hitachi contends that "controlling the flow internally" means having flow from one vane recess to the other vane recess in order to cause a phase change. (*See* Hitachi Resp. Br. at p. 8 ("[c]laim 10 itself shows that the oil flow is totally internal to the VCT mechanism because the oil flows *from one vane recess, through the spool valve, to the other vane recess*") (emphasis omitted and added); *id.* at p. 7 n.4 ("claimed regulation of oil *back and forth between the recesses* as the camshaft timing adjustments are made") (emphasis omitted and added)). If Hitachi's assertions are to be accepted at face value, then the Strauber patent, which was said in the prosecution history to "control the flow of oil both internal and external to the VCT mechanism," must have internal flow between the vane recesses (or so-called "working chambers" in Strauber) to cause a phase change. In fact, Strauber does no such thing.

According to Hitachi, Strauber is a "traditional" OPA system. (Hitachi Resp. Br. at p. 9). Also according to Hitachi, Strauber does *not* allow the flow of oil internally from working chamber to working chamber. (Hitachi Resp. Br. at p. 10). Instead, Strauber supplies oil from the external MOG to *only one* chamber to change the timing. (Hitachi Resp. Br. at pp.

9-10). No oil flows internally from one chamber to the other chamber to cause a phase change. (*Id.*). Thus, under Hitachi's own construction and interpretation, Strauber does not have any "internal" flow control. At best, Strauber has "external" flow control *only*. But the applicants said that Strauber "controls the flow of oil internal[ly] and external[ly]." Accordingly, Hitachi's interpretation of "internal and external" simply cannot be correct.

Hitachi's construction also completely ignores the context in which the prosecution history statements were made. In the initial January 4, 1994 Office Action, the examiner cited the prior art Linder patent as showing, among other things, "a solenoid valve 24 to control the flow of the working fluid between two chambers 7 and 8." (1/4/94 Office Action at 2 (Suppl. Matterer Decl. Ex. 23)).[4] The examiner then cited Strauber "to further show" a "solenoid to operate a spool valve to control the flow of the working fluid." (1/4/94 Office Action at 3). The examiner reiterated this in the August 1, 1994 Office Action, when he stated that Strauber was being relied upon "solely to teach a solenoid operated spool valve to control the flow of the working fluid which includes all the detailed elements as claimed." (8/1/94 Office Action at 2-3 (Suppl. Matterer Decl. Ex. 24)). Thus, the examiner was relying on Strauber for its solenoid operated spool valve, not for anything else.

It was in response to these rejections that the applicants made the statements regarding "control[ling] the flow of oil internal and external" and "control[ling] the flow of oil internal to the VCT mechanism only." (6/30/94 Reply to Office Action at 4; 11/1/94 Reply to Office Action at 3; Appeal Br. at 8). These statements were made to respond to the examiner's assertion that Strauber discloses a solenoid operated spool valve that controls the flow of oil.

---

[4] References to the "Suppl. Matterer Decl." are to the Supplemental Declaration of Mary B. Matterer in Support of the Responsive Claim Construction Brief of BorgWarner and BorgWarner Morse TEC Inc.

Notwithstanding Hitachi's conjecture that the statements related to controlling "the flow of oil between the internal parts of the actuator," (Hitachi Opening Br. at p. 14), the applicants clearly were not making a statement concerning vane actuation. Rather, when considered in context, it is apparent that the applicants' statement related only to how the flow of oil is controlled through the solenoid operated spool valve, not to CTA or OPA actuation of the vanes of a VCT system as Hitachi contends.

This is reinforced by looking at the applicants' other statement regarding Strauber. Specifically, the applicants also explained the difference between the Strauber "common ('on-off' only) solenoid to control a spool of a two-position only system" as compared to the claimed invention, which uses "a variable force solenoid to control the position of a spool of a continuously variable system." (6/30/94 Reply to Office Action at 4; 11/1/94 Reply to Office Action at 3; Appeal Br. at 8). Thus, all the applicants' statements were about solenoid operated spool valves, not vane actuation. Indeed, the applicants even began their remarks by stating that "[t]he present invention relates to the use of a variable force solenoid in a VCT system to position a spool valve and the use of a lever arrangement to amplify the force applied to the spool valve" and that "[c]omments related to those subjects *alone* [were] as follows." (6/30/94 Reply to Office Action at 3 (emphasis added)).

BorgWarner's position, which contrasts the control or the passage of flow through the external and internal lands of the spool valve in Strauber as compared to through the internal lands of the spool valve only in the '738 patent, is consistent with the internal/external versus internal only distinction made in the prosecution history. BorgWarner's position is also consistent with the key distinction BorgWarner made over the prior art (such as Strauber) in both the specification and the prosecution history, namely, removing flow from the "external ends" of

the spool valve, and allowing flow to proceed along the internal lands only. This method of directing the flow of oil avoids problems arising from the influence of oil pressure against the external ends of the spool, which would otherwise need to be accounted for and balanced by the variable force solenoid.

The real distinction being made about "internal only" ('738 patent) as opposed to "internal and external" (Strauber) is illustrated in the following figures, where oil is represented in orange. As shown, oil flows along the internal and external *lands* of the Strauber spool valve, but only along the internal *lands* of the spool in the preferred embodiment of the '738 patent:



Internal Flow

Strauber

External Flow

'738 patent, Figure 19

Internal Flow Only

No External Flow

FIG. 19

9

(U.S. Patent No. 5,012,774 (Strauber), Fig. 1 (numbers removed, figure modified to show only relevant portions in color, labels added); '738 patent, Fig. 19 (coloring and labels added)). In this context, the distinction between Strauber and the '738 patent makes sense and is consistent with the statements made in the patent and prosecution history, as pointed out in BorgWarner's earlier briefs. Because, at a minimum, BorgWarner's interpretation of the prosecution history is reasonable, there is no clear and unambiguous disclaimer along the lines suggested by Hitachi. *See SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1288 (Fed. Cir. 2005) (where patentee's reading of the prosecution argument is "at least reasonable," there is no "clear and unmistakable surrender" of claim meaning).[5]

  This is especially apparent in light of Hitachi's inability to advance a single, coherent explanation of the phrase "VCT mechanism" and what the applicants meant by their statements. In its opening brief and proposed claim construction statement, Hitachi asserted that the "VCT mechanism" is the "VCT actuator," which it defined as consisting only of the "vane lobe/check valve mechanism." (Hitachi Opening Br. at pp. 22, 23). Now, Hitachi contends that the "VCT mechanism" is the "camshaft-mounted vane (or piston-cylinder) structure *with a flow path through the spool valve*, not including the MOG." (Hitachi Resp. Br. at pp. 14-15 (emphasis added and omitted)). Hitachi also, for the first time in its reply brief, cites to a number of BorgWarner patents, and a newly-filed expert declaration, as defining what is meant by a

---

  [5] Hitachi's new contention that the applicants should have made the "external/internal" comments in relation to U.S. Patent No. 5,172,659 ("Butterfield" or "the '659 patent") if the distinction was over systems that had oil on the external ends of the spool, rather than only along internal lands, is without merit. (Hitachi Resp. Br. at pp. 12-13, 14). With respect to Butterfield, the applicants focused on the lever (stroke amplifier) during the prosecution because that is the aspect of Butterfield upon which the examiner focused. (*See, e.g.,* 1/4/94 Office Action at 3; 6/30/94 Reply to Office Action at 2, 4; 8/1/94 Office Action at 2-3; 11/1/94 Reply to Office Action at 2; 12/5/94 Office Action at 2-3 (Second Suppl. Matterer Decl. Ex. 34); Appeal Br. at 7).

"VCT mechanism." (Hitachi Resp. Br. at pp. 15-16). But those patents, and the expert's declaration, also confirm that the term "VCT mechanism," which is never used in the claims of the '738 patent at issue, has a meaning that varies based on the context. For example, Hitachi cites to U.S. Patent No. 5,218,935 ("the '935 patent"), which states that "[t]he VCT mechanism is then actuated by the stepper motor movement which changes its position relative to a crankshaft." ('935 patent, col. 4, lines 1-3 (Matterer Decl. Ex. 6)). The only device "actuated" by the stepper motor movement is the spool valve, not the vane actuator.

Even if the Court considers Hitachi's latest interpretation of the prosecution history to be reasonable (which it is not), the shift in Hitachi's position between its two briefs reinforces that there is no clear and unambiguous disclaimer. If the prosecution history were so clear, Hitachi would have urged its current position in its opening brief, which addressed Strauber and the prosecution history statements at length. (*See, e.g.,* Hitachi Opening Br. at pp. 14-15, 20-23, 31). If it were so clear, Hitachi's reply brief would not have required two newly-filed expert declarations to explain its shifting positions. Because it is not clear and unambiguous, the prosecution history statement regarding Strauber does not limit the scope of claims 10 and 11. *See, e.g., Inverness Med. Switz. GmbH v. Warner Lambert Co.*, 309 F.3d 1373, 1382 (Fed. Cir. 2002); *N. Telecom Ltd. v. Samsung Elecs. Co.*, 215 F.3d 1281, 1293-95 (Fed. Cir. 2000).[6]

---

[6] Hitachi's contention that the prior art patents incorporated by reference into the '738 patent specification can somehow limit the scope of asserted claim 10 to a CTA VCT system is also without merit. (Hitachi Resp. Br. at pp. 17-18). Hitachi accuses BorgWarner of selectively pointing to material in the incorporated patents, but that is precisely what Hitachi does in arguing that the incorporated patents somehow disavow OPA systems in the '738 patent. The very case Hitachi cites makes clear that even if the incorporated patents disavowed OPA, they do not limit the scope of claims 10 and 11 of the '738 patent. *Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1553 (Fed. Cir. 1996), *abrogated on other grounds, Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 234 F.3d 558 (Fed. Cir. 2000) (en banc) (stating that

**C.    Hitachi's Argument Regarding The "Spool Valve Selectively Allowing And Blocking Flow Of Hydraulic Fluid Through An Inlet Line And Through Return Lines" Is Without Merit.**

In its response brief, Hitachi accuses BorgWarner of attempting to change the words of claim 10 with its construction of the "allowing and blocking" limitation. But BorgWarner intended its construction to follow the plain language of the claim and mean that the spool valve must allow and block the flow of fluid. In light of Hitachi's newly raised arguments, BorgWarner is willing to change the word "or" to "and" in its proposed construction to conform more closely to the plain language of the claim.

