

5,184,578

**1**

## VCT SYSTEM HAVING ROBUST CLOSED LOOP CONTROL EMPLOYING DUAL LOOP APPROACH HAVING HYDRAULIC PILOT STAGE WITH A PWM SOLENOID

### FIELD OF THE INVENTION

This invention relates to an internal combustion engine in which the timing of the camshaft of a single camshaft engine, or the timing of one or both of the camshafts of a dual camshaft engine, relative to the crankshaft is varied to improve one or more of the operating characteristics of the engine.

### BACKGROUND OF THE INVENTION

It is known that the performance of an internal combustion engine can be improved by the use of dual camshafts, one to operate the intake valves of the various cylinders of the engine and the other to operate the exhaust valves. Typically, one of such camshafts is driven by the crankshaft of the engine, through a sprocket and chain drive or a belt drive, and the other of such camshafts is driven by the first, through a second sprocket and chain drive or a second belt drive. Alternatively, both of the camshafts can be driven by a single crankshaft powered chain drive or belt drive. It is also known that engine performance in an engine with dual camshafts can be further improved, in terms of idle quality, fuel economy, reduced emissions or increased torque, by changing the positional relationship of one of the camshafts, usually the camshaft which operates the intake valves of the engine, relative to the other camshaft and relative to the crankshaft, to thereby vary the timing of the engine in terms of the operation of intake valves relative to its exhaust valves or in terms of the operation of its valves relative to the position of the crankshaft. Heretofore, such changes in engine valve timing have been accomplished by a separate hydraulic motor operated by engine lubricating oil. However, this actuating arrangement consumes significant additional energy and it increases the required size of the engine lubricating pump because of the required rapid response time for proper operation of the camshaft phasing actuator. Further, these arrangements are typically limited to a total of 20° of phase adjustment between crankshaft position and camshaft position, and typically such arrangements are two-position arrangements, that is, on, or fully phase adjusted as one position, or off, or no phase adjustment, as a second position. The present invention is designed to overcome these problems associated with prior art variable camshaft timing arrangements by providing a self-actuating, variable camshaft timing arrangement which does not require external energy for the operation thereof, which does not add to the required size of the engine lubricating pump to meet transient hydraulic operation requirements of such variable camshaft timing arrangement, which provides for continuously variable camshaft to crankshaft phase relationship within the operating limits, and which provides substantially more than 20° of phase adjustment between the crankshaft position and the camshaft position. Prior U.S. Pat. Nos. which describe various systems of the foregoing type are 5,046,460 and 5,002,023, the disclosures of each of which are incorporated by reference.

**2**

### SUMMARY OF THE INVENTION

The present invention provides a method for phase adjustment of an internal combustion engine in which the position of the camshaft, or the positions of one or both of the camshafts in a dual camshaft system, is phase adjusted relative to the crankshaft by an actuating arrangement which is controlled by a robust closed loop system having a hydraulic pilot stage with a pulse width modulated (PWM) solenoid. A predetermined set point dictates the desired camshaft phase angle for certain engine performance criteria. This variable camshaft timing (VCT) system can be used to improve important engine operating characteristics such as idle quality, fuel economy, emissions or torque A preferred embodiment of a camshaft mounted hydraulic VCT mechanism uses one or more radially extending vanes which are circumferentially fixed relative to the camshaft and which are receivable in cavities of a sprocket housing that is oscillatable on the camshaft Hydraulic fluid is selectively pumped through a proportional (spool) valve to one side or another of each vane to advance or retard the position of the camshaft relative to the sprocket. A pumping action occurs in reaction to a signal generated by a closed loop feedback system. Closed loop feedback control is imperative for any but the "two-position" case, i.e., fully advanced or fully retarded. This is because camshaft phase is controlled by the integral of the spool valve position. That is, spool position corresponds not to camshaft phase, but to its rate of change. Thus, any steady state spool position other than null (centered) will cause the VCT to eventually go to one of its physical limits in phase. Closed loop control allows the spool to be returned to null as the camshaft phase reaches its commanded position or set point. An additional result of using feedback control is that the system performance is desensitized to mechanical and environmental variations. This results in a reduction of the effects of short term changes, such as changes in oil pressure or temperature, or long term variations due to tolerances or wear. In addition, set point tracking error in the presence of unanticipated disturbances (e.g. torque shifts) is reduced. A degree of sensitivity reduction and disturbance rejection is referred to as the "robustness" of the control system. Closed loop control can thus provide stable set point tracking with some degree of robustness.

Accordingly, it is an object of the present invention to provide an improved VCT method and apparatus which utilizes a hydraulic PWM spool position control and an advanced control algorithm that yields a prescribed set point tracking behavior with a high degree of robustness. Further, it is an object of the present invention to provide a VCT method and apparatus of the foregoing type which maintains substantially unchanged performance over a wide range of parameter variations. Specifically, it is an object of the present invention to provide a VCT method and apparatus of the foregoing type which is substantially insensitive to fluctuations in engine oil pressure, and changes in system parameters such as component tolerances, spring rate, air entrainment and leakage which utilizes a predetermined set point to dictate the desired camshaft phase angle to effectuate certain engine performance criteria.

For a further understanding of the present invention and the objects thereof, attention is directed to the drawings and to the following brief descriptions

BW 002319



5,184,578

3

thereof, to the detailed description of the preferred embodiment, and to the appended claims.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1a is a block diagram of a basic closed loop feedback system for a VCT system;

FIG. 1b is a block diagram of the robust VCT control law of a preferred embodiment of the present invention used in a closed loop feedback system;

FIG. 1c is a block diagram of the digital implementation of the robust VCT control law illustrated in FIG. 1b;

FIG. 1d is a block diagram of the robust VCT control law of an alternate embodiment of the present invention utilizing a single-loop configuration and filtered set point;

FIG. 1e is a block diagram of the robust VCT control law of an alternate embodiment of the present invention including variation compensation and disturbance feed-forward;

FIG. 1f is a block diagram illustrating the component stages of a synchronous disturbance filter;

FIG. 2 is an elevational view of a camshaft with an embodiment of a variable camshaft timing system applied thereto;

FIG. 3 is a view similar to FIG. 2 with a portion of the structure thereof removed to more clearly illustrate other portions thereof;

FIG. 4 is a sectional view taken on line 4—4 of FIG. 3;

FIG. 5 is a sectional view taken on line 5—5 of FIG. 3;

FIG. 6 is a sectional view taken on line 6—6 of FIG. 3;

FIG. 7 is an end elevational view of an element of the variable camshaft timing system of FIGS. 2–6;

FIG. 8 is an elevational view of the element of FIG. 7 from the opposite end thereof;

FIG. 9 is a side elevational view of the element of FIGS. 7 and 8;

FIG. 10 is an elevational view of the element of FIG. 9 from the opposite side thereof; and

FIG. 11 is a simplified schematic view of the variable camshaft timing arrangement of FIGS. 2–10.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

As is described in the aforesaid U.S. Pat. Nos. 5,046,460 and 5,002,023 and as is schematically shown in FIG. 2a, camshaft and crankshaft measurement pulses in a VCT system are generated by camshaft and crankshaft pulse wheels 27 and 28, respectively, as the crankshaft (not shown) and camshaft 26 are rotated, and these can be used to actuate the operation of one or more hydraulic elements of a hydraulically operated VCT system. According to the present invention, in a VCT system, for example, a system according to the embodiment of FIGS. 2–10, as hereinafter described, the measurement pulses are detected by camshaft and crankshaft measurement pulse sensors 27a and 28a, 60 respectively, and issued to a phase measurement device 107. The time from successive crank-to-cam pulses, divided by the time for an entire revolution and multiplied by 360°, gives the measured phase difference, $\Theta_p$ 20. The phase measurement $\Theta_p$ 20 is then supplied to a synchronous filter 25, schematically shown in FIG. 1f. As the camshaft rotates, the torque pulses 10 superimpose a high frequency disturbance on the VCT phase,

4

$\Theta_p$ 20. Thus, there is an exact synchronization between the torque pulses 10 and the high frequency disturbance. Likewise, the camshaft measurement pulses 27a are also synchronized with the disturbance. According to the present invention it is possible to take advantage of this synchronization to efficiently filter the phase measurement, $\Theta_p$ 20, so that the high frequency disturbance is isolated from the control action. As the camshaft speed varies, the filter frequency automatically tracks the disturbance frequency. The filter itself is a discrete-time notch filter with a sampling frequency equal to that of the camshaft measurement pulse frequency 27a. The filtered phase measurement, $\Theta_f$ 30, is supplied to a control law 108. Since the high frequency disturbance is isolated, the control law 108 does not attempt to compensate for it. This further makes it possible to save actuation power, reduce wear and enhance signal linearity by such a filtering step herein described.

FIG. 1f illustrates an embodiment for the filter in the case when the number of camshaft measurement pulses per revolution (n) is greater than twice the number of torque pulses per revolution (m). The filter eliminates the fundamental frequency of the torque disturbance. In the case when n < 2m, the disturbance is "aliased" to a lower frequency and this is the frequency addressed by the filter. Further stages can also be added to eliminate harmonics of the disturbance frequency.

The variables for FIG. 1f are as follows:

$z^{-1}$ = delay by one camshaft measurement pulse
$B = -2\cos(2\pi m/n)$
$A = 1/(2 + B)$

the feedback control law 108 is described in detail in FIG. 1b. The filtered phase angle measurement, $\Theta_f$ 30, is sent to a proportional-integral control block 208 where the filtered phase angle measurement $\Theta_f$ 30, is subtracted from a set point $r$ 35 to give the tracking error, $e$ 31. The tracking error $e$ 31 is then processed by a proportional-integral (PI) control block 208 to give infinite DC gain as well as phase lead to compensate for integrator lag. The integral action assures that the steady-state tracking error goes to zero.

The output of the PI control block 208 is then used to control the "inner loop" of the system. The filtered phase angle measurement 30 is subtracted from it, resulting in an inner loop error, $e_1$ 33. This loop error $e_1$ 33 is multiplied by a loop gain, $K_2$, and subjected to the effect of a phase-lead compensation 308. Such phase-lead compensation 308 gives a quick response by substantially cancelling the low frequency phase lag of the PWM pilot stage 106 (shown in FIGS. 1a and 11). The gains and phase-lead frequencies provide enough freedom to achieve independent control of closed-loop dynamics and robustness.

FIG. 1c shows the identical feedback control law 108 for digital implementation. The variables for the PI control block 408 are:

$T_s = 0.02$ sec.

$z^{-1} =$ unit delay

The variables for the phase-lead compensation block 508 are:

$a = w_{lag}/w_{lead}$

BW 002320



5,184,578

5

$b = \omega_{cp} - W_{hy}T_s$

In FIG. 14, an alternate embodiment of the VCT control law 108 is shown utilizing a single-loop configuration. The set point, $r$ 35 is pre-processed by a filter, F(s) 35a prior to subtracting the feedback signal $\Theta/30$. The resulting error, $e_2$ 34 is then processed by the PI control block 218 and phase-lead block 318, resulting in the PWM duty cycle. Thus, it is an object of this alternate embodiment of the present invention to incorporate the advantages of the control law shown in FIGS. 18 and c into a single-loop configuration.

FIG. 1e is an alternate embodiment of the present invention which illustrates an expanded closed loop feedback system including variation compensation and disturbance feed forward 508. The gain of this hydromechanical system depends on a number of variables such as hydraulic supply pressure, engine speed, oil temperature and natural crankshaft/camshaft orientation. In order to counteract the phenomena in the controller 208, the net effect of all the variables is estimated and the proportional gain, $K_p$ is increased as response decreases. The controller 208 anticipates disturbance phenomena by adjusting the null duty cycle, $U_{null}$ 611, according to an estimate of the net effect. An estimate, A null 609, is determined as a nonlinear function of pressure, temperature and the predetermined set point 35. It is then subtracted from a nominal null, $U_0$ 610, to give an overall value, $U_{null}$ 611, used in the control loop.

FIGS. 2-10 illustrate an embodiment of a hydraulic vane system in which a housing in the form of a sprocket 32 is oscillatingly journalled on a camshaft 26. The camshaft 26 may be considered to be the only camshaft of a single camshaft engine, either of the overhead camshaft type or the inblock camshaft type. Alternatively, the camshaft 26 may be considered to be either the intake valve operating camshaft or the exhaust valve operating camshaft of the dual camshaft engine in any case, the sprocket 32 and the camshaft 26 are rotatable together, and are caused to rotate by the application of torque to the sprocket 32 by an endless roller chain 38, shown fragmentarily, which is trained around the sprocket 32 and also around a crankshaft not shown. As will be here after described in greater detail, the sprocket 32 is oscillatingly journalled on the camshaft 26 so that it is capable of oscillating through a limited arc with respect to the camshaft 26 during the rotation of the camshaft, an action which will adjust the phase of the camshaft 26 relative to the crankshaft.

An annular pumping vane 60 is fixedly positioned on the camshaft 26, the vane 60 having a diametrically opposed pair of radially outwardly projecting lobes 60a, 60b and being attached to an enlarged end portion 26a of the camshaft by bolts 62 which pass through the vane 60 into the end portion 26a. In that regard, the camshaft 26 is also provided with a thrust shoulder 26b to permit the camshaft to be accurately positioned relative to an associated engine block, not shown. The pumping vane 60 is also precisely positioned relative to the end portion 26a by a dowel pin 64 which extends therebetween. The lobes 60a, 60b are received in radially outwardly projecting recesses 32a, 32b, respectively, of the sprocket 32, the circumferential extent of each of the recesses 32a, 32b being somewhat greater than the circumferential extent of the vane lobes 60a, 60b which are received in such recesses to permit limited oscillating movement of the sprocket 32 relative to the vane 60. The recesses 32a, 32b are closed around the lobes 60a, 60b, respectively, by spaced apart, transversely extending annular

6

plates 66, 68 which are fixed relative to the vane 60, and, thus, relative to the camshaft 60, by bolts 70 which extend from one to the other through the same lobes, 60a or 60b. Further, the inside diameter 32c of the sprocket 32 is sealed with respect to the outside diameter of the portion 60d of the vane 60 which is between the lobe 60a, 60b, and the tips of the lobes 60a, 60b of the vane 60 are provided with sealed receiving slots 60e, 60f, respectively. Thus, each of the recesses 32a, 32b of the sprocket 32 is capable of sustaining hydraulic pressure, and within each recess 32a, 32b, the portion on each side of the lobe 60a, 60b, respectively, is capable of sustaining hydraulic pressure.

The functioning of the structure of the embodiment of FIGS. 2–10, as thus far described, may be understood by reference to FIG. 11. Hydraulic fluid, illustratively in the form of engine lubricating oil, flows into the recesses 32a, 32b by way of a common inlet line 82. The inlet line 82 terminates at a juncture between opposed check valves 84 and 86 which are connected to the recesses 32a, 32b, respectively, by branch lines 88, 90, respectively. The check valves 84, 86 have annular seats 84a, 86a, respectively, to permit the flow of hydraulic fluid through the check valves 84, 86 into the recesses 32a, 32b, respectively. The flow of hydraulic fluids through the check valves 84, 86, is blocked by floating balls 84d, 86d, respectively, which are resiliently urged against the seats 84a, 86a, respectively, by springs 84c, 86c, respectively. The check valves 84, 86, thus, permit the initial filling of the recesses 32a, 32b and provide for a continuous supply of makeup hydraulic fluid to compensate for leakage therefrom. Hydraulic fluid enters the line 82 by way of a spool valve 92, which is incorporated within the camshaft 26, and hydraulic fluid is returned to the spool valve 92 from the recesses 32a, 32b by return lines 94, 96, respectively. Because of the location of the check valves 84 and 86 which block the backflow of hydraulic fluid, the need for the spool valve 100 to return to the null (centered) position to prevent such backflow is eliminated.

The spool valve 92 is made up of a cylindrical member 98 and a spool 100 which is slidable to and fro within the member 98. The spool 100 has cylindrical lands 100a and 100b on opposed ends thereof, and the lands 100a and 100b, which fit snugly within the member 98, are positioned so that the land 100b will block the exit of hydraulic fluid from the return line 96, or the land 100a will block the exit of hydraulic fluid from the return line 94, or the lands 100a and 100b will block the exit of hydraulic fluid from both return lines 94 and 96, as is shown in FIG. 11, where the camshaft 26 is being maintained in a selective intermediate position relative to the crankshaft of the associated engine.

The position of the spool 100 within the member 98 is influenced by an opposed pair of springs 102, 104 which act on the ends of the lands 100a, 100b respectively. Thus, the spring 102 resiliently urges the spool 100 to the left, in the orientation illustrated in FIG. 11, and the spring 104 resiliently urges the spool 100 to the right in such orientation. The position of the spool 100 within the member 98 is further influenced by supply of pressurized hydraulic fluid within a portion 98a of the member 98, on the outside of the land 100a, which urges the spool 100 to the left. The portion 98a of the member 98 receives its pressurized fluid (engine oil) directly from the main oil gallery ("MOG") 138 of the engine, and



7

5,184,578

8

this oil is also used to lubricate a bearing 132 in which the camshaft 26 of the engine rotates.

The control of the position of the spool 100 within the member 98 is in response to hydraulic pressure within a control pressure cylinder 134 whose piston 134a bears against an extension 100c of the spool 100. The surface area of the piston 134a is greater than the surface area of the end of the spool 100 which is exposed to hydraulic pressure within the portion 98a, and is preferably twice as great. Thus, the hydraulic pressures which act in opposite directions to the spool 100 will be in balance when the pressure within the cylinder 134 is balance that of the pressure within the portion 98a. This facilitates the control of the position of the spool 100 in that, if the springs 102 and 104 are balanced, the spool 100 will remain in its null or centered position, as illustrated in FIG. 11, with less than full engine oil pressure in the cylinder 134, thus allowing the spool 100 to be moved in either direction by increasing or decreasing the pressure in the cylinder 134, as the case may be.

The pressure within the cylinder 134 is controlled by a solenoid 106, preferably of the pulse width modulated type (PWM), in response to a control signal from a closed loop feedback system 108, shown schematically, in FIG. 11. The feedback control system processes a signal sent from a sensing device 107 which measures the phase angle between the camshaft 26 and the crankshaft, not shown. The closed loop feedback system 108 compares the phase angle to a predetermined set point and issues a signal to the solenoid 106. With the spool 100 in its null position when the pressure in the cylinder 134 is equal to one-half the pressure in the portion 98a, as heretofore described, the on-off pulses of the solenoid 106 will be of equal duration; by increasing or decreasing the on duration relative to the off duration, the pressure in the cylinder 134 will increased or decreased relative to such one-half level, thereby moving the spool 100 to the right or to the left, respectively. The solenoid 106 receives engine oil from the main engine oil gallery (MOG) 130 through an inlet line 124 and selectively delivers engine oil from such source to the cylinder 134 through a supply line 138. As is shown in FIGS. 4 and 5, the cylinder 134 may be mounted at an exposed end of the camshaft 26 so that its piston 134a bears against an exposed end 100c of the spool 100. In this case, the solenoid 106 is preferably mounted in a housing 134b which also houses the cylinder 134c.

Makeup oil for the recesses 32a, 32b of the sprocket 32 to compensate for leakage therefrom is provided by way of a small, internal passage 130 within the spool 100, from the passage 98a to annular space 98b of the cylindrical member 98, from which it can flow into the inlet line 82. A check valve 122 is positioned within the passage 130 to block the flow of oil from the annular space 98b to the portion 98a of the cylindrical member 98.

The vane 60 is alternating urged in clockwise and counter clockwise directions by the torque pulsation in the camshaft 26 and these torque pulsations tend to oscillate the vane 60, and, thus, the camshaft 26, relative to the sprocket 32. However, in the FIG. 11 position of the spool 100 within the cylindrical member 98, such oscillation is prevented by the hydraulic fluid within the recesses 32a, 32b of the sprocket 32 on opposite sides of the lobes 60a, 60b, respectively, of the vane 60, because it is so hydraulic fluid can leave either of the recesses 32a, 32b, since both return lines 94, 98 are blocked by the position of the spool 100. If, for example, it is desired to

permit the camshaft 26 and vane 60 to move in a counter clockwise with respect to the sprocket 32, it is only necessary to increase the pressure within the cylinder 134 to a level greater than one-half that in the portion 98a of the cylindrical member. This will urge the spool 100 to right and thereby unblock the return line 94. In this condition of the apparatus, counter clockwise torque pulsations in the camshaft 26 will put fluid out of the portion of the recess 33a and allow the lobe 60a of vane 60 to move into the portion of the recess which has been emptied of hydraulic fluid. However, reverse movement of the vane 60 will not occur as the pulsations in the camshaft become oppositely directed unless and until the spool 100 moves to the left, because of the blockage of the fluid flow through the return line 96 by the land 100b of the spool 100. Thus, large pressure variations induced by camshaft torque pulses will not affect the condition of the system, eliminating the need to synchronize the opening and closing of the spool valve 92 with individual torque pulses. While illustrated as a separate closed passage in FIG. 11, the periphery of the vane 66 actually has an open oil passage slot, element 60c in FIGS. 2–10, which permits the transfer of oil between the portion of the recess 32a on the right side of the lobe 60a and the portion of the recess 32b on the right side of the lobe 60b, which are the nonactive sides of the lobes 60a and 60b; thus, counter clockwise movement of the vane 60 relative to the sprocket 32 will occur when flow is permitted through return line 94 and clockwise movement will occur when flow is permitted through return line 96.

