# EXHIBIT 1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES -- GENERAL

Case No.   SACV 03-1322-JVS(MLGx)                    Dated:  December 9, 2004

Title:   APPLIED MEDICAL RESOURCES CORP v. JOHNSON & JOHNSON, et al.

PRESENT:   HONORABLE JAMES V. SELNA, U.S. DISTRICT JUDGE

| Karla J. Tunis | Not Present |
|---|---|
| Courtroom Deputy | Court Reporter |

DOCKETED ON CM
DEC 1 4 2004
BY _____ 040

ATTORNEYS PRESENT FOR PLAINTIFFS:          ATTORNEYS PRESENT FOR DEFENDANTS:

Not Present                                                     Not Present

PROCEEDINGS:   **Order Re Markman Hearing**

Applied Medical Resources Corp. ("Applied") and Ethicon Endo-Surgery, Inc. ("EES") have submitted to the Court proposed claim constructions regarding certain language in United States Patent Numbers 5,271,380 (the "'380 Patent"), 5,431,151 (the "'151 Patent"), 6,007,481 (the "'481 Patent") (collectively, the "Riek Patents"), 5,741,298 (the "'298 Patent"), and 5,584,850 (the "'850 Patent"). The relevant claim language is construed by the Court in Section II, below.

I.     STANDARD

It is well settled that claim construction is "exclusively within the province of the court." Markman v. Westview Instruments, Inc., 517 U.S. 370, 372 (1996). Such construction "begins and ends" with the claim language itself, Interactive Gift Express, Inc. v. Compuserve, Inc., 256 F.3d 1323, 1331 (Fed. Cir. 2001), but extrinsic evidence may also be consulted "if needed to assist in determining the meaning or scope of technical terms in the claims." Pall Corp. v. Micron Separations, Inc., 66 F.3d 1211, 1216 (Fed. Cir. 1995). The Court's starting point in determining the meaning of the terms at issue in these Motions therefore is the intrinsic evidence: the claim language, specification, and prosecution history of the relevant patents.

In construing the claim language, the Court begins with a presumption that the words "have the meaning that a person of ordinary skill in the relevant art would ordinarily attribute to them." Novartis Pharms. Corp. v. Abbott Labs., 375 F.3d 1328, 1334 (Fed. Cir. 2004). The presumption may be rebutted, however, if (1) the patentee acts as his own lexicographer, or (2) the claim term is too vague for an accurate meaning to be ascertained from the language used. Id. All that is required for a patentee to act as his own lexicographer is that a different meaning is set out in the specification in a manner sufficient to provide notice of the meaning to a person of ordinary skill in the art. In re Paulsen, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

With these principles in mind, the Court now turns to the construction of the claim language at issue.

II.    DISCUSSION

A.    The '298 Patent

The '298 Patent, entitled "Method and Devices for Video-Assisted Surgical Techniques," was issued to Counterplaintiff Cathel Macleod on April 21, 1998. The device is intended to reduce the size and number of incisions required for surgery by providing a seal around the incision through which surgical instruments or a surgeon's hand may be inserted. ('298 Patent, col. 4, ll. 3-21.) The disputed claim language appears in Claims 1-6 and 12 of this patent.

1.    "Compliant Sealing Ring"

Claim 1 of the '298 Patent describes:

A device for sealing an incision made in a body wall having an exterior surface and an interior surface, said device comprising a complaint low-profile sealing ring and a sealing cap connectable to said sealing ring, and said sealing ring having an inner opening region, a first section connected to a second section, and third section connected to said second section, wherein said device is designed to be fitted into said incision such that said first section is in contact with said exterior surface surrounding said incision and said third section is in contact with said interior surface, wherein a thickness of said first section is designed to extend slightly above said exterior surface to as to minimize limitations on lateral movement within and below a level of said incision.

('298 Patent, col. 10, ll. 46-59.) The parties do not dispute what is meant by "Compliant"[1]; rather, they disagree about what must be compliant: the entire sealing ring, or only sections two and three of the sealing ring.

Each party's proposed claim construction of "Compliant Sealing Ring" is as follows:

|  | *EES's Proposed Construction* | *Applied's Proposed Construction* |
|---|---|---|
| "Compliant Sealing Ring" | A sealing ring that has flexible sections within and below the incision. (EES's Mem. re '298 Patent, p. 5.) | Each section of the sealing ring must be compliant. (Applied's Mem. re '298 Patent, pp. 7-13.) |

EES supports its narrower interpretation by arguing that the claim language does not specifically state that all three sections of the sealing ring must be compliant. (EES's Mem. re '298 Patent, p. 5.) Rather, EES directs the Court to the following language in Claim 12: ". . . said sealing ring having a first section of a <u>fixed shape</u> connected to a second section . . . ." (<u>Id.</u> at pp. 5-6, <u>citing</u> '298 Patent, col. 12, ll. 1-2) (emphasis added.) Since the parties have agreed that "fixed shape" means "not subject to a change in shape," EES contends that the first section of the sealing ring cannot be compliant. (EES's Mem. re '298 Patent, p. 6.)

Applied, on the other hand, challenges EES's position by relying on the plain language of the claims, as well as the patent's written description and prosecution history. (Applied's Mem. re '298 Patent, pp. 8-13.) These sources, Applied avers, compel the conclusion that each section of the sealing ring must be compliant. (<u>Id.</u>)

The Court, as it must, begins with the words of the claims themselves and affords them their ordinary and customary meanings. <u>Vitronics Corp. v. Conceptronic, Inc.,</u> 90 F.3d 1576, 1582 (Fed. Cir. 1996). The term "compliant sealing ring" is clear; there is no basis from this language to support the position advanced by EES and hold that only sections two and three of the sealing ring must be compliant. The Court notes, however, that the language of Claim 12 is at odds with this conclusion because that claim specifies that the first section of the sealing ring must be of a "fixed shape."

Claims cannot, however, be interpreted in a vacuum; they "must be read in view of the specification, of which they are a part." <u>Id.</u> Here, the specification can harmonize

---

[1]The parties agree that "Compliant" means "flexible or likely to yield." (Applied's Mem. re '298 Patent, p. 7; EES's Mem. re '298 Patent, p. 5.)

the apparent contradiction in the claim language. The written description of the '298 Patent states that, "In a particular embodiment of the invention, the sealing ring preferably is a <u>fixed, non-inflatable device that is sufficiently compliant</u> that it may be moved about without causing a significant loss of contact with the incision." ('298 Patent, col. 5, ll. 6-9) (emphasis added.) Thus, it is clear that the sealing ring can be, at the same time, both fixed (in shape) and compliant (i.e., flexible).[2] Therefore, the Court construes "compliant sealing ring" to mean that the entire sealing ring must be compliant.

Moreover, the requirement that the external portion of the sealing ring be able to accommodate a connectable sealing cap does not negate the ability of that layer to be compliant, as EES contends. To be sure, the portion around the connection may be rigid, at least when the cap is affixed, but that does not make the otherwise flexible portions of that layer rigid.

Reference to the prosecution history does not change this conclusion. The fact that McLeod distinguished the Cuschieri patent as "elastically-deformable balloon" does not negate a finding that the entire sealing ring must be compliant. (J.A. at B-67.) There is a difference between being compliant and being elastic, and that was what differentiated McLeod's invention.

Where, as in Claim 12, the claim language calls for a "sealing ring having a first section of a fixed shape," the Court finds that the shape of the first section must remain the same, notwithstanding the flexibility of the material used. This conclusion is bolstered by noting, as EES points out, that "at least some part of the first section of the sealing ring would have some rigidity in order to receive a sealing cap connectable to the device, as shown in one of the preferred embodiments." (EES's Mem. re '298 Patent, p. 6.)

