**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| HITACHI, LTD. and HITACHI AUTOMOTIVE PRODUCTS (USA), INC., | ) <br> ) <br> ) |
| Plaintiffs, | ) <br> ) |
| v. | ) <br> ) Civil Action No. 05-048-SLR |
| BORGWARNER INC. and BORGWARNER MORSE TEC INC., | ) <br> ) **PUBLIC VERSION** <br> ) |
| Defendants. | ) <br> ) |
| ———————————————————— | ) <br> ) |
| BORGWARNER INC., | ) <br> ) |
| Counterclaimant, | ) <br> ) |
| v. | ) <br> ) |
| HITACHI, LTD. and HITACHI AUTOMOTIVE PRODUCTS (USA), INC., | ) <br> ) <br> ) |
| Counterdefendants. | ) <br> ) |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' *DAUBERT*
MOTION TO EXCLUDE EXPERT TESTIMONY OF
LESLIE J. KASPER AND ROGER L. MAY ON ISSUE OF DAMAGES**

*OF COUNSEL:*

SIDLEY AUSTIN BROWN & WOOD, LLP
Hugh A. Abrams
Thomas D. Rein
Lisa Schneider
Marc A. Cavan
Lara V. Hirshfeld
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000
Date: December 14, 2006
Redacted Dated: December 21, 2006

Richard K. Herrmann (I.D. #405)
Mary B. Matterer (I.D. #2696)
Lewis H. Lazarus (I.D. #2374)
MORRIS JAMES LLP
500 Delaware Avenue
Suite 1500
Wilmington, DE 19801-1494
(302) 888-6800
mmatterer@morrisjames.com

*Attorneys for BorgWarner Inc. and
BorgWarner Morse TEC Inc.*

## TABLE OF CONTENTS

I.      STATEMENT OF NATURE AND STAGE OF PROCEEDINGS ....................................1

II.     SUMMARY OF ARGUMENT ..............................................................................................1

III.    STATEMENT OF FACTS ..................................................................................................2

        A.      Jarosz's Report ......................................................................................................3

        B.      May's Report ...........................................................................................................3

        C.      Kasper's Report ......................................................................................................4

IV.     ARGUMENT ........................................................................................................................4

        A.      The Standard for Admissibility of Expert Testimony...............................................4

        B.      The Testimony Of May And Kasper Should Be Excluded As Cumulative ............5

        C.      The Testimony Of May And Kasper Should Be Excluded Because It Is
                Merely Disguised Fact Testimony, Not Expert Testimony .....................................7

        D.      The Court Should Exclude May and Kasper's Testimony Because It Does
                Not Meet The Standards Governing Admissibility Of Expert Testimony ...........11

                1.      Qualifications ...............................................................................................11

                2.      Reliability......................................................................................................12

                3.      Fit ................................................................................................................19

        E.      The Court Should Exclude May and Kasper's Testimony On The
                Appropriate Royalty Base Because It Contradits The Law ...................................20

        F.      The Court Should Exclude Portions Of Jarosz's Testimony...................................22

V.      CONCLUSION...................................................................................................................23

## TABLE OF AUTHORITIES

### CASES

*Advanced Med. Optics, Inc. v. Alcon Labs., Inc.,*
No. Civ. A. 03-1095-KAJ, 2005 WL 3454283 (D. Del. Dec. 16, 2005) ...............20, 21

*Am. Tourmaline Fields v. Int'l Paper Co.,*
No. Civ. A. 3:96CV33630, 1999 WL 242690 (N.D. Tex. Apr. 19, 1999) .................13

*Chamberlain v. City of Albuquerque,*
No. Civ. 02-603 JB/ACT, 2005 WL 2313538, *9 (D.N.M. July 25, 2005) ...............22

*Crowley v. Chait,*
322 F. Supp. 2d 530 (D.N.J. 2004) .........................................................................8, 17

*Daubert v. Merrell Dow Pharms., Inc.,*
509 U.S. 579 (1993) .....................................................................................................5

*Elcock v. Kmart Corp.,*
223 F.3d 734 (3d Cir. 2000) .........................................................................................5

*EZ Dock, Inc. v. Schafer Sys., Inc.,*
No. Civ. 98-2364 (RHK/AJB), 2003 WL 1610781 (D. Minn. Mar. 8, 2003) ............22

*Georgia-Pacific Corp. v. United States Plywood Corp.,*
318 F. Supp. 1116 (S.D.N.Y. 1970), *modified and aff'd,*
446 F.2d 295 (2d Cir. 1971)..........................................................................3, 4, 7, 13

*Go Med. Indus. Pty, Ltd. v. Inmed Corp.,*
300 F. Supp. 2d 1297 (N.D. Ga. 2003), *aff'd,* -- F.3d --,
Nos. 05-1241, -1267, -1588, 2006 WL 3041853 (Fed. Cir. 2006) ..............................21

*Izumi Prods. Co. v. Koninklijke Philips Elects. N.V.,*
315 F. Supp. 2d 589 (D. Del. 2004), *aff'd,* 140 Fed. Appx. 236 (Fed. Cir.
2005) (on published opinion), *cert denied,* 126 S.Ct. 1772 (2006) ...............4, 5, 11, 12

*Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.,*
103 F. Supp. 2d 268 (S.D.N.Y. 2000)........................................................................21

*Kumho Tire Co., Ltd. v. Carmichael,*
526 U.S. 137 (1999)......................................................................................................5

*Minebea Co., Ltd. v. Papst,*
No. Civ. A. 97-0590 (PLF), 2005 WL 1459704 (D.D.C. June 21, 2005) .............13, 17

*In re Paoli R.R. Yard PCB Litig.*,
   35 F.3d 717 (3d Cir. 1994)..................................................................................12

*Phillips v. Gen. Motors Corp.*,
   No. Civ. A. 99-3423, 2000 WL 1285380 (E.D. La. Sept. 12, 2000) ..........................6

*R.J. Reynolds Tobacco Co. v. Premium Tobacco Stores, Inc.*,
   No. 99 C 1174, 2004 WL 1613563 (N.D. Ill. July 19, 2004) ....................................19