But Hitachi still misses the point. Hitachi contends that "the word 'and' requires that the spool valve both allow *and block* oil flow <u>through the inlet line</u>." (Hitachi Resp. Br. at p. 21 (original emphasis in italics, underlined emphasis added)). Hitachi makes this argument in order to assert that the MOG cannot be the source of oil because it contends that the spool valve never blocks the flow of fluid from the MOG in the preferred CTA embodiment.[7] In advancing this position, Hitachi is once again distorting the plain meaning of claim 10 and failing to harmonize the claim with the preferred CTA embodiment, which has a MOG source.

The claim requires a spool valve that is capable of "selectively allowing and blocking the flow of hydraulic fluid through an inlet line and through return lines." ('738 patent, col. 12, lines 23-25). Hitachi wishes that the claim required the spool valve to be capable of "selectively allowing and blocking the flow of hydraulic fluid through an inlet line and

---

"incorporation by reference does not convert the invention of the incorporated patent into the invention of the host patent"). BorgWarner has properly relied on the incorporated patents for what is specifically incorporated into the '738 patent disclosure, namely, the closed-loop control system from U.S. Patent No. 5,184,578 as described below.

[7]    The specification states that, in the preferred embodiment, the inlet from the MOG bypasses "vented spool 200." However, as explained in BorgWarner's responsive brief, the MOG inlet does *not* bypass the spool valve, or the internal lands in the spool valve; instead, it just bypasses the internal passage along the center of the spool itself. (*See* BorgWarner Resp. Br. at pp. 18-19).

*selectively allowing and blocking the flow of hydraulic fluid* through return lines." But that is not what the claim says. The claimed "allowing and blocking" can be satisfied in a wide variety of ways. It is satisfied if the spool valve allows and blocks the flow of hydraulic fluid through returns lines alone, if it allows and blocks through an inlet line alone, if it allows though an inlet line and blocks through return lines, if it blocks through an inlet line and allows through return lines, or if it allows and blocks through both an inlet and return lines. It can also be satisfied if an inlet line and/or return lines are indirectly allowed or blocked. All the spool valve has to do is allow *and* block the flow of fluid so that fluid can flow through these lines.

      The specification confirms this. It explains that, in the preferred embodiment, the spool valve selectively allows *and* blocks the flow of fluid through return lines 194 and 196. (*See, e.g.,* '738 patent, col. 7, lines 20-30 (explaining how the lands of the spool in the spool valve will "block the exit of hydraulic fluid from return line 196," from "return line 194," or from "both return lines 194 and 196"); col. 9, lines 7-41 (explaining how the movement of the spool in the spool valve can "block" and "unblock" return lines 194 and 196)). Flow from the MOG source is allowed through the spool valve and through "[i]nlet line 182," but there is no disclosure that it is directly blocked. Indeed, even under Hitachi's erroneous definitions of the terms "source" and "inlet line" (which place the source in a recess in the vane housing, and the inlet line only between the spool valve body and the "means for transmitting rotary movement to the camshaft"), the flow through the inlet line (which would be "inlet line 182" in the preferred embodiment) is not directly blocked by the spool valve -- the lands of the spool in the spool valve never block "inlet line 182." It would therefore be legal error to adopt Hitachi's position and interpret claim 10 to require that the spool valve has to directly allow and block the flow of fluid through an inlet line *and* directly allow and block the flow of fluid through return lines.

There is no way to square such a construction with the specification, even under Hitachi's convoluted construction of "source."

## II.  HITACHI'S CONTENTION THAT THE SPECIFICATION DISCLAIMED A PWM INPUT SIGNAL TO THE VARIABLE FORCE SOLENOID IS DIRECTLY CONTRADICTED BY THE PREFERRED EMBODIMENT OF THE '738 PATENT.

In contrast to its opening brief, where it devoted less than a single page to the construction of the term "variable force solenoid," Hitachi devotes nearly four pages in its response brief to making arguments that could have, and should have, been raised in its opening brief to support its contention that the claimed "variable force solenoid" cannot be driven by a pulse-width modulated ("PWM") non-current input signal.  Most egregiously, Hitachi addresses the preferred embodiment of the '738 patent for the first time in its reply brief and cites numerous passages from an extrinsic expert declaration that was only supplied with Hitachi's reply.

As stated in the expert report accompanying BorgWarner's Opening Brief, one of skill in the art would recognize that the claimed "variable force solenoid" could be operated with PWM excitation, as well as direct current, and would recognize that PWM excitation would reduce hysteresis effects that would otherwise occur with the use of a direct current signal. (Ribbens Infringement Report (Matterer Decl. Ex. 17)) at pp. 34-36).  Although the applicants distinguished their invention over specific differential pressure control systems that utilized a solenoid with an on/off output, they certainly did not *disclaim* the use of any solenoid using a PWM signal as Hitachi contends.

This necessarily follows from the concession made in Hitachi's Response Brief. There, Hitachi acknowledges, as it must, that the '738 patent states unequivocally that "[t]he preferred embodiment employs a closed-loop feedback system, such as the one disclosed in U.S. Pat. No. 5,184,578, which corrects for any phase angle error." ('738 patent, col. 3, lines 13-16;

Hitachi Resp. Br. at p. 35). The closed loop feedback system described in the '578 patent, and incorporated into the preferred embodiment of '738 patent, makes clear that the output from the closed loop control system -- and hence, the input to the variable force solenoid in claims 10 and 11 of the '738 patent -- is a PWM signal. Hitachi's construction, therefore, reads out the preferred embodiment's use of a PWM signal.

Also for the first time in its reply brief, Hitachi acknowledges that in the '578 patent, "block 108 is a 'closed loop feedback system.'" (Hitachi Resp. Br. at p. 35). And, as the '578 patent explains, the output of this closed loop system is a PWM signal -- "solenoid 106, preferably of the pulse width modulated type (PWM), [controls pressure] *in response to a control signal from a closed loop feedback system 108*, which is shown schematically in Fig. 11." ('578 patent, col. 7, lines 21-25 (Matterer Decl. Ex. 2)). Numerous figures from the '578 patent are in accord, showing that the output from the closed loop feedback system 108 is a "PWM Duty Cycle." For example, as shown below, Figures 1b and 1c from the '578 patent both show the closed loop feedback system 108 (the number 108 is pointed toward the entire figure) and a "PWM Duty Cycle" output from the closed loop system:



PWM Duty Cycle is the result of the closed loop control. *This PWM signal goes directly to the solenoid.*

('578 patent, Figs. 1b and 1c (caption added). *See also* Fig. 1d). Figure 11, a portion of which is

shown below, further shows that the closed loop control system (box 108) feeds a signal directly to solenoid 106:



## FIG. 11

('578 patent, portion of Fig. 11). Given the incorporation of the closed loop control system of the '578 patent into the preferred embodiment of the '738 patent, the Court should reject Hitachi's attempt to erroneously exclude the preferred embodiment (solenoids that are driven by a PWM input signal) from the definition of a "variable force solenoid."

The distinction made in the '738 patent over the so-called "PWM solenoid" in the '578 patent was far more limited. As expressly stated in the '738 patent specification, the term "PWM solenoid" was being used to define "the PWM solenoid *typically used in a conventional DPCS*." ('738 patent, col. 2, lines 48-50 (emphasis added)). In the '578 patent, the "PWM Duty Cycle" output from the closed loop control system is sent to such a "PWM solenoid," which is an on/off solenoid that cycles through its full stroke with every PWM input pulse, and controls hydraulic pressure in a DPCS system via the on-off pulsations of the solenoid. ('578 patent, col. 7, lines 21-24, lines 30-38).

16

In contrast, in the '738 patent, the "PWM Duty Cycle" output from the closed loop control system is sent to a so-called "variable force solenoid" that does not cycle through its full stroke with every PWM input pulse, but only travels a short distance and directly controls the position of the spool valve. ('738 patent, col. 3, lines 34-37). In other words, the variable force solenoid of the '738 patent eliminates the *hydraulic pressure* against the end of the spool and *directly controls* the position of the spool valve in response to the input signal. But the output from the closed loop control system, and hence the input to the solenoid, is a PWM signal in both cases. Nothing in the specification or prosecution history of the '738 patent supports Hitachi's contention that there was a disclaimer of employing a PWM *input* signal to the solenoid.

## III.    HITACHI'S CONTENTION THAT "CONNECTED" IN CLAIM 11 REQUIRES A PHYSICAL ATTACHMENT IS WITHOUT MERIT.

Hitachi now argues that BorgWarner's proposed construction for "connected," namely, that there is an operational connection such that movement of the armature causes a corresponding movement of the spool, cannot be squared with the specification of the '738 patent. (Hitachi Resp. Br. at p. 37). Hitachi points to the statement from the specification that in Figure 20, "[l]ever arrangement 201e connects armature 201b with spool extension 200c." ('738 patent, col. 8, lines 54-55). Hitachi contends that this statement proves that the term "connected" means a physical attachment because that is what is shown in Figure 20. However, in its opening brief, Hitachi contended that Figures 19 and 20 both show a "physical connection" (Hitachi Opening Br. at pp. 38-39), and as BorgWarner has explained, in Figure 19, there is a connection, but no physical attachment -- a point Hitachi does not dispute.