Further, the passage 82 is provided with an extension 82a to the nonactive side of one of the lobes 60a or 60b, shown as the lobe 60b, to permit a continuous supply of makeup oil to the nonactive sides of the lobes 62a and 62b for better rotational balance, improved damping of vane motion, and improved lubrication of the bearing surfaces of the vane 60.

The elements of the structure of FIGS. 2–10 which correspond to the elements of FIG. 11, as described above, are identified in FIGS. 2–10 by the referenced numerals which were used in FIG. 11, it being noted that the check valves 84 and 86 are disc type check valves in FIGS. 2–10 as opposed to the ball type check valves of FIG. 11. While this type check valves are preferred for the embodiment of FIGS. 2–10, it is to be understood that other types of check valves can also be used.

Although the best mode contemplated by the inventors for carrying out the present invention as of the filing date hereof has been shown and described herein, it will be apparent to those skilled in the art that suitable modifications, variations, and equivalents may be made without departing from the scope of the invention, such scope being limited solely by the terms of the following claims.

What is claimed is:

1. In an internal combustion engine having a rotatable crankshaft and a rotatable camshaft, the camshaft being position variable relative to the crankshaft, being subject to torque reversals during the rotation thereof, having a vane with at least one lobe secured to the camshaft for rotation therewith, and having a housing mounted on the camshaft for rotation with the camshaft and for oscillation with respect to the camshaft, the housing having at least one recess receiving the at least one lobe of the vane and permitting oscillation of the at least one lobe within the at least one recess as the hous-

BW 002322

5,184,578

9

ing oscillates with respect to the camshaft, a method comprising:

providing means for transmitting rotational movement from the crankshaft to the housing;

providing means for varying the position of the housing relative to the camshaft in reaction to torque reversals in the camshaft, said means delivering hydraulic fluid to said vane;

providing check valve means functionally positioned between said housing and said means for varying the position of the housing to eliminate the need for blocking a backflow of hydraulic fluid by the operation of said means for varying the position of said housing;

providing actuating means for supplying hydraulic fluid to said means for varying the position of the housing;

providing processing means for controlling the on-off pulses of said actuating means by generating a PWM duty cycle to said actuating means; and

providing sensing means for determining a phase angle between the crankshaft and the camshaft and issuing a feedback signal to said processing means.

2. The method according to claim 1 wherein said means for varying the position of the housing comprises a hydraulic cylinder and a proportional spool valve, the position of said spool valve being controlled by the pressure of the hydraulic fluid contained in said cylinder.

3. The method of claim 1 wherein said actuating means comprises a solenoid valve, said solenoid valve controlling the flow of hydraulic fluid to said hydraulic cylinder.

4. The method according to claim 3 wherein said solenoid valve is of the pulse width modulated (PWM) variety.

5. The method of claim 1 wherein said processing means comprises:

means to control proportional gain;

means to control integral gain;

means to compensate for phase-lead; and

means to compensate for outside disturbances.

6. The method of claim 1 wherein said processing means further comprises a means for filtering a predetermined set point in a single-loop system.

7. The method of claim 1 wherein said processing means further comprises at least one filtering means for compensating for the difference between actual engine dynamics and the estimation of said dynamics.

8. In an internal combustion engine having a rotatable crankshaft and a rotatable camshaft, the camshaft being position variable relative to the crankshaft and being subject to torque reversals during the operation thereof, the method comprising:

providing the camshaft with a vane having at least one lobe, the vane being rotatable with the camshaft and being non-oscillatable with respect to the camshaft;

providing the camshaft with a housing having at least one recess, the housing being rotatable with the camshaft and being oscillatable with respect to the camshaft, the at least one recess of the housing receiving the at least one lobe of the vane and permitting oscillation of the at least one lobe within the at least one recess as the housing oscillates with respect to the camshaft;

providing means for transmitting rotary movement from the crankshaft to the housing;

10

providing means for varying the position of the housing relative to the camshaft in reaction to torque reversals in the camshaft, said means delivering hydraulic fluid to said vane;

providing check valve means functionally positioned between said housing and said means for varying the position of the housing to eliminate the need for blocking a backflow of hydraulic fluid by the operation of said means for varying the position of said housing;

providing actuating means for supplying hydraulic fluid to said means for varying the position of the housing;

providing processing means for controlling the on-off pulses of said actuating means by generating a PWM duty cycle to said actuating means; and

providing sensing means for determining a phase angle between the crankshaft and the camshaft and issuing a feedback signal to said processing means.

9. The method according to claim 8 wherein said means for varying the position of the housing comprises a hydraulic cylinder and a proportional spool valve, the position of said spool valve being controlled by the pressure of the hydraulic fluid contained in said cylinder.

10. The method of claim 8 wherein said actuating means comprises a solenoid valve, said solenoid valve controlling the flow of hydraulic fluid to said hydraulic cylinder.

11. The method according to claim 10 wherein said solenoid valve is of the pulse width modulated (PWM) variety.

12. The method of claim 8 wherein said processing means comprises:

means to control proportional gain;

means to control integral gain;

means to compensate for phase-lead; and

means to compensate for outside disturbances.

13. The method of claim 8 wherein said processing means further comprises a means for filtering a predetermined set point in a single-loop system.

14. The method of claim 8 wherein said processing means further comprises at least one filtering means for compensating for the difference between actual engine dynamics and the estimation of said dynamics.

15. The method according to claim 8 wherein the means for varying the position of the housing relative to the camshaft comprises means for permitting the position of the housing to move in a first direction relative to the camshaft in reaction to a torque pulse in the camshaft in a first direction, means for preventing the position of the housing from moving relative to the camshaft in a second direction in reaction to a torque pulse in the camshaft in a second direction, and means for selectively reversing the first and second directions of the movement of the housing relative to the camshaft with respect to the first and second directions of torque pulses in the camshaft.

16. The method according to claim 15 wherein the at least one recess is capable of sustaining hydraulic pressure, wherein the at least one lobe divides the at least one recess into a first portion and a second portion, and wherein the varying of the position of the housing relative to the camshaft comprises:

transferring hydraulic fluid into one of the first portion and the second portion of the recess.

BW 002323

5,184,578

**11**

17. The method according to claim 16 wherein the varying of the position of the housing relative to the camshaft further comprises;

simultaneously transferring hydraulic fluid out of the other of the first portion and the second portion of the recess.

18. The method according to claim 16 wherein the hydraulic fluid is engine lubricating oil from a main oil gallery of the engine.

19. An internal combustion engine comprising:

a crankshaft, said crankshaft being rotatable about an axis;

a camshaft, said camshaft being rotatable about a second axis, said second axis being parallel to said axis, said camshaft being subject to torque reversals during the rotation thereof;

a vane, said vane having at least one lobe, said vane being attached to said camshaft, being rotatable with said camshaft and being non-oscillatable with respect to said camshaft;

a housing, said housing being rotatable with said camshaft and being oscillatable with respect to said camshaft, said housing having at least one recess, said at least one recess receiving said at least one lobe, said at least one lobe being oscillatable within said at least one recess;

rotary movement transmitting means for transmitting rotary movement from the crankshaft to the housing; and

means reactive to torque reversals in the camshaft for varying the position of the housing relative to the camshaft by permitting the housing to move in a first direction relative to the camshaft in reaction to a torque pulse in the camshaft in a first direction and for preventing the housing from moving in a second direction relative to the camshaft in reaction to a torque pulse in the camshaft in a second direction.

20. An engine according to claim 19 wherein said means reactive to torque reversals comprises:

sensing means for determining a phase angle between the crankshaft and the camshaft;

processing means for receiving a feedback signal sent from said sensing means, said processing means utilizing said feedback signal to adjust said phase angle;

actuating means for receiving a processed signal from said processing means and for varying the position of the housing relative to the camshaft in reaction

**12**

to torque reversals in the camshaft as detected by said sensing means; and

check valve means functionally positioned upstream of said vane for eliminating the need for blocking a backflow of hydraulic fluid by the operation of said means for varying the position of said housing.

21. The method of claim 20 wherein said processing means further comprises a means for filtering a predetermined set point in a single-loop system.

22. The method of claim 20 wherein said processing means further comprises at least one filtering means for compensating for the difference between actual engine dynamics and the estimation of said dynamics.

23. An engine according to claim 20 wherein said at least one lobe divides said at least one recess into a first portion and a second portion, and wherein said means reactive to torque reversals comprises means for transferring hydraulic fluid into one of said first portion and said second portion, said one of said first portion and said second portion of said at least one recess being capable of sustaining hydraulic pressure.

24. An engine according to claim 23 wherein said means reactive to torque reversals further comprises means for simultaneously transferring hydraulic fluid out of the other of said first portion and said second portion.

25. An engine according to claim 24 wherein each of said first portion and said second portion of said at least one recess is capable of sustaining hydraulic pressure, and wherein said means reactive to torque reversals is capable of being reversed to transfer hydraulic fluid out of said one of said first portion and said second portion and to transfer hydraulic fluid into said other of said first portion and said second portion, said engine further comprising:

an engine control unit responsive to at least one engine operating condition for selectively reversing the operation of said means reactive to torque reversals.

26. An engine according to claim 25 wherein said hydraulic fluid comprises engine lubricating oil, and further comprising:

conduit means for transferring engine lubricating oil from a portion of said engine to said control means; and

second conduit means for transferring engine lubricating oil from said control means to said portion of said engine.

* * * * *

8

BW 002325

Court of Appeals, Federal Circuit

· In re Fritch

No. 91-1318

Decided August 11, 1992

## JUDICIAL PRACTICE AND PROCEDURE

**1. Procedure — Judicial review — Standard of review — Patents (§410.4607.09)**

Obviousness determination is based on underlying factual inquiries concerning claimed invention and prior art, which are reviewed for clear error on appeal, but ultimate conclusion of obviousness is reviewed as matter of law.

## PATENTS

**2. Patent construction — Claims — Broad or narrow (§125.1303)**

Prior art patent. for grass edging and watering device cannot be held to teach that device is flexible and conformable to ground in its entirety, since base portion of device includes prominent anchoring leg which would inhibit longitudinal flexibility, and since patent's express teaching that trench is necessary to install device in harder ground shows that it is not freely conformable thereto.

**3. Patentability/Validity — Obviousness — Relevant prior art — Particular inventions (§115.0903.03)**

**Patentability/Validity — Obviousness — Combining references (§115.0905)**

Claims for landscape edging device are not prima facie obvious in view of combined teachings of two prior patents, since primary reference does not suggest overall flexibility · and landscape retention function of claimed device, and since secondary reference does not, merely by virtue of flexibility of device described therein, suggest extensive modifications which would bring primary reference into conformity with application claims.

**4. Patentability/Validity — Obviousness — Combining references (§115.0905)**

Mere fact that prior art may be modified to reflect features of claimed invention does not make modification, obvious unless desirability of such modification is suggested by prior art; claimed invention cannot be used as instruction manual or "template" to piece together teachings of prior art so that claimed invention is rendered obvious.

Appeal from the U.S. Patent and Trademark Office, Board of Patent Appeals and Interferences.

Patent application of John R. Fritch (serial no. 06/838,721, landscape apparatus and method). From decision upholding rejection of application claims 1-7, 9-24, 29 and 30, applicant appeals. Reversed.

Charles L. Gholz, of Oblon, Spivak, McClelland, Maier & Neustadt, Arlington, Va. (John R. Fritch, Corpus Christi, Texas, on brief), for appellant.

Jameson Lee, associate solicitor (Fred. E. McKelvey, solicitor, with him on brief; Richard ·E. Schafer, of counsel), for appellee.

Before Smith, senior circuit judge,. and Plager and Rader, circuit judges.

Smith, J.

John R. Fritch (Fritch) appeals the 27 February 1991 decision of the Patent and Trademark Office Board of Patent Appeals and Interferences (Board) affirming-in-part the Examiner's final rejection of the remaining claims in Fritch's application entitled Landscape Edging Apparatus and Method.[1] The Examiner concluded that Fritch's invention would have been obvious to one of ordinary skill in the art and was therefore unpatentable under 35 U.S.C. § 103. The Board, except for allowing claim 28, agreed. The Board's decision is reversed.

### Issue

The issue is whether the Board erred in affirming the Examiner's determination that the prior art references of Wilson and Hendrix rendered the subject matter of Fritch's independent claims 1, 13, 24, and 29 obvious to one of ordinary skill in the art.

### Background

In his final rejection, the Examiner rejected claims 1-24 and 27-30 of Fritch's application as unpatentable for obviousness under 35 U.S.C. § 103. Fritch appealed the final rejection to the Board. The Board affirmed the rejection as to claims 1-24, 29 and 30, entered a new ground of rejection for claim 27, and reversed as to claim 28. The Board agreed with the Examiner that the teachings of the Wilson and Hendrix patents rendered

---

[1] Serial No. 06/838,721,

the subje
13, 24, ar
in the art
dispositic
argumen
The clair
9-24, 29

The in
landscap
planar b.
ing reta
elongate
bottom
slope gr
of the b
and the
landsca
tainer [
fused)
longitu
Fritch i
retainer
rate ur
mowab
a lands
functio
indepei
represe
1. A
entir
and
vary
elon,
havi
able
a th
inte
ing
ther
port
ing
spa
ly c
one
to
oth
por

13.
ent
an
va
elo
ha
ab
a

the subject matter of independent claims 1, 13, 24, and 29 obvious to one of ordinary skill in the art. Fritch does not appeal the Board's disposition as to claims 27 and 28, and at oral argument withdrew the appeal as to claim 8. The claims remaining in this appeal are 1-7, 9-24, 29 and 30.

### The Fritch Invention

The invention claimed by Fritch involves a landscape edging device which includes a planar base portion and an upwardly extending retainer portion. The base portion is elongate, thin, flexible and has a planar bottom surface conformable to a varying slope ground surface. One longitudinal edge of the base portion serves as a mowing strip and the other serves as a retaining flange for landscape fill. The upwardly extending retainer portion is integrally connected (e.g., fused) to the base portion and defines a longitudinally extending enclosed space. The Fritch invention is intended to be used as a retainer for landscape fill in order to separate unmowable landscape fill from the mowable lawn. It may also be used to secure a landscaping sheet to the ground, or to function as guards at the base of a fence. Independent claims 1 and 13 on appeal are representative of the subject matter claimed:

1. A landscape edging strip formed in its entirety of a thin gauge, flexible material and conformable to a ground surface of varying slope, comprising a continuous elongate, thin gauge, flexible base portion having a planar bottom surface conformable to said varying slope ground surface; a thin gauge, elongate retainer portion integral with said base portion and extending upwardly therefrom and transversely thereover to overlie a portion of said base portion; all of said retainer portion defining a longitudinally extending enclosed space; said retainer portion being integrally connected to said base portion adjacent one longitudinal edge of said base portion to define a mowing strip adjacent the other longitudinal edge of said base portion.

* * * * *

13. A landscape edging strip formed in its entirety from thin gauge, flexible material and conformable to a ground surface of varying slope, comprising a continuous elongate, thin gauge, flexible base portion having a planar bottom surface conformable to said varying slope ground surface; a thin gauge, elongate retainer portion

integral with said base port ion and extending upwardly therefrom and transversely thereover to overlie a portion of said base portion; all of said retainer portion defining a longitudinally extending enclosed space; said retainer portion being integrally connected to said base portion at a transverse location between the longitudinal edges of said base portion, thereby defining a longitudinally extending retaining flange on one side of said retainer portion and a mowing strip on the other side of said retainer portion.

* * * * *

The critical language in Fritch's independent claims is that the device is to be, in its entirety, both flexible and "conformable to a ground surface of varying slope". These limitations, although located in the claims' preambles, "are necessary to give meaning to the claim[s] and properly define the invention".[1] Figure 1 from Fritch's drawings is reproduced below:



FIG. 1

### The Prior Art
#### a. The Wilson Patent

The Wilson patent relied upon by the Examiner and the Board is entitled "Grass Edging and Watering Device".[2] The embodiment of the Wilson device includes a substantially flat mowing strip extending horizontally from a longitudinally extending body portion. Opposite the mowing strip is a scored flange which may be broken off when not needed or wanted. Between the mowing strip and the flange, and extending vertically from the body portion is an anchoring leg. Located above the anchoring leg is the body portion which contains a water conduit and sprinkler head assembly. The device is intended to be used adjacent to the borders of walks and plant beds. Figures 1 and 4 from Wilson's drawings are reproduced below:

---

[1] *Perkin Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 896, 221 USPQ 669, 675 (Fed. Cir. 1984).
[2] U.S. Patent No. 3,485,449.

BW 002327

1782        *In re Fritch*        23 USPQ2d





### b. The Hendrix Patent

The Hendrix patent is entitled "Loose Material Retainer Strip". The Solicitor chose not to discuss the Hendrix reference in his brief, stating that the Board had deemed Hendrix unnecessary to its decision. The Solicitor overstates the Board's position. The Board based its decision upon "a collective evaluation of the Wilson and Hendrix patents". We include Hendrix in our discussion because it did play a role in the rejection of Fritch's independent claims.

The Hendrix device is composed of elongated, flexible strips having substantially C-shaped cross-section. The bottom lip of the device is to be wider than the top lip in order to facilitate fastening the device to the ground. The device will fit most gentle contours, and the top lip will yield laterally to build-up of gravel until the gravel can be redistributed. The concave portion of the strip is installed such that it faces the material to be retained in place. Hendrix contemplates that the retainer will be used in retaining gravel in driveways, lining flower beds, or on the shoulders of asphalt or concrete highways. Figure 1 of Hendrix's drawings is reproduced below:



Fig. 1

---

[asterisk] U.S. Patent No. 4,349,596.

---

### Standard of Review

[1] "[O]bviousness is a question of law to be determined from the facts."[a] The obviousness determination "is based upon underlying factual inquiries concerning the claimed invention and the prior art" which are reviewed for clear error.[b] However, it is the ultimate conclusion of obviousness which the Federal Circuit reviews as a matter of law.[c]

### Teachings of Wilson

Fritch takes exception to the Examiner's findings of fact related to the teachings of the Wilson patent. The Examiner's rejection and the Board's opinion rely heavily on the use of Wilson in view of other references to declare the Fritch invention obvious. The Board states that it agrees with the Examiner's finding of fact regarding the teachings of Wilson. In the Examiner's answer, which the Board quotes, the Wilson device is described as follows:

Wilson discloses a landscaping edging strip comprising a relatively thin gauge, elongated flexible base portion including a mower strip B having a planar bottom surface conformable to a varying slope surface.

The Board states that the Wilson reference presents "substantial evidence that Wilson is both thin and flexible." The Board regards the Wilson device as teaching that it is flexible and conformable in its entirety. This finding demonstrates clear error.

[2] It is well settled that a prior art reference is relevant for all that it teaches to those of ordinary skill in the art.[d] The base portion of Wilson is not planar in its entirety, as the Board's opinion suggests, but also includes a prominent anchoring leg to secure the device to the ground. The anchoring leg, which runs the length of the Wilson device, would inhibit longitudinal flexibility of the Wilson device. Indeed, Wilson expressly contemplates flexibility and conformability *only* in the mower strip. Wilson states that its mower strip may be lifted in order to pack dirt thereunder for the purpose of securing the device to the ground. Fritch, on the other hand, is claimed to be flexible in its entirety.

---

[a] *In re De Blauwe*, 736 F.2d 699, 703, 222 USPQ 191, 195 (Fed. Cir. 1984).
[b] *In re Kulling*, 897 F.2d 1147, 1149, 14 USPQ2d 1056, 1057 (Fed. Cir. 1990).
[c] *In re De Blauwe*, 736 F.2d at 703, 222 USPQ at 195.
[d] *Beckman Instruments Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1551, 13 USPQ2d 1301, 1304 (Fed. Cir. 1989).

SPQ2d

law to
: obvi-
under-
: the
which
r, it is
which
:ter of

The Board's holding that Wilson is flexible in its entirety is based upon a misapprehension of the scope of Wilson's teachings.

Second, Wilson's anchoring leg prohibits conformability to the ground surface in the manner claimed by Fritch. The Examiner's description of Wilson as having a "planar bottom surface conformable to a varying slope surface" is applicable *only* in reference to the mower strip. This description, however, ignores the anchor leg and the fact that it must be placed *into* the ground. Wilson expressly teaches that the anchoring leg may be pushed into soft soils, but in harder terrain a trench is needed in order to place the Wilson sprinkler system. In order to install the Wilson apparatus, the ground surface must be altered to conform to the device rather than, as the Solicitor contends, that Wilson is freely conformable to the ground. Fritch, on the other hand, does not require such extensive alteration of the ground surface in order to install the device.

iiner's
igs of
ection
in the
ces to
. The
amin-
ngs of
:h the
iribed

dging
:auge,
ling a
:ttom
slope

*Prima Facie Obviousness*

In proceedings before the Patent and Trademark Office, the Examiner bears the burden of establishing a prima facie case of obviousness based upon the prior art.[7] "[The Examiner] can satisfy this burden only by showing some objective teaching in the prior art or that knowledge generally available to one of ordinary skill in the art would lead that individual to combine the relevant teachings of the references."[19] The patent applicant may then attack the Examiner's prima facie determination as improperly made out, or the applicant may present objective evidence tending to support a conclusion of nonobviousness."[9]

rence
son is
gards
flexi-
This

refer-
those
: por-
ty, as
o in-
:cure
g leg,
vice,
f the
: con-
only
n its
pack
uring
ither
rety.