2.    "Sealing Port" and "Sealing Ring"

The parties dispute whether the terms "sealing port" and "sealing ring" are used synonymously in the '298 Patent. Applied contends that the terms are used interchangeably; EES argues that "sealing port" should be construed to mean "the sealing ring, together with a sealing cap." (EES's Mem. re '298 Patent, p. 11.)

The term "sealing port" is not found anywhere in the specification or claims of the '298 Patent, other than in Claim 5, which states:

---

[2]For example, as Applied suggests, a rubber washer is both compliant and of a fixed shape. (Applied's Reply re '298 Patent, p. 3.)

> . . . inserting a compliant low-profile multi-function sealing
> port into a selected incision of said one or more incisions,
> wherein said multi-function sealing port isolates said selected incisions, and
> wherein said sealing port is of a thickness
> designed to extend slightly above a body surface surrounding
> said selected incision so as to minimize limitations on lateral movement
> within and below a level of said selected incision . . . .

('298 Patent, col. 11, ll. 4-11.)

EES contends that "[b]ecause the specification refers to 'cap port 100' in several instances, as distinguished from 'sealing ring 10,' Applied is incorrect in asserting that the '298 [P]atent uses the words 'ring' and 'port' interchangeably." (EES's Mem. re '298 Patent, p. 12.) EES's argument is misplaced. Applied does not assert that the words "port" and "ring" are used interchangeably; rather, it argues that the terms "sealing port" and "sealing ring" are synonymous. (Applied's Mem. re '298 Patent, p. 13.)

The Court also rejects EES's argument that the "sealing port" is the sealing ring together with the sealing cap. (EES's Reply re '298 Patent, p. 12.) EES correctly states that the "sealing port" in Claim 5 "contemplates that a surgeon can perform endoscopic surgery (among other procedures) through the port." (Id. at 11.) This, however, undermines EES's position that the "sealing port" is the sealing ring together with its cap, since it would be impossible to perform surgery through the port if the sealing cap is on.

The Court notes that patent claims must "particularly point[ ] out and distinctly claim[ ] the subject matter which the applicant regards as his invention." 35 U.S.C. § 112; Bancorp Services, LLC v. Hartford Life Ins. Co., 359 F.3d 1367, 1371 (Fed. Cir. 2004). The fact that the term is not described in the specification or elsewhere in the claims makes it susceptible to failure for indefiniteness. The Court finds, however, that the language of Claim 5 provides enough information that a person skilled in the art would understand what is claimed. Bancorp Services, 359 F.3d at 1371.

Claims 1 and 12 recite that a compliant sealing ring "is designed to be fitted into [an] incision," and that "a thickness of [a] first section is designed to extend slightly above [the incision] so as to minimize limitations on lateral movement within and below a level of said incision." ('298 Patent, col. 10, ll. 52-29, col. 12, ll. 5-12.) Similarly, Claim 5 states that a compliant sealing port is "insert[ed] . . . into a selected incision . . . wherein [the] sealing port is of a thickness designed to extend slightly above a body surface surrounding [the] incision so as to minimize limitations on lateral movement

within and below a level of [the] incision." (Id. at col. 11, ll. 1-11.) The Court finds that a person skilled in the art would understand that a "sealing port" performs the same function as a "sealing ring." Therefore, the Court construes the terms as synonyms.

    3.    "Low Profile"

In its opening brief, EES proposed that "low profile" should be construed to mean "the sealing ring has a small elevation above the body wall." (EES's Mem. re '298 Patent, p. 7.) Applied has accepted this construction (Applied's Reply re '298 Patent, p. 5) and the Court concurs that it is consistent with the patent's specification.[3]

    4.    "Sealing Ring"

Both parties agree that "sealing ring" should be construed to mean "a ring that seals." (EES's Mem. re '298 Patent, p. 7; Applied's Reply re '298 Patent, p. 5.) The Court agrees and adopts this construction.

    5.    "In Contact"

Each party's proposed construction of "in contact" is as follows:

|  | Applied's Proposed Claim Construction | EES's Proposed Claim Construction |
|---|---|---|
| "In Contact" | "The union or junction of surfaces." (Applied's Reply re '298 Patent, p. 6.) | "The referenced section and surface have to touch or press against one another." (EES's Mem. re '298 Patent, p. 8.) |

The Court adopts EES's construction, which is consistent with both the dictionary definition of the word "contact" and with the patent's specification. Webster's Third International Dictionary 490 (3d ed. 1993).

    6.    "Slightly Above"

Both parties agree that this term does not require construction. (EES's Mem. re

---

[3]The Court rejects EES's alternative construction, proposed for the first time in its Reply Brief. See Eberle v. Anaheim, 901 F.2d 814, 818 (9th Cir. 1990) (explaining that the Court does not need to consider arguments that are first raised in a reply brief).

'298 Patent, p. 9; Applied's Reply re '298 Patent, p. 6.)  The Court concurs and thus does not engage in construction of this term.

### 7.  "Connectable to"

EES argues that "connectable" should be construed to mean "may be optionally joined, fastened, or linked." (EES's Mem. re '298 Patent, p. 10.) The Court, however, agrees with Applied that this term is clear and does not require construction. See United States Surgical Corp. v. Ethicon, Inc., 103 F.3d 1554, 1568 (Fed. Cir. 1997).

### 8.  "Multi-function Sealing Port"

Each party's proposed construction of "multi-function" is as follows:

|  | Applied's Proposed Claim Construction | EES's Proposed Claim Construction |
|---|---|---|
| "Multi-function" | "A sealing port that performs more than one function." (Applied's Reply re '298 Patent, p. 10.) | "A sealing port which permits a surgeon the flexibility to perform tactile surgery, endoscopic surgery, or video-assisted surgery, all through the same incision, if desired." (EES's Mem. re '298 Patent, p. 13.) |

EES advances two arguments in support of its position: (1) it is based on the plain and ordinary meaning of the term "multi-function", and (2) Applied acted as its own lexicographer. (EES's Mem. re '298 Patent, p. 13.) Although these arguments are inconsistent with one another, the Court will address each in turn.

First, the Court rejects the idea that the plain and ordinary meaning of "multi-function" is, as EES contends: "permits a surgeon the flexibility to perform tactile surgery, endoscopic surgery, or video-assisted surgery, all through the same incision, if desired." This proposed construction is not based on a dictionary or any other plain meaning of the term.

Second, the Court finds that the Applicant did not act as his own lexicographer because the Applicant did not clearly attribute a different meaning to the term "multi-function." EES directs the Court to the following language in the '298 Patent

specification: "The present invention includes a multi-function port device that permits a surgeon the flexibility to perform textile surgery, endoscopic surgery, or video-assisted surgery, all through the same incision, if desired." ('298 Patent, col. 6, l. 66 - col. 7, l. 2.) The patent, however, also is clear that the "multi-functional access port [is used] for deploying a wide array of instruments and manipulation devices . . . ." (Id. at Abstract.) There is no basis to limit the function to those in EES's proposed construction.

The Court agrees with Applied that the plain and ordinary meaning of the term "multi-functional" is "performs more than one function." The language of the '298 Patent is consistent with this meaning, which compels the Court to conclude that Applied did not act as its own lexicographer. Texas Digital Sys. v. Telegenix, Inc., 308 F.3d 1193, 1204 (Fed. Cir. 2002) (explaining that a patentee acts as a lexicographer by clearly setting forth a definition of the term different from its ordinary meaning); Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1116-17 (Fed. Cir. 2004) (same).