*Seatrax, Inc. v. Sonbeck Int'l, Inc.*,
   200 F.3d 358 (5th Cir. 2000) .................................................................................21

*Specht v. Jensen*,
   853 F.2d 805 (10th Cir. 1988) ...............................................................................21

*United States. v. Bilzerian*,
   926 F.2d 1285 (2d Cir. 1991).................................................................................20

*United States v. Stevens*,
   935 F.2d 1380 (3d Cir. 1991).................................................................................5

*Waldorf v. Shuta*,
   142 F.3d 601 (3d Cir. 1998)..................................................................................5

## RULES

Fed. R. Evid. 403 ..................................................................................................6

Fed. R. Evid. 702 ...................................................................................2, 4, 5, 11, 13

Fed. R. Evid. 703 ..................................................................................................14

BorgWarner Inc. and BorgWarner Morse Tec Inc. ("BorgWarner") hereby move to exclude certain expert testimony offered by plaintiffs/counterdefendants Hitachi, Ltd. and Hitachi Automotive Products (USA), Inc.'s (herein collectively "Hitachi"). Specifically, BorgWarner seeks to exclude, in whole or part, the proffered expert testimony of Roger L. May and Leslie J. Kasper with respect to the issue of damages, and more specifically their proffered testimony concerning the royalty rate and royalty base that should be used in calculating an award of damages in this case. Additionally, BorgWarner seeks to exclude the testimony of Hitachi expert John C. Jarosz to the extent it is founded on any of the excluded testimony of May or Kasper and/or on facts provided to Jarosz solely through Hitachi's counsel.

## I.      STATEMENT OF NATURE AND STAGE OF PROCEEDINGS

This case involves U.S. Patent No. 5,497,738 ("the '738 patent"), which relates to variable camshaft timing ("VCT") systems in automotive engines. BorgWarner asserts that claims 10 and 11 of the '738 patent are valid and infringed. Fact discovery and expert discovery are closed. The parties exchanged expert reports on September 9, 2006 and rebuttal reports on October 12, 2006. Opening and Responsive *Markman* briefs have been served. Motions for summary judgment on various issues have been filed by the parties and are currently pending. (*See* D.I. 270, 272, 274, 276, 278).

## II.     SUMMARY OF ARGUMENT

BorgWarner seeks to recover a reasonable royalty on the components sold by Hitachi that are used in infringing VCT systems. As damages cases go, this one is relatively straightforward. Notwithstanding that fact, Hitachi submitted three largely repetitive expert reports on the issue of damages – one from an expert (Jarosz) with extensive experience testifying on reasonable royalties in patent cases, and two from patent lawyers (May and Kasper) whose expertise is predicated on the fact that they formerly worked for companies in the

1

automobile industry where, to some degree, they participated in licensing negotiations. The Court should exclude the testimony of May and Kasper, and correspondingly limit the testimony of Jarosz, for several reasons.

- *First,* May's proposed testimony is cumulative of Kasper's (indeed their reports at times read as if they were written by the same person), and together their testimony on the royalty rate and royalty base are duplicative of Jarosz's testimony on the same subjects. In short, there is no reason Hitachi needs three "experts" to say, essentially, the same thing: that BorgWarner should be limited to a nominal royalty on a limited royalty base.

- *Second,* May and Kasper do not offer helpful "expert" testimony, but instead little more than fact testimony that takes the form of sweeping generalizations extrapolated from personal experience. This fact testimony was injected into the case far too late to permit BorgWarner any reasonable opportunity to test its veracity by seeking, for example, documents or testimony that might shed light on their former employers' licensing activities.

- *Third,* the proposed testimony of May and Kasper does not meet the minimal standards of admissibility imposed by Fed. R. Evid. 702 and judicial decisions applying the rule.

- *Fourth,* the testimony of May and Kasper as to what constitutes an appropriate royalty base in this case contradicts substantive law as to what is properly included in a royalty base.

- *Finally,* to the extent it excludes any portion of the testimony of attorneys May and Kasper, the Court should likewise exclude Jarosz from giving such testimony, thereby preventing Hitachi from end-running the exclusion of the patent attorneys' testimony.

## III.    STATEMENT OF FACTS

BorgWarner seeks a reasonable royalty on sales of components used in infringing VCT systems by Hitachi and its affiliates. On September 6, 2006, BorgWarner submitted the expert report of Cate Elsten. (*See* Expert Report of Cate M. Elsten (Ex. 7 to Declaration of Mary Matterer ("Matterer Decl.")). Applying several well-known methodologies commonly used in patent cases, Ms. Elsten performed various calculations and opined as to a reasonable royalty-based damages award. (*Id.* at pp. 23-46). Hitachi submitted reports from May, Kasper, and

2

Jarosz. All three offered opinions on the appropriate royalty rate and appropriate royalty base, and all three made reference to the *Georgia-Pacific* factors in the course of doing so.[1] May and Kasper also opined on the competence of an opinion prepared by another law firm, the Sughrue firm, and whether it was reasonable for Hitachi to have relied on it. (*See* Matterer Decl. Ex. 1 at ¶ 2; Matterer Decl. Ex. 2 at ¶ 2). This motion is directed solely at the reasonable royalty testimony.

### A.    Jarosz's Report

Jarosz is an economist who specializes in "IP valuation and monetary relief assessment." (Expert Report of John C. Jarosz (Matterer Decl. Ex. 8), at p. 3). His resume details a long history of testifying and publishing in the IP damages area. (*Id.* at Tab 1). Jarosz considered portions of the record in the case, including license agreements produced by the parties, (*id.* at Tab 2), discussed the *Georgia-Pacific* factors, and opined that a reasonable royalty in this case would be REDACTED (*Id.* at p. 65). Jarosz described his work in the case as an "economic-based analysis." (*Id.*).