In fact, the term "connected" is used in the specification in a number of different ways. Hitachi is attempting to use the description of one embodiment in the specification as a means to limit claim 11 to cover only that embodiment and only that usage of the word

17

"connect." But the specification and claims use the term "connected" and "connection" in a broader, more generic manner that does not necessarily require a physical, fixed attachment between the two "connected" components. For example, the specification uses the term "connection" in the context of a "chain drive connection" between two sprockets. ('738 patent, col. 5, line 63-67). The two sprockets are not "physically attached" to one another. Instead, the chain drive "connects" the two sprockets by bearing against the teeth of each sprocket to operationally connect the sprockets and cause the transmission of power. Similarly, the specification uses "connected" to describe the hydraulic connection or link between the recesses (132a, 132b) and the check valves (184, 186) in the preferred embodiment of the '738 patent. ('738 patent, col. 7, lines 1-4). The check valves and recesses are not physically touching or physically attached -- there is merely a "connection" or linkage between the valves and recesses. Claim 5 also refers to "hydraulically connecting" two recesses. ('738 patent, col. 11, lines 17-26). In such a case, the recesses are not physically attached to one another -- they are connected via hydraulic fluid. In all of these cases, including the embodiment shown in Figure 19, where the armature "bears against" the spool, and in Figure 20, where a complex lever arrangement "connects" the armature to the spool, there is a "connection," even though the two connected parts are not necessarily physically attached.[8]

## IV.    NOTHING REQUIRES THE "AIR GAP" IN CLAIM 11 TO EXTEND THE LENGTH OF THE ARMATURE.

Hitachi states that it believes that the claimed "air gap" in claim 11 has to extend

---

[8] Hitachi also ignores that claim 11, which is the claim at issue with regard to the term "connected," does not cover the lever embodiment of Figure 20 under its proposed claim constructions. In its recitations, claim 11 expressly requires that an "air gap" separate the armature from the coil. ('738 patent, col. 12, lines 44-45). Under Hitachi's proposed construction of the "air gap" limitation, claim 11 only covers Figure 19, not Figure 20, because Figure 20 does not show an "air gap" that extends "the length of the armature," as Hitachi contends it must. Thus, the "connection" based on the lever arrangement of Figure 20 described in the specification has no relevance to the interpretation of claim 11.

the length of the armature (Hitachi Opening Br. at p. 40), or at least the length of any overlap between the solenoid coil and armature (Hitachi Resp. Br. at p. 38). The Court should reject Hitachi's attempt to read in this length specification for the air gap. All that claim 11 requires is that the air gap "separate[s] [the] coil from [the] armature." ('738 patent, col. 12, lines 43-44). The air gap does not have to have any specific length.

Moreover, Hitachi's construction is directly contradicted by the drawing of Figure 19. In Figure 19, the coil is marked as element 201a, the armature as 201b, and the gap is marked as 201c. Quite clearly, the gap 201c extends only along a *portion* of the armature 201b, and not the "entire length of the armature," as required by Hitachi's proposed claim construction. To borrow Hitachi's phrase, Hitachi's statement that its construction "completely comports with Figure 19" is nothing but "sheer sophistry." (Hitachi Resp. Br. at pp. 28, 38).

## V.    CONCLUSION

For the above reasons, and for those set forth in its previous claim construction briefs, BorgWarner respectfully requests that the Court adopt BorgWarner's proposed claim constructions.

Dated: November 3, 2006

Richard K. Herrmann (I.D. #405)
Mary B. Matterer (I.D. #2696)
MORRIS, JAMES, HITCHENS & WILLIAMS
222 Delaware Avenue, 10th Floor
Wilmington, DE 19801
(302) 888-6800

Hugh A. Abrams (*pro hac vice*)
Thomas D. Rein (*pro hac vice*)
Lisa A. Schneider (*pro hac vice*)
Marc A. Cavan (*pro hac vice*)
Lara (Fleishman) Hirshfeld (*pro hac vice*)
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-7000

19

## CERTIFICATE OF SERVICE

I hereby certify that on November 3, 2006, I caused the following document, **BORGWARNER INC. AND BORGWARNER MORSE TEC INC.'S MOTION TO FILE SUR-REPLY CLAIM CONSTRUCTION BRIEF**, to be electronically filed with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

Steven J. Balick, Esq.
John G. Day, Esq.
Tiffany Geyer Lydon, Esq.
ASHBY & GEDDES
222 Delaware Avenue, 17th Floor
Wilmington, DE  19801

Additionally, I hereby certify that on November 3, 2006, I caused the foregoing document to be served via email and overnight courier on the following non-registered participants:

Michael D. Kaminski, Esq.
Pavan K. Agarwal, Esq.
Liane M. Peterson
FOLEY & LARDNER LLP
3000 K Street, N.W., Suite 500
Washington, D.C.  20007-5109
mkaminski@foley.com
pagarwal@foley.com
lpeterson@foley.com

_____ /s/ Mary B. Matterer _____
Mary B. Matterer (I.D. #2696)
MORRIS, JAMES, HITCHENS & WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, Delaware 19801
(302) 888-6800
mmatterer@morrisjames.com
 Attorneys for Defendants and Counterclaimant,
 BORGWARNER INC., and
 BORGWARNER MORSE TEC INC.

# EXHIBIT 3

ISSUE CLASSIFICATION
Class | Subclass
123 | ⑰

**5497738**

| UTILITY SERIAL NUMBER 08 | 056635 | PATENT DATE MAR 1 2 1996 | PATENT NUMBER | 5497738 |

| SERIAL NUMBER | FILING DATE | CLASS | SUBCLASS | GROUP ART UNIT | EXAMINER |
|---|---|---|---|---|---|
| 08/056,635 | 05/03/93 | 123 | 09u.15 | 3402 | Lo |

APPLICANTS
EDWARD C. SIEMON, ITHACA, NY; STANLEY B. QUINN JR., ITHACA, NY.

**CONTINUING DATA*****************
VERIFIED     CIP of SN 07/940,273 filed 9/3/92, now US 5,218,935

**FOREIGN/PCT APPLICATIONS***********
VERIFIED     None

NOTE · DISCLAIMER
The term of this patent
subsequent to 06/15/10
has been disclaimed

**CERTIFICATE**
SEP 17 1996
**OF CORRECTION**

FOREIGN FILING LICENSE GRANTED 07/29/93

| Foreign priority claimed ☐ yes ☒ no | 35 USC 119 conditions met ☐ yes ☒ no | Verified and Acknowledged Examiner's Initials | AS FILED | STATE OR COUNTRY | SHEETS DRWG. | TOTAL CLAIMS | INDEP. CLAIMS | FILING FEE RECEIVED | ATTORNEY'S DOCKET NO. |
|---|---|---|---|---|---|---|---|---|---|
| | | | | NY | 13 | 22 | 3 | $884.00 | 92007 |

ADDRESS
BORG-WARNER AUTOMOTIVE, INC.
PATENT DOCKET ADMINISTRATOR
6700 18-1/2 MILE ROAD
P. O. BOX 8022
STERLING HEIGHTS, MI 48311-8022

TITLE
VCT CONTROL WITH A DIRECT ELECTROMECHANICAL ACTUATOR

U.S. DEPT. of COMM.-Pat. & TM Office — PTO-436L (rev. 10-78)

| PARTS OF APPLICATION FILED SEPARATELY | | Applications Examiner |
|---|---|---|

| NOTICE OF ALLOWANCE MAILED | | CLAIMS ALLOWED |
|---|---|---|
| 8-23-95 | Assistant Examiner | Total Claims 13 | Print Claim 1 |

| ISSUE FEE | | | DRAWING |
|---|---|---|---|
| Amount Due 1210 | Date Paid 11-91-95 | WEILUN LO PATENT EXAMINER GROUP 3400  Primary Examiner | Sheets Drwg. 13 | Figs. Drwg. 20 | Print Fig. 20 |

FORM PTO-1257   U.S. Department of Commerce
(Rev. 11-13)   Patent and Trademark Office

DISCLAIMER LABEL
Application No. 08/056,635
A terminal disclaimer has been entered and recorded under 35 U.S.C. 253 in this file.
DO NOT DESTROY
om PTO-436A
(or. 6/92)

ISSUE BATCH NUMBER 10055

PREPARED FOR ISSUE

WARNING: The information disclosed herein may be restricted. Unauthorized disclosure may be prohibited by the United States Code Title 35, Sections 122, 181 and 368. Possession outside the U.S. Patent & Trademark Office is restricted to authorized employees and contractors only.

(FACE)

BW 002076

http://orbison:8888/ShowPatentFee.jsp



## UNITED STATES PATENT AND ★★★★ TRADEMARK OFFICE

| | | | | | | |
|---|---|---|---|---|---|---|
| **Patent Number** | 5497738 | **Issued** 03/12/1996 | **Application Number** | 08056635 | **Filed** | 05/03/1993 |
| **Status** | 12th year fee window opens: 03/12/2007 | | | | **Small Entity** | NO |
| **Window Opens** | 03/12/2007 | **Surchg Due** | | | **Expiration** | |
| **Fee Amt Due** | 3150 | **Surchg Amt Due** | | | **Total Amt Due** | 3150 |
| **Fee Code** | 1553 | MAINTENANCE FEE DUE AT 11.5 YEARS - REF FC 185 BEFORE 10/01/2002 | | | | |
| **Surchg Code** | | | | | | |
| **Title** | VCT CONTROL WITH A DIRECT ELECTROMECHANICAL ACTUATOR | | | | | |

### Address for Fee Purpose

BORG-WARNER AUTOMOTIVE, INC.
PATENT DOCKET ADMINISTRATOR
6700 18-1/2 MILE ROAD
P. O. BOX 8022
STERLING HEIGHT MI 483118022 US

## Most Recent Significant Events (up to 7)

2003/08/28  Payment of Maintenance Fee, 8th Year, Large Entity.
1999/08/30  Payment of Maintenance Fee, 4th Year, Large Entity.
1995/12/04  Payor Number Assigned.
            End of Maintenance History

[ New Query ]  [ Print ]