Fritch has attacked the Board's finding that the Examiner established that Fritch's claimed invention was prima facie obvious in view of the teachings of the prior art. The Board states that "a collective evaluation of the Wilson and the Hendrix patents would have rendered the subject matter of independent claims 1, 13, 24, and 29 obvious to one of ordinary skill." Fritch maintains that there is no teaching, suggestion, or incentive in the prior art to modify or to combine the

teachings of the prior art in the manner suggested by the Examiner. We agree.

[3] Wilson teaches a grass edging and watering device which includes an anchoring leg for securing the device to the ground. Wilson contemplates that a trench will need to be dug in order to allow the anchoring leg to be placed into the ground if the condition of the soil requires it. This anchoring leg prohibits flexibility and conformability over the length of Wilson. Any flexibility or conformability in Wilson, which the Board states extends to the entire device, is limited to the mower strip. It is only the mower strip that is mentioned as being flexible in order to aid installation. Hendrix has been cited for its teaching of a flexible retainer strip that is able to conform to the ground surface.

Wilson addresses the problems of arresting growth of grass between areas and watering plants without wetting sidewalks. Wilson lacks any suggestion or incentive to use its water conduit as a landscape retainer since this would arguably result in clogged sprinkler heads.[11] Wilson also teaches that its mower strip is flexible in order to allow dirt to be packed thereunder. There is no suggestion in Wilson to extend that flexibility to the entire device. Wilson also lacks any teaching or suggestion that one should remove the anchoring leg. Hendrix does not, simply by virtue of its flexible nature, suggest these extensive changes which the Board states are obvious. Neither Wilson nor Hendrix, alone or in combination, provide any incentive to combine the teachings of the references in the manner maintained by the Board.

[4] "Obviousness cannot be established by combining the teachings of the prior art to produce the claimed invention, absent some teaching or suggestion supporting the combination. Under section 103, teachings of references can be combined *only* if there is some suggestion or incentive to do so."[11] Although couched in terms of combining teachings found in the prior art, the same inquiry must be carried out in the context of a purported obvious "modification" of the prior art. The mere fact that the prior art may be modified in the manner suggested by the Examiner does not make the modification obvious unless the prior art suggested

. 222

:. 14

222

Pro-
Q2d

---

[7] *In re Piasecki*, 745 F.2d 1468, 1471-72, 223 USPQ 785, 787-88 (Fed. Cir. 1984).

[8] *In re Fine*, 837 F.2d 1071, 1074, 5 USPQ2d 1596, 1598 (Fed. Cir. 1988) (citing *In re Lalu*, 747 F.2d 703, 705, 223 USPQ 1257, 1258 (Fed. Cir. 1988)).

[9] *In re Heidt*, 433. F.2d 808, 811, 167 USPQ 676, 678 (CCPA 1970).

[11] This court has previously found a proposed modification inappropriate for an obviousness inquiry when the modification rendered the prior art reference inoperable for its intended purpose. *In re Gordon*, 733 F.2d 900, 902, 221 USPQ 1125, 1127 (Fed. Cir. 1984).

[11] *ACS Hosp. Systems, Inc. v. Montefiore Hosp.*, 732 F.2d 1572, 1577, 221 USPQ 929, 933 (Fed. Cir. 1984).



1786        *CBS Inc. v. Mercandante*        23 USPQ2d

the desirability of the modification." Wilson and Hendrix fail to suggest any motivation for, or desirability of, the changes espoused by the Examiner and endorsed by the Board.

Here, the Examiner relied upon hindsight to arrive at the determination of obviousness. It is impermissible to use the claimed invention as an instruction manual or "template" to piece together the teachings of the prior art so that the claimed invention is rendered obvious." This court has previously stated that "'[o]ne cannot use hindsight reconstruction to pick and choose among isolated disclosures in the prior art to deprecate the claimed invention." [18]

### Conclusion

The decision of the Board affirming the Examiner's rejection of independent claims 1, 13, 24, and 29 of Fritch's application as unpatentable over the prior art under 35 U.S.C. § 103 is reversed. Since dependent claims are nonobvious if the independent claims from which they depend are nonobvious, the Board's affirmance of the rejection of dependent claims 2-7, 9-12, 14-23, and 30 is also reversed.[19]

### *REVERSED*

---

### U.S. Patent and Trademark Office Trademark Trial and Appeal Board

### CBS Inc. v. Mercandante

### Nos. 85,324 and 85,330

### Decided June 15, 1992

---

[15] *In re Gordon,* 733 F.2d at 902, 221 USPQ at 1127.

[16] *In re Gorman,* 933 F.2d 982, 987, 18 USPQ2d 1885, 1888 (Fed. Cir. 1991). *See also Interconnect Planning Corp. v. Feil,* 774 F.2d 1132, 1138, 227 USPQ 543, 547 (Fed. Cir. 1985).

[17] *In re Fine,* 837 F.2d at 1075, 5 USPQ2d at 1600.

[18] *In re Fine,* 837 F.2d at 1076, 5 USPQ2d at 1600 (citing *Hartness Int'l, Inc. v. Simplimatic Eng'g Co.,* 819 F.2d 1100, 1108, 2 USPQ2d 1826, 1831 (Fed. Cir. 1987)). *See also In re Sernaker,* 702 F.2d 989, 991, 217 USPQ 1, 3 (Fed. Cir. 1983) (when argued together, dependent claims stand or fall with the independent claims from which they depend).

---

Released June 25, 1992

## TRADEMARKS AND UNFAIR TRADE PRACTICES

**1. Acquisition, assignment, and maintenance of marks — Acquisition through use — Priority of use (§305.0503)**

**Practice and procedure in Patent and Trademark Office — Interpartes proceedings — Opposition and cancellation — In general (§325.0305.01)**

**Infringement; conflicts between marks — Likelihood of confusion — In general (§335.0301)**

Opposer which uses mark "Rescue; 911" for its television show, which asserts that it has licensed use of mark on various merchandise items, and which seeks to oppose registration of "911 Rescue Bars," for candy bars, must clearly indicate in its pleading whether its claim of likelihood of confusion is based upon its services or its collateral merchandise, or both, and whether it claims priority of use of its mark on its collateral merchandise.

---

Consolidated trademark oppositions no. 85,324 and 85,330, by CBS Inc. against James V. Mercandante and Rose Marie Mercandante, d/b/a 911 Rescue Bar, applications serial no. 74/076,762, filed July 9, 1990, and 74/081,873, filed July 25, 1990, in which applicants counterclaim to cancel opposer's pleaded registration. On opposer's motion to amend its answer to counterclaim, and on applicant's motions to strike opposer's affirmative defenses, and for judgment on the pleadings. Motion for judgment on pleadings granted in part.

David S. Fishman, Windsor, Conn., for applicants.

Marshall J. Nelson, Washington, D.C., for opposer.

Before Sams, Rice, and Quinn, members.

**By the board.**

James V. Mercandante and Rose Marie Mercandante filed applications to register

---

**9**

BW 002331

Heald Machine Co., 385 F.2d 456, 155 USPQ 515, CCPA 1967. It is not necessary that a [16] possible infringer use the identical terminology of the owner's trademark, rather the fact that they are very similar or that the infringer uses a large portion of the trademark terminology can be indicative of the infringement. American Home Products Corp. v. B.F. Ascher & Co., Inc., 473 F.2d 903, 176 USPQ 532, CCPA 1973; Industria Espanola de Perlas Imatacion S.A. v. National Silver Co., 459 F.2d 1049, 173 USPQ 796 CCPA 1972.

[17] The function of a trademark is to impart information as to the source or sponsorship of the product. Smith v. Chanel, Inc., 402 F.2d 562, 159 USPQ 388, C.A.2, 1968; Clairol, Inc. v. Gillette Co., 389 F.2d 264, 156 USPQ 593, C.A.2, 1968. As succinctly stated by the Honorable Wallace S. Gourley of this court in Gamlen v. Gamlen, supra, at page 636, 78 USPQ at 261-262:

> "A defendant's good faith in believing that he has so marked his goods as to distinguish them from the plaintiff's will not protect him from a charge of unfair competition if the court finds that confusion has resulted or is likely to result. No person can adopt a trademark so resembling that of another trademark that ordinary purchasers buying with ordinary caution are likely to be misled. Best & Co., Inc. v. Miller, 2 Cir. 167 F.2d 374, 77 USPQ 133."

The defendant cannot complain that such relief for the plaintiff will cause it financial damage, since it, itself, has brought about the situation where, it is presently obvious, the defendant is attempting to exploit the plaintiff's property without its consent and to the plaintiff's unquestioned irreparable harm.

At this juncture, this appears to be a situation wherein a distributor has appropriated a trademark from his one-time supplier. Although this is not a final determination and the defendant will have a full opportunity to present evidence, after pretrial discovery, I must now conclude that the defendant is attempting to expropriate the value of the NU-SASH trademark based upon years of the plaintiff's ingenuity, effort and financing. To take from another the results of his inspiration, hard work and financial backing and then attempt to enlist the judiciary to aid such strategy will not so easily find support in equity. As of now that appears sufficiently clear to me and accordingly, for the present, a preliminary injunction will be granted.

The additional Findings of Fact and Conclusions of Law in this opinion are to be adopted and made part of the Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52.

## ORDER

And now, to-wit, this 30th day of October 1974, upon consideration of the evidence before me and briefs of counsel for the parties hereto, it appearing to me that irreparable damage will be suffered by the plaintiff, Louisiana-Pacific Corporation, if the defendant, Nu-Sash of Pittsburgh, Inc., is not enjoined from using "NU-SASH" or colorable imitations thereof in connection with its sales and advertising, and it further appearing that any loss or damage suffered by the defendant if this Order is in error will be adequately compensated for in damages as to which the plaintiff will file a Bond in security.

Now, therefore, it is hereby ordered, adjudged and decreed that the defendant, Nu-Sash of Pittsburgh, Inc., its officers, agents, servants, employees, privies, successors, assigns and attorneys and all persons in active concert and participation with it, pending final hearing and determination of this action, be and hereby are enjoined and restrained from:

(a) Using the terms "NU-SASH", "NU-Thermal-SASH", or any other counterfeit, copy or colorable imitation of the plaintiff's federally registered "NU-SASH" trademark on or in connection with the defendant's trade name or in the manufacture, distribution, advertising and sale of replacement windows and related goods;

(b) Passing off, or providing others with the means of passing off in any manner, the defendant's products or products of others sold by the defendant, as those of the plaintiff or as having any connection with the plaintiff; and

(c) Using any marks, or doing any other acts or things likely to induce the belief on the part of the public that the defendant is or the defendant's products are in any way connected with the plaintiff or the plaintiff's products.

The amount of the Bond to be furnished by the plaintiff is hereby fixed in the amount of $100,000.

---

**Court of Customs and Patent Appeals**

In re NOMIYA, KOHISA, AND MATSUMURA

No. 74-514 Decided Feb. 6, 1975

**PATENTS**

**1. Patentability — Invention — In general (§51.501)**

By filing patent application containing figures labeled prior art, and statements explanatory of such figures, applicants (Japanese citizens and residents) admitted that fig-

608     *In re Nomiya, Kohisa, and Matsumura*     184 USPQ

uires may be considered prior art for any purpose, including use of evidence of obviousness under 35 U.S.C. 103; it is of no consequence that applicants' invention may have been made in Japan.

### 2. Patentability — Invention — In general (§51.501)

In re Hellsund, 177 USPQ 170, held that statement by applicant, whether in patent application or in other papers submitted during prosecution, that certain matter is prior art to him, is an admission that that matter is prior art for all purposes, whether or not a basis in 35 U.S.C. 102 can be found for its use as prior art.

### 3. Patentability — Invention — In general (§51.501)

If there is no evidence that a person of ordinary skill in the art at time of applicants' invention would have expected problem to exist at all, it is not proper to conclude that invention which solves this problem, which is claimed as an improvement of prior art device, would have been obvious to that hypothetical person.

### 4. Patentability — Invention — In general (§51.501)

There must be a reason apparent at time invention was made to person of ordinary skill in the art for applying the teaching at hand, or use of teaching as evidence of obviousness will entail prohibited hindsight.

**Particular patents—Transistor**

Nomiya, Kohisa, and Matsumura, Semiconductor Circuit Devices Using Isolated Gate-Type Field Effect Elements Having Protective Diodes, rejection of claims 1 to 8 and 33 of application reversed.

Appeal from Board of Appeals of the Patent Office.

Application for patent of Kosei Nomiya, Toshihiko Kohisa, and Isao Matsumura, Serial No. 768,794, filed Oct. 18, 1968; Patent Office Group 254. From decision rejecting claims 1 to 8 and 33, applicants appeal. Reversed.

PAUL M. CRAIG, JR., Washington, D. C., for appellants.

JOSEPH F. NAKAMURA (R. V. LUPO of counsel) for Commissioner of Patents.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE, and MILLER, Associate Judges.

RICH, Judge.

This appeal is from the decision of the Patent Office[1] Board of Appeals affirming the rejection under 35 U.S.C. 103 of claims 1-8 and 33 in application serial No. 768,794, filed October 18, 1968, for "Semiconductor Circuit Devices Using Insulated Gate-Type Field Effect Elements Having Protective Diodes." We reverse.

### The Invention

Appellants' invention pertains to insulated-gate-type field-effect transistors (hereinafter "IGFET") and their use in semiconductor capacitive memory circuits having very low capacitance. For ease of discussion we reproduce Figs. 1 and 2 of the application:



FIG. 1
PRIOR ART

---

[1] Pub. L. 93-596, effective January 2, 1975, changed the names of the Patent Office and the Commissioner of Patents to the "Patent and Trademark Office" and the "Commissioner of Patents and Trademarks," respectively. For convenience and brevity hereinafter we shall use the abbreviation PTO.



FIG. 2
PRIOR ART

The structure of $Q_1$ in Fig. 1 is an IGFET, consisting of two P-type regions, $S_1$ and $D_1$, diffused into an N-type starting crystal, or substrate, usually of silicon, with an insulating oxide layer $SiO_2$ formed on the surface of the N-type substrate and contacting the diffused P-type regions. A metal gate electrode $G_1$ is attached to the insulating layer. IGFETs used as switching devices, as contemplated by appellants, are customarily fabricated in the OFF-mode.[1] In this mode, when no voltage is applied to the gate, the two P-type regions, called source ($S_1$) and drain ($D_1$), are electrically insulated from each other by the N-type region surrounding them. However, when a negative voltage, such as a clock pulse, is applied to the gate, the electric field so produced induces a thin P-type channel across the surface of the N-type region connecting the source and the drain, permitting a current to pass between them. See In re Carlson, 56 CCPA 1309, 412 F.2d 255, 162 USPQ 233 (1969). Fig. 2 is a circuit diagram of a dynamic shift register employing the IGFET device of Fig. 1 as a switch to control a bit of information stored in capacitor C, which may be distributive capacitance of the circuit.

According to the application,

* * * since the gate $G_1$ of an insulated gate-type field effect transistor $Q_1$ as shown in Figure 1 has a high capacitive input impedance, a very small amount of electric charge accumulated on the gate $G_1$ induces

a high voltage and sometimes causes the insulating film (usually silicon dioxide) between the gate $G_1$ and semiconductor substrate 1 to break down. Therefore, it has been proposed that a protective diode be formed, i.e. a zener diode, $Re_{C1}$, integrally in the semiconductor body 1 and that the diode be connected in parallel with the gate $G_1$ as shown in Figure 1. It has been believed that the protective diode could prevent the insulating film from breakdown without interfering with the characteristics of the field effect transistor.

Appellants claim to have discovered that when IGFETs having protective diodes formed in the same substrate, as shown in Fig. 1, are used as switches for storing information or input signals in a memory element having very small capacitance (C on Fig. 2), parasitic transistor action between the protective diode and the drain region may take place when the PN junction $J_R$ of the protective diode $Re_{C1}$ is forward biased[2] by a noise signal, causing the signal stored in the memory element to discharge through the drain region $D_1$ despite the lack of a pulse applied to the gate electrode. The solution to this problem found by appellants, which they claim as their invention, is a voltage-limiting means auxiliary to the protective diode, which can be a high resistance or another protective diode (hereinafter called "shunt diode"), formed outside the substrate or electrically isolated from other circuit elements on the substrate, connected in parallel with and in the same direction as the protective diode $Re_{C1}$.

Claim 1, with reference letters keyed to Fig. 1 and emphasis supplied, is illustrative:

---
[1] A P-type semiconductor contains more holes, or electron gaps in the lattice of the material, than it does electrons free of covalent bonds in the lattice. An N-type material has an excess of free electrons over holes. These electrons and holes are referred to as "carriers"; "minority carriers," mentioned infra, are electrons in P-type semiconductors and holes in N-type semiconductors.

[2] "Forward bias" is the application of a potential difference to a P-N junction in the direction which aids current flow across the junction.

1. In a semiconductor device comprising:

an insulated gate-type field effect component [Q₁] including a semiconductor substrate [1] of first conductivity type, source [S₁] and drain [D₁] regions of second conductivity type opposite to said first conductivity type formed in a surface of said semiconductor substrate, and an insulated gate electrode [G₁] disposed on said surface between said source and drain regions and insulated from said substrate by an insulating film [SiO₂]; and

a protecting semiconductor diode [Rec₁] formed integrally in said substrate and connected in parallel between said insulated gate electrode and said semiconductor substrate for protecting the insulating film interposed between said gate electrode and said substrate from breakdown; *the improvement comprising*

auxiliary means connected with said semiconductor device for *preventing* minority carriers from said protecting semiconductor diode from reaching said drain region through said semiconductor substrate when noise signals are applied to the protecting diode.

Claim 2 is similar to claim 1 and is cast in the same "Jepson" form. Dependent claims 3-8 depend from claim 2 and recite various added limitations. Claim 33 defines a "memory circuit device" containing appellants' invention. If claim 1 is patentable, so are the other claims.

**The Rejection**

The examiner cited Bergersen et al. [Bergersen] U. S. patent 3,408,511, issued October 29, 1968 on an application filed May 13, 1966. The Bergersen specification states in part:

This invention relates to an improved insulated-gate field-effect transistor (IGFET) circuit having large bipolarity voltage capabilities. This circuit is operative as an active component of an electronic chopper or an electronic analog switching circuit and is adapted to receive large bipolarity analog input signal voltages.

When an insulated-gate field-effect transistor is used in analog switching or chopper circuits, it must be voltage controlled in such a manner that the P-N junctions between semiconductor substrate and source regions and between semiconductor substrate and drain regions do not become forward biased and enable current to flow from either the substrate region to the source region or from the substrate region to the drain region, respectively. This requirement means that the insulated-gate field-effect transistor can only handle input signals of a limited amplitude if these signals are con-

nected directly in parallel with either of the above defined P-N junctions and between one of the source or drain regions and the substrate region, which is usually at ground potential. If, using the above-described connection, the input signals applied across either of the P-N junctions would be at a voltage level sufficiently high to forward bias these P-N junctions into conduction, than an alternative input signal connection must be resorted to. One such alternative connection involves disconnecting the substrate region from its ground return and from the source of input signals, leaving the substrate region floating. This mode of IGFET operation will prevent the P-N junctions between substrate and source regions and between substrate and drain regions from becoming forward biased, but it will also subject the substrate region to extraneous noise pickup and this is obviously an undesirable compromise for enabling the insulated-gate field-effect transistor to handle large bi-polarity signals connected between either source or drain and substrate regions.

* * *

A feature of this invention is the provision of an insulated-gate field-effect transistor circuit including adjacent source, substrate and drain regions with a P-N junction between the substrate and source regions and a P-N junction between the substrate and drain regions. A voltage limiting circuit is connected to the substrate region and includes a diode which is connected between the substrate region and either the source or the drain region. This diode becomes conductive for large amplitude signals of one polarity which are applied to one of the source or drain regions and thereby protects one of the above-identified P-N junctions from becoming forward biased. When large amplitude input signals of an opposite polarity are applied to the same source or drain region, this diode becomes reverse biased and prevents the input signals from reaching the other of the two P-N junctions, and forward biasing this junction.

* * *

The substrate region * * * and the source and drain regions * * * are analogous to two spatially separated diodes connected back to back. Since the source and drain regions * * * are isolated by the substrate region * * * any drain to source current or source to drain current in the absence of a gate voltage is extremely low. The P-N junctions * * * of the so-called back to back diodes defined above must not be allowed to become forward biased for any amount of channel conduction since this would cause

BW 002335

her of the
between
s and the
at ground
ibed con-
across ei-
at a volt-
vard bias
ion, than
ion must
e connec-
substrate
from the
substrate
ET oper-
junctions
ions and
ons from
will also
xtraneous
v an un-
g the in-
o handle
between
regions.

ie provi-
transis-
ce, sub-
a P-N
d source
veen the
ge limit-
trate re-
is con-
ion and
n. This
ampli-
are ap-
regions
ve-iden-
forward
signals
t to the
iode be-
e input
the two
ng this

e source
gous to
nnected
rain re-
rate re-
ent or
ice of a
e P-N
to back
wed to
unt of
cause

extraneous currents to flow to the input and
output circuits of a practical chopping or
switching device * * *.