B.    The '850 Patent

The '850 Patent, entitled "Trocar Having an Anti-Inversion Seal," was issued on December 17, 1996. The patent describes a trocar[4] with a novel seal design that prevents "inversion" when medical instruments are removed. The disputed claim terms are found in Claim 9, which states in relevant part:

> A trocar adapted to form a seal around a surgical instrument, the trocar comprising . . . portions of the proximal wall of the housing defining a hole sized and configured to receive the instrument into the working channel . . . .

('850 Patent, col. 8, l. 58 - col. 9, l. 7) (emphasis added).

1.    "Proximal Wall"

Both parties agree that the term "proximal wall" should be given its ordinary meaning. (Applied's Mem. re '850 Patent, p. 8; EES's Mem. re '850 Patent, p. 5). They disagree, however, as to what the correct meaning is. The parties' proposed constructions are as follows:

---

[4]A trocar is a "medical device that is used during minimally invasive surgery to provide an access channel into the body through which a surgeon may insert medical instruments." (Applied's Mem. re '850 Patent, p. 1.)

|  | *Applied's Proposed Claim Construction* | *EES's Proposed Claim Construction* |
|---|---|---|
| "Proximal Wall" | "The housing wall structure nearest to the surgeon during normal operation." (Applied's Mem. re '850 Patent, p. 8.) | "The external layer of structural material of the housing that is nearest the surgeon." (EES's Mem. re '850 Patent, p. 5.) |

The parties thus agree that "proximal" means "nearest the surgeon." The Court concurs with this construction, as it comports with the ordinary meaning of that word. The crux of the dispute, then, is whether the word "wall" must be construed. Applied takes the position that "wall" requires no definition; EES contends that it does.

The Court agrees with EES. While the word "wall" requires no definition in ordinary conversation, a "housing wall structure" is not so obvious that it "would be readily understood by a jury without any additional explanation." (Applied's Mem. re '850 Patent, p. 8) (citing U.S. Surgical Corp. v. Ethicon, Inc., 103 F.3d 1554, 1568 (Fed. Cir. 1997).) Therefore, the Court adopts EES's proposed construction, which is consistent with the drawings of the patent's preferred embodiment. (See, e.g., '850 Patent, figs. 1, 3, 8.)[5]

At oral argument, Applied urged the Court to delete the word "external" from EES's proposed construction. The Court declines to make this change. The word "external" is consistent with the dictionary definition of "proximal." (See Mace Declaration, Ex. A, p. 1828.) Applied's concern that "external layer" could be interpreted as some portion of the layer, say, measured in molecules or nanometers or even picometers, is eliminated by the reference to "structural material," which implies the entire first layer, a structure. Moreover, both parties indicated at oral argument that Applied's concern would be an improper interpretation.

> 2.    "Hole"

The parties also dispute the proper construction of the word "hole." Each party's proposed construction is as follows:

---

[5] The Court does not believe, as Applied asserts, that "external wall" requires further construction. (Applied's Reply re '850 Patent, p. 3.)

|  | *Applied's Proposed Claim Construction* | *EES's Proposed Claim Construction* |
|---|---|---|
| "Hole" | "An opening defined by the portions of the proximal wall. The hole has a depth determined by the thickness of the portions of the proximal wall which define the hole." (Applied's Mem. re '850 Patent, p. 9.) | "An opening through something." (EES's Mem. re '850 Patent, p. 7.) |

EES's proposed construction is based on the plain and ordinary meaning of the word "hole." (EES's Mem. re '850 Patent, p. 7.) Applied's construction, on the other hand, is based on what it perceives to be a dispute in this case: the location or depth of the hole. (Applied's Mem. re '850 Patent, p. 9.) It is improper for the Court to construe claims based on the potential implications for infringement analysis. Rather, the Court will construe claim terms in accord with their ordinary meaning. Vitronics, 90 F.3d at 1582. Therefore, the Court refuses to read Applied's proposed limitations into the claim and adopts EES's construction of "hole." See N. Telecom Ltd. v. Samsung Elecs. Co., 215 F.3d 1281, 1290 (Fed Cir. 2000).

3.    "Engaging"

Claim 9 of the '850 Patent includes the following language: "the spacer engaging the septum valve . . . ." ('850 Patent, col. 9, l. 9.) Each party's proposed construction of "engaging" is as follows:

|  | *Applied's Proposed Claim Construction* | *EES's Proposed Claim Construction* |
|---|---|---|
| "Engaging" | "Contacting the septum valve to establish a pivot edge." (Applied's Mem. re '850 Patent, p. 12.) | "Contacting" (EES's Reply re '850 Patent, p. 12.) |

Both parties thus agree that the plain and ordinary meaning of "engaging" is "contacting." The Court concurs. The dispute, then, is whether the additional limitation proposed by Applied should be read into the claim.

Applied supports its proposed construction by referring the Court to the patent's specification, which states: "In general, it is the purpose of the spacer or annular flange 52 to establish a <u>pivot edge</u> which appears as a point 92 in the axial plane of FIG. 3A." ('850 Patent, col. 7, ll. 30-32) (emphasis supplied by Applied.) The Court, however, will not read limitations that appear in the specification into the claims. <u>Liebel-Flarsheim Co v. Medrad, Inc.</u>, 358 F.3d 898, 904 (Fed. Cir. 2004); <u>Loctite Corp. v. Ultraseal Ltd.</u>, 781 F.3d 861, 867 (Fed. Cir. 1985). Since there was no pivot edge limitation in the claim language and no express disavowal of spacers without a pivot edge in the written description, the Court rejects Applied's proposed construction. Therefore, the Court construes "engaging" to mean "contacting."

C.    <u>The Riek Patents</u>

The Riek Patents describe various embodiments of trocars that may be inserted into the body. These trocars have hollow shafts ending in a transparent tip, which enables physicians to illuminate and view surrounding tissue as the instrument is inserted.

1.    The '380 Patent

The parties dispute two terms–"conical" and "pointed"–both of which are found in Claim 1 of the '380 Patent. That Claims states:

> An instrument for the direct penetration of body tissue comprising . . . a transparent, pointed conical window at the distal end of said shaft having an apex in advance of said hollow shaft . . . .

('380 Patent, col. 7, ll. 4-9.)

a.    "Conical"

Each party's proposed construction of "conical" is as follows:

|  | Applied's Proposed Claim Construction | EES's Proposed Claim Construction |
|---|---|---|
|  |  |  |

| "Conical" | "A surface traced by moving a straight line passing through a fixed vertex." (Applied's Mem. re Riek Patents, p. 10.) | "Resembling a cone." (EES's Mem. re Riek Patents, p. 4.) |
|---|---|---|

Applied challenges EES's proposed construction as "squarely at odds with the arguments made during prosecution of the '380 Patent." (Applied's Mem. re Riek Patents, p. 10.) This is because, Applied explains, the claim language was changed originally from "a conical, beveled, or tapered window" to "generally conical window," and finally to "pointed conical window." (Id.) Therefore, Applied contends, the '380 Patent was issued because of its narrow language; EES cannot now seek a broad interpretation of the term. (Id. at 10-11.)

The Court agrees. Ultimately, the fact that "general conical window" was rejected by the patent examiner estops EES from asserting its proposed construction. Springs Window Fashions LP v. Novo Indus., L.P., 323 F.3d 989, 995 (Fed. Cir. 2003). The public notice function of a patent and its prosecution history compels this conclusion. Id. If the Court accepted EES's construction, it "would undercut the public's reliance on a statement that was in the public record and upon which reasonable competitors formed their business strategies." Id. (quoting Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc., 222 F.3d 951, 957 (Fed. Cir. 2000).)