### B.    May's Report

May is a patent lawyer who worked for nearly 30 years at Ford Motor Company or affiliates, representing Ford with respect to intellectual property matters. (Expert Report of Roger L. May (Matterer Decl. Ex. 2), at pp. 1-2). He retired from Ford in 2001 and has not provided expert testimony by deposition or at trial in the last four years on any subject. (May 12/7/06 Dep. Trans. (Matterer Decl. Ex. 3), at p. 8-10). Relying on his "experience in the automobile industry," (*id.* at p. 16), May considered portions of the record in the case, including

---

[1]    *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970), *modified and aff'd*, 446 F.2d 295 (2d Cir. 1971).

license agreements produced by the parties, discussed the *Georgia-Pacific* factors, and opined that a reasonable royalty in this case would be REDACTED REDACTED " (Matterer Decl. Ex. 2 at ¶ 16).  May testified that he is familiar with methodologies used in determining royalties, but that "his practice and approach" is "not to be wed to those methodologies." (Matterer Decl., Ex. 3 at p. 17).

### C.    Kasper's Report

Kasper is a patent lawyer who worked for over 30 years at Eaton Corporation, during which he was "involved in more than thirty patent and/or know-how license agreements," about half of which related to automotive products, of which "four or five, at least" related to engine technology.  (Expert Report of Leslie J. Kasper (Matterer Decl. Ex. 1), at ¶ 9; Kasper 12/15/06 Dep. Trans. (Matterer Decl. Ex. 4), at pp. 211-12).  Kasper has never testified as an expert witness on any subject. (Matterer Decl. Ex. 4 at p. 8).  Kasper considered portions of the record in the case, including license agreements produced by the parties, discussed the *Georgia-Pacific* factors, and opined that a reasonable royalty in this case REDACTED REDACTED (Matterer Decl. Ex. 1 at ¶ 16).  Kasper testified that "a lot of my methodology was my experience in looking at royalty rates for many, many years." (Matterer Decl. Ex. 4 at p. 34).

## IV.    ARGUMENT

### A.    The Standard for Admissibility of Expert Testimony

"Federal Rule of Evidence 702 governs the admissibility of expert testimony." *Izumi Prods. Co. v. Koninklijke Philips Elecs. N.V.*, 315 F. Supp. 2d 589, 600 (D. Del. 2004), *aff'd*, 140 Fed. Appx. 236 (Fed. Cir. 2005) (unpublished opinion), *cert. denied*, 126 S. Ct. 1772 (2006).  To be admissible, expert testimony must be based on "scientific, technical, or other

specialized knowledge [that] will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. "[T]he Third Circuit has construed Rule 702 as embodying 'three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit.'" *Izumi*, 315 F. Supp. 2d at 600 (*quoting Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000)). To qualify as an expert, a witness must have "specialized knowledge" in the form of practical experience, academic training, or other credentials. *Izumi*, 315 F. Supp. 2d at 600 (*quoting Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998) (internal citation and quotation marks omitted)). In order to satisfy the reliability requirement, an expert's opinion must be based upon sound methods and procedures, and not the expert's "subjective belief or unsupported speculation"; and "the expert must have 'good grounds' for his or her belief." *Id.* (internal citations and quotation marks omitted). Also, "Rule 702 requires that the expert testimony must fit the issues in the case. In other words, the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." *Id.* at 601. The Supreme Court has made clear that the district judge serves a gate keeping function to prevent the admissibility of expert opinion, whether scientific or otherwise, that does not meet these requirements. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591-92 (1993); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147-49 (1999).

**B.    The Testimony Of May And Kasper Should Be Excluded As Cumulative**

While the basic purpose of admitting expert testimony is to assist the trier of fact in understanding complex or unfamiliar subject matter, a party does not have *carte blanche* to transform a trial into a parade of experts who all say, essentially, the same thing. Expert testimony should be excluded if it is cumulative or if its presentation is needlessly time consuming. *See, e.g., United States v. Stevens*, 935 F.2d 1380, 1399 (3d Cir. 1991) (finding expert testimony properly excluded because its probative value was outweighed by concerns of

"undue delay, waste of time, or needless presentation of cumulative evidence") (internal citation and quotation marks omitted); Fed. R. Evid. 403. Where a party identifies one person qualified to opine on a given subject, allowing it to have two or three witnesses give essentially identical testimony serves no good purpose. Moreover, having multiple witnesses testify on the same subject prejudices the responding party to the extent jurors are inclined to place significance on the sheer number of witnesses a party calls to testify.

The Court should exercise its discretion to exclude the testimony of May and Kasper as to the appropriate royalty rate and royalty base, because that testimony is purely cumulative of Jarosz's testimony on the same subject. *See, e.g., Phillips v. Gen. Motors Corp.*, No. Civ. A. 99-3423, 2000 WL 1285380, at *3 (E.D. La. Sept. 12, 2000) (excluding portion of one of the party's expert reports because it was entirely duplicative of a portion of the party's other expert report). Much of the proposed testimony of May and Kasper is – both broadly and in certain particulars – cumulative of the other's testimony, and of portions of Jarosz's proposed testimony. For example:

- May, Kasper, and Jarosz each opine that BorgWarner's damages expert, Ms. Elsten, included too many VCT system components in the royalty base she used to calculate damages. (*Compare* Matterer Decl. Ex. 2 at ¶ 91 *with* Matterer Decl. Ex. 1 at ¶ 97 *and* Matterer Decl. Ex. 8 at p. 22). Each of the trio of Hitachi experts opines that only the actuator and solenoid components should be included in the royalty base. (*See* Matterer Decl. Ex. 2 at ¶ 89; Matterer Decl. Ex. 1 at ¶ 96; Matterer Decl. Ex. 8 at p. 28).

- May, Kasper, and Jarosz each opine that Ms. Elsten's proposed royalty rate is too high. (*See* Matterer Decl. Ex. 2 at ¶¶ 124-25; Matterer Decl. Ex. 1 at ¶ 134; Matterer Decl. Ex. 8 at pp. 31-39).



- May, Kasper, and Jarosz each purport to base their opinions, in part, on a review of license agreements entered into by the parties-in-suit. (*Compare* Matterer Decl. Ex. 2 at ¶¶ 35-79 *with* Matterer Decl. Ex. 1 at ¶¶ 53-91 *and* Matterer Decl. Ex. 8 at pp. 45-47).