9/24/03 4:24 PM

BW 002077

OB 056635

APPROVED FOR LICENSE ☐

INITIALS _____

| Date Entered or Counted | CONTENTS | Date Received or Mailed |
|---|---|---|
| 8/9 | 1. Application ———— papers. ✓ | |
| | 2. Letter RE: Oath / Dec. missing | 6/8/93 ✓ |
| | 3. Oath Surcharge | 11-26-93 |
| | 4. Lion Cert | 5-3-93 ✓ |
| 11/4 | 5. Supp Declaration | 1-29-93 ✓ |
| 11/26 | 6. Prel. Amendment | 11-29-93 ✓ |
| 12/20/93 | 7. Terminal Disclaimer (NOT ACCEPTABLE) | 11-29-93 ✓ |
| 12-22-93 | 8. Exr. Interview Summary | Dec. 20, 1993 ✓ |
| 12-22-93 | 9. Terminal Disclaimer (ACCEPTABLE) | Dec. 20, 1993 ✓ |
| 12-22-93 | 10. Exr. Interview Summary | Dec. 22, 1993 ✓ |
| 12/27 | 11. Ex. Int. Sum. | JAN 4 1994 |
| 12/27 | 12. Rejection(3) | JAN 4 1994 |
| 7/20 | 13. Extension of Prove (3) / Amendment B / Drawing | 7-5-94 ✓ |
| 8/1 | 14. Rejection (3) | O1 AUG 1994 |
| 8/11 | 15. Request for Reconsideration | 11-7-94 |
| 11/30 | 16. Final Rejection (3) | 12-5-94 ✓ |
| 4/13 | 17. Extension (time) / Notice of Appeal | 3-20-95 ✓ |
| 4/13 | 18. Advisory Action | APR 14 1995 ✓ |
| 6/19 | 19. Appeal Brief | 5-26-95 |
| | 20. Amendment C/2 mdy / (3) | 8-17-95 |
| 8/21 | 21. Interview Summary | 8-23-95 |
| 8/21 | 22. Notice of Allowability | 8-23-95 |
| 10/13/95 | 23. Formal Drawing (3) sht 1 in 9/25/95 | 4/ |
| | 24. PROGRANT MAR 12 1996 | |
| | 25. Request for C of C | 6-4-96 |
| | 26. Quest. Report | 8/5/96 |
| | 27. | |
| | 28. | |
| | 29. | |
| | 30. | |
| | 31. | |
| | 32. | |
| | (FRONT) | |

BW 002078

| BAR CODE LABEL | U.S. PATENT APPLICATION | | |
|---|---|---|---|
| SERIAL NUMBER | FILING DATE | CLASS | GROUP ART UNIT |
| 08/056,635 | 05/03/93 | 123 | 3402 |

**APPLICANT**

EDWARD C. SIEHON, ITHACA, NY; STANLEY B. QUINN JR., ITHACA, NY.

\*\*CONTINUING DATA\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
VERIFIED

\*\*FOREIGN/PCT APPLICATIONS\*\*\*\*\*\*\*\*\*\*\*\*
VERIFIED

FOREIGN FILING LICENSE GRANTED 07/29/93

| STATE OR COUNTRY | SHEETS DRAWING | TOTAL CLAIMS | INDEPENDENT CLAIMS | FILING FEE RECEIVED | ATTORNEY DOCKET NO. |
|---|---|---|---|---|---|
| NY | 13 | 22 | 3 | $884.00 | 92007 |

**ADDRESS**

BORG-WARNER AUTOMOTIVE, INC.
PATENT DOCKET ADMINISTRATOR
6700 18-1/2 MILE ROAD
P. O. BOX 8022
STERLING HEIGHTS, MI 48311-8022

**TITLE**

VCT CONTROL WITH A DIRECT ELECTROMECHANICAL ACTUATOR

This is to certify that annexed hereto is a true copy from the records of the United States Patent and Trademark Office of the application which is identified above.

By authority of the
COMMISSIONER OF PATENTS AND TRADEMARKS

| Date | Certifying Officer |
|---|---|

BW 002079

08 056635



Case Docket No. 92007 ____      Date: May 03, 1993 ____

THE COMMISSIONER OF PATENT AND TRADEMARKS
Washington, D. C. 20231

Sir:

Transmitted herewith for filing is a patent application of
ET. AL.
Inventor(s): Edward C. Siemon
               Stanley B. Quinn, Jr.

For: VCT CONTROL WITH A DIRECT ELECTROMECHANICAL ACTUATOR

Enclosed are:

  __X__  13  sheets of informal drawings
  ____  An Assignment of the invention to _____
  ____  A certified copy of a _____ application.
  ____  An associated power of attorney.
  ____  A verified statement to establish small entity status under 37 CFR 1.9 and
        37 CFR 1.27.
  __X__  PTO Form 1449 with copies of patents cited in specification.

The filing fee has been calculated as shown below:

|  | No. Filed | No. Extra | Small Entity | | Large Entity | |
|---|---|---|---|---|---|---|
| Basic fee |  |  |  | $355.00 |  | $710.00 |
| Total Claims | 22-20 | 2 | X11 | - | X22 | 44.00 |
| Indep. Claims | 3-3 | 0 | X37 | - | X74 | 0 |
| Multiple Depend. Claim(s) Present _0_ | | | $230 | -- | | 0 |
| Assignment Recordal Fee $40.00 | | | | - | | 0 |

TOTAL _____    TOTAL   $ 754.00

  __X__  Please charge my Deposit Account No. 02-3182 in the amount of $754.00
        A duplicate copy of this sheet is enclosed.

  ____  A check in the amount of $ _____ to cover the filing fee is enclosed.

  __X__  The Commissioner is hereby authorized to charge payment of the following
        fees associated with this communication or credit any overpayment to
        Deposit Account No. 02-3182. A duplicate copy of this sheet is enclosed.

  __X__  Any additional filing fees required under 37 CFR 1.16.

  __X__  Any patent application processing fees under 37 CFR 1.17.

CERTIFICATE OF MAILING BY "EXPRESS MAIL"       Respectfully submitted,
"Express Mail" Mailing Label No.
    IB 517747769 US                 _Gerald R. Black_
Date of Deposit: May 03, 1993           'Gerald R. Black
I hereby certify that this paper or fee is    Reg. No. 29,514
being deposited with the United States      Borg-Warner Automotive, Inc.
Postal Service "Express Mail Post Office   Patent Department
to Addressee" Service Under 37 CFR 1.10   6700 18 ½ Mile Road
on the date indicated above and is addressed   Sterling Heights,
to the Commissioner of Patents & Trademarks,   Michigan 48311-8022
Washington, D.C. 20231              Phone: 1-313-726-4431
     Olive Carrick
(Typed or Printed Name of Person Mailing
Paper or Fee)
_____
Signature of Person Mailing Paper or Fee

BW 002080

08 056635

PATENT APPLICATION SERIAL NO. _____

U.S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE
FEE RECORD SHEET

PTO-1556
(5/87)

08/056 635

92007                    -28-

## ABSTRACT OF THE DISCLOSURE

A camshaft (126) has a vane (160) secured to an end
thereof for non-oscillating rotation therewith.  The
5    camshaft also carries a sprocket (132) which can rotate
with the camshaft but which is also oscillatable with the
camshaft.  The vane has opposed lobes (160a, 160b) which
are received in opposed recesses (132a, 132b),
respectively, of the sprocket.  The recesses have greater
10    circumferential extent than the lobes to permit the vane
and sprocket to oscillate with respect to one another, and
thereby permit the camshaft to change in phase relative to
a crankshaft whose phase relative to the sprocket is fixed
by virtue of a chain drive extending therebetween.  The
15    camshaft tends to change in reaction to pulses which it
experiences during its normal operation, and it is
permitted to change only in a given direction, either to
advance or retard, by selectively blocking or permitting
the flow of hydraulic fluid, preferably engine oil, through
20    the return lines (194, 196) from the recesses by
controlling the position of a vented spool (200) within a
valve body (198) of a control valve (192) in response to a
signal indicative of an engine operating condition from an
engine control unit (208) via cable (238).  The vented
25    spool is selectively positioned within the valve body by a
electromechanical actuator (201) which is controlled by the
engine control unit.  The spool is centered when an optimum
phase angle between crankshaft and camshaft is achieved.

BW 002082

08 056635

IB 7517747769 US

−1−

# VCT CONTROL WITH A DIRECT ELECTROMECHANICAL ACTUATOR

## FIELD OF THE INVENTION

5        This invention relates to an hydraulic control system
for controlling the operation of a variable camshaft timing
(VCT) system of the type in which the position of the
camshaft is circumferentially varied relative to the
10      position of a crankshaft in reaction to torque reversals
experienced by the camshaft during its normal operation.
In such a VCT system, an electromechanical/hydraulic system
is provided to effect the repositioning of the camshaft in
reaction to such torque reversals, and a control system is
15      provided to selectively permit or prevent the hydraulic
system from effecting such repositioning.

        More specifically, the present invention relates to a
control system which utilizes a variable force solenoid to
directly control the position of a fully vented spool valve
20      which is an useful part of the hydraulic system.

## BACKGROUND OF THE INVENTION

        Consideration of information disclosed by the
following U.S. Patents, which are all hereby incorporated
25      by reference, is useful when exploring the background of
the present invention.

        U.S. Patent 5,002,023 describes a VCT system within
the field of the invention in which the system hydraulics
includes a pair of oppositely acting hydraulic cylinders
30      with appropriate hydraulic flow elements to selectively
transfer hydraulic fluid from one of the cylinders to the
other, or vice versa, to thereby advance or retard the
circumferential position of a camshaft relative to a
crankshaft.  The control system utilizes a control valve in
35      which the exhaustion of hydraulic fluid from one or another
of the oppositely acting cylinders is permitted by moving a

BW 002083

92007                              -2-

spool within the valve one way or another from its centered
or null position. The movement of the spool occurs in
response to an increase or decrease in control hydraulic
pressure, $P_c$, on one end of the spool and the relationship

5   between the hydraulic force on such end and an oppositely
direct mechanical force on the other end which results from
a compression spring that acts thereon.

U.S. Patent 5,107,804 describes an alternate type of
VCT system within the field of the invention in which the

10  system hydraulics include a vane having lobes within an
enclosed housing which replace the oppositely acting
cylinders disclosed by the aforementioned U.S. Patent
5,002,023. The vane is oscillatable with respect to the
housing, with appropriate hydraulic flow elements to

15  transfer hydraulic fluid within the housing from one side
of a lobe to the other, or vice versa, to thereby oscillate
the vane with respect to the housing in one direction or
the other, an action which is effective to advance or
retard the position of the camshaft relative to the

20  crankshaft. The control system of this VCT system is
identical to that divulged in U.S. Patent 5,002,023, using
the same type of spool valve responding to the same type of
forces acting thereon.