It is significant that Bergersen does not ex-
plicitly disclose a protective diode formed in
the same substrate as the IGFET so protected.

In order to understand one of appellants'
arguments, we must look to the PTO position
as it developed. In his first rejection of the ap-
pealed claims the examiner said:

Applicant's [sic] figures 1 and 2 [repro-
duced supra] illustrate the prior art. Ber-
gersen et al. teach the prevention of a dif-
fused N region in a P substrate from being
biased in the forward direction by the input
signals through the use of a shunt diode and
a resistor. Pursuant to this teaching it is ob-
vious to one of ordinary skill in the art to
prevent any of the diode junctions of Appli-
cant's [sic] prior art figures from becoming
forward bias [sic] through the use of a shunt
diode. No new, novel or unexpected result is
seen to occur by so doing.

The Examiner's Answer on appeal states that
"Applicant [sic] figure 1 shows the prior
art," and concludes:

In the prior art diode protected IGFET
the protection diode is usually used to pre-
vent spurious signals, i.e. noise from dam-
aging the gate insulator. Noise is usually
bipolar. As such it is rather apparent that
the noise signal will forward bias the prior
art protection diode. Thus the prior art pro-
tection diode is known to operate on bipolar
signals, both positive and negative, other-
wise only half the protection for the gate in-
sulator would be present. Bergersen et al.
disclose that noise signals will undesirably
forward bias junctions of an IGFET. For-
ward biased junctions in IGFET's are un-
desirable as they create leakage currents be-
tween the input and output. The solution to
the problem as per Bergersen et al. is to pre-
vent the junction from becoming forward
biased by shunting the junction with a diode
of lower threshold voltage. Pursuant to this
teaching it is obvious to one of ordinary skill
in the art to add a shunt diode across the
protection diode of the prior art that be-
comes forward biased during half of the
protection function. No new, novel, or un-
expected results are seen to occur by so
doing. Germanium diodes are well known
to have a lower threshold voltage than sili-
con diodes, thus being an obvious design
choice to use in the application of the teach-
ing of Bergersen et al.

The board adopted the examiner's reasoning
and added some of its own, stating:

We find it logical to apply the teaching of
Bergersen et al. to any junction on a single

chip. One skilled in the art having studied
Bergersen et al. and looking at appellants'
Figure 1 would realize and understand that
a diode provided purely for gate protection
which is integrated into the same chip as the
FET might be a source of undesired minor-
ity carrier injection from forward biasing in
the same way as the source or drain in a
field effect transistor as described by Ber-
gersen et al.

* * *

We have no doubt that the examiner is
relying on the admitted prior art of Figures
1 and 2 of appellants' drawing. We agree
with appellants that the dotted line showing
of the transistor action resulting from the
forward biasing of the protective diode as
depicted in Figure 2 should not be consid-
ered as prior art. The dotted line showing
clearly represents appellants' contribution
and in our opinion the examiner has so con-
strued it.

### Opinion

[1] Appellants' brief now questions the
PTO's use of Figs. 1 and 2 of their application
as "prior art" under 35 U.S.C. 103, arguing
that there is no statutory basis for considering
Figs. 1 and 2 to be "prior art" in the § 103
sense. The oath in the application shows that
appellants are citizens and residents of Japan;
presumably the invention was made in Japan.
Appellants point out that what may have been
known to them in Japan would not be prior
art by virtue of any portion of 35 U.S.C. 102.

We see no reason why appellants' represen-
tations in their application should not be ac-
cepted at face value as admissions that Figs. 1
and 2 may be considered "prior art" for any
purpose, including use as evidence of obvious-
ness under § 103. In re Garfinkel, 58 CCPA
883, 887, 437 F.2d 1000, 1004, 168 USPQ
659, 662 (1971); In re Hellsund, 59 CCPA
1382, 1387, 474 F.2d 1307, 1311, 177 USPQ
170, 173 (1973).[*] By filing an application con-
taining Figs. 1 and 2, labeled prior art, ipsis-
simis verbis, and statements explanatory

[2] [*] Although the author of this opinion did not
join the opinion of the court in Hellsund, there was
no disagreement among the members of the court
with the basic proposition that a statement by an ap-
plicant, whether in the application or in other pa-
pers submitted during prosecution, that certain mat-
ter is "prior art" to him, is an admission that that
matter is prior art for *all* purposes, whether or not a
basis in § 102 can be found for its use as prior art.
The point of controversy in Hellsund was not
*whether* a binding admission had been made, but
*what* was admitted. The opinion of the court called
it an admission of "prior art," but the author of this
opinion found it to be an admission merely that the
Opel patent contained a disclosure of an invention
made prior to Hellsund's invention.

BW 002336

thereof [1] appellants have conceded what is to be considered as prior art in determining obviousness of their improvement. That appellants' invention may have been made in Japan is of no consequence in light of their admission.

It is necessary to consider everything appellants have said about what is prior art to determine the exact scope of their admission. The relevant portion of the specification under the heading "Description of the Prior Art" states:

> According to investigation, however, it has been revealed that since the PN junction $J_R$ of the diode $Rec_1$ is biased in the forward direction by noise pulses $e_{N_1}$, a bipolar transistor is formed [with] the region 2 (as an emitter), the substrate 1 (as a base) and the drain region $D_1$ of the field effect transistor $Q_1$ (as a collector) since the junction $J_{D_1}$ is usually biased in the backward direction. Minority carriers injected into the substrate 1 from the diode region 2 diffuse in the substrate 1 and reach the drain region $D_1$, *as shown by the broken line arrow in Figure 1.* [Emphasis added.]

The board in its opinion, agrees, conceded that the bipolar transistor action described by appellants in the passage above quoted was not part of the admitted prior art.[4] Therefore, on this record, the admission is only that the structure shown in Figs. 1 and 2 combining an IGFET and its protective diode in a common substrate and the use of that structure in a dynamic shift register circuit were known to the art when appellants invented their improvements.

What we said in In re Sponnable, 56 CCPA 823, 832-33, 405 F.2d 578, 585, 160 USPQ 237, 243 (1969), is relevant here:

> It should not be necessary for this court to point out that a patentable invention may lie in the discovery of a source of a problem even though the remedy may be obvious once the source of the problem is identified. This is *part* of the "subject matter as a whole" which should always be considered in determining the obviousness of an invention under 35 U.S.C. 103. In re Antonson, 47 CCPA 740, 272 F.2d 948, 124 USPQ 132; In re Linnert, 50 CCPA 753, 309 F.2d 498, 135 USPQ 307. The court must be ever alert not to read obviousness

into an invention on the basis of the applicant's own statements; that is, we must view the prior art without reading into that art appellant's teachings. In re Murray, 46 CCPA 905, 268 F.2d 226, 122 USPQ 364; In re Sporck, 49 CCPA 1039, 301 F.2d 686, 133 USPQ 360. The issue, then, is whether the teachings of the prior art would, *in and of themselves and without the benefits of appellant's disclosure,* make the invention as a whole, obvious. In re Leonor, 55 CCPA 1198, 395 F.2d 801, 158 USPQ 20.

See also In re Conover, 49 CCPA 1205, 304 F.2d 680, 134 USPQ 238 (1962). Appellants' specification identifies the problem discovered by them in part as follows:

> The emitter common current amplifier factor β of this transistor structure [Fig. 1] is in the order of $10^{-3}$ to $10^{-4}$. This factor of the transistor structure is much smaller than those of usual bipolar transistors (in the order of several tens to several hundreds). Therefore, the parasitic bipolar transistor seems to be of negligible value because of the extremely small current amplifier factor...
>
> When an insulated gate-type field effect transistor having a protective diode is used as a control switch for storing an information signal or an input signal in a memory element having very small capacitance, the parasitic bipolar transistor, according to our study, cannot be neglected even if the current amplifier factor β is extremely small as aforementioned. * * *
>
> Since the zero voltage level part of the pulse $V_{CP}$, however, often includes a noise signal $e_N$ [Fig. 2] which comprises high frequency components of fairly large amplitude, * * * the diode $Rec_1$ is biased in the forward polarity by the noise signal $e_N$. Only in this instant, a parasitic bipolar transistor $Q_0$ is constructed, the collector current $i_C$ flows through the transistor $Q_0$ and the capacitor C in spite of the OFF-state of the transistor $Q_1$. Therefore the stored charge in the capacitor C discharges. Especially in such a memory circuit device as that which uses a capacitive memory element of very little capacitance an extremely small amount of collector current iC of the parasitic transistor $Q_0$ causes the [charge] stored in the capacitor C to be reduced considerably since the amount of the stored charge is very small, and it results in misoperation of the memory circuit device.
>
> [ 3 ] If, as appellants claim, there is no evidence of record that a person of ordinary skill in the art at the time of appellants' invention would have expected the problem in the IG-FET to exist at all, it is not proper to conclude that the invention which solves this problem,

[1] The application contains a section entitled "Description of the Prior Art," which explains Figs. 1 and 2 in detail. We note also that appellants, in an amendment to the application and in their briefs on appeal to the board, repeatedly acknowledged that Figs. 1 and 2 illustrate the prior art.

[4] It is clear from the specification that the dotted line on Fig. 2 referred to by the board represents the same phenomenon as the "broken line arrow" on Fig. 1.

which is claimed as an improvement of the prior art device,[1] would have been obvious to that hypothetical person of ordinary skill in the art. The significance of evidence that a problem was known in the prior art is, of course, that knowledge of a problem provides a reason or motivation for workers in the art to apply their skill to its solution. Logically, the instant situation is one step removed from the circumstances illustrated by Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 67-68 (1923), where *the problem* of rippling in paper produced on Fourdrinier paper-making machines at high speed *was known*, but the source of the problem was not.

Thus, we must first ask the question: does Bergersen, when considered in conjunction with the prior art structures disclosed in Figs. 1 and 2, suggest the existence of the problem solved by appellants? We think not. While we agree with the PTO that Bergersen supplies the obvious expedient of using voltage-limiting means to prevent the injection of minority carriers (i.e., extraneous currents) from a forward-biased PN junction of the IGFET into the IGFET substrate, we find nothing in Bergersen which, when applied to a structure having a protective diode disposed in a common substrate with an IGFET and not insulated electrically therefrom, is evidence that a person of ordinary skill in the art would have recognized that the misoperation of IGFET memory elements employing such a protective diode was caused by forward biasing of the PN junction, not of the IGFET, but of the protective diode. Bergersen, in fact, is better evidence for the conclusion that a person of ordinary skill in the art would consider that the protective diode Reci of Fig. 1 would *prevent* injection of minority carriers into the IGFET substrate, not be a *cause* thereof.

[4] The board attempted to overcome the lack of nexus between Bergersen's teachings and the structure of Fig. 1 by saying that "it [is] logical to apply the teachings of Bergersen et al. to any junction on a single chip." There must, however, be a reason apparent at the time the invention was made to the person of ordinary skill in the art for applying the teaching at hand, or the use of the teaching as evidence of obviousness will entail prohibited hindsight. Graham v. John Deere Co., 383 U.S. 1, 36, 148 USPQ 459, 474 (1966). From the portion of Bergersen quoted supra, it appears that the single protective diode of Bergersen would protect one IGFET PN junction from becoming forward biased when signals of a particular polarity are applied to the source

or drain region of the IGFET, and would protect the *other* PN junction when signals of the reverse polarity are applied. While this teaching is available to show that any PN junction may be protected from forward bias by a shunt diode, it does not suggest a problem, or the solution thereto, concerning an IGFET with a protective diode formed in the same substrate in the absence of knowledge that forward bias on the protective diode causes parasitic transistor action or other undesirable phenomena between the PN junction of the protective diode and the source-substrate or substrate-drain PN junction of the IGFET. Parasitic transistor action for the IGFET use contemplated by appellants was a significant source of faulty operation. The board recognized that appellants contributed this knowledge.

The solicitor's argument begs the question:

While it may be true that appellants were the first to recognize and describe the existence of a "parasitic bipolar transistor," that recognition and description, while a professional credit to appellants, is not sufficient to establish the patentability of the claims. After all, what causes the existence of the parasitic bipolar transistor in appellants' system is the forward biased P-N Junction—the same problem recognized in the Bergersen patent.

It is, of course, not the same problem since Bergersen makes no suggestion that bipolar transistor action might occur when the protective diode and IGFET are formed in a common substrate.

On this record, therefore, we find no evidentiary basis for the finding that a person of ordinary skill in the art would have had reason to apply an additional shunt diode (or other voltage-limiting means) to an IGFET already equipped with a protective diode formed in the same substrate.

The rejection of claims 1-8 and 33 is *reversed*.

---

**Court of Claims of the United States**

Douglas v. United States

No. 197-70          Decided Jan. 22, 1975

PATENTS

1. Specification — Sufficiency of disclosure (§62.7)

Specification is not required to be a production blueprint for constructing device nor can patentee be expected to foresee every technological problem that may be encoun-

---

[1] The matter in claim 1 before the word "improvement" reads on Fig. 1, supra. By using this "Jepson" form, appellants are relying solely on the subject matter following "improvement" to provide patentable distinction over the prior art.

10

BW 002339

cube" and "rotat-
ent, claim 3,
ry its burden to
er the doctrine of
ered no evidence
ngagement and its
of the puzzle are
isted in the steps
cubes in an eight
of engaging and
er puzzles. Essen-
asserted that its
of sets of cubelets
ually perpendicu-
; and then restore
that assertion en-
cubelets and their
t/rotation out of
ause of its conten-
cubelets in every
at in the claims,
npt to prove that
rs used in the no-
antial change.
duced abundant
y. Based upon this
t found "that Ru-
it are far superior
[the patentee],"
pp. at 664 n.3, 34
[ "that the means
ngaging his 3x3x3
d more creativity
uzzle designers of
the relevant time
tly to the appeal
of those puzzles."
1315. Although a
que, an embellish-
post-['201 patent]
low the accused
escape the 'web of
*Aircraft Co. v.*
1331, 1365, 219
. 1983), under the
does not extend to
Although Rubik's
s of engaging and
was offered that
h 26 or 36 cubes
ps of engaging and
y eight cubes.
to support' it, we
n's theory of in-
: "engaging/rotat'
aim to be always
', no matter how
w they are made
s of the respective
best, and Molecu-
: that the accused
a method which

achieves substantially the same results in
substantially the same way as the claimed
method.

Having no evidence before it on which to
base a finding of equivalence, the district
court's finding of direct infringement by the
puzzle user was clearly erroneous. *See W.L.
Gore & Assoc., Inc. v. Garlock, Inc.*, 842
F.2d 1275, 1281, 6 USPQ2d 1277, 1282
(Fed. Cir. 1988). In the absence of direct
infringement, CBS cannot be held liable for
inducing infringement under section 271(b).
*Met-Coil Sys. Corp. v. Korners Unlimited,
Inc.*, 803 F.2d 684, 687, 231 USPQ 474, 477
(Fed. Cir. 1986).

### CONCLUSION

We hold that the district court was clearly
erroneous in holding claims 3-5 of the '201
patent infringed by the 3x3x3 and 4x4x4
puzzle users, and, therefore, CBS cannot be
held liable for inducing infringement under
35 U.S.C. §271(b). The judgment, accord-
ingly, is reversed.

### COSTS

Parties are to bear their own costs.
*REVERSED*

Patent and Trademark Office
Board of Patent Appeals and Interferences

Ex parte Hiyamizu

No. 650-06

Decided April 28, 1988
Released October 24, 1988

### PATENTS

1. Patentability/Validity — Obviousness —
Person of ordinary skill in art
(§115.0902)

Level of knowledge possessed by person of
ordinary skill in art is somewhere between
that possessed by lay person and that pos-
sessed by expert; and such hypothetical per-
son is no more definable by way of creden-
tials than is hypothetical "reasonably
prudent man" standard in negligence law.

2. Patentability/Validity — Obviousness —
References and claims as whole
(§115.0904)

Patentability/Validity — Obviousness —
Combining references (§115.0905)

Test, in reviewing rejection under 35 USC
103 in which examiner has relied on teach-
ings of several references, is whether refer-
ences, viewed individually and collectively,
would have suggested claimed invention to
person possessing ordinary skill in art, and
citing references which merely indicate that
isolated elements and/or features recited in
claims are known is not sufficient basis for
concluding that combination of claimed ele-
ments would have been obvious.

Appeal from refusal to allow claims (Mar-
tin Edlow, primary examiner).
Application for patent filed July 27, 1981,
serial no. 286,863, for high electron mobility
single heterojunction semiconductor devices
and methods for production thereof, by Sato-
shi Hiyamizu and Toshio Fujii. From deci-
sion of examiner refusing to allow claims,
applicants appeal. Reversed.
John P. Moran, of Staas & Halsey, Wash-
ington, D.C., for appellants.
Before Henon, Rubinson, and Hairston, ex-
aminers-in-chief.
Henon, examiner-in-chief.

This appeal is from the refusal of the
examiner to allow claims 1 and 5 through 13,
which constitute all the claims remaining in
the application.

The invention relates to improved struc-
ture for high electron mobility heterojunc-
tion semiconductor devices. Claim 1 is con-
sidered to be representative and reads as
follows:

1. A high electron mobility heterojunc-
tion semiconductor device comprising:
   a semi-insulating GaAs substrate;
   an undoped AlGaAs layer grown on the
semi insulating GaAs substrate;
   a GaAs layer grown on said undoped
AlGaAs layer, said GaAs layer having a
low N-type impurity concentration;
   a N-type AlGaAs layer grown on said
GaAs layer, and defining a heterojunction
between said GaAs layer and said N-type
AlGaAs layer;
   at least one gate electrode formed on
said N-type AlGaAs layer; and
   a pair of source and drain electrodes
arranged flanking said at least one gate
electrode.

The references relied on by the examiner
are:

BW 002340

1394         _x parte Hiyamitu       10 USPQ2d       10 USPQ2d   C.

Mills et al. (Mills)    4,155,784   May 22, 1979
Dingle et al. (Dingle)   4,194,935   Mar. 25, 1980
Japan (Mitsubishi)     54-132161   Jan. 29, 1979

Mimura et al. (Mimura), *Japanese Journal of Applied Physics,* Vol. 19, No. 5 (May 1980), pp. 1225—1227.

All the claims in issue stand rejected as being directed to obvious subject matter within the meaning of 35 U.S.C. 103. As evidence of obviousness, the examiner relies on the teachings of Mimura considered with Dingle, Mills and Mitsubishi. As stated in the final rejection of December 31, 1984 (paper no. 23) the apparent position of the examiner is that if the person of ordinary skill in the pertinent art were confronted with a chromium diffusion problem in a conventional high electron mobility transistor of the nature disclosed by Mimura, such an artisan would look to the teachings of Mills or Mitsubishi for a solution to the problem and would have found it obvious to include a "buffer layer" between the Mimura substrate and the undoped GaAs layer and that the artisan would have further found it obvious that the "buffer layer" may comprise both undoped GaAs or GaAlAs layers. As to the additional requirements found in dependent claims 6 through 11, the examiner relies on the teachings of Dingle.

Rather than reiterate the extensive arguments by appellants and the examiner, reference is made to the several briefs, answer and final rejection for the respective details thereof.

## OPINION

Preliminarily we note that although the Figueroa patent (4,346,394) has been cited and discussed in both the final rejection and answer, it has not been included in the statement of the rejection. Accordingly, we have not considered the teachings of Figueroa in forming our decision. Note *In re Hoch,* 428 F.2d 1341, 166 USPQ 406 (CCPA 1970).

[1] As an additional preliminary matter, we disagree with the examiner's assertion (answer page 5) that by definition "one of normal (sic, ordinary) skill in the art" is an engineer or scientist at the doctorate level working at least 40 hours per week in semiconductor research or development, as evidenced by the publication attached to appellant's principal brief. The statutory "person having ordinary skill in the art" created by Congress to provide a standard of patentability is a hypothetical person presumedly possessing knowledge in the field to which the claimed "subject matter pertains," wherein

the level of said knowledge resides somewhere between that possessed by the layman and that possessed by the expert. Note *Standard Oil Company v. American Cyanamid Co.,* 774 F.2d 448, 227 USPQ 293 (Fed. Cir. 1985); and *Kimberly-Clark Co. v. Johnson and Johnson,* 745 F.2d 1437, 223 USPQ 603 (Fed. Cir. 1984). It is our view that such a hypothetical person is no more definable by way of credentials than is the hypothetical "reasonably prudent man" standard found in laws pertaining to negligence. As to the publication relied on by the examiner as evidence in support of his definition, we find that the publication fails to support said definition. That is to say, the publication fails to indicate how many hours per week the authors work, and although each of the authors has apparently earned a doctorate degree, such would merely indicate to us that the authors are highly skilled and, perhaps, experts. In summary, although the hypothetical "person having ordinary skill in the art" to which the claimed subject matter pertains would, of necessity have the capability of understanding the scientific and engineering principles applicable to the pertinent art, we disagree that the evidence in this application supports the conclusion that such a hypothetical person would require a doctorate or equivalent knowledge in science or engineering.