Therefore, the Court adopts Applied's proposed construction of "conical."[6]

b.    "Pointed"

Each party's proposed construction of "pointed" is as follows:

|  | *Applied's Proposed Claim Construction* | *EES's Proposed Claim Construction* |
|---|---|---|

---

[6]In light of the Federal Circuit's recent decision in On-Line Techs., Inc. v. Bodenseewerk, 386 F.3d 1133 (Fed. Cir. 2004), the Court recognizes that it is realistically impossible to limit the '380 Patent window to an exact geometrical cone. Id. at 1139. Indeed, unless the vertex is one atom, no object can be perfectly conical. Therefore, the Court's construction includes shapes that closely approximate cones. See id.

| "Pointed" | "tapers to or ends in an especially sharp apex, as distinguished from a rounded end." (Applied's Mem. re Riek Patents, p. 11.) | "having a narrowly rounded end." (EES's Mem. re Riek Patents, p. 4.) |
|---|---|---|

The parties' proposed constructions both are derived from the dictionary definition of "point." (Applied's Mem. re Riek Patents, p. 11; EES's Mem. re Riek Patents, p. 4.) Webster's Dictionary defines "point" as "the extreme terminal usu. sharp or narrowly rounded part of something . . . a usu. sharp, tapering, or otherwise narrowly converging end." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1749-50 (3d ed. 1993).

Reference to a dictionary–extrinsic evidence–in this instance, however, is inappropriate because the proper construction of "pointed" can be derived from the patent's intrinsic evidence. Vitronics, 90 F.3d at 1583. To be sure, the purpose of the instrument described in the '380 Patent is to penetrate body tissue. ('380 Patent, col. 1., ll. 4-5.) This obviates any construction that describes a blunt or otherwise rounded end that would prevent efficient penetration of the device. Moreover, the prosecution history of the '380 Patent bolsters this conclusion since the Applicants distinguished their invention from the prior art by arguing that a window with "such a sharp point" was not obvious. (J.A. at p. C-147.) Therefore, the Court rejects EES's proposed construction.

The Court, however, also rejects Applied's proposed construction insofar as it requires an "especially sharp" apex. The Court finds this language to be both vague and beyond what is compelled by the patent's intrinsic evidence. Accordingly, the Court construes "pointed" to mean "ends in a sharp apex, as distinguished from a rounded end."

    2. The '151 Patent

The '151 Patent was the second Riek Patent to issue, and is a continuation of the '380 Patent. Therefore, where identical terms are used in both patents, the Court will adopt its construction of the term as used in the '380 Patent and described above. Elkay Mfg. Co. v. Ebco Mfg. Co., 192 F.3d 973, 980 (Fed. Cir. 1999).

        a.    "Having an External Surface At or Within a Straight Line
              Extending From Said Apex to the Boundary of Said Base"

Each party's proposed construction of this term is as follows:

|  | Applied's Proposed Claim Construction | EES's Proposed Claim Construction |
|---|---|---|
| "Having an External Surface At or Within a Straight Line Extending From Said Apex to the Boundary of Said Base" | "No portion of the external surface of the window may extend beyond a surface defined a 'right circular cone' from the apex to the boundary of the base." (Applied's Mem. re Riek Patents, pp. 12-13.) | "Some portion of the external surface is within the straight line from the apex to the base." (EES's Mem. re Riek Patents, pp. 8-9.) |

As the foregoing proposed constructions indicate, the dispute is whether the entire external surface, or merely a portion of it, must be at or within a straight line from the apex to the base. EES focuses on the word "an" and argues that only "an external surface" must be at or within the line. (EES's Mem. re Riek Patents, p. 9.) To support this construction, EES directs the Court to various Federal Circuit decisions that construe "a" or "an" to mean "at least one" or "one or more." (Id.) Those cases are distinguishable because the patents at issue in the cases cited by EES were capable of having more than one object for the word "an" to modify. See KCJ Corp. v. Kinetic Concepts, Inc., 223 F.3d 1351 (Fed. Cir. 2000) (involving an air mattress that is capable of having one or more inflatable chambers); Abtox, Inc. v. Exitron Corp., 122 F.3d 1019 (Fed. Cir. 1997) (involving an apparatus to sterilize medical instruments that is capable of having one or more chambers); Elkay Mfg. Co., 192 F.3d 973 (involving adapters to bottled-water coolers that are capable of having one or more feed tubes or flow paths). Here, however, cones by definition only have one surface. Therefore, there cannot be more than one external surface to the conical window.

Further, the claim language does not require, as EES suggests, that only a portion of the external surface to be at or within a straight line extending from the apex to the base. Rather, the Court finds that a person skilled in the art would understand the disputed language to require all of the external surface to be at or within the line that extends from the apex to the base. Interactive Gift Express, 256 F.3d at 1332. Therefore, the Court construes the disputed language to mean "the external surface must be completely at or within a straight line extending from the apex to the boundary of the base."

b.    "Right Circular Cone"

Each party's proposed construction of "right circular cone" is as follows:

|  | Applied's Proposed Claim Construction | EES's Proposed Claim Construction |
| --- | --- | --- |
| "Right Circular Cone" | "A shape generated by the rotation of a right triangle about one of its legs as the axis." (Applied's Mem. re Riek Patents, p. 14.) | "A cone which has an apex positioned above the center of the base circle." (EES's Mem. re Riek Patents, p. 9.) |

Applied's proposed construction is a paraphrase of the dictionary definition of "right circular cone," which is: "A solid generated by the rotation of a right triangle about one of its legs as axis, the length of this leg being the altitude of the cone and the length of the hypotenuse of the right triangle its slant height." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 12 (3d. ed. 1981).

EES attempts to dismiss Applied's proposed construction as "Euclidean" because it is "unduly rigid." (EES's Mem. re Riek Patents, p. 10.) The Court disagrees. As opposed to the term "conical" used in the '380 Patent, the term "right circular cone" is not a vague, general term; rather, it is a specific geometric phrase that has a precise definition. The '151 Patent Applicants cannot escape the consequence of their own word choice. Int'l Rectifier Corp. v. IXYS Corp., 361 F.3d 1363, 1372 (Fed. Cir. 2004).

EES argues that Int'l Rectifier is distinguishable because the words "straight lines" were expressly included in dictionary definition of "polygon," and there was no intrinsic evidence to suggest that polygons could have non-straight sides. (EES's Reply re Riek Patents, p. 10.) Here, EES argues, there is nothing in the specification indicating that a cone or a right circular cone must have straight lines. (Id.) Therefore, EES continues, Int'l Rectifier is not controlling. (Id.) The Court is unpersuaded because EES merely has recognized a distinction without a difference. While there may be no mention of "straight lines" in the dictionary definition of right circular cone, there clearly is mention of a right triangle. As in Int'l Rectifier, there is nothing in the specification to suggest that right circular cones cannot be made by reference to a right triangle. Therefore, the Court finds that the facts of this case are similar to Int'l Rectifier and rejects EES's attempt to distinguish that case on this ground.

Finally, EES argues that in light of On-Line Techs., it would be impractical to limit the window to a perfect right circular cone. (EES's Mem. re Riek Patents, p. 10.) This argument is unavailing. The specification of the '151 Patent states that:

> Preferred is a right circular cone, because the said cone
> is the most simple to fabricate and produces the lowest
> optic distortion during observation.

('151 Patent, col. 3, ll. 19-21.) It follows that requiring a perfect right circular cone is not impractical. On the contrary, it should be "the most simple to fabricate."