- May, Kasper, and Jarosz each refer to the 15 *Georgia-Pacific* factors, and their discussion of the factors is largely repetitive and consistent. (*Compare* Matterer Decl. Ex. 2 at ¶¶ 94-122 *with* Matterer Decl. Ex. 1 at ¶¶ 107-29 *and* Matterer Decl. Ex. 8 at pp. 57-64).

- May, Kasper, and Jarosz each opine that, for purposes of determining a reasonable royalty in this case, BorgWarner and Hitachi should not be considered competitors. (*Compare* Matterer Decl. Ex. 2 at ¶¶ 80-86 *with* Matterer Decl. Ex. 1 at ¶ 112 *and* Matterer Decl. Ex. 8 at pp. 39-41).

- May and Kasper each opine that in license agreements under which know-how, trade secrets, or technical assistance are included along with patent rights, the value attributable to patents is significantly less than the value attributable to the others. (*Compare* Matterer Decl. Ex. 2 at ¶ 32 *with* Matterer Decl. Ex. 1 at ¶¶ 37, 39-43).

- May and Kasper each opine that a certain set of BorgWarner license agreements included royalties far exceeding the range May and Kasper propose for this case because, *inter alia,*  . (*Compare* Matterer Decl. Ex. 2 at ¶¶ 50, 57 *with* Matterer Decl. Ex. 1 at ¶¶ 80, 89).

In summary, the May and Kasper reports are essentially two-of-a-kind, and Jarosz provides opinions on the reasonable royalty issue. Hitachi apparently believes a parade of experts vouching for one another at trial will maximize its chances of success, but it should be limited to having one expert per issue.

### C.  The Testimony Of May And Kasper Should Be Excluded Because It Is Merely Disguised Fact Testimony, Not Expert Testimony

Hitachi may contend that May and Kasper's testimony is not cumulative of Jarosz's testimony because the testimony of the patent experts is "experience-based" and Jarosz's testimony is "economics-based." (Matterer Decl. Ex. 8 at p. 65). But this simply underscores yet another reason why May and Kasper's testimony should be excluded. Testimony about their experiences at Ford and Eaton is, in essence, fact testimony. For example, May supports his criticism of Elsten's royalty rate testimony by saying,

(Matterer Decl. Ex. 2

at ¶ 125). Speaking of his experience at Eaton, Kasper stated

REDACTED

(Matterer Decl. Ex. 1 at ¶ 135). The intended import of statements like these is to leave the jury with the impression that no automotive industry royalty could *ever* approach the 5% level, because these 30-year industry veterans say *they* have not seen one at that level. But neither May nor Kasper points to any industry-wide publication, study, survey, or analysis that would justify extrapolation of their personal experiences to an entire industry. And BorgWarner has no access to the licensing files of Ford and Eaton, and therefore no way to test the accuracy of the sweeping statements made by these patent attorneys – particularly because their reliance on their experience at Ford and Eaton was not disclosed until after the conclusion of fact discovery. By couching their opinions in terms of their experience, without the ability to grant BorgWarner access to any of the documents underlying that experience, May and Kasper can say just about whatever they want to say, safe in the knowledge that they are insulated from scrutiny. That is simply unfair to BorgWarner and would be highly prejudicial.

Additionally, as one court explained, "an expert may not be used simply as a vehicle for the admission into evidence of otherwise inadmissible hearsay testimony." *Crowley v. Chait*, 322 F. Supp. 2d 530, 553 (D.N.J. 2004) (citing case). In this case, Hitachi clearly sets out to use these patent attorneys to testify to facts not disclosed during discovery and which cannot be tested or verified at this late date. And even May and Kasper lack personal knowledge of many of these supposed "facts."

For example, in his report, May stated that he did not consider BorgWarner to be a competitor of Hitachi's for the sale of VCT systems (a fact, if true, that would tend to have a downward impact on royalties),

REDACTED

. (Matterer Decl. Ex. 2 at ¶ 81; Matterer Decl. Ex. 3 at p. 115).

REDACTED

(Matterer Decl. Ex. 3 at p. 116).[2]

REDACTED

(*Id.* at pp. 113-18).

REDACTED

REDACTED

(Matterer Decl. Ex. 2 at ¶ 80) (emphasis added). But this statement again is based entirely on hearsay.

REDACTED

(Matterer Decl. Ex. 3 at pp. 110-11),

REDACTED

(*Id.* at p. 118).

REDACTED

---

[2] Stock was not mentioned by name or otherwise in May's report. He only mentioned Stock when asked at his deposition about the basis for certain statements made in the report. (Matterer Decl. Ex. 3 at pp. 115-16).

REDACTED

*(See id.* at pp.

110-19; Matterer Decl. Ex. 2 at ¶ 80).



In a further attempt to bolster his testimony that BorgWarner and Hitachi were not "truly competitors" (Matterer Decl. Ex. 2 at Heading IX), May attempts to downplay the fact that BorgWarner and Hitachi apparently *were* at some point competing against one another to supply a VCT system to Ford. May wrote: "Based on my experience in dealing with Ford purchasing, it is possible that ... Ford may have been using the BorgWarner price as leverage to force Hitachi into price reductions." (*Id.* at ¶ 82). At his deposition, however, May all but admitted he was speculating (in his words, "making a[n] estimate of what I think might have happened") (Matterer Decl. Ex. 3 at pp. 119-20), and admitted that he did not know who in Ford's purchasing department had interacted with Hitachi, and that he had not "spoken to anyone at Ford purchasing" concerning the subject of his statement. (*Id.* at p. 120).

Kasper, too, presents inadmissible factual evidence that he camouflages as expert opinion. For instance, Kasper opines that "a royalty rate or amount which represents about 15-20% of anticipated profit of the licensed product would be considered a maximum to which the licensee would willingly agree." (Matterer Decl. Ex. 1 at ¶ 124). However, Kasper admitted in his deposition that this conclusion was based solely on his experience, and more specifically premised upon the supposed fact that Eaton's typical royalty rate was 10 to 15 percent of anticipated profit. (Matterer Decl. Ex. 4 at pp. 205-8). For example, Kasper stated that this rule was "just an estimate based on experience." (*Id.* at 204). Kasper conceded that this conclusion

does not find support in any publications since "companies tend to be fairly secretive about things like profitability levels." (*Id.* at p. 209). And when Kasper was asked how he could be "comfortable suggesting that 15 to 20 percent is an appropriate benchmark," he responded "it's a general observation." (*Id.* at pp. 209-10).