U.S Patents 5,172,659 and 5,184,578 both address the

25  problems of the aforementioned types of VCT systems created
by the attempt to balance the hydraulic force exerted
against one end of the spool and the mechanical force
exerted against the other end. The improved control system
disclosed in both U.S Patents 5,172,659 and 5,184,578

30  utilizes hydraulic force on both ends of the spool. The
hydraulic force on one end results from the directly
applied hydraulic fluid from the engine oil gallery at full
hydraulic pressure, $P_s$. The hydraulic force on the other
end of the spool results from an hydraulic cylinder or

35  other force multiplier which acts thereon in response to

BW 002084

92007                          -3-

system hydraulic fluid at reduced pressure, $P_c$, from a PWM
solenoid. Because the force at each of the opposed ends of
the spool is hydraulic in origin, based on the same
hydraulic fluid, changes in pressure or viscosity of the
5    hydraulic fluid will be self-negating, and will not affect
the centered or null position of the spool. There are,
however, several disadvantages inherent in the inventions
disclosed in the '659 and '578 patents.

One disadvantage is the inability of this differential
10   pressure control system ("DPCS") to properly control the
position of the spool during the initial start-up phase of
the engine. When the engine first starts, it takes several
seconds for oil pressure to develop. During that time, the
position of the spool valve is unknown. Because the system
15   logic has no known quantity with which to perform the
necessary calculations, the DPCS is prevented from
effectively controlling the spool valve position until the
engine reaches normal operating speed.

Another problem with existing VCT systems is sluggish
20   dynamic response. Even after the engine stabilizes at
normal operating speed, individual characteristics vary
substantially from engine to engine. A new engine at high
speed and low temperature can have a drastically different
oil pressure than a worn engine at hot idle. Current
25   methods employed to allow operation over such a wide
spectrum of engine characteristics (such as increased
cross-sectional area of the hydraulic piston and the
undersizing of springs) result in a slow response time,
requiring relatively low closed-loop controller gains to
30   maintain stability.

The low closed-loop controller gains render the system
more sensitive to component tolerances and operating
environment. The net effects (such as a change in the PWM
duty cycle required to achieve a null position of the

4

BW 002085

92007                                 -4-

spool) cause degradation of overall closed-loop system
performance.

Finally, the moving parts of the PWM solenoid
typically used in a conventional DPCS create unwanted noise
5   in the system.  During operation, the solenoid cycles
through its full stroke with every PWM pulse.  The rapid
cycling results in armature and poppet "chatter", i.e.,
high frequency collisions, thus introducing the unwanted
noise.

10   SUMMARY OF THE INVENTION

The present invention provides an improved method and
apparatus for controlling the position of a vented spool in
a hydraulic control valve.  Specifically, the present
15   invention provides an improved method and apparatus for
controlling the position of a vented spool in a hydraulic
control valve in a VCT system, for example, a hydraulic
control valve similar to the one used in an oppositely-
acting hydraulic cylinder VCT timing system of the type
20   disclosed in U.S. Patent 5,002,023, or a hydraulic control
valve similar to the one used in a vane-type VCT timing
system of the type disclosed in U.S. Patent 5,107,804.

The control system of the present invention eliminates
the hydraulic force on one end of the spool resulting from
25   directly applied hydraulic fluid from the engine oil
gallery at full hydraulic pressure, $P_s$, utilized by previous
embodiments of the VCT system.  The force on the other end
of the vented spool results from an electromechanical
actuator, preferably of the variable force solenoid type,
30   which acts directly upon the vented spool in response to an
electronic signal issued from an engine control unit
("ECU") which monitors various engine parameters.  The ECU
receives signals from sensors corresponding to camshaft and
crankshaft positions and utilizes this information to
35   calculate a relative phase angle.  The preferred embodiment

92007                    -5-

employs a closed-loop feedback system, such as the one
disclosed in U.S. Patent 5,184,578, which corrects for any
phase angle error. The present invention offers an
efficient and economical solution to the problems recited
5      above, as well as additional advantages over the
conventional DPCS.

When the relationship between spool position and
control signal (solenoid current) is independent of engine
oil pressure, any problems associated with oil pressure or
10     its fluctuation are eliminated. For example, the lack of
normal operating oil pressure during initial engine start-
up does not result in start-up error because the signal
from the ECU is fed immediately to the solenoid which
directly positions the spool.

15     The use of a variable force solenoid also solves the
problem of sluggish dynamic response. Such a device can be
designed to be as fast as the mechanical response of the
spool valve, and certainly much faster than the
conventional (fully hydraulic) DPCS. The faster response
20     allows the use of increased closed-loop gain, making the
system less sensitive to component tolerances and operating
environment.

Also, a variable force solenoid armature only travels
a short distance, as controlled by the current from the
25     ECU, as opposed to the complete cycles which result from
the use of a PWM solenoid. Because the travel required
rarely results in extremes, the chattering is eliminated,
rendering the system virtually noise-free.

Possibly the most important advantage over the
30     conventional DPCS is the improved control of the basic
system. The present invention provides a greatly enhanced
ability to quickly and accurately follow a command input of
VCT phase.

Furthermore, because the preferred embodiment of the
35     present invention is not dependent upon oil pressure, the

BW 002087

92007                    -6-

present invention can be used for applications where an
oil-free actuator is desirable, such as with timing belt
engines.

     In an alternate embodiment, a lever arrangement or
5    equivalent is functionally positioned between the
electromechanical actuator and the spool. The lever
arrangement effectively acts as a stroke amplifier/force
attenuator, allowing either a reduction in the required
solenoid current or reduction in the air gap distance
10    without sacrificing valve travel.

     Accordingly, it is an object of the present invention
to provide an improved method and apparatus for controlling
the operation of a hydraulic control valve of the vented
spool type. It is a further object of the present
15    invention to provide an improved method and apparatus for
controlling the operation of a hydraulic control valve of
the vented spool type in an automotive variable camshaft
timing system.

     For a further understanding of the present invention
20    and the objects thereof, attention is directed to the
drawings and the following brief description thereof, to
the detailed description of the preferred embodiment, and
to the appended claims.

25    BRIEF DESCRIPTION OF THE DRAWING

     Figure 1 is a fragmentary view of a dual camshaft
internal combustion engine incorporating an embodiment of a
variable camshaft timing arrangement according to the
present invention, the view being taken on a plane
30    extending transversely through the crankshaft and the
camshafts and showing the intake camshaft in a retarded
position relative to the crankshaft and the exhaust
camshaft;

BW 002088

92007                    -7-

Figure 2 is a fragmentary view similar to a portion of Figure 1 showing the intake camshaft in an advanced position relative to the exhaust camshaft;

Figure 3 is a fragmentary view taken on line 3-3 of Figure 6 with some of the structure being removed for the sake of clarity and being shown in the retarded position of the device;

Figure 4 is a fragmentary view similar to Figure 3 showing the intake camshaft in an advanced position relative to the exhaust camshaft;

Figure 5 is a fragmentary view showing the reverse side of some of the structure illustrated in Figure 1;

Figure 6 is a fragmentary view taken on line 6-6 of Figure 4;

Figure 7 is a fragmentary view taken on line 7-7 of Figure 1;

Figure 8 is a sectional view taken on line 8-8 of Figure 1;

Figure 9 is a sectional view taken on line 9-9 of Figure 1;

Figure 10 is an end elevational view of a camshaft with an alternative embodiment of a variable camshaft timing system applied thereto;

Figure 11 is a view similar to Figure 10 with a portion thereof removed to more clearly illustrate other portions thereof;

Figure 12 is a sectional view taken on line 12-12 of Figure 10;

Figure 13 is a sectional view taken on line 13-13 of Figure 10;

Figure 14 is a sectional view taken on line 14-14 of Figure 11;

Figure 15 is an end elevational view of an element of the variable camshaft timing system of Figures 10-14;

BW 002089

92007                          -8-

Figure 16 is an elevational view of the element of
Figure 15 from the opposite end thereof;

Figure 17 is a side elevational view of the element of
Figures 15 and 16;

5        Figure 18 is an elevational view of the element of
Figure 17 from the opposite side thereof; and

Figure 19 is a simplified schematic view of the
variable camshaft timing arrangement of Figures 10-18; and

Figure 20 is a simplified schematic view similar to
10    Figure 19 of an alternative embodiment of the present
invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

In the embodiment of Figures 1-9, a crankshaft 22 has
15    a sprocket 24 keyed thereto, and rotation of the crankshaft
22 during the operation of the engine in which it is
incorporated, otherwise not shown, is transmitted to an
exhaust camshaft 26, that is, a camshaft which is used to
operate the exhaust valves of the engine, by a chain 28
20    which is trained around the sprocket 24 and a sprocket 30
which is keyed to the camshaft 26. Although not shown, it
is to be understood that suitable chain tighteners will be
provided to ensure that the chain 28 is kept tight and
relatively free of slack. As shown, the sprocket 30 is
25    twice as large as the sprocket 24. This relationship
results in a rotation of the camshaft 26 at a rate of one-
half that of the crankshaft 22, which is proper for a 4-
cycle engine. It is to be understood that the use of a
belt in place of the chain 28 is also contemplated.

30    The camshaft 26 carries another sprocket, namely
sprocket 32, Figure 3, 4 and 6, journalled thereon to be
oscillatable through a limited arc with respect thereto and
to be otherwise rotatable with the camshaft 26. Rotation
of the camshaft 26 is transmitted to an intake camshaft 34
35    by a chain 36 which is trained around the sprocket 32 and a

BW 002090

92007                              -9-

sprocket 38 that is keyed to the intake camshaft 34. As
shown, the sprockets 32 and 38 are equal in diameter to
provide for equivalent rates of rotation between the
camshaft 26 and the camshaft 34. The use of a belt in
5    place of the chain 36 is also contemplated.

As is illustrated in Figure 6, an end of each of the
camshafts 26 and 34 is journalled for rotation in bearings
42 and 44, respectively, of the head 50, which is shown
fragmentarily and which is bolted to an engine block,
10    otherwise not shown, by bolts 48. The opposite ends of the
camshafts 26 and 34, not shown, are similarly journalled
for rotation in an opposite end, also not shown, of the
head 50. The sprocket 38 is keyed to the camshaft 34 at a
location of the camshaft 34 which is outwardly of the head
15    50. Similarly, the sprockets 32 and 30 are positioned, in
series, on the camshaft 26 at locations outwardly of the
head 50, the sprocket 32 being transversely aligned with
the sprocket 38 and the sprocket 30 being positioned
slightly outwardly of the sprocket 32, to be transversely
20    aligned with the sprocket 24.