[2] Turning to a consideration of the rejection of the claims in issue as being directed to obvious subject matter under 35 U.S.C. 103, we find from a careful review of the record in this application that the rejection cannot be sustained. We reach such a conclusion substantially for the reasons presented by appellants in their briefs and our additional comments below.

Under 35 U.S.C. 103 where the examiner has relied on the teachings of several references, the test is whether or not the references viewed individually and collectively would have suggested the claimed invention to the person possessing ordinary skill in the art. Note *In re Kaslow,* 707 F.2d 1366, 217 USPQ 1089 (Fed. Cir. 1983). It is to be noted, however, that citing references which merely indicate that isolated elements and/or features recited in the claims are known is not a sufficient basis for concluding that the combination of claimed elements would have been obvious. That is to say, there should be something in the prior art or a convincing line of reasoning in the answer suggesting the desirability of combining the reference in such a manner as to arrive at the claimed invention. Note *In re Deminski,* 796 F.2d 436, 230 USPQ 313 (Fed. Cir. 1986). Furthermore, it is well settled that where the

claimed inventi
covery of the so
solution are co
"invention as a v
Note *In re Kasl*
F.2d 364, 184 U
*In re Sponnoble*
237 (CCPA 197

Reviewing th
examiner, we in
references teacl
and its possible r
lants beginning
4 of the specific
presume for the
admissions foun
pages 2 and 3 o
Dingle pertaini
migration woul
noted by the ex.
rejection and w
tion to look to t
the problem, w
collective teach.
have suggested
For example,
structure simila
by appellants to
tion and the ref
or suggestions
its solution as it
...Mills teache
arsenide buffer
and the active
tion of the sub:
layer. However
omitted prior a.
such a buffer l
Mitsubishi, we
to teach the
claimed ternar:
terial taught by
the examiner a
functions for th
by the referen.
say, Mills teacl
buffer layer for
migration of c
nherence, Mits
the ternary la
*alia,* forming
boundary betw
the buffer lay
quires defining
the upper Ga
GaAs layer. It
appear to us
obvious to mc
urged by the c
lants' claims a:
simplicity and

ge resides some-
ed by the layman
oc expert. Note
*American Cyana-*
USPQ 293 (Fed.
*lark Co. v. John-*
1437, 223 USPQ
ur view that such
nore definable by
the hypothetical
standard found
gence. As to the
he examiner as
efinition, we find
to support said
the publication
hours per week
ugh each of the
ned a doctorate
idicate to us that
d and, perhaps,
ough the hypo-
nary skill in the
subject matter
ave the capabi-
entific and engi-
to the pertinent
vidence in this
lusion that such
require a doc-
ge in science or

ion of the rejec-
eing directed to
35 U.S.C. 103,
of the record in
ction cannot be
conclusion sub-
ented by appel-
additional com-

e the examiner
f several refer-
not the refer-
ed collectively
imed invention
ry skill in the
2d 1366, 217
). It is to be
ferences which
elements and/-
is are known is
uding that the
ts would have
here should be
a convincing
er suggesting
he reference in
t the claimed
ski., 796 F.2d
r. 1986). Fur-
iat where the

claimed invention solves a problem, the dis-
covery of the source of the problem and its
solution are considered to be part of the
"invention as a whole" under 35 U.S.C. 103.
Note *In re Kaslow, supra; In re Nomiya,* 509
F.2d 566, 184 USPQ 607 (CCPA 1975); and
*In re Sponnoble,* 405 F.2d 578, 160 USPQ
237 (CCPA 1979).

Reviewing the prior art relied on by the
examiner, we initially note that none of the
references teaches or suggests the problem
and its possible causes as identified by appel-
lants beginning at the last paragraph of page
4 of the specification. However, even if we
presume for the sake of argument that the
admissions found in the paragraph bridging
pages 2 and 3 of appellants' disclosure coup-
led with the discussion found in Mills and
Dingle pertaining to the effects of impurity
migration would have suggested the problem
noted by the examiner at page 3 of his final
rejection and would have served as motiva-
tion to look to the prior art for a solution to
the problem, we are not convinced that the
collective teachings of the references would
have suggested appellants' claimed solution.
For example, Mimura merely teaches a
structure similar to that which is admitted
by appellants to be known in their specifica-
tion and the reference includes no teachings
or suggestions pertaining to the problem or
its solution as identified by appellants.

Mills teaches the inclusion of a gallium
arsenide buffer layer between the substrate
and the active layer so as to prevent migra-
tion of the substrate dopant into the active
layer. However, both Mimura and the ad-
mitted prior art structure already include
such a buffer layer. As to the teachings of
Mitsubishi, we do not consider the reference
to teach the interchangeability of the
claimed ternary material for the binary ma-
terial taught by Mills, as seemingly urged by
the examiner at page 7 of the answer. The
functions for the respective layers as taught
by the references are different. That is to
say, Mills teaches the inclusion of the binary
buffer layer for the purpose of preventing the
migration of chromium to the active layer,
whereas, Mitsubishi teaches the inclusion of
the ternary layer for the purpose of, *inter
olia,* forming the heterojunction at the
boundary between the operating layer and
the buffer layer. Moreover, the claim re-
quires defining the heterojunction between
the upper GaAs layer and the N-type Al-
GaAs layer. In light of the above, it would
appear to us that it would not have been
obvious to modify Mimura in the manner
urged by the examiner without using appel-
lants' claims as a guide. It is to be noted that
simplicity and hindsight are not proper crite-

ria for resolving the issue of obviousness;
note *In re Horn,* 203 USPQ 969 (CCPA
1979). As to the teachings of Dingle which,
in some respects, are far more pertinent to
the problem and its solution as disclosed by
appellants, we note that the solution taught
by the reference, namely modulating the
doping and bandgap of the multilayered
structure (column 3, second full paragraph),
is significantly different from the structure
specified in the claims in issue. In light of the
above, we are convinced that the evidence
adduced by the examiner fails to support his
conclusion that the claims at bar are directed
to obvious subject matter within the meaning
of 35 U.S.C. 103.

### DECISION

The decision of the examiner rejecting
claims 1 and 5 through 13 under 35 U.S.C.
103 is reversed.
*REVERSED*

Court of Appeals, Third Circuit

CW Communications Inc. v. International
Research Services Inc.

No. 88-3331

Decided October 31, 1988
(Unpublished)

**TRADEMARKS AND UNFAIR TRADE
PRACTICES**

**1. Registration and its effects — Federal
registration — Incontestability — In
general (§315.0309.02)**

Mark which is merely descriptive may be
non-registrable, but once mark obtains in-
contestable status mere descriptiveness can-
not be used as basis for challenging it.

**2. Types of marks — Generic marks —
Particular marks (§327.0605)**

Mark "ComputerWorld," for newspaper
directed to those interested in computers, is
not generic.

**3. Infringement; conflicts between marks —
Likelihood of confusion — Particular
marks — Marks similar (§335.0304.03)**

Federal district court's finding of likeli-
hood of confusion between "Computer-
World," for newspaper directed to those in-
terested in computers, and "Computer
World," for retail store services, distributor-

**11**

BW 002343

of Miami,

hen, both
K. Kauf-
nan, Ben-
Fla., for

he Court
iss those
o not re-
serted by
ntiff has
ement by
plaintiff,
,422,735.
n-Fusion
g sealing
nts have
ims one,
ent No.
the in-
of U.S.
s' coun-
whether
ents are
ble con-
laims of
t plain-
d. The
entions.
ites has
ne that
ns. Co.
.S. 227,
ed four
ntiff led
defen-
sserted
ns or
nal and
rwood
. Inc.,
ich an
t case.
exists
intiff.
T that
is suit
urden
these
from
'itiga-

notion
ig to
in its
con-
aims

Court of Appeals, Federal Circuit

Orthopedic Equipment Company, Inc. et al.
v. United States

No. 250-77

Decided Mar. 11, 1983

PATENTS

1. Patentability — Invention — In general
(§51.501)

Traditional test, enunciated in Graham v.
John Deere Co., 148 USPQ 459, for Section
103 nonobviousness requires factfinder to
make several determinations.

2. Patentability — Invention — In general
(§51.501)

Nonobviousness of claims whose significant
elements were well known in prior art as of
time of patent's filing date arises only if they
embody combination of those well-known ele-
ments that was not obvious to one of ordinary
skill in art.

3. Patentability — Tests of — Skill of art
(§51.707)

One factor bearing on determination of
relevant art is type of skill required to under-
stand patent's disclosure; beyond rudimentary
knowledge of electromechanical devices, to
understand disclosure of patent relating to
information processing hardware one should
be familiar with workings of information pro-
cessing systems hardware.

4. Patentability — Tests of — Skill of art
(§51.707)

One of skill in art of designing information
processing systems hardware would have
been familiar with telephone line-switching
technology.

5. Patentability — New use or function —
Analogous art (§51.555)

Factor bearing on determination of rel-
evant art is type of art applied to claims by
PTO.

6. Patentability — New use or function —
Analogous art (§51.553)

One looks to nature of problem confronting
inventor in determining relevant art of claims
in suit.

7. Patentability — New use or function —
Analogous art (§51.553)

It is reasonable to expect that appellants
who believed that specific art was relevant art

would seek to rebut defendant's Section 103
charge of obviousness in second art by demon-
strating nonobviousness of claims in that spe-
cific art.

8. Patentability — Tests of — Skill of art
(§51.707)

Evidence adduced in support of Section 102
defenses can be probative on issue of level of
skill in pertinent art even if it is inadequate to
establish existence of Section 102 defense; in
this regard, there is no distinction between
Section 102(a) proofs and Section 102(g)
proofs; moreover, Jacobson Bros., Inc. v. US,
185 USPQ 168, leaves no doubt about proba-
tiveness of prior art or educational back-
grounds of those working in field.

9. Patentability — Anticipation — Knowl-
edge of prior art presumed (§51.215)

Person of ordinary skill in art at time of
patentee's invention is presumed to have be-
fore him all of relevant prior art.

10. Patentability — Anticipation — Com-
bining references (§51.205)

It is wrong to use patent in suit as guide
through maze of prior art references, combin-
ing right references in right way so as to
achieve result of claims in suit; Monday
morning quarterbacking is improper when
resolving nonobviousness question in court of
law.

11. Patentability — Anticipation — Com-
bining references (§51.205)

Claims may be obvious in view of combina-
tion of references, even if features of one
reference cannot be substituted physically into
other reference's structure; what matters in
Section 103 nonobviousness determination is
whether person of ordinary skill in art, hav-
ing all teachings of references before him, is
able to produce structure defined by claim;
fact that features of one reference cannot be
substituted into second reference's structure
may indicate that claims were nonobvious in
view of combined teachings of two references;
but this is not necessarily so; same can be said
regarding complete mechanical misfit be-
tween two separate patented devices when
combination is alleged to demonstrate obvi-
ousness of patent claims.

12. Patentability — Anticipation — Com-
bining references (§51.205)

Fact that two disclosed apparatuses would
not be combined by businessmen for economic
reasons is not same as saying that it could not
be done because skilled persons in art felt that
there was some technological incompatability

that prevented their combination; u... / latter fact is telling on nonobviousness issue.

13. Patentability — Anticipation — Combining references (§51.205)

Patentability — Evidence of — In general (§51.451)

Patentability — Evidence of — Delay and failure of others to produce invention (§51.459)

Failure of appellants to show existence of long-felt need for patented device amply explains why no businessman would undertake to literally combine two prior devices; however, this does not indicate any technological incompatibility between the two prior art devices.

Particular patents — Business Information Systems

3,304,416, Wolf, Business Order Control Systems Apparatus, claims 1, 2, 6, and 7 invalid.

———

Appeal from the United States Claims Court, Colaianni, Trial Judge; 212 USPQ 523.

Petition by Orthopedic Equipment Company, Inc., and Marriott Corporation, against the United States, for compensation for use of an invention. From order dismissing petition, plaintiffs appeal and defendant cross-appeals. Affirmed; Nies, Circuit Judge, concurring with opinion.

See also 205 USPQ 483.

William D. Hall, Potomac, Md. (Harry M. Saragovitz, Washington, D.C., on the brief) for appellants and cross-appellants.

Thomas J. Scott, Jr., Washington, D.C. (J. Paul McGrath, Thomas J. Byrnes, and Claud A. Daigle, Jr., on the brief) for appellee and cross-appellant.

Before Markey, Chief Judge, and Davis, Nichols, Kashiwa, and Nies, Circuit Judges.

Per curiam.

Both sides appeal from the judgment of the United States Claims Court [*] in this patent infringement suit. Appellants Orthopedic

———

[*] Pursuant to the order of this court dated October 4, 1982, the Claims Court thereafter issued a final judgment in accordance with Trial Judge Colaianni's recommended decision of August 14, 1981. We treat both sides' exceptions to that decision as an appeal and cross-appeal from that judgment. Appellants, plaintiffs in the Court of Claims, filed their exceptions first and we designate them appellants and cross-appellees.

Equipment Company, Inc. (L ...opedic) and Marriott Corporation (Marriott), plaintiffs in the suit, brought this action pursuant to 28 U.S.C. §1498 seeking compensation for the unauthorized manufacture or use by or for the United States of a nation-wide material handling system which is alleged to infringe claims 1, 2, 6, and 7 of United States Letters Patent No. 3,304,416 (the Wolf patent), entitled "Business Order Control System Apparatus." They filed administrative claims for compensation with several Department of Defense agencies for infringement of the Wolf Patent. The first of these administrative claims was filed in July 1976; none of the claims has ever been denied. The present suit was filed in the United States Court of Claims on May 6, 1977. Then Trial Judge Colaianni, after a trial, issued an opinion and findings holding that the invention set forth in claims 1, 2, 6 and 7 of the Wolf patent would have been obvious within the meaning of 35 U.S.C. §103 and that the claims were therefore invalid. He either rejected or declined to pass upon other defenses raised by the United States. But he did decide that the plaintiffs were entitled to collect $1,181.25 as part of the reasonable and necessary costs of a certain deposition. The final judgment was that, upon payment by the United States to the plaintiffs-appellants of $1,181.25 as part of those deposition costs, the petition was to be dismissed. Plaintiffs appeal from the determination of invalidity, and defendant appeals from the award of deposition costs and also from the judge's failure to consider, or his rejection of, most of the Government's other defenses.

Because we agree with Judge Colaianni's reasons for his decision that the claims were invalid for obviousness, we confine our discussion of invalidity to those points and do not consider the United States' contentions that invalidity can be reached on other grounds. On the question of obviousness (Part I infra) our opinion incorporates, for the most part, Judge Colaianni's opinion. We also consider (Part II infra) the issue of deposition costs.

I · Obviousness

Appellants accuse the appellee of infringing claims 1, 2, 6, and 7 of the patent in suit. Claims 1 and 2 are very similar to one another. Likewise, claims 6 and 7 are very similar to each other. The main differences between the claims are the differences which exist between these two similar groups. The parties agreed at trial to treat claims 2 and 7 as representative of their respective groups. This convention will also be followed in this

BW 002345

opinion. However, should a peculiar aspect of either claim 1 or claim 6 affect the outcome of the determination of validity, then this fact will be emphasized.

### The Claims

Wolf claims 2 and 7, presented in subparagraph form with the sequencing of the claim elements slightly rearranged from the sequencing found in the patent itself,[1] are as follows:

### Claim 2

  (a)(1) An electrical system
    (2) for controlling the operation of a business;
  (b)(1) comprising
  (c)(1) a plurality of order stations,
  (d)(1) means
    (2) at each of said order stations
    (3) for generating coded messages corresponding to the orders entered at said station,
  (e)(1) a central station
    (2) connected for control in turn from any of said order stations,
  (f)(1) means
    (2) for programming the operation of each order station to cause the transmission of the messages,
    (3) in orderly fashion,
    (4) to the central station,
  (g)(1) a plurality of work stations
    (2) at which are to be performed respective items of work called for by said messages,
  (h)(1) means
    (2) at said control station
    (3) for recording the messages as received,
    (4) and for computing numerical information
    (5) based on the content of said messages,
  (i)(1) and means

[1] The rearranged sequencing and the subparagraphing is superimposed on the claims of the patent solely for the purpose of facilitating discussions involving the claims. The superimposition permits a precise identification of the various claim elements. It is a more detailed location scheme than the column and line-number scheme which one finds in patents. The rearranged sequencing has no bearing on the patentability of these particular claims. The following shorthand will be used in this opinion: Claim 2(a)(1), or element 2(a)(1), shall refer to subparagraph (a)(1) of claim 2 of the Wolf patent, i.e., "An electrical system."

    (2) at each work station,
    (3) responsive to the relayed message portions,
    (4) for providing a visual display
    (5) of order information pertinent to that work station.

### Claim 7

  (a)(1) A remote control
    (2) and computing
    (3) system
    (4) for mercantile operations
  (b)(1) comprising
  (c)(1) work stations,
  (d)(1) at least one order station,
    (2) remote from said work stations,
  (e)(1) and a central station;
  (f)(1) remotely controllable
    (2) order registering equipment
    (3) at said central station
  (g)(1) means connecting
    (2) said order station to said equipment
    (3) to register therein signals representing items of work to be performed;
  (h)(1) automatic means
    (2) associated with said central station
    (3) for translating said signals into a registrable code
    (4) and for appending thereto codes representative of each work item;
  (i)(1) and a calculator control
    (2) led by said automatic means
    (3) for registering the items of work and price data individual thereto
    (4) and for computing said data to provide an output total;
  (j)(1) and means
    (2) associated with said central station
    (3) for transferring portions of said signals selectively to respective work stations
    (4) to control the manifestation thereof of such work items for processing at said stations[,]
  (k)(1) apparatus
    (2) at each work station
    (3) for registering
    (4) and intelligibly manifesting
    (5) the items of work to be performed, as called for by said signals[.]

### The Nonobvious Subject Matter

#### Requirement of 35 U.S.C. § 103

[1] The traditional test, enunciated in Graham v. John Deere Co., 383 U.S. 1, 148 USPQ 459 (1966), for §103 nonobviousness requires the factfinder to make several determinations. The test provides:

Under §103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved need, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy. [383 U.S. at 17-18, 148 USPQ at 467.]

*Scope and Content of the Prior Art Summarized*

Much of the prior art in the trial record consists of United States Letters Patent which were considered by the Patent and Trademark Office (PTO) during the prosecution of the Wolf patent. These patents for the most part reside within the art of information processing system hardware. A number of them draw upon the technology found in telephone line-switching devices. The technology embodied in the information processing and telephone fields tends to evolve rapidly in response to prior and concurrent developments.

The individual patents themselves disclose one or more, but less than all, of the separate Wolf claim elements. Their combined teachings disclose all of the Wolf claim elements. Several of these patents each show how to combine two or more of the Wolf claim elements. They demonstrate the facility with which the various means identified in the Wolf claims can be made to interface with each other in order to form the desired information processing devices.

*The Relevant Art of the Invention in Suit*

[2,3] The claims in suit provide a convenient starting point for determining the relevant art. The significant claim elements which combine to form the claims in suit were well-known in the prior art as of the time of the Wolf filing date. Thus nonobviousness of these claims would arise only if they embody a combination of these well-known elements that was not obvious to one of ordinary skill in the art. One factor bearing on the determination of the relevant art is the type of skill required to understand the disclosure of the Wolf patent, which relates to information processing hardware. Beyond a rudimentary

knowledge of electromechanical devices, one should be familiar with the workings of information processing systems hardware.

[4] One of skill in the art of designing information processing systems hardware at the time of the Wolf filing date would have been familiar with telephone line-switching technology. This conclusion is apparent from the Andrews-Vibbard[2] disclosure, the Gimpel[3] disclosure, and is consistent with the fact that the technology used for the routing of signals in the early models of information processing systems hardware was borrowed from telephone line-switching technology.

[5] A second factor bearing on the determination of the relevant art is the type of art applied to claims by the PTO. As already noted, much of this art deals with information processing systems hardware and telephone line-switching technology.

[6] In determining the relevant art of the claims in suit one looks to the nature of the problem confronting the inventor. Weather Engineering Corp. of America v. United States, 614 F.2d 281, 287, 204 USPQ 41, 46–47 (Ct. Cl. 1981). The appellants' expert, when asked to state the concept embodied in these claims that was not already present in the prior art as of the filing date of Wolf, said:

> The concept of the message identifying an item of work being transmitted through a central station — or is transmitted to a central station, and then the use of the item identifier to route the message onto an appropriate work station with the ability, at the central station, to also perform numerical computations where the — at least some of the operands for that computation are also determined by the item description code entered at the work station, or — at the order station.[4]

In other words, appellants allege that one source of the patentability of the claims in suit is the way that the apparatus, as defined by the Wolf claims, uses the coded input information to make two separate types of decisions without the aid of direct human intervention at the time when the decisions are made. The first determination involves selecting price information from a data storage apparatus and appending the price information to the item input information. The Wolf system looks at the item code, and based on this code it is able to pick out the price of this item from the price information stored in the memory registers of the central station. It

[2] United States Letters Patent No. 2,977,048.
[3] United States Letters Patent No. 2,987,704.
[4] Trial transcript, pp. 87-88.

then assoc... item code... item inpu... ployed to... known in... systems h... of Wolf.

The se... ing the ap... the coder... work stat... numerica... selection... of the co... ployed ... known i... switchin...