The Court thus accepts Applied's proposed construction, as it comports with the definition of "right circular cone."

c.    "Sharply Tapering"

Each party's proposed construction of "sharply tapering" is as follows:

| | Applied's Proposed Claim Construction | EES's Proposed Claim Construction |
|---|---|---|
| "Sharply Tapering" | "Becoming gradually smaller towards a sharp point." (Applied's Mem. re Riek Patents, p. 14.) | "Becom[ing] smaller towards one end." (EES's Mem. re Riek Patents, p. 11.) |

The parties agree that "tapering" means "to become gradually smaller toward one end." (Applied's Mem. re Riek Patents, p. 14; EES's Mem. re Riek Patents, p. 11.) The dispute thus is how "sharply" modifies "tapering": EES argues that "sharply" refers to the rate of taper; Applied contends that "sharply" requires the window to taper towards a sharp end.

Applied argues that EES's proposed construction is an oxymoron because it would result in a "rapid, gradual diminution." (Applied's Mem. re Riek Patents, p. 15.) The Court has reviewed the intrinsic record and agrees that EES's proposed construction must be rejected. See Tex. Digital Sys. v. Telegenix, Inc., 308 F.3d 1193, 1204 (Fed. Cir. 2002). Specifically, the specification explains that "[b]ecause of its conical, beveled, or tapered form, the window is useful as a point, which effects both the penetration of the tissue and also the widening of the perforation opening." ('151 Patent, col. 3, ll. 14-17) (emphasis added.) The Court finds that this language clarifies that the window must come to a sharp point, and therefore is consistent with Applied's proposed construction. Moreover, the Court notes that this conclusion is bolstered by the prosecution history, in which the Applicants sought to distinguish the '151 Patent from prior art by arguing that its "sharp pointed tapering window" is sufficiently different from a "rounded-off end portion" claimed by Fourestier. (J.A. at E-170.)

Therefore, the Court concludes that "sharply" modifies "taper" to explain that the window must gradually come to a sharp point.

d.    "Generally Conical"

Each party's proposed construction of "generally conical" is as follows:

|  | Applied's Proposed Claim Construction | EES's Proposed Claim Construction |
|---|---|---|
| "Generally Conical" | "Having, approximately, a surface traced by a moving straight line passing through a fixed vertex." (Applied's Mem. re Riek Patents, p. 16.) | "A structure loosely resembling a cone." (EES's Mem. re Riek Patents, p. 11.) |

The Court rejects both proposed definitions because it finds that the plain, ordinary meaning of the phrase suffices. As explained *supra*, "conical" means "resembling a cone" or "anything shaped like a cone." In contrast to the '380 Patent, in which "generally conical" was specifically rejected and replaced by "pointed conical," the language of the '151 Patent is much more liberal. The Court thus construes the phrase "generally conical" to mean "generally resembling a cone."

e.    "Means Outwardly of Said Window and Extending to Adjacent to Said Distal End for Effecting the Advance of Said Instrument Into Body Tissue to Create or Expand an Artificial Access to a Body Cavity."

Although the disputed language includes the word "means," EES argues that it should not be construed as means-plus-function language pursuant to 35 U.S.C. § 112 ¶ 6 ("§ 112"). The Court's inquiry thus is twofold: (1) does § 112 apply, and, (2) if so, what is the proper construction of the disputed language?

i.    Application of § 112

Initially, the Court notes that there is a presumption that § 112 applies because the claim term uses the word "means." <u>CCS Fitness v. Brunswick Corp.</u>, 288 F.3d 1359, 1369 (Fed. Cir. 2002). This presumption may be rebutted, however, by demonstrating "sufficient structure, material, or acts within the claim itself to perform entirely the recited function . . . ." <u>Sage Prods. v. Devon Indus.</u>, 126 F.3d 1420, 1427-28 (Fed. Cir.

1997).

Here, EES argues that the claim recites the following structure "outwardly of said window and extending to adjacent to said distal end." (EES's Mem. re Riek Patents, p. 12.) This structure, EES contends, is sufficient "to call to mind a specific set of possible alternatives, such as wings or a wedge or a helical or spiral structure." (EES's Mem. re Riek Patents, p. 13.) Although EES is correct that the claim need not denote a specific structure, the Federal Circuit has explained that:

> What is important is whether the term is one that is understood to describe structure, as opposed to a term that is simply a nonce word or a verbal construct that is not recognized as the name of structure and is simply a substitute for the term "means for."

Lighting World, Inc. v. Birchwood Lighting, Inc., 382 F.3d 1354, 1360 (Fed. Cir. 2004).

Although EES's expert, Aaron Voegele, opines that the claim language calls to mind certain representative structures--for example, a wedge or wings, or a helical or spiral structure--the Court is unpersuaded. On the contrary, the Court finds that "outwardly of said window and extending to adjacent to said distal end" is not recognized as the name of structure and thus is insufficient to rebut the presumption that § 112 applies. See id.

        ii.    Claim Construction

Having found that the quoted claim language falls within the ambit of § 112, the Court now turns to the proper construction of the claim. This is a two-step analysis: the Court must (1) identify the claimed function, and (2) identify the structure in the written description necessary to perform that function. Micro Chemical, Inc. v. Great Plains Chemical Co., Inc., 194 F.3d 1250, 1258 (Fed. Cir. 1999).

The parties agree, and the Court concurs, that the recited function of the claim is "effecting the advance of said instrument into body tissue." (EES's Mem. re Riek Patents, p. 14; Applied's Mem. re Riek Patents, p. 16.)

Next, the Court turns to identifying the structure to perform the stated function. In doing so, the Court reviews each embodiment and notes that the "claim encompasses all structure in the specification corresponding to that element and equivalent structures." Micro Chemical, 194 F.3d at 1258. EES argues that the relevant structure

is "any of the segments of element 48 depicted in Fig. 7 or disclosed in Col. 6, ln. 45 -
Col. 7, ln. 13." (EES's Mem. re Riek Patents, p. 16.) Applied, however, contends that
this is too broad; EES must clearly associate a single segment of element 48 with the
function of effecting the advance of the instrument. (Applied's Reply re Riek Patents, p.
11.) The Court agrees. A segment of element 48 does not by itself perform the
function; it is merely a location, or a portion, of the structure. BBA Nonwovens
Simpsonville, Inc. Superior Nonwovens, LLC, 303 F.3d 1332, 1344 (Fed. Cir. 2002).
The Court must look to the entire structure performing the function. NOMOS Corp. v.
BrainLaw USA, Inc. 357 F.3d 1364, 1368 (Fed. Cir. 2004.) Therefore, the Court finds
that the relevant structure is element 48 as a whole, and not its constituent segments.

Finally, the Court must construe two disputed terms within the claim: outwardly
and adjacent.

(a)    "Outwardly of Said Window"

Applied argues that "outwardly" means "externally." (Applied's Mem. re Riek
Patents, pp. 17-18.) EES, on the other hand, contends that it means "towards the
outside." (EES's Reply re Riek Patents, p. 14.)

An examination of the intrinsic evidence compels the Court to adopt Applied's
proposed construction. EES concedes that any of the segments of element 48, which is
depicted in Figure 7 of the '151 Patent would accomplish the stated function of the
claim. (EES's Mem. re Riek Patents, p. 14.) The Court, after examining Figure 7, finds
that the relevant structure is located completely externally to the window, not merely
"towards the outside" as EES contends. Moreover, the specification recites that, "As
Figure 7 shows, the gripping element consists of a rotatable spiral 48, mounted
externally to the . . . window . . . ." ('151 Patent, col. 6, ll. 52-54) (emphasis added.)
Therefore, the Court construes "outwardly" to mean "externally."