Opinions founded on speculation or on unarticulated "experience" are not back doors through which evidence gets admitted in a case. As "gate keeper," the Court should exclude the testimony of May and Kasper to prevent Hitachi from using expert testimony as a vehicle for injecting inadmissible fact testimony into the case.

### D. The Court Should Exclude May and Kasper's Testimony Because It Does Not Meet The Standards Governing Admissibility Of Expert Testimony

Even if the Court does not exclude May and Kasper's testimony for the reasons cited above, it should exclude the testimony for Hitachi's failure to meet the requirements of admissibility under Fed. R. Evid. 702. As noted above, the Court must consider the qualifications of the experts, the reliability of the proffered testimony, and its "fit" in this case. *Izumi Prods. Co.*, 315 F. Supp. 2d at 600 (internal citation and quotation marks omitted).

#### 1. Qualifications

Neither May nor Kasper claim to be an expert on accounting or financial subjects. (Matterer Decl. Ex. 3 at p. 29; Matterer Decl. Ex. 4 at p. 43), and, unlike Jarosz and Elsten, neither made any attempt to apply standard economics-based quantitative methodologies in reaching his conclusions.[3] May and Kasper are being positioned as "industry experts" on licensing. While May and Kasper could offer a perspective on licensing based on their personal experiences, that does not qualify them – without more – to make sweeping statements about

---

[3] Elsten and Jarosz essentially agree on the quantitative methodologies that are appropriate for valuing patent rights in litigation – and each used or considered using the same in this case. (*See* Matterer Decl. Ex. 7 at pp. 23, 30-35; Matterer Decl. Ex. 8 at pp. 51-57).

industry licensing practice.   At best, May and Kasper can claim some personal knowledge of how Ford and Eaton approached licensing and the rates those companies have paid and commanded historically.   But neither May nor Kasper in his report suggests any basis from which the Court can conclude that their experiences at Ford and Eaton can be extrapolated and treated as reflecting industry norms.   Indeed, as someone who worked for Ford – an OEM at the top of the automotive industry pecking order – May represented a client who enjoyed maximum bargaining power.   (*See* Matterer Decl. Ex. 2 at ¶¶ 23-24).   Kasper, for his part, worked on an automotive engine-related licensing deal "four or five" times in 33 years (Matterer Decl. Ex. 4 at pp. 211-12) – a frequency that does not lead to the conclusion that he can speak authoritatively to the practices of an entire multi-tiered industry of OEMs and suppliers or even to the practices of Eaton.

## 2.    Reliability

Expert testimony must be reliable to be admitted.   "An expert's opinion is reliable if it is 'based on the "methods and procedures of science" rather than on "subjective belief or unsupported speculation."'"  *Izumi*, 315 F. Supp. 2d at 600 (internal citations omitted).   Much of the case law on "reliability" relates to efforts to scrutinize the methodology employed by experts in some scientific or technical field.[4]  May and Kasper are not scientific or technical experts – they are proffered as "experts" solely by virtue of having worked as attorneys for Ford and Eaton

---

[4] To that end, Courts consider the following non-exhaustive list of factors in determining whether the method used in arriving at proposed expert testimony is reliable or not: "(1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put."  *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 n.8 (3d Cir. 1994).

for many years, and having engaged at some level in patent licensing negotiations. (*See, e.g.,* Matterer Decl. Ex. 2 at ¶¶ 7, 9-10; Matterer Decl. Ex. 1 at ¶¶ 7-9).

Non-technical expert testimony, too, must be reliable. *Am. Tourmaline Fields v. Int'l Paper Co.*, No. Civ. A. 3:96CV33630, 1999 WL 242690, at *3 (N.D. Tex. Apr. 19, 1999) ("It is unquestionable that the *Daubert* analysis applies to *all* expert testimony, whether based on scientific knowledge or on experience, training, or other specialized knowledge.") (citing cases). In *Minebea Co., Ltd. v. Papst*, No. Civ. A. 97-0590 (PLF), 2005 WL 1459704 (D.D.C. June 21, 2005), the Court cited reliability concerns in excluding the testimony of "a patent lawyer with extensive experience in patent disputes and patent licensing" who was proffered to testify on "the calculation of a reasonable royalty" based on "his experience and by applying" the *Georgia-Pacific* factors. *Id.,* at *3. The court then went on to exclude the lawyer's testimony because "it is unclear what facts or data he has relied upon and his methodology is unreliable." *Id.* The court also noted that the patent lawyer/expert (1) did not offer any mathematical computations leading to his proposed royalty rate; (2) did not compare lump sum license payments to running royalty rates; (3) did not take into account market conditions in his analysis; and (4) did "not do a detailed per patent analysis for each license agreement he considered." *Id.* For the cited reasons, the court found the "proposed testimony to be too speculative to satisfy the reliability threshold of Rule 702 since such testimony would invite conjecture and confusion rather than assist the jury in determining a reasonable royalty rate." *Id.*

Some of the same specific observations can be made regarding May and Kasper's proffered testimony. Judging from their reports, May and Kasper did not offer mathematical computations leading to their proposed royalty rates (*see* Matterer Decl. Ex. 1 at *passim*; Matterer Decl. Ex. 2 at *passim*) and did not do a detailed analysis of the patents involved in each

license they considered (*see* Matterer Decl. Ex. 1 at pp. 17-30; Matterer Decl. Ex. 2 at pp. 10-24).[5] More fundamentally, "it [was] unclear what facts or data" May and Kasper relied on, but, as explained before, it is clear that they *did not* consider or investigate various "facts," thereby undermining the reliability of their opinions.