The sprocket 32 has an arcuate retainer 52 (Figures 7
and 8) as an integral part thereof, and the retainer 52
extends outwardly from the sprocket 32 through an arcuate
opening 30a in the sprocket 30. The sprocket 30 has an
25    arcuate hydraulic body 46 bolted thereto and the hydraulic
body 46, which houses certain of the hydraulic components
of the associated hydraulic control system, receives and
pivotally supports the body end of each of a pair of
oppositely acting, single acting hydraulic cylinders 54 and
30    56 which are positioned on opposite sides of the
longitudinal axis of the camshaft 26. The piston ends of
the cylinders 54 and 56 are pivotally attached to an
arcuate bracket 58, and the bracket 58 is secured to the
sprocket 32 by a plurality of threaded fasteners 60. Thus,
35    by extending one of the cylinders 54 and 56 and by

BW 002091

92007                              -10-

simultaneously retracting the other of the cylinders 54 and
56, the arcuate position of the sprocket 32 will be changed
relative to the sprocket 30, either to advance the sprocket
32 if the cylinder 54 is extended and the cylinder 56 is
5    retracted, which is the operating condition illustrated in
Figures 2 and 4, or to retard the sprocket 32 relative to
the sprocket 30 if the cylinder 56 is extended and the
cylinder 54 is retracted, which is the operating condition
illustrated in Figures 1, 3, 7 and 8.  In either case, the
10   retarding or advancing of the position of the sprocket 32
relative to the position of the sprocket 30, which is
selectively permitted or prevented in reaction to the
direction of torque in the camshaft 26, as explained in the
aforesaid U.S. Patent 5,002,023,  will advance or retard
15   the position of the camshaft 34 relative to the position of
the camshaft 26 by virtue of the chain drive connection
provided by the chain 36 between the sprocket 32, which is
journalled for limited relative arcuate movement on the
camshaft 26, and the sprocket 38, which is keyed to the
20   camshaft 34.  This relationship can be seen in the drawing
by comparing the relative position of a timing mark 30b on
the sprocket 30 and a timing mark 38a on the sprocket 38 in
the retard position of the camshaft 34, as is shown in
Figures 1 and 3, to their relative positions in the
25   advanced position of the camshaft 34, as is shown in
Figures 2 and 4.
        Figures 10-20 illustrate two embodiments of the
present invention in which a housing in the form of a
sprocket 132 is oscillatingly journalled on a camshaft 126.
30   The camshaft 126 may be considered to be the only camshaft
of a single camshaft engine, either of the overhead
camshaft type or the in block camshaft type.
Alternatively, the camshaft 126 may be considered to be
either the intake valve operating camshaft or the exhaust
35   valve operating camshaft of a dual camshaft engine.  In any

BW 002092

92007                    -11-

case, the sprocket 132 and the camshaft 126 are rotatable
together, and are caused to rotate by the application of
torque to the sprocket 132 by an endless roller chain 138,
shown fragmentarily, which is trained around the sprocket
5    132 and also around a crankshaft, not shown. As will be
hereinafter described in greater detail, the sprocket 132
is oscillatingly journalled on the camshaft 126 so that it
is oscillatable at least through a limited arc with respect
to the camshaft 126 during the rotation of the camshaft, an
10   action which will adjust the phase of the camshaft 126
relative to the crankshaft.

An annular pumping vane 160 is fixedly positioned on
the camshaft 126, the vane 160 having a diametrically
opposed pair of radially outwardly projecting lobes 160a,
15   160b and being attached to an enlarged end portion 126a of
the camshaft 126 by bolts 162 which pass through the vane
160 into the end portion 126a. In that regard, the
camshaft 126 is also provided with a thrust shoulder 126b
to permit the camshaft to be accurately positioned relative
20   to an associated engine block, not shown. The pumping vane
160 is also precisely positioned relative to the end
portion 126a by a dowel pin 164 which extends therebetween.
The lobes 160a, 160b are received in radially outwardly
projecting recesses 132a, 132b, respectively, of the
25   sprocket 132, the circumferential extent of each of the
recesses 132a, 132b being somewhat greater than the
circumferential extent of the vane lobe 160a, 160b which is
received in such recess to permit limited oscillating
movement of the sprocket 132 relative to the vane 160. The
30   recesses 132a, 132b are closed around the lobes 160a, 160b,
respectively, by spaced apart, transversely extending
annular plates 166, 168 which are fixed relative to the
vane 160, and, thus, relative to the camshaft 126, by bolts
170 which extend from one to the other through the same
35   lobe, 160a, 160b. Further, the inside diameter 132c of the

BW 002093

92007                           -12-

sprocket 132 is sealed with respect to the outside diameter
of the portion 160d of the vane 160 which is between the
lobes 160a, 160b, and the tips of the lobes 160a, 160b of
the vane 160 are provided with seal receiving slots 160e,
5    160f, respectively.  Thus each of the recesses 132a, 132b
of the sprocket 132 is capable of sustaining hydraulic
pressure, and within each recess 132a, 132b, the portion on
each side of the lobe 160a, 160b, respectively, is capable
of sustaining hydraulic pressure.

10        The functioning of the structure of the embodiment of
Figures 10-18, as thus far described, may be understood by
reference to schematic Figures 19 and 20.  It also is to be
understood, however, that the hydraulic control system of
Figures 19 and 20 is also applicable to an opposed
15    hydraulic cylinder VCT system corresponding to the
embodiment of Figures 1-9, as well as to a vane type VCT
system corresponding to the embodiment of Figures 10-18.

        In any case, hydraulic fluid, illustratively in the
form of engine lubricating oil, flows into the recesses
20    132a, 132b by way of common inlet line 182.  Inlet line 182
terminates at a juncture between opposed check valves 184
and 186 which are connected to recesses 132a, 132b,
respectively, by branch lines 188, 190, respectively.
Check valves 184, 186 have annular seats 184a, 186a,
25    respectively, to permit the flow of hydraulic fluid through
check valves 184, 186 into recesses 132a, 132b,
respectively.  The flow of hydraulic fluid through check
valves 184, 186 is blocked by floating balls 184b, 186b,
respectively, which are resiliently urged against seats
30    184a, 186a, respectively, by springs 184c, 186c,
respectively.  Check valves 184, 186, thus, permit the
initial filling of recesses 132a, 132b and provide for a
continuous supply of make-up hydraulic fluid to compensate
for leakage therefrom.  Hydraulic fluid enters inlet line
35    182 by way of spool valve 192, which is incorporated within

92007                    -13-

camshaft 126, and hydraulic fluid is returned to spool
valve 192 from recesses 132a, 132b by return lines 194,
196, respectively.

Spool valve 192 is made up of cylindrical member 198
5    and vented spool 200 which is slidable to and fro within
cavity 198a. Vented spool 200 has cylindrical lands 200a
and 200b on opposed ends thereof, and lands 200a and 200b,
which fit snugly within member 198, are positioned so that
land 200b will block the exit of hydraulic fluid from
10   return line 196, or land 200a will block the exit of
hydraulic fluid from return line 194, or lands 200a and
200b will block the exit of hydraulic fluid from both
return lines 194 and 196, as is schematically shown in
Figures 19 and 20, where camshaft 126 is being maintained
15   in a selected intermediate position relative to the
crankshaft of the associated engine, referred to as the
"null" position of spool 200.

In the present invention, the position of vented spool
200 within member 198 is influenced by spring 202 which
20   acts on the end of land 200a. Thus, spring 202 resiliently
urges spool 200 to the left, as oriented in Figures 19 and
20. Inlet line 182 receives its pressurized fluid (engine
oil) directly from main oil gallery ("MOG") 230 of the
engine by way of conduit 230a, bypassing vented spool 200.
25   This oil is also used to lubricate bearing 232 in which
camshaft 126 of the engine rotates.

The control of the position of spool 200 within member
198 is in direct response to electromechanical actuator
201, preferably a variable force solenoid, as shown in
30   Figure 19. An electrical current is introduced via cable
238 through solenoid housing 201d into solenoid coil 201a
which repels, or "pushes", armature 201b. Armature 201b
bears against extension 200c of vented spool 200, thus
moving vented spool 200 to the right, as oriented in Fig.
35   19. If the force of spring 202 is in balance with the

92007                    -14-

force exerted by armature 201b in the opposite direction,
spool 200 will remain in its null or centered position.
Thus, vented spool 200 can be moved in either direction by
increasing or decreasing the current to solenoid coil 201a,
5   as the case may be. Of course, the configuration of
solenoid 201 may be reversed, converting the force on spool
extension 200c from a "push" to a "pull." This would
require the function of spring 202 to be redesigned to
counteract the force in the new direction of armature 201b
10  movement. However, there are instances when it is
desirable for spool 200 to be forced to the far left, or
biased, position. The location of spring 202 in cavity
198c, as shown in Figure 19, or in cavity 198a, as shown in
Figure 20, ensures the return of spool 200 to its biased
15  position when there is no current applied to solenoid coil
201a, such as periods of power failure or engine shutdown.

      The movement of armature 201b is controlled by an
electrical current applied to solenoid coil 201a in
response to a control signal from electronic engine control
20  unit (ECU) 208, shown schematically in Fig. 19, which may
be of conventional construction. In previous versions of
the VCT system, the force exerted against spool extension
200c must balance with the force of spring 202 plus any
system oil pressure in cavity 198a acting on the end of
25  land 200a if a null position of spool 200 was desired. A
problem arose when attempting to achieve this balance
because the system included a component which could vary
significantly, namely oil pressure. The optimum solution
is a control system completely independent of variable
30  parameters, i.e., one independent of engine oil pressure.

      In the present invention, oil pressure in cavity 198a
is relieved, leaving only the force of armature 201b to be
balanced against the force of spring 202 to achieve a null
position of spool 200. Relieving the pressure in cavity
35  198a may be accomplished, for example, by providing an

BW 002096

92007                              -15-

engine oil flow path to the vane system which bypasses
spool 200, that is, does not utilize a passage internal to
spool 200 to supply oil to inlet line 182, as in previous
systems.  The bypass of spool 200 may be achieved by
5    connecting bypass line 220a directly to inlet line 182 and
substituting inlet oil check valve 222a for the check valve
previously contained in the passage internal to the spool.
In conjunction with providing an alternate flow path,
venting spool valve 198 to atmosphere via vent 198d would
10   complete the objective of relieving the pressure in cavity
198a which acted on the end of land 200a in previous VCT
systems.