In vie... seem th... ing the b... by choos... systems.... evant ar... the fiel... hardwa...

[7] A... comes f... as their... experie... field, ... inform... Appell... relevan... signific... witness... ience i... tise in... Nikola... wareh... his tes... lee's d... viousn... truly b... housin... they w... ant's ... inform... demon... claims... latter... mony... millia... the ap... in fac... than ... actio...

[5] N... vac i... comp... hard...

? USPQ

ces, one
of infor-

esigning
ware at
ild have
vitching
nt from
ie Gim-
·ith the
routing
rmation
irrowed
ogy.
·etermi-
c of art
already
mation
ephone

of the
of the
feather
United
Q 41,
expert,
died in
sent in
Wolf,

entify-
mitted
nsmit-
use of
essage
th the
·he —
that
y the
work

t one
ns in
fined
input
es of
uman
sions
olves
stor-
nfor-
The
based
ce of
ed in
n. It

9.
1.

then associates this price information with the item code in all subsequent processing of the item input information. The hardware employed to perform this selection was well-known in the art of information processing systems hardware design as of the filing date of Wolf.

The second determination involves selecting the appropriate route for transmission of the coded input information to the proper work station, as well as to the calculator for numerical computations. The system's route selection is made depending upon the identity of the coded information. The hardware employed to perform this selection was well-known in the art of designing telephone line-switching hardware.

In view of the foregoing factors, it would seem that one can come no closer to pinpointing the relevant art of the Wolf claims than by choosing the art of information processing systems hardware. We conclude that the relevant art of the Wolf patent claims resides in the field of information processing systems hardware.

[7] Additional support for this conclusion comes from the fact that the appellants chose as their chief witness a person whose primary experience was in the computer hardware field,[3] which is the major component of information processing systems hardware. Appellants' assertion of warehousing as the relevant art is unpersuasive. In defining the significance of the invention, appellants' chief witness, Mr. Nikolai, relied on his experience in the computer field, not on any expertise in the field of warehousing. In fact, Mr. Nikolai did not possess any expertise in the warehousing art, yet the appellants advanced his testimony in their rebuttal of the appellee's defense of invalidity for lack of nonobviousness of the Wolf claims. If the appellants truly believed that the relevant art was warehousing, it appears reasonable to expect that they would have sought to rebut the defendant's §103 charge of obviousness in the art of information processing systems hardware by demonstrating the nonobviousness of the claims in the art of warehousing. To do the latter appellants could not advance the testimony of Mr. Nikolai, who was totally unfamiliar with the warehousing art. However, the appellants' choice of Mr. Nikolai was not in fact ill-advised; their actions speak louder than their words in this instance, and their actions bolster the conclusion that the relevant

[3] Mr. Nikolai testified: "My experience at University in the early days involved exposure to digital computer hardware, digital communication hardware."

art is in the field of information processing systems hardware.

### Section 103 Defense Based on Nelson-Robinson and Andrews-Vibbard

The one of appellee's §103 defenses that was accepted by the trial judge is based upon the combined teachings of two United States Letters Patents, Nos. 1,974,191 and 2,977,048.

United States Letters Patent No. 1,974,191 entitled, "Merchandise Control Systems," was filed by Martin L. Nelson and Harold C. Robinson on April 18, 1932 (the Nelson-Robinson patent). It was classified by the PTO in class 178, subclass 4, and issued on September 18, 1934. It was not considered by the PTO during the prosecution of the claims in suit.

The Nelson-Robinson apparatus includes both order stations and work stations, namely: credit checks, inventory record monitoring, and transaction documentation. Nelson-Robinson envisions a customer bringing merchandise he want to purchase to a sales clerk at an order station. Attached to the merchandise is a merchandise display card which contains information coded as a pattern of perforations. The sales clerk operates a transmitter which receives the punched merchandise display card together with a sale clerk's card and a cashier's card, each of the three cards containing information in the form of punch codes. The transmitter in effect reads the punched information by completing certain circuits through the punched holes. Electric signals then activate various other devices at the work stations, depending upon the circuit connections made in the transmitter. A printing machine, located at the work station where the credit checks are made, prints out information pertinent to the sales transaction. A punch card machine, located at the inventory record room, punches out an inventory card for the purchased merchandise. Information concerning item description, quantity, and price is transmitted to appropriate adding machines which keep running totals of item quantities and dollar sales volume, and this information can be visually displayed on a printed page.

The Nelson-Robinson apparatus discloses all the elements of the claims in suit except the central station and certain elements associated with the central station. In Wolf's claim 2, for example, the Nelson-Robinson apparatus lacks elements (e), (f), and (h) (3). It also



lacks elements (e), (f), (g), (h), (i) (3), and (j) (2) of Wolf's claim 7.

United States Letters Patent No. 2,977,048, entitled, "Automatic Calculator," was filed by Ernest O. Andrews and Edward L. Vibbard on December 17, 1946 (the Andrews-Vibbard patent). It was classified by the PTO in class 235, subclass 162. This is the same class as the Wolf patent, but a different subclass. Andrews-Vibbard issued on March 28, 1961, but was never considered by the Patent Office during the prosecution of the claims in suit.

The Andrews-Vibbard described apparatus is an electrical computing device of some sophistication which has provisions for storing results of intermediate calculations and later accessing those results for use as inputs for further calculations. The input information is coded onto perforated paper tapes. The type of calculation to be performed by the machine, and the timing of this performance in relation to other calculations, is controlled by a separate coded perforated tape called the master control tape. This tape contains the operating commands which permitted the apparatus to perform its basic addition and subtraction operations in a way that enabled it to do multiplication and division calculations, and ultimately to arrive at solutions to ballistic equations.

The Andrews-Vibbard apparatus, though not primarily a data storage or memory device, nonetheless did perform a limited storage function during the course of its calculation procedure. Moreover, as disclosed, the apparatus is capable of storing information on a paper tape for selection assessing by a computing device. The selection process was accomplished by means of telephone line-switching hardware, which Andrews-Vibbard teaches was well-known to those skilled in the art of early information processing systems hardware design. The patent in suit relies on an identical data storage arrangement for its price information. In addition, the Andrews-Vibbard apparatus satisfies all of the central station requirements of the claims in suit. The following claim 2 elements can be found in Andrews-Vibbard: (e), (f), (h), and (i). The following claim 7 elements can be found in Andrews-Vibbard: (e), (f), (g), (h), (i), and (j).

The claims in suit make considerable use of means language which reads broadly on the devices disclosed in the prior art. The structural elements or devices disclosed in the Wolf specification that perform the functions defined in the means portions of the claims were each well-known in the prior art at the time

of the Wolf invention,[*] as is amply demonstrated by Nelson-Robinson and Andrews-Vibbard. Thus, the patentability of the claims is not derived from the structural elements disclosed in the specification. The only difference between these references and the claims is that neither reference alone discloses the precise combination of elements claimed in the Wolf patent. Thus, the patentability of the claims must stem from the alleged fact that the specific combination of claim elements in Wolf was not disclosed in the prior art and the additional allegation that the specific combination of claim elements was nonobvious to one of ordinary skill in the art.

The appellants have argued that, not only would one of ordinary skill not know how to arrive at the claimed combination of elements, but that the appellee failed altogether to prove the level of ordinary skill in the art which pertains to the Wolf claims. This deficiency, it is said, makes it impossible to state one way or the other what one of ordinary skill in the art was capable of doing, or why in light of such skill such a person might have found the claimed invention lacking in nonobviousness.

### Level of Skill in the Art

Some of the factors which have been considered in evaluating the level of ordinary skill in the art appear in the following excerpt from Jacobson Bros., Inc. v. United States, 512 F.2d 1065, 185 USPQ 168 (Ct. Cl. 1975):

[T]he various prior art approaches employed, the types of problems encountered in the art, the rapidity with which innovations are made, the sophistication of the technology involved, and the educational background of those actively working in the field are among the factors which will oftimes aid in developing a picture of what is the level of skill of the ordinary person in an art. Considerations such as commercial success and the failure of others, characterized as "secondary" in Graham, are nontheless invaluable as real-life indicia * * * of the level of skill in the art. * * *.

The appellee's proof of the issue of the level of skill in the art consists of the following: (1) The evidence adduced in support of its § 102 defenses (defenses the trial judge prohibited on procedural grounds); (2) the prior art patents; and (3) the testimony and educational qualifications of the witnesses who were working in the art of information processing systems hardware prior to May 26, 1958.

[*] The appellants conceded this fact below.

[8] The
§ 102 defe
Air Force
issue of the
even if it
lish the ex
we do not
this regar
monds Pre
153 USPC
(case settl
plaintiff),
v. United
116 (Ct. C
pra, leave
of prior a
those wor

In term
time of th
trial judg
strated the
the art w
informati
route thi
the origi
the level
capable
input in
the relati
have the
bined in
then rou
dance w
level of
the basi
tion tec
from me
tion, an
input is
controll
quired
the art
were c
inventi
the le
confine
and st
hardw
the el
uals w
intellig
posses

The C

[9,1
simple

'SA
Genur.
nie fu
AUTO
ed to

demon-
andrews-
ne claims
elements
-y differ-
ie claims
.oses the
.imed in
bility of
ged .fact
iim ele-
he prior
hat the
ius was
the art.
iot only
how to
ements,
o prove
which
iciency,
ne way
l in the
.ight of
md the
usness.

n con-
·dinary
xcerpt
States,
t. Cl.

s em-
ntered
:nova-
·f the
tional
.n the
will
what
on in
·rcial
icter-
are
idicia
* *
· the
low-
rt of
udge
the
and
.ssca
:tion
May

[8] The evidence adduced in support of the § 102 defenses (the SAGE defense and the Air Force defense)[1] can be probative on the issue of the level of skill in the pertinent art even if it be considered inadequate to establish the existence of a § 102 defense (an issue we do not reach). There is no distinction in this regard between § 102(a) proofs. Simmonds Precision Prods., Inc. v. United States, 153 USPQ 465, 468 (Ct.Cl. Trial Div. 1967) (case settled by stipulation of judgment for plaintiff), and § 102(g) proofs, Int'l Glass Co. v. United States, 408 F.2d 395, 161 USPQ 116 (Ct.Cl. 1969). Moreover, Jacobson, supra, leaves no doubt about the probativeness of prior art or the educational backgrounds of those working in the field.

In terms of the level of skill in the art at the time of the Wolf filing date, we accept the trial judge's finding that the evidence demonstrated the following facts: Those skilled in the art were able to coordinate specific input information with related stored data and then route this combined information based upon the original input information. It was within the level of skill in the art to conduct a system capable of performing calculations on the input information before associating it with the related stored data. It was also possible to have the calculations performed on the combined input information and stored data, and then route the calculation results in accordance with the initial input information. The level of skill had reached a point where all of the basic information transfer and manipulation techniques, e.g., accessing stored data from memory devices based on input information, and routing information based upon input information, were completely machine-controllable. No human intervention was required in the systems which those skilled in the art of information processing hardware were capable of building at the time of the invention in suit. The advances being made in the level of skill in the art were primarily confined to improving the speed, reliability, and storage and handling capacities of the hardware. Electronic devices were replacing the electromechanical devices. The individuals working in the art were of above average intelligence and educational training. Many possessed advanced university degrees.

The Claims in Suit Lack Nonobviousness

[9,10] The question of nonobviousness is a simple one to ask, but difficult to answer. The

[1]'SAGE is an acronym for the Semi-Automatic Ground Environment air defense system. The other air force system mentioned is the Air Force's early ALTODIN system defense. These are both advertised in more detail in the findings below.

person of ordinary skill in the art at the time of the patentee's invention, which in this case is May 26, 1958, is presumed to have before him all of the relevant prior art. As has been previously explained, the available art shows each of the elements of the claims in suit. Armed with this information, would it then be nonobvious to this person of ordinary skill in the art to coordinate these elements in the same manner as the claims in suit? The difficulty which attaches to all honest attempts to answer this question can be attributed to the strong temptation to rely on hindsight while undertaking this evaluation. It is wrong to use the patent in suit as a guide through the maze of prior art references, combining the right references in the right way so as to achieve the result of the claims in suit. Monday morning quarterbacking is quite improper when resolving the question of nonobviousness in a court of law.

Mr. Bloch, the expert witness engaged by the appellee, testified that the claimed invention would be obvious to one of ordinary skill in the art at the time of Mr. Wolf's invention date. The testimony of this witness on this point consisted of conclusions without supporting explanations. The trial judge considered that the lack of supporting explanations was an omission which detracted from the persuasiveness of the conclusions of Mr. Bloch. Nonetheless the court below held that the testimony of this witness, when combined with other evidence, was sufficient to constitute a prima facie demonstration of obviousness pursuant to 35 U.S.C. § 103.

In rebuttal of this prima facie demonstration of obviousness, the appellants offered the testimony of Mr. Nikolai, a witness experienced on matters of patentability, though not a person of ordinary skill in the art of information processing systems hardware during the relevant time period. Mr. Nikolai testified that it would not be obvious to one of ordinary skill in the art to combine the Nelson-Robinson apparatus with the Andrews-Vibbard apparatus, both cited by the appellee, to achieve the result of the claims in suit. Building upon this point, appellants allude to the unlikelihood of a retail business using an apparatus like Andrews-Vibbard because of its enormous size, cost, and complexity in comparison to the needs of the retail businessman. However, Mr. Nikolai did not testify that it would not have been obvious to combine the elements found in the disclosures of Nelson-Robinson and Andrews-Vibbard and thereby arrive at the combination of elements recited in the claims in suit. There is a distinction between trying to physically com-

bine the two separate apparatus disclosed in two prior art references on the one hand, and on the other hand trying to learn enough from the disclosures of the two references to render obvious the claims in suit. Mr. Nikolai's testimony touched upon the former, but ignored the latter.

[11] Claims may be obvious in view of a combination of references, even if the features of one reference cannot be substituted physically into the structure of the other reference. In re Anderson, 391 F.2d 953, 958, 157 USPQ 277, 281 (CCPA 1968). What matters in the § 103 nonobviousness determination is whether a person of ordinary skill in the art, having all of the teachings of the references before him, is able to produce the structure defined by the claim. In re Twomey, 218 F.2d 593, 104 USPQ 273, 275 (CCPA 1955). The fact that features of one reference cannot be substituted into the structure of a second reference may indicate that the claims were nonobviousnes in view of the combined teachings of the two references. But this is not necessarily so, as Anderson, supra, makes clear. The same can be said regarding a complete mechanical misfit between two separate patented devices when the combination is alleged to demonstrate the obviousness of patent claims. But Mr. Nickolai's testimony does not address these points. Rather, he raises only the point that it was not likely that the Andrews-Vibbard apparatus would be integrated into the Nelson-Robinson apparatus by one of ordinary skill in the art. This may be so for reasons of economic feasibility, but not for any want of technological feasibility. The combination of these two inventions does not make good economic sense, but there is no mismatch between these technologies.

[12] In other words, the fact that the two disclosed apparatus would not be combined by businessmen for economic reasons is not the same as saying that it could not be done . because skilled persons in the art felt that there was some technological incompatibility that prevented this combination. Only the latter fact is telling one the issue of nonobviousness.

[13] The failure of appellants to show the existence of a long-felt need for the patented device amply explains why no businessman would undertake to literally combine the Nelson-Robinson and Andrews-Vibbard apparatus. However, this does not indicate any technological incompatibility between these two prior art defenses. Indeed, as the trial judge correctly found, it appears quite feasible both economically and technologically, to combine the *several elements* comprising the Nelson-Robinson and Andrews-Vibbard devices to arrive at the claims in suit. Moreover, it

appears that to do so would have been obvious to one of ordinary skill in the art at the time Wolf made his invention.

In sum, Judge Colaianni's conclusion of obviousness, which we accept, rests on the testimony of Mr. Bloch regarding the disclosures of the Nelson-Robinson and Andrews-Vibbard patents, and the exhibits and testimony offered by the appellee in support of its prohibited § 102 defenses. Moreover, the inability of the appellants to effectively undermine the foregoing evidence or to present evidence of such factors as long-felt need, teaching away in the prior art, the failure of others, and commercial success, leaves the appellee's prima facie case of obviousness unshaken.

## II — Deposition Costs

This part of the opinion considers the deposition costs of appellants' expert witness. Judge Colaianni found in his opinion below that the cross-appellant had earlier offered to pay the reasonable and necessary expenses associated with such a deposition, and that the judge had previously determined (in his order of August 10, 1979) the amount of money which defendant had previously obligated itself to pay; in the judge's view, he had determined the dollar amount of the costs which the defendant voluntarily had offered to pay in order to secure permission to depose Mr. Nikolai. Since the cross-appellant continued to dispute $1,181.25 of the amount of the judge's dollar determination, an amount which to this day remains unpaid, the judge thereafter concluded as a matter of law that the defendant's offered payment was overdue. This order was reviewed by the Court of Claims in its order dated June 26, 1981. In this order the court stated:

In preparing his ultimate report, the trial judge should then treat the costs issue (when there is one) in the same manner as all substantive legal issues in the cases, i.e., he should make proposed findings of fact and conclusions of law on the court issue.

In his opinion below, Judge Colaianni said: "Neither the parties nor I ever anticipated that this dispute as to the amount of the costs presented a triable issue. It began purely as a matter incidental to discovery. Both parties were silent on this matter in their post-trial briefs and proposed findings of fact. There is no evidence in the trial record upon which to base factual findings, nor, in view of the court's June 26, 1981, order, are there any legal issues left to be resolved. My original determinations were based upon the statements of counsel and my own personal

knowledge of the events. All of this information appears in my orders and the related motions of the parties. These orders are dated: January 24, 1979; March 23, 1979; August 10, 1979; April 24, 1981; May 11, 1981; Thus, I reaffirm the conclusion of my August 10, 1979, order as to the $1,181.25 amount which the defendant promised to pay to the plaintiffs as part of the reasonable and necessary costs of the deposition in question."

We are satisfied that Judge Colaianni's decision on this issue (together with his finding on the point) met the essential requirement of the Court of Claims order, supra, and, having thoroughly reviewed his orders and memoranda as well as the numerous related motions and responses by both parties, we accept his determination both as to the amount due and the circumstances giving rise to the determination of that particular amount. Our review of the record reveals a history of poor relations between these parties over matters pertaining to discovery, apparently having begun with appellants' refusal to answer certain interrogatories by the Government. This refusal was confirmed by order of Judge Colaianni on December 22, 1978, in which he stated that "[t]o require plaintiffs to answer these interrogatories would, in effect, be ordering plaintiffs to prepare defendant's case for it. That is hardly within the purpose or scope of the discovery rules."

The Government did not appeal that refusal, but then sought, and was granted, the right to depose appellants' expert witness Mr. Nikolai, claiming that this deposition was its only remaining avenue for gaining information it needed. Those deposition costs are here at issue as a result of the trial judge's decision both that the Government had earlier agreed to pay reasonable and necessary expenses associated with this deposition and also that a portion of the deposition was used by the Government to "develop" its case. Those determinations are supported by the record and have not been shown by the cross-appellant to have been either erroneous in law or abuses of discretion. Cf. Fed. R. Civ. P. 26(C).

### III — Conclusion

Appellants are entitled to collect $1,181.25 as part of the reasonable and necessary costs of the deposition of Mr. Nikolai. The claims in suit are invalid for obviousness per 35 U.S.C. § 103 (1976), and accordingly the petition was properly dismissed subject to the Government's payment of $1,181.25 to appellants.

*Affirmed.*

*Niles, Circuit Judge, concurring.*

I agree with the majority that the judgment of the Claims Court that the asserted claims of the Wolfe patent are invalid under 35 USC § 103 should be affirmed. In my view, the majority adopts portions of the trial judge's opinion which are unnecessary to the issues on appeal and, thus, to a great extent the majority's opinion is dictum.

Appellants make no attack on use of Andrews-Vibbard as a prior art reference apart from the fact that it is a large, expensive, and specialized machine which a businessman would not have considered a practical tool to use in connection with selection of the items of merchandise ordered by a customer or for preparing a pricing invoice. I agree with the majority that this argument does not destroy the relevancy of Andrews-Vibbard.

The trial judge found that the apparatus disclosed in Nelson-Robinson and Andrews-Vibbard can be physically combined. Appellants do not show any error in this conclusion. In view of the teachings of these prior art references and the problem confronting the inventor, the trial judge did not err in holding that the subject invention would have been obvious to one of ordinary skill in the art on the record before him.

---

Court of Appeals, Second Circuit

Eden Toys, Inc.
v. Florelee Undergarment Co., Inc.

Nos. 82-7188 and 82-7236
Decided Dec. 2, 1982

## COPYRIGHTS

1. **Infringement — In general (§24.201)**

**Parties to suit — In general (§49.1)**

Copyright Act authorizes only two types of claimants to sue for copyright infringement, owners of copyright, and persons who have been granted exclusive licenses by owners of copyrights; Copyright Act does not permit holders of rights under copyright to choose

**12**

BW 002353

# THE WILEY ENGINEER'S DESK REFERENCE

## A CONCISE GUIDE FOR THE PROFESSIONAL ENGINEER

SANFORD I. HEISLER, P.E.
*Bechtel Power Corporation*
*San Francisco, California*

A Wiley-Interscience Publication

JOHN WILEY & SONS

New York   ·   Chichester   ·   Brisbane   ·   Toronto   ·   Singapore

BW 002354

378 CONTROLS

### 6.6.4 Motor Actuators

Motor actuators called motor operators (electric) are suitable for either modulating or on–off service. They are particularly useful for high-pressure applications since their gearing (often worm) provides very large forces for valve stem movement. These operators may be of substantial weight and this must be considered in their application. When specified, they can be used on valves for throttling service. Motor operator closure times range from several seconds to several minutes, depending on valve size, motor sizing, gearing selected, and so forth.