(b)    "Extending to Adjacent to Said Distal End"

EES argues that "adjacent" should be given its ordinary meaning of "close to" or
"near" the distal end of the window (EES's Reply re Riek Patents, pp. 13-14.). Applied,
however, argues that the prosecution history precludes the Court from adopting the
ordinary meaning, and contends that the term be construed to mean "at least to the axial
border" of the distal end of the window. (Applied's Mem. re Riek Patents, p. 19.)

Both parties recognize that the Riek Patent applicants used the term "adjacent" to
distinguish the '151 from the prior art. Specifically, Fourestier's similar device had an
edge that extended more than half-way down the distal end of tip of the window. (See

J.A. at E-174; EES's Reply re Riek Patents, pp. 13-14; Applied's Mem re Riek Patents, p. 19.) The '151 Patent applicants argued during the prosecution, however, that Fourestier's device did not have an edge which extended "substantially to the distal end of the window." (J.A. at E-174) (emphasis added). As a result of this argument, the applicants received the current disputed claim, which requires the edge to extend "adjacent to the distal end." (EES's Reply re Riek Patents, p. 13.)

Based on this history, Applied argues that the ordinary meaning of "adjacent"–"close" or "near to"–must be rejected. The Court agrees. There are several dictionary definitions of "adjacent," including: to lie near, border on, and not distant or far off. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 11 (3d. ed. 1981). The Court must consider the prosecution history to determine which definition is the correct construction in this case. Novartis, 363 F.3d at 1310; Inverness Med. Switz. Gmbh v. Warner Lambert Co., 309 F.3d 1373, 1379 (Fed. Cir. 2002). The Court finds that "border on" goes too far and is inconsistent with the arguments made during the prosecution history. Therefore, Applied's proposed construction is rejected. The Court also finds, however, that EES's proposed construction is not precise enough to distinguish the '151 Patent from the prior art. The Court thus construes "adjacent" to mean "substantially near."

> f.    "Sharp"

The term "sharp" is used in Claims 1, 15, and 38 of the '151 Patent to modify the shape of the window. Each party's proposed construction of that term is as follows:

|  | *Applied's Proposed Claim Construction* | *EES's Proposed Claim Construction* |
|---|---|---|
| "Sharp" | "Terminating in a point [or edge], not smoothly obtuse or rounded." (Applied's Mem. re Riek Patents, p. 19.) | "A structure that has a narrowly converging end adapted to cutting or piercing." (EES's Mem. re Riek Patents, p. 14.) |

The Court is faced with the same issue as it confronted above: there are multiple dictionary definitions that apply to the term "sharp." The Court, as it must, has reviewed the specification and finds that EES's proposed definition is most accurate because it is clear that the objective of the window is to pierce body tissue. (See, e.g., '151 Patent, col. 3, ll. 14-17.) Therefore, the Court adopts EES's proposed construction of "sharp."

> g.    "Means for Effecting the Advance of Said Instrument

Comprising a Penetrating Element Having First and Second Surfaces Converging Substantially to a Line Lying Outwardly of Said Transparent Window."

EES argues that "means for effecting the advance" should not be subject to § 112 because it recites sufficient structure to perform the function. (EES's Mem. re Riek Patents, p. 15.) This argument is unavailing. Claim 23, from which the quoted language is derived, is dependent of Claim 12, which the Court already has concluded falls within the ambit of § 112.[7] EES cannot avoid this result and make an end-run around the statute merely by adding a dependent claim that recites structure. Laitrum Corp v. Rexnord, Inc., 939 F.3d 1533, 1538 (Fed. Cir. 1991). Therefore, the "means" clause is construed consistently with the Court's construction of Claim 12.

The parties do not dispute the remainder of the language in Claim 12, and the Court therefore does not construe it.

      h.   "Penetration Means Outwardly of Said Transparent Window Extending to Adjacent to the Distal End Thereof for Piercing Said Body Tissue to Create or Expand an Artificial Access to a Body Cavity."

EES contends that Claim 25 is not subject to § 112. (EES's Mem. re Riek Patents, p. 17.) As explained above, since the claim uses the word "means," the Court begins with a presumption that § 112 applies; however, that presumption may be rebutted if the claim recites sufficient structure.

Here, EES seeks to rebut the presumption by arguing that the following structure is sufficient: "penetration . . . outwardly of [the] window . . . extending to adjacent to the distal end . . . ." (Id.) EES likens the language in Claim 25 to other cases where the Federal Circuit has removed claims from the ambit of § 112. For example, in Envirco Corp v. Clestra Cleanroom, Inc., 209 F.3d 1360 (Fed. Cir. 2000), the Court found that the word "baffle" in "second baffle means disposed radially outward" was sufficient structure. Similarly, in Cole v. Kimberly-Clark Corp., 102 F.3d 524 (Fed. Cir. 1996), the Court held that "perforation" in "perforation means extending from the leg bank means to the waist band means" is not subject to § 112 because the claim describes "not only the structure . . . but also its location." Id. at 531. EES argues that the language of Claim 25 recites both structure and its location, and thus is analogous to Envirco and Cole. (EES's Mem. re Riek Patents, p. 18.)

---

[7]See Section II.C.2.e, supra.

The Court, however, agrees with Applied that the cases relied on by EES are distinguishable from the instant claim language. Specifically, in Envirco, the Court explained that a "baffle" is "a device (as a plate, wall or screen) to deflect, check, or regulate flow." Envirco, 209 F.3d at 1365. In Cole, the Court found that "perforation" means "a hole, or one of a number of holes, bored or punched through something, as those between individual postage stamps of a sheet to facilitate separation." Cole, 102 F.3d at 531. Thus, it is clear that in both cases the recited structure was a noun that would connote structure to someone skilled in the art.

Here, "penetration" is a function, not an object, and does not suggest any particular structure. Indeed, the dictionary definition of that word, "the act or process of penetrating," is devoid of any structural reference. The remainder of the Claim language, " outwardly of [the] window . . . extending to adjacent to the distal end . . ." merely describes location. Location without corresponding structure, however, is insufficient to rebut the presumption that § 112 applies. Therefore, the Court finds that Claim 25 falls within the purview of § 112.

As explained above, the Court's task when analyzing a claim subject to § 112 is to identify both the function and the corresponding structure identified in the specification. Here, the Court finds that the function is "piercing [the] body tissue." The Court agrees with the parties that the related structure for completing this function is the spiral 48. The location of the spiral is construed to be consistent with the Court's analysis discussed supra.[8]

Finally, the parties dispute whether the spiral 48 must rotate "relative to the window." EES contends that this requirement is not disclosed in the specification and thus should be rejected. (EES's Mem. re Riek Patents, p. 18.) Applied, however, directs the Court to the following specification language: "the spiral screw 48 is thus mounted rotatably on the conical window 34 and firmly held axially." (Applied's Reply re Riek Patents, p. 16 (quoting '151 Patent, col. 6, ll. 63-65).) The Court agrees with Applied that the spiral must rotate, but there is nothing in the specification to support the argument that it must rotate relative to the window. Therefore, the Court refuses to read in this additional limitation and finds that the spiral 48 merely must rotate.

i.    "Point Element"

The term "point element" is found in Claims 49 and 53, both of which recite a "point element . . . shaped to penetrate body tissue." ('151 Patent, col. 10, ll. 23-62.) Each party's proposed construction of "point element" is as follows:

---

[8]Specifically, the Court reiterates its constructions of "outwardly" and "adjacent."

| | *Applied's Proposed Claim Construction* | *EES's Proposed Claim Construction* |
|---|---|---|
| "Point Element" | "A terminal of the instrument shaped for traumatic piercing that has a sharp end." (Applied's Mem. re Riek Patents, p. 20.) | "A narrowly converging end." (EES's Mem. re Riek Patents, p. 18.) |

The crux of the parties' dispute is whether the point element must (1) be shaped for traumatic piercing, and/or (2) be sharp. The Court addresses each issue in turn.