In many instances, May and Kasper make general or specific statements based on their memories and nothing more, leaving BorgWarner with no plausible way to "test" these statements by examining the facts underlying those statements. For example:

- In his report, May cited certain specific license agreements he'd worked on at Ford relating to  (Matterer Decl. Ex. 2 at ¶¶ 28-30). But May admitted he made no attempt to secure copies of the referenced license agreements, that such agreements are confidential, that he did not know which patents were licensed under those agreements, that his testimony was based entirely on his memory of the terms of those licenses, and that he did not know how BorgWarner could go about testing whether his memory was correct. (Matterer Decl. Ex. 3 at pp. 129-30).

- In his report, May stated that "[i]t is widely recognized that the value attributable to patents is very often significantly less than that ascribed to the trade secrets, technical information, know-how and technical assistance." (Matterer Decl. Ex. 2 at ¶ 32).

REDACTED

---

[5] Moreover, the May and Kasper reports do not reveal any extensive consideration of market conditions in relation to the licenses reviewed (*see, e.g.,* Matterer Decl. Ex. 1 at pp. 17-30; Matterer Decl. Ex. 2 at pp. 10-24). With respect to license agreements containing lump sum payment provisions, there is no indication in May or Kasper's reports that these lump sum payments were (or could have been) converted to running royalty rates for purposes of comparative analysis. (Matterer Decl. Ex. 1 at ¶¶ 61-64, 67, 74 and 77; Matterer Decl. Ex. 2 at ¶¶ 47-48, 50, 52, 67, 73 and 76).

- Kasper observed in his report that a substantial portion of the upfront payment referenced in one of the Hitachi license agreements he reviewed was "for the know-how and the transfer-related costs incurred by the licensor." (Matterer Decl. Ex. 1 at ¶ 64). When asked how he knew that, Kasper pointed to information that was provided *after* he submitted his expert report by Hitachi's

  REDACTED (Matterer Decl. Ex. 4 at p.167). Again, Kasper did not know who at Hitachi provided this information to counsel and did not know how Hitachi came up with the reported apportionment. (*Id.* at pp. 167-68).

- Kasper admitted that to determine whether REDACTED , one would have to "look at the products, study the patents, study the know-how that was provided, [and] look at the competitive products" to try to apportion the value. (*Id.* at p. 173). He admitted he did not do those things with respect to that license or with respect to any of the licenses he reviewed that contained provisions covering both patents and either know-how, technical assistance and/or trade secrets. (*Id.* at p. 174). With respect to "any agreement in which know-how or technical assistance" was included, Kasper said he inquired through counsel as to how Hitachi valued the patents versus the other IP components, and was given "percentages [that] were all over ... the entire range," and that he does not know "what the basis was for them saying that." (*Id.* at pp. 249-50).

- Kasper based his testimony about the appropriate royalty rate in part on three agreements he worked on at Eaton. (Matterer Decl. Ex. 1 at ¶¶ 50-52). When he left Eaton in 2006, Kasper copied one page from each of two of those agreements, and later produced those two pages in this case. He did not produce, and has never attempted to obtain, complete copies of those agreements, which are considered confidential by Eaton, one of which he believes was 25-30 pages long. (Matterer Decl. Ex. 4 at pp. 215-20, 231). He claims other portions of these agreements corroborate his memory of their terms. (*See, id.* at pp. 222, 226, 230).

- Kasper says, in his report, that the highest royalty rate he had ever seen for a single-patent non-exclusive license without any accompanying know-how was 2 percent (Matterer Decl. Ex. 1 at ¶ 135). But he could not identify the specific agreement that included the rate. He said, "I am going from memory on that point" and it is "just one of those things I've kind of catalogued in my mind." (Matterer Decl. Ex. 4 at pp. 260-61).

15

Frequently, May and Kasper draw conclusions based on "facts" that were provided solely by Hitachi's outside counsel:

- In building his argument that Elsten's royalty base was too inclusive, REDACTED (Matterer Decl. Ex. 3 at pp. 53-54)[6] But May admitted he did no analysis to reach that conclusion and simply was informed orally by Hitachi's counsel of that fact. (Matterer Decl. Ex. 3 at p. 52) Kasper likewise testified he did not do any analysis of the price, costs, or profits of ECUs with and without VCT functionality, REDACTED REDACTED (Matterer Decl. Ex. 4 at pp. 79-80).

- In support of his opinion that certain "ancillary components" should be excluded from the royalty base (even though necessary to performing the claimed process), May said he "learned from Hitachi" that these components performed certain VCT-unrelated functions. (Matterer Decl. Ex. 2 at ¶ 107). At his deposition, he admitted he asked counsel for a list of these functions and received a list via email, but does not recall speaking to anyone at Hitachi about the list. (Matterer Decl. Ex. 3 at pp. 149-51).

- Kasper likewise refers to certain "understanding[s]" gained through information provided by Hitachi's counsel concerning so-called "ancillary components" that impacted his conclusion as to what constituted an appropriate royalty base in this case (Matterer Decl. Ex. 1 at ¶¶ 98-102). Kasper admitted, as to those facts recited in paragraph 99 of his report, that he did not do anything to independently verify the information provided. (Matterer Decl. Ex. 4 at p. 240 ("There is really nothing that I could do to independently verify it.")).

- 

---

[6]  If ECUs that include VCT functionality command a greater price than those without, that fact, under Hitachi's analysis, would support an argument for including VCT-enabled ECU sales in the royalty base and, in any event, would support an argument for a higher royalty rate.

May's "understanding" came from Hitachi's counsel, who he said "probably" received the information "in a communication from Hitachi." (Matterer Decl. Ex. 3 at p. 219). He also admitted that he did not inquire further as to the source of the statement, because "I've been involved in so many of these types of agreements, particularly with the Japanese, where they just throw in patents as part of the agreement." (*Id.* at p. 220).

- Similarly, . REDACTED

 . . . Kasper said he was "not interested in knowing the name" of the individual at Hitachi who provided that information to Hitachi's counsel. (Matterer Decl. Ex. 4 at p. 157).