With the oil pressure variable eliminated, the only
forces left to consider in controlling the position of
15   vented spool 200 are ones with predictable rates of change.
The force of armature 201b corresponds to the electrical
current applied to solenoid coil 201a, and the force of
spring 202 is also predictable (with respect to spring
position).  The result is the position of spool 200 being
20   readily ascertainable based on solenoid current alone.

The type of solenoid normally used in the preferred
embodiment is the cylindrical armature, or variable area,
solenoid shown in Figure 19.  Main air gap 201c extends
radially around armature 201b and may contain nonmagnetic
25   bearing material.  As armature 201c moves axially, the
cylindrical area of main gap 201c increases but the force
and distance to the coil remain constant.  Because the
force is relatively insensitive to axial armature position,
an extremely precise distance from solenoid housing 201d to
30   vented spool 200 is not required.

An alternate embodiment of the present invention is
shown in Fig. 20.  A variable force solenoid of the flat-
faced armature, or variable gap, type is used.  Force is
inversely proportional to the square of air gap 201c.  It
35   is thus advantageous to limit air gap 201c to a relatively

BW 002097

92007                          -16-

small value. By using a stroke amplifier in conjunction
with a variable gap solenoid, a net gain in force can be
achieved. Lever arrangement 201e connects armature 201b
with spool extension 200c and provides just such a gain in
5       force. This net gain can be exploited by reducing the
physical size of electromechanical actuator 201, thus
decreasing the current requirements of solenoid coil 201a
without sacrificing valve travel.

By using only imbalances between an electrically-
10      generated  force on one end 200a of spool 200 and a spring
force on other end 200b for movement in one direction or
another (as opposed to using imbalances between hydraulic
loads from a common source on both ends), the control
systems of Figures 19 and 20 are completely independent of
15      hydraulic system pressure. Thus, it is not necessary to
design a compromised system to operate within a potentially
wide spectrum of oil pressures, such that may be attributed
to individual characteristics of particular engines. In
that regard, by designing a system which operates within a
20      narrower range of parameters, it is possible to rapidly and
accurately position the spool 200 in its null position for
enhanced operation of a VCT system.

The vane 160 is alternatingly urged in clockwise and
counterclockwise directions by the torque pulsations in the
25      camshaft 126 and these torque pulsations tend to oscillate
vane 160, and, thus, camshaft 126, relative to sprocket
132. However, in the spool position shown in Figures 19
and 20, such oscillation is prevented by the hydraulic
fluid within recesses 132a, 132b of sprocket 132 on
30      opposite sides of lobes 160a, 160b, respectively, of vane
160, because no hydraulic fluid can leave either recesses
132a or 132b. Both return lines 194, 196 are blocked by
the position of vented spool 200. If, for example, it is
desired to permit camshaft 126 and vane 160 to move in a
35      counterclockwise direction with respect to sprocket 132, it

BW 002098

92007                          -17-

is only necessary to increase the amount of current to
solenoid coil 201a. This will "push" armature 201b to the
right, urge spool 200 to the right, and thereby unblock
return line 194. In this condition of the apparatus,
5      counterclockwise torque pulsations in camshaft 126 will
pump fluid out of the portion of recess 132a and allow lobe
160a of vane 160 to move into the other portion of recess
132a which has been emptied of hydraulic fluid. However,
reverse movement of vane 160 will not occur as the torque
10     pulsations in camshaft 126 become oppositely directed
unless and until vented spool 200 moves to the left,
because of the blockage of fluid flow through return line
196 by land 200b of spool 200. While illustrated as a
separate closed passage in Figures 19 and 20, the periphery
15     of vane 160 has open oil passage slot 160c shown in Figures
10, 11, 15, 16 and 17, which permits the transfer of oil
between the portion of recess 132a on the right side of
lobe 160a and the portion of recess 132b on the right side
of lobe 160b, which are the non-active sides of lobes 160a
20     and 160b; thus, counterclockwise movement of vane 160
relative to sprocket 132 will occur when flow is permitted
through return line 194 and clockwise movement will occur
when flow is permitted through return line 196.

Further, inlet line 182 is provided with extension
25     182a to the non-active side of one of lobes 160a or 160b,
shown as lobe 160b, to permit a continuous supply of make-
up oil to the non-active sides of lobes 160a, 160b for
better rotational balance, improved damping of vane motion,
and improved lubrication of the bearing surfaces of vane
30     160. The flow of make-up oil does not affect, and is not
affected by, the operation of electromechanical actuator
201. Make-up oil will continue to be provided to lobes
160a and 160b.

Although the best mode contemplated by the inventors
35     for carrying out the present invention as of the filing

92007                    -18-

date hereof has been shown and described herein, it will be
apparent to those skilled in the art that suitable
modifications, variations, and equivalents may be made
without departing from the scope of the invention, such
5   scope being limited solely by the terms of the following
claims.

BW 002100

92007                          -19-

WHAT IS CLAIMED IS:

     1.   An internal combustion engine, comprising:

a crankshaft, said crankshaft being rotatable about an axis;

a camshaft (126), said camshaft being rotatable
5   about a second axis, said camshaft being subject to torque
reversals during rotation thereof;

a vane (160), said vane having first and second
circumferentially spaced apart lobes (160a, 160b), said
vane being attached to said camshaft, said vane being
10  rotatable with said camshaft and being non-oscillatable
with respect to said camshaft;

a housing (132), said housing being rotatable
with said camshaft and being oscillatable with respect to
said camshaft, said housing having first and second
15  circumferentially spaced apart recesses (132a, 132b), each
of said first and second recesses receiving one of said
first and second lobes and permitting oscillating movement
of said one of said first and second lobes therein;

means for transmitting rotary movement from said
20  crankshaft to said housing; and

means for controlling the oscillation of said
housing, said control means being reactive to torque
reversals in said camshaft for varying the position of said
housing relative to said camshaft, said control means
25  comprising:

a spool valve body (198);

a spool (200), said spool being reciprocable
within said body and having first and second spaced apart
lands (200a, 200b), said spool further having a vent to
30  atmosphere (198d);

a first return line means (194) extending from
one of said first recess and said second recess to said
spool valve body, one of said first and second lands

BW 002101

92007                    -20-

blocking flow through said first return line means in a
first range of positions of said spool within said valve
body and permitting flow through said first return line
means in a second range of positions of said spool within
said valve body;

    a second return line means (196) extending from
the other of said first recess and said second recess to
said valve body, the other of said first and second lands
blocking flow through said second return line means in said
second range of positions of said spool within said valve
body, permitting flow through said second return line means
in a first portion of said first range of positions of said
spool within said valve body, and blocking flow through
said second return line means in a second portion of said
first range of positions of said spool within said valve
body;

    an inlet line means (182) extending from said
valve body to each of said first recess and said second
recess, said inlet line means permitting hydraulic fluid to
flow from said valve body to said each of said first recess
and said second recess regardless of the position of said
spool, said inlet line means having check valve means (184,
186) for preventing the flow of hydraulic fluid from each
of said first recess and said second recess to said valve
body;

    means for sensing (207a, 207b) the positions of
said crankshaft and said camshaft;

    an engine control unit (208), said engine control
unit for receiving information from said sensing means and
for calculating a relative phase angle between said
crankshaft and said camshaft using said information;

    an electromechanical actuator (201), said
electromechanical actuator for controlling the position of
said spool in response to a signal issued from said engine
control unit; and,

BW 002102

92007                    -21-

means for biasing (202) said spool valve, said biasing
means for urging said spool valve to a full advance
position during periods when said electromechanical
actuator is deenergized.

5

2.   An engine according to Claim 1 wherein each of
said first and second lobes respectively divides each of
said first and second recesses into a first portion and a
10    second portion, each of said one of said first portion and
said second portion of said each of said first and second
recesses being capable of sustaining hydraulic pressure.

3.   An engine according to Claim 2 wherein said
15    control means is capable of being reversed to transfer
hydraulic fluid out of said one of said first portion and
said second portion of said each of said first and second
recesses and to transfer hydraulic fluid into said other of
said first portion and said second portion of said each of
20    said first and second recesses.

4.   An engine according to Claim 3 wherein said
hydraulic fluid comprises engine lubricating oil, said
engine further comprising at least one conduit means (230a)
25    for transferring engine lubricating oil from a pressurized
lubricating oil source (230) to said control means and back
again in response to said torque reversals of said
camshaft.

30    5.   An engine according to Claim 4 further comprising
means for hydraulically connecting (182a) one of said first
portion and said second portion of one of said first recess
and said second recess with one of said first portion and
said second portion of the other of said second recess to
35    permit hydraulic fluid to flow between said one of said

92007                                    -22-

first portion and said second portion of said one of said
first recess and said second recess and said one of said
first portion and said second portion of said other of said
first recess and said second recess.

5

6.   An engine according to Claim 5 further comprising
at least one other conduit means (220a), said other conduit
means providing communication for the flow of hydraulic
fluid through said valve body to said inlet line means,
10    said other conduit means having second check valve means
(222a) for preventing the flow of hydraulic fluid from said
inlet line means through said body.

7.   An engine according to Claim 6 wherein said
15    electromechanical actuator comprises a variable force
solenoid.

8.   An engine according to Claim 7 wherein said
variable force solenoid comprises:
20         a coil (201a), said solenoid coil for receiving
an electrical current from said engine control unit;
           an armature (201b), said armature being
substantially surrounded by said coil, said armature being
connected to said spool, said coil, when energized, for
25    creating a magnetic field sufficient to cause said armature
to exert a force upon said spool and induce movement in
said spool, said movement corresponding to said signal from
said engine control unit;
           an air gap, said air gap for separating said coil
30    from said armature; and,
           a housing, said housing for providing an
enclosure for said coil, said armature, and said air gap.

9.   An engine according to Claim 8 wherein said
35    electromechanical actuator further comprises a stroke

92007                    -23-

amplifier, said stroke amplifier providing a net gain in
force as applied to said vented spool.