### 6.6.5 Stored Energy Actuators

Stored energy actuators are used for on–off or single-stroke service, generally of either the weight (gravity), compressed air, compressed spring, or explosive type. These actuators are "tailored" (although not necessarily custom designed) for the specific application and are frequently specified to provide extremely rapid opening or closure [e.g., ¾ to ⅞ second for valves as large as 36 in. (0.9 m)]. The explosive type is generally limited to the smaller sizes (to 3 in.; 76 mm) and, unlike the other types, is designed for one cycle and is not reuseable.

### 6.6.6 Solenoid Valves

Solenoid valves are suitable for on–off service and utilize a solenoid to move the valve disc to either the fully open or fully closed position. They are usually of the globe type, utilizing a circular disc and seat and are normally of moderate size—2 inches (51 mm) and smaller. For larger sizes the solenoid may be used as a pilot to operate an air or hydraulic actuator. Response time is very rapid; ⅛ second is typical. In addition, modulating solenoid valves are available for special applications.

### 6.7 MAN/MACHINE INTERFACE[1,4,5]

#### 6.7.1 Human vs. Machine Capabilities

*Limitations of Humans*

Accuracy—Susceptible to constant and variable errors.
Speed—Time required for decision and movement.
Force—Depends on body member in use and fatigue.
Computing—Slow, inaccurate (limited to single integration and differentiations).
Decision making—Optimum strategy not always used; preservation exists.
Information input rate—Susceptible to overloading; stress and boredom affect performance.

*Advantages of Humans*

Detection—Can detect a wide range of signals, strong to weak.
Perception—Can see through complex situations, have constancy, and can detect signals through noise.

08/17/95  THU 10:22 FAX 419 244 8862        WILLIAN.BRINKS                                    ⌀001

<u>CERTIFICATE OF FACSIMILE TRANSMISSION</u>

I HEREBY CERTIFY THAT THIS PAPER IS BEING FACSIMILE
TRANSMITTED TO THE PATENT AND TRADEMARK OFFICE ON THE
DATE SHOWN BELOW, FED-308-8143/703-305-3449 (Group 3402)

<u>August 17, 1995</u>
(DATE)

<u>Wanda J. Lawrence</u>

*Wanda J. Lawrence*
(SIGNATURE)

**FAX COPY RECEIVED**

**AUG 1 7 1995**

**GROUP 3400**

*approved for
entry*

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| In re application of: | : | Group Art Unit: 3402 |
| EDWARD C. SIEMON, ET AL. | : | |
| Serial No. 08/056,635 | : | Examiner:  W. Lo |
| Filed:  May 3, 1993 | : | |
| For: VCT CONTROL WITH A | : | Attorney Dkt. No.: 91016A |
| DIRECT ELECTRO- | : | |
| MECHANICAL, ACTUATOR | : | |

<u>AMENDMENT AFTER FINAL ACTION UNDER 37 C.F.R. §1.116</u>

Commissioner of Patents and Trademarks
Washington, D.C. 20231

Sir:

This paper is being filed in response to the telephone
communication of August 14, 1995 between the Examiner and
Counsel for Applicant.  During that conversation, the
Examiner agreed to allow the above-referenced application
(in which an appeal is currently pending) if certain changes
to the claims were made.

If an additional fee or refund is required, please
charge or credit Deposit Account No. 02-3182.

Please amend the above-named application as follows:

<u>IN THE CLAIMS</u>

1 (amended).  An internal combustion engine,
comprising:

a crankshaft, said crankshaft being rotatable
about an axis;

30038  08/17/95 08056635       02-3182  030  117      970.00CH

08/17/05 THU 10:22 FAX 410 244 8862    WILLIAN,BRINKS                    @002

a camshaft (126), said camshaft being rotatable about a second axis, said camshaft being subject to torque reversals during rotation thereof;

a vane (160), said vane having first and second circumferentially spaced apart lobes (160a, 160b), said vane being attached to said camshaft, said vane being rotatable with said camshaft and being non-oscillatable with respect to said camshaft;

a housing (132), said housing being rotatable with said camshaft and being oscillatable with respect to said camshaft, said housing having first and second circumferentially spaced apart recesses (132a, 132b), each of said first and second recesses receiving one of said first and second lobes and permitting oscillating movement of said one of said first and second lobes therein;

means for transmitting rotary movement from said crankshaft to said housing; and,

means for controlling the oscillation of said housing, said control means being reactive to torque reversals in said camshaft for varying the position of said housing relative to said camshaft, said control means comprising:

a spool valve body (198);

a spool (200), said spool being reciprocable within said body and having first and second spaced apart lands (200a, 200b), said spool further having a vent to atmosphere (198d);

a first return line means (194) extending from one of said first recess and said second recess to said spool valve body, one of said first and second lands blocking flow through said first return line means in a first range of positions of said spool within said valve body and permitting flow through said first return line means in a

2

BW 002357

08/17/95   THU 10:22 FAX 416 244 8862       WILLIAN,BRINKS                                      @003

second range of positions of said spool within said valve body;

a second return line means (196) extending from the other of said first recess and said second recess to said valve body, the other of said first and second lands blocking flow through said second return line means in said second range of positions of said spool within said valve body, permitting flow through said second return line means in a first portion of said first range of positions of said spool within said valve body, and blocking flow through said second return line means in a second portion of said first range of positions of said spool within said valve body;

an inlet line means (182) extending from said valve body to each of said first recess and said second recess, said inlet line means permitting hydraulic fluid to flow from said valve body to said each of said first recess and said second recess regardless of the position of said spool, said inlet line means having check valve means (184, 186) for preventing the flow of hydraulic fluid from each of said first recess and said second recess to said valve body;

means for sensing (207a, 207b) the positions of said crankshaft and said camshaft;

an engine control unit (208), said engine control unit for receiving information from said sensing means and for calculating a relative phase angle between said crankshaft and said camshaft using said information;

an electromechanical actuator (201), said electromechanical actuator comprising a variable force solenoid, said variable force solenoid for controlling the position of said spool in response to a signal issued from said engine control unit; and,

means for biasing (202) said spool valve, said biasing means for urging said spool valve to a full advance position during periods when said electromechanical actuator is deenergized.

3

BW 002358

08/17/95  THU 16:23 FAX 419 244 6682        WILLIAN.BRINKS                        ☒004

Please cancel Claim 7 without prejudice.

Claim 8, line 1: amend "Claim 7" to read --Claim 1--.

Claim 9, line 1: amend "Claim 7" to read --Claim 1--.

Claim 11, line 29: insert --fluid-- between "hydraulic" and "through".

## REMARKS

After receiving Paper No. 16, a final rejection (mailed December 5, 1994), Applicant filed a Notice of Appeal on March 15, 1995 and an Appeal Brief on May 24, 1995.

On August 14, 1995, the Examiner telephoned counsel for Applicant.  Examiner Lo stated that if all the limitations contained in Claim 7 (i.e., those regarding the variable force solenoid) were incorporated into independent Claim 1, then the application would be allowable.  Claim 1 is amended in this paper to incorporate such limitations.

Presently, two claims on appeal, Claims 8 and 9, are dependent upon Claim 7 (which was cancelled in this paper).  Accordingly, this paper also amends Claims 8 and 9 so that they are in proper form for allowance.

Finally, according to a suggestion made by the Examiner, Claim 11 is amended to add a word which was inadvertently omitted in the original application.  The additional language does not introduce any new matter.

## CONCLUSION

In view of the foregoing, Applicant respectfully requests that this Amendment After Final Action (amending Claims 1, 8, 9, and 11 and cancelling Claim 7) under 37 C.F.R. §1.116 be accepted and entered.  An indication of allowability of Claims 1-6, 8-11, and 13-15 is also requested.

4

BW 002359

Should Examiner require additional information or wish
to discuss matters further, the undersigned attorney for
Applicant is willing to do so via telephone or fax.

Respectfully submitted,

David A. Spenard
Registration No. 37,449

Willian Brinks Hofer Gilson & Lione
1130 Edison Plaza
Toledo, Ohio 43604-1537
(419) 244-6576
(419) 244-8862 (fax)

5

BW 002360



08/17/95   10:28   ☎703 305 3483      CRP 340                    ☑001

```
                    *********************
                    ***  ACTIVITY REPORT  ***
                    *********************
RECEPTION OK

TX/RX NO.            8971

CONNECTION TEL             418 244 8882

CONNECTION ID       WILLIAN.BRINKS

START TIME          08/17 10:23

USAGE TIME          02'10

PAGES                 5

RESULT              OK
```

BW 002361





**UNITED STATES DEPARTMENT OF COMMERCE**
Patent and Trademark Office
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED APPLICANT | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 08/056,635 | 05/03/93 | SIEMON | 34M1/0823 |

| | EXAMINER |
|---|---|
| | LO, W |
| ART UNIT | PAPER NUMBER |
| | 2 0 |

DATE MAILED: 3402

BORG-WARNER AUTOMOTIVE, INC.
PATENT DOCKET ADMINISTRATOR
6700 18-1/2 MILE ROAD
P. O. BOX 8022
STERLING HEIGHTS, MI 48311-8022

**EXAMINER INTERVIEW SUMMARY RECORD**

08/23/95

All participants (applicant, applicant's representative, PTO personnel):

(1) _Mr. David Spenard_                    (3) _____

(2) _Ex. Weilun Lo_                        (4) _____

Date of interview: _8/14/95_

Type: ☒ Telephonic   ☐ Personal (copy is given to ☐ applicant ☐ applicant's representative).

Exhibit shown or demonstration conducted: ☐ Yes ☒ No.  If yes, brief description: _____

Agreement ☒ was reached with respect to some or all of the claims in question.  ☐ was not reached.

Claims discussed: _1, 7, 8, 9, and 11_

Identification of prior art discussed: _Art of record_

Description of the general nature of what was agreed to if an agreement was reached, or any other comments: _Agreement was reached that "variable force solenoid" is allowable and claim 1 would be more clearly defined by including such limitation which is in claim 7 C will be canceled and dependencies of claims 8 and 9 will be changed from 7 to 1._

(A fuller description, if necessary, and a copy of the amendments, if available, which the examiner agreed would render the claims allowable must be attached. Also, where no copy of the amendments which would render the claims allowable is available, a summary thereof must be attached.)

Unless the paragraph below have been checked to indicate to the contrary, A FORMAL WRITTEN RESPONSE TO THE LAST OFFICE ACTION IS NOT WAIVED AND MUST INCLUDE THE SUBSTANCE OF THE INTERVIEW (e.g., items 1–7 on the reverse side of this form). If a response to the last Office action has already been filed, then applicant is given one month from this interview date to provide a statement of the substance of the interview.

☒ It is not necessary for applicant to provide a separate record of the substance of the interview.

☒ Since the examiner's interview summary above (including any attachment) reflects a complete response to each of the objections, rejections and requirements that may be present in the last Office action, and since the claims are now allowable, this completed form is considered to fulfill the response requirements of the last Office action.

Examiner's Signature: _Weilun Lo_

PTOL-413 (REV. 1-84)

ORIGINAL FOR INSERTION IN RIGHT HAND FLAP OF FILE WRAPPER

BW 002362




UNITED STATES DEPARTMENT OF COMMERCE
Patent and Trademark Office
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED APPLICANT | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 08/056,635 | 05/03/93 | SIEMON | 34M1/0923 |

| | EXAMINER |
|---|---|
| L.O. W | |
| ART UNIT | PAPER NUMBER |
| 3402 | |

BORG-WARNER AUTOMOTIVE, INC.
PATENT DOCKET ADMINISTRATOR
6700 18-1/2 MILE ROAD
P. O. BOX 8022
STERLING HEIGHTS, MI 48311-8022

DATE MAILED: 08/23/95

## NOTICE OF ALLOWABILITY

PART I.
1. ☒ This communication is responsive to _the amendment filed 8/17/95_
2. ☒ All the claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice Of Allowance And Issue Fee Due or other appropriate communication will be sent in due course.
3. ☒ The allowed claims are _1-6, 8-11, and 13-15_
4. ☐ The drawings filed on _____ are acceptable.
5. ☐ Acknowledgment is made of the claim for priority under 35 U.S.C. 119. The certified copy has [_] been received. [_] not been received. [_] been filed in parent application Serial No. _____ filed on _____
6. ☐ Note the attached Examiner's Amendment.
7. ☒ Note the attached Examiner Interview Summary Record, PTOL-413.
8. ☐ Note the attached Examiner's Statement of Reasons for Allowance.
9. ☐ Note the attached NOTICE OF REFERENCES CITED, PTO-892.
10. ☐ Note the attached INFORMATION DISCLOSURE CITATION, PTO-1449.

PART II.
A SHORTENED STATUTORY PERIOD FOR RESPONSE to comply with the requirements noted below is set to EXPIRE THREE MONTHS FROM THE "DATE MAILED" indicated on this form. Failure to timely comply will result in the ABANDONMENT of this application. Extensions of time may be obtained under the provisions of 37 CFR 1.136(a).

1. ☐ Note the attached EXAMINER'S AMENDMENT or NOTICE OF INFORMAL APPLICATION, PTO-152, which discloses that the oath or declaration is deficient. A SUBSTITUTE OATH OR DECLARATION IS REQUIRED.
2. ☒ APPLICANT MUST MAKE THE DRAWING CHANGES INDICATED BELOW IN THE MANNER SET FORTH ON THE REVERSE SIDE OF THIS PAPER.
   a. ☒ Drawing informalities are indicated on the NOTICE RE PATENT DRAWINGS, PTO-948, attached hereto or to Paper No. _12_. CORRECTION IS REQUIRED.
   b. ☐ The proposed drawing correction filed on _____ has been approved by the examiner. CORRECTION IS REQUIRED.
   c. ☐ Approved drawing corrections are described by the examiner in the attached EXAMINER'S AMENDMENT. CORRECTION IS REQUIRED.
   d. ☒ Formal drawings are now REQUIRED.

Any response to this letter should include in the upper right-hand corner, the following information from the NOTICE OF ALLOWANCE AND ISSUE FEE DUE: ISSUE BATCH NUMBER, DATE OF THE NOTICE OF ALLOWANCE, AND SERIAL NUMBER.

Attachments:
☒ Examiner's Amendment
☒ Examiner Interview Summary Record, PTOL-413
– Reasons for Allowance
– Notice of References Cited, PTO-892
– Information Disclosure Citation, PTO-1449

– Notice of Informal Application, PTO-152
– Notice re Patent Drawings, PTO-948
– Listing of Bonded Draftsmen
– Other

WEILUN LO
PATENT EXAMINER
GROUP 3400

PTOL-37 (REV. 4-89) *

USCOMM-DC-89-3709

BW 002363



**UNITED STATES DEPARTMENT OF COMMERCE**
Patent and Trademark Office

Address: Box ISSUE FEE
COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

34M1/0823

BORG-WARNER AUTOMOTIVE. INC.
PATENT DOCKET ADMINISTRATOR
6700 18-1/2 MILE ROAD
P. O. BOX 9022
STERLING HEIGHTS, MI 48311-9022

☐ Note enclosed communication from the examiner

☐ This notice is issued in view of applicant's communication filed _____

**NOTICE OF ALLOWANCE
AND ISSUE FEE DUE**

| SERIES CODE/SERIAL NO. | FILING DATE | TOTAL CLAIMS | EXAMINER AND GROUP ART UNIT | | DATE MAILED |
|---|---|---|---|---|---|
| 08/056,675 | 05/03/93 | 019 | LO, H | 3403 | 09/23/95 |

First Named Applicant: STEMON, EDWARD C.

TITLE OF INVENTION
VCT CONTROL WITH A DIRECT ELECTROMECHANICAL ACTUATOR

| ATTY'S DOCKET NO. | CLASS-SUBCLASS | BATCH NO. | APPLN. TYPE | SMALL ENTITY | FEE DUE | DATE DUE |
|---|---|---|---|---|---|---|
| 3-92007 | 123-090,170 | O55 | UTILITY | NO | $1210.00 | 11/24/95 |

**THE APPLICATION IDENTIFIES ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED.**

**THE ISSUE FEE MUST BE PAID WITHIN THREE MONTHS FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. THIS STATUTORY PERIOD CANNOT BE EXTENDED.**

**HOW TO RESPOND TO THIS NOTICE:**

I. Review the SMALL ENTITY Status shown above.
If the SMALL ENTITY is shown as YES, verify your current SMALL ENTITY status:

  A. If the status is changed, pay twice the amount of the FEE DUE shown above and notify the patent and Trademark Office of the change in status, or
  B. If the Status is the same, pay the FEE DUE shown above.

If the SMALL ENTITY is shown as NO:
A. Pay FEE DUE shown above, or
B. File verified statement of Small Entity Status before, or with, pay of 1/2 the FEE DUE shown above.

II. Part B of this notice should be completed and returned to the Patent and Trademark Office (PTO) with your ISSUE FEE. Even if the ISSUE FEE has already been paid by charge to deposit account, Part B should be completed and returned. If you are charging the ISSUE FEE to your deposit account, Part C of this notice should also be completed and returned.

III. All communications regarding this application must give series code (or filing date), serial number and batch number. Please direct all communication prior to issuance to Box ISSUE FEE unless advised to contrary.

**IMPORTANT REMINDER: Patents issuing on applications filed on or after Dec. 12, 1980 may require payment of maintenance fees. It is patentee's responsibility to ensure timely payment of maintenance fees when due.**

PTOL-85 (REV. 12-93) (0651-0033)    4. PATENT AND TRADEMARK OFFICE COPY

BW 002364



I M... f CERTIFY THAT THIS CORRE.'OXDENCE .IS BEIN. .'OSITED WITH
THE UNITED STATES POSTAL SERVICE AS FIRST-CLASS MA... .'II AN ENVELOPE
ADDRESSED TO: COMMISSIONER OF PATENTS AND TRADEMARKS, WASHINGTON,
D.C. 20231 ON:

September 25, 1995
(DATE OF DEPOSIT)

*Vanda J. Lawrence*

September 25, 1995
(DATE OF SIGNATURE)

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| In re application of: | : | Group Art Unit: 3402 |
| | : | |
| EDWARD C. SIEMON, ET AL. | : | |
| | : | |
| Serial No. 08/056,635 | : | Examiner: W. Lo |
| | : | |
| Filed: May 3, 1993 | : | |
| | : | |
| For: VCT CONTROL WITH A | : | Attorney Dkt. 91016A |
|   DIRECT ELECTRO- | : | |
|   MECHANICAL ACTUATOR | : | |

### REPLY TO NOTICE OF DRAFTPERSON'S PATENT DRAWING REVIEW

Commissioner of Patents and Trademarks
Washington, D.C. 20231

Sir:

This paper is in reply to the required drawing corrections as stated in the Notice of Allowability (Paper No. 21) mailed on August 23, 1995.

Please find enclosed two sets of new formal drawings (Figures 1-20) in accordance with PTO Form 948 as attached to Paper No. 12. One copy may be used for the Official patent file and one may be used by the Drafting Branch Office.

Respectfully submitted,

David A. Spenard
Registration No. 37,449

WILLIAM BRINKS HOFER GILSON & LIONE
1130 Edison Plaza
Toledo, Ohio 43604-1537
(419) 244-6578
(419) 244-8862 (fax)

BW 002365



5497738

056636

FIG. I

BW 002366





FIG. 2



FIG. 6

BW 002367



FIG. 3

FIG. 5

BW 002368



FIG. 4

FIG. 9

BW 002369





| APPROVED | O.G. FIG. | |
|---|---|---|
| BY | CLASS | SUBCLASS |
| DRAFTSMAN | | |

FIG. 7



FIG. 8



FIG. 10

BW 002371



FIG. 11

BW 002372



FIG. 12

BW 002373



FIG. 13

BW 002374






FIG. 15

FIG. 16



FIG. 14



FIG. 17



FIG. 18



BW 002376



FIG. 19

BW 002377



FIG. 20

BW 002378

B

## PART B—ISSUE FEE TRANSMITTAL

*MAILING INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE. Blocks 2 through 6 should be completed where appropriate. All further correspondence including the issue Fee Receipt, the Patent, advance orders and notification of maintenance fees will be mailed to addressee entered in Block 1 unless you direct otherwise, by: (a) specifying a new correspondence address in Block 3 below; or (b) providing the PTO with a separate "FEE ADDRESS" for maintenance fee notifications with the payment of Issue Fee or thereafter. See reverse for Certificate of Mailing.*

| 1. CURRENT CORRESPONDENCE ADDRESS |
|---|
| 34M1/0823 |
| BORG-WARNER AUTOMOTIVE, INC. |
| PATENT DOCKET ADMINISTRATOR |
| 6700 18-1/2 MILE ROAD |
| P. O. BOX 8022 |
| STERLING HEIGHTS, MI 48311-8022 |

[stamp: NOV 21 1995 PAT & TRADEMARK OFFICE]

| 2. INVENTOR(S) ADDRESS CHANGE (Complete only if there is a change) |
|---|
| INVENTOR'S NAME |
| Street Address |
| City, State and ZIP Code |
| CO-INVENTOR'S NAME |
| Street Address |
| City, State and ZIP Code |
| ☐ Check if additional changes are on reverse side |

| SERIES CODE/SERIAL NO. | FILING DATE | TOTAL CLAIMS | EXAMINER AND GROUP ART UNIT | | DATE MAILED |
|---|---|---|---|---|---|
| 08/056,635 | 05/03/93 | 013 | LO, W | 3402 | 08/23/95 |

1st Named Applicant   SIEMON,   EDWARD G.