The Court finds the following language from the '151 Patent specification particularly relevant in determining whether the point element must be shaped for traumatic piercing:

> The invention has as its object the provision of an instrument for the penetration of body tissue, the said instrument which reduces as much as possible the risk of damage to vessels, organs, and the like via improved optic control during insertion.

('151 Patent, col. 2, ll. 35-39.) EES argues that the foregoing language cuts against a shape for traumatic piercing; Applied, however, contends that the language supports its proposed construction. Specifically, Applied reasons that the "point element must be capable of traumatically piercing body parts as small as blood vessels, but such damage is prevented by optic control." (Applied's Reply re Riek Patents, p. 17) (emphasis in original). The Court rejects Applied's reasoning. Although, as Applied argues, the invention may be capable of traumatically piercing body parts, the specification is clear that the intent is "to reduce as much as possible the risk of damage." Therefore, it would be inconsistent with the specification to design the point element to be shaped for traumatic piercing when it is trauma that the device is meant to avoid.

In resolving the question of whether the point element must be sharp, the Court notes that Claim 52 states: "The instrument of claim 49, said point element being truncated." ('151 Patent, col. 10, ll. 46-47) (emphasis added.) As explained below, the Court construes "truncated" to mean "abbreviated by or as if by lopping." This construction precludes a finding that the point element is sharp since an apex cannot at the same time be both truncated and sharp.

At oral argument, Applied argued that the window 34 is one section of the point

12. Therefore, Applied continued, since the window 34 is sharp, then the point 12 must also be sharp. The Court rejects this argument. As already explained, the window must come to a narrowly converging end adapted to cutting or piercing; the point element, however, is truncated. These constructions are harmonized by construing the window as separate and distinct from the point element. As Fig. 2 of the '151 Patent illustrates, the window 34 lies external to a conical point. The Court finds that the point element 12 is the interior (tapered) cone, and does not include the exterior (sharp) window 34.

Therefore, the Court finds that the point element need not be shaped for a traumatic piercing nor must it end in a sharp point. The Court adopts EES's proposed construction as consistent with the dictionary definition of the term "point."

j.    "Converges"

Claim 49 states "said point element having a surface that converges to at least one real or virtual point." ('151 Patent, col. 10, ll. 30-31) (emphasis added.) Each party's proposed construction of "converges" is as follows:

|  | Applied's Proposed Claim Construction | EES's Proposed Claim Construction |
|---|---|---|
| "Converges" | "The surface of the point element tends toward a single point." (Applied's Mem. re Riek Patents, p. 22.) | "At least one surface of the point element must converge to a single point, real or virtual." (EES's Reply re Riek Patents, p. 19.) |

The Court rejects EES's proposed construction for two reasons. First, its proposed definition differs from what it originally proposed in its opening brief, which was identical to Applied's current proposed construction. (EES's Mem. re Riek Patents, p. 19.) The Court is not required to consider new arguments that are first raised in a reply brief. Eberle, 901 F.2d at 818. The Court is particularly disinclined to accept EES's new argument because Applied had changed their original position to conform with EES's proposed construction. (See EES's Reply re Riek Patents, p. 19.) It would be unfair to allow EES to change that position in its reply brief after Applied apparently has relied on it.

Second, even if the Court permitted EES's new position, it would fail because the point element, like the conical window, only has one surface. (See '151 Patent, fig. 4; col. 5, ll. 1-5 (describing "the surface of the point").) Therefore, the Federal Circuit cases that construe "a" and "an" to mean "at least one" or "one or more" are inapposite.

The Court thus adopts Applied's proposed construction.

      k.    "Virtual Point"

Although originally disputed, both parties have agreed that this term does not require construction. (EES's Mem. re Riek Patents, p. 20; Applied's Mem. re Riek Patents, p. 17.)

      l.    "Truncated"

Claim 52 states: ". . . said point element being truncated." Each party's proposed claim construction of "truncated" is as follows:

| | Applied's Proposed Claim Construction | EES's Proposed Claim Construction |
|---|---|---|
| "Truncated" | "The point element has its apex replaced by a plane section." (Applied's Mem. re Riek Patents, p. 22.) | "The apex is abbreviated by or as if by lopping." (EES's Mem. re Riek Patents, p. 20.) |

Both parties claim that their proposed construction is derived from the term's plain and ordinary meaning. Applied, however, further contends that its definition is supported by Figures 5 and 6 of the '151 Patent. The Court finds, however, that Figures 5 and 6 do not provide any more support to Applied's proposed construction than they do to EES's.

Confronted with two possible dictionary definitions, the Court turns to the patent's specification to find the correct construction. Novartis, 363 F.3d at 1310. Here, however, the Court finds nothing to support either proposed construction, other than Figures 5 and 6, which do not provide enough information for the Court to accept one definition over the other. In this circumstance, the Court will interpret the claim as broadly as is provided for in the patent itself. Goldenberg v. Cytogen, Inc., 373 F.3d 1158, 1164 (Fed. Cir. 2004). Since the Court finds nothing in the patent to justify Applied's narrower construction, the Court rejects it and adopts EES's proposed construction.

      m.    "Advancing Element"

Claim 53 of the '151 Patent states in relevant part that: "an advancing element at said point element to facilitate the advance of said point element, said advancing

element having first and second surfaces converging substantially to a line, said line lying <u>outwardly of and adjacent to</u> the distal end of said point element." ('151 Patent, col. 10, ll. 57-62) (emphasis added).

Applied has not proposed a construction of the term "advancing element" in either its opening or reply briefs. EES, however, proposes that the Court construe the term to mean "the advancing element must have two surfaces forming a line. This line lies outwardly of and relatively near the distal end of the point element." (EES's Mem. re Riek Patents, p. 21.) The Court rejects this construction because the Court already has construed "outwardly" and "adjacent." The language of this claim is to be read consistently with the Court's previous construction of those terms.

Therefore, the Court adopts the following construction: "The advancing element must have two surfaces forming a line. This line lies externally of and substantially near the distal end of the point element."[9]

n.    "Spiral"

Each party's proposed construction of "spiral" is as follows:

|  | Applied's Proposed Claim Construction | EES's Proposed Claim Construction |
|---|---|---|
| "Spiral" | "A three-dimensional curve (as a helix) with one or more turns about an axis." (Applied's Mem. re Riek Patents, p. 22.) | "A configuration that winds around a center or pole." (EES's Mem. re Riek Patents, p. 21.) |

Once again, each party has relied on a dictionary definition to support its construction. The Court has reviewed the patent specification and agrees with Applied that EES's proposed construction is too vague because it does not specify that the spiral must make at least one turn around the axis. It is clear from Figure 7 of the patent that the spiral must wind around the point many times in order to facilitate its function of "bor[ing] into the tissue like a corkscrew." ('151 Patent, fig. 7; col. 7, l. 6.) Therefore, the Court adopts Applied's proposed construction, which is consistent with the patent's specification.