*(Id.* at p. 165)

May and Kasper's frequent reliance on their own memories and/or facts conveyed by Hitachi's counsel puts BorgWarner at a disadvantage it should not face. How, for example, can BorgWarner be expected to confront May on the details of the Ford/FGT licensing negotiations when it has no way to review the underlying documents or interview the participants in the deal? Similarly, how can BorgWarner expect to test Kasper's statement that he has not seen a single-patent licensing agreement with a rate exceeding 2 percent, when the basis for his testimony is "just one of those things I've kind of catalogued in my mind"? (Matterer Decl. Ex. 4 at p. 261).

For a court to determine whether an expert's opinion is based on "good grounds," the basis for the opinion has to be clear to the court (and the opposing party). "The information upon which an expert bases his testimony must be reliable, and the selective furnishing of information by counsel to an expert runs afoul of Fed. R. Evid. 703." *Crowley*, 322 F. Supp. 2d at 542, 546-47 (barring any testimony not based upon independent analysis but based solely upon filtered information provided by counsel without conducting any independent investigation). The *Minebea* court seemingly was troubled by the fact that the patent expert's

analysis was not transparent. While much of May and Kasper's opinion is supposedly based on their "experience," the details they rely on are either not known, not verifiable, or both.

As apparently was also the case with the excluded patent lawyer expert in the *Minebea* case, May and Kasper ignored many relevant areas of inquiry, thereby undermining the reliability of their conclusions. For example:

- In May's report, he cited several supposedly non-infringing alternatives, the existence of which (he said) would have negatively impacted BorgWarner's leverage in royalty negotiations. (*See* Matterer Decl. Ex. 2 at ¶¶ 109-13). But May admitted he did not consider the development costs that might be incurred by Hitachi in developing any of the alternatives (Matterer Decl. Ex. 3 at pp. 82-83); did not study how the adoption of any of the alternatives would impact pricing (*id.* at p. 84); did not study the comparative profitability of any of the alternatives he considered (*id.* at p. 85); and did not study any differences among the alternatives and the accused system in terms of performance, fuel economy or emissions. (*Id.* at pp. 85-88). In other words, May was quick to embrace what he was told – that alternatives existed – but did nothing to determine whether those alternatives were economically or technically viable.

- Likewise, Kasper cited the same supposedly non-infringing alternatives in his report as May had in his (Matterer Decl. Ex. 1 at ¶ 115), but admitted he did not compare the upfront development costs between the accused and alternative systems (Matterer Decl. Ex. 4 at pp. 100-01), and did not compare the price, profitability, or relative technical, financial, or marketing merits of the accused and alternative systems or the impact on fuel economy or emissions of the accused and alternative systems. (*Id.* at pp. 101-9).

- In analyzing the licenses produced by Hitachi and BorgWarner in the case, May opined based on his "experience and my informed opinion based on reading the agreements" that where patents were licensed along with know-how and technical assistance, "less than half" of the royalty would be attributable to patents (Matterer Decl. Ex. 2 at ¶ 69). Yet he admitted that he did not ask anyone at Hitachi – the company that retained him – to describe for him the nature and extent of the technical assistance, trade secrets or know-how licensed in those agreements. (Matterer Decl. Ex. 3 at p. 193). Indeed, with respect to all of the licenses he examined from Hitachi's and BorgWarner's files, his opinion about the relative value of the patents and other components of intellectual property was based solely on his experience and his review of the agreements themselves. (*Id.* at p. 191).

18

- May admitted he did not do "an exhaustive study" of all the financial data in the case to determine whether Hitachi anticipated making more profit on the components used in the accused VCT system than components used in other VCT systems sold by Hitachi. (*Id.* at pp. 207-8). May admitted that the only profit margin analysis on VCT components he reviewed was analysis on actuators and solenoids for a six-month period in 2005, and that he did not review any other financial data from which a profitability analysis could have been constructed. (*Id.* at pp. 211-12). The document he relied on for his profitability observation was in Japanese, and he was simply told by counsel what type of VCT system the information covered. (*Id.* at p. 213).

- REDACTED

  (Matterer Decl. Ex. 2 at ¶ 50). But he admitted he did not engage in any study or analysis of the profitability of the option at issue, by itself or compared to the profitability of the accused VCT system. (Matterer Decl. Ex. 3 at pp. 231-32, 234). He stated that "I think the numbers are higher than I would have expected. I'm perhaps grasping for why that is ..." and admitted it was "speculation on [his] part" to assume less attention was paid by negotiators to the royalty rate given the profitability of the vehicle for which it was used. (*Id.* at p. 230). In short, May was quick to make the sort of logical leap that renders an opinion unreliable on its face.

- REDACTED

(Matterer Decl. Ex. 3 at p. 223; Matterer Decl. Ex. 4 at pp. 150-51).

In sum, the testimony offered by May and Kasper is based on little more than their memories of licensing deals on which they worked for former employers, facts provided by Hitachi's counsel not verified by May or Kasper, and conclusions drawn from facts, license agreements, and data that went largely unexamined. The indicia of reliability are missing, and May and Kasper's testimony should be excluded.

### 3.    Fit

In addition to being reliable, an expert's opinion must be "sufficiently rooted in the facts of the case at issue to enable it to assist the jury's resolution of a factual dispute." *R.J. Reynolds Tobacco Co. v. Premium Tobacco Stores, Inc.*, No. 99C1174, 2004 WL 1613563, at *9

(N.D. Ill. July 19, 2004) (citing cases).  "If the applicable data and the proffered opinion are separated by an analytical chasm, it cannot be bridged solely by the expert's say-so,..." *Id.* (citing case).  In *R.J. Reynolds*, the court precluded expert testimony of a witness who, though he admittedly had a "long and varied history" in the field to which the suit pertained, "offer[ed] no application of that expertise that could shore up assumptions upon which his damage calculations rest." *Id.*  The same is true of May and Kasper.  Even assuming these men had experience working for industry participants and that they were familiar with their respective employer's licensing practices, that does not automatically render their opinions analytically sound, or grant them free reign to draw conclusions based on a cursory review of the record, conversations with Hitachi's counsel, and the impenetrable "black hole" of "experience."  May's experience at Ford and Kasper's at Eaton, and their opinions as to what was standard or typical, do not "fit" the issue to be determined in this case:  "what would BorgWarner and Hitachi have agreed to, in this particular case?"  That question calls for the kind of broader-based analysis Elsten and Jarosz undertook, not May or Kasper's pronouncements as industry "experts."