10.   An engine according to Claim 8 wherein said
stroke amplifier comprises a lever arrangement (201e).

11.   In an internal combustion engine having a
variable camshaft timing system, a method of regulating the
flow of hydraulic fluid, comprising the steps of:
        sensing the positions of a crankshaft and a
camshaft;
        calculating a relative phase angle between said
crankshaft and said camshaft, said calculating step using
an engine control unit to process information obtained from
said sensing step; said engine control unit for issuing a
electrical signal corresponding to said phase angle; and,
        controlling the position of a vented spool
slidably situated within a spool valve body, said control
being in response to said signal received from said engine
control unit, said controlling step utilizing an
electromechanical actuator to vary the position of said
vented spool whereby allowing or preventing flow of
hydraulic fluid through said valve body.

12.   The method of Claim 11 wherein said
electromechanical actuator comprises a variable force
solenoid.

13.   The method of Claim 12 wherein said variable
force solenoid comprises:
        a coil, said coil for receiving said electrical
signal from said engine control unit;
        an armature, said armature being substantially
surrounded by said coil, said armature being connected to
said spool, said coil, when energized, creating a magnetic

92007                    -24-

field sufficient to cause said armature to exert a force
upon said spool and induce movement in said spool, said
movement corresponding to said signal from said engine
control unit;

5          an air gap, said air gap for separating said coil
from said armature; and,
          a housing, said housing for providing an
enclosure for said coil, said armature, and said air gap.

10        14.  The method of Claim 13 wherein said
electromechanical actuator further comprises a stroke
amplifier, said stroke amplifier for providing a net gain
in force as applied to said spool.

15        15.  The method of Claim 16 wherein said stroke
amplifier comprises a lever arrangement.

          16.  In a hydraulic system comprising a source of
hydraulic fluid under pressure (230), a first hydraulic
20   operator (160a), first conduit means (188) for delivering
hydraulic fluid from said source to said first hydraulic
operator, second conduit means (194) for exhausting
hydraulic fluid from said first hydraulic operator, a
second hydraulic operator (160b), third conduit means (190)
25   for delivering hydraulic fluid from said source to said
second hydraulic operator, fourth conduit means (196) for
exhausting hydraulic fluid from said second hydraulic
operator, and means for controlling the exhausting of
hydraulic fluid from said first hydraulic operator and said
30   second hydraulic operator, said control means comprising:
          a spool valve (192), said spool valve being in
communication with said second conduit means and said
fourth conduit means, said spool valve comprising a valve
body (198) and a vented spool (200), said spool being
35   reciprocable within said valve body and comprising first

BW 002106

92007                                    -25-

and second opposed ends and first and second spaced apart
lands (200a, 200b) between said opposed ends, said first
land being capable of blocking flow through said second
conduit means in first and third positions of said spool
5    and permitting flow through said second conduit means in a
second position of said spool, said second land being
capable of blocking flow through said fourth conduit means
in said first and second positions of said spool and
permitting flow through said second conduit means in said
10   third position of said spool;

fifth conduit means (230a), said fifth conduit
means for transmitting hydraulic fluid from said source to
said valve body;

sixth conduit means (182), said sixth conduit
15   means for transmitting hydraulic fluid from said valve body
to said first and said third conduit means; and,

means for positioning said spool within said
valve body whereby controlling the flow of hydraulic fluid
to said first and said second hydraulic operators, said
20   positioning means comprising an electromechanical actuator.

17.  A hydraulic system according to Claim 16 wherein
said control means further comprises a seventh conduit
means in communication with said sixth conduit means in
25   each of said first, second and third positions of said
spool and with said first conduit means and said third
conduit means, said seventh conduit means permitting the
flow of hydraulic fluid from said valve body to said first
hydraulic operator and said second hydraulic operator,
30   whereby hydraulic fluid being exhausted from one of said
first hydraulic operator and said second hydraulic operator
will be returned to the other of said first hydraulic
operator and said second hydraulic operator without
returning to the source of hydraulic fluid.

35

BW 002107

92007                          -26-

18. A hydraulic system according to Claim 17 further
comprising check valve means for preventing flow of
hydraulic fluid from said first hydraulic operator and said
second hydraulic operator through said first conduit means
5    and said third conduit means into said seventh conduit
means.

19. A hydraulic system according to Claim 18 wherein
said positioning means further comprises:
10        means for sensing (207a, 207b) the positions of
said crankshaft and said camshaft;
        an engine control unit (208), said engine control
unit for receiving information from said sensing means and
for calculating a relative phase angle between said
15   crankshaft and said camshaft using said information, said
engine control unit further for issuing an electrical
signal to said electromechanical actuator, said signal
corresponding to said relative phase angle; and,
        means for biasing said vented spool, said biasing
20   means for urging said vented spool within said valve body
in a direction opposite to the direction of the force
applied to said vented spool by said electromechanical
actuator.

25        20. A hydraulic system according to Claim 19 wherein
said electromechanical actuator comprises a variable force
solenoid.

        21. A hydraulic system according to Claim 20 further
30   comprising a stroke amplifier functionally positioned
between said electromechanical actuator and said vented
spool, said stroke amplifier for providing a net gain in
force as applied to said vented spool.

BW 002108

92007                              -27-

22. A hydraulic system of Claim 21 wherein said
stroke amplifier comprises a lever arrangement.

BW 002109



PRINT OF DRAWINGS
AS ORIGINALLY FILED

056635

FIG. I

BW 002110

PRINT OF DRAWINGS
AS ORIGINALLY FILED

08  056635



FIG. 2



FIG. 6

BW 002111



08 056635



FIG. 3

FIG. 5

BW 002112

PRINT OF DRAWINGS
AS ORIGINALLY FILED

08 056635



FIG. 4

FIG. 9

BW 002113

PRINT OF DRAWINGS
AS ORIGINALLY FILED

08 056635



FIG. 7



FIG. 8

BW 002114

PRINT OF DRAWINGS
AS ORIGINALLY FILED

08 056635



FIG. 10

BW 002115



PRINT OF DRAWINGS
AS ORIGINALLY FILED

08 056635



FIG. 11

PRINT OF DRAWINGS
AS ORIGINALLY FILED

0B 056635



FIG. 12

PRINT OF DRAWINGS
AS ORIGINALLY FILED

08 056635



FIG. 13

BW 002118

PRINT OF DRAWINGS
AS ORIGINALLY FILED

08 056635



FIG. 15          FIG. 16



FIG. 14

PRINT OF DRAWINGS
AS ORIGINALLY FILED

08  056635



FIG. 17



FIG. 18

BW 002120



FIG. 19

PRINT OF DRAWINGS
AS ORIGINALLY FILED

08 056635



PRINT OF DRAWINGS
AS ORIGINALLY FILED

08 056635

FIG. 20

BW 002122



**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| APPLICATION NUMBER | FILING DATE | FIRST NAMED APPLICANT | | ATTY. DOCKET NO./TITLE |
|---|---|---|---|---|
| 08/056,635 | 05/03/93 | SIEMON | E | 92007 |

0391/0608

GERALD R. BLACK
BORG-WARNER AUTOMOTIVE, INC.
PATENT DEPARTMENT
6700 18 1/2 MILE ROAD                                   0000
STERLING HEIGHTS, MI 48311-8022
                                              DATE MAILED:  06/08/93

## NOTICE TO FILE MISSING PARTS OF APPLICATION
### FILING DATE GRANTED

An Application Number and Filing Date have been assigned to this application. However, the items indicated below are missing. The required items and fees identified below must be timely submitted ALONG WITH THE PAYMENT OF A SURCHARGE for items 1 and 3-6 only of $ _130.00_ for large entities or $ _65.00_ for small entities who have filed a verified statement claiming such status. The surcharge is set forth in 37 CFR 1.16(e).

If all required items on this form are filed within the period set below, the total amount owed by applicant as a ☒ large entity, ☐ small entity (verified statement filed), is $ _130.00_

Applicant is given ONE MONTH FROM THE DATE OF THIS LETTER, OR TWO MONTHS FROM THE FILING DATE of this application, WHICHEVER IS LATER, within which to file all required items and pay any fees required above to avoid abandonment. Extensions of time may be obtained by filing a petition accompanied by the extension fee under the provisions of 37 CFR 1.136(a).

1. ☐ The statutory basic filing fee is: ☐ missing    ☐ insufficient. Applicant as a ☐ large entity ☐ small entity, must submit $_____ to complete the basic filing fee.

2. ☐ Additional claim fees of $_____ as a ☐ large entity, ☐ small entity, including any required multiple dependent claim fee, are required. Applicant must submit the additional claim fees or cancel the additional claims for which fees are due.

3. ☒ The oath or declaration:
   ☒ is missing.
   ☐ does not cover items omitted at time of execution.

   An oath or declaration in compliance with 37 CFR 1.63, identifying the application by the above Application Number and Filing Date is required.

4. ☐ The oath or declaration does not identify the application to which it applies. An oath or declaration in compliance with 37 CFR 1.63, identifying the application by the above Application Number and Filing Date, is required.

5. ☐ The signature to the oath or declaration is: ☐ missing; ☐ a reproduction; ☐ by a person other than the inventor or a person qualified under 37 CFR 1.42, 1.43, or 1.47. A properly signed oath or declaration in compliance with 37 CFR 1.63, identifying the application by the above Application Number and Filing Date, is required.

6. ☐ The signature of the following joint inventor(s) is missing from the oath or declaration:
   _____. An oath or declaration listing the names of all inventors and signed by the omitted inventor(s), identifying this application by the above Application Number and Filing Date, is required.

7. ☐ The application was filed in a language other than English. Applicant must file a verified English translation of the application and a fee of $_____ under 37 CFR 1.17(k), unless this fee has already been paid.

8. ☐ A $_____ processing fee is required for returned checks. (37 CFR 1.21(m)).

9. ☐ Your filing receipt was mailed in error because check was returned without payment.

10. ☐ The application does not comply with the Sequence Rules. See attached Notice to Comply with Sequence Rules 37 CFR 1.821-1.825.

11. ☐ Other.

Direct the response and any questions about this notice to _Susan Free_ Application Processing Division, Special Processing and Correspondence Branch (703) 308-1202.

## *A copy of this notice MUST be returned with the response.*

FORM PTO-1533 (REV. 1-93)                        **OFFICE COPY**