VCT CONTROL WITH A DIRECT ELECTROMECHANICAL ACTUATOR

| ATTY'S DOCKET NO. | CLASS-SUBCLASS | BATCH NO. | APPLN. TYPE | SMALL ENTITY | FEE DUE | DATE DUE |
|---|---|---|---|---|---|---|
| 007 | 123-090.170 | 055 | UTILITY | NO | $1250.00 | 11/24/95 |

30.00
$ 1,280.00

| 3. Correspondence address change (Complete only if there is a change) | 4. For printing on the patent front page, list the names of not more than 3 registered patent attorneys or agents OR, alternatively, the name of a firm having as a member a registered attorney or agent. If no name is listed, no name will be printed. | |
|---|---|---|
| | 1  William Brinks Hofer et al | |
| | 2  Greg Dziegielewski | |
| | 3  | |

DO NOT USE THIS SPACE

DBG0336  12/28/95  08056635        02-3182  120  142   $1250.00CH
DB00337  12/29/95  08056635        02-3182  120  561    30.00CH

| 5. ASSIGNMENT DATA TO BE PRINTED ON THE PATENT (print or type) | |
|---|---|
| (1) NAME OF ASSIGNEE | 6a. The following fees are enclosed: |
| Borg-Warner Automotive, Inc. | ☒ Issue Fee |
| (2) ADDRESS (CITY & STATE OR COUNTRY) | ☐ Advance Order - # of Copies ____ |
| Sterling Heights, Michigan | 6b. The following fees should be charged to: |
| | DEPOSIT ACCOUNT NUMBER ____ 02-3182 |
| A. ☐ This application is NOT assigned. | (ENCLOSE PART C) |
| B. ☒ Assignment previously submitted to the Patent and Trademark Office. | ☒ Issue Fee |
| ☐ Assignment is being submitted under separate cover. Assignments should be checked in See ASSIGNMENTS. | ☒ Advance Order - # of Copies ____ 10 |
| *PLEASE NOTE: Unless an assignee is identified in Block 5, no assignee data will appear on the patent. Inclusion of assignee data is only appropriate when an assignment has been previously submitted to the PTO or is being submitted under separate cover. Completion of this form is NOT a substitute for filing an assignment.* | ☒ Any Deficiencies in Enclosed Fees |
| | The COMMISSIONER OF PATENTS AND TRADEMARKS is requested to apply the Issue Fee to the application identified above. |
| | (Authorized Signature)                                      (Date) |
| | Greg Dziegielewski      11/17/95 |
| | Greg Dziegielewski - Reg. No.28,073 |
| | NOTE: The Issue Fee will not be accepted from anyone other than the applicant; a registered attorney or agent; or the assignee or other party in interest as shown by the records of the Patent and Trademark Office. |

*1. TRANSMIT THIS FORM WITH FEE-CERTIFICATE OF MAILING ON REVERSE*

PTOL-85B (REV.12-93)(0651-0033)

BW 002379

**Certificate of Mailing**

I hereby certify that this correspondence is being deposited with the United States Postal Service with sufficient postage as first class mail in an envelope addressed to:

Box ISSUE FEE
Commissioner of Patents and Trademarks
Washington, D.C. 20231

on _____November 17, 95_____
                        (Date)

                        Olive Carrick
(Name of person making deposit)

(Signature)                *Olive Carrick*

(Date)            November 17, 95

Note:  If this certificate of mailing is used, it can only be used to transmit the Issue Fee. This certificate cannot be used for any other accompanying papers. Each additional paper such as an assignment or formal drawing,  must have its own certificate of mailing.

Burden Hour Statement: This form is estimated to take .2 hours to complete.   Time will vary depending upon the needs of the individual case.  Any comments on the amount of time you are required to complete this form should be sent to the Office of Information Systems, Patent and Trademark Office, Washington, D.C. 20231; and to the Office of Information and Regulatory Affairs, Office of Management and Budget, (Project 0651-0033), Washington, D.C. 20503.  DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS.  SEND TO: Commissioner of Patents and Trademarks, Box Issue Fee, Washington, DC 20231.

REVERSE PTOL-85B (REV. 12-93)(0651-0033)

BW 002380



PTO UTILITY GRANT

Paper Number ___24

The Commissioner of Patents
and Trademarks

*Has received an application for a patent for a new and useful invention. The title and description of the invention are enclosed. The requirements of law have been complied with, and it has been determined that a patent on the invention shall be granted under the law.*

*Therefore, this*

United States Patent

*Grants to the person or persons having title to this patent the right to exclude others from making, using or selling the invention throughout the United States of America for the term of seventeen years from the date of this patent, subject to the payment of maintenance fees as provided by law.*

*Commissioner of Patents and Trademarks*

*Attest*

PTO-1584

(RIGHT INSIDE)



'I HEREBY CERTIFY THAT THIS CORRESPONDENCE IS BEING DEPOSITED WITH THE UNITED STATES POSTAL SERVICE AS FIRST CLASS MAIL IN AN ENVELOPE ADDRESSED TO: COMMISSIONER OF PATENTS AND TRADEMARKS, WASHINGTON, D.C. 20231 ON:

*May 30, 1996*
(DATE OF DEPOSIT)

*Dianne M. Dempsey*

*May 30, 1996*
(DATE OF SIGNATURE)

CofC
#25

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re application of:              :    Group Art Unit: 3402

EDWARD C. SIEMON, ET AL.          :

Patent No. 5,497,738              :    Examiner: W. Lo

Filed: May 3, 1993                :

For: VCT CONTROL WITH A           :    Attorney Dkt. 91016A
     DIRECT ELECTRO-
     MECHANICAL ACTUATOR          :

---

CERTIFICATE OF CORRECTION UNDER 37 C.F.R. §1.323

Commissioner of Patents and Trademarks
Washington, D.C. 20231

Sir:

Please correct the error(s) set forth on the attached two copies of the Certificate of Correction Form PTO 1050 (REV. 3-82), attributable to the Applicant. The appropriate fee of $100.00 according to 37 C.F.R. 1.20(a) may be charged to Deposit Account No. 02-3182.

APPROVED
AUG 1 6 1996
FOR THE COMMISSIONER OF PAT. & T.M.

Respectfully submitted,

David A. Spenard
Registration No. 37,149

WILLIAM BRINKS HOFER GILSON & LIONE
1130 Edison Plaza
Toledo, Ohio 43604-1537
(419) 244-6578
(419) 244-8862 (fax)

06/10/96  5497738    02-3182  080 145    100.00CH

BW 002382



# UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.    : 5,497,738

DATED    : March 12, 1996

INVENTOR(S) : Edward C. Siemon and Stanley B. Quinn, Jr.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

ON THE FRONT PAGE:

Under [*] Notice: "Jun. 15, 2010" should be --Sept. 3, 2012-- (Because of GATT, the parent's expiration date has been extended).

IN THE SPECIFICATION:

Column 1, line 42, delete "on".

IN THE CLAIMS:

Claim 10, line 28, after "crankshaft" insert a --,--;

Claim 10, line 29, after "housing" insert a --,--.

MAILING ADDRESS OF SENDER:
David A. Spenard
Brinks Hofer Gilson & Lione
1130 Edison Plaza
Toledo, Ohio   43604-1537

PATENT NO.   5,497,738

No. of add'l. copies
@ 30¢ per page

FORM PTO 1050 (REV. 2-82)

BW 002383



NOTICE RE: CERTIFICATES OF CORRECTION                    Paper No. 26

DATE    : 8/9/96

TO      : Supervisor, Art Unit _____ 342

SUBJECT : Certificate of Correction Request in Patent No. 5,497,738

A response to the following question(s) is requested with respect to the accompanying request for a certificate of correction.

☑ 1. Would the change(s) requested under 37 CFR 1.323 constitute new matter or require reexamination of the application?

☑ 2. Would the change(s) requested under 37 CFR 1.323 materially affect the scope or meaning of the claims allowed by the examiner in the patent?

☐ 3. Applicant disagrees with change(s) initialed and dated by Examiner in lieu of an Examiner's Amendment. Should the change request be granted?

☐ 4. With respect to the change(s) requested, correcting Office errors, should the patent read as shown in the certificate of correction?

☐ 5. If the amendment filed _____ had been considered by the Examiner, would the amendment have been entered?

*PLEASE RESPOND WITHIN 7 DAYS AND RETURN THE FILE TO ROOM 809, PK1*

_Mary F. Clapp_
Patent Assistant

---

TO: CERTIFICATES OF CORRECTION BRANCH                    DATE:

The decision regarding the change(s) requested in the certificate of correction is shown below.

1.  ☐ YES   ☑ NO    ☐ Comments below
2.  ☐ YES   ☑ NO    ☐ Comments below      **RUSH**
3.  ☐ YES   ☐ NO    ☐ Comments below
4.  ☐ YES   ☐ NO    ☐ Comments below      **RUSH**
    ☐ YES   ☐ NO    ☐ Comments below

For both 1 & 2
Comments _The requested changes do not constitute new matter_
_nor change the scope of the claims_   Ex. HY

HENRY YUEN
SUPERVISORY PATENT EXAMINER
GROUP 3400

Supervisor                                                    Art Unit  3402

PTOL-300 (REV. 10/87)                    U.S. DEPARTMENT OF COMMERCE Patent and Trademark Office

BW 002384

**PATENT APPLICATION FEE DETERMINATION RECORD**
Effective October 1, 1992

Application or Docket Number

08/056635

### CLAIMS AS FILED - PART I

| FOR | NUMBER FILED (Column 1) | NUMBER EXTRA (Column 2) | SMALL ENTITY RATE | FEE | OR OTHER THAN SMALL ENTITY RATE | FEE |
|---|---|---|---|---|---|---|
| BASIC FEE | | | | $355.00 | OR | $710.00 |
| TOTAL CLAIMS | 22 minus 20 = | 2 | x$11= | | OR x$22= | 44.00 |
| INDEPENDENT CLAIMS | 3 minus 3 = | — | x 37= | | OR x 74= | |
| MULTIPLE DEPENDENT CLAIM PRESENT | | | +115= | | OR +230= | |
| If the difference in column 1 is less than zero, enter "0" in column 2 | | | TOTAL | | OR TOTAL | 754.00 |

### CLAIMS AS AMENDED - PART II

| | CLAIMS REMAINING AFTER AMENDMENT (Column 1) | | HIGHEST NUMBER PREVIOUSLY PAID FOR (Column 2) | PRESENT EXTRA (Column 3) | SMALL ENTITY RATE | ADDITIONAL FEE | OR OTHER THAN SMALL ENTITY RATE | ADDITIONAL FEE |
|---|---|---|---|---|---|---|---|---|
| **AMENDMENT A** Total | 14 | Minus | ** 20 | - | x$11= | | OR x$22= | |
| Independent | 2 | Minus | *** 3 | - | x 37= | | OR x 74= | |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM | | | | | +115= | | OR +230= | |
| | | | | | TOTAL ADDIT. FEE | | OR TOTAL ADDIT. FEE | |

| | CLAIMS REMAINING AFTER AMENDMENT (Column 1) | | HIGHEST NUMBER PREVIOUSLY PAID FOR (Column 2) | PRESENT EXTRA (Column 3) | RATE | ADDITIONAL FEE | OR RATE | ADDITIONAL FEE |
|---|---|---|---|---|---|---|---|---|
| **AMENDMENT B** Total | | Minus | | | x$11= | | OR x$22= | |
| Independent | | Minus | | | x 74= | | OR x 74= | |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM | | | | | +230= | | OR +230= | |
| | | | | | TOTAL ADDIT. FEE | | OR TOTAL ADDIT. FEE | |



U.S. DEPARTMENT OF COMMERCE—PATENT & TRADEMARK OFFICE
PACE DATA ENTRY CODING SHEET

PTO 1355 (REV 1085)

| | | DATE 6-2-93 |
|---|---|---|
| 1ST EXAMINER | | |
| 2ND EXAMINER | | DATE 7-23-93 |

**APPLICATION NUMBER:** 056635

**TYPE APPL:** 1

**SMALL ENTITY?:** 0

**FILING DATE:** MONTH 05 DAY 03 YEAR 93

**FILING FEE:** 8 6 7

**FOREIGN LICENSE:** Y

**SPECIAL HANDLING:** 0

**GROUP ART UNIT:** 3 4 0 2

**ATTORNEY DOCKET NUMBER:** 9 2 0 8 7

**CLASS:** 1 2 3

**SHEETS OF DRAWING:** 0 1 3

**STATUS CODE:** 0 0 3

**CONTINUITY CODE:**

0
0
0
0
0

**TOTAL CLAIMS:** 0 2 2

**INDEPENDENT CLAIMS:** 0 0 3

**CONTINUITY DATA**

PARENT APPLICATION SERIAL NUMBER

PARENT PATENT NUMBER

PARENT FILING DATE: MONTH DAY YEAR

**PCT/FOREIGN APPLICATION DATA**

PCT/FOREIGN APPLICATION SERIAL NUMBER

FOREIGN FILING DATE: MONTH DAY YEAR

**FOREIGN PRIORITY CLAIMED**

**COUNTRY CODE**

ORIGINAL CLASSIFICATION

PATENT NUMBER

| CLASS | SUBCLASS |
|-------|----------|
| 123 | 90.17 |

APPLICATION SERIAL NUMBER

056,635.

CROSS REFERENCE(S)

| CLASS | SUBCLASS (ONE SUBCLASS PER BLOCK) | | | | | |
|-------|------|---|---|---|---|---|
| 123 | 90.31 | | | | | |
| 137 | 312 | | | | | |

APPLICANT'S NAME (PLEASE PRINT)

SIEMON et al.

IF REISSUE, ORIGINAL PATENT NUMBER

INTERNATIONAL CLASSIFICATION

| F | 0 | 1 | L | 1 / 34 |
|---|---|---|---|--------|
|   |   |   |   |        |

GROUP ART UNIT

3402

ASSISTANT EXAMINER (PLEASE STAMP OR PRINT FULL NAME)

PRIMARY EXAMINER (PLEASE STAMP OR PRINT FULL NAME)

WEILUN LO

PTO 270
(REV. 8-81)

ISSUE CLASSIFICATION SLIP

U.S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE

BW 002387

Staple Issue Slip Here

| POSITION | ID NO. | DATE |
|---|---|---|
| CLASSIFIER | 21 | 5/27/93 |
| EXAMINER | 8-356 | 6-2-93 |
| TYPIST | 15 | 7/29 |
| VERIFIER | 292 | -3.6-9 |
| CORPS CORR. | | |
| SPEC. HAND | | 7-23-93 |
| FILE MAINT. | TC | 6-3-93 |
| DRAFTING | | |

## INDEX OF CLAIMS

| Final | Original | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 1 | ✓ | ✓ | ✓ | | | | | |
| 2 | 2 | | | | | | | | |
| 3 | 3 | | | | | | | | |
| 4 | 4 | | | | | | | | |
| 5 | 5 | | | ✓ | | | | | |
| 6 | 6 | | | ✓ | | | | | |
| 7 | 7 | | | ↓ | | | | | |
| 8 | 8 | | | | | | | | |
| 9 | 9 | | | | | | | | |
| 9 | 10 | ✓ | ✓ | ✓ | | | | | |
| 10 | 11 | | | | | | | | |
| | 12 | | | | | | | | |
| 11 | 13 | ✓ | ✓ | ✓ | | | | | |
| 12 | 14 | ✓ | ✓ | ↓ | | | | | |
| 13 | 15 | ✓ | ✓ | ✓ | | | | | |
| | 16 | | | | | | | | |
| | 17 | | | | | | | | |
| | 18 | | | | | | | | |
| | 19 | | | | | | | | |
| | 20 | | | | | | | | |
| | 21 | | | | | | | | |
| | 22 | | | | | | | | |
| | 23 | | | | | | | | |
| | 24 | | | | | | | | |
| | 25 | | | | | | | | |
| | 26 | | | | | | | | |
| | 27 | | | | | | | | |
| | 28 | | | | | | | | |
| | 29 | | | | | | | | |
| | 30 | | | | | | | | |
| | 31 | | | | | | | | |
| | 32 | | | | | | | | |
| | 33 | | | | | | | | |
| | 34 | | | | | | | | |
| | 35 | | | | | | | | |
| | 36 | | | | | | | | |
| | 37 | | | | | | | | |
| | 38 | | | | | | | | |
| | 39 | | | | | | | | |
| | 40 | | | | | | | | |
| | 41 | | | | | | | | |
| | 42 | | | | | | | | |
| | 43 | | | | | | | | |
| | 44 | | | | | | | | |
| | 45 | | | | | | | | |
| | 46 | | | | | | | | |
| | 47 | | | | | | | | |
| | 48 | | | | | | | | |
| | 49 | | | | | | | | |
| | 50 | | | | | | | | |

**SYMBOLS**
- ✓ ......... Rejected
- = ......... Allowed
- – (Through numeral) Canceled
- + ......... Restricted
- N ......... Non-elected
- I ......... Interference
- A ......... Appeal
- O ......... Objected

| Final | Original | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 51 | | | | | | | |
| | 52 | | | | | | | |
| | 53 | | | | | | | |
| | 54 | | | | | | | |
| | 55 | | | | | | | |
| | 56 | | | | | | | |
| | 57 | | | | | | | |
| | 58 | | | | | | | |
| | 59 | | | | | | | |
| | 60 | | | | | | | |
| | 61 | | | | | | | |
| | 62 | | | | | | | |
| | 63 | | | | | | | |
| | 64 | | | | | | | |
| | 65 | | | | | | | |
| | 66 | | | | | | | |
| | 67 | | | | | | | |
| | 68 | | | | | | | |
| | 69 | | | | | | | |
| | 70 | | | | | | | |
| | 71 | | | | | | | |
| | 72 | | | | | | | |
| | 73 | | | | | | | |
| | 74 | | | | | | | |
| | 75 | | | | | | | |
| | 76 | | | | | | | |
| | 77 | | | | | | | |
| | 78 | | | | | | | |
| | 79 | | | | | | | |
| | 80 | | | | | | | |
| | 81 | | | | | | | |
| | 82 | | | | | | | |
| | 83 | | | | | | | |
| | 84 | | | | | | | |
| | 85 | | | | | | | |
| | 86 | | | | | | | |
| | 87 | | | | | | | |
| | 88 | | | | | | | |
| | 89 | | | | | | | |
| | 90 | | | | | | | |
| | 91 | | | | | | | |
| | 92 | | | | | | | |
| | 93 | | | | | | | |
| | 94 | | | | | | | |
| | 95 | | | | | | | |
| | 96 | | | | | | | |
| | 97 | | | | | | | |
| | 98 | | | | | | | |
| | 99 | | | | | | | |
| | 100 | | | | | | | |

(LEFT INSIDE)

BW 002388



| SEARCHED | | | |
|---|---|---|---|
| Class | Sub. | Date | Exmr. |
| 123 | 90, 15 | 9/22/93 | WL |
| | 90, 17 | | |
| | 90, 31 | | |
| 74 | 568R | | |
| 137 | 312 | | |
| | 625, 65 | | |
| 464 | 1 | | |
| | 2 | | |
| | 160 | | |
| update | | 12/21/93 | WL |
| update | | 11/28/94 | WL |
| update | | 8/14/95 | WL |

| SEARCH NOTES | | | |
|---|---|---|---|
| | | Date | Exmr. |
| Consulted Ex. Mikulsky of AU 3407 for a search in Cl. 137 | | 9/22/93 | WL |
| APS search (see attachment) | | 8/14/95 | WL |

| INTERFERENCE SEARCHED | | | |
|---|---|---|---|
| Class | Sub. | Date | Exmr. |
| all the above | | 8/14/95 | WL |

(RIGHT OUTSIDE)

BW 002389

# EXHIBIT 4

# EXHIBIT  REDACTED
# IN  ITS  ENTIRETY

# EXHIBIT 5

# EXHIBIT  REDACTED
# IN  ITS  ENTIRETY

# EXHIBIT 6

# EXHIBIT  REDACTED
# IN  ITS  ENTIRETY

# EXHIBIT 7

# EXHIBIT REDACTED
# IN ITS ENTIRETY

# EXHIBIT 8

# EXHIBIT  REDACTED
# IN  ITS  ENTIRETY

# EXHIBIT 9

# EXHIBIT  REDACTED
# IN  ITS  ENTIRETY

# EXHIBIT 10

# EXHIBIT REDACTED
# IN ITS ENTIRETY

# EXHIBIT 11

# EXHIBIT REDACTED IN ITS ENTIRETY