---

[9]Lest there be any ambiguity, the Court reiterates its previous construction of "outwardly" and rejects EES's proposed construction of "toward the outside." (EES's Mem. re Riek Patents, p. 21.)

o.    "Substantially Symmetrical"

Claim 59 states in relevant part that: "said window having a surface configuration substantially symmetrical about the longitudinal axis thereof . . . ." ('151 Patent, col. 11, ll. 22-24) (emphasis added.) Each party's proposed construction of "substantially symmetrical" is as follows:

|  | Applied's Proposed Claim Construction | EES's Proposed Claim Construction |
|---|---|---|
| "Substantially Symmetrical" | "Dividing the window along any plane containing the longitudinal axis of the window, the surface configurations on both sides of the plane must have corresponding points whose connecting lines are perpendicularly bisected by the plane." (Applied's Mem. re Riek Patents, p. 23.) | "Exhibiting substantial correspondence in size and shape of parts." (EES's Mem. re Riek Patents, p. 22.) |

As both parties have mentioned in their briefs, there are multiple dictionary definitions for "symmetrical." After reviewing the intrinsic record, however, the Court is persuaded that Applied's proposed construction is correct.

EES's construction is overly broad. Given the precise claim language, "substantially symmetrical about the longitudinal axis," the Court finds that the patentees intended a specific geometric definition rather than the general construction proposed by EES. In such instances, the general-usage definition is usurped by the definition that would be understood by a person skilled in the art. Vanderlande Indus. Nederland BV v. ITC, 366 F.3d 1311, 1321 (Fed. Cir. 2004).

Therefore, the Court finds that Applied's proposed construction, which is in accord with the proper geometric definition that would be understood by a person skilled in the art, is correct. The Court notes, however, that "symmetrical" is modified by "substantially." Minor variations or imperfections thus are acceptable.

3.    The '481 Patent

The parties dispute only one term in this patent: "cutting edge." Their proposed constructions are as follows:

|  | Applied's Proposed Claim Construction | EES's Proposed Claim Construction |
|---|---|---|
| "Cutting Edge" | "A sharp edge that causes tissue stresses to be localized to or nearly to a line, creating a 'clean cut.'" (Applied's Mem. re Riek Patents, p. 24.) | "A sharp edge that severs, cuts, or divides." (EES's Mem. re Riek Patents, p. 24.) |

EES's proposed construction is based on the plain and ordinary meaning of "cutting." (EES's Mem. re Riek Patents, p. 24.) The plain and ordinary meaning will not be used, however, when the applicant acts as his own lexicographer by clearly setting forth a definition in the specification or prosecution history. CCS Fitness, 288 F.3d at 1366.

Applied contends that the patentees acted as a lexicographer by stating in the prosecution history that a "cutting edge" is "sharp enough to cause tissue 'stresses to be localized to or nearly to a line, creating a clean cut.'" (Applied's Reply re Riek Patents, p. 22 (quoting J.A. at D-155) (internal quotations deleted).) The Court has reviewed the language cited by Applied and finds that it is insufficient to put one of ordinary skill in the art on notice of the change from the ordinary meaning. Innova/Pure Water, Inc. v. Safari Water Filtration Sys., 381 F.3d 1111, 1117 (Fed. Cir. 2004). Specifically, the sentence cited by Applied states that "Sharp pointed ridges cause the stresses . . . ." The term "cutting edge" is not used in that sentence. Moreover, the paragraph that contains the sentence is explaining what one skilled in the art would be aware of when considering Auburn's patent, not the '481 Patent. (J.A. at D-155.) Therefore, the Court finds that the language cited by Applied is insufficient to alter the ordinary meaning of the term.

Nevertheless, the Court has reviewed the prosecution history and finds that the patentees did act as their own lexicographer with respect to "cutting edge." Specifically, in a declaration filed by John M. Collins to the Patent and Trademark Office, it was explained that "the wire 48 of Riek et al provides an edge which cuts through tissue when moved along tissue, and therefore is a cutting edge." (J.A. at D-153.) The Court finds this language unambiguous and therefore sufficient to put an ordinary person on notice as to the term's meaning. The parties, however, agree, and the Court concurs, that the edge must be sharp. (EES's Reply re Riek Patents, p. 23; Applied's Mem. re

Riek Patents, p. 24.) As EES concedes, this additional limitation is consistent with the prosecution history. (EES's Reply re Riek Patents, p. 23.)

Therefore, the Court construes "cutting edge" to mean "a sharp edge which cuts through tissue when moved along tissue."

## III.    CONCLUSION

The Court construes the disputed terms as follows:

| The '298 Patent | |
|---|---|
| **TERM** | **CONSTRUCTION** |
| "Compliant Sealing Ring" | Each section of the sealing ring must be compliant |
| "Sealing Ring" | A ring that seals. |
| "Sealing Port" | This is synonymous to "Sealing Ring." |
| "Low Profile" | A small elevation above the body wall. |
| "In Contact" | The referenced section and surface have to touch or press against one another. |
| "Multi-function" | Performs more than one function. |

| The '850 Patent | |
|---|---|
| **TERM** | **CONSTRUCTION** |
| "Proximal Wall" | "The external layer of structural material of the housing that is nearest the surgeon." |
| "Hole" | "an opening through something." |
| "Engaging" | "Contacting" |

| The '380 Patent | |
|---|---|
| **TERM** | **CONSTRUCTION** |
| "Conical" | A surface traced by moving a straight line passing through a fixed vertex. |

MINUTES FORM 90
CIVIL - GEN

**Page 29 of 31**

Initials of Deputy Clerk ___kit___



| "Pointed" | Ends in a sharp apex, as distinguished from a rounded end |
|---|---|

| The '151 Patent | |
|---|---|
| **TERM** | **CONSTRUCTION** |
| "Having an external surface at or within a straight line extending from said apex to the boundary of said base" | The external surface must be completely at or within a straight line extending from the apex to the boundary of the base. |
| "Right Circular Cone" | A shape generated by the rotation of a right triangle about one of its legs as the axis. |
| "Sharply Tapering" | Becoming gradually smaller towards a sharp point. |
| "Generally Conical" | Generally resembling a cone. |
| "Means outwardly of said window and extending to adjacent to said distal end for effecting the advance of said instrument into body tissue to create or expand an artificial access to a body cavity" | This claim is subject to 35 U.S.C. § 112 ¶ 6. The recited function is "effecting the advance of said instrument into body tissue." The structure to perform this function is element 48 as a whole, and not its constituent segments.<br><br>"Outwardly" means "externally"<br><br>"Adjacent" means "substantially near" |
| "Sharp" | A structure that has a narrowly converging end adapted to cutting or piercing |
| "Means for effecting the advance of said instrument comprising a penetrating element having first and second surfaces converging substantially to a line lying outwardly of said transparent window." | The recited structure does not remove the "means" claim from § 112. |

| "Penetration means outwardly of said transparent window extending to adjacent to the distal end thereof for piercing said body tissue to create or expand an artificial access to a body cavity." | This claim is subject to 35 U.S.C. § 112 ¶ 6. |
|---|---|
| "Point Element" | A narrowly converging end |
| "Converges" | The surface of the point element tends toward a single point. |
| "Truncated" | The apex is abbreviated by or as if by lopping. |
| "Advancing Element" | The advancing element must have two surfaces forming a line. This line lies externally of and substantially near the distal end of the point element. |
| "Spiral" | A three-dimensional curve (as a helix) with one or more turns about an axis. |
| "Substantially Symmetrical" | Diving the window along any plane containing the longitudinal axis of the window, the surface configurations on both sides of the plane must have corresponding points whose connecting lines are perpendicularly bisected by the plane. Minor variations or imperfections are acceptable. |

| The '481 Patent | |
|---|---|
| **TERM** | **CONSTRUCTION** |
| "Cutting Edge" | A sharp edge which cuts through tissue when moved along tissue. |