### E.    The Court Should Exclude May and Kasper's Testimony On The Appropriate Royalty Base Because It Contradicts The Law

May and Kasper both offer opinions that certain components should be included in the royalty base in calculating damages, and others should not. (Matterer Decl. Ex. 2 at ¶¶ 87-93; Matterer Decl. Ex. 1 at ¶¶ 95-106).  In doing so, however, they seek to usurp the role of the court.  The "use of [expert testimony] must be carefully circumscribed to assure that the expert does not usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991).

May and Kasper rely on their industry experience to opine that only the actuator and solenoid components of the accused VCT system ought be included in any royalty calculation. (Matterer Decl. Ex. 1 at ¶¶ 25-31; Matterer Decl. Ex. 2 at ¶¶ 31-33). As Ms. Elsten points out in her report, however, Claims 10 and 11 of the patent refer to components other than the actuator and solenoid. (Matterer Decl. Ex. 7 at pp. 11-12). In *Advanced Med. Optics, Inc. v. Alcon Labs., Inc.*, No. Civ. A. 03-1095-KAJ, 2005 WL 3454283, at *8 (D. Del. Dec. 16, 2005), the court considered a post-trial argument that a jury erroneously included too much in a royalty base, where the defendant argued that the "royalty base should be limited to the value of the upgrades" or "new features that embody the inventions." *Id.* The court rejected the argument, "because for both the '240 and '765 patents, the asserted claims cover elements found throughout the [accused] devices, including, for example, handpieces and pumps." *Id.* By testifying that a hypothetical negotiation would result only in the agreement to pay royalties on certain components recited in the claims covering the accused system but not others, May and Kasper are attempting through testimony to define the law of the case in a way that contradicts *Advanced Medical Optics. See Specht v. Jensen*, 853 F.2d 805, 810 (10th Cir. 1988) ("In no instance can a witness be permitted to define the law of the case"); *Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*, 103 F. Supp. 2d 268, 284-85 (S.D.N.Y. 2000) (excluding expert testimony that contradicted substantive law on damages). While May and Kasper may believe earnestly that in the "real world" the parties would not include all components in the royalty base (Matterer Decl. Ex. 1 at ¶¶ 25-31; Matterer Decl. Ex. 2 at ¶28-30), that does not mean they can ignore the fact that the claims asserted of the patent describe a system that depends on the function of components beyond the actuator and solenoid.

**F.    The Court Should Exclude Portions Of Jarosz's Testimony**

Jarosz indicates that in forming his opinions, he had "spoken with, and reviewed the expert reports of Mr. Kasper and Mr. May ...." (Matterer Decl. Ex. 8 at p. 4). In his report, Jarosz references May and Kasper on various occasions to bolster some point he is making. (Matterer Decl. Ex. 8 at pp. 29, 32, 45, 47, 51, 54 and 56). Obviously, to the extent the Court decides to exclude or limit May or Kasper's testimony, any of Jarosz's testimony that is based on facts and conclusions provided entirely by May or Kasper should likewise be excluded. *See Go Med. Indus. Pty, Ltd. v. Inmed Corp.*, 300 F. Supp. 2d 1297, 1317 (N.D. Ga. 2003), *aff'd*, --F.3d --, Nos. 05-1241, 1267, 1588, 2006 WL 3041853 (Fed. Cir. 2006); *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 371-72 (5th Cir. 2000); *EZ Dock, Inc. v. Schafer Sys., Inc.*, No. Civ. 98-2364 (RHK/AJB), 2003 WL 1610781, at *4-6 (D. Minn. Mar. 8, 2003).

Additionally, Jarosz should not be allowed to testify to any opinion he formed based in whole or part on any information that was provided directly to him by Hitachi's counsel, because Hitachi's counsel instructed him not to answer questions about his conversations with counsel. (*See, e.g.*, Jarosz 11/21/06 Dep. Trans. (Matterer Decl. Ex. 9), at pp. 41-42).[7]

---

[7] By instructing Jarosz not to answer questions about his non-privileged discussions with Hitachi's counsel, Hitachi ought to be precluded from offering testimony based on those discussions. *Chamberlain v. City of Albuquerque*, No. Civ. 02-603 JB/ACT, 2005 WL 2313538, *9 (D.N.M. July 25, 2005) (if a party wants an expert to testify at trial, then counsel must make certain that they and their "expert do not so frustrate the taking of a deposition that the Court decides the opposing party has not had a fair opportunity to depose him and thus precludes his testimony.")

## V.     CONCLUSION

For all the foregoing reasons, BorgWarner respectfully seeks an order:

(a)     excluding or limiting the testimony of Roger May;

(b)     excluding or limiting the testimony of Leslie Kasper;

(c)     limiting the testimony of John Jarosz; and/or

(d)     instructing Hitachi to elect one expert witness, from among Messrs. May,

Kasper, or Jarosz, on the subject of the amount of royalty-based damages that would be

appropriate to compensate BorgWarner in the event Hitachi is found liable for infringing the '738

patent.

Dated:  December 14, 2006

Richard K. Herrmann (I.D. #405)
Lewis H. Lazarus (I.D. #2374)
Mary B. Matterer (I.D. #2696)
Morris James Hitchens & Williams LLP
500 Delaware Avenue, Ste. 1500
Wilmington, DE 19899
(302) 888-6800

Hugh A. Abrams (pro hac vice)
Thomas D. Rein (pro hac vice)
Lisa A. Schneider (pro hac vice)
Paul E. Veith (pro hac vice)
Marc A. Cavan (pro hac vice)
Stephanie P. Koh (pro hac vice)
Lara V. Hirshfeld (pro hac vice)
Sidley Austin LLP
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

Attorneys for BorgWarner Inc., and BorgWarner
Morse Tec Inc